UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
………………………………………………………………X
GUATEGUARD, INC.,

                            Plaintiff,

          -against-


GOLDMONT REALTY CORP.,
LEON GOLDENBERG,
ABI GOLDENBERG,


                          Defendants.
………………………………………………………………X

Civil Case No.: 1:20-CV-01609 (VEC)(GWG)

## <u>MEMORANDUM OF LAW IN OPPOSITION</u><br><u>TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT</u>

Eden P. Quainton
**QUAINTON LAW, PLLC**
*Attorneys for Plaintiff*
*GateGuard, Inc.*
2 Park Avenue, 20th Floor
New York, New York 10016
(212) 419-0575
Email: eden.quainton@quaintonlaw.net

## <u>TABLE OF CONTENTS</u>

PRELIMINARY STATEMENT .................................................................................. 1

STANDARD OF REVIEW ..................................................................................... 2

COUNTERSTATEMENT OF FACTS ......................................................................... 2

LEGAL ARUMENT .............................................................................................. 8

   I.   DEFENDANTS HAVE FAILED TO COMPLY WITH LOCAL RULE 56.1 AND RULE 4(H)(ii) OF THE INDIVIDUAL PRACTICE RULES OF JUDGE VALERIE E. CAPRONI. ........................................................................................................ 8

   II.   DEFENDANTS HAVE FAILED TO SUSTAIN THEIR BURDEN OF SHOWING THE ABSENCE OF ANY GENUINE ISSUES OF MATERIAL FACT. .......................... 9

     A.   There Is a Genuine Issue of Material Fact as to Ari Goldenberger's Participation in the Alleged $1 Million Investment. .............................................................. 9

     B.   There is a Genuine Issue of Material Fact as to Whether Any Material Misrepresentations Were Made. .............................................................. 14

     C.   There is a Genuine Issue of Material Fact as to Whether Plaintiff's Reliance on Defendants' Misrepresentations Was Justifiable. .......................................... 21

     D.   There is a Genuine Issue of Material Fact as To GateGuard's damages. ................. 24

CONCLUSION ................................................................................................ 25

## TABLE OF AUTHORITIES

**Page**

__Cases__

*Anderson v. Liberty Lobby,*
  477 U.S. 242 (1986)............................................................................................. 2

*Antwi v. Health & Human Sys. (Centers) F.E.G.S.,*
  13-CV-835, 2014 WL 4548619 (S.D.N.Y. Sept. 15, 2014) ................................... 9

*Banker's Tr. Co. of W. New York v. Steenburn,*
  409 N.Y.S.2d 51 (Chatauqua Sup. Ct. 1May 19, 1978), *aff'd sub nom. Bankers Tr. Co. of W.*
  *New York v. Steenburn*, 70 A.D.2d 786, 418 N.Y.S.2d 723 (1979) ..................................... 16

*Berlin v. JetBlue Airways Corp.,*
  No. 18-CV-1545(EK)(LB), 2022 WL 1423695 (E.D.N.Y. May 5, 2022) ........................... 19

*Bistricer v. Bistricer,*
  No. 85 C 4381, 1987 WL 6402 (E.D.N.Y. Feb. 2, 1987)................................................ 20, 23

*Chiarelli v. Nissan N. Am., Inc.,*
  No. 14CV4327NGGPK, 2017 WL 2982974 (E.D.N.Y. July 12, 2017); .............................. 9

*Hayles v. Aspen Properties Grp., LLC,*
  No. 1:16-CV-08919-MKV, 2020 WL 5764371 (S.D.N.Y. Sept. 28, 2020)........................... 9

*Hillburn by Hillburn v. Maher,*
  795 F.2d 252 (2d Cir. 1986) ................................................................................. 25

*Hyosung Am., Inc. v. Sumagh Textile Co.,*
  137 F.3d 75 (2d Cir. 1998) ................................................................................... 24

*JP Morgan Chase Bank v. Winnick,*
  350 F. Supp. 2d 393 (S.D.N.Y. 2004) ................................................................... 2

*Keywell Corp. v. Weinstein,*
  33 F.3d 159 (2d Cir. 1994) ................................................................................... 24

*LaFond v. General Physics Services Corp.,*
  50 F.3d 165 (2d Cir.1995) .................................................................................... 2

*Lang v. Retirement Living Pub. Co.,*
  949 F.2d 576 (2d Cir.1991) .................................................................................. 2

*Lifeguard Licensing Corp. v. Ann Arbor T-Shirt Co., LLC*,
   No. 15 CIV. 8459 (LGS), 2018 WL 3364388 (S.D.N.Y. July 9, 2018) .............................. 20

*M & T Mortg. Corp. v. White*,
   736 F. Supp. 2d 538 (E.D.N.Y. 2010) ................................................................................. 21

*Mallis v. Bankers Tr. Co.*,
   615 F.2d 68 (2d Cir. 1980) ................................................................................................. 24

*Merit Grp., LLC v. Sint Maarten Int'l Telecommunications Servs., NV*,
   No. 08-CV-3496GBD, 2009 WL 3053739 (S.D.N.Y. Sept. 24, 2009), *aff'd*, 378 F. App'x
   116 (2d Cir. 2010) ............................................................................................................. 20

*MSF Holding Ltd. v. Fiduciary Trust Co. Int'l*,
   435 F. Supp. 2d 285 (S.D.N.Y. 2006) ................................................................................... 8

*New York State Elec. & Gas Corp. v. Sec'y of Lab.*,
   88 F.3d 98 (2d Cir. 1996) ................................................................................................... 25

*Orlin v. Torf*,
   126 A.D.2d 252, (3d Dep't 1987) ....................................................................................... 15

*Premier Cap. Mgmt., LLC v. Cohen*,
   No. 02 C 5368, 2008 WL 4378300 (N.D. Ill. Mar. 24, 2008) ............................................ 21

*Purisma v. Tiffany Entm't*,
   09-CV-3502, 2014 WL 3828291 (E.D.N.Y. June 20, 2014), *report and recommendation
   adopted by* 2014 WL 3828376 (E.D.N.Y. Aug. 4, 2014) ...................................................... 8

*Ryan Ready Mixed Concrete Corp. v. Coons*,
   25 A.D.2d 530 (2nd Dep't 1966) ........................................................................................ 15

*Searight v. Doherty Enterprises, Inc.*,
   No. 02-CV-0604(SJF)(JO), 2005 WL 2413590 (E.D.N.Y. Sept. 29, 2005) .......................... 9

*Shaw v. Rolex Watch, U.S.A., Inc.*,
   673 F. Supp 674 (SDNY 1987) .......................................................................................... 14

*T.Y. v. N.Y.C. Dep't of Educ.*,
   584 F.3d 412 (2d Cir. 2009). .............................................................................................. 9

*Tahini Invs., Ltd. v. Bobrowsky*,
   99 A.D.2d 489 (2nd Dep't 1984) ........................................................................................ 24

*Taylor v. Always Ready & Reliable Sec., Inc.*,
  No. 13 CIV. 8524 CM, 2014 WL 5525745 (S.D.N.Y. Oct. 27, 2014) .................................. 9

*Thompson v. Gjivoje*,
  896 F.2d 716 (2d Cir.1990) ..................................................................................... 2

*Weyant v. Okst*,
  101 F.3d 845 (2d Cir.1996) ..................................................................................... 2

*Zobrist v. Coal-X, Inc*,
  708 F.2d 1511 (10th Cir. 1983). ........................................................................... 21

**Rules**
Fed. R. Civ. P. Rule 56(a) ......................................................................................... 2

Fed. R. Civ. P. Rule 56(d)(4) .................................................................................. 16

Fed. R. Civ. P.. Rule 11 ............................................................................................. 9

Individual Practice Rules of Judge Valerie E. Caproni, ............................................ 1

Rule 4(H)(ii) of the Individual Practice Rules of Judge Valerie E. Caproni ............ 8

Local Rules for the United States District Courts for the Southern and Eastern Districts of
  New York ................................................................................................................ 1

Local Civl 56.1 of the Local Rules of the United States District Courts for the Southern and
  Eastern Districts of New York ....................................................................... 1, 8, 9

## PRELIMINARY STATEMENT

This case is before the Court on the Motion for Summary Judgement (the "Motion") of Defendants Goldmont Realty Corp., Leon Goldenberger and Abi Goldenberger, collectively "Defendants."  The Motion should be denied for both procedural and substantive reasons. Procedurally, Defendants have violated the Local Rules for the United States District Courts for the Southern and Eastern Districts of New York and the Individual Practice Rules of Judge Valerie E. Caproni, both of which require the moving party to prepare a Rule 56.1 Statement of Undisputed Facts, which Defendants have willfully failed to do. Substantively, the case involves credibility determinations that are not appropriate on a motion for summary judgment, notably in light of Leon's materially contradictory testimony as to whether he committed to make an investment in Plaintiff GateGuard, Inc.  Rather than performing a thorough review of the record and attempting to argue their case substantively, Defendants assert that the case against Abi does not raise a triable issue because GateGuard's CEO, Ari Teman  testified that the investment would be made by Leon. Defendants distort the record and claim that Plaintiff had alleged that Abi had "made" an investment, when the real issue as plead is whether Abi "participated" in making the investment, which an abundance of evidence not addressed by Defendants supports. Second, Defendants claim that the doctrine of third-party reliance bars Plaintiff's claim because Teman testified that the investment would be made into Friend or Fraud, Inc., GateGuard's parent company. But Defendants ignore that Teman was CEO of both GateGuard and FFI and the alleged representation was made to him as CEO of GateGuard, was ultimately for the benefit of GateGuard, and induced detrimental reliance by GateGuard. Defendants make a half-hearted attempt to argue justified reliance and damages, but their brief is fatally flawed by their woefully inadequate knowledge or use of the record. As a result, they completely fail to meet their burden of establishing the absence of a genuine issue of material fact and their motion should be denied.

1

## STANDARD OF REVIEW

A motion for summary judgment is to be granted only "when the pleadings, evidence obtained through discovery, and affidavits show that there is no genuine issue as to any material fact, and that the moving party is entitled to summary judgment as a matter of law." *Lang v. Retirement Living Pub. Co.,* 949 F.2d 576, 580 (2d Cir.1991). Fed. R. Civ. P. 56(a). The court is "required to view the evidence in the light most favorable to the party opposing summary judgment, to draw all reasonable inferences in favor of that party, and to eschew credibility assessments." *Weyant v. Okst,* 101 F.3d 845, 854 (2d Cir.1996). "All ambiguities in the evidentiary record must be resolved in favor of the nonmoving party." *JP Morgan Chase Bank v. Winnick*, 350 F. Supp. 2d 393, 404 (S.D.N.Y. 2004). The moving party bears the burden of showing the absence of a genuine issue of material fact. *Thompson v. Gjivoje,* 896 F.2d 716, 720 (2d Cir.1990) (citations omitted). "The judge's function is not ... to weigh the evidence and determine the truth of the matter." *Anderson v. Liberty Lobby,* 477 U.S. 242, 249 (1986). Rather the court's role "is carefully limited to discerning whether there are any genuine issues of material fact to be tried, *not* to deciding them. Its duty, in short, is confined at this point to issue-finding; it does not extend to issue-resolution." *LaFond v. General Physics Services Corp.,* 50 F.3d 165, 171 (2d Cir.1995). A dispute about a genuine issue of material fact exists if the evidence is such that "a reasonable [fact finder] could return a verdict for the nonmoving party." *Anderson,* 477 U.S. at 248.

## COUNTERSTATEMENT OF FACTS

Plaintiff GateGuard, Inc. ("Plaintiff," "GateGuard" or the "Company") develops, manufactures, installs and services an AI-enabled, "virtual doorman" intercom. Ex. A., GG_00015, attached Google Drive "deck." Plaintiff is wholly owned by Friend or Fraud, Inc. ("FFI"), which is in turn principally owned by Ari Teman ("Teman") the CEO of GateGuard and

FFI. *Id.* Declaration of Ari Teman, dated March 16, 2023 (the "Teman Decl."). In the summer of 2018, Teman met Abi Goldenberg ("Abi"), a representative of Goldmont Realty Corp. ("Goldmont"). Ex. B, GG__00025. Abi is also the son of Leon Goldenberg ("Leon"), a prominent New York real estate developer with ownership interests in several hundred properties, and the Chief Executive Officer and President of Goldmont. Ex. C, Deposition of Leon Goldenberg, dated August 17, 2021 (the "Leon Dep.") 15:7-8, 22:13-22, 46:23; 231:10-25, 270:2-4, 279:7-9; Ex. D, Pl. Ex. 140; Ex. E., Pl Ex. 141; Ex. F, Deposition of Abi Goldenberg, dated August 10, 2021 (the "Abi Dep.") 28:23-25. Goldmont manages between eighty and one hundred residential properties in New York. Leon Dep., 21:21; Abi Dep. 17:21-24; 131:22-24. Abi is also a partner in a similarly named company, Goldmont Properties, LLC, Abi Dep. 12-13, and is the person at Goldmont responsible for purchasing intercom devices and intercom services. Leon Dep. 304:2-4.

Abi learned that Teman was seeking to raise $5 million for the development of GateGuard shortly after they met. Ex. G, GG__00027; Abi Dep. 349:12-13. Teman proposd that he and Abi "talk investing" during their early conversations in September 2018. *Id.* Not long after they met, in September, 2018, GateGuard invoiced Goldmont, through Abi, for its first intercoms and related serviced. Ex. H, GG00275-GG-000282. Payment on the invoices was made in October 2018. Abi Dep. 310:2-4; 311:11-16.

On December 26, 2018, to follow up on the investment discussed with Abi, Teman met with Leon and Abi in Leon's office. Ex. I, Deposition of Ari Teman, dated August 5, 2021, 104:22-25; 105: 1-11; 116: 21-22; Abi Dep. 363:7-18; Ex. J, GG_00037; Leon Dep. 104:15-21. Leon was very impressed with GateGuard, as he stressed repeatedly throughout his deposition. Leon Dep. 311:2-5, 11-12 ("I thought he had a great product"); Leon Dep. 196:8 ("he had a great product and it worked well"). Leon even attempted to get his stepson-in-law to become a vendor

for GateGuard. Leon Dep. 353:6-7. During this meeting, according to Teman, Leon agreed to make an investment of $1 million. Teman Dep. 105:1-11; 116:14-25. Leon disputes this. Leon Dep. 115:6-8. According to Leon, Teman never produced the GateGuard financial numbers requested by Leon. Leon Dep. 115:2-4, 15-17. However, Teman provided the requested numbers on several occasions in Google Drive and Dropbox links. Ex. K, GG_00015; Ex L. GG_00002. Nonetheless, Leon insisted Teman never provided GateGuard numbers. Leon Dep. 2-4. Leon initially testified he was not interested in making an investment in GateGuard. Leon Dep. 115:6-8. However, he subsequently changed his testimony and stated that, after Teman pressed him, he indicated he would invest, "maybe." Leon Dep. 130:2-6. Leon emphasized that Teman "could have made a lot of money. He could have done it with me. He could have become a real big company. He had a great idea and it worked well." Leon Dep. 196:6-8. There was never any dispute that, as a matter of economic substance, any investment would be made into GateGuard. Leon Dep. 116. At the conclusion of the December 26, 2018 meeting, Leon knew that Teman believed Goldmont had agreed to make an investment. Leon Dep. 134:7-11. Leon and Teman then shook hands, but Leon insists the handshake did not signify any sort of agreement on a deal. Leon Dep. 123:20-22.

Abi participated in the investment process from the beginning and discussed the opportunity with his father. Teman Dep. 116:21-22; 179:17-21; Leon Dep. 137:5-9. Indeed, Abi frequently brought non-real estate deals to Leon and discussed investments in such transactions with his father. Leon Dep. 138:10-17. The investment was intended to be part of a $5 million raise, in which Teman hoped that friends of the Goldenbergs could also be convinced to invest. Ex. A, GG_00015, attached Google Drive "deck;" Ex. M, GG_00019. Abi and Leon contemplated that Abi would be involved in "running the books" for the investment. Abi Dep., 243: 23-25 – 244:1-9. Although Abi was not personally going to invest company money, he

4

participated in the decision-making process, questioning "does it make sense, is there anything there." Abi Dep. 366:17-20. Leon testified that, in reality, Abi was investing alongside him because Goldmont was a family business. Leon Dep. 141:6-14. As Leon put in responding "yes" to the question of whether Abi was investing alongside him, "my entire family invests alongside me." Leon Dep. 141:13-13.

Following the representation made at the December 26 2018 meeting, GateGuard changed its pricing structure and embarked on a new "free" installation campaign, pursuant to which GateGuard devices would be offered for free and the Company would make money on recurring fees. Teman worked closely with Abi on the new market penetration strategy and Abi, with Leon's approval, committed to a "purchase" of 61 "free" devices, a large number of which were ordered in early February. Ex. N, GG__00056. The devices would otherwise have been installed for $1500 plus an $849 security deposit, itself a discount from GateGuard's normal pricing that Abi had agreed to in the past. Ex. O, GG00254; Ex. P - GG 00276.  Abi and Teman remained close, and Abi without hesitation agreed to refer GateGuard to another large customer. Ex. Q, GG_00043. GateGuard then placed a substantial order for devices to be installed with its supplier in China to satisfy the new installation requirements. Ex. N, GG_00056. GateGuard also began an aggressive advertising campaign on the back of the contemplated investment, Ex. R, GG__00017, while the parent company, FFI, hired several employees for the contemplated expansion of GateGuard's business. Ex. S, GG00204-GG-00214; Ex. T, GG00221-GG00232. GateGuard entered into a new office lease arrangement in Manhattan, which also required additional technical support. Ex. U, GG00196-GG00201.

In parallel, Teman provided Abi and Leon with updates on GateGuard's progress in the hopes of encouraging them to find additional investors for the $5 million round. Ex. V, GG__00016; Ex. R, GG__00017; Ex M, GG__0019; Ex. X, GG__00046.  Leon and Abi were

encouraged to use these additional potential investors for additional "negotiating power." Abi Dep. 353:6. Leon acknowledged that he sought to bring in additional investors to get "power" over Teman and GateGuard. Leon Dep. 105:4-17. Leon specifically admitted that with the participation of the additional investors he would get sufficient power to lower the GateGuard valuation and, effectively, as Teman alleged, purchase the company for a fraction of what was promised by lowering, through negotiating leverage, the company valuation. Leon Dep. 105:9-17. Leon approached Yechiel Bromberg ("Bromberg"), a friend of his and an insurance company executive, to invest in GateGuard. Leon Dep. 107:19-21, 22-24; 109:19. Abi went to Manhattan to describe how the GateGuard intercom worked to potential investors. Abi Dep. 367:12-18. He may have met with Ari at the GateGuard offices to discuss the investment on a further occasion before discussions proceeded with a larger group. Abi Dpe 368:9-11.

In February, 2019, a meeting was organized to discuss a potential investment that was attended by Teman, Abi, Yechiel Bromberg, an accountant named Barry Schecter and a potential new executive for GateGuard, Ely Pasternak. Abi Dep. 361:8-21; Ex. Y, GG00260-GG00264. Then, on March 4, 2019, a meeting was organized for March 7, 2019 to discuss the $5 million round with Leon and Abi and some of their friends and business acquaintances, Ely Pasternak, Yechiel Bromberg and Jerry Weissman, a childhood friend of Leon's. Ex. Z, GG_00021; Abi Dep. 350:8-18; Leon Dep. 111:22-25, 112:4-6. Apparently, at this meeting Jerry Weissman was not interested in investing in GateGuard. Leon Dep. 369:16-19. This information was not immediately communicated to Teman, who continued to promote GateGuard aggressively, including through a high-profile presentation of the Company's technology at Yeshiva University on March 12, 2019. Ex. AA, GG00214-217. Then, with no warning, on March 13 Leon informed Teman that the deal with the larger group of investors had fallen through. Exhibit BB, Supplemental Responses to Request For Production to Abi Goldenberg ("A. Goldenberg

Supp. Responses")000212.  Abi stated to Teman that he thought it was still possible to do a deal just with the Goldenbergs. Exhibit BB, Supplemental Responses to Request For Production to Abi Goldenberg ("A. Goldenberg Supp. Responses") 000137. Teman responded with a series of anguished emails that made Leon believe Teman was not "stable." Leon Dep. 128:15-17, 161:21-23; Ex. CC, GG__00023.  According to Leon it was at that point that he was not interested in investing in GateGuard "anymore." Leon Dep. 128:18-20; 166:15-18.[1] Leon claimed that, notwithstanding his earlier denials of any willingness to invest, until Teman "exploded" "I tried to go into business with him. I thought enough of it [the GateGuard intercom] that I was willing to invest with him until he, you know, exploded." Leon Dep. 311:13-16.

Subsequently, Leon executed an Equipment Purchase Agreement on behalf of Goldmont contemplating the payment of $369,000 to GateGuard that would cover a certain number of the previously delivered devices. Dkt. 69-4. Leon Dep, 289:4-9. Leon denied that the agreement contemplated the payment of $369,000, either directly or through a third-party financier, saying "all of it is a lie" and there was not "one iota of truth" to these contractual provisions, insisting "it's a lie, it's a lie, it's a lie." Leon Dep: 357:14-15, 359:19.[2] Goldmont

---

[1] Leon displayed a hot temper at his deposition, at one point refusing to answer questions because he believed he was being tricked, repeatedly referring to Teman as "your piece of garbage client" and asserting that he was trying to "waste" counsel's time. Leon Dep. 168-69, 363:4-7, 367:17. His animus against Teman got the better of him and he admitted he wanted Teman to be put in prison to "resolve" the "problem" of the pending lawsuit. Leon Dep. 376:11-14.

[2] The Equipment Purchase Agreement provides, in pertinent part: "The total purchase price to Goldmont for the 41 devices is $369,000. . .Upon delivery of the devices to Goldmont, Goldmont agrees to make the Purchase Payments to a Third-Party Financier (TPF) designated by GateGuard.Goldmont reserves the right to veto said TPF conditional upon the requirements and proficiency of such TPF. In the event Goldmont elect to veto said TPF, Goldmont agrees to make an upfront payment to GateGuard, within 30 days of delivery of the Devices." Dkt. 69-4.

refused to make payment under the agreement and the contract claim relating to the agreement

has been referred to arbitration. Dkt. 101.

## **LEGAL ARUMENT**

I.   **DEFENDANTS HAVE FAILED TO COMPLY WITH LOCAL RULE 56.1 AND RULE 4(H)(ii) OF THE INDIVIDUAL PRACTICE RULES OF JUDGE VALERIE E. CAPRONI.**

Under Local Rule 56.1 of the Local Rules of the United States District Courts for the

Southern and Eastern Districts of New York (the "Local Rules"),

> (a) Upon any motion for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure, there shall be annexed to the notice of motion a separate, short and concise statement, in numbered paragraphs, of the material facts as to which the moving party contends there is no genuine issue to be tried. Failure to submit such a statement may constitute grounds for denial of the motion.

Rule 4(H)(ii) of the Individual Practice Rules of Judge Valerie E. Caproni (the "Individual

Practice Rules") further provides:

> a.   **Organization of 56.1 Statements**. The 56.1 Statement must be organized into numbered paragraphs, and each numbered paragraph must contain only one factual assertion. Each factual assertion must be supported by a citation to the portion(s) of the evidentiary record relied upon. The moving party shall provide all non-moving parties with a Microsoft Word version of the 56.1 Statement, so that they may incorporate their responses into a single document.

.

Defendants have utterly failed to comply with their obligations under the Local Rules and

the Individual Practice Rules and their motion must be denied for this reason. "The failure to file

a Rule 56.1 Statement, is, on its own, grounds for denial of a motion for summary judgment.");

*Purisma v. Tiffany Entm't*, 09-CV-3502, 2014 WL 3828291, at *1 (E.D.N.Y. June 20, 2014),

*report and recommendation adopted by* 2014 WL 3828376 (E.D.N.Y. Aug. 4, 2014) ("As courts

in this district have observed repeatedly, the failure to file a Rule 56.1 Statement is grounds for

dismissal of a motion for summary judgment."); *MSF Holding Ltd. v. Fiduciary Trust Co. Int'l*, 435 F. Supp. 2d 285, 304-05 (S.D.N.Y. 2006) (denying summary judgment where movant failed to submit Rule 56.1 statement); *Antwi v. Health & Human Sys. (Centers) F.E.G.S.*, 13-CV-835, 2014 WL 4548619 at *4-5 (S.D.N.Y. Sept. 15, 2014) (denying summary judgment motion for failure to comply with Local Civil Rule 56.1). Without the Statement of Undisputed Facts and the specific record citations that support Defendants' factual or legal assertions, the Court is unable to perform its function of determining whether a material issue of fact exists. *Chiarelli v. Nissan N. Am., Inc.*, No. 14CV4327NGGPK, 2017 WL 2982974, at *2 (E.D.N.Y. July 12, 2017); *Searight v. Doherty Enterprises, Inc.*, No. 02-CV-0604(SJF)(JO), 2005 WL 2413590, at *1 (E.D.N.Y. Sept. 29, 2005)(because "defendant has failed to submit the required Rule 56.1 statement, the Court is unable to adequately assess whether there exist any genuine issues of material fact"). "The requirement is strict." *T.Y. v. N.Y.C. Dep't of Educ.*, 584 F.3d 412, 417 (2d Cir. 2009). Indeed, it "is especially appropriate to deny summary judgment where a *defendant-movant* fails to file a Rule 56.1 statement. *Hayles v. Aspen Properties Grp., LLC,* No. 1:16-CV-08919-MKV, 2020 WL 5764371, at *6 (S.D.N.Y. Sept. 28, 2020) (emphasis in original). *See also Taylor v. Always Ready & Reliable Sec., Inc.*, No. 13 CIV. 8524 CM, 2014 WL 5525745, at *2 (S.D.N.Y. Oct. 27, 2014).[3]

## II.    DEFENDANTS HAVE FAILED TO SUSTAIN THEIR BURDEN OF SHOWING THE ABSENCE OF ANY GENUINE ISSUES OF MATERIAL FACT.

### A.    There Is a Genuine Issue of Material Fact as to Ari Goldenberger's Participation in the Alleged $1 Million Investment.

---

[3] Defendants' failure is all the more egregious in that they have threatened Plaintiff with Fed. R. Civ. Pro. Rule 11 sanctions. Declaration of Eden P. Quainton dated March 16, 2023 (the "Quainton Decl.") at ¶ 34. A party that cannot comply with its own basic obligations should not be heard to accuse its adversary of "frivolous" behavior.

Defendants begin their summary judgment motion with a material misstatement of Plaintiff's amended complaint that attempts to avoid the issue of Ari Goldenberg's involvement with an unconvincing sleight of hand. Defendants claim that Plaintiff has alleged each of Leon and Abi Goldenberg agreed "***to make*** a substantial investment into GateGuard of up to $1 million." Defendants' Memorandum in Support of Summary Judgement Motion (the "Mem. in Support") at 2 (emphasis added). This is false. Plaintiff actually alleged that Abi Goldenberg represented he "***would participate*** in making a substantial financial investment into GateGuard, such investment totaling no less than $1 million dollars." Ex DD, Amended Verified Complaint. ¶ 43 (emphasis added). Defendants thus falsely frame the issue as whether Abi Goldenberg personally promised to "make" an investment as opposed to whether he represented he would "participate" in making an investment. In attempting unconvincingly to establish that there is no material issue of fact as to Abi's "***participation***" in the proposed investment, Defendants rely exclusively on two statements from Plaintiff that "it was very clear it was Leon Goldenberg" who would "put in" the contemplated $1 million, Mem. in Support at 5, and "Leon was making the investment" Mem. in Support at 6.  Of course, that Leon would actually write the $1 million check is not in dispute. The issue is whether there is a material issue of fact as to Abi's "***participation***." Here, the record is overwhelming that Abi would participate in making the investment.

First, notwithstanding the understanding that Leon Goldenberg would write the check, Plaintiff testified clearly that he believed the investment was a collective Goldenberg affair: Teman Dep.,56:5-23. Plaintiff's primary point of contact on the investment had always been Abi Goldenberg, and Abi was present at the discussions when the representation as to the million-dollar investment was made. Teman Dep., 63:25-64:1-4. Indeed, from the beginning of his discussion with the Goldenbergs about an investment into GateGuard, Teman almost always

10

viewed Abi and Leon as a unit. *See* A. Goldenberg Supp. Responses, 000012-000013 ("Dear

Leon and Abi"); 000018 (addressed to Goldmont and Abi, as well as other potential investors);

000100, January 24, 2019 ("Dear Leon and Abi, Exciting news. Yoseff Sachor will join us as

one of our operations leaders"); 000095, February 5, 2019 ("Dear Leon and Abi, Two bits of

great news . . .").[4]

Not only were Abi and Leon a father-son family unit, but Abi was intimately involved in

the details of the investment, clearly demonstrating his participation, as Plaintiff wrote to Leon

Goldbenerg, Yechiel Bromberg, Ely Pasternak, Jeanne Weissberg and Abi on March 15, 2019:

> **There was no ambiguity in my discussions with Abi
> either. It was *only* a question of valuation**. **In fact we
> made major financial decisions based off of this—and
> Abi will confirm I described these in detail to him**
> (hiring staff, orders with China, The Real Deal ads, YU
> sponsorship, etc.)—we took on major responsibilities
> and liabilities (and I keep my word) because it was 100%
> clear that Abi's family was investing.

A.Goldenberg Supp. Responses, 000110

Ari returned to this theme a few weeks later on April 2, 2019 in an email to Abi:

> How can I support you when it's operating at a massive
> loss because of your fraudulent misrepresentation of an
> investment that wasn't going to be made. What's the plan
> here? You offer $1500/849/building, but then tell me
> **your family is going to invest** and now you get free
> devices and I'm losing money every day from this?

Ex. EE, GG_00006

Even if Leon was the one who ultimately wrote checks, Abi was the gatekeeper and it was through

and with him that payments on deals were made, as Ari made clear in an email on a later contract,

currently subject to arbitration:

> Abi, Please. I've seen this "he's busy" pattern before.
> He's your father. Please get 5-15 minutes with him

---

[4] Abi Goldenberg's production follows the objections to Plaintiff's RFP with a Bates stamping
protocol that simply identifies the number associated with the document but not the party.

> today, at his home, and get this signed. I won't rehash
> what we've been through. We have an agreement. Your
> attorney agrees to it, please sign it today.

Ex FF - GG_00003

It was not just Ari assuming that Abi and his father were a unit. Abi himself made clear that,

although Leon would ultimately write checks, Abi could speak for the family. A.Goldenberg Supp.

Responses, text exchange February 6-7, 2019, 000134 ("we would love that). Payment checks,

although signed by Leon, were sent and followed up on by Abi. A.Goldenberg Supp. Responses,

text exchange February 14-15, 2019, 000135. After Weissman and Brombeg decided not to proceed

with an investment, Abi reinforced that he was an active participant in the separate Goldmont

investment that was still being falsely represented as a possibility:

> 3/14/19, 10:21 PM - Abi Goldenberg:
> Ari, I really do feel terrible that this fallout is putting you under ***I
> do think that there are other ways of moving forward*** even
> without them. ***I dont think it's time to throw in the towel.  I think
> we should discuss further tomorrow.*** If you want to.

A.Goldenberg Supp. Responses, text message February 14, 2019, 000137.

Even if Leon was "making" the investment, Abi was "participating" as he always did, even

on projects he was managing for the family: the ultimate check writing authority was Leon's, but

Abi managed the transaction, with Ari often putting in far more time than his father A.Goldenberg

Supp. Responses, text message March 19, 2019, 000143; undated text message, 000157. *See also*

*supra* at 3-7.

Far from contradicting the picture of Leon "making" the investment in the sense of

writing the checks, with Abi "participating" in the investment by discussing matters with his

father, making suggestions, imposing conditions and following through operationally, Teman's

deposition confirms this overall picture of Abi's participation in the promised investment. Teman

testified that the terms of the deal were agreed to in Leon's office, with both Leon and Abi

12

present. Teman Dep., 64:2-4, 19-20. Leon and Abi jointly imposed conditions on GateGuard as part of their representation that $1 million would be invested in the Company:

> And he [Ely Pasternak] was represented and pushed quite forcefully to be the Chief Operating Officer. One of the terms Abi and Leon had made very clear was that they wanted us to bring on operations people and sales people.

Teman Dep., 65:4-8.

With respect to third parties also considering an investment, the Goldenberg deal was clearly understood and represented to be a transaction in which both Abi and Leon were participating:

> Q. And Ely Pasternak and Yechiel Bromberg speaking on behalf of Leon Goldenberg, that was your understanding?
> A. Well, you know, I don't want to say on behalf of, but relaying what Leon Goldenberg had said, as was Abi Goldenberg and Leon Goldenberg – sorry that's too many Goldenbergs for one sentence – Abi Goldendberg and Leon Goldenberg, and Leon Goldenberg as well to my face in his office.

Teman Dep., 67:9-15.

Teman reinforced this point later in the deposition:

> Leon confirmed the investment in his office as did Abi Goldenberg in video chats and on the phone.

Ex. A Teman Dep., 80:16-18

As the Teman deposition progressed, Teman became more explicit on the manner in which he believed Abi and Leon were a conjoined entity, using his most colorful language to depict the manner in which Abi, the son, would necessarily "participate" in any investment "made" by Leon, the father:

> And my understanding was that Abi and Leon and Yechiel were sort of one entity and that it was – I mean I don't think Abi could make his own decisions . . . So let's call them one entity, it's really just like Leon with a little, you know, Abi-sized head popping off his shoulder, basically.

Teman Dep., 70 :25-71 : 1-3, 6-9.

Abi himself summarized best the nature of his participation in investments in which Leon is the one writing the checks:

> ***I invest in deals, but I don't personally invest the money***.

Abi Dep. 246:21-23 (emphasis added).

Thus, Defendants have completely failed to carry their burden of establishing that there is no genuine issue of material fact as to whether Abi "participated" in making the alleged $1 million investment. *See supra* at 3-7.

### B. There is a Genuine Issue of Material Fact as to Whether Any Material Misrepresentations Were Made.

#### 1. GateGuard has standing to bring its fraudulent misrepresentation claim.

In the same half-hearted way Defendants attempt to meet their burden of establishing that Abi did not participate in the contemplated GateGuard investment by cherry-picking a few statements in isolation from the record as a whole, Defendants rely on Teman's statement that the investment dollars would flow first to GateGuard's parent company, FFI, in an effort to show that Plaintiff does not have standing to bring its fraud claim against Defendants. Mem. in Support at 7-8. According to Defendants, citing *Shaw v. Rolex Watch, U.S.A., Inc.*, 673 F. Supp 674 (SDNY 1987), the issue is one of third-party reliance. Mem. in Support at 7.

Defendants' argument represents a misunderstanding of the facts and the law. GateGuard was not relying on a promise separately made to its parent company. Rather, the allegation is that a representation was made ***directly to*** GateGuard, through its CEO Teman, that an investment would be made for GateGuard's benefit through GateGuard's parent company, FFI. Abi Dep., 243: 23-25 – 244:1-4. Teman had always presented his business as that of GateGuard. GG00275-GG00282. When Teman met with Abi and Leon, with Yechiel Bromberg, and with Jerry Weissman, it was always clear that the operational entity that would benefit from the investment

would be GateGuard. Teman analogized the situation to the relationship between Google and its

parent company, Alphabet:

> If you say, hey, I got
> hired by Gmail, right, you got hired by
> Alphabet or Google, and then there's a
> department, there's Gmail. And Gmail might
> have its own operating entity, it might have –
> you know, I'm sure it does, I'm sure there's
> like, you know, Google Mail Operations, LLC or
> something like that. So it's all the same
> company, it's all Alphabet, it's all Google.

Teman Dep. 103:1-9.

Teman's point is that GateGuard amd FFI were a unit and that payment made to FFI would flow

operationally to GateGuard, so GateGuard would both rely on and benefit from the alleged

investment promise.

*Shaw,* on which Defendants base their third-party reliance theory, speaks to an entirely

different situation. In *Shaw,* an importer of watches sought to rely on the fraud a third-party had

allegedly committed on a completely unrelated entity, the United States Customs Service. *Shaw,*

673 F. Supp. at 676, 682. This has nothing to do with a situation in which a representation is

made to a corporate subsidiary that an investment will be made in the parent company for the

benefit of the subsidiary. The other cases cited by Defendants make the case for Plaintiff in even

starker terms. In *Orlin v. Torf,* 126 A.D.2d 252, 254 (3d Dep't 1987), the plaintiff, a grandson of

a couple buried in a Jewish cemetery, claimed that he had standing to rely on a fraudulent

misrepresentation allegedly made by the owner of a funeral home to the owners of the cemetery

authorizing the disinterment of the grandparents. The plaintiff had no connection to the funeral

home or the cemetery owners and obviously had no standing to rely on an alleged

misrepresentation from one third party to another. In *Ryan Ready Mixed Concrete Corp. v.*

*Coons,* 25 A.D.2d 530 (2nd Dep't 1966), the court held that a commercial plaintiff could not

sustain a fraud action against an insurance broker for misrepresentations made not to the plaintiff but to the potential insurer, although a cause of action for breach of contract against the broker would lie.

All these cases, however, sharply draw a contrast with the present case. Here, Teman is the CEO of both GateGuard and Friend of Fraud. *See supra* at 2-3. He has worked with Abi in his capacity as the CEO of GateGuard and it is as the CEO of GateGuard that he is presenting an investment opportunity to Abi and Leon. *See* Ex. A _GG00015, Google Drive spreadsheet showing GateGuard financials. His communications with Leon and Abi uniformly reference GateGuard, rather than FFI. *See, e.g.*, A. Goldenberg Supp. Responses, 000095-000096. Both Abi and Leon think of him as the representative of GateGuard, as is evident throughout their depositions in which they uniformly view Teman and GateGuard as indistinguishable. The alleged promise was made to GateGuard and Teman as CEO of GateGuard. *See* Teman Decl. at ¶¶ 6-7.[5] It is GateGuard who allegedly relied to its detriment on the promise. *See infra* at ___. In such circumstances, the party to whom the fraudulent misrepresentation is made plainly has standing to sue, just as it would if were to pursue an action based on a failure to perform a service for a third party. See *Banker's Tr. Co. of W. New York v. Steenburn,* 409 N.Y.S.2d 51, 67 (Chatauqua Sup. Ct. 1May 19, 1978), *aff'd sub nom. Bankers Tr. Co. of W. New York v. Steenburn*, 70 A.D.2d 786, 418 N.Y.S.2d 723 (1979).  The Court should not credit Defendants' strained third-party reliance theory.

2.  <u>Statements that are knowingly false when made are actionable as fraudulent misrepresentations.</u>

---

[5] The Teman Decl. is offered under Fed. R. Civ. P. Rule 56(d)(4), is based on personal knowledge, does not contain hearsay allegations, and does not contradict any of Teman's deposition testimony.

In attempting to obtain summary judgment as a matter of law, Defendants assert that a promissory misrepresentation is not actionable as fraud in New York. This is wrong. As long as Plaintiff pleads that the misrepresentation was ***knowingly*** made, a promissory misrepresentation is actionable as fraud. *See Sabo v. Delman*, 3 N.Y.2d 155 (1957) (promise made with a preconceived and undisclosed intention of not performing the promise constitutes a misrepresentation of a material existing fact). Provided the plaintiff pleads a present intention not to honor its commitment or promise, a fraud claim will lie. *Tribune Printing Co. v. 263 Ninth Ave. Realty, Inc.*, 57 N.Y.2d 1038, 1041 (1982) (a false statement, promissory in nature, may be deemed the statement of a material existing fact, because it falsely represents the declarant's state of mind and the state of his mind is a fact); 5 *Neckles Builders, Inc. v. Turner*, 117 A.D.3d 923, 925 (2nd Dep't 2014)("a statement of present intention is deemed a statement of a material existing fact, sufficient to support a fraud action"). Here, GateGuard's allegation is that, when the promise of a $1 million investment was made, Defendants had no intention of honoring the promises. Ex. DD, Verified Amended Complaint ¶¶ 45, 45.  Whether this is true or not requires live testimony and an assessment of credibility and a weighing of all the relevant evidence by the trier or fact.

3.  Whether any material misrepresentations were made is a question of credibility that cannot be resolved on a summary judgment motion.

It is black letter law that questions of credibility are not appropriate for resolution on a motion for summary judgment. "On a motion for summary judgment, the court is not to weigh the evidence, or assess the credibility of the witnesses, or resolve issues of fact, but only to determine whether there are issues to be tried." *United States v. Rem*, 38 F.3d 634, 644 (2d Cir. 1994) (citations omitted). Resolutions of credibility conflicts and choices between conflicting versions of the facts are matters for the jury, not for the court on summary judgment. *Rem*, 38 F.3d at 644 (citations omitted).

Here, whether or not an actionable misrepresentation was made to GateGuard turns entirely on the credibility of the two opposing accounts of what occurred at the December 26 2018 meeting. Teman alleges that, at the meeting, a knowingly false promise was made to him (as the CEO of GateGuard) that Leon, with the participation of Abi, would invest $1 million into GateGuard. *See supra* at 4. Leon counters that no commitment was made at that time. *Id*. Given these conflicting accounts, a live assessment of credibility by the trier of fact is necessary to determine the truth. *See, e.g.*, *Harkin v. WDF, Inc.*, 924 N.Y.S.2d 309 (Sup. Ct. NY County, Jan. 7, 2011) (a decision as to whose version of what occurred at a particular meeting is true raises a credibility for the trier of fact, making summary judgment inappropriate).

Moreover, this is not simply a "he said/she said" dispute. The evidence in the record supports Teman's version and undermines Leon's. First, although Leon initially insists in his deposition that he had no intention of investing, he waffles repeatedly, (1) testifying that he said "maybe" he would invest, *supra* at 4, while acknowledging and not dispelling Teman's understanding that the "check was written," Leon Dep. 134: 8-9, (2) testifying his decision not to invest was only taken later, after Teman's anguished notes and emails had made him question Teman's "stability, *see* supra at 4, 7 and (3) then demonstrating an apparently uncontrollable animus against Teman that would clearly support an inference of a motive to lie, repeatedly calling Teman a "piece of garbage," knowingly misrepresenting the contents of the Equipment Purchase Agreement, the core provisions of which he falsely characterized as a "lie," and even admitting throwing Teman in prison would "resolve" his "problem" under the Equipment Purchase Agreement. *Supra* at 7 and Note 1. Indeed, the contradiction in Leon's testimony alone raises a credibility issue that precludes summary judgment. *See Cosme v. City of New York*, 20 A.D.3d 320, 322 (1st Dep't 2005) (affirming summary judgment because it "is not the court's task to resolve the ambiguities and apparent contradictions found in a witness's testimony so as

to impart a clarity and precision that the testimony does not actually have"). *Bausch & Lomb, Inc. v. Alcon Lab'ys, Inc.*, 79 F. Supp. 2d 243, 244 (W.D.N.Y. 1999) (inconsistencies and contradictions in expert testimony lead to denial of summary judgment).[6]

Second, Abi's testimony is consistent with Teman's assertion that a promise was made at the December 26 meeting. *See supra* at 7. Moreover, Abi's credibility is also at issue, as it is not disputed that Teman has been discussing an investment in GateGuard with him from their earliest encounters and he participated in the meeting at which the alleged misrepresentation was made. *See supra* at 3.

Third, Teman testified that Yeshiel Bromberg and Ely Pasternak had confirmed to him the Goldmont commitment. Teman Dep. 116:22-25 – 117:1. The testimony of these individuals at trial, and the jury's assessment of their credibility, will bear on the assessment of Teman's account. Since Teman's theory is that the Leon and Abi knowingly misrepresented their intentions in order to be able to purchase GateGuard at a fraction of its price, using their "power" in the negotiations, *supra* at 6, the third-party testimony would be highly relevant and admissible as exception to the rule against hearsay. Fed. R. Evid. Rule 803(3).

Fourth, other indicia support the credibility of Teman's account. Leon acknowledged that he and Teman shook hands at the end of the December 26 meeting, when Leon knew that Teman believed the "checks were written" and did nothing to dispel that belief, indicating that Leon intended for Teman to continue believing a deal had been struck to motivate Teman to further develop the business. Teman's own conduct, in hiring employees, beginning a new marketing campaign, promoting the widespread distribution of "free" intercoms, including to

---

[6] Contradictions in a party's testimony, in fact, can be grounds for summary judgment ***against*** the party with the contradictory testimony. *Berlin v. JetBlue Airways Corp.*, No. 18-CV-1545(EK)(LB), 2022 WL 1423695, at *7 (E.D.N.Y. May 5, 2022)

Goldmont, placing orders with a supplier in China for additional intercoms, taking new office space, demonstrates that he certainly believed a commitment had been made and strongly supports the inference that Leon and Abi intended that Teman believe the commitment had been made. Defendants' contention that no misrepresentation can have been made because there was no term sheet and all the details had not been worked out demonstrates a misunderstanding of the law of fraudulent misrepresentation. Mem. in Support at 11. There is no requirement under a fraudulent misrepresentation theory that there be a contractual "agreement on terms, conditions, percentages allegedly agreed upon, or equity amount." The test is whether a misrepresentation is specific and material. *Merit Grp., LLC v. Sint Maarten Int'l Telecommunications Servs., NV*, No. 08-CV-3496GBD, 2009 WL 3053739, at *4 (S.D.N.Y. Sept. 24, 2009), *aff'd*, 378 F. App'x 116 (2d Cir. 2010). A false promise to invest a definite sum – here one million dollars – for the development of a start-up is both material and specific and can sustain a cause of action for fraudulent misrepresentation. *See Bistricer v. Bistricer*, No. 85 C 4381, 1987 WL 6402, at *1 (E.D.N.Y. Feb. 2, 1987) (allegation of knowingly false promise defendants would invest $1.4 million on plaintiff's behalf sufficient to state claim for fraudulent misrepresentation). Defendants have failed to carry their burden of establishing the absence any genuine dispute as to the material misrepresentation allegedly made by Leon with the participation of Abi.

4. There is a genuine issue of material fact as to Defendants' scienter.

Remarkably, Defendants ignore entirely the issue of *scienter*, or the required mental state for a fraudulent misrepresentation. A moving party's failure to address a key element of a cause of action on a motion for summary judgment creates a serious uphill battle for, if it does not preclude entirely, the granting of a motion for summary judgment. See *Lifeguard Licensing Corp. v. Ann Arbor T-Shirt Co., LLC*, No. 15 CIV. 8459 (LGS), 2018 WL 3364388, at *4 and Note 2 (S.D.N.Y. July 9, 2018)(denying motion for summary judgment after defendants' moving

20

papers failed to address two of three elements required to satisfy fair use); *Premier Cap. Mgmt., LLC v. Cohen*, No. 02 C 5368, 2008 WL 4378300, at *6 (N.D. Ill. Mar. 24, 2008)(movant's failure to address key element of Reg D exemption result in denial of summary judgment).  In any event, *scienter* is, almost by definition, an issue that requires presentation of testimony and circumstantial evidence because a party intent on committing fraud rarely writes a memo to files to document her intent. Here, Leon's subsequent changes of story, from a unequivocal declaration that no commitment was made, to the confession that "maybe" he had made an investment promise, to his admission that he was using the meeting with his close friends to gain negotiating "power" over Teman and his contradictory statements that he continued to consider the investment until he received Teman's anguished communications, combined with Abi's statement that, notwithstanding Weissman's and Bromberg's unwillingness to invest, Goldmont could still follow-through on an investment when it was clear no such investment was possible, clearly present a genuine issue of fact as to Defendants' *scienter*, precluding summary judgment on this ground.

### C. There is a Genuine Issue of Material Fact as to Whether Plaintiff's Reliance on Defendants' Misrepresentations Was Justifiable.

As with the other elements of a fraudulent misrepresentation action, justifiable reliance is highly fact specific. It is the overall context of a transaction or proposed transaction that determines whether reliance is justifiable or not. *M & T Mortg. Corp. v. White*, 736 F. Supp. 2d 538, 567 (E.D.N.Y. 2010) (justifiable reliance is also assessed in the larger context of the case and the questions raised); *see also Zobrist v. Coal-X, Inc.*, 708 F.2d 1511, 1516 (10th Cir. 1983). Here, the overall context of the transaction raises a jury question as to the reasonableness of GateGuard's reliance. From the very earliest interactions between Teman and Abi, Teman made clear that GateGuard was interested in more than simply placing intercoms on Goldmont's buildings. *See supra* at 3. The meeting between Teman, Leon and Abi was specifically set up so

that Teman could make a pitch for an investment in a proposed $5 million funding round. *See supra* at 2-3. Leon knew that Teman believed an investment decision was being made at the meeting and did nothing to disabuse him of this notion. Rather, at the conclusion of the meeting Teman and Leon shook hands, a gesture Leon claims was simply a way of saying goodbye, but that, in the context of the meeting, could reasonably be interpreted as meaning the parties had an understanding.  Leon himself admitted that he "tried to go into business" and "was willing to invest with" Teman, admissions far more consistent Teman's testimony that Leon had made a commitment of $1 million than the complete lack of investment interest Leon elsewhere contends he had displayed. *See supra* at 4, 7.

As Teman took aggressive action based on his understanding that a promise had been made, neither Abi nor Leon cautioned him to slow down, to be careful, to wait for other investments. Rather, every indication is that Leon and Abi encouraged Teman's full steam ahead approach, knowing as Leon said, that Teman believed the "check was written." *Id.* In addition, the relationships among the parties involved strengthens the case that Teman's reliance was justified. Leon brought in as potential additional investors in the proposed $5 million fundraising round close personal friends of his, including Jerry Weissman, who was a childhood friend. *See supra* at 5.  This conduct is inconsistent with Leon's categorical affirmation that he was "not interested enough to invest. I think that's critical," Leon Dep. 115:6-7, and raises another credibility issue precluding summary judgment. At the same time, Teman and Abi were close and had become, as Abi stated, "very friendly." Abi Dep. 138:22-23. Shortly after the December 26 meeting, Abi personally went to Manhattan to explain the working of the product to other potential investors. *See supra* at 6.  Abi's personal implication in the project supports the reasonableness of Teman's reliance.

Rather than addressing any of the real factual issues surrounding the issue of justifiable reliance, Defendants focus on the absence of a definitive agreement. Mem in Support at 11. However, as noted, the absence of a definitive agreement, while perhaps germane in a contract analysis, is not relevant in a fraudulent misrepresentation analysis. Defendants quibble over minutiae such as the calculation of a tiny amount of dilution, which Teman testified was not a material issue in any event because the Company only had a small number of existing investors. Teman Dep. 59:5-6 (there would be a "little bit" of dilution). The small amount of dilution would not, in any event, affect the nature of the alleged false promise, which concerned a $1 million investment, not a percentage ownership calculated to several decimals, as Leon acknowledged in stating he aimed to use his "power" to change "valuation." *See supra* at 6. Indeed, the dilution issue underscores a credibility question as to whether Leon's promise to invest $1 million was knowingly false when made, as he subsequently indicated he intended to use his power to obtain for a quarter of million dollars what he would otherwise have paid $1 million to obtain. Leon Dep, 105:11-17. As to issues such as preferences, Teman simply testified to a truism in investment circles, that any sophisticated investor such as Leon would obviously have understood: early investors get priority over subsequent investors. Teman Dep at 61:1-11. The precise calculations are immaterial to the alleged misrepresentation, which is that a million dollars would be invested, not that any specific preference terms had been promised or agreed to, much as in *Bistricer, supra at* 20, the fraudulent misrepresentation was that defendants would invest $1.4 million, not that they would guarantee any particular return or pursue any particular investment strategy.

Defendants' last gasp attempt to argue that a reasonable businessperson would not have relied on Defendants' alleged misrepresentation is unconvincing. Defendants argue that the Plaintiff could have made use of "ordinary intelligence" to determine the falsity of Defendants'

representation, but this makes little sense. *See* Mem. in Support at 12. Teman was on friendly terms with Abi, every indication was that he had won Leon's respect, and he was being introduced into a circle of Leon's close friends. He had no reason to believe that Leon and Abi were lying to him and any probing into any ulterior motives would have been extremely misplaced, to say the least. He had no reason to be "placed on guard" as Defendants suggest. Nor is there anything unusual in the start-up world for investors to commit $500,000 or $1,000,000 on a handshake, with the details to be worked out later, as anyone who has represented start-up clients knows. Moreover, contrary to Defendants' contentions, Plaintiff should not be precluded from claiming reliance on an oral misrepresentation where the facts as to Defendants' true intentions lie peculiarly within their and not Plaintiff's knowledge. *See Tahini Invs., Ltd. v. Bobrowsky*, 99 A.D.2d 489, 490 (2nd Dep't 1984). Defendants' true intention behind the $1 million promise lies peculiarly within Defendants' knowledge and Plaintiff cannot be expected to engage in mind reading when all external indications were that the representation was genuine.[7]

### D. There is a Genuine Issue of Material Fact as To GateGuard's damages.

In a particularly unconvincing manner, Defendants assert that GateGuard did not suffer any damages from the alleged misrepresentation. Here Defendants argument is hobbled by their failure to prepare a Rule 56.1 Statement and to review the record carefully before filing their

---

[7] The cases cited in the Mem. in Support at 12 are of no help to Defendants. In *Hyosung Am., Inc. v. Sumagh Textile Co.*, 137 F.3d 75, 78 (2d Cir. 1998), the plaintiff could have insisted on laboratory test results to confirm the accuracy of certain representations. Any such "strong arm" tactics were unrealistic in the context of a proposed start-up investment. In *Mallis v. Bankers Tr. Co.*, 615 F.2d 68, 81 (2d Cir. 1980), Judge Friendly there held that Plaintiff's reliance ***was*** reasonable, adopting a very expansive notion of reasonable reliance. Finally, in *Keywell Corp. v. Weinstein*, 33 F.3d 159, 164 (2d Cir. 1994) the Court held that the plaintiff could not rely on an environmental representation in a purchase agreement because the plaintiff had access to an environmental audit showing the representation to be false. Nothing remotely similar is at issue here.

motion. Defendants assert that the meeting at which the alleged misrepresentation was made occurred on March 7, 2018. Mem. in Support at 13-14. However, the uncontroverted evidence is that the initial investment meeting between Teman, Leon and occurred on December 26, not March 7. *See supra* at 3. The March 7 meeting Defendants refer to was the ***second*** investment meeting, at which GateGuard was looking for additional investments for its contemplated $5 million fundraising round. *See supra* at 6.  Most of the damages suffered by GateGuard – its adoption of an aggressive new "free" intercom strategy, its placing of additional orders with its Chinese supplier, its new marketing campaign, its hiring of employees, its office relocation – all occurred *before* March 7 and were predicated on the reliance on the false promise made on December 26, 2018. *See supra* at 5; Teman Decl. at ¶ 9. While the consequences and repercussions of the false representation were felt for some time after March 7, it was the alleged December 26 misrepresentation, not the failure to secure additional funding from Bromberg and Weissman, that caused out-of-pocket damages and crippled the Company's prospects.[8] By failing to review the record and comply with its obligations under the Rules, Defendants have raised a frivolous argument they know is contradicted by deposition testimony.

## CONCLUSION

For the reasons set forth above, Defendants' Motion should be denied and the parties should be directed to file a joint pretrial order within 14 days of the denial of the Motion.

Dated:    New York, New York,
          March 16, 2023

                              **QUAINTON LAW, PLLC**
                              By: *Den Quainton*
                              *Attorneys for Plaintiff*
                              *GateGuard Inc.*

---

[8] To the extent the date in the pleading on file is inconsistent with the undisputed deposition testimony of all three deponents, the pleadings can be conformed to the evidence. *Hillburn by Hillburn v. Maher*, 795 F.2d 252, 264 (2d Cir. 1986). Indeed, the conforming of the pleadings to the evidence "requires no motion or formal amendment of the pleadings." *New York State Elec. & Gas Corp. v. Sec'y of Lab.*, 88 F.3d 98, 105 (2d Cir. 1996).

25

2 Park Ave., 20th Floor
New York, New York 10016
(212) 419-0575
Email: equainton@gmail.com

## <u>CERTIFICATE OF SERVICE</u>

The undersigned certifies that on March 16 2023, the foregoing document was filed through the CM/ECF system and thereby served electronically on counsel for Goldmont Realty Corp., Leon Goldenberg and Abi Goldenberg.

Dated:　New York, New York,
　　　　March 16, 2023

/s/ *Eden P. Quainton*
QUAINTON LAW, PLLC
*Attorneys for Plaintiff*
*GateGuard, Inc.*
2 Park Avenue, 20th Floor
New York, New York 10016
(212) 419-0575
Email: equainton@gmail.com