UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

Civil Action No. 1:20-cv-01609-AJN-GWG

----------------------------------------x

GATEGUARD, INC.,

                    Plaintiff,


        - against -


GOLDMONT REALTY CORP., LEON GOLDENBERG,

ABI GOLDENBERG,

                    Defendants.

----------------------------------------x


                    Remote deposition

                    August 17, 2021

                    10:05 a.m.




        VIDEO-RECORDED VIDEOCONFERENCE DEPOSITION of

LEON GOLDENBERG, before Michele Moskowitz, a

shorthand reporter and Notary Public of the State

of New York.

Page 2

APPEARANCES

FISHERBROYLES, LLP

Attorneys for Plaintiff

445 Park Avenue, 9th Floor

New York, New York  10022

BY:  ARIEL REINITZ, ESQ.

ariel.reinitz@fisherbroyles.com


KOSS & SCHONFELD, LLP

Attorneys for Defendants

90 John Street, Suite 503

New York, New York  10038

BY:  SHIRA GOLDMAN MOYAL, ESQ.

shira@kandsllp.com




ALSO PRESENT:

Howard Brodsky, Legal Videographer

Page 4

I N D E X

----------------- E X H I B I T S --------------

| PLAINTIFF | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 118 | Document | 259 |
| Exhibit 140 | Magazine cover | 273 |
| Exhibit 160 | E-mail | 335 |

Page 3

I N D E X

| WITNESS | EXAMINATION BY | PAGE |
|---|---|---|
| LEON GOLDENBERG | MR. REINITZ | |

--------- INFORMATION/DOCUMENTS REQUESTED ------

PAGE

Production of documents    289

Production of any of documents that Mr. Goldenberg used to refresh his recollection    391

---------------- E X H I B I T S --------------

| PLAINTIFF | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 100 | Defendants' Responses to Plaintiff's First Set of Interrogatories to Defendant Leon Goldenberg | 23 |
| Exhibit 101 | Verifications | 25 |
| Exhibit 102 | August 30, 2019, e-mail | 53 |
| Exhibit 104 | E-mail thread Bates stamped Defendants' 00017 | 102 |
| Exhibit 110 | Settlement agreement | 150 |
| Exhibit 111 | September 11, 2019, document | 151 |
| Exhibit 120 | E-mail Bates stamped 000020 and 000021 | 159 |
| Exhibit 121 | Real Deal Article | 160 |
| Exhibit 115 | E-mail Bates stamped Defendants' 000087 | 189 |
| Exhibit 116 | E-mail Bates stamped Defendants' 000116 | 212 |
| Exhibit 117 | Article | 228 |

Page 5

THE VIDEOGRAPHER:  Good morning. Here begins the video recorded virtual remote deposition of Leon Goldenberg appearing from his location in Brooklyn, New York.

This deposition is taken by the plaintiff in the matter of GateGuard, Inc., plaintiff vs. Goldmont Realty Corp., et al. defendants, Case No. 1:20-cv-1609 in the United States District Court, Southern District of New York.

Today is Tuesday, August 17, 2021, the time is approximately 10:05 a.m. Eastern Daylight Time.  My name is Howard Brodsky and I am the legal video specialist in association with Veritext Legal Solutions with offices located in New York, New York. The court reporter is Michele Moskowitz in association with Veritext.

Will counsel please state their appearances for the record.

MR. REINITZ:  Ariel Reinitz, Fisherbroyles, LLP, for plaintiff GateGuard, Inc.

2 (Pages 2 - 5)

Page 6

GOLDENBERG

MS MOYAL:  Shira Goldman Moyal, Koss & Schonfeld, for the defendants.

THE VIDEOGRAPHER:  Thank you, Counsel.  And the parties have stipulated and agreed that the court reporter may take the deponent's oath remotely.

Will the court reporter please swear in the witness.

THE COURT REPORTER:  Sorry, do both counsel agree to the remote swearing?

MR. REINITZ:  Yes.

MS. MOYAL:  Yes

L E O N  G O L D E N B E R G , after having first been duly affirmed by a Notary Public of the State of New York, was examined and testified as follows:

EXAMINATION BY

MR. ATTORNEY:

Q.    Please state your name for the record.

A.    Leon Goldenberg.

Q.    Good morning, Mr. Goldenberg.

A.    Good morning.

MR. REINITZ:  Just a few

Page 7

GOLDENBERG

administrative items before we dive in, first of all, Ms. Moyal, in terms of the exhibits, are you agreeable for us to handle like we did last time, which is I'll e-mail you as we go?

MS. MOYAL:  Correct.

MR. REINITZ:  Great.  Another administrative item also for you, Ms. Moyal, before we dive in, in terms of -- I don't know if you want to give -- I'm sure you've discussed the deposition with Mr. Goldenberg in advance, but if there's anything you want to -- any thoughts you want to impart to Mr. Goldenberg, I'm going to invite you to do that now as opposed to interjecting, you know, as we're going.

If you want to object under Rule 30, if you have objections to the form of the question, that's fine, but beyond that, suggesting to Mr. Goldenberg he should answer if he knows or shouldn't guess, I'd ask that we not do that this time around, if that's okay.

MS. MOYAL:  That's fine by me.  I've

Page 8

GOLDENBERG

already spoken to him.

MR. REINITZ:  Okay.

Q.    Mr. Goldenberg, have you ever been deposed before?

A.    Yes.

Q.    Approximately how many times?

A.    Hard to say.  I'm a landlord.  I've had a lot of trip and falls.

Q.    More than ten?

A.    Probably around there.

Q.    Okay.  Are you taking any medication now that may affect your ability to testify today?

A.    No.

Q.    Okay.  How do you feel this morning?  You feel okay?

A.    I feel fine.

Q.    Okay.  Did you get a good night's sleep last night?

A.    Actually, not.  Not because of this.

Q.    Okay.  Do you feel well enough to be able to testify --

A.    Yes.

Q.    -- today?

Page 9

GOLDENBERG

Be able to tell the truth, you know, in terms of the best of your abilities and the best of your recollections?

A.    Yes.

Q.    Okay.  As you know I guess from your prior experience, this is going to be sort of a question-and-answer session.  I'll be asking the questions, you'll be hopefully providing the answers.  If I ever ask a question that doesn't make sense, and I'm sure that's going to happen, please let me know and I'll be happy to rephrase the question.

I'm going to just ask if you agree that if you are answering a question, that means that you've understood it, does that work?

A.    Yes.

Q.    Okay.  I know you mentioned that you're in Brooklyn this morning, is that -- is this your office?

A.    That's my office.

Q.    Okay.  And that's the office of -- also the office of Goldmont Realty Corp.?

A.    Correct.

Q.    Okay.  Anybody else in the room with

3 (Pages 6 - 9)

Page 10

GOLDENBERG

Q. you today?

A. No.

Q. Okay. Anybody outside the room in the office this morning?

A. Yes.

Q. Okay.

A. The office is full.

Q. About how many people?

A. In the office?

Q. Yes.

A. Ten.

Q. Any devices with you in the room this morning?

A. What kind of devices?

Q. Well, I'm taking for granted since we're doing this, there's a computer that you're --

A. Correct.

Q. -- doing the deposition on now. Any other computers other than the one you're using for the deposition?

A. Yes.

Q. How many other computers are in the room?

Page 11

GOLDENBERG

A. One other one.

Q. Are you using it now?

A. No.

Q. Is it on?

A. No.

Q. Okay. Any other devices? Cell phones? Tablets?

A. All that kind of stuff.

Q. Okay. How many cell phones in the room?

A. Two.

Q. Both of them yours?

A. Both mine.

Q. Are they on right now?

A. Yes.

Q. Okay. Are you -- are the screens on? I mean, I don't know if you can see, like, notifications messages as they come in.

A. No.

Q. Okay. The computer itself that you're -- you're on now that we're conducting the deposition from, do you have any other applications running besides this --

A. I have a lot of them.

Page 12

GOLDENBERG

Q. -- Zoom? Okay. Do you have your e-mail open on the computer?

A. I have my e-mails open.

Q. What else?

A. I can go through the list. Is there any point to that?

Q. Yes.

A. Is there something you want specifically to know?

Q. Well, candidly, I'm curious as to whether or not -- in other words, if there are chat applications or other applications --

A. No.

Q. -- that would be able to --

A. Nobody else is listening to this right now.

Q. I'm less concerned with someone else listening, but my concern is that there not be -- in other words, you not be getting messages, you know, tips or notes. You know, like we would think of, you know, if we're sitting across each other in a conference room, I can see if, you know, someone's -- you know, your attorney is

Page 13

GOLDENBERG

passing you a note, you know, giving you pointers on the side, that -- that's what I'm curious as to whether or not you have other --

A. I --

Q. -- applications that would allow you to get communications from others.

A. I guess my e-mail would allow me.

Q. Okay. Is that -- like I said, is that open? Is that visible to you --

A. Yes.

Q. -- right now?

A. Yes.

Q. Okay. Can you minimize the e-mails so that the -- that you're not getting messages, so they're not visible? I don't mind if you look at them during the breaks, but I'm going to ask that you not be getting e-mails. Is that -- are you agreeable to that?

A. Fine.

Q. Okay. Let me know when you've done that.

A. It's done.

Q. Okay. In terms of the deposition, again, just administratively, at any point in

4 (Pages 10 - 13)

Page 14

GOLDENBERG

time if you need a break, don't hesitate, you can -- you can take one, unless I've asked a question, otherwise I'll -- if you're in the middle of a question, I'll ask you to answer it and then we can -- we can take a break at any time.

Also, just in terms of, like, the day, I don't know if you need a -- have a specific -- any kind of hard stop like for lunch or other meetings or anything like that or --

A.   I think we can finish this in a few hours if you move it along.  There's really nothing to ask.

Q.   Okay.  Well, we'll see how -- how the day goes but -- all right.  So --

A.   I normally do lunch and Mincha from 1 to 2:00.

Q.   Okay.  So that's where I was going with this.  So 1 to 2 p.m. is let's say a hard stop for you?  We can pencil that in?

A.   Yeah.

Q.   Okay.  That's helpful.  All right.

Just sort of generally, you're a party to this case, Goldmont Realty Corp. is a

Page 15

GOLDENBERG

party to this case.  What is the relationship between yourself and Goldmont Realty Corp.?

A.   First off, I should not be a party to this case because this was signed by Goldmont Realty Corp., not Leon Goldenberg.  I sign as the president of Goldmont Realty.

Q.   Okay.  So you are the president of Goldmont Realty Corp.  When -- approximately when was Goldmont Realty Corp. founded?

A.   1983.

Q.   And you founded Goldmont Realty Corp.?

A.   Yes.

Q.   Are there any other partners in Goldmont Realty Corp. other than yourself?

A.   There might be my wife.

Q.   Other than you and your wife, anyone else?

A.   No.

Q.   Just for the record, your wife's name is?

A.   Agnes.

Q.   Agnes, last name Goldenberg?

A.   Yes.

Page 16

GOLDENBERG

Q.   Goldmont Realty Corp. is a -- to your knowledge, is that a New York corporation?

A.   Yes.

Q.   Other than yourself and your wife, Agnes, does Goldmont Realty Corp. have any other officers?

A.   Probably does.

Q.   If Goldmont Realty Corp. had other officers other than yourself and your wife, who would those officers be?

A.   Different people in the office.  I'm not sure.

Q.   Can you identify them?

A.   No.

Q.   So it's possible any -- you mentioned there's ten people in the office with you today, it's possible all of them are officers --

A.   No.

Q.   -- of Goldmont Realty Corp.?

A.   No.  One or two.

Q.   Which one or two by --

A.   I don't want to say.  I'm not sure.

Q.   Okay.  Who is in the office --

A.   If you need to know -- if it's

Page 17

GOLDENBERG

something you need to know, you can send me afterwards a request for information, I'll get it for you.  I'm not trying to be hard.  I just don't know.

Q.   Understood.  Who is in the office with you today?  You mentioned ten people.

A.   Who is in the office today?  Miriam Stern, Jeannie Weisberg, Tamara -- I don't know her last name, it's Russian -- oh, Tamara Feldman, Diana Belorusets, Shirley Lichtenstein, Saul Horowitz.  And there may be some others.

Q.   Okay.

A.   Abby Linsky.  I don't know who's actually sitting in the office right now.

Q.   Understood.  Understood.  You mentioned Saul Horowitz, what is Saul's role in -- within Goldmont Realty Corp.?

A.   He's the controller.

Q.   Okay.  And his background is -- he's a CPA --

A.   Yes.

Q.   -- by training?  Okay.

Approximately how long has Mr. Horowitz worked as gold's controller?

5 (Pages 14 - 17)

Page 18

GOLDENBERG

A. Over 15 years.

Q. Outside of Mr. Horowitz's responsibilities for Goldmont Realty Corp., does he -- do you know if he has any other -- does he have an independent accounting practice? Does he do -- handle other work?

A. He has some private accounts.

Q. Okay. But to your knowledge, Mr. Horowitz's primary responsibilities are for -- to Goldmont Realty Corp.?

A. Correct.

Q. Just sort of generally in terms of your background, so you founded Goldmont Realty Corp. I think you said -- was it 1983?

A. Yes.

Q. In the early '80s. Before then what was your professional background?

A. Very varied.

Q. Okay. Is that in the real estate business? In other businesses?

A. Other businesses. Multiple businesses.

Q. Okay. Can you give me an example?

A. Does it make a difference?

Page 19

GOLDENBERG

Q. Sure. It might. I guess we'll find out.

A. I was in the jewelry business, I was in the commodities business, I was in -- I had a butcher store, I had an antique shop.

Q. Okay. These are --

A. And a few others.

Q. Okay. Were these businesses primarily in Brooklyn or elsewhere?

A. Brooklyn, Manhattan.

Q. Was Goldmont Realty Corp. your first foray into real estate business?

A. No.

Q. What was your first business exposure to real estate?

A. My first investment property I bought in 1974.

Q. Where was that?

A. 1610 Avenue R in Brooklyn.

Q. You purchased that -- was that you personally or with a group of investors?

A. Personally.

Q. Is that a residence?

A. Three-family house.

Page 20

GOLDENBERG

Q. Did you live there?

A. No.

Q. So you purchased it as an investment?

A. Correct.

Q. Do you still own it today?

A. No.

Q. Approximately when did you sell it?

A. Five to seven years ago.

Q. Okay. So 1610 Avenue R you owned. Was that -- did you own that when you bought it personally or was it through an entity?

A. Personally.

Q. Prior to founding Goldmont Realty Corp., did you make any other real estate investments through other entities?

A. Yes.

Q. What entities?

A. I wouldn't remember. You're asking me about 40 years ago.

Q. Understood. Understood. Do you -- do you know if you still have -- own equity in any of those entities that you made those investments in, early real estate investments in?

A. I don't believe so.

Page 21

GOLDENBERG

Q. Okay. Going back to Goldmont Realty Corp., what is Goldmont Realty Corp.'s -- how would you characterize its primary business?

A. Management.

Q. Is that management of real estate properties?

A. Yes.

Q. Where are the real estate -- where are the properties that Goldmont manages primarily located?

A. Primarily New York City and the metropolitan area, but we're out in other states also.

Q. What other states? I don't need an exhaustive list, but just for example.

A. New Jersey, Pennsylvania, South Carolina, Florida.

Q. Okay. Approximately how many properties does Goldmont Realty Corp. manage?

A. About 80 to 100.

Q. Does Goldmont Realty Corp. own any of the properties that it manages?

A. Goldmont Realty is a general partner in some of the properties.

6 (Pages 18 - 21)

Page 22

GOLDENBERG

Q.   So if I understand correctly, Goldmont Realty Corp. -- let's say Goldmont Realty Corp. does not wholly own any properties, but it may own an entity -- it may own equity in some properties?

A.   Correct.

Q.   Is that accurate?  Okay.

Do you personally own equity in any of the properties that Goldmont Realty Corp. manages?

A.   Yes.

Q.   Approximately what percentage of the 80 to 100 properties that Goldmont Realty Corp. manages do you own equity in?

A.   Probably 60 percent.

Q.   Would you say -- again, I know -- of those -- that 60 percent, do you own let's say more than 50 percent equity in any of those properties?

A.   In some.

Q.   Most?  So let's say more than 50 percent of those properties, do you own a majority --

A.   Can't recall.

Page 23

GOLDENBERG

Q.   Back to my previous question, of those entities that you, I'm talking about you, Leon Goldenberg personally, own equity in, do you own that equity personally or is that through other entities?

A.   Various ways.

Q.   I'm now going to show you --

MR. REINITZ:  Ms. Moyal, I sent you a couple of exhibits.  I don't know if you got them or not.  You should.

MS. MOYAL:  Yes.

MR. REINITZ:  Okay.

(Defendants' Responses to Plaintiff's First Set of Interrogatories to Defendant Leon Goldenberg were marked Plaintiff's Exhibit 100 for identification, as of this date.)

Q.   I'm just pulling up an exhibit here, Mr. Goldenberg.  Give me a second.

Mr. Goldenberg, let me know when you can see this up on your screen.

A.   I see it.

Q.   Great.  This is a five-page document. I'm going to give you some time -- I'm just going

Page 24

GOLDENBERG

to flip through it.  I'm going to give you some time to take a look at it.  The title is "Defendants' Responses to Plaintiff's First Set of interrogatories to Defendant Leon Goldenberg." I'm just --

MS. MOYAL:  What exhibit is this?

MR. REINITZ:  This is exhibit -- I'm sorry.  Exhibit 100, Plaintiff's Exhibit 100.

Q.   I'm just going to flip through here, it's five pages, and I'm going to flip back to the top and I'll give you all the time that you need if you'd like to read it.

A.   I cannot move the pages.

Q.   Sure.  So all you got to do is let me know when you're ready.

A.   Go to the next page.  Next page. Next page.  Okay.

Q.   All set?

A.   Yes.

Q.   I'm going to close this now.  I'm going to pull it back up in just a second here, but I'm going to open up with a second document here that I'm going to ask you to take a look at

Page 25

GOLDENBERG

as well.

(Verifications were marked Plaintiff's Exhibit 101 for identification, as of this date.)

Q.   Now I'm showing you -- let me know when you can see them.  There should be two documents.  That's going to be Plaintiff's Exhibit 100 I just showed you, the --

A.   Yeah.

Q.   -- and also Plaintiff's Exhibit 101, which is -- are three pages here, which I'll flip through --

A.   Right.

Q.   -- of what we call verifications. Let me know when you'd like me to -- there's three pages here.

A.   Okay.  You can go.  Yeah.

Q.   Okay.  So I'm going back to document -- excuse me, Exhibit 100.  These are the responses that we received from your attorneys, from Koss & Schonfeld, in response to interrogatories, which is just a fancy way of saying questions, written questions, that we sent you in this case.

7 (Pages 22 - 25)

Page 26

GOLDENBERG

The first question here, I'm flipping to page 2 of Exhibit 100 asks you to identify electronic communication mediums you've used since January 2017 to send and receive information. The responses we received were -- from your attorneys were BlackBerry, Twitter, e-mail, telephone, and WhatsApp.

Is that still accurate today? We received this in April, so I just want to confirm that --

A. BlackBerry is not really a whatcha -- but I don't have a BlackBerry anymore.

Q. Okay. Fair enough. What kind of phone do you use now?

A. Wrong guy to ask.

Q. That's okay. Can you show it to me? Do you have it there?

A. Here's one.

Q. I won't hold you to it. Yeah. Okay. Can I see the back? I just want to know the --

A. This replaces the BlackBerry.

Q. Okay. Do you know if it's an iPhone or an Android device?

A. One is an Android, the other one I

Page 27

GOLDENBERG

don't know.

Q. Okay. Fair enough. So you have two phones. And is that -- I take for granted those are two different phone numbers, right?

A. Correct.

Q. Just out of curiosity, why do you have two phones?

A. I'm a busy guy.

Q. Okay. Is one -- do you use one for -- I don't know if it's for -- you know, for business and one for personal or are they divided in how you use them in other ways?

A. Interchangeable.

Q. Okay. I'm flipping here to page 3 of Exhibit 100. This asks -- for each electronic communication medium identified above it asks for whether it's the account or the number basically to identify what -- how you are using whether it's e-mail or phone or apps. So we received this response from your attorneys. I just want to confirm that this is still correct. There are several phone numbers here, which you can --

A. Yes. I'm looking at it.

Q. -- can see actually four different

Page 28

GOLDENBERG

phones. Are there any other -- other than these, do you have any other phone numbers that you use?

A. I use -- in other residences I use other numbers.

Q. Okay. So you have -- if I understand correctly, you have -- you have other -- you know, other residencies and each of which may have a -- let's say a land line?

A. Correct.

Q. It's got another -- okay.

As far as e-mails go, there are three -- I'm sorry, there are two e-mail addresses here, goldmont@aol.com, leon@goldmontrealty.com, do you have any other e-mail addresses other than these?

A. No.

Q. Then there is @leongoldenberg1, is that a Twitter account?

A. That's a Twitter account.

Q. Okay. Flipping back up here to page 2, there's -- we talked about BlackBerry, we talked about Twitter just now. E-mail, telephone, and WhatsApp. Do you use WhatsApp frequently?

Page 29

GOLDENBERG

A. No.

Q. Okay. Generally when you use it, is that -- I don't know if it's usually family communications or other types of -- when do you use it?

A. There are groups that I have on WhatsApp.

Q. Okay. Are those personal groups? Are those professional business-related groups?

A. There may be one business. The rest are all having to do with different work that I do, charity work, political work, stuff like that.

Q. Okay. Other than WhatsApp, do you have any other apps that you use to communicate with people? Send messages? Receive messages?

A. I don't -- I don't think so. I mean, I really don't even know what else there is.

Q. Okay.

A. I don't know if there are chat rooms, if that's what you mean. So I really don't know what else -- I'm sure there are different ways, but I'm too old to know them.

Q. Understood. We're on Zoom today, do

8 (Pages 26 - 29)

Page 30

GOLDENBERG

you use Zoom regularly?

A. Yes.

Q. Okay. Generally for what purpose?

A. Same as business or -- almost never personal, but a lot of different charities and political work.

Q. Prior to the pandemic, so let's just say roughly before what is that, March --

A. April 2020.

Q. April 2020, okay. Did you use Zoom much before then?

A. No.

Q. Okay. Did you use -- I mean, there are other video platforms, videoconferencing platforms, let's say Skype, there are a few others. Did you use other types of videoconferencing regularly before then?

A. I used Skype once in a while.

Q. Okay.

A. It's finished. Does it still exist?

Q. I think so. I guess we can find out. I'm looking now here at Exhibit 101. That's the three-page verification document that I'm showing. The first page -- again, these are

Page 31

GOLDENBERG

three roughly identical verifications that we received from your attorneys which were connected to three sets of these interrogatory responses.

The first one is signed by Stephan Abi Goldenberg, who is a -- also a party in this case. The second is signed also by Stephan Abi Goldenberg on behalf of Goldmont Realty Corp. So I just -- if you want to read it for a second here, I'll invite you to. I'm on page 2 of Exhibit 101, the corporate verification for Goldmont Realty Corp. And then let me know when you've taken a look at it and I just have a couple questions about it.

A. Okay.

Q. Stephan Abi Goldenberg is -- that's your son, correct?

A. Correct.

Q. Okay. And in the corporate verification document here, I don't know if you can see my mouse here, it's --

A. Right.

Q. Stephan -- Mr. Abi Goldenberg is signing on behalf of Goldmont Realty Corp. as its officer. To your knowledge, is Abi Goldenberg an

Page 32

GOLDENBERG

officer of Goldmont Realty Corp.?

A. I guess.

MS. MOYAL: Objection, calls for a legal conclusion.

Q. Does -- is there any other -- anyone else at Goldmont Realty Corp. other than you who would have the authority to determine whether or not Abi Goldenberg is an officer of the company?

MS. MOYAL: Objection, calls for a legal conclusion. Over objection, you can answer. You can answer over objection.

A. I'm not sure.

Q. Other than yourself and as it appears from this document Abi Goldenberg, and I know you mentioned your wife, Agnes Goldenberg, do you know if Goldmont Realty Corp. has any other officers?

A. It may.

Q. Okay.

A. I'm not trying to play around. It's a small company. There are several people that may be officers. It's just not something that I focus on.

Q. Understood. To your knowledge, does

Page 33

GOLDENBERG

Abi Goldenberg sign other documents on behalf of Goldmont Realty Corp.?

A. Sometimes.

Q. What's an example of a document that you know Abi Goldenberg signs on behalf of Goldmont Realty Corp.?

A. I can't tell you. I wouldn't know.

Q. Does Abi Goldenberg ever sign let's say checks on behalf of Goldmont Realty Corp.?

A. I don't believe so.

Q. Okay. Does -- to your knowledge, does Abi Goldenberg sign agreements, any agreements, on behalf of Goldmont Realty Corp.?

A. He may have.

Q. Okay. I'm flipping now to page 3, that's the verification on behalf of you. Just take a look at it and let me know when you're ready.

A. Okay.

Q. So the verification here, I'm just reading it, states that deponent, that's Leon Goldenberg, is a defendant in this action, and I'm skipping here, and knows the contents thereof to be true and accurate in all respects. I'm

9 (Pages 30 - 33)

Page 34

GOLDENBERG

sorry, let me just read the whole thing.

"Deponent is a defendant in the within action. Deponent has read the foregoing Defendants' Responses to Plaintiff's First Set of Interrogatories to Defendant Leon Goldenberg dated April 21, 2021, and knows the contents thereafter to be true and accurate in all respects; the same is true as to deponent's own knowledge, except as to those matters therein stated to be alleged upon information and belief, and as to those matters, deponent believes them to be true." And then there's your signature -- obviously that's your signature block.

Is that statement still correct today, Mr. Goldenberg?

A.    I would say so.

Q.    Okay. And now I have these two documents open side by side, Exhibit 101 and Exhibit 100, can you confirm that this verification applies to this document here?

A.    No.

Q.    You cannot confirm?

A.    No.

Q.    Okay. So --

Page 35

GOLDENBERG

A.    Don't ask me legal questions.

Q.    Right. Well, I'm -- to be very clear, Mr. Goldenberg, we received these documents from your attorneys in sort of -- separately, and the verification -- you can ask Ms. Moyal maybe at break, but as far as I'm concerned, the verification here is in reference to this document, the responses, so I'm asking you to confirm that the verification here does actually apply to the responses, the interrogatory responses, as shown in Exhibit 100.

MS. MOYAL: Again, objection, calls for a legal conclusion. Over objection you can answer.

A.    Exactly the same thing. I'm not an attorney. You're an attorney, she's an attorney. They asked me to sign, I sign. If it's for this, it's for this. If it's not, don't ask me to come to a legal conclusion.

Q.    Okay. Fair enough. So I'll ask then -- and I know you reviewed it before, but I'll give you the opportunity to review it again. Exhibit 100, five-page document, let me know if you want more time, otherwise I'll ask if you

Page 36

GOLDENBERG

could now just confirm that the contents of Exhibit 100 is true and accurate in all respects.

MS. MOYAL: Same objection to the extent that you're asking him to compare to the verification. Is that the question?

MR. REINITZ: No. No, no. I'm actually -- Ms. Moyal, I'm actually suggesting we can -- you know, let's put the verification aside for a second if you like and I'm asking Mr. Goldenberg now to -- I mean, he's reviewed it, but I'm inviting him to review it again and to confirm or to verify right now that the contents of the interrogatory responses are correct.

A.    I didn't sign that, did I?

Q.    Is that a question for Ms. Moyal, Mr. Goldenberg?

A.    No. It's a question for you. You're asking the question. It's not my signature on there.

Q.    Okay.

A.    That's my signature that you're pointing to, but on the other one, you're -- you do not have my signature.

Page 37

GOLDENBERG

Q.    And that's -- and that's -- I think -- I'm just going to say I think we're talking about -- we're -- we're touching on the same point, which is yes, the interrogatory document is signed by your attorney, Mr. Schonfeld, and the verification -- which again, that's something maybe you can take up with Ms. Moyal during the break, but the verification is in direct reference to this document.

So without any legal conclusions, I'm simply asking you to confirm -- and we can even again put the document with your signature aside for the moment. If you like, I can close it if that's helpful. And I'm asking you to review the five-page Exhibit 100 and to let me know whether it is or is not true and accurate in all respects.

MS. MOYAL: Leon, do you want to take a couple of minutes and read it over and take your time?

A.    I don't know really -- to me it's all a bunch of legally gobbledygook. "Defendant objects to" --

10 (Pages 34 - 37)

Page 38

GOLDENBERG

Q.   That's right.  If -- if you like Mr. Goldenberg, I can highlight -- the only parts I'm really interested in one way or the other in your verification is --

A.   Right.

Q.   Well, it's really this here.

MS. MOYAL:  Can you make that bigger and close the verification?

A.   Yeah.  So that hasn't changed.  We just went through that.

Q.   Can you still see it here?

A.   Yes.  But it's -- we went through that.

Q.   We sure did.  But I'm asking for you to verify that it's true and accurate in all respects.

A.   Yes.

Q.   Okay.  So interrogatory No. 1, the response here that I've highlighted, is true and accurate in all respects?

A.   Yes.  I used BlackBerry -- well, not BlackBerry.  I use e-mail, Twitter, e-mail, telephone, and what do you -- cell phone if you want to put that down.  I guess that's what I

Page 39

GOLDENBERG

meant by BlackBerry.

Q.   I'm now moving to interrogatory No. 2, and I'm going to highlight the portion here, "Without waiving the above objections defend responds...," and I'll also note, Mr. Goldenberg, you mentioned a few minutes ago that you may have land lines at some other residencies that may not be listed, I recognize that.

A.   Correct.

Q.   Other than that, can you confirm that the response here is true and accurate in all respects?

A.   Yes.

Q.   Now we're moving to interrogatory No. 3, "Identify each person with whom you've communicated concerning GateGuard," and I'm going to highlight your response here and you can let me know if that's true and accurate in all respects.

A.   Well, I never spoke to you.  This is the first time we're speaking.  I don't know why your name is there.  And Avi Goldenberg?  Okay, I guess maybe.  Your name should not be there.

Q.   Okay.  So that's --

Page 40

GOLDENBERG

A.   We haven't had any conversation.  I think is the first time that we're -- we're meeting by Zoom or by any other manner.

Q.   For what it's worth, I agree.
So putting my name aside, which is -- again, just for the record, that's Attorney Ariel Reinitz -- is the response otherwise true and accurate in all respects?

A.   Yes.

Q.   I think -- you know what, I apologize, Mr. Goldenberg, that was number -- I don't want to have you do this again because it's kind of silly, but that was identify each person with whom you've communicated concerning Ari Teman and that's interrogatory No. 4 --

A.   That's one more person.

Q.   Go ahead.  I'm sorry.

A.   He's mentioned in one of the e-mails.  I don't remember his name.  I'll remember -- I should remember it soon.

Q.   Okay.  So there's one -- I'm sorry.  With the caveat there's one other individual mentioned in e-mail that isn't listed -- and I just want to go back, I may have misspoke,

Page 41

GOLDENBERG

interrogatory No. 3, identify each person with whom you communicated concerning GateGuard, and I'm going to highlight --

A.   Right.

Q.   -- the response here which I believe is identical, but I'm not going to speak for you.  You can take a look.

A.   Okay.  Again, I never spoke to you.

Q.   Correct.  Okay.

A.   I'm not sure I ever spoken to Mr. Rubinstein either, but there might have been an e-mail.

Q.   Okay.  That's attorney Jacob Rubinstein?

A.   Right.  And -- okay.  Barry Schechter, I never speak to him.  It could have been on an e-mail.

Q.   So let's recap here.  Let's -- we're starting with GateGuard, there's one question -- request about -- question about whether -- whom you spoke to about GateGuard and whom you spoke to about Mr. Teman.  So starting with interrogatory 3, each person with whom you communicated with GateGuard, we said we're going

11 (Pages 38 - 41)

Page 42

GOLDENBERG

to strike me, that's wrong.

A.  Right.

Q.  Abi Goldenberg, did you speak to Abi Goldenberg?

A.  Yes.

Q.  Okay.  Attorney Jacob Rubinstein?

A.  I don't believe I spoke to him.

Q.  Okay.

A.  But there could have been e-mails back and forth.  I know the name.

Q.  Okay.  Myself, I'm out.  Yechiel Bromberg?

A.  Correct.

Q.  You definitely spoke to Yechiel about GateGuard and Mr. Teman?

A.  Yes.

Q.  Jeannie Weisberg?

A.  Jeannie Weisberg's my assistant, so she's heard different things.  I haven't had conversations about it specifically.

Q.  Jerry Weisman?

A.  Yes.

Q.  Barry Schechter?

A.  Yechiel and -- and I think Jerry

Page 43

GOLDENBERG

dealt with Barry, but there may have been e-mails that I was sent.  I don't believe I had a conversation with him.  Maybe.

Q.  And what was -- we'll come back it to later.

What was the context in which the group, that's you, Mr. Schechter, Mr. Weisman, were communicating?

A.  A possible investment in GateGuard.

Q.  Okay.  Avi Goldenberg?

A.  Avi Goldenberg is my nephew, and I really don't know -- I didn't talk to him about GateGuard.  There's a possibility there was an article written by a rabbi in Teaneck about Ari Teman, he might have sent it to me, and that's how I saw it.  I really don't know.  I didn't really have any conversations with my nephew about GateGuard.

Q.  And that was -- the rabbi you mentioned an article, do you -- do you know -- recall the name of the rabbi?

A.  Pruzansky.

Q.  Do you know Rabbi Pruzansky?

A.  I've met him.  I wouldn't say I know

Page 44

GOLDENBERG

him.

Q.  Have you ever spoken to him about GateGuard?

A.  No.

Q.  Okay.  Or about Mr. Teman for that matter?

A.  No.

Q.  So circling back then, other than the -- again, a couple of these we just flagged?

A.  Eli is the first name of the guy that -- whose name escapes me.  It might take me a while to remember the second name too.

Q.  No problem.  Like you said, we've got a little bit of time.

Other than -- we're -- we'll put an asterisk there for that one individual.  And with some of the I guess let's say modifications that we've made to the current list, is the list otherwise accurate?

A.  Yes.

Q.  Okay.  So nobody -- everyone else here other than, again, myself, Jacob Rubinstein that we flagged, everybody else here you did certainly speak to about GateGuard and Mr. Teman

Page 45

GOLDENBERG

and there's nobody else other than these?

A.  Right.

Q.  These folks and that one that you mentioned?  Okay.

Now, going back to -- a few minutes ago we discussed your son Abi and his role in Goldmont.  What's Abi's title at -- within Goldmont Realty Corp.?

A.  No specific title.  He has a lot of different jobs.

Q.  Okay.  What are some of those jobs?

A.  Looking for new ideas, you know, to use in the buildings, to improve, you know, heating, water usage, he does investigating on purchasing of buildings.  Everybody has different -- multiple roles.  Nobody has one set role.

Q.  Okay.  Other than Abi Goldenberg, any other family members, immediate family members, work for Goldmont Realty Corp.?

A.  Yes.

Q.  Who's that?

A.  My son-in-law, Sam Blau.

Q.  Okay.  Anyone else?

12 (Pages 42 - 45)

Page 46

GOLDENBERG

A.    Yes.  I have a daughter, Lily Fertig, Nicole Fertig.

Q.    Just generally, what are -- what are Nicole and Sam's -- respectively what are their roles?

A.    Nicole is the accounts payable and Sam is the office manager.

Q.    Other than the office -- I've got the address here somewhere, I think you mentioned you're there today -- in Brooklyn, does Goldmont Realty Corp. have any other offices?

A.    We just opened one in Lakewood.

Q.    Okay.  And that's the -- is that to manage properties in New Jerry?

A.    Not specifically, no.

Q.    Approximately how many employees does Goldmont Realty Corp. have?

A.    Close to 20.

Q.    Other than Goldmont Realty Corp., what -- what other entities do you hold equity ownership in?

A.    150.

Q.    Are those primarily in the real estate business as well?

Page 47

GOLDENBERG

A.    Primarily, but different things.

Q.    Okay.  I'm just scrolling down here, this is interrogatory No. 5, "Identify all entities in which you held an interest, including as an owner, member, shareholder, partner, beneficiary, and licensee at any time from January 1, 2017, to the present," and like you mentioned, this is -- this is a lot of lawyerly stuff, but basically we didn't -- we didn't receive a response.

A.    Right.

Q.    You mentioned, again, just a second ago 150 -- approximately 150 entities?

A.    100, 150.  I really don't have a count.

Q.    Understood.  Understood.  And I'm not going to quiz you on all 150 now.

Other than yourself, who else within let's say Goldmont Realty Corp. has knowledge of all those entities?

A.    I guess Saul Horowitz.

Q.    Okay.  And Mr. Horowitz, is he involved in let's say setting up any of those entities?

Page 48

GOLDENBERG

A.    Yes.

Q.    Fair to say Mr. Horowitz has set up most of those entities?

A.    I -- that's -- that would just be a guess.

Q.    Okay.  Fair to say Mr. Horowitz has set up many of those entities?

A.    Yes.

Q.    Okay.  And just generally, do many of those entities let's say correspond to individual properties?

A.    Many of them do.

Q.    Okay.  And those are properties that you -- let's say you have an equity ownership interest in?

A.    Generally.

Q.    Okay.  Of those 150 entities, what -- roughly what percentage would you say are located in New York City?

A.    Ooh.  75 percent.

Q.    Okay.

A.    I don't know if it's 150, but -- and I've -- I've set up 150 entities in my life.  How many we still have, I can't tell you.

Page 49

GOLDENBERG

Q.    Fair enough.  Of the remaining 25 percent that are real estate let's say, where would those be located?

A.    New Jersey, Pennsylvania, South Carolina, Florida, Texas, California.

Q.    Within those -- the entities that you invest in in various -- that could be in New York City or elsewhere that you invest in real estate, do you have any partners that you invest in routinely?

A.    Yes.

Q.    Can you name them?

A.    About a half a dozen.

Q.    Okay.  Who would that be?

A.    Marchei Eisenberg, Chaim Goldenberg, Michael Litman.  There are different groups that I invest in with.

Q.    Can you clarify what you mean by groups?

A.    Coal Town Group, we have investments with them.  I have with -- I have, you know -- in real estate you have a lot of different partners in different deals.

Q.    Understood.  You mentioned Chaim

13 (Pages 46 - 49)

Page 50

GOLDENBERG

Goldenberg, is that a relative?

A.    Distant.

Q.    And Coal Town Group, are there any individuals there that you primarily work with?

A.    Steve Newman, Israel Weinberg, and Jonathan Weinberg.

Q.    So you mentioned -- again, this is going back a few minutes -- that you've -- you've been deposed any number of times throughout -- over the course of obviously your decades in business, have you ever been deposed in a -- in a case that you weren't a party?  So you were let's say a witness or --

A.    I can't tell you.

Q.    Okay.  Have you ever -- other than a lawsuit in court, have you ever resolved business -- any kind of business disputes that may have arisen in other ways?

A.    Yes.

Q.    Outside of court?

A.    Yes.

Q.    What other ways other than through the court system have you --

A.    Beth din.

Page 51

GOLDENBERG

Q.    Beth din, okay.  And just for the record, Mr. Goldenberg, I think we more or less speak the same language, but for the record a beth din is a rabbinic court; is that correct?

A.    Correct.

Q.    Approximately how many times have you been involved in disputes that have gone before a beth din?

A.    About ten.

Q.    Any beth din proceedings that you've been involved in let's say in the last five years?

A.    Probably not.

Q.    Last ten years?

A.    Yes.

Q.    I'm not asking about specifics about any case, but what -- I don't know -- how would you generally describe the types of disputes that you've been involved in in front of -- that have gone to a beth din?

A.    Real estate related.

Q.    Obviously this proceeding that we're taking your deposition for today is in court, it's actually in federal court, at any point did

Page 52

GOLDENBERG

you personally suggest that -- whether it's to Mr. Teman or to anyone else involved in the case that maybe this case should be resolved in a beth din?

A.    I did not.  Because Mr. Teman says he's not Orthodox and therefore doesn't believe in it.  I would be happy to go to a beth din to resolve it.

Q.    In your discussions with Abi Goldenberg -- I'll take a step back.

Have you discussed this case with Abi Goldenberg?

A.    Yes.

Q.    Okay.  In your discussions with Abi Goldenberg about this case, have you -- did either of you discuss the possibility of handling it in a beth din?

A.    I think we did.

Q.    Okay.  But just to clarify, at no point did you mention the option to -- directly to Mr. Teman?

A.    I don't believe so.

Q.    Okay.

A.    Mr. Teman told me several times he is

Page 53

GOLDENBERG

no longer Orthodox.

Q.    Okay.  Well, so to your knowledge, does beth din only resolve disputes between Orthodox parties?

A.    No.  But generally people who are not Orthodox will not come to a beth din.

Q.    Okay.  Fair enough.

A.    If you want to suggest it to him, I'm ready to go.  You're his attorney.

Q.    Fair enough.  Okay.  I'll -- we can make the -- it's something I can raise with him, absolutely.  I'm going to close out of Exhibit 1 here and I'm going to show you, Mr. Goldenberg, Exhibit -- Plaintiff's Exhibit 102.  Just give me a second here to pull it up.

(August 30, 2019, e-mail was marked Plaintiff's Exhibit 102 for identification, as of this date.)

Q.    Let me know when you can see it.

A.    I see it.

Q.    So Plaintiff's Exhibit 102 is an e-mail from Jacob Rubinstein, jacobrubinsteinesq @gmail.com --

A.    Right.

14 (Pages 50 - 53)

Page 54

GOLDENBERG

Q.    -- to ari@teman.com and myself.  It was sent Friday, August 30, 2019, at 3:32 p.m., the subject is external sender, that's a -- my e-mail inserts that -- binder2.pdf and there was an attachment binder2.pdf.  Mr. Rubinstein writes, "Please ignore previous e-mail and use the attached.  Thanks.  Jacob 516-967-2622."

And now I'm going to flip through, Mr. Goldenberg, it's about 30 some-odd pages of that attachment binder2.  Let me know --

A.    Yes.

Q.    -- if you'd like to read it.  Okay.

A.    No, I don't want to read it.

Q.    Unless you want to read this, Mr. Goldenberg, I'll flip through it quickly.

A.    Flip through it.

Q.    You're more than welcome to slow me down or stop me at any point.  That's the end.

Anything you want to review more closely, Mr. Goldenberg?  Otherwise I'll scroll back up to the top.

A.    No.

Q.    Okay so again, the agreement is dated -- I'm sorry, the e-mail attaching the

Page 55

GOLDENBERG

agreement is dated August 30, 2019, and I'm flipping to page 4 of Exhibit 102.  Is that your signature on page 4?

A.    Yes.

Q.    Do you recall signing this agreement?

A.    I can't say I recall it, but it's my signature.

Q.    Back to page 1 of Exhibit 102, Jacob Rubinstein, his name came up a minute ago, have you ever met Mr. Rubinstein?

A.    No.  I don't believe so.

Q.    Have you ever spoken to Mr. Rubinstein?

A.    I don't believe so.  I'm not sure.

Q.    Do you know if Mr. Rubinstein at -- was at any time an attorney for Goldmont Realty Corp.?

A.    I don't believe so.  But we did interview several attorneys before we hired Mr. Schonfeld and I don't -- I might have been on a phone -- I'm sure if he's one of them.  I really -- the name really doesn't ring a bell at all.

Q.    Fair enough.  Other than yourself, do

Page 56

GOLDENBERG

you know of -- is there anyone else at Goldmont Realty Corp. who hires attorneys?

A.    My son.

Q.    That's Abi?

A.    Yeah.

Q.    Okay.  So it's possible -- well, scratch that.

So Mr. Rubinstein, you just testified you never met him.  He, as you see in this e-mail, sends an attachment of a scanned document with your signature on it.  You just testified he wasn't -- you never met him, so was anyone else in your presence when you signed this document?

A.    I can't tell you.  Two years ago.

Q.    Okay.  Do you recall discussing this agreement with your son, with Abi Goldenberg, before signing it?

A.    The problem was I did not discuss it with him.

Q.    What do you mean when you say "the problem?"  What do you mean by that?

A.    I would never have signed a 30-page agreement.

Q.    Okay.  You testified, Mr. Goldenberg,

Page 57

GOLDENBERG

a few minutes ago that you're in the -- been in the real estate business for I think 40 some -- 40 plus years; is that fair to say?

A.    Right.  Yes.

Q.    Have you ever signed any documents in connection with any real estate transactions?

A.    Yes.

Q.    In the past 40 years?

A.    Yes.

Q.    Let's say in the past year, how many documents have you signed --

A.    Many.

Q.    -- in connection -- okay.

Any of them, fair to say, longer than 10 pages?

A.    Yes.

Q.    Any documents that you've signed longer than 20 pages?

A.    Yes.

Q.    Any documents that you've signed longer than 30 pages?

A.    Yes.

Q.    Any documents that you've signed longer than 100 pages?

15 (Pages 54 - 57)

Page 58

GOLDENBERG

A. Doubt it. Maybe.

Q. Longer than 50 pages?

A. I don't sit and count.

Q. Longer than 30 pages?

A. I don't sit and count the pages.

Q. Okay. Fair to say, Mr. Goldenberg, you've signed other agreements that are lengthy in your estimation?

A. Correct.

Q. Okay.

A. All reviewed by my attorney before I sign them.

Q. Understood. Now, I'm flipping here to -- this is page -- let's say pages 5 -- I'll give you some time here -- 5, 6, 7, 8 -- let's see, 5, 6, 7, and 8 of Exhibit 102. And that's also referred to as appendix A. At the top I'm reading "Goldmont Realty Corp. Buildings."

A. Mm-hmm.

Q. Take your time and, again, I'm -- Mr. Goldenberg, I'm not going to quiz you on each one of these, but do you generally recognize the addresses listed in this table?

A. Yes.

Page 59

GOLDENBERG

Q. Again, I'll let you take a look at here.

A. Yes.

Q. Do you recognize generally these addresses?

A. Yes.

Q. Are these -- again, I won't hold you to every single last one of them, but do these appear to primarily be buildings that are managed by Goldmont Realty Corp.?

A. Correct.

Q. Does -- again, this agreement was signed -- the e-mail I'm showing you again dated August 30, 2019, so that's, well, almost exactly two years ago. Roughly can you say now does Goldmont Realty Corp. still manage let's say most of these buildings?

A. Yes.

Q. Any of them offhand that you can think of that Goldmont Realty Corp. no longer manages?

A. Go to the next page. We still manage all of them.

Q. Now, this -- before signing this

Page 60

GOLDENBERG

agreement, had you, you personally, at any point gone to -- let's say gone to GateGuard's website?

A. Possibly.

Q. Do you recall if at any point before signing this agreement you placed an order through GateGuard's website, you personally?

A. I cannot tell you at what point.

Q. I'm asking a very specific question, Mr. Goldenberg. I'm asking whether or not you went to the website, do you recall ever you yourself personally placing an order for let's say intercom devices or intercom services through GateGuard's website?

A. No. I never did.

Q. Do you know if anyone else at Goldmont Realty Corp. at any time placed an order for GateGuard devices, intercoms, or GateGuard services through GateGuard's website?

A. I -- my son placed orders. I cannot tell you if it was through the website or by e-mail or by fax. I can't tell you how.

Q. Understood. Understood. But you -- your testimony is, if I understand correctly -- and I just want to clarify. You -- you were

Page 61

GOLDENBERG

aware that Abi Goldenberg had placed prior orders -- I'm sorry, I'll -- let me try that again.

You were aware before signing this agreement that Abi Goldenberg had placed orders for intercom devices or intercom services with GateGuard?

A. Correct.

Q. How many discussions -- well, if any -- did you have any discussions with Abi Goldenberg about this agreement while it was still let's say being negotiated?

A. About the agreement or about buying from GateGuard? There's two different things here.

Q. Yes, that's correct. And I'm -- now I'm speaking specifically about this specific agreement.

A. The agreement, no.

Q. Okay. Now, to your first point, did you ever discuss with Abi Goldenberg just generally whether or not you should purchase intercoms or services from GateGuard?

A. Yes.

16 (Pages 58 - 61)

Page 62

GOLDENBERG

Q. Do you recall the first -- approximately when the first time you spoke to Abi Goldenberg about GateGuard was?

A. No.

Q. Do you recall whether it was Abi who let's say -- Abi Goldenberg who raised the subject for the first time or whether you brought -- did he bring it to you or did you bring it to him, the possibility of working with GateGuard?

A. I'm not sure. I might have passed a -- you know, he was sending out these e-mails. I might have forwarded an e-mail to him. He might have found them on his own. I really can't tell you. I -- my habit is that when I get -- you know, when I see something on -- and I get an e-mail selling this X, Y, or Z and if I think it's interesting, I will forward it on to different people in the office.

Q. And the idea -- just to clarify, Mr. Goldenberg, the idea is that they -- whomever it may be, the relevant person in the office, would investigate further and maybe report back to you about whether or not it's worth pursuing?

Page 63

GOLDENBERG

A. Right.

Q. Okay. Now I'm looking back here again at pages 5 through 8 of Exhibit 102. In the second column -- now, the first column here under Address, we've discussed there's a list of quite a few addresses which you testified are primarily let's say all connected to Goldmont Realty Corp. In the second column, Total Devices Ordered --

A. Managed by Goldmont Realty Corp.

Q. Managed. I apologize. I'm not -- I don't want to -- I'm not trying to play any tricks with that. They're managed primarily, these properties, by Goldmont Realty Corp.

In the second column under Total Devices Ordered, there's a note here for -- I'm flipping back through the list -- on let's say a number of these buildings, quite a few actually, "Cannot" -- I'm reading here -- "Cannot do w/o" -- I would assume that's --

A. Without.

Q. -- without -- "permission of owner. Reached out to them to get permission. Pending."

Do you know what that means?

Page 64

GOLDENBERG

A. Exactly what it says.

Q. Okay. Is there -- how would you generally characterize the distinction between the buildings under which this note appears and the other buildings on the list where you see generally like a 1 for the number of devices ordered?

A. Most of them are buildings that we manage for other owners, the ones that have that note.

Q. So the ones with that note, I just again want to clarify, Goldmont Realty Corp. does not -- let's say does not own any equity in any of those buildings?

A. Do you want to go to the next page?

Q. Sure.

A. Correct.

Q. I'll keep going.

A. There's another page? Oh, I didn't realize that.

Q. Yeah, take your time.

A. Okay. Okay. Correct. And the last two just say that it's a duplicate.

Q. Okay. Right. So is it fair to say

Page 65

GOLDENBERG

Goldmont Realty Corp. does not -- for these -- each of these addresses -- I don't have to list all of them, but we can see it here, each address for which there's a note -- corresponding note, "Cannot do without permission of owner, reached out to them to get permission," would it be accurate to say that Goldmont Realty Corp. does not own equity in any of these properties?

A. Correct.

Q. Conversely, would it be fair to say that Goldmont Realty Corp. does own equity in all of the others?

A. No.

Q. Okay. Would it be fair to say that Goldmont Realty Corp. owns equity in some of the other buildings --

A. Yes.

Q. -- for which there's -- okay.

Now, these properties, again I'm speaking about the ones it's indicated cannot do without permission of owner, for those properties, who -- who owns them?

A. I can't tell you exact entity.

Q. Is it -- let's say primarily is it

17 (Pages 62 - 65)

Page 66

GOLDENBERG

one -- one group of investors or --

A. Yes.

Q. -- a single -- okay. Who -- who would that be?

A. The Swieca family.

Q. And that's the -- I don't know if they -- they have names, the principals of that --

A. It's a large family.

Q. Okay. So it's a family --

A. It's a fund.

Q. Is it a -- excuse me, I'm sorry?

A. It's a fund. I'm not sure of the exact name.

Q. It's a fund, okay. So the name is -- and I just want to get it for the record -- S-W-I-E-C-A; is that correct?

A. Approximately.

Q. Okay. So the Swieca family, Mr. Goldenberg, owns -- for each of these buildings, again, indicated -- I'm just going to give a few examples. 1016 President Street, 1834 -- I don't know if that's Caton Avenue -- 199 Linden, 20 -- 21 East 21st just for example,

Page 67

GOLDENBERG

to your knowledge, the Swieca family or the Swieca family's fund owns all those buildings?

A. Correct.

Q. And then in that case Goldmont -- if I understand correctly, Goldmont Realty Corp.'s role is in managing those buildings for the Swieca family?

A. Correct.

Q. The Swieca family or the Swieca family fund then pays Goldmont a fee? Is it a management fee?

A. Correct.

Q. Okay. Approximately how long has Goldmont Realty Corp. been working with the Swieca family or the Swieca family fund?

A. I think more than ten years.

Q. And does this list -- again, those identified as cannot do without permission, is that -- does that -- is that an exhaustive list of all the Swieca family properties Goldmont manages for the Swieca family?

A. I believe so. I'm not sure. I would have to compare, you know.

Q. Understood. Understood. Does

Page 68

GOLDENBERG

Goldmont Realty Corp. invest in any -- in -- maybe not in these, I think you mentioned, but in other properties with -- together with the Swieca family?

A. No.

Q. Do you personally, you, Leon Goldenberg, personally invest in any properties with the Swieca family?

A. No.

Q. Now, in your let's say ten -- approximately ten-year business relationship with the Swieca family, I'm speaking specifically about Goldmont Realty Corp.'s management of this -- the properties for the Swieca family, has the issue of intercoms that are used at those buildings ever come up?

A. Those discussions would have been with Abi.

Q. Okay. So if I understand correctly, it's possible, but you -- you personally, Leon Goldenberg, were not involved in any discussions with the Swieca family about intercoms?

A. I don't believe so. Could they have questioned me at one of the meetings,

Page 69

GOLDENBERG

possibility. I don't remember.

Q. Flipping back -- jumping back to the other properties that are listed here with the 1s that are part of the agreement, does Goldmont Realty Corp. -- is that generally one of Goldmont Realty Corp.'s responsibilities is to provide the intercoms for the buildings?

A. It's not our job to provide intercoms because the buildings all have intercoms. It's our job to look at what's new, what would be good, what would be useful, and in many cases make the decision whether to purchase or not.

Q. Understood. So just for example, if an intercom at one of the buildings breaks, is it Goldmont Realty Corp.'s responsibility to fix it?

A. Correct.

Q. Okay. So fair to say, you know, let's say servicing intercoms at the buildings is -- that's part of Goldmont's management responsibilities?

A. Servicing, not purchasing.

Q. Servicing, correct. And now with respect to the -- going back to the -- let's call them if it works for you the Swieca family

18 (Pages 66 - 69)

Page 70

GOLDENBERG

properties, is -- are intercoms not part of Goldmont's -- servicing intercoms, is that not part of Goldmont's responsibilities for the Swieca family buildings?

A. Again, servicing, not replacing.

Q. Okay. So if an intercom breaks at one of the Swieca family properties, is Goldmont's responsibility to fix it or something else?

A. Well, to get somebody to fix it. We don't --

Q. Right.

A. -- repair them ourselves.

Q. Understood. So I just want to clarify, if an intercom breaks let's say -- we can pick any of these, right. 25 Tennis Court, if the intercom goes down, is Goldmont Realty Corp. responsible for resolving that issue?

A. Yes.

Q. And is that something that you -- that Goldmont Realty Corp. let's say will interface with the Swieca family or the representatives in order to -- I don't know if -- to get approval for a specific intercom or does

Page 71

GOLDENBERG

Goldmont handle that independently without the involvement of the Swiecas?

A. It has to do with an amount. I think we're allowed either -- up to 5 or 7500 at our own discretion.

Q. Okay.

A. 5,000 or 7500. Not $5.

Q. Okay. So now just sort of zooming out a little bit for the agreement, was using GateGuard at the Swieca properties -- did that -- did that ever come up let's say internally with your discussions with Abi?

A. Yes.

Q. Okay. And what was the -- was there any concern about using GateGuard at the Swieca properties?

A. In the beginning, not.

Q. Okay.

A. It's only after Ari shut down one of our intercoms that it became a problem. Are you aware of that?

Q. Perhaps not as well as you are, so why don't you tell me.

A. He shut down one of our intercoms.

Page 72

GOLDENBERG

He has that ability.

Q. Do you know -- recall approximately when it was?

A. No.

Q. Was it before -- let's just start slow. Was it before or after this agreement was signed?

A. I would have to assume after.

Q. Okay.

A. I really can't tell you the -- you know because I don't know what you...

Q. I guess I'm a little confused, Mr. Goldenberg, because I just understood a minute ago you were suggesting -- again, I don't want to put words in your mouth, so by all means clarify afterwards, but my understanding was that you and Abi or perhaps others at Golden -- at -- and Abi Goldenberg or others at Goldmont Realty Corp. were concerned about using GateGuard at the Swieca properties and that's --

A. No. In general.

MS. MOYAL: Objection, mischaracterization. You can answer.

A. You didn't ask anything about Swieca.

Page 73

GOLDENBERG

Q. Okay. Let's -- again, I'm looking at the -- at the page -- at the exhibit in front of us, which -- and again, we've now discussed for a few minutes now that the buildings for which "Cannot do without permission of owner, reached out to them to get permission," those were all Swieca family buildings.

A. Correct.

Q. And I understood -- and again, I may have misunderstood, so I just really want to clarify with you -- that that was motivated by concerns that you had about let's say GateGuard or Mr. Teman and -- go ahead.

A. No.

Q. No, okay. So and then you alluded to again an incident when the intercom was shut down. So okay. Again, I'm not -- it's not a gotcha here, but I'm just trying to clarify the --

A. I think I got you.

Q. No, no. That's --

A. Let you know that he plays around with the intercoms.

Q. No, understood. Understood. So

19 (Pages 70 - 73)

Page 74

GOLDENBERG

the -- there was an intercom that was shut down, do you recall the property -- the address or what property it was?

A.    No.

Q.    Okay.  Do you recall when it was?

A.    Not exactly.

MS. MOYAL:  Objection, asked and answered.  Over objection you can answer.

Q.    Do you recall when it was?

A.    No.

Q.    Okay.  Now, internally -- again, you mentioned just I think a minute ago that you had discussed with Abi Goldenberg -- I would -- I think I used the term a concern, but you can use a different term -- about using GateGuard intercoms at properties owned by the Swieca family.

A.    No.

Q.    No, you didn't, okay.  So can you clarify?

A.    At this point we thought we were going ahead on all our properties and therefore we recommended for Swieca also to do it.

Q.    Okay.

Page 75

GOLDENBERG

A.    It was a substantial -- anything new we go to them.  We don't do it without asking them.  And we recommended that they do it also.

Q.    Okay.

A.    In as much time as he -- he may have denied it, but he shut down one of our intercoms and we realized that we're dealing with a person who is not working on the same plane that I would like to work.

Q.    Fair enough.  So do you recall approximately when the -- you mentioned just a second ago some let's say communications with the Swieca family about the possibility of using GateGuard?

A.    I did not have those.

Q.    Okay.  Do you know if other -- was it others at Goldmont?

A.    We went through that.  Abi --

Q.    Okay.

A.    -- spoke to them.  They may have questioned me at a meeting.  I meet with them on a fairly regular basis.  They may have questioned me about doing it.  I can't say I recall specifically because the meetings are generally

Page 76

GOLDENBERG

two to three hours.

Q.    Sure.

A.    And they question me about a lot of different things that are going on.

Q.    Sure.

A.    And I can't tell you, you know, if they asked me about GateGuard, they didn't ask me about GateGuard.  It's very possible it did come up and -- but again, I cannot verify that.

Q.    Fair enough.  So the -- other than the Swieca family and other than the properties that are listed here that my understanding is Goldmont Realty Corp. may own let's say equity in in some of them, did -- do you know if anyone at Goldmont Realty Corp. suggested -- well, you know what, scratch -- scratch all that.

Other than the Swieca family, are there any other funds or individuals or families that Goldmont Realty Corp. manages properties for?

A.    Co-ops and condos.

Q.    That's -- if I understand, those are -- those are types of properties.  I'm asking for the individual or entities or the families

Page 77

GOLDENBERG

other than the Swiecas that Goldmont Realty Corp. manages properties for.

A.    Well, we manage for co-ops and condos.  They're different entities.

Q.    Okay.  Other than the Swiecas, do you know if Goldmont -- whether yourself or any other representatives of Goldmont discussed the possibility of using GateGuard with any other ownership?

A.    With the co-ops and condos.

Q.    Okay.  Do you recall specifically which co-ops or condos Goldmont discussed GateGuard with?

A.    No.  I'm not part of those conversations.

Q.    Okay.  Who at Goldmont would be part of those conversations?

A.    It would be either Abi or possibly in conjunction with Sam, who manages or -- this -- Jonathan, who manages co-ops and condos also.

Q.    Okay.  So let's just say -- I mean, we can come at this from different points in time, but let's say after this -- the agreement was signed.  So let's -- again, we can look at

20 (Pages 74 - 77)

Page 78

GOLDENBERG

the -- it was end of August 2019 Goldmont -- the agreement was signed. That's the -- that's the date -- I'm sorry, August 30, 2019, the agreement -- you signed the agreement and then after that, I mean, was there an internal discussion let's say in Goldmont where there was a decision to hey, let's -- let's reach out to the co-op ownership or property ownership to discuss the option of installing GateGuard?

A. I can't tell you when that took place, but those conversations took place, that it was a good thing to offer to the co-ops and condos and the Swiecas.

Q. In terms of the response --

A. One last thing I'd like to clarify.

Q. Sure.

A. You have a letter there, you have a cover letter that says August 30th, I do not -- there's no date -- I don't see a date on this agreement.

Q. Yup. That's --

A. I don't know what that cover letter has to do with this agreement.

Q. Yeah. So all of that -- all that

Page 79

GOLDENBERG

is -- just to clarify again, this is an e-mail from Jacob Rubinstein, who we've -- we've discussed, and the agreement that we're looking at with your signature, that was the attachment here. So the attachment --

A. I -- I don't say it's not. I didn't send it.

Q. Understood.

A. I'm still not aware of who Jacob Rubinstein represents.

Q. Understood. I never -- I never suggested you did send it.

Let's just talk, like, logistics for half a second. I mean, I'm -- from what I can see of your desk, Mr. Goldenberg, it looks like a lot of -- a lot of paper here. Do you have a printer in your office?

A. Yes.

Q. Okay. So most -- to the extent that you review documents, do you usually print them out and review them on paper as opposed to reading them on a computer?

A. Some like this, some like that.

Q. Okay. When you sign agreements, do

Page 80

GOLDENBERG

you generally print it out from -- from your printer and then sign it with a pen?

A. When I sign an agreement, generally my attorney sends it to me and it's been reviewed.

Q. Okay.

A. And then he reviews the business points with me.

Q. Fair enough. And do you have a scanner in your office?

A. It probably is. I've never done it.

Q. Do you have a copy machine?

A. I have a -- yeah, I have a printer.

Q. Okay.

A. Probably makes copies too.

Q. Where I'm going with this is so when you -- you print out let's say an agreement like you mentioned, your attorney reviews it --

A. I don't print it out.

Q. -- he discusses -- he or she discusses it with you -- I'm sorry?

A. I don't print it out.

Q. You don't print it out. Okay.

A. No.

Page 81

GOLDENBERG

Q. But in an example of another agreement that you've signed, you receive the -- however it -- whether you print it, whether someone else prints it, an attorney prints it and provides it to you, you sign it and then do you scan it or --

A. Somebody else scans it.

Q. Someone else. Okay. So you provide the papers back.

Do you know currently where the signed copy of this agreement is?

A. No.

Q. Okay. Do you have it?

A. I? No.

Q. Okay. Just sort of generally, this is a -- you know, kind on a -- on a tangent here, but over the course of this lawsuit, and I know you've been involved in a few others, you know, part of the fun let's say is collecting documents, were you involved in collecting any documents for this case?

A. No.

Q. Okay. So you didn't collect any documents at any time in connection with this

21 (Pages 78 - 81)

Page 82

GOLDENBERG

case?

A.   The only thing that I did was to check my e-mails.

Q.   Okay.  And which e-mails -- e-mail accounts did you check?

A.   The two that you have there.

Q.   Okay.  How did you check them, just generally?

A.   I did a search.

Q.   What terms -- I'm not going to hold you to every single one, but what terms do you recall searching?

A.   I would assume Ari Teman.

Q.   Okay.  Did you search for GateGuard?

A.   Maybe.  I don't remember.

Q.   Okay.  Do you still have -- I mean, to your knowledge, do you still have most of the e-mails that you had let's say from a year ago or two ago?

A.   I don't keep them.  I mean, they're -- you know, if you do a search, they come up.

Q.   I understand that.  I'm asking perhaps differently.  Do you delete -- as a

Page 83

GOLDENBERG

matter of practice, do you delete a lot of the e-mails?

A.   Yes.

Q.   Okay.  Do you recall deleting -- since let's say this case started, do you recall deleting any e-mails relating to Mr. Teman?

A.   Even when I delete them, they still come up in a search.

Q.   Okay.  Do you recall deleting any e-mails relating to GateGuard?

A.   Not offhand.

Q.   Okay.

A.   I assume that I do.

Q.   Okay.  So it's possible --

A.   Otherwise I'd have 100,000 e-mails open on my desk.

Q.   Okay.  So it's possible -- again, I'm not -- I'm not going to hold you to it now, but it's possible you deleted e-mails relating to Mr. Teman or -- or to GateGuard?

A.   I definitely deleted e-mails relating to Mr. Teman.  I deleted e-mails relating to everything else.

Q.   Okay.

Page 84

GOLDENBERG

A.   I delete e-mails.  That's my practice.  I read it, I delete it.  You do a search, they come up.

Q.   Fair enough.  Okay.  Now, in terms of, again, the -- you mentioned -- we talked about your e-mails.  Now, again, I'm just -- just looking at your -- at your desk.  From what the -- the portion of it I can see, you've got, you know, some -- a couple of stacks of paper there that at least would appear to be stacks of paper, did you search the paper documents that you have in your office for documents relating to GateGuard or Teman or anything else --

A.   No.

Q.   -- connected to this case?

A.   No.

Q.   Okay.  Other than I guess what I can see -- I'm not going to ask you for a tour of your office now, but other than what I can see, do you have other -- other areas of your office that you have other papers, paper documents?

A.   We have a room of files.

Q.   Okay.  And are those files related to Goldmont Realty Corp.'s business?

Page 85

GOLDENBERG

A.   Yes.

Q.   Okay.  And fair to say it's possible that there are documents in there relating to GateGuard or Mr. Teman?

A.   It's a possibility.

Q.   Okay.  And you personally, if I'm understanding correctly, did not search the file room or the paper files let's say for documents relating to GateGuard or Mr. Teman?

A.   I wouldn't know where to start.

Q.   Okay.  Who would know at Goldmont Realty Corp.?  Who would know where to start?

A.   Different people.

Q.   Can you name one?

A.   Can I name one?

Q.   Yeah.

A.   Yes.  Julie, who scans everything in.

Q.   What's Julie's last name, I'm sorry?

A.   Sorry, a long Russian name.

Q.   Okay.  So Julie with a Russian name.  That's okay.  And she's -- am I understanding correctly Julie is -- one of her responsibilities is scanning paper documents?

A.   Right.

22 (Pages 82 - 85)

Page 86

GOLDENBERG

Q. Okay. And then is there a document management system that -- does Goldmont Realty Corp. maintain the scanned files on let's say a hard drive?

A. I cannot begin to tell you.

Q. Okay.

A. Not my responsibility.

Q. But if -- if you wanted to find out more, it sounds like you would -- your first call might be to Julie?

A. Yes.

Q. Okay. Other than Julie, anyone else involved in document -- maintaining documents for Goldmont Realty Corp.?

A. I think primarily her. I don't know that anybody else is responsible.

Q. Okay.

MS. MOYAL: How about we take a five, ten-minute break. Leon, do you want five, ten minutes?

THE WITNESS: I'm good any time. I mean, I wouldn't mind trying to plow through this. How long do you think this is going to take?

Page 87

GOLDENBERG

MS. MOYAL: All right. I need to take a five-minute break, so if we can just do that. I need to make a call.

THE WITNESS: So let's take a break.

MS. MOYAL: Okay.

THE VIDEOGRAPHER: Okay. Counsel, do you want to go off the record? We agree?

MR. REINITZ: Yeah. Let's -- do you want to just do it till -- I'm looking at -- it's 11:37. How's till 45? We'll be back on.

MS. MOYAL: That's fine.

THE VIDEOGRAPHER: Well, okay.

MS. MOYAL: I don't want to do the math wrong and then we're -- so let's just do 11:45 back on.

THE VIDEOGRAPHER: We're going off the record. The time is 11:37.

(A brief recess was taken.)

THE VIDEOGRAPHER: The time is 11:48. We are on the record.

MR. REINITZ: Ms. Moyal, I'm sending you another couple of exhibits.

Q. Mr. Goldenberg, I'm going to be

Page 88

GOLDENBERG

pulling up here Plaintiff's Exhibit 103. Let me know when you can see it.

A. Yeah.

Q. Take a look at it. It's also marked as -- that's Defendants' Exhibit Bates stamp at the bottom 000002.

A. Yeah.

Q. Okay. It's just one page here. Take a look at and let me know when -- when you're ready.

A. I'm ready.

Q. This is an e-mail from you, Leon Goldenberg, goldmont@aol.com, to A Goldenberg, agoldenberg@goldmontrealty.com, dated December 8, 2018, subject "Teman lawsuit."

Do you recall sending this e-mail?

A. Yes.

Q. What was the -- what prompted you to send this e-mail?

A. He wanted me -- Ari wanted us to give him information for him to obtain loans.

Q. Ari, you're referring to Mr. Teman?

A. Yes.

Q. And there's a couple of sort of brief

Page 89

GOLDENBERG

kind of thoughts I would say here. The first is, "Did we promise in the conmtract [sic] to give him info for credit."

A. Right.

Q. The contract --

A. Shoot. Sorry. It's a new phone. I'm not sure how to disconnect it. Okay.

Q. Everything all right?

A. Yes.

Q. So that -- I know I was curious about the phones before. Is that -- when did you get the phone?

A. A month.

Q. Did that replace another phone or is this a new phone?

A. That replaced the BlackBerry --

Q. Okay.

A. -- I was sorry to see go.

Q. Okay. Fair enough. Do you still have the BlackBerry?

A. I mean, the phone. It's not useful.

Q. Understood. But it's still in your possession is what --

A. Yes. It should be.

23 (Pages 86 - 89)

Page 90

GOLDENBERG

Q.   Okay.  So back to Exhibit 103, you write to Abi Goldenberg on December 8, 2019, "Did we promise in the conmtract [sic] to give him info for credit."

A.   Correct.

Q.   So the contract, is that -- to your knowledge, is that a reference to the signed agreement that we were reviewing before the break?

A.   Yes.  By now I'm aware that there's a contract.

Q.   Okay.  So at this point, again we're in December 2019, you ask Abi the contract that you, Leon Goldenberg, signed -- you're asking Abi about whether we, that's I assume a reference to Goldmont Realty Corp. --

A.   Correct.

Q.   -- is that correct?

A.   Correct.

Q.   Whether we, Goldmont Realty Corp., promise to give him -- him, is that a reference to Mr. Teman?

A.   Yes.

Q.   Or to GateGuard I guess in the

Page 91

GOLDENBERG

context of the contract?  Did we promise in the contract to give him info for credit.  So what does that -- what are you talking about there when you reference info for credit?

A.   Mr. Teman approached Abi about giving him credit information on us so that he can borrow against it when we had signed these contracts and I had no interest in doing that.

Q.   Okay.  Is that -- the arrangement as you just described it, is that something that you've done in the past --

A.   Never.

Q.   -- with others?

A.   Never, never and never will.

Q.   Okay.  And --

A.   Don't use my credit to get your credit line.

(Reporter clarification.)

A.   Don't use my credit to get your money.  Don't use my credit to get your funding.

Q.   So the info that you're referring to there, what generally did you have in mind?

A.   What he had in mind was my financial information.

Page 92

GOLDENBERG

Q.   By yours, again I want to be precise here, you mean Goldmont Realty Corp.'s?

A.   Goldmont, whatever -- yeah.  I mean, I guess he would love to get my personal credit too.

Q.   Okay.  So in this e-mail here you're suggesting that Mr. Teman -- I guess I'll rephrase that.

You're asking Abi Goldenberg whether or not Goldmont agreed in the contract, in the signed agreement --

A.   Right.

Q.   -- to give Mr. Teman Goldmont's financial information so that Mr. Teman can obtain some sort of credit?

A.   Correct.

Q.   Is that your understanding?

A.   Correct.

Q.   Okay.  Did -- without sort of zooming in on a specific piece of that, but did you generally talk about the financing aspect of this agreement with Abi Goldenberg before you signed the agreement?

A.   There was no financing.  We were

Page 93

GOLDENBERG

paying cash.

Q.   Okay.  So --

A.   Check.  Not cash-cash.

Q.   Okay.  So okay.  And then in the second line here --

A.   I take that back.  There was -- there was a schedule of payments, we gave deposits, and we paid exactly as the contract called for.  There was no -- there was nothing that -- would he finance it?  Maybe.  But not something that was brought up before we did the deal.  And I wouldn't agree to it in any case.

Q.   Okay.  Just sort of as an aside, and we'll come back to this e-mail in a second, does Goldmont -- right now, today, is Goldmont still using GateGuard intercoms?

A.   Only the ones -- there were originally four or five that were uninstalled as a trial.

Q.   Okay.

A.   After that -- we signed the contract.  After that everything fell apart.  After that he -- after we told him we're not interested in going forward, he sent us all the intercoms,

24 (Pages 90 - 93)

Page 94

GOLDENBERG

which are still sitting here in this office and have not been installed.

Q. So let's unpack that a little bit. You mentioned -- I don't want to hold you to a specific number, but let's say less than ten -- you said four or five -- less than ten intercoms, GateGuard intercoms, are currently installed or still installed let's say on Goldmont managed properties; is that accurate?

A. Yes.

Q. Okay. Do you know if Goldmont Realty Corp. is still using the intercoms?

A. Goldmont does not use the intercoms. The buildings use the intercoms.

Q. Okay. Do you know if the buildings, let's say the tenants are still using the intercoms, GateGuard intercoms, at those buildings at which they were installed?

A. I believe so.

Q. Okay. Does --

A. You have to ask Abi to know for sure.

Q. Okay. To the extent that any issues -- service issues come up for any of those GateGuard intercoms, does GateGuard provide

Page 95

GOLDENBERG

service for those intercoms to resolve --

A. I wouldn't know. I only know about the incident where there was a problem and it became obvious that he shut it down, Ari Teman shut it down, and that's what blew everything out of the water.

Q. But you don't have any -- you testified, but I'm asking again, you don't -- you don't recall when that was generally?

A. No.

MS. MOYAL: Asked and answered.

MR. REINITZ: I acknowledge that.

Q. In the -- back in Exhibit 103, you write in the second line here of your e-mail, "Is TPF mentioned in the contract." Do you know what TPF refers to?

A. I believe that that was the company that he wanted to get credit from and that he wanted to us give information to.

Q. Okay. And that was -- that's something -- again, I don't want to put words in your mouth, so I'll ask it, were you aware of that -- the involvement of that company before the agreement was signed?

Page 96

GOLDENBERG

A. No.

Q. Do you know if anyone else at Goldmont was aware --

A. No. I --

Q. -- of the --

A. I'm pretty sure the answer was that it never appeared anywhere and there was -- there was nothing in the contract about us giving out credit information.

Q. Okay. In other -- let's say in other business transactions let's say even unrelated to intercoms for a minute, does Goldmont -- is Goldmont ever hesitant to provide financial information upon request?

A. It depends what -- if we're leasing something, if we're renting something, will give information. If we're buying a service from a vendor, no, we're not giving information. If I buy a boiler, I just put in -- I just replumb buildings, I pay, there's no credit given. I lease a car, I have to give information.

Q. Understood. In the scenarios in which you just mentioned where Goldmont Realty Corp. is going to provide some financial

Page 97

GOLDENBERG

documentation, whatever that may be, who is the person or the people at Goldmont who are -- would be responsible for collecting and providing that financial documentation?

A. Saul Horowitz.

Q. Anyone else?

A. Maybe Abby Linsky.

Q. Do you know if Saul Horowitz was involved at any point in the discussions about this credit that's referenced in this e-mail?

A. No. That's my decision whether I'll give it. If I decide to give it, then I'll ask him to give it. But I make the decision who we give credit to. And the decision was no. And certainly not to anyone that was involved with Ari Teman by this time.

Q. Understood. So if I understand correctly then, you, Leon Goldenberg, would -- in a general circumstance, putting GateGuard aside for a minute, you would make a -- let's say a business decision about whether, like you said, you wanted to get involved in a particular transaction, whatever it may be, that would potentially involve financing or specifically

25 (Pages 94 - 97)

Page 98

GOLDENBERG

involved providing some kind of documentation, financials relating to Goldmont, once you made that decision, then and only then -- would it be correct to say only then would Saul Horowitz be involved in providing the documentation to the whomever it was requesting it?

A.    Correct.

MS. MOYAL:  Objection, compound.

Over objection you can answer.

Q.    In let's say the past year, how frequently have you instructed Saul Horowitz to provide any form of financial documentation for other transactions?

A.    We have refinanced buildings.  I cannot tell you how many.

Q.    I'm not asking for a number, Mr. Goldenberg.  I'm just sort of -- is it -- is this a request that you make of Mr. Horowitz frequently or infrequently would you say?

A.    Frequently enough.

Q.    Okay.  So it's -- it's fair to say -- again, I know you're not -- you're not going to speak for Mr. Horowitz, so I don't know if it's something that takes a long time for him or not,

Page 99

GOLDENBERG

but would it be fair to say that you regularly ask Mr. Horowitz to provide financial documentation for other transactions?

MS. MOYAL:  Objection, asked and answered.  I think he already said frequently enough, unless the question's different.

Q.    Mr. Goldenberg, would it -- strike that.

So in the third line here on this e-mail you ask -- I think it's a question to Abi Goldenberg -- "Did I sign personally or as Goldmont?"  Well, just you know what, let's back up here.

So this is an e-mail you sent to Abi Goldenberg.  Did Abi Goldenberg ever respond to you?

A.    Yes.

Q.    Okay.  What did he respond with respect to let's say the first question, do you recall?

A.    It's not in the contract.

Q.    So just to be very clear, in response to let's say question number one, "Did we promise

Page 100

GOLDENBERG

in the contract to give him info for credit," Abi Goldenberg sent you -- was the response by e-mail?

A.    Abi works right behind me.

Q.    Okay.

A.    On that wall.

Q.    Understood.  So is it possible that you just discussed it just in person or by phone?

A.    Correct.  Not by phone.  He just, you know, walks through my door.

Q.    He walked through the door, okay.  Is that --

A.    Or I walked through his door.  I pass his door ten times a day.

Q.    Understood.  Is -- does -- just sort of parenthetically, does Abi Goldenberg -- is he in the office at -- in Goldmont -- at in Brooklyn on a daily basis?

A.    No.

Q.    Okay.  About how frequently does Abi Goldenberg come to the office?

A.    About three days a week.

Q.    And the other days of the week that he's -- that Abi Goldenberg is working, is he

Page 101

GOLDENBERG

working from home or do you know?

A.    He's working from home, he's on the road.  You know, I don't keep track.

Q.    Understood.

A.    I don't ask him where he is.

Q.    Understood.  So in the -- in response to the first question, "Did we promise in the contract to give him info for credit," Abi Goldenberg in some fashion responded to you effectively no; is that correct?

A.    Correct.

Q.    In response to the second question, did Abi Goldenberg respond to you on that issue?

A.    Yes.

Q.    What was -- what did Abi Goldenberg respond to the question, "Is TPF mentioned in the contract?"

A.    It wasn't.

Q.    Okay.  In response to the third question -- your third question, "Did I sign personally or as Goldmont," did Abi Goldenberg respond to that one?

A.    Well, it really wasn't for him, but it was for the attorney already, and I did not

26 (Pages 98 - 101)

Page 102

GOLDENBERG

sign it personally.

Q. Okay.

A. I signed it Goldmont.

Q. Okay. And then you indicate here, "Add atty," I believe that's an abbreviation for attorney" --

A. Right.

Q. -- "to this chain."

A. Right.

Q. Without getting into the substance of what may or may not have been communicated to the attorney, who was the attorney who was added to the chain?

A. I believe it was Mr. Schonfeld. I can't tell you for sure.

Q. Just sort of generally, is that -- what was the reason you asked to add an attorney to the chain?

A. Because some of them were legal questions. Not some. I think almost all of them are legal.

(E-mail thread Bates stamped Defendants' 00017 was marked Plaintiff's Exhibit 104 for identification, as of this

Page 103

GOLDENBERG

date.)

Q. Okay. I'm going to close -- that was Exhibit -- I'm closing out Exhibit 103 and now I'm going to show you, Mr. Goldenberg, Plaintiff's Exhibit 104. It's opening up here on my end. Let me know when you can see it.

A. It's open.

Q. Great. So this is a three-page e-mail thread that begins Bates stamp -- Defendants' Bates stamp 00017. Take your time and let me know when I can flip to the next page.

A. Yeah. Okay. Okay. That's nothing. Okay.

Q. So this is an e-mail thread. I'm just triple checking here, I think they're all the same day. No, not quite. It starts here on the bottom of page 2 of Exhibit 104 Thursday, February 28, 2019, an e-mail from Ari Teman to goldmont@aol.com, that's your e-mail, correct, Mr. Goldenberg?

A. Yes.

Q. A Goldenberg, I believe that's Abi Goldenberg, Yechiel Bromberg, and Barry Schechter?

Page 104

GOLDENBERG

A. Right.

Q. Subject "Amazing updates." And then Mr. Teman -- it's a relatively brief e-mail, I'm not going to read the whole thing into the record.

A. Right.

Q. But you know, it's some updates about where he was -- what he was up to with his business.

Can you just provide some context here? What -- were you in discussions with Mr. Teman before February 28, 2019, about a potential investment in GateGuard?

A. He came to my office. I can't tell you when. I think it was the only time I met him. He had mentioned to my son that he's looking for money so that he can grow the company. And I liked his system, it was a good system, and I -- I said I would be willing to meet with him.

We met, we had a conversation for about an hour I would say and that's when I reached out to -- I can't tell in which order, but to Yechiel and to Jerry about possibly

Page 105

GOLDENBERG

getting together because I would not put a million dollars in, and maybe together, and then we can have some, you know, power on -- on valuations.

Q. What do you mean when you say you would have some power -- to have power on valuation? What do you mean by that?

A. When somebody wants an investor in a company, he has to give it a value and, you know, depending on what he thinks his business is worth, but if he needs a quarter of -- if he needs a million of dollars and you give him a quarter of a million dollars, you can negotiate, you know -- if he needs the million and you can give him the entire million, you have much more power to negotiate the valuation that he's using.

Q. Just to be clear, when you talk about negotiating a valuation, so if you're -- and take the example you just gave, if -- if you -- you put together let's say a group or you have the money yourself, you have a million dollars that the company, the entrepreneur, wants -- wants to take in as an investment, that -- when -- when you speak about providing leverage -- I'm sorry,

27 (Pages 102 - 105)

Page 106

GOLDENBERG

providing power to negotiate, the power is that the valuation would be lower, which would mean that the million dollars would represent a higher percentage of the equity in the company in that case? Is that what you mean?

A. Correct.

Q. Okay. So again, just to clarify a bit more, the idea was if you could bring together -- you would put whatever amount you would put in on your own as an investment and if you could collect some friends or whomever, some others to put in additional money and sort of bundle it, that would allow you to collectively negotiate for a larger percentage of Mr. Teman's company, is that -- is that generally accurate?

A. Yes.

Q. Okay.

A. What does this have to do with the contract?

Q. I don't know. Well, we'll find out. So the individuals -- and I know we've -- we've mentioned them briefly before, Yechiel Bromberg, other than the discussion here with GateGuard, have you made any other -- or discussed any other

Page 107

GOLDENBERG

investments let's say in the past with Mr. Bromberg?

A. Yes.

Q. Have you made any other investments with -- together with Mr. Bromberg in the past?

A. I'm not sure.

Q. So it's possible you haven't -- you've never actually invested with Mr. Bromberg?

A. Correct.

Q. Have you discussed let's say more than ten investments over the years with Mr. Bromberg?

A. No.

Q. Okay. So --

A. What does that have to do with the lawsuit?

Q. I guess we'll find out. But Mr. Bromberg -- you approached Mr. Bromberg to invest in GateGuard; is that accurate?

A. Yes.

Q. Okay. What -- what's -- generally what is Mr. Bromberg's business?

A. Insurance.

Q. Other than with respect to GateGuard,

Page 108

GOLDENBERG

let's say before you introduced Mr. Teman and GateGuard to Mr. Bromberg, had you discussed other investment opportunities with him?

A. With who?

Q. With Mr. Bromberg? With Mr. Bromberg.

A. Yes.

Q. What types of investments were those opportunities?

A. I can't tell you.

Q. I know we've discussed at length your involvement in real estate -- real estate investments, other than real estate, what other types of investments have you made let's say in the last ten years?

A. Very varied.

Q. Okay. Can you give me an example?

A. Healthcare, tech.

Q. Okay. And --

A. Restaurants.

Q. I didn't --

A. We can be here all day talking about things that have zero to do with this lawsuit. If you want to know about my life history, sit

Page 109

GOLDENBERG

down for three weeks, I'll tell you my entire life.

MS. MOYAL: All right. Let -- let him just ask the questions. We'll get out of here faster.

Q. So you -- at some point prior to February 28th you approached Mr. Bromberg, was that by phone, by e-mail? How did you reach out to Mr. Bromberg about GateGuard?

A. I wouldn't remember.

Q. How about --

A. Through my phone.

Q. Okay. So you picked up the phone, you called Mr. Bromberg. Do you -- do you speak often to Mr. Bromberg?

A. On a regular basis.

Q. Is he a neighbor of yours?

A. Friend.

Q. A friend, okay. How about Mr. Weisman? How long -- have you invested -- made any other investments with Mr. Weisman in the past?

A. Yes.

Q. Approximately how many investments

28 (Pages 106 - 109)

Page 110

GOLDENBERG

have you made together with Mr. Weisman?

A.   Several.

Q.   Are those in real estate?

A.   No.

Q.   Any of them in real estate?

A.   No.

Q.   What -- what types of investments other than real estate were they?

A.   Technology.

Q.   What is the most recent technology company you invested in with Mr. Weisman?

A.   Three, four years ago.

Q.   Do you recall the name of the company?

A.   Not offhand.

Q.   Do you recall -- other than Mr. Weisman, do you recall any other individuals involved in the company?

A.   Not offhand.

Q.   How did the -- how was -- did the investment go?  Was it a good investment?

A.   No.

Q.   Do you know if the company is still operating?

Page 111

GOLDENBERG

A.   Not.

Q.   The company is no longer operating?

A.   No.

Q.   Okay.  Other than that company that's no longer operating that you referenced, are there any other technology companies you've invested in with Mr. Weisman?

A.   I don't believe so.  There were one or two, but they were sort of the same.  I'm not sure exactly how it was divided.  But they're all gone.

Q.   And were those companies based in New York City?

A.   The offices were.  I don't really know where the companies were domiciled.

Q.   Okay.  But the -- let's say the key personnel that you met, if you met anyone, for those companies were based in New York?

A.   Correct.

Q.   Okay.  How do you know Mr. Weisman?

A.   How I do know Mr. Weisman?

Q.   Yes.

A.   I know him since before you were born.

Page 112

GOLDENBERG

Q.   Wow.

A.   The same with Mr. Bromberg.

Q.   Okay.  So fair to say they're childhood friends?

A.   Yes.

Q.   Okay.  Other than investments that Mr. Weisman has made with you, what's Mr. Weiss's business?

A.   Insurance.

Q.   Okay.  Like same type of insurance as Mr. Bromberg?

A.   I really can't tell you.  I mean, they're both in the insurance business.

Q.   Okay.  How about Barry Schechter?

A.   Barry Schechter is an accountant.

Q.   Okay.  Is he an -- also -- was he involved as a potential investor in GateGuard as well?

A.   I can't tell you.  I don't know if Yechiel brings them in.  He really brings them in for the valuation, you know, for the financials.  I believe he's his personal accountant.  Could be invest, could be not.  I really don't know.  We never got to that point.

Page 113

GOLDENBERG

Q.   Okay.  So I think you mentioned, but I want to just clarify, before February 28th, in other words before the -- this correspondence here, had you met with Mr. Teman together with Mr. Bromberg and Mr. Weisman?

A.   No.  There was one meeting and he's -- you know, they're trying to set up the meeting, so I assume the meeting took place after.

Q.   Okay.  So whenever it was, there's -- shortly -- well, at some point after this e-mail exchange there was a meeting between Mr. Teman -- were you there at the meeting --

A.   Yes.

Q.   Okay.  Who else was there?

A.   I believe Abi was there.  It was in Mr. Weisman's office.  Yechiel was there and it could be this Eli was there.  He brought him in.  Yechiel brought him in.

Q.   And just -- and I'm sorry for jumping around here, but in the other investments that you've made in the past in other technology companies, approximately -- you talked about the valuation, approximately what percentage of those

29 (Pages 110 - 113)

Page 114

GOLDENBERG

companies were you acquiring with the investments that you made?

A. Small percents.

Q. Okay. Before the meeting actually took place, other than these e-mails, were there -- was there a phone call among you and any of these other individuals: Mr. Weisman, Mr. Bromberg, Mr. Schechter?

A. I don't believe I spoke to Mr. Schechter about it. I definitely spoke to Jerry about it and to Yechiel.

Q. So Yechiel writes -- again -- "We are trying to put together a group so that Leon has negotiating power with this guy."

A. Correct?

Q. Is it fair to say that again at this point, February 28th, this is before the meeting, you were interested in possibly investing in GateGuard?

A. Correct.

Q. Okay. And you were interested enough to at least try to corral some of your friends to invest in GateGuard as well?

A. Interested enough to hear more about

Page 115

GOLDENBERG

GateGuard, interested enough to hear more about the numbers of GateGuard, which he never produced, interested enough to hear what he wants for it, interested enough to find out more information. Not interested enough to invest. I think that's critical. I was not ready to make a commitment. And again, what does this have to do with your lawsuit? I take it you don't have to answer questions, you just have to ask them.

Q. Not today.

A. I will get my point across the bottom line is -- the bottom line is there was one meeting and one meeting only. It had nothing to do with this lawsuit. It was one meeting and he never produced what he was supposed to and therefore it went to hell. And then he wrote an e-mail, which I guarantee you're not going to show me --

MS. MOYAL: No, no, no. We'll get to that. Don't worry, Leon, we'll get to all of that.

Q. Understood. For what it's worth, Mr. Goldenberg, it is relevant to the lawsuit, but we don't -- you are correct --

Page 116

GOLDENBERG

A. But you don't know how.

Q. You are -- I was going to say --

MS. MOYAL: Let him ask questions.

Q. You are correct inasmuch as I'm -- my job is to ask the questions today.

A. Your job is to fish.

Q. Okay. So Mr. Weisman and Mr. Bromberg and yourself are discussing here putting together a group so that Leon has negotiating power with this guy. Did you have a -- you know, sort of an idea of what the -- what percentage roughly of the -- of GateGuard -- the million-dollar -- potential million-dollar investment would correspond to?

A. No.

Q. Was that -- did Mr. Weisman or Mr. Bromberg or anyone else involved in the discussions make any suggestions along those lines about the percentage of GateGuard that that would -- an investment would correspond to?

A. No. Because we didn't have the information of what he thought he could make not just based on I'm going to make a billion dollars. We didn't have that information.

Page 117

GOLDENBERG

That's what we asked him for at that meeting, give us some really concrete numbers how you're getting to it, which never came, okay.

And at that meeting, let me be very clear, no commitment was made by anybody to Mr. Teman that we're going to invest with him. Absolutely no commitment was made. The commitment was made give us real numbers and then we'll meet again. I want to get on the record what I want.

Q. Understood. And -- and you --

A. Whether you like it or my attorney likes it, I really don't care.

Q. You've -- you've done that in spades, Mr. Goldenberg, I can assure you. The only thing I'll ask, and this is for more the videographer, who I think is -- when you lean forward real close to the camera, it -- I mean, your --

A. I want to get my message across.

Q. -- your hairline -- I have to say, Mr. Goldenberg, I -- I wish my hairline -- I had a hairline like yours, but that's all we can see. So with that said, if you don't mind, just keep -- keep yourself in that position and

30 (Pages 114 - 117)

Page 118

GOLDENBERG

you'll -- the video will look even better.

So next, the same day -- so Jerry says we're trying to -- I'm sorry. Mr. Bromberg writes to the group here, and that's Mr. Weisman, that's yourself, and that's Mr. Schechter, we're trying to put together a group so Leon has negotiating power and then there's a sort of a general question here from Mr. Weisman, "What is this about?"

A. Right.

Q. And then Mr. Bromberg responds, "This is the system I mentioned to you the other day." And he continues here, "The basic system Leon or his son Abi can give you a full description since they have it on some of their buildings and just ordered it for the rest of their properties."

Is that -- well, I'll ask it like this: is -- did you discuss with -- just let's say with Mr. Bromberg your use of GateGuard as -- on your properties, on Goldmont Realty Corp.'s properties?

A. Did Mr. Bromberg bring Jerry into the conversation? I can't tell you. It would seem from this that he did. I know Jerry and I've

Page 119

GOLDENBERG

done deals with Jerry, so maybe I did reach out to him, maybe Yechiel reached out to him. I really can't tell you. Maybe I suggested in the conversation with Yechiel to reach -- I really don't remember how it went.

Q. Understood. What I'm asking, Mr. Goldenberg, specifically is before these e-mails, did you have a -- let's say a one-on-one or a phone call or a conversation with Mr. Bromberg just generally about Goldmont Realty Corp.'s use of GateGuard intercoms on its properties?

A. It would seem obviously I did. And I'd assume I did and this just didn't wake up out of thin air, this e-mail.

Q. So in those discussions with Mr. Bromberg, again prior to this e-mail, is it fair to say you were generally positive about your experiences with GateGuard's intercoms at that time?

A. Yes. I would not have signed up all the buildings if I wasn't excited about it. Until I found out that he can control it from his place and cut me off when he wants, cut off my

Page 120

GOLDENBERG

buildings from my -- my tenants from being able to get in. And until he sent me nasty e-mails about threats.

Q. Okay. So and again, you just --

A. You weren't going to ask me about those, were you?

Q. No, I'll be happy -- I'll be happy to. You're begging me to, aren't you? I was trying to, you know, keep --

A. You're trying to avoid the e-mails you don't like.

Q. -- it to the good times, right. Say that again, I'm sorry.

A. You're trying to avoid the e-mails you don't like.

Q. I don't know about that.

So again, you just testified, Mr. Goldenberg, you gave some sort of let's say review or gave some feedback initially to Mr. Bromberg about your experiences with GateGuard intercoms at the time, again --

MS. MOYAL: Objection. He said "I assume I did."

MR. REINITZ: Okay.

Page 121

GOLDENBERG

Q. You assume that you did as -- as memorialized in Mr. Bromberg's e-mail, you have no -- you have no reason to believe you didn't -- that Mr. Bromberg is memorializing this incorrectly or falsely, it's fair to assume you did -- you did provide him feedback regarding your experience with GateGuard?

MS. MOYAL: Objection. Just mischaracterization. He just said, "I assume I spoke to Bromberg." That was the extent of his testimony.

MR. REINITZ: That's fine. Thank you.

Q. Fair to say, Mr. Goldenberg, prior to February 28th Goldmont Realty Corp. had ordered GateGuard intercoms for all of its buildings?

A. It says that here so I -- you know, you have -- you have the contract. Do you have a date on the contract? You know, you're asking me to place things in order. I can't tell you that.

Q. Understood. So you alluded to it, and again, I know you're dying to talk about it so we can, after this meeting, you're correct there were some angry e-mails, I can probably

31 (Pages 118 - 121)

Page 122

GOLDENBERG

pull them up, I didn't -- you are correct I didn't mark them for discussion today.

A. Interesting.

Q. But yeah, so there were -- there were some -- there was some let's say heated exchange between -- well, certainly coming from Mr. --

A. Heated on one side.

Q. Right. Understood. Understood. And I don't dispute that. And then after that, so after that -- let's say that sequence of correspondence that you mentioned that Mr. Teman certainly expressed through e-mail his being upset about the investment or the potential investment, were there any further subsequent discussions at any point in time after that between you and Mr. Teman about potential investment?

A. I don't believe so. I think once I got those e-mails, I was completely turned off. I was not going to invest with somebody -- I hate to use the word, but did not seem stable and -- and I -- I don't believe that after that I ever spoke to him again. I even stopped communicating with him with e-mails. I stopped responding to

Page 123

GOLDENBERG

his e-mails. I just wasn't interested in -- in being told a lie.

And it was clearly a lie because nobody told him, nobody gave him the feeling that we're ready to sign on the dotted line. Two major issues were how much money do you need to get to ABC and what is ABC and what kind of a valuation it will be. And those two things were not clarified at the first meeting and then never clarified at the first meeting.

Although most people come with proper projections right away, he didn't. He just said I can do, you know, 10,000 buildings, buh, buh, buh, buh, buh, buh, and I'll make a million -- a billion dollars and that's it. There were no real numbers of how he got to everything and how he makes money. And that's what we asked him for and that's how we left the meeting.

Nobody -- I shook his hand goodbye, but nobody shook hands we got a deal. Nobody indicated we had a deal. This was in his mind. He walked out of that meeting these guys have a million dollars, I can probably get another million out of them if I need it, let's get

Page 124

GOLDENBERG

moving, let's do this, boom. And that didn't happen.

And I highly doubt that Yechiel Bromberg told him outside, Yeah, you got a deal. I know Yechiel for over 50 years. He doesn't talk like that. Very thought-out person. But it was a huge turnoff to me.

Q. Fair enough. So again, to the best of your recollection then, after -- again, there was the -- the e-mails that we're looking at now, I think we all can agree there was a meeting let's say, you know, among the group here plus Mr. Teman and Abi and I think one or two others at which Mr. Teman let's say pitched -- you know, he pitched the investment to the group, there was a -- again, certainly one, I don't know if there were more than one, certainly an angry e-mail from Mr. Teman back to the group expressing his frustration or his disappointment that you alluded to, and then after that my question, Mr. Goldenberg, is after that angry exchange, were there any -- did you ever have any further discussions with Mr. Teman about a potential investment in GateGuard?

Page 125

GOLDENBERG

A. No.

MS. MOYAL: Asked and answered. You don't have to reanswer that. That was already asked and answered.

MR. REINITZ: Ms. Moyal, for what it's worth, I mean, asked and answered is an objection, I don't -- I don't know if that's a basis not to answer.

MS. MOYAL: Well, you're asking the same question three times over sometimes so --

A. I will answer.

MS. MOYAL: -- I would like to just make my objection.

A. I never spoke to him again. I don't believe I ever spoke to him again, period. I certainly was not going to invest with him.

MR. REINITZ: Ms. Moyal --

A. And I never gave him the indication that I would.

Q. Understood.

MR. REINITZ: Ms. Moyal, you can make the objections as far as I'm concerned all day, just don't instruct -- as far as I'm

32 (Pages 122 - 125)

Page 126

GOLDENBERG

concerned, just don't instruct the witness not to answer.

MS. MOYAL: That's why I made the objection.

MR. REINITZ: Okay.

Q. So this is again let's say February going into March 2019, Mr. Goldenberg, and however -- again, I don't -- I don't have the exact dates in front of me, but the -- you know, there was the meeting with the group between the group that's Mr. Weisman, Mr. Bromberg, yourself, some others, and Mr. Teman, then like you mentioned, there was a -- an angry e-mail Mr. Teman sent shortly thereafter, I can look it up, but I don't -- probably sometime in March 2019, and then fast forward, when was the next time that Goldmont -- putting aside the investment, when was the next time Goldmont discussed let's say internally doing any sort of business with GateGuard?

A. As far as doing business?

Q. Yeah. I'm not talking about investment, but doing other business.

A. I'm not sure. I'm not sure of

Page 127

GOLDENBERG

timeline.

Q. Okay.

A. It seems that I signed the contract on all my buildings before that, but I'm really sure of the timeline.

Q. I'm happy to bring it up again and I -- you don't ever -- you should never take my word for anything, right, but --

A. No, there's no dates. There's no date on the contract so I can't tell you.

Q. Understood. The e-mail though that we -- from Jacob Rubinstein --

A. Right.

Q. -- was dated -- and I'll show you again, that was dated August -- I don't want to tell you wrong either, but I can show it to you here, August 30th I want to say 2019.

A. Right. But that doesn't tell me anything.

Q. Okay. So and we can put that -- it's August 30th, I just checked. Do you want to see it again?

A. No.

Q. Okay. August 30, 2019.

Page 128

GOLDENBERG

A. Doesn't mean anything. He sent the contract at that date. Doesn't mean I signed it at that date. Doesn't mean anything.

Q. Fair enough.

A. And I'm not even sure who he is or who he represents.

Q. Fair enough. So between -- let's make it simple -- April 1, 2019, and August -- and September 1, 2019, do you recall having any conversations with Mr. Teman about anything?

A. As I said before, after that e-mail I may have spoken to him once because he was bothering Abi. I really did not want to speak to him. And I think there was one more conversation where he went again off the handle and I said goodbye. And I think if there was, there was one more conversation, very brief, I have -- I had no interest anymore in doing any investment with him. Done.

Q. Okay.

A. I want to be very clear. Done. It was not going to happen.

Q. You've made that clear, Mr. Goldenberg, I appreciate that.

Page 129

GOLDENBERG

The -- so now let's go backwards. So -- so your -- well, let's just clarify this one point. So it's your testimony right now that to your recollection after this last let's say exchange, you know, sequence of your exchanges with Mr. Teman in which yes, he got angry, you didn't -- you don't recall ever speaking to him again?

A. For some reason I think there was one more conversation because he was really on -- you know, hocking on Abi that I should talk to him. I did not want to talk to him. I think there might have been one more conversation, but it was very brief and it didn't go too well.

Q. Understood. Now, what about -- let's go backwards. Before this let's say the setting up this meeting and then having the meeting with Jerry Weisman and Yechiel Bromberg and the others, had you met with Mr. Teman before let's say March 1, 2019, about potential investment before involving Mr. Weisman?

A. I told you there was one meeting with him. He was here in my office. First I think we spoke on the phone, then he came to the office,

33 (Pages 126 - 129)

Page 130

GOLDENBERG

and that's when he brought up -- and I really didn't react to -- to the investment at that point. Then he was asking Abi, you know, would your father invest, would your father invest, and I said maybe.

Q. Did it ever come up in any of the let's say meetings about potential investment that you had or the discussions, the calls, or the meetings with GateGuard about potential investment -- did the -- did the idea that you would invest in GateGuard and Abi would, quote, sign the checks -- did that ever come up?

A. What does that mean?

Q. I don't know. What I can tell you is that it was -- the term was -- that Abi signs the checks was referenced in some -- let's say chats between Abi and Mr. Teman. So I'm asking --

A. I don't know --

Q. -- if that was ever something that came up in your discussions with Abi.

A. I don't know what that means.

Q. Okay. Does -- have you made any other investments in other companies in which by virtue of your investment you have authority --

Page 131

GOLDENBERG

you have let's say the sole authority to control the financials of the company, let's say signing the checks or writing the checks?

A. Outside of real estate?

Q. Let's say inside real estate for a second.

A. Oh, inside real estate I sign all the checks.

Q. Do you -- have you invested in any entities in which you are not let's say the -- let's say the majority owner on which you, quote, sign the checks?

A. I can't tell you for sure, but I can tell you for sure that I've asked for that at a number of times.

Q. When you ask for that in a negotiation, what does that -- what does that mean?

A. That's giving me more control.

Q. So just for -- and just to put round numbers on it, not -- they may be totally off, but for example if you're negotiating let's say to acquire -- make a million-dollar investment, you're going to acquire 25 percent, let's say a

Page 132

GOLDENBERG

quarter of the equity in a company --

A. Yes.

Q. -- and you ask -- you're asking for the authority to sign -- quote, sign the checks, that you -- you view that as sort of an additional level of control over the company --

A. Correct.

Q. -- than -- than the minority ownership. Okay.

And is that -- that general type of arrangement something that you have in place with other entities right now?

A. Mostly in real estate.

Q. Okay. So let's say real estate properties in which you own a minority share but in which you or the entity that you control, quote, signs the checks for those entities.

A. Correct.

Q. And that was -- that specific term is something that you negotiated for?

A. Hold on a second. My -- I don't know why somebody's calling my conference line. Sorry. Go ahead. Do you want to repeat that?

Q. Sure. So the ability -- we're

Page 133

GOLDENBERG

talking about the ability to, quote, sign the checks for an investment, a company that you're investing in, was that -- that term -- you mentioned you've used it in real estate deals in the past, you have the authority to sign the checks for buildings or for properties in which you're a minority owner; is that correct?

MS. MOYAL: Objection to form. Over objection you can answer.

Q. Mr. Goldenberg?

A. Yes.

Q. You testified, if I understood correctly a minute ago, that you have the -- you have negotiated successfully to be able to, quote, sign the checks in certain real estate deals that you've done?

A. Yes.

Q. Have you ever negotiated for the same term in non-real estate deals?

A. I probably have.

Q. Have you ever -- do you ever recall that -- the same -- or a comparable term coming up in your negotiations with GateGuard?

A. No. It didn't reach that level.

34 (Pages 130 - 133)

Page 134

GOLDENBERG

Q.    Okay.  So as far as --

A.    Once you're ready to make an investment and you agree on -- on the valuation of the building, then there's a bunch of other things that get agreed to.  We didn't get close.  We didn't get close to an agreement.  In his mind the minute he sat down with us the check was written.  Forget about that he -- there was a meeting.  The minute he sat down he was -- he thought the check was written.

Q.    And the -- do you know if anyone else involved in any of the meetings -- and that would be let's say Abi Goldenberg or Yechiel Bromberg or anyone else, Mr. Weisman -- if anyone else proposed the signing the checks term or that option in any of the discussions at any point?

A.    As far as I know, we only had that one discussion.  I don't know that anybody met with him any other time.

Q.    Okay.  In any of the meetings let's say that you were present at, you don't ever recall the term -- having someone else other than Mr. Teman having the authority to sign the checks, that was not something you recall ever

Page 135

GOLDENBERG

coming up?

A.    Possibility maybe my son and I discussed it.  I don't remember discussing it.

Q.    Okay.

A.    I don't think that we were at that point, at that level.

Q.    Understood.  In the context of these discussions, other than the valuation which you mentioned, obviously the dollars and the projections that you were asking for, was there any discussion of what the potential let's say -- what you thought of maybe at the time as a potential investment?  Was there any discussion of what that would be used for?

MS. MOYAL:  Objection to form.  You can answer.

A.    Can I answer?

Q.    Yeah, but I'll rephrase it if it's helpful.

In any of your discussions other than the -- let's say the dollar amounts, was there any discussion of what GateGuard would use the investment money for?

MS. MOYAL:  With who?  Discussions

Page 136

GOLDENBERG

during meetings?

Q.    Were there discussions during any of the meetings?

A.    Yes.  I don't remember offhand now.  Some was to buy equipment, some was to, you know, get out more social media advertising, possibly, you know, hire people.  The idea was to get out -- to get into 10,000 buildings as quickly as possible.

Q.    Were you -- were you -- were those discussions primarily let's say Mr. Teman making -- sort of telling you what he was going to do with the investment money or were -- was anyone involved -- any of the potential investors involved making suggestions to him about what he should do with the money?

A.    I don't think we suggested.  I think he was telling us what he was going to do.  Did we discuss it?  Does this make sense, that, that could be, but I don't think that we told him to buy more equipment or we told him to, you know -- you know, to advertise more.  I don't think we -- that was a discussion.

Q.    So you have the meetings about the

Page 137

GOLDENBERG

investment -- one or more meetings about the investment, maybe some calls as well.

A.    Well, maybe I had two right.

Q.    Understood.  Did you and -- let's say you and Abi Goldenberg ever discuss the potential investment separately?  In other words, outside of the context of those meetings?

A.    Yes.  That's how we got to it.

Q.    Okay.  And during those discussions that you had with Abi Goldenberg, was the investment -- who -- who was under discussion to be making the investment?  Was it you personally, was it Goldmont Realty Corp., or was it another entity?

A.    That didn't come up for discussion.

Q.    Okay.  In any of the discussions that you had with let's say Abi Goldenberg about this potential investment in GateGuard, did any of those discussions involve a potential role that Abi Goldenberg would play going forward in GateGuard if the investment was made?

A.    I don't remember now.  It's a possibility something was, but I don't remember.

Q.    At any point -- putting GateGuard

35 (Pages 134 - 137)

Page 138

GOLDENBERG

aside, has Abi Goldenberg ever discussed other investment opportunities with you outside of the real estate business?

A.   Not sure.

Q.   Putting GateGuard aside and the potential --

A.   Yes.  I take it back.  Yes.  There have been, yes.

Q.   Okay.  And are those investment opportunities that let's say Abi Goldenberg has identified and then brought to you to discuss?

A.   Yes.

Q.   Approximately when was the last time you've discussed a nonreal estate investment with Abi Goldenberg?

A.   The last few months.

Q.   Okay.  What type of company or investment opportunity was that?

A.   A crane company.

Q.   Okay.  Did you go forward in making the investment in the crane company?

A.   No.  You have all day, you're getting paid.  I really don't.  So I'd like to know where you're going with things.  Try to stay on track.

Page 139

GOLDENBERG

I know it's not my job to tell you, but I really would appreciate it.  I really don't want to spend here till 5:00.

Q.   I will do my best to accommodate -- accommodate that, but --

A.   You're going off tangent.  Crane -- crane companies and this.  What for?  Are you trying to annoy me?  You're succeeding.

MS. MOYAL:  Okay.  All right, Leon.

A.   You're succeeding.  Let me tell you.

MS. MOYAL:  Let him ask the questions and we'll be out of here faster.

A.   And that's not good to have a hostile witness, and you know that.

Q.   I can assure you --

A.   But you're getting me to the point of being hostile.

MS. MOYAL:  Leon, do you want to take a break or do you want to continue?

THE WITNESS:  No.  No.  I want to rant now.

MS. MOYAL:  All right.  So let him -- let him ask the questions.  We'll get out of here.

Page 140

GOLDENBERG

Q.   I can assure you I'm trying to do many things, but none of them are to annoy you, Mr. Goldenberg.

A.   But you're -- you're doing it by just going off on complete --

MS. MOYAL:  Leon.

A.   This tangent you're -- that you're sitting on for the last half hour about the business has zero to do with your lawsuit.  Zero.  All you're doing is making out your client --

MS. MOYAL:  All right.

A.   -- cleared.

MS. MOYAL:  Leon, let's try to get this moving, all right.

Q.   Going back to your discussions with Abi Goldenberg about potential investment in GateGuard, other than GateGuard has Abi Goldenberg ever expressed to you an interest in getting involved in other businesses outside of your Goldmont Realty Corp.?

A.   Yes.

Q.   Was that part of any of the discussions that you had with him about a potential investment in GateGuard?

Page 141

GOLDENBERG

A.   You mean -- when you say getting involved, what does that mean?  Investing or going to work?  What do you -- let's be specific what you're asking.

Q.   Sure.  Was -- okay.  Fair enough.  Was any of your discussions with Abi Goldenberg about investment in GateGuard -- did any of those discussions involve -- involve a discussion of Abi Goldenberg also investing in GateGuard?

A.   Would he invest alongside of me?

Q.   Yes.

A.   My entire family invests alongside of me.

MS. MOYAL:  He's asking specifically in this case.

A.   We didn't discuss it.

MS. MOYAL:  Am I right?

A.   So let me explain to you how it works.  I go see a business, I meet about a business, I decide that it's worthwhile pursuing, I decide it's worthwhile investing in, and then I determine who, how, what, when, and where the investment is made.  I don't think about who's putting in the money until I'm ready to sign on

36 (Pages 138 - 141)

Page 142

GOLDENBERG

the dotted line.

Q.    Understood.  So in your -- going back just about a minute, Abi Goldenberg, if I understand correctly, has at times discussed let's say interests beyond Goldmont Realty Corp.? Interest -- interest in getting involved in businesses, I'm sorry, beyond Goldmont Realty Corp.; is that accurate?

A.    Correct.

Q.    At any point in time has -- have any of those discussions involved you making a potential investment in a business that would, you know, be a part of -- or be a -- facilitate Abi Goldenberg's involvement in such -- in the business?

A.    When you say involvement, leaving Goldmont, going there?

Q.    That I suppose is --

MS. MOYAL:  Is that --

Q.    That I suppose is between you and -- and Abi Goldenberg.

A.    Right.

Q.    But I meant more in I would say generally Abi Goldenberg taking an active role,

Page 143

GOLDENBERG

day-to-day role in another company outside of Goldmont Realty Corp.  Perhaps continuing his responsibilities at Goldmont Realty and broadening his horizons let's say with experiences working for another company as well.

MS. MOYAL:  Objection to form.  Over objection you can answer.

A.    We've had many discussions.  I can't tell you offhand.  Different businesses.  I sit on the boards of innumerous businesses.

Q.    Understood.  So at any point in your discussions with Abi Goldenberg about GateGuard -- at any point in time did Abi Goldenberg mention let's just say an interest in potentially being involved -- potentially taking an active role in GateGuard's operations let's say?

A.    I cannot tell you for sure.  I talk to him when he's here ten times a day, when he's not here five times a day.  We have multiple conversations about multiple different things. We discuss everything.  We're very close.  We discuss everything.  So I can't tell you whether he was -- did it come up?  Maybe.  I don't

Page 144

GOLDENBERG

remember.  I just don't remember.  Maybe it did.

Q.    Understood.  In any of your meetings with Mr. Teman, putting aside the investment negotiation or discussion let's say, the investment discussions that took place, were there any discussions with -- in any of your meetings with Mr. Teman about Goldmont's practices when it comes to paying their vendors?

A.    First, let's be clear, I believe I only met with him twice, when he came to my office and when we had the meeting at Jerry's office.  I believe I only had two or three conversations with him outside of that, okay. One was when he came to my office -- I think even before -- before we started doing business I might have gotten on the phone with him and one after.  That's the extent of my conversations.

Did I tell him they pay my bills promptly?  I probably did.  It's part of my sales pitch if you want to do business with me.  And I do pay my bills promptly.

Q.    And by you, I just want to be very clear, Mr. Goldenberg, you're referring to -- that's Goldmont Realty Corp.?

Page 145

GOLDENBERG

A.    Well, it's not Goldmont's bills. Each building is a different entity.

Q.    Okay.  So for the entities -- for each of the entities on -- you know, let me back up here.

Goldmont Realty Corp. manages -- you said I think it was 80 to 100 -- approximately 80 to 100 buildings?

A.    Correct.

Q.    Roughly fair to say that each -- each of those buildings is let's say formally owned by its own entity that corresponds to a building, an LLC or something?

A.    For the most part.  There are some entities that own two or three properties.

Q.    Okay.  So then the payments that you're referring to, is that -- if Goldmont manages a building for the, you know, whatever it is, XYZ LLC, is -- and there's a bill to pay on that building, is -- is Goldmont Realty Corp. making the payment or is that -- the XYZ entity is making the payment, which is initiated -- Goldmont Realty Corp. was making it for the entity?

37 (Pages 142 - 145)

Page 146

GOLDENBERG

A. Right. Correct.

Q. I'm sorry, is it the latter?

A. Each individual entity has its own checking account and -- and Goldmont in essence says write the checks. But we write -- you know, Goldmont writes the checks.

Q. Okay. So again, XYZ LLC owns, you know, a property, you know, on wherever, on Coney Island Avenue in Brooklyn and Goldmont --

A. How did you know that?

Q. -- and Goldmont's managing it -- I'm sorry?

A. That's exactly the ownership of the building on Coney Island.

Q. There you go. Wow. All right. So Goldmont's managing -- Goldmont Realty Corp. manages the building and when there's a bill that needs to be, paid Goldmont Realty Corp. is essentially, or maybe actually, writing a check drawn on the account of XYZ LLC, but it's Goldmont who's actually making that -- that check, you know, making that payment happen?

A. Correct.

Q. Is that correct? Okay.

Page 147

GOLDENBERG

And so you just mentioned a minute ago, Mr. Goldenberg, that your practice or Goldmont Realty Corp.'s practice is to pay all of its vendors promptly; is that correct?

A. Correct.

Q. Okay. Do you recall any discussions with Mr. Teman about that practice, about your practice of paying vendors promptly?

A. No.

Q. Okay. Did you ever discuss with Mr. Teman what -- what would happen if the ownership of the building changed, whether or not he would be -- he could still expect to get paid?

A. No, I didn't have that conversation.

Q. Did you ever discuss with Mr. Teman what happens to vendors once the building is refinanced?

A. No.

Q. Have -- just sort of generally, has let's say Goldmont Realty Corp. ever had any issues with any disputes with its vendors in terms of payment?

A. None. What do you say to that? This is the first one.

Page 148

GOLDENBERG

Q. Fair enough. So fair to say --

A. Imagine I'm in business for 40 years and I've never been with a vendor -- been tied up with a vendor in court until now? What do you say to that, Mr. Ariel? 40 years in business. My first lawsuit. I'm a very reasonable guy. You could talk to me. You could deal with me. You don't have to land up in court with me. When you're rational. This is my first -- I want to repeat that.

MS. MOYAL: It's on the record.

A. My first -- on the record, first time in court with a vendor.

Q. Have you -- other than vendors, have you been in court with -- on any other -- for anyone else on any other lawsuits?

A. Trip and fall.

MS. MOYAL: Objection. You can answer over objection.

A. Only trip and falls, you know, buildings where people fell. I don't -- did I -- was I ever part of any other lawsuit? Possibility. Not with a vendor. I'm in business too many years to remember everything I've been

Page 149

GOLDENBERG

through. But I am not in court.

Q. So other than vendors -- well, I should say you mentioned you've never been in court with a vendor, you mentioned --

A. I've had buildings that burnt down and I paid my vendors in full.

Q. Okay. Understood. Other than vendors -- well, I should say -- let's --

A. I've had buildings where every partner but me walked away and I paid the vendors in full.

Q. Understood. So other than vendors and other than slip and fall accidents that you mentioned, any other lawsuits that you -- that Goldmont Realty Corp. let's say has been involved in in the last ten years?

A. Not offhand, no.

Q. Okay. And any other sort of disputes --

A. When I say slip and falls, sometimes they're real accidents. I don't, you know --

Q. Understood. Premises liability. I understand. I understand. I mean, owning property, I get that. That kind of stuff

38 (Pages 146 - 149)

Page 150

GOLDENBERG

happens. I understand that.

So other than -- than those types of lawsuits, you don't -- you don't recall offhand any -- any claims against Goldmont for -- from vendors or from anyone else that they weren't being paid?

A. No.

Q. Okay.

MS. MOYAL: Did you answer that, Leon?

THE WITNESS: Are you asking me a question? I think I answered that.

MS. MOYAL: Okay. So how about we stop here, it is 1 p.m., for lunch and Mincha.

MR. REINITZ: Can I --

Q. I just have one more exhibit I'll show you real quick and then we'll break.

MS. MOYAL: Are you okay with that, Leon?

THE WITNESS: Yes.

MR. REINITZ: Okay. It shouldn't take long.

(Settlement agreement was marked

Page 151

GOLDENBERG

Plaintiff's Exhibit 110 for identification, as of this date.)

Q. Mr. Goldenberg, let me when you can see Plaintiff's Exhibit 110.

A. (Reading document.) Yes. Okay.

MS. MOYAL: What exhibit is this?

MR. REINITZ: This is Exhibit 110.

A. Yes. Do you have a question about it?

Q. If you want -- I'm not going to ask you to read this whole -- it's about 24 pages. I just want to -- I'll flip through it and I'll give you time to read it later.

A. Right.

Q. I just want to know if -- this is a negotiated settlement agreement and I'm going to ask you whether this is your signature here on page 18.

A. Yes.

(September 11, 2019, document was marked Plaintiff's Exhibit 111 for identification, as of this date.)

Q. Okay. I'm also going to show you here Plaintiff's -- very quickly, as I know you

Page 152

GOLDENBERG

got to run, this is Plaintiff's Exhibit No. 111. Let me know when you can see it.

A. No, it's in --

Q. I know.

A. It's not on a full page. It's the same thing, no?

Q. Can you see it?

A. Yes.

Q. And I'm going to flip through it here. Again, I'll let you read it.

A. It's the same thing.

Q. We'll, this is a different case.

A. Oh, it's a different case? Okay.

Q. I just want to confirm again, you can --

A. Yeah.

Q. Whether that's your signature --

A. Yeah.

Q. -- on page --

A. I didn't realize it's the same attorney. Okay.

Q. Okay. You want to take a break now?

A. You can question me on it.

Q. Oh. Okay. So let's start with this

Page 153

GOLDENBERG

one. So this one is -- this document is dated September 11, 2019.

A. Right.

Q. Do you know anything about this case --

A. Yes.

Q. -- Gregorio Romero vs. Goldmont Realty Corp.?

A. Yes.

Q. What do you know about the case?

A. He was a porter that we fired and there was a little kink in the law that basically he can say -- and both of them, the other guy also, said they worked 70 hours a week, in other words 30 hours of overtime, and they do not have to prove it. And this is basically like a trip and fall. You go to court, eventually you make a settlement.

He was fired for cause. The other super was fired for cause. He -- he took care of -- of a 16-unit building and he said he worked 70 hours a week. And now we put time clocks into the buildings because -- I don't know if you know, but to manage a -- to be a super of a 16-

Veritext Legal Solutions

212-279-9424          www.veritext.com          212-490-3430

Page 154

GOLDENBERG

unit building doesn't take 70 hours a week. But the -- this is -- you know, you have -- same thing like -- like trip and falls, you have these lawyers that, you know, find these supers and just start lawsuits.

Q. Okay. So these two cases, fair to say your understanding is they're more or less same general issue like you mentioned, they were supers that were working for Goldmont Realty's buildings?

A. Well, they -- buildings, right.

Q. And then they were -- the supers claimed -- you just disputed it, so I recognize that, but the supers claimed they were not paid properly and ultimately Goldmont Realty entered into a settlement. Without -- and again, I recognize you didn't -- there was no admission of -- of fault, but there was a settlement -- do you know if there was a settlement paid to both of the supers in these two cases?

A. Yes.

Q. Do you recall approximately the amount? I'm not -- this is not --

A. No. No.

Page 155

GOLDENBERG

Q. I'm not playing a game here.

A. No.

Q. You can take a look at here.

A. No. I didn't deal with it.

Q. Okay. But you did sign the --

A. Well, I'm the -- I am Goldmont Realty, so I have to sign.

Q. Okay. So in his --

A. This one is not my building. And this one, his lawsuit went back to prior to our ownership.

Q. Okay. This --

A. Okay.

Q. -- is 612 Ocean Avenue Partners?

A. Yeah.

Q. So you don't -- you, Leon Goldenberg, don't -- you don't own any interest -- you don't have any ownership interest in that building?

A. No.

Q. Or that entity?

A. No.

Q. Does Goldmont Realty Corp. today manage that building?

A. Yes.

Page 156

GOLDENBERG

Q. Who does own 612 Ocean Avenue Partners?

A. Swieca fund.

Q. Okay. So this was a lawsuit brought against Goldmont Realty Corp. Now, this is a settlement agreement. Do you recall whether you read this agreement or not before you signed it?

A. No. Our attorney would have read it.

Q. Okay. And then you signed it here, that's 8/27/19.

A. Okay.

Q. And it's actually I think simplest -- we can look at a couple of different places, but I believe it's mentioned in the letter here to the judge the -- I'm looking at here at page 2 of Exhibit 111, "Under the settlement and in accordance with the retainer agreement of plaintiff Romero, plaintiff Romero's counsel received $33,760." So does that more or less correspond to what you recall --

A. I wouldn't remember

Q. -- the settlement to be?

A. I wouldn't remember. As you can see clearly --

Page 157

GOLDENBERG

Q. Does that --

A. As you can see clearly, as you can see clearly, this is driven by the attorneys.

Q. Understood. Does 33,000 -- is that roughly what you would expect one of these cases --

A. They -- I mean, there are a lot of these cases. I, thank God, only had two of them. And now we have clocks all over because of it and time sheets. Because they're really bogus. They're driven by attorneys. Don't worry, I get your money, and they do get our money.

Q. I recognize, Mr. Goldenberg, you dispute that and the factual basis let's say for this case and you've -- you've done just that now, I don't -- and that's -- the settlement I don't think calls any of that into question, but is it fair to say that the super here was accusing you of not paying him what he was owed?

A. Correct.

Q. Okay. All right. I think that's -- I mean, that's it for me on these exhibits. We can keep going, but if now's a good time as to break --

40 (Pages 154 - 157)

Page 158

GOLDENBERG

A.   Yes.

Q.   -- then let's break.

MS. MOYAL:  So let's do 1:06 to 2:06, I guess.

THE WITNESS:  2:00?

MS. MOYAL:  Yes.

THE WITNESS:  Okay.

THE VIDEOGRAPHER:  The time is 1:07. We are off the record.

(A lunch recess was taken.)

THE VIDEOGRAPHER:  The time is 2:05. We are on the record.

MS. MOYAL:  Just on the record before you start, I want to reserve the right to review the transcript before it's finalized.

MR. REINITZ:  Sounds good.

MS. MOYAL:  No objection?

MR. REINITZ:  No objection at all.

A.   I'd like to clarify one thing from before.  Those two cases that you showed me, I classify as trip and falls.

Q.   Thank you, Mr. Goldenberg.

MR. REINITZ:  I'm just going to send you an e-mail, Ms. Moyal, with some more

Page 159

GOLDENBERG

exhibits and then I'll be right with you.

(E-mail Bates stamped 000020 and 000021 was marked Plaintiff's Exhibit 120 for identification, as of this date.)

Q.   Mr. Goldenberg, let me know when you can see -- this is going to be Plaintiff's Exhibit 120.

A.   Yes.

Q.   This is a two-page e-mail.  Let me know when you've had a chance to review it.

A.   Okay.  Can I see the next page? Yeah.  Okay.

Q.   Working backwards here -- and this is also Defendants' Bates stamp 000020 and 000021. This e-mail thread begins -- and it's from Yechiel Bromberg.  I'm looking here at the bottom of first page 1 on Exhibit 120.

A.   Right.

Q.   Yechiel Bromberg to Leon Goldenberg, CC'ed Jeannie Weisberg and the date here is July 30, 2019, and the subject is "Were you aware of this?" and it includes a link --

A.   Yeah.

Q.   -- to an article from The Real Deal.

Page 160

GOLDENBERG

I'm going to show you that article in just a second as Exhibit 121.  Are you -- are you generally familiar with the article?

A.   Yeah.  I mean, I haven't read it in two years, but yes.

(Real Deal Article was marked Plaintiff's Exhibit 121 for identification, as of this date.)

Q.   Okay.  Let me see if I can pull it up for you.  This is going to be Plaintiff's Exhibit 121.  It's from The Real Deal and the title of the article is "Prop Tech Exec Ari Teman Arrested on Bank Fraud Charges, GateGuard Intercoms Founder Faces up to 30 Years in Prison."  It's an article date July 23, 2019.

Let me know when you've had a chance to read it, Mr. Goldenberg.

A.   You want me to the read the article?

Q.   I'm not asking -- you don't need to, but I'm giving you the opportunity to should you like.

A.   Well, are you going to question me about the article?  I didn't write the article.

Q.   No, I -- well, only generally.

Page 161

GOLDENBERG

It's -- I'm not going to test --

MS. MOYAL:  Take --

A.   I see no reason to read it.

Q.   Fair enough.

A.   Ask your questions and then I'll tell you then if I need to read it.

Q.   Okay.  Is this the article that you -- you recalled reading two years ago, approximately?

A.   I can't tell you I remember.  I -- people sent me, Abi sent me all kinds of articles that he was in when he was being arrested.

Q.   Okay.  That is --

A.   If people sent it, I read it.

Q.   I want to just go back to what you just said.  You said Abi, is that Abi Goldenberg your son?

A.   Yes.

Q.   Okay.  He sent you this article as well?

A.   I don't -- I'm not saying this article, but there were, you know, different things that he sent me.  I don't remember what he sent.

41 (Pages 158 - 161)

Page 162

GOLDENBERG

Q. He sent you let's say other -- other articles or other materials about Mr. Teman?

A. Yes. Possibly it was this one. I don't remember, but you know --

Q. That's fine. No, I'm not -- I'm not holding you to that.

A. Yes.

Q. So he sent -- do you recall if Abi sent -- Abi Goldenberg sent you those materials by e-mail?

A. No.

Q. What -- if Abi Goldenberg didn't send you the materials by e-mail, what -- how would he send them to you?

A. When I walk by his office, he would say, "Take a look at this."

Q. Okay. So maybe it would be -- he didn't necessarily send them to you, but he showed them -- he showed you them, right?

A. Right.

Q. Okay.

A. Right.

Q. And those were just generally other -- let's say other stories or other

Page 163

GOLDENBERG

documents about Mr. Teman?

A. Yes.

Q. Okay. So again, I won't make you read the content here, but this is -- I'm now going to flip back to Plaintiff's Exhibit No. 120. Let me know when you can see that.

A. Yeah.

Q. Okay. This is the e-mail -- now, Mr. Bromberg, who we discussed before lunch, a friend -- a childhood friend of yours, someone who you were discussing at one point potentially investing in GateGuard with, he send you this link, "Were you aware of this?" and you respond same day from goldmont@aol to Yechiel Bromberg, "Yes. So we know he's a little crazy. Nothing major. He is full steam ahead." What did you mean by that?

A. Exactly what I said.

Q. Okay.

A. He is a little crazy, okay. I don't know if I'm supposed to say that. He's certainly not fully stable. And you know, I wasn't surprised. First, I heard about it already, and I wasn't surprised. And he says he's still going

Page 164

GOLDENBERG

ahead and he's still going to, you know, take his company to great heights.

Q. Okay. So it's fair to say -- this is -- again, we're talking now about -- this is the end of July 2019. Before lunch we looked at the agreement, I know you -- you may not have recalled the exact date, but the agreement was forwarded to GateGuard by Jacob Rubinstein with your signature on it on August 30th, so just about exactly one month later. So fair to say you knew at this point -- again, about a month before the agreement was signed, you knew that Mr. Teman had been arrested; is that -- is that accurate?

A. I don't know when the agreement was signed. You keep saying that. You have a letter. I'm not going to admit it. You can ask me 20 times. If it makes you happy, you can keep asking the same question. I'm going to be very, very clear, you have an e-mail that was sent from Jacob Rubinstein on August 30th. That's what you have. You do not have a date on the contract.

Again, you do not have -- I'm going to say it three times so maybe it will go in.

Page 165

GOLDENBERG

You do not -- and you're not going to trick me later on to say yes. You do not have a date on the contract, you do not have a date on the contract. I do not know when I signed that contract. You could probably tell me when I signed that contract. So stop trying to confuse me.

MS. MOYAL: All right.

A. Stop trying to play games, here the contract is August 30th. It's not August 30th. Am I clear? I'd like to hear from you a yes or a no, otherwise I'm not answering another question.

Q. You've made yourself very clear, Mr. Goldenberg. I'm not -- I'm really not trying to drive you crazy on this point. So understood.

Putting aside whatever may or may not have happened on August 30th or before or after that, is it fair to say that prior to August 30th you knew Mr. Teman had been arrested?

A. Yes.

Q. Okay. And did Yechiel -- did Mr. Bromberg discuss this article with you at any time before --

A. I don't remember.

42 (Pages 162 - 165)

Page 166

GOLDENBERG

Q. -- he sent it to you?

A. I don't remember. I doubt it.

Q. Did you -- did you discuss it with him at any point after he sent it to you?

A. I certainly didn't call him about it. Did I call him about something else and it came up? Maybe. I don't remember. It was -- he's no longer on my agenda. He's no longer on my mind. I know what he is. I know what his -- I don't know what all his problems are, but I know what he is and we're not going -- I wasn't going to go back to Yechiel and say, Listen, despite everything let's invest with him. It was over. When he sent me that letter, he ended any talk of investment. It didn't make a difference. Did he come up in some conversation? I see Yechiel on a regular basis. It's a possibility.

Q. All right. Fair enough. So is it -- do you know if at any point after July 30th anyone else at Goldmont, maybe not yourself, anyone else at Goldmont was negotiating an agreement with Mr. Teman?

A. I don't know when the agreement was negotiated. And that was with Abi. There was

Page 167

GOLDENBERG

nobody else involved.

Q. Okay. After you received the -- this link, let's say the story, in the e-mail from Mr. Bromberg, did you discuss it with anyone else?

A. I don't think so. You know, I had no interest and nobody to talk to about it. I'm not a gossiper by nature. I don't call people and say did you see this, did you hear this. I don't do that.

Q. Understood. I'm -- I'm just going back to what you mentioned about a minute ago that I believe Abi Goldenberg had showed you some other articles or other materials about Mr. Teman?

A. Being arrested.

Q. Right. So did you discuss it with him?

A. In what sense?

Q. Did you discuss any -- let's say any concerns about the fact that Mr. Teman had been arrested?

A. Yes. I guess that would have come up. I cannot remember the conversation.

Page 168

GOLDENBERG

Q. Okay. But fair to say at least in your response to Mr. Bromberg here on July 30th, you indicated, "Nothing" -- in other words, "Yes, we know he's a little crazy, nothing major, he is full steam ahead." Is it fair to say that the fact -- simply the fact that Mr. Teman had been arrested in and of itself was not a major concern to you?

A. It's not that it was not a concern. I really didn't -- you know, by this time I was pretty much done with it.

Q. Okay. Fair to say that to the extent that Goldmont signed an agreement with GateGuard at some point after July 30, 2019 --

A. No, no, no, no, no, no, no, no. You're putting days in there again. Don't put days -- you have a contract, you show me the date. Don't ever ask me that date again. Don't try to --

Q. I'm not --

A. You are trying to catch me. You are. And I want it on the record you're trying to catch me. Stop trying to catch me. Don't use dates. You don't know the date? You know the

Page 169

GOLDENBERG

date damn well. And I know you know the date. And she doesn't want me to get angry, I'm getting angry. I am fricken angry at you. Stop with that. I know you're trying to play tricks. I know that's your job. You're not going to get away with it. Am I clear? I don't know no date. I don't know the date the contract was signed. Is that clear? Answer. You don't answer? I don't answer another one of your questions.

MS. MOYAL: Leon, Leon.

(Simultaneous crosstalk.)

THE WITNESS: Answer.

MS. MOYAL: We got the message, Leon.

THE WITNESS: No, I want him to answer.

MS. MOYAL: Okay. Leon, it's --

THE WITNESS: No problem. I'm not answering questions.

Q. Mr. Goldenberg, you've -- you've -- you've been very clear, and I reiterate I -- there is no trick that I'm trying to play --

A. There is a trick.

Q. -- or game I'm trying to play with respect to the -- to the dates of the -- when the

Page 170

GOLDENBERG

agreement may or may not have been signed. I can assure you that that's not something at this juncture I am trying to make an issue out of. All I'm calling your attention to and trying to ask you question about is what may or may not have been your impressions or concern or lack of concern about the fact -- simply the fact that Mr. Teman had been -- it was public information at that point that Mr. Teman had been arrested on July 30, 2019, that was something that Mr. Bromberg had called to your attention and I'm simply asking in that context about the extent of your knowledge about that information at that time.

A.   By that time nothing about him surprised me.

Q.   Understood.

A.   Including his arrest.

Q.   Understood. Okay. So I guess more generally, I mean, the fact that someone -- whether it's Mr. Teman, whether it's someone else, I mean, does the fact that he was accused of a crime in and of itself disqualify -- would that disqualify Mr. Teman from doing business

Page 171

GOLDENBERG

with Goldmont Realty or were you still open to doing business with --

A.   I think by that time we were done with him.

Q.   Okay. So you were --

A.   I did want to get my $60,000 back. I wrote him $1,000 checks from I think 50, 60 accounts. I did want to get my money back from him. I never got that.

Q.   I just -- I want to clarify --

A.   are you aware of that?

Q.   I'm not sure. I'm trying to clarify, if I may. So you're suggesting, Mr. Goldenberg, that there's some amount of money that Mr. Teman owes you?

A.   Yeah. Over $60,000.

Q.   Okay. So if I understand correctly, that's -- you said $1,000 checks --

A.   Approximately.

Q.   $60,000, is that $1,000 times 60?

A.   It -- I think it was 50 accounts. Some were 1100, some, you know, different amounts. But the total is about $60,000 that we gave him for a deposit and that's when he pulled

Page 172

GOLDENBERG

that thing where he -- he shut us down on one of the buildings and I said we're not going forward.

Q.   Okay. And then the deposit that you referenced or that you claim, that's funds as far as you know that Mr. Teman or GateGuard still has?

A.   I doubt that he has it, but he did deposit it.

Q.   Is that -- have you made -- I don't know if that's something that -- do you know if you or anyone else at Goldmont has called Mr. Teman or GateGuard's attention to at any point?

A.   I did not.

Q.   Okay.

A.   I did call it to the attention of my attorneys that I'd like to get my money back.

Q.   Okay. Understood. So Mr. Bromberg sends you this -- the link, and it's not clear to me and I apologize if I asked that a minute ago, did -- had -- did you first learn of Mr. Teman's arrest from this link or did you -- had you known about?

A.   No. You see quite obviously I said I

Page 173

GOLDENBERG

know about it.

Q.   Okay. I didn't -- I wasn't sure. Okay. So you knew about it beforehand?

A.   Yeah.

Q.   Do you recall who first told you about it?

A.   I would assume it was Abi, but it's an assumption.

Q.   Okay. And you did mention -- you did testify that Abi had told -- Abi Goldenberg had shown you some other, again, articles or other things about Mr. Teman, did you ever at any point after that instruct Abi to -- or anyone I would say, anyone at Goldmont to try to unwind its existing relationships with GateGuard?

A.   Yes.

Q.   Okay. Let's start with Abi. What did you tell Abi?

A.   I don't know what I told him, but we're not going forward, I'd like to get my money back, which I told Abi I believe we'll never see.

Q.   Okay. So putting aside whether or not you will or you could get -- get the referenced -- the money you referenced as a

44 (Pages 170 - 173)

Page 174

GOLDENBERG

deposit back, what did you tell Abi Goldenberg about seeking to unwind Goldmont's business relationship with GateGuard?

A. We're done with him, we're not going forward, we'd like to get our money back, that's it.

Q. Okay. Did any of the discussions between let's say you and Abi Goldenberg touch on the agreement or the agreements that were in place between GateGuard and Goldmont?

A. No. I don't -- I think at that time neither one of us realized that when he signed on -- he thought he just signed those four pages that you sent me. He did not realize that by signing that he is signing on to the link of the 30 pages. So he didn't realize that he had signed that entire contract. And I'm still not sure that we signed the entire contract. That's a question for the lawyers to decide, not for me. But I would never have allowed that to happen. Had he told me there's a link that's attached to this contract with 30 pages, I would said we're not signing it.

Q. Okay. And I know you --

Page 175

GOLDENBERG

A. Let me just go one step further. I used multiples of vendors, I used multiples of contracts and most are not signed and they still do the work. And we're not talking about jobs for a $1,000 or $500.

Q. So two things -- I want to come back to that in a second, but you mentioned -- in your last sentence, Mr. Goldenberg, you used "he" a couple of times, are you referring to Abi Goldenberg?

A. Did I use what?

Q. You said he -- he said this or he did this --

A. You got to ask me right away. I don't remember now.

Q. Okay. Fair enough. And you just said now even more recently something to the effect of that you have other vendors who you have -- do you not sign contracts with; is that correct?

A. Correct.

Q. Does that mean that they provide you let's say with a contract to sign and you just choose not to sign it?

Page 176

GOLDENBERG

A. No. They generally don't even provide me with a contract.

Q. Okay. So there's no written -- let's say no written agreement between Goldmont Realty Corp. and again other vendors that it works with?

A. And some vendors.

Q. Okay. Other -- other vendors though it sounds like by implication there is -- there are other written contracts that Goldmont does sign; is that correct?

A. Right. They're printed. They're exactly what I'm signing. There's no -- nothing that says see attached link for all its -- not that I know it says it here.

Q. Okay. Fair enough. And so going back to it, you testified I believe a minute or two ago that at this point let's say the relationship between Goldmont and GateGuard wasn't -- let's just say wasn't great and you had instructed Abi Goldenberg to cut ties with Mr. Teman and with GateGuard; is that accurate?

A. Yes.

Q. At any point in those discussions did Abi Goldenberg raise the issue of whether there

Page 177

GOLDENBERG

would be financial consequences to cutting ties with GateGuard or with Mr. Teman?

A. I don't know exactly at what point we became aware about the 30 pages. I can't tell you if it was -- he sent it to -- him and Abi were back and forth. Abi was trying to make some sort of a peace. He kept calling Abi, crying to Abi, you know, come on, I got to, help, and Abi is just a very soft, easy-going guy and he tried and he spoke to me numerous times. I'm not sure when we became aware of the 30 pages did Ari say, by the way, if you think you're done with me, you're not because look what you signed. I really don't know exactly. You have to ask him.

Q. Understood. I just want to be very clear, I know I often may not be, I'm asking specifically about your conversations, your discussions, your communications simply with Abi Goldenberg.

A. Right.

Q. Did it ever come up between the two of you, not with Teman, just between you and Abi, about -- you said more or less to Abi, Abi get rid of Teman, get rid of GateGuard, we don't want

Page 178

GOLDENBERG

to deal with it anymore, did Abi ever -- not really push back, but did he ever raise the fact well, we can do that, but there may be a price to pay, there may be -- you may owe him some money under the agreement, did that ever come up?

A. Not right away.

MS. MOYAL: Objection, mischaracterization. Over objection you can answer.

A. Not right away.

Q. But at some point in the discussions with Abi maybe later on --

A. Yeah.

Q. -- you raised the fact that --

A. That he signed the contract with 30 pages or he thinks he signed a contract with 30 pages or seems he signed a contract with 30 pages and I blew my top. And I can't tell you when he found out.

Q. So at some point it sounds like -- not -- maybe not initially, at some point Abi told you that there was a -- I mean, you said 30 pages, but a -- let's say a lengthy agreement --

A. Right.

Page 179

GOLDENBERG

Q. -- between GateGuard and Goldmont?

A. Right.

Q. And that was something that you were not, I guess, happy to hear?

A. No.

Q. Okay. And how did you respond? Other than blowing your top, but I got that. I got that.

A. What can I tell you? We're still not going forward with it.

Q. Okay. So you -- so you -- at that point fair to say you understood that -- again, putting aside the legalities of what the identity may or may not have actually said, you understood that there -- there may be -- the contract may reflect an understanding between GateGuard and Goldmont as to what -- what happens in the event that Goldmont wants to cut it's ties with GateGuard?

A. Correct.

MS. MOYAL: Objection, legal conclusion. Over objection you can answer.

A. Yeah, let's be clear, I cannot give you a legal decision.

Page 180

GOLDENBERG

Q. Understood.

A. I'll be very clear, I don't know -- again, I don't know if that contract is really part of what I signed, but it certainly put us in a bad situation where it could be argued, we could be here, sitting here, arguing yes, no, you two would be fighting it out is it really part of the contract, it's not part of the contract and then arguing what the contract does say if it is part of the contract and no matter what, that's going to cost money. Even though at the end of the day when we win, when we win, be very clear, at the end of the day it will have cost me a nice few dollars to get out of this.

Q. Understood.

A. And, and I'm still sure, not that I don't want my $60,000 back, I'm still sure I'll never see it.

Q. Understood. So other than let's say yourself, whose signature appears on the agreement we looked at earlier today and other than Abi Goldenberg, who we've been discussing obviously was involved in a lot of the events that were -- we're also discussing, who else, as

Page 181

GOLDENBERG

far as you know, would know one way or the other as to -- again, you called into question exactly what you signed. Other than yourself and perhaps Abi Goldenberg, who else might know anything about that?

A. I think only the attorneys. We -- I didn't have any discussion with anybody else.

Q. Okay. So other than yourself, Abi Goldenberg, Mr. Teman and the -- now the attorneys involved, I know we've mentioned --

A. There was a discussion, I don't know if it was part of it, with some of the other people that he stuck. But I don't know if I was on any of those calls.

Q. Can you be more specific about -- you said he -- somebody he --

A. Abi, Abi was on calls. I don't believe I was on the calls. We're not the only landlords. Let's be very clear about that. Mr. Teman has screwed a lot of landlords. That's why he's been arrested, okay. Found guilty, not found guilty, but he was arrested for valid reasons, and that was basically playing games, cheating, stealing. Maybe I'm not supposed to

46 (Pages 178 - 181)

Page 182

GOLDENBERG

say that on the record. I'm sure you can tell me if I'm allowed to say that. But basically that's what he did.

He really did not play by the rules, let's put it that way. I don't want to say he cheated and stole, but the government thinks he did and that's why they arrested him, okay. They didn't arrest him because he did jaywalking. They arrested him because of the things that he was doing to different landlords. And there's a whole group of landlords out there that would, you know, love to financially bury him and get rid of him. Because he's suing everybody. That's you. I don't know how you're getting paid. That's a separate issue, but that's your problem. That's not my problem. Yeah, I know you don't want to hear that.

Q. That's true. That's true. So --

A. If I were you, I would be concerned about how I'm getting paid.

MS. MOYAL: Leon, let him ask questions.

Q. I do -- I do appreciate --

A. My concern?

Page 183

GOLDENBERG

Q. I do. I do. Genuinely.

So going back to it, you mentioned that you may have been -- or Abi may have been -- someone was involved in some discussions with other -- other landlords; is that correct?

A. Different people. I don't know who. But I -- I don't think I took part of any of these conversations. I really didn't have an interest. All this makes me angry.

Q. Fair enough. Fair enough. So you heard about them I guess through -- did you hear about them from Abi Goldenberg?

A. Whatever I heard, I heard from him, yeah.

Q. Okay. So your understanding is that Abi Goldenberg was in -- in some discussions with other -- other landlords --

A. I don't know.

Q. -- who had been --

A. Different people that --

Q. -- let's say had issues, had business disputes let's just say with Mr. Teman?

A. Yes.

Q. Okay. And that --

Page 184

GOLDENBERG

A. And maybe it wasn't discussions. Maybe it was just, you know, a lot more articles that he was reading than me.

Q. Understood.

A. You have to ask him.

Q. Okay. Fair enough.

A. You did. You had seven hours with him.

Q. Yes.

A. I didn't think you'd want seven hours with me.

Q. Say that again, I'm sorry.

A. You had seven hours with Abi, so I imagine you asked him all these questions. I didn't think you had seven hours of questions for me.

Q. Oh, I don't know. I'm not sure either. I guess we'll find out. But I guess the quicker you let me ask the questions, the sooner I might be done.

So going back to it, Mr. Teman is arrested, you find out he's arrested. Whether it's through Mr. Bromberg, whether it's through Abi, whether it's through other ways, you tell

Page 185

GOLDENBERG

Abi get rid of this -- we don't want to work with GateGuard anymore, we need to get rid of this, get ourselves out of this business relationship. At some point you mentioned that Abi tells you, seems perhaps for the first time, that there was a lengthy agreement that Goldmont signed with GateGuard?

A. That may have signed.

Q. May have signed. Fair enough. May have signed with GateGuard. And did you find out at any point that GateGuard was making a claim -- whatever -- putting aside the legality of you did owe them money, you didn't own them money, did you learn at any point in time that GateGuard was claiming that Goldmont owed it money, owed GateGuard money?

A. Yes.

Q. When, approximately, was the first time that you learned that GateGuard was claiming that Goldmont owed it money under the agreement?

A. I cannot tell you, but you know, he made the threat to Abi that you -- you know, you owe me a lot of money, you have to go through on all these deals. And -- and I think that's when

47 (Pages 182 - 185)

Page 186

GOLDENBERG

we started talking to attorneys. I can't -- I can't give you dates.

Q. Fair enough. So Mr. Teman -- or you heard -- if I understand correctly, you heard or you learned from Abi, from your discussions, communications with Abi Goldenberg, that GateGuard was demanding or claiming money from Goldmont under the agreement; is that -- is that correct?

A. That's correct.

Q. Okay. What was your response to Abi telling you that that GateGuard says we owe --

A. We'll see him in court.

Q. Okay. So at any point did -- did any other -- let's say whether it's Abi or, I don't know, Mr. Horowitz or any other personnel at Goldmont ask for your authorization to pay GateGuard?

A. No.

Q. Okay. So fair to say based on your discussions then -- whether it was with Abi Goldenberg or anyone else at Goldmont, fair to say that you denied GateGuard's request to pay it under the -- pay GateGuard under the agreement?

Page 187

GOLDENBERG

A. I don't think there was a formal request. I think it was just on the phone. There may have been a formal one. I can't tell you.

Q. Okay. But fair to say --

A. The first one was definitely just on the phone and then maybe at some point he sent a formal -- I -- I really don't remember.

Q. Okay. Fair to say though that to your knowledge Goldmont has never paid GateGuard the -- whatever amount of money -- I don't -- doesn't make a difference what right now --

A. I paid him $60,000 --

Q. Right.

A. -- for the systems that he shipped us way after that. He shipped them to our office. He knew we weren't going to install them. They're still sitting here in boxes. No, I'm out $60,000. So let's not say that I owe him. He owes me $60,000 and he can pick up his equipment.

Q. Fair enough. Well, let's just to touch on that for a second. The intercom devices that you mentioned that were delivered to Goldmont's offices, where are they now, do you

Page 188

GOLDENBERG

know?

A. They're right here in the office somewhere.

Q. I mean --

A. In boxes.

Q. In -- when you saw in the office, is that in another -- is it in the room with you there now?

A. No.

Q. Okay.

A. They're in the office. The office is 3, 4,000 square feet.

Q. Okay. So they're somewhere around. I mean, have you seen them recently?

A. No. Because he kept them in the front, Abi, where they delivered them. The problem was they delivered them and nobody was here to tell them not to take it. You know, it was a delivery. He thought it was like, you know, paper or something like that. And he kept it in the front and every time I walked in, I saw it, I got a little annoyed so I said get it out of here.

Q. Gotcha.

Page 189

GOLDENBERG

A. So he put it -- I don't know where he put it.

Q. Okay.

A. But they're sitting right here. He can pick them up.

Q. Understood.

A. Any time between 9 -- 8:30 and 6 p.m.

Q. Understood.

A. Monday to -- Monday to Thursday. Friday till 2.

Q. Fair enough. So Abi tells you more or less that GateGuard is making a claim, is demanding payment under the agreement that we've been discussing, your response is I think, if I understand correctly, basically, you know, we'll see you in court, we're not going -- Goldmont is not going to pay GateGuard what -- what it is claiming under the agreement; is that -- is that accurate?

A. That sums it up.

Q. Okay. I'm going to close out of this exhibit here.

MR. REINITZ: I'm just sending you some more exhibits, Ms. Moyal.

48 (Pages 186 - 189)

Page 190

GOLDENBERG

(E-mail Bates stamped Defendants' 000087 was marked Plaintiff's Exhibit 115 for identification, as of this date.)

Q.   I'm about to show you, Mr. Goldenberg, Plaintiff's Exhibit 115.  Let me know when you can see it.

A.   I see it.

Q.   Okay.  This is -- I'm going to now flip through -- it's about six pages.  I'm going to flip through to the bottom.  I know I've gone real fast here.  I'm going to slow down and then I'm going to bring it back to the top.  This is -- starts with Defendants' Bates No. 000087.  The subject is "Forward external sender contact information" and it starts here and I'll allow you to -- all the time you'd like to read it.  It begins with a message --

A.   Let's start with the bottom.

Q.   Sure.  It's -- I think it lost some of the formatting so it's a business of a bit of a mess.

A.   This is nothing.

Q.   Okay.

A.   (Reading document.)  This is to Ariel

Page 191

GOLDENBERG

from Nir Gozal.  Okay.  He's asking him to pick up his equipment.

Q.   Yeah.  For what it's worth, Mr. Goldenberg, again, this is not a gotcha, this, if I'm not mistaken, was an e-mail that was unintentionally sent to or forwarded I think to Abi Goldenberg.

A.   Okay.

Q.   Intended I think for someone else.  And then all I'm going to really be interested in is I think the e-mail at the top from Mr. Rubinstein, but you'll --

A.   Who's Gozal?

Q.   If I'm not mistaken, Mr. Gozal is another attorney representing some other --

A.   Client.

Q.   -- GateGuard customer.

A.   Okay.  So we're not the only ones.

Q.   Yes.  Yes.

A.   We should get together, do a joint -- what do you call that, that lawsuit?

Q.   Class action?

A.   Class action.  Okay.  So you got a lot of people after him.

Page 192

GOLDENBERG

Q.   Well, this is -- you know, again, this -- this is a -- I guess it's a different -- different set of circumstances, but I think, like I said, it's really besides the point.  The only -- you're welcome to read all of it as long as you like.

A.   I'm not really that interested.

Q.   Yeah.  I'm really primarily interested in the e-mail all the way -- again, neither Abi Goldenberg, nor I think anyone else from Goldmont is involved in any of these e-mails.  I think it was Ari Goldberg.  I think there may have been like a mistake, you know, when the e-mail was populating the e-mail addresses too quickly.  So I think it may have been -- accidentally Mr. Teman may have sent it at some point to Abi and then --

A.   Oh, forwarded to Abi because it's Ari Goldberg and --

Q.   Ari Goldberg and Abi Goldenberg, yeah.  And then the only e-mail -- again, I'm interested primarily --

A.   So this came from Ari.

Q.   Well, again, so I'm giving you the

Page 193

GOLDENBERG

chance to read it.  We come back to the top here and then you have a -- another angry e-mail I would say from Mr. Teman to Mark Silber.  And I think again it was intended for A Goldberg and it was accidentally sent to Abi Goldenberg.

A.   I see.

Q.   That's where Goldmont and you guys come into the picture.

A.   (Reading document.)  Okay.

Q.   Then again I'm primarily interested in this -- this e-mail from Mr. Rubinstein --

A.   Okay.

Q.   -- which you can take a look at.

A.   Okay.  So I take it Rubinstein is my attorney.

Q.   Are you all right there with the phone, Mr. Goldenberg?

A.   Yeah.

Q.   Okay.

A.   Okay.

Q.   Okay.  So all set?

A.   Yeah.  What do you want to know?

Q.   So Mr. Rubinstein, you are correct, is in this context acting -- as I understand it

49 (Pages 190 - 193)

Page 194

GOLDENBERG

at least as Goldmont's attorney. So he stepped in. Again, Mr. Teman accidentally, as I understand it, sent this e-mail to Abi Goldenberg, presumably Abi Goldenberg forwarded it to Mr. Rubinstein, who stepped in here, and Mr. Rubinstein writes, "Your client stands to lose" -- in reference apparently to Mr. Teman. "Your client stands to lose much more. I've made a list of legal issues, some of which criminal, since this started. I would hate for it to come to that. I'm leaving open this opportunity until Friday. With or without Abi's blessing, I will file whatever necessary to quash this psycho."

Did you ever have any discussions let's start with Abi Goldenberg about whether or not anything Mr. Teman -- anything he was doing was criminal in nature?

A.    I definitely believe some of the things he was doing was criminal, but I am an Orthodox Jew and I will not go to the police or to the FBI. And the discussion came up and the discussion was well since he's not Orthodox, I said he's still a Jew, and therefore I cannot go to any criminal authorities. Not that he doesn't

Page 195

GOLDENBERG

deserve it. I felt very strongly that he deserved to be stopped because he's just ongoing, ongoing. You yourself how many -- how many times -- how many different cases have you had with him? You seem to be his only attorney. You know somehow you're making --

Q.    I was going to --

(Simultaneous crosstalk.)

A.    All of this was gonavisha schtick (ph.) Do you know what that means? Ariel, would you like to translate?

Q.    Well, I'll take that one.

MR. REINITZ:  Yes. If I heard Mr. Goldenberg correctly, I believe the term was gonavisha schtick.

Q.    Did I get that right?

A.    Yeah.

Q.    And if my Yiddish serves me correctly, I believe gonavisha is deft like, it's a reference to theft or stealing, and schtick is sort of games. So what I guess you would say is schemes. How would you translate it, Mr. Goldenberg?

A.    That's a good way to -- schemes of

Page 196

GOLDENBERG

how to steal money from people.

Q.    Okay.

A.    And not run an honest enterprise. And the shame is that his idea was phenomenal. He could have made a lot of money. He could have done it with me. He could have become a real big company. He had a great idea and it worked well. He was the first one out there. Now Amazon's doing it. Everybody's doing it now. He was there three, four years ago. He could have had a real company. He could have made real money. He could have had real investors. But that's not how he plays.

Like "On the Waterfront", "I could have been something." He could have been something. Instead he's playing around suing everybody in the world. Can I settle this, can I settle that, give me a few dollars to settle it, give me the $60,000 that you owe me and forgot about that and give me a few more dollars and I'll call it quits. That's not the way you make money.

MS. MOYAL:  Leon, let him ask a question.

Page 197

GOLDENBERG

THE WITNESS:  I'm not interested in his questions anymore.

MS. MOYAL:  Well, that's what you're here for. So let him ask you a question.

Q.    I appreciate the commentary, Mr. Goldenberg. Ms. Moyal knows that too.

So you mentioned -- you testified just, I don't know, a minute or two ago that your Orthodox Jewish faith, as far as you're concerned, precluded you let's say from going to the authorities about Mr. Teman; is that -- is that accurate?

A.    Accurate.

Q.    So in other words, it was something -- going to the authorities about Mr. Teman was something that you -- you considered or others maybe --

A.    Yes.

Q.    -- that you were talking to --

A.    Yes.

Q.    -- had considered --

A.    Yes. What he's done is criminal. No question.

Q.    Okay. Can you be -- can you be more

50 (Pages 194 - 197)

Page 198

GOLDENBERG

specific about what -- what conduct you believe to be criminal?

A. Too many things, too much under the bridge. At the end of the day he's done a lot of criminal things. And he didn't get arrested because he was a nice guy and he didn't get arrested because he was misunderstood and he didn't get arrested, as Rabbi Pruzansky said, because he was -- bad landlords wanted to get him.

He got arrested because of what he did. And playing with intercoms might also be criminal. Because that gave him access to tenants, to tenants' information. That's not something he was supposed to do. Who knows what he did. Who knows what he did with all this information. I think the authorities might want to know, but again, it won't be from me.

Q. So again, I want to go back to it because you mentioned --

A. I know you want to go back.

Q. -- the -- whether or not you personally acted on it, it sounds -- my under -- my impression from what you just testified is

Page 199

GOLDENBERG

that, you know, maybe others that you were just talking to --

A. No.

Q. -- shared the --

A. No. I'm going to cut you off because I said it before. He was not the subject of my conversation.

Q. Fair enough. Fair enough. So Jacob -- back to Exhibit 115 that I'm showing you now, Jacob Rubinstein as an attorney -- I think you -- you confirmed is an attorney for Goldmont writes --

A. I didn't confirm. I asked you.

Q. Okay. Who appears to be acting in a representative capacity for -- on behalf of Goldmont in this context writes to me, "I've made a list of legal issues, some of which criminal, since this started." Did you ever discuss with Abi Goldenberg a list of criminal issues about Mr. Teman?

A. No.

Q. Are you aware --

A. We discussed the idea of whether it's criminal, whether we think it's criminal, and

Page 200

GOLDENBERG

whether we have a right to go to the authorities. And the question of his not being Orthodox came up and I said it doesn't play.

Q. Other than yourself and Abi Goldenberg, who -- who else was involved in the discussions you mentioned?

A. With me? Only Abi.

Q. Okay. Do you know if Abi had discussions on the same topic with anyone else?

A. No, I don't know what his discussions were. He had multiple discussions on this.

Q. On the topic --

A. You asked him about his discussions.

Q. I want to be very clear, we're talking about on the topic of --

A. It doesn't matter.

Q. -- whether or not --

A. I don't -- I -- I don't know what all of his discussions were with different people. I really don't.

Q. Fair enough. So there's a reference here again to a list of legal issues, some of which are criminal --

A. Correct.

Page 201

GOLDENBERG

Q. -- since this started.

MS. MOYAL: Just to understand, you're asking him about an e-mail from his supposed attorney that he doesn't even know is his attorney, correct?

THE WITNESS: Yes. Thank you for asking me.

MR. REINITZ: I'm -- is there an objection, Ms. Moyal?

MS. MOYAL: No. I'm just trying to understand the question.

A. It's a question to you because I'm not on that e-mail.

Q. And I didn't --

A. Can I tell you what's in his head? Sorry, I can't do that.

MS. MOYAL: I'm just trying to understand your question, Ariel.

MR. REINITZ: Yes. It's no to all of the above. My question -- I'm referencing Mr. Rubinstein's e-mail and I'm asking based on that whether Mr. Goldenberg himself is aware of let's say -- I just asked him if he knew of any list of legal issues, some of

Page 202

GOLDENBERG

which were criminal, and he answered, I think --

Q. Well, do you want to answer that again, Mr. Goldenberg?

A. I will answer that again.

MS. MOYAL: I'm just going to object, before you answer, calls for a legal conclusion. Over my objection you can answer.

A. And that's what I'm going to say. I'm not a lawyer, but to me it smelled. It didn't pass the smell test. And whether it would have been criminal or not would be up to the criminal justice system to decide. But do I think that some of the things he did for --

MS. MOYAL: Again --

A. -- to us was criminal? That's for you to figure out.

Q. Fair enough. And so I just -- I just want to put this in context here to -- to understand. So at this point do you recall whether GateGuard had notified Goldmont that GateGuard believed Goldmont owed money to GateGuard?

Page 203

GOLDENBERG

A. I can't give you timing. I do know that before we hired Mr. Schonfeld we spoke to another attorney and we went back and forth with two different -- you know, to decide which attorney to use. That might have been Jacob Rubinstein. The name really doesn't ring a bell. I can't say that -- that it was Mr. Rubinstein. I'm not -- this is the first time I'm seeing this e-mail. I don't believe -- I don't believe Abi showed it to me. He may have. I mean, it is a year and a half ago, almost two years ago. So I'm not really at all familiar with this.

But it's clear that we already had his equipment here because he's saying, you know, he wants to know when they're picking it up. I think I saw it somewhere else, you know, further down. (Reading document.) Yeah, I think I saw somewhere further down about picking up the equipment. Maybe that was a different e-mail, you know, part of the chain.

Q. Understood. So Mr. Rubinstein here writes, "I will file whatever necessary to quash this psycho."

A. Right.

Page 204

GOLDENBERG

Q. Putting aside --

A. With or without Abi's permission, notice.

Q. Right. Right. I recognize that, with or without Abi's blessing, yes. I'm asking you, Mr. Goldenberg, whether at any point in your discussions let's say with Abi Goldenberg you discussed taking other action other than let's say reporting to authorities --

A. You mean like beating up on him? Is that what you're hinting at?

Q. I'm not hinting at anything. I'm just asking -- just that could be --

A. Please, please, please.

Q. -- that could be any --

A. Don't even make that innuendo.

Q. I can assure you --

A. I will not even -- I will not even deem to answer a question like that.

Q. Mr. Goldenberg, I want to clear -- I think Ms. Moyal, though she may not now --

MS. MOYAL: Just clarify the question then.

MR. REINITZ: Yes.

Page 205

GOLDENBERG

Q. The term quash, Ms. Moyal I think will even agree with me, though we don't do that too much --

MS. MOYAL: That's true.

Q. -- during depositions, quash is a legal term, among other things. So I -- that could be, as far as I'm concerned -- quashing, even if it's in reference to a person, could be taking other -- another formal legal action. Maybe --

A. Yeah. Legal action, that's what he's talking about.

Q. -- filing -- so that's -- again, I'm -- I'm not interpreting and I'm not asking you to interpret what's in Mr. Rubinstein's head. I'm asking whether you had any other discussions with Mr. Abi Goldenberg about taking action other than again making a criminal -- let's say a criminal charge, taking other action.

A. I want to be very clear --

MS. MOYAL: Objection to form. Over objection you can answer.

A. Okay. I'll be very clear. We talked about criminal, which I think he deserved, and we

52 (Pages 202 - 205)

Page 206

GOLDENBERG

talked about legal action. And that's why we met with different attorneys. We did not meet with the Mafia.

Q. Thank you. That wasn't my question, but I appreciate the answer.

MR. REINITZ: Ms. Moyal, can you still see the exhibit? I think you disappeared.

MS. MOYAL: I can. Give me one second.

A. I didn't know you were old enough to know what the Mafia is.

MS. MOYAL: My computer just -- I can only see Leon. Give me one second. Okay.

THE WITNESS: You don't need to see him.

MS. MOYAL: I need to see the document. Okay.

MR. REINITZ: Can you see this document?

MS. MOYAL: Yeah. Go for it.

MR. REINITZ: Great.

Q. So you just testified, again, Mr. Goldenberg, you were -- you and Abi

Page 207

GOLDENBERG

Goldenberg discussed potential criminal action let's say or making a criminal allegation against Mr. Teman or against GateGuard, you discussed, I think, if I understood your answer just now, other potential legal action --

(Video disruption.)

THE VIDEOGRAPHER: Do you want to go off the record?

MR. REINITZ: I was going to give it another 15 seconds and then we'll probably -- let's call it until -- do you want to just call it until -- do you want to do 3:05 or 3:10?

THE WITNESS: Fine by me.

THE VIDEOGRAPHER: So the time is 3:01. We are off the record.

(A brief recess was taken.)

THE VIDEOGRAPHER: The time is 3:14. We are on the record.

Q. Mr. Goldenberg?

A. Yeah.

Q. Can you hear me?

A. Yeah.

Q. Great.

Page 208

GOLDENBERG

MR. REINITZ: Ms. Moyal, are you still there?

MS. MOYAL: Yes.

MR. REINITZ: Okay.

Q. Before we took a brief break, Mr. Goldenberg, you were testifying, if I recall correctly, regarding one or more discussions you had with Abi Goldenberg regarding let's say whether or not to lodge criminal accusations against Mr. Teman; is that correct?

A. Correct.

Q. And you mentioned as well -- or you testified, if I recall correctly, that you personally based on your Orthodox Jewish faith concluded that it was not -- it would not be appropriate for you to lodge criminal accusations against Mr. Teman; is that correct?

A. Correct.

Q. Do you know if Abi Goldenberg came to the same conclusion?

A. We came to it together.

Q. Okay. So during those discussions that you had with Abi Goldenberg, you both agreed that you would not let's say pursue any criminal

Page 209

GOLDENBERG

accusations against Mr. Teman?

A. Correct.

Q. Do you know if Abi Goldenberg ever spoke to any authorities that were pursuing criminal accusations against Mr. Teman?

A. He may have. You have to ask him.

Q. I did. I did ask him. I'm asking you whether you know if he -- if he ever spoke to any authorities --

A. It's a possibility, and it's vague, that he got a call from one of the -- from a police -- from a -- somebody from either police, FBI, I don't know who -- who it was. I'm not sure. I'm not sure if he returned the call. If he got a call, returned a call. I really don't know.

Q. Did he ever -- after the discussions that you had with him about whether or not it was appropriate let's say based on your faith to pursue any criminal accusations against Mr. Teman, was there ever a follow-up after that phone call that you mentioned?

A. I don't know.

Q. So you may have -- may have mentioned

53 (Pages 206 - 209)

Page 210

GOLDENBERG

a phone call, if I'm understanding -- I just want to make sure I understand --

A.   He might have made mentioned it before we made a final decision. That might -- might have prompted the questioning.

Q.   So is it your understanding then that -- again, I'm just asking based on what you know. I'm not asking what he did or didn't do, just what -- what he -- you discussed with him, with Abi Goldenberg. It's possible that Abi Goldenberg received a call from a -- let's say a police officer or from a prosecutor --

A.   Investigator, let's call it that.

Q.   An investigator, okay. One of the -- generally we call them -- one of the authorities and did that precipitate -- did that --

A.   It may have.

Q.   Okay.

MS. MOYAL:  Let him finish the question. I don't understand. What was the end of the question?

MR. REINITZ:  Sure.

Q.   The end of the question is did you at that point, after Abi Goldenberg received the

Page 211

GOLDENBERG

call that -- one or more calls that you mentioned, is that when you had the discussion about whether or not to -- it was appropriate under the Orthodox Jewish faith to --

A.   It's under the Jewish faith, not Orthodox.

Q.   Right.

A.   It has nothing to do with being Orthodox.

Q.   I'm -- say that again, Mr. --

A.   I want to be clear. You know, it's not -- we don't have a -- different laws. There's one law. Other people aren't following them.

MS. MOYAL:  Just objection to form. You answered it.

MR. REINITZ:  Thank you.

Q.   Other than Abi Goldenberg, did you discuss the issue let's say of whether or not Mr. Teman was acting in a criminal manner with anyone else at Goldmont?

A.   No, I don't believe so.

Q.   Other than Abi Goldenberg and outside Goldmont, did you ever discuss whether or not

Page 212

GOLDENBERG

Mr. Teman's conduct was criminal with anyone else?

A.   No.

Q.   Going back to it, what in your lay opinion was -- specifically do you believe was criminal about any of your interactions with Mr. Teman?

MS. MOYAL:  Again, over objection -- just calls for legal conclusion. Over objection you can answer.

A.   I'm not a lawyer. It's just a gut feeling.

Q.   So fair to say there wasn't -- there wasn't one specific -- one specific thing Mr. Teman did that you could just put your finger on and say that -- that's -- he should go to jail for that, that makes him a criminal, but it was let's say an overall feeling about his conduct generally?

A.   Correct.

MS. MOYAL:  Same objection.

(E-mail Bates stamped Defendants' 000116 was marked Plaintiff's Exhibit 116 for identification, as of this date.)

Page 213

GOLDENBERG

Q.   Fair enough. Mr. Goldenberg, I'm going to show you Plaintiff's Exhibit 116. Give me a minute here and I will let you know when you can see it.

A.   Okay.

Q.   And that's -- also begins with Defendant's Bates 000116. It's an e-mail that begins forward A-I-T-Z-A, Aitza, request and it's four pages long. I'll let you review it or I can flip to the bottom if you want to read up if that's easier.

A.   Flip to the bottom. Okay. I agree with my nephew. What should I tell you?

MS. MOYAL:  Let him ask the question.

THE WITNESS:  I'm giving the answers that he doesn't want to hear and that he won't ask.

MS. MOYAL:  It's okay. Let him ask the questions he wants to ask.

A.   Okay. Do you want me to see the next page?

Q.   I got to tell you, Mr. Goldenberg, you're making this too much fun, you're going to make me want to stay all night.

54 (Pages 210 - 213)

Page 214

GOLDENBERG

A.    No. No. What do you want me to do to cut it short? Okay. Yup. What do you want to know?

Q.    You already answered my first question, which is that -- but I'll ask it anyway, do you agree with Avi Goldenberg?

A.    Yes.

Q.    And I think you wrote as much -- or I believe let's say Abi Goldenberg wrote as much, "I agree with your assessment 100 percent."

A.    Right.

Q.    But you confirmed that as well in writing and again just now. You told him, "Right. If you don't know the story, take it off your blog." Do you recall what this is in reference to?

A.    He wrote a blog that it was unfair -- I mean, I read it -- I'm not even sure I read it. It could be that he just told me about it. And that it was unfair for him to go -- get a jail sentence for -- I don't know how long, but it was a long time, and that was really a bundle of nasty landlords, he used a much stronger language, who went after him.

Page 215

GOLDENBERG

So you don't know what the story is, that's -- you know, you don't know the story either. You really don't know the story. You may think you know the story. You don't know the story, but you know, right away you -- you lambaste an entire industry because of one guy who really is wrong. Not every landlord is out to get Ari Teman. Despite what he tells you. I don't think all the landlords decided ooh, this guy's got a great idea, why don't we gang up on him and destroy his business model. Do you think that that's what was done? Or somebody that's going -- that's suing so many different landlords because he screwed all of them, because he took my $60,000 and didn't return it and -- and then -- then shut down some of my -- my intercoms, okay. Now, do you have a question?

Q.    I do. I just wanted to make sure you were done.

A.    I'm never done.

Q.    Sometimes, Mr. -- sometimes you lean back and you're just winding up for -- for round two I wanted to give you the chance. So -- okay. So Avi Goldenberg, I think you mentioned but I

Page 216

GOLDENBERG

just want to be very clear on the record, is your nephew; is that correct?

A.    Correct.

Q.    And before Avi Goldenberg -- now, this is -- the e-mail is dated July 9, 2020, so that's a little over a year ago. And it is in reference -- I'm going to show it to you in a second. I'm not going to play games -- play -- quiz you on it just yet, but the blog post that it is in reference to, that was written by Rabbi Steven Pruzansky. We'll look at that in a second. And my question is before July 9, 2020, did you have a -- did you communicate with Avi Goldenberg about Mr. Teman?

A.    No, I don't believe so.

Q.    So --

A.    No reason to.

Q.    Fair enough. So Avi Goldenberg it appears from this thread -- which I know the -- the first few e-mails are really irrelevant, but it appears from the thread Avi Goldenberg I guess had some sort of relationship -- he knows Rabbi Pruzansky in some capacity?

A.    Avi Goldenberg lives in Bergenfield,

Page 217

GOLDENBERG

New York -- New Jersey. Teaneck. It's -- Bergenfield/Teaneck, it's sister cities, if you want to call it that. Pruzansky was a rebbe in Teaneck.

Q.    Okay.

A.    And I would -- well I don't want to assume. Anything I say is an assumption. I won't assume. For once I won't assume.

Q.    Fair enough.

A.    I'm keeping track of how many times I didn't assume. That's one.

Q.    Fair enough. So Rabbi -- I'm sorry, Avi Goldenberg writes an e-mail to Rabbi Pruzansky and he says here, "I'm writing about your most recent post about Ari Teman. My uncle is one of a number of frum landlords who Mr. Teman took advantage of." Now, just for the record here, frum, is that -- to your knowledge, Mr. Goldenberg, that's a reference to Orthodox Jew?

A.    Correct.

Q.    That's a Yiddish term?

A.    Yes.

Q.    So "My uncle is one of a number of

55 (Pages 214 - 217)

Page 218

GOLDENBERG

frum landlords who Mr. Teman took advantage of."
Did you ever discuss with Avi Goldenberg that
Mr. Teman took advantage of you?

A. No.

Q. Do you know if Abi Goldenberg ever
discussed whether or not Mr. Teman took advantage
of you with Avi, Avi with V, Goldenberg?

A. I really didn't want to assume, but
you're really forcing me to assume or to say no,
I don't know.

Q. How frequently are you in touch with
Avi Goldenberg?

A. Every month or two.

Q. Okay. Are there any -- do you have
any -- I mean, it's -- it's family -- family
obviously, I don't know if -- are there other
let's say mutual family members that you're --
you know, maybe you and Avi have in common
that you're --

A. Avi --

MS. MOYAL: Objection to form.

(Reporter clarification.)

Q. Are there other mutual family members
between you and Avi Goldenberg that you are

Page 219

GOLDENBERG

frequently in contact with?

A. I'm in touch with my brother. I do
not discuss my business with my brother, period.

Q. Have you ever discussed your business
generally with Avi Goldenberg?

A. No.

Q. So fair to say you don't know how Avi
Goldenberg knew Mr. Teman took advantage of you?

A. You keep pushing me to assume. I
marked it down on my one no assumption. But you
spoke to Avi. He would have told you.

Q. I'm asking you whether you know. The
answer can be, "No, I don't know."

A. Anything I say is an assumption.

Q. Okay. So I'm asking -- I can ask it
a lot of different ways, and I might end up doing
that but --

A. Do you want -- say it out loud. Spit
it out. You want me to assume.

Q. I do not want to you assume. I want
you to tell me what you know and if --

A. I don't know.

Q. -- the answer is I don't know, then
the answer is I don't know.

Page 220

GOLDENBERG

A. I don't know.

MS. MOYAL: Objection, asked and
answered. He's answered it repeatedly a few
times. He said it would just be an
assumption. I think he was clear.

Q. And I'm not -- I'm not asking the
same question. What I am asking though is
whether there were other mutual contacts that you
and Avi Goldenberg have with whom you may have
discussed or you did discuss --

MS. MOYAL: Asked and answered.

Q. -- Mr. Teman

MS. MOYAL: Over objection you can
answer.

A. I have told you before in general I
am not a gossip. That's my nature. I'm not a
gossip. I don't call up people and say, Did you
hear what Ari Teman did to me? I do not have
those discussions. Not to Avi's friends and not
to my friends. So it did not come from me.

Q. Fair enough. So again, my -- what
I'm gathering from -- you know, I know we've
beaten this horse a couple of times, it's fair to
say, Mr. Goldenberg, you don't know how Avi

Page 221

GOLDENBERG

Goldenberg knew that at least in your view
Mr. Teman took -- had taken advantage of you?

A. Correct.

Q. Thank you. Avi Goldenberg continues,
"I don't have an opinion on the length or
fairness of his sentence and it may well be worth
examining, but I think it would be worth your
while to speak to some of the frum Jews Mr. Teman
took advantage of, including issuing threats and
slander against them while refusing to go to beis
din before maintaining a full-throated defense of
his actions and partially slandering them and
their business practices."

A. So tell me what's not factual.

Q. I'm not sure --

MS. MOYAL: Let him ask you a
question.

Q. My question is --

THE WITNESS: I'm trying to get him
to answer my question.

Q. Well, let's work backwards here. So
Avi Goldenberg writes here that Mr. Teman refused
to go to beis din, or beth din that we discussed
before, which correct me if I'm wrong,

56 (Pages 218 - 221)

Page 222

GOLDENBERG

Mr. Goldenberg, you would -- would you agree that a beth din is a -- that's a rabbinic court?

A. Yes.

MS. MOYAL: Asked and answered.

A. Yes.

Q. Is it -- is it accurate to say that Mr. Teman in your opinion -- in your experience with Mr. Teman, is it accurate that -- to say that Mr. Teman refused to go to beth din?

A. I did not call him to beth din. I don't know if Abi asked him that. Maybe. Could be some of the other landlords did. But I certainly assumed that he would not be going to beth din. Could be Abi did ask him and that's how it came out. I really don't know.

And there's also a separate issue, even if you're willing to go to beth din, what happens when the beth din rules against you? Do you say it's a rabbinic court, I don't believe in it, and I don't follow through on it? Hmm.

Q. Candidly, Mr. Goldenberg, I think between the two of us, you've got more beth din experience than I do, so you tell me. What does happen when one party -- does that ever -- has it

Page 223

GOLDENBERG

ever happened in your experience?

A. Yes. So if you go to a good beth din, they write a good arbitration agreement and the other guy's stuck with it, but then he can go to court and -- and try to turn it over. I've had that done to me when they ruled against the other side. And he was an Orthodox Jew. And he went to court and said he didn't get notice, he didn't buh, buh, buh, buh, buh. If you don't want to pay a beth din, there's no enforcement that's the problem. There's no enforcement.

MS. MOYAL: Let him ask the question.

Q. So fair to say then that that -- that that concern that you just mentioned whether or not the -- even though if even hypothetically Mr. Teman would have agreed to go to a beth din, that's not -- that concern that you just raised whether or not the beth din's ruling could be enforced would not be an issue or a concern unique to Mr. Teman, that's a concern that's universal let's say in all --

A. No, no, no. It's much more with somebody who's not Orthodox. Somebody that's otherwise, you call his rabbi. You could go to

Page 224

GOLDENBERG

court. I've been to court to enforce arbitration awards. They're costly, they're time consuming. And so you did one -- one time consuming going through the beth din and now you're back in court anyway because the guy refused to pay.

Now, when it's somebody that doesn't believe in it, he's going to come to court and he's going to say I'm not Orthodox, I didn't know what I was signing, it was in Hebrew, it was in English, I didn't understand, they translated it, but I didn't, buh, buh... and then I'm done. And you know Mr. Teman can do that very well.

Q. So if I'm understanding your explanation just now, that -- that was perhaps a thought process you went through in concluding that it wouldn't even be worthwhile raising the option of a beth din as far as you were concerned with Mr. Teman?

A. Could be Abi did. I can't tell you.

Q. But -- but back to Avi Goldenberg -- Avi Goldenberg's e-mail to Rabbi Pruzansky, he writes that Mr. Teman refused to go to beth din and further suggests -- again, I'm going back in the sentence here, I think it would be worth your

Page 225

GOLDENBERG

while to speak to some of the frum Jews Mr. Teman took advantage of, including issuing threats and slander against them while refusing to go to beis din before maintaining a full-throated defense of his actions and partially slandering -- so I know that's a mouthful, but in your opinion is the fact that Mr. Teman -- let's say even if he did refuse to go to a beth din, is that a factor that you believe supports whether or not he should go to prison?

A. No. He should go to prison if he committed a crime. Going -- not going to beis din is not a crime.

Q. Okay.

A. Not -- not in civil society.

Q. Okay. How about slander? If he -- I'm not sure what that's referring to, I'm not going to ask you to read Mr. -- read Avi Goldenberg's mind.

A. Right.

Q. But there's a claim here again, I -- which I don't even know what -- again, that there -- Mr. Teman issued slander against some unnamed, quote, frum Jews.

57 (Pages 222 - 225)

Page 226

GOLDENBERG

A.    Mm-hmm.

Q.    Does that -- do you believe that would be a basis for Mr. Teman to -- is that supporting him going to prison or a prison sentence?

A.    No. No. No

MS. MOYAL:  Objection to the form.

A.    This has nothing to do with prison. This is about who the character is.  And then -- Rabbi Pruzansky slandered every landlord, that's exactly what he did.  He took every landlord and put them in the same way -- I told a state senator last week when we said about why they passed the laws in June 2019, he said, Well, there were some landlords that did.  And I said, If every Greek -- because he was Greek, I said if one Greek robs somebody, do you take all Greeks and put them in jail?  And that's what Pruzansky did.

(Reporter clarification.)

A.    There could be one landlord that did something to him wrong.  Possibility.  More likely he did a lot of bad to a lot of landlords. So therefore you take whatever you hear from Ari

Page 227

GOLDENBERG

Teman, who comes across very nice, if you're not doing business with him -- you know, I -- have a saying, great guy to invite Shabbos over for Kiddush.  Kiddush is for the party after the prayer services.  Invite him over for Kiddush, have a good time, have a couple of drinks, he's a great guy to pal around with, but God forbid you do business with him.

Q.    Fair enough.

A.    Telling Rabbi Pruzansky talk to -- there's enough of them out there on the other side that you can talk to and you can then determine whether you're defending the right guy or not.  I once got a call from a child molester in jail that for $8,000 I can bail him out.  I didn't know he was a child molester.  I made some calls and found out he was a child molester.  I didn't bail him out.  It's a Jew sitting in jail, I should have bailed him out.  Same thing here.

Mr. Ari Teman has done enough things to enough people, owes enough people, has taken away a lot of money, you want to call it theft, not call it theft, we have different ways of looking at it, okay.

Page 228

GOLDENBERG

MS. MOYAL:  All right.  Let him ask a question.

THE WITNESS:  I'm not understanding the question because I want -- he wants to whatchamacallit.  He wants to ask me about what my nephew thought.

MS. MOYAL:  So --

THE WITNESS:  I don't know what my nephew thought.  All --

MS. MOYAL:  Okay.  So let him ask.

THE WITNESS:  -- the hours here asking me what this one thought and that one thought.  You want me to assume everything.

MS. MOYAL:  Then don't assume and answer his questions, okay.

THE WITNESS:  We'll try.

MS. MOYAL:  Okay.

THE WITNESS:  Only because you asked nicely.

(Article was marked Plaintiff's Exhibit 117 for identification, as of this date.)

Q.    Okay.  Now I'm going to -- we're going to come back to the e-mail in a second.

Page 229

GOLDENBERG

I'm going to show you now, Mr. Goldenberg -- this is going to be Plaintiff's Exhibit 117.  Let me know when you can see it.  You know, and actually -- well, yeah, let me know when you can see it.

A.    Oh, he grew up in the shul.  You have to make it a little bigger.

Q.    Sure.

A.    That's exactly what he did, acceptance of terms.  Nobody knew what they were signing on just like me.  Go to the next page. Yeah, it was criminal intent, I'll tell you that.

MS. MOYAL:  Let him ask a question. There's no question pending right now.

THE WITNESS:  I'm giving the answers.

A.    Okay.

Q.    So is this -- I know you alluded to it a few minutes ago, was this the article that you read or --

A.    Yes.

Q.    I think you said you may -- okay. Had you read it before you got the e-mail from Avi Goldenberg that we just looked at a minute ago? I'll pull it back in a minute.

58 (Pages 226 - 229)

Page 230

GOLDENBERG

A.   I don't remember.  I don't remember.

Q.   Did you -- let's start -- other than Avi Goldenberg and Abi with a B Goldenberg --

A.   They're both named after the same person.

Q.   Interesting.

A.   Their both Aba.

Q.   Okay.  Is there -- did you discuss this Rabbi Pruzansky's blog post that we're looking at here as Exhibit 117 with anyone else?

A.   No.

Q.   I know we looked at -- this is going back a little while -- a link that Mr. Bromberg had sent you about another article about Mr. Teman.  Did anyone else send you a link to this article?

A.   I don't remember.  I would think Abi. I don't think that many people knew that I was involved with -- with GateGuard.

Q.   I know you mentioned that you have -- I don't want to put words in your mouth, but you've met let's say Rabbi Pruzansky at some point in time; is that correct?

A.   Correct.

Page 231

GOLDENBERG

Q.   When was the last time, approximately, that you met Rabbi Pruzansky?

A.   Way before this article.

Q.   Have you seen Rabbi Pruzansky since reading this article?

A.   I hate to disappoint you, but I wouldn't recognize him.

Q.   Fair enough.

A.   I do a lot of community work and a lot of political work and I run a school in New Jerry for secular Jewish kids, so through that school we've had fundraisers in different communities, so I believe Rabbi Pruzansky came to some of those fundraisers.

Q.   Understood.  Now, the political work that you mentioned, what -- how would you just generally describe that?

A.   All in -- for the -- until the last two years, all community related, including mostly in New York, but in New Jersey also because I run the school in New Jersey, so I meet with different levels of government to work on funding for schools and things that pertain to the Orthodox community.

Page 232

GOLDENBERG

Q.   Understood.  You just mentioned something about the last -- something changed in the last two years?

A.   The last two years I've spent time on real estate also.

Q.   That's specifically -- I just want to be very clear, Mr. Goldenberg, that is legal -- I'm sorry, political issues relating to the real estate industry?

A.   Correct.

Q.   And the issues that you're -- I don't want to --

A.   What we're referring to has nothing to do with intercoms.

Q.   Understood.  Your community service, the community advocacy that you engage in is primarily -- if I understood you correctly, that's a -- focused on education primarily?

A.   Primarily education, but many other issues that impact our community.

Q.   So Rabbi Pruzansky in this blog here, which you testified I believe you had read before and you now have read again --

MS. MOYAL:  Objection.  I think he

Page 233

GOLDENBERG

said he may have.

MR. REINITZ:  Fair enough.

A.   Once I read it, I remember reading it.

MS. MOYAL:  Okay.

Q.   So before we looked at this, you had reflected about how you -- I think the -- you expressed it as you believed --

A.   Anti-landlord?  Okay.  (Reading document.)

(Simultaneous crosstalk.)

MS. MOYAL:  Wait.  Leon --

Q.   You can read silently or read slowly but --

A.   No, I'm trying to find the --

MS. MOYAL:  So read to yourself. Ariel, did you finish your question?

MR. REINITZ:  I'm not sure.

Q.   But Mr. Goldenberg, my question is whether the comment that you made earlier about your position that Rabbi Pruzansky was slandering all landlords in his blog, whether you could point me to the specific sections of the blog that you believe were slandering all landlords.

59 (Pages 230 - 233)

Page 234

GOLDENBERG

A.    So there are two things.  In the paragraph that starts "each landlord."

Q.    Okay.

A.    "At trial claims made by the landlords" -- he said it earlier though that -- that we don't pay our bills.  Maybe it was later.  At trial claims made by landlords and their representatives that the contracts were entered into without being read, which is true, and that reference to this arrangement was somehow ignored or they simply didn't recall them, were allowed to stand according to great weight and this despite the realty that these contracts are generally produced by lawyers --

(Reporter clarification.)

A.    And this despite the realty that these contracts are generally perused by lawyers and representatives.  It is a very odd circumstance as most people are well aware that she should never sign something they haven't read.

So first off, all contracts that we sign for buildings to buy, to sell are read by contracts -- by lawyers.  When we're dealing with

Page 235

GOLDENBERG

vendors, they're generally not that complex and they're a page or two, and therefore read in-house by many landlords.

But there's something further.  In exaberating (ph) the situation -- and it should not be lost on anyone that in the sometimes sordid world of New York real estate, it is common for some owners to simply refuse to pay their bills in a timely fashion.  They just say sue me.  That is despicable in its right, but it also what engenders the institution remotely created checks in the first place.  There are very few landlords that don't pay their bill.  Doesn't mean there aren't any.  But he's trying to make it like it's all landlords.

Q.    I'm sorry, Mr. Goldenberg, are you still reading?

A.    No.

Q.    So fair to say that you took the -- this blog post by Rabbi Pruzansky somewhat personally?

A.    I took it personally, but I wasn't going to do anything about it.

Q.    Understood.  And you -- your

Page 236

GOLDENBERG

understanding of the blog post -- again, I'm not asking what Rabbi Pruzansky meant or what Avi Goldenberg meant, but your reading of Rabbi Pruzansky's blog post when we read this section above about the landlords accepting their terms, you understood this to refer to Goldmont as one of those landlords?

A.    Yeah. Yeah.

Q.    Okay.  Was Goldmont at all involved in -- to your knowledge, in Mr. Teman's criminal trial --

A.    No.

Q.    -- that's described in this blog post?

A.    No.

Q.    Do you know -- if Goldmont wasn't involved, do you know any of the landlords that are referenced here that were involved?

A.    He has no names so I can't tell you.

Q.    Right.  I'm not asking whether the blog post lists any names.  I'm asking if you on your own independently know any of the landlords that were involved in Mr. Teman's trial?

A.    Not offhand.  I didn't follow the

Page 237

GOLDENBERG

trial, I don't know who testified, I don't know who filed complaints.  I don't know anything about it.

Q.    Do you know anything about the current status of Mr. Teman's case?

A.    No.

Q.    Do you know whether he was sentenced to prison?

A.    I believe he was not.  I believe he was sentenced and then it -- was something happened, I don't know exactly, but I don't believe he's sitting.  I really -- you know, as much as you may not believe this, he's not what I think about every day when I wake up.

Q.    If there's one thing you've told me today that I believe, it's that.  I do believe you.  I believe a lot of other things too.

So again, in Rabbi Pruzansky's blog post here, and I'm scrolling to the bottom of Exhibit 117, Mr. -- Rabbi Pruzansky writes, "This could have been handled as a civil dispute.  As such, it is a clear case of" -- and this is in italics -- "Pidyon Shvuyim."

A.    Yeah.  You need to -- translation?

60 (Pages 234 - 237)

Page 238

GOLDENBERG

Q.   What -- do you know what Pidyon Shvuyim is --

A.   Yes.

Q.   -- Mr. Goldenberg?

A.   Yes.  I've been involved in many cases.  I'm involved in one now.

Q.   What is --

A.   That is -- that is getting -- basically saving a Jew from jail.

Q.   So let's go slow.  Pidyon Shvuyim, to your knowledge, is Hebrew for -- what was it?  I just want you to --

A.   Saving a person -- Pidyon is saving.  Shvuyim is -- is from -- it really goes back to the last century.  People sitting in -- R -- Rubashkin was a case like that.

Q.   Let's go really slow.  Pidyon Shvuyim is redeeming captives is fair to say?  That's --

A.   Redeeming captives, yes.

Q.   Okay.  And that is a -- the rabbi here is -- again, I don't want you to put words in the rabbi's mouth, but this is an allusion let's say to a Jewish principle of redeeming -- helping redeem someone who's in prison?

Page 239

GOLDENBERG

A.   Correct.

Q.   Okay.  And you just mentioned just a second ago about your involvement in this -- in this -- these activities in other cases?

A.   Correct.

Q.   Okay.  Approximately how many cases have you been involved in a Pidyon Shvuyim?

A.   Over the years?

Q.   Yeah.

A.   Half a dozen.

Q.   Okay.  And the one you mentioned recently?

A.   What about it?

Q.   What's your involvement in the case?

A.   My involvement is in -- I actually helped pass a law on the federal level, it's called the First Step Act, and there's somebody that does not fit exactly but, he does fit in and he's sitting in jail, he's 76 and he's in a hospital -- for nine months in a prison hospital.

Q.   And so what's your role, Mr. Goldenberg, in those efforts?

A.   I am working with members of Congress, I'm working with attorneys to try to

Page 240

GOLDENBERG

get him out.

Q.   And that's the -- just in a general sense, you're -- you're let's say advocating among members of Congress to assist this individual in being eligible let's say for the First Step Act?

A.   Correct.

Q.   Were you -- I think you mentioned this just a second ago as well, you -- what was your involvement in passing the First Step Act?

A.   I pushed several members of Congress to get it done.

Q.   Which members of Congress were you involved in --

A.   I prefer not to mention their names.

Q.   Okay.

A.   It really has nothing to do with this case.

Q.   Okay.  I mean, you're the one that mentioned it so --

A.   Well, come over one time for coffee, we can, you know, shoot the breeze.

Q.   I may take you up on it, but right now we're talking about Pidyon Shvuyim and Rabbi

Page 241

GOLDENBERG

Pruzansky's blog.

A.   Right.

Q.   I think I'd also need Ms. Moyal's permission, at least as long as this case is going on.

But Rabbi Pruzansky in his blog is suggesting in his opinion it appears that Mr. Teman's case is a case of Pidyon Shvuyim and he says here, If you are moved by Ari -- Mr. Teman's plight and wish to assist his appeal fund, please contribute to his GoFundMe account at -- and it gives a link for a GoFundMe, Justice Matters Ari Teman, Legal Defense Fund.  And he closes with an appeal prayer let's say for compassion for -- (in Hebrew) of compassion on Mr. Teman in his legal travails.

So I'm going now back to your e-mails with Avi Goldenberg, and I can try to pull them up together or I can bring them back if you want, but if Avi Goldenberg was -- if I recall -- and again, we can look right back at it if you like, he was essentially asking Rabbi Pruzansky to pull this blog post down; is that accurate, as far as you recall?

61 (Pages 238 - 241)

Page 242

GOLDENBERG

A. Yes.

Q. I'm going to show it to you here so you can -- and you agree -- I think you testified before you basically agreed generally with that -- that sentiment that Rabbi Pruzansky should have taken the blog down?

A. No. He should have spoken to some of these horrid landlords first and then make a decision.

Q. Okay. But I'm now showing you back Exhibit 116 and I'm flipping now up -- we're looking for the most part at Avi Goldenberg's e-mail on July 9th. I'm flipping up one page to your e-mail here dated August 4th. You write here, Leon Goldenberg, "If you don't know the story, then take your blog off until you find out the story."

A. Right. I don't say don't put up a blog. And if you agree with Ari after you spoke to others, keep it up. But find out the story.

Q. So fair to say your -- it was your assumption that the rabbi had not -- did not know the entire story. I think you write as much, right, if you don't know the story -- your

Page 243

GOLDENBERG

assumption is that the rabbi didn't know -- Rabbi Pruzansky did not know the story before he --

A. (Indiscernible.)

Q. I'm sorry?

A. There's your side, there's my side, and there's the truth.

Q. Absolutely. Absolutely. And then so in the interim though you were -- your position was that Rabbi Pruzansky should not have publicly supported Mr. Teman's legal defense fund?

A. I did not call Rabbi Pruzansky, I did not instigate my nephew to call Rabbi Pruzansky with my thoughts. He wrote it, he wrote it, end of story.

Q. Now, Avi Goldenberg -- I'm flipping back to his e-mail here -- he suggests -- this is the next paragraph -- it is possible that after investigation, you may rest with your initial conclusions that as stated in the long post -- the post long sentences are rarely fair or just, but at least hear out some of the people who have been harassed and threatened by Mr. Teman and then decide if maybe keeping him locked up isn't such a bad thing.

Page 244

GOLDENBERG

A. I agree with that.

Q. If you are interested in having that discussion, please let me know and I will be happy to put you in touch.

So if I -- again, I don't want to ask you to interpret what Avi Goldenberg was saying, but appears to me he's offering to connect Rabbi Pruzansky with you presumably for a discussion?

A. Presumably.

Q. Is that something -- a discussion with Rabbi Pruzansky, is that something you discussed with Avi Goldenberg?

A. No.

Q. So Avi Goldenberg was -- fair to say he was, to your knowledge, just offering this without having cleared it with you first, he was just proposing it?

A. Did he ask would I talk to him? He might have said that. I don't remember the conversation. I don't remember if I had the conversation with him or just Avi had it.

Q. But sounds -- everything okay, Mr. Goldenberg?

A. Yeah. It's my granddaughter. I'm

Page 245

GOLDENBERG

ready.

Q. If -- I'm sorry?

A. I'm ready for you.

Q. Ready. So Avi Goldenberg offers to put -- offers to Rabbi Pruzansky that if he would like, he'd be happy to put him, the rabbi, in touch with you for a discussion --

A. He doesn't say with me.

Q. Okay. In the previous sentence Avi Goldenberg -- and again, I just want to be clear throughout, this is an e-mail which I think you've confirmed several times you generally, if not entirely, agree with. Avi Goldenberg writes, "Hear out some of the people who have been harassed and had threatened and then decide if maybe keeping him locked up isn't such a bad thing." You agree with that, right? I think you just testified -- I just want to clarify, you agree that keeping Mr. Teman locked up isn't such a bad thing?

MS. MOYAL: Over objection --

A. I did not say that.

MS. MOYAL: Legal conclusion and spec -- sorry, and mischaracterization.

62 (Pages 242 - 245)

Page 246

GOLDENBERG

Over objection you can answer.

A.    It certainly is questionable.  There are some people that they did their crime, you sentence them, you can let them out a week later, they'll never do it again.  There are some people that did their crime, you sentence them for ten years, and you let them out and they're going to do it again.  The question is where does Ari Teman fit in?  I don't have an answer to that.

Q.    Do you think keeping Mr. Teman locked up isn't such a bad thing?

A.    I would --

MS. MOYAL:  Objection, mischaracterization.  Over objection you can answer.

A.    What I said is there are people that commit a crime, get sentenced, if they spend a week in jail, they'll never commit it again and there are people that will spend ten years in jail and will commit the crime again.  And my question to you is where does Ari Teman fit in?  In which one of those?  I didn't answer it.  You're not going to answer it either.

MS. MOYAL:  Anything else?

Page 247

GOLDENBERG

MR. REINITZ:  Oh, yeah.

Q.    Just to recap here, so in Rabbi Pruzansky's e-mail here, the -- what I've got -- and I'm just going to run through a couple things here, you can follow me, Mr. Teman took advantage, in what way do you believe Mr. Teman took advantage of you?

MS. MOYAL:  Objection.

MR. REINITZ:  I'll withdraw the question.

Q.    Mr. Goldenberg, do you believe Mr. Teman took advantage of you?

A.    Yes.

Q.    In what way?

A.    There are a lot of things --

MS. MOYAL:  Sorry, sorry.  Objection, calls for a legal conclusion.  Over objection you can answer.

MR. REINITZ:  What legal conclusion does asking --

MS. MOYAL:  How he was taken advantage of?

MR. REINITZ:  Is that a legal --

MS. MOYAL:  That's for a lawyer.

Page 248

GOLDENBERG

MR. REINITZ:  What legal conclusion -- what legal analysis is required to determine if someone is taken advantage of?

MS. MOYAL:  To the extent that an attorney is required and someone is taken advantage of, then yes.

MR. REINITZ:  Okay.

MS. MOYAL:  I stand by my objection.

A.    He's holding my $60,000.

Q.    Anything else?

A.    I'm sure if I go through all the files and the history, I'll find plenty of other stuff.

Q.    Offhand nothing comes to mind?

A.    No.  Because I'm not -- you know, you're living this case.  I'm not.  I'm living this case today.

Q.    Fair enough.

A.    And a half an hour yesterday.

Q.    Fair enough.  Again, Mr. Teman took advantage of -- we just discussed that.  Issuing threats, did Mr. Teman ever issue threats against you?

Page 249

GOLDENBERG

A.    I believe there were.  Not physical threats, but all kinds of other threats.  "Because of you I'm going to commit suicide," I think that's a threat.  He definitely sent me things like that.  "Because of you I'm not keeping kosher anymore.  I'm eating a hamburger right now.  It's Yom Kippur.  I'm sending it right now."  Yeah, I -- I think those things are sort of threats.  In a different way, but they're threats.  And yes, he sent a lot of those things.  That I should feel terrible for him.  Sorry, I don't.

Q.    Slander, did Mr. Teman ever slander you?

A.    This letter is not about me.  This letter is about Rabbi Pruzansky.

Q.    Yeah.  I'm just using this --

A.    You want to know everything that he's done to me?

Q.    I'm asking about the terms that are used in this letter that you commented on several times.  I'm asking whether or not that's applicable, you believe that Mr. Teman slandered you.

63 (Pages 246 - 249)

Page 250

GOLDENBERG

A. If everything that my nephew wrote is applicable to me or him in general? To him, yes.

Q. I'm asking about --

A. Should I tell you exactly who he slandered and where? I can't tell you.

Q. My question is very specific. I'm asking to your knowledge did Mr. Teman slander you, Mr. Leon Goldenberg?

A. He may have. He may have. I don't know who he talks to.

Q. Do you know -- did -- to your knowledge, did Mr. Teman ever slander Goldmont Realty Corp.?

A. I would have to assume yes. And you have to ask Abi, but he would know much more.

Q. We've talked about refusing to go to beis din, but I'll ask you again, did Mr. Teman refuse to go to a beis din?

A. I did not have that conversation with him.

Q. Did Mr. Teman ever harass you, Mr. Goldenberg?

A. Yeah. Yeah. Yeah. His sending me these e-mails are harassment, yeah. Yeah. And I

Page 251

GOLDENBERG

think you would agree to that and --

Q. Anything?

A. Telling me he's sitting on (in Hebrew) having a hamburger, a trafe (ph) hamburger, yeah, that's kind of harassment.

Q. Anything other than some of the e-mails we've -- we've discussed that you would consider harassment by Mr. Teman?

A. Telling me he's going to sue me for -- I mean, how much is this lawsuit for? Do you have a number there? 3 million? 4 million? I think that's a form of harassment.

Q. So fair to say --

A. He got my $60,000. He's suing me for 3 million dollars.

Q. So this -- this lawsuit --

A. Telling me -- telling me to start -- telling me, If you give me 5, 600,000, we'll call it quits, if not, I'm going to you sue for 3 million. How much is the lawsuit for? Is it for 3 million? Is there a number?

Q. I think we've got to let -- that's a discussion Ms. Moyal and I can have another time, but I'm not sure if there's a specific number.

Page 252

GOLDENBERG

So that -- just to very clear, Mr. Goldenberg, your position now is that the -- this current lawsuit is a form of harassment by Mr. Teman against you?

A. 100 percent.

Q. And threats -- threatened or threats let's say by Mr. Teman, did Mr. Teman ever threaten you?

MS. MOYAL: Asked and answered.

A. This line of questioning is totally out of order. Don't read my nephew's e-mail and ask me what my nephew wrote. You want to call my nephew, call my nephew.

Q. I'm absolutely not --

A. Don't ask me -- don't sit there reading that -- I'm not answering it anymore. I'm done.

Q. Okay.

A. I'm done with this e-mail.

Q. Okay. Well, my last question which I can close the e-mail and ask you is any of the conduct we discussed, which -- and I'm not going to catch them all, but sending e-mails, sending let's say nasty e-mails, filing a lawsuit,

Page 253

GOLDENBERG

slander, or assuming that slander happened, what else? I think you said holding some amount of money?

A. Not some amount. $60,000.

Q. Okay. Holding $60,000. So that -- would you agree that that conduct is a basis for keeping someone locked up?

MS. MOYAL: Objection. One, calls for legal conclusion; two, objection to form and mischaracterization. Over objections you can answer.

A. I will say again what I said before. You don't want to hear it, but I'm going to repeat it. There are some people that are found guilty of a crime and committed the crime and sit in jail for one week and if they come out after a week, they will never commit it again. There are some people that will be sentenced to ten years after they committed a crime, will come out and do the exact same crime all over again, okay. And I know such people. The question is where does Ari Teman fit in? That's what you're going to get from me. Nothing more. I'm not going to tell you he should be sitting in jail, he should

64 (Pages 250 - 253)

Page 254

GOLDENBERG

not be sitting in jail, how long he should be there, should it be ten years, five years, fifty years, or the 30 years that Rabbi Pruzansky talks about.

Q. Fair enough. We'll close out of that exhibit.

The legal defense fund though that Rabbi Pruzansky was let's say promoting --

A. Mentioning.

Q. I'm sorry?

A. Mentioning in his letter.

Q. Yeah. He mentioned --

A. I did not contribute.

Q. That wasn't my question, but I appreciate you clarifying that.

Putting aside your personal opinions about whether or not Mr. Teman does belong in prison, doesn't belong in prison, in any other cases that you've been involved in, I know mentioned several, have you ever felt that a legal defense fund was inappropriate for someone to try to help someone else that was collecting for a legal defense fund?

A. Yes.

Page 255

GOLDENBERG

MS. MOYAL: Objection. You can answer.

A. Yes.

MR. REINITZ: What's the objection, Ms. Moyal?

MS. MOYAL: Relevance, but go for it.

MR. REINITZ: We've established relevance.

Q. What case was that or cases?

A. A case of an agunah. You know what an agunah is?

Q. I do, but can you just --

A. A chained woman.

Q. -- claim for the record -- clarify for the record?

A. And husband was sitting in jail for a different offense.

(Reporter clarification.)

A. And the husband was in jail for a different offense. Nothing to do with her. He kept her chained for 18 years and they were raising money.

Q. And so in that case -- I just want to understand, so in that case you advocated for the

Page 256

GOLDENBERG

legal defense fund to be shut down, for them not to collect money?

A. It wasn't a fund like this one. This is a real GoFundMe page. This was before they had GoFundMe pages.

Q. Okay. So in that case that you mentioned with the agunah, with the chained woman, what efforts -- what steps did you take to stop the legal defense fund?

A. I made sure he didn't get released on bail.

Q. How did you do that?

A. What's the difference? I stopped the funding.

Q. You just testified to it, so that's the difference.

A. I stopped the funding.

Q. Okay. So there -- however the funding was coming about, there was -- someone was funding I guess some kind of legal --

A. Right.

Q. -- efforts to --

A. Right.

Q. -- help the -- an individual get out

Page 257

GOLDENBERG

of prison and you put an end to it?

A. Yes.

Q. Approximately when was that?

A. A lot of years.

Q. Okay. Other than that incident that you just testified to, any other times in which you've stopped legal defense fund -- people collecting for a legal defense?

A. No. I think that's the only one.

Q. Okay. So that one --

A. It's not something I do on a daily basis.

Q. I'm sorry?

A. It's not something I do on a daily basis.

Q. Fair enough. I guess from the other side of it, have you -- have you ever contributed to a legal defense fund?

A. Many times.

Q. Okay. What's the most recent time you've contributed to a legal defense fund?

A. Probably did one in -- probably do it I would say probably at least every year or so.

Q. Okay. And are those -- is that

65 (Pages 254 - 257)

Page 258

GOLDENBERG

generally some people that you know personally or cases --

A.   No.

Q.   -- that you hear about?

A.   That I hear about.

Q.   And have you ever contributed to a legal defense fund of someone you knew personally?

A.   Yeah.

Q.   What was the most recent time you contributed to a legal defense fund?

A.   I don't remember.

Q.   Fair enough.

A.   What does that have to do with any of this?

Q.   Well, I mean, we're -- you've --

A.   You want to know if I'm a nice guy? Yeah, I'm a nice guy.

Q.   I have no doubt --

A.   You want to know whether I think there are some people that should be in jail? Yes.

Q.   Mr. Goldenberg, I never questioned whether you are a nice guy.  Let's make that --

Page 259

GOLDENBERG

that clear.  Let me make that -- me make that clear for the record.

I'm now going to show you Defendants' -- I'm sorry, Plaintiff's Exhibit 118.  Let me know when you can see it.

(Document was marked Plaintiff's Exhibit 118 for identification, as of this date.)

A.   Sarah Stern.

MS. MOYAL:  Let him ask the question.

THE WITNESS:  I know.  They're asking me here.  They need me.

Q.   Mr. Goldenberg, who is -- who is in the room with you now?

A.   My assistant.  She went out.

Q.   Okay.  Has she been there -- was she in the room for the while -- for a while?

A.   No.

Q.   All --

A.   No.

Q.   Okay.  So I'll let you take a look at this and then you can -- you can start from here and you can let me know when I can flip to the next page.

Page 260

GOLDENBERG

A.   Very nice.  Okay.  One thing, obviously this is Pruzansky --

MS. MOYAL:  Let him ask --

A.   Obviously there's another side to the story.

MS. MOYAL:  All right.  Let him ask you the questions.  There's no question pending.

A.   But again, such is not uncommon among New York landlords.  Okay.  I see no point in my reading this.

Q.   Okay.  You're welcome to read it. I'm not going to force you to.

A.   I'll tell you what, send it to me on an e-mail and then when I have time, I'll read it.

Q.   Well --

A.   I don't know who Sarah Stern is.

Q.   Okay.

MS. MOYAL:  Let him ask you the questions, okay.  He's going to ask you questions.

Q.   My first question is whether you know anyone by the name of Sarah Stern.

Page 261

GOLDENBERG

A.   I do.

Q.   Okay.

A.   But it's not this one.  I don't think it's this one.

Q.   Okay.  Who is Sarah Stern?

A.   She runs an organization called EMET.

Q.   Okay.

A.   E-M-E-T.

Q.   Just generally, what do you know about their organization?

A.   Well, first off, she doesn't live in New York City, she lives in Silver Springs.  That is an organization that focuses on Israel and trying to tell -- EMET meaning truth, tell the truth about Israel.

Q.   Fair enough.  Have you ever spoken to the Sarah Stern you just referenced about Mr. Teman?

A.   Yes.

Q.   Okay.  Approximately when was that?

A.   We're going to go off on another tangent.

Q.   Well, we got to do what we got to do.

A.   Until June I had a radio show.  I had

66 (Pages 258 - 261)

Page 262

GOLDENBERG

her on my show.

Q.   Okay.  And then in June what happened?

A.   I retired.

Q.   Okay.  So you had Ms. Stern on your radio show?

A.   Yeah.

Q.   Approximately when was that?

A.   Give or take a year, year and a half.

Q.   Okay.  And was it during the radio show when you were discussing Mr. Teman with -- with Ms. Stern?

MS. MOYAL:  Objection.

A.   That was a good try.

Q.   Maybe I misunderstood.  I wasn't -- I thought that -- I may have misunderstood, Mr. Goldberg --

A.   We were discussing her organization, EMET.  We were not discussing --

Q.   I apologize.

A.   -- Ari Teman.

Q.   I apologize.

A.   Again, let me --

Q.   Then I apologize.

Page 263

GOLDENBERG

A.   I don't wake up with Ari.  I don't go to sleep with Ari, okay.  He is not on my mind. I don't sit and discuss him with anybody.  I haven't discussed him with anybody.  I really don't care to discuss him with anybody.  I feel bad enough that I got screwed by him.  I feel bad enough that I didn't tell my son beforehand you don't sign -- don't -- you read everything that you write --

MS. MOYAL:  Let him ask you the question.

A.   -- if there's a link that has 30 pages, you're stuck.

MS. MOYAL:  Let him ask you the question.

Q.   I appreciate that.  I must have -- maybe I'm the only one who misheard you.  I thought you had said you had spoken to Ms. Stern that you referenced about Mr. Teman.  I did not -- I was not trying to play gotcha with that. Thank you for clarifying that.

So it's my understanding then that you -- Sarah Stern of EMET that you referenced from Silver Springs, Maryland, you have never

Page 264

GOLDENBERG

spoken to her, to your knowledge, about Mr. Teman?

A.   No.

Q.   Thank you.

A.   And I don't think this is her because this says Sarah Stern, NYC.

Q.   Fair enough.  Okay.  So I just wanted to ask generally if you've ever seen any of the contents of this e-mail.

A.   No.

Q.   Okay.  Have you ever spoken to anyone about having others, let's say people other than Avi Goldenberg who we just discussed a few minutes ago, reach out to Rabbi Pruzansky about his support public support of Mr. Teman?

A.   No.

Q.   So you have no knowledge of anyone other than Avi Goldenberg reaching out to Rabbi Pruzansky regarding his support of Mr. Teman?

A.   Correct.

Q.   Have you -- there are some links here, again I'm not going to force you to look at them, and again they're not particularly interesting.

Page 265

GOLDENBERG

A.   These are court links.  I never do -- go on those.

Q.   Okay.  So have you -- I'm just asking generally have you ever -- have you reviewed any documents relating to Mr. Teman's criminal case?

A.   No.

Q.   Okay.  Just sort of more generally, I know I mentioned your work in Pidyon Shvuyim for -- in other cases, have you -- have you been involved in any other cases let's say in the last two or three years --

A.   I'm involved in one right now.

Q.   Okay.  So other than -- do you know if any of those cases are in -- this -- the court that this case is is the Southern District of New York or SDNY --

A.   I do not --

Q.   -- have you been involved in any other cases in New York?

A.   I do not deal with the courts.  I deal on the political angle.

Q.   Okay.  So have you -- now I'm not talking about you having criminal accusations yourself, but have you done any work let's say in

67 (Pages 262 - 265)

Page 266

GOLDENBERG

connection with sentencing, trying to write letters for anybody to -- for sentencing?

A.    Yes.

Q.    Who have you written a letter for in support of their leniency for sentencing?

A.    The last one, Chaim Deutsch.

Q.    Okay.  And who is Chaim Deutsch?

A.    He was a councilman in -- across the street from me.

Q.    He lives across the street from you?

A.    No.  He was a councilman in the district across the street from my house.

Q.    Okay.  What's your -- how long have you known Mr. Deutsch?

A.    20, 25 years.

Q.    Okay.  And he -- do you know just generally what he was -- what -- what he was dealing with?

A.    Look it up.  Let's not waste time with this.

Q.    Okay.  I'm curious as --

A.    Google him, he'll come right up.

Q.    Fair enough.  So you wrote a letter in support of Mr. Deutsch in advance of his

Page 267

GOLDENBERG

sentencing; is that accurate?

A.    Yes.

Q.    Okay.  Anyone else recently?

A.    Probably not in the last year.

Q.    Okay.  With respect to -- and I know you mentioned him a little while ago, Sholom Rubashkin.  Are you familiar with the Rubashkin case?

A.    Yes.

Q.    Just generally, how would you describe the legal predicament that Mr. Rubashkin was in, to your knowledge?

MS. MOYAL:  Again, objection, calls for a legal conclusion.  Over objection you can answer.

A.    I want to make it quick.  He was -- he was -- there was a raid by ICE, which today if you did that, every single liberal in the U.S. would be on top of him.  He was found innocent of all those charges.  He was found guilty of a charge that nobody was found guilty of since I think 1868 when the statute was made of not paying for your animals in 30 days, for your cattle in 30 days.  That's what he was found

Page 268

GOLDENBERG

guilty of.

The court mixed in, told anybody that wanted to bid on the bankruptcy on his meat supply place would be investigated.  That got a lot of people out of it.  And the only one that bid, bid I think 27 million, he owed the bank about 6, 7 million more than that, which they were willing to pay, and because of the -- because of the judge saying that nobody could bid, that's it.

Then the judge -- the prosecutor asked for 25, years, which is utterly ridiculous, and the judge gave him 27 years.  Was he guilty of anything?  Yes.  Should he have sat in jail for a year or two?  Yes.  Did he sit in jail for a couple of years?  Yes.  And so it was an unjust sentence, it was anti-Semitic sentence, it was an anti-Semitic court, and therefore we fought to get him out of jail.  Not that he shouldn't have gone to jail, but he should not have received 27 years.

Q.    Fair enough.  And when you say -- just a minute ago, Mr. Goldenberg, you said we, we fought, who -- who -- other than yourself, who

Page 269

GOLDENBERG

was fighting for Mr. Rubashkin?

A.    Thousands of people probably.

Q.    Okay.  What -- you personally, what -- what efforts were you involved in for -- on behalf of the Mr. Rubashkin?

A.    Speaking to the attorneys, speaking to members of the Congress to push the President for the final pardon.

Q.    And the President you're referring to is President -- which President?

A.    Trump.

Q.    Okay.  And what was the outcome of those efforts?

A.    He was pardoned.  First there were efforts to overturn the case, but in the end it was -- the only thing that was left was a pardon.

Q.    Okay.

A.    I'm not sure which one he got.

Q.    Did you ever speak to President Trump about the Rubashkin case?

A.    No.

Q.    Okay.  Did you speak to other members of the President's cabinet, the attorney general or others, about the case?

68 (Pages 266 - 269)

Page 270

GOLDENBERG

A. No. I speak to members of Congress. I did -- no, I take it back. I probably did speak to the Attorney General, Barr.

Q. Any other members of the President's -- President Trump's cabinet? Jared Kushner or anyone else?

A. No. But Jared was very instrumental. But not through me.

Q. Do you know Mr. Kushner?

A. No. I've met him a couple of times, but I can't say I know him.

Q. Other than the Rubashkin case, just in the last let's say few years, were you involved in any other clemency efforts?

A. Yes.

Q. Which efforts were you involved?

A. No. I'd rather not discuss. They're still ongoing.

Q. Fair. Any clemency efforts that were successful other than the Rubashkin case?

A. Over the years? Yeah. I'm not -- one thing, let's be very clear, I don't take credit. I was one of the cards in the wheel.

Q. I wasn't giving you any credit, but

Page 271

GOLDENBERG

I -- whether or not you deserve credit, which I'm sure you do, Mr. Goldenberg, to at least some extent, I'm just asking what -- which cases -- successful clemency cases other than the Rubashkin case that you were involved in any capacity.

A. There have been others. Jonathan Pollard.

Q. For the record -- and I'm certainly familiar with Mr. Pollard's case, when we have coffee one of these days, we'll -- we can catch up. I've got a Jonathan Pollard story too.

A. I'll tell you the time I went to visit him with a member of Congress too.

Q. Okay. And you went to -- was that in North Carolina?

A. In North Carolina; Butner, North Carolina.

Q. Okay. And so your clemency efforts on behalf of Mr. Pollard, who were you -- what members of Congress or what members of the -- of federal government were you --

A. Mostly members of Congress.

Q. -- petitioning? Members of Congress?

Page 272

GOLDENBERG

A. And one or two senators also.

Q. Okay. And with respect to -- I'm coming back home here with Mr. Teman. Were you aware that Mr. Teman was seeking a Presidential pardon?

A. No.

Q. Okay. So --

A. Doesn't surprise me, but no.

Q. Okay. So fair to say then that you were not in touch with any members of let's say the federal government or the White House or anything else about --

A. Either way.

Q. Okay. Neither for nor against Mr. Teman's --

A. Right.

Q. -- case? Fair enough. I don't know -- I've got more to go, but now's a good time for like a five- or ten-minute break.

A. Okay.

Q. Do you want to do ten minutes?

A. Ten minutes. I'll take ten hours.

THE VIDEOGRAPHER: The time is 4:26.

Page 273

GOLDENBERG

We are off the record.

(A brief recess was taken.)

THE VIDEOGRAPHER: Time is 4:40. We're on the record.

Q. Mr. Goldenberg, can you hear me?

A. Yes, I can.

Q. Excellent. I'm sending Ms. Moyal some exhibits.

Just in terms of background here, I know we're jumping around a little bit, how long have you lived in Brooklyn?

A. Most of my life. Bronx born, Brooklyn raised.

Q. What part of the Bronx?

A. The south.

Q. South Bronx? Wow.

A. The real south.

Q. Okay.

A. That's where I come from.

Q. Do you own any real estate there?

A. Not in the south. In Riverdale.

(Magazine cover was marked Plaintiff's Exhibit 140 for identification, as of this date.)

69 (Pages 270 - 273)

Page 274

GOLDENBERG

Q.   Okay.  Mr. Goldenberg, let me know when you can see Plaintiff's Exhibit 140.

A.   That's me.

Q.   Okay.  Have you seen this picture before?

A.   Yes.

Q.   Have you seen this -- I believe it's a magazine cover, have you seen it before?

A.   Yes.

Q.   Have you ever -- anyone ever ask you about it before I'm asking you about it now?

MS. MOYAL:  At deposition?

A.   At deposition, no.

Q.   Not in a deposition.  In general, has anyone ever mentioned this --

A.   I get stopped every week.

Q.   I figured.  Okay.  And approximately how long -- the date's a little -- I can zoom in, but the date is a little fuzzy, but I have the article that I'll show you in a minute in the next exhibit.  Just approximately how long ago was this?

A.   This would have been June or beginning of July 2019.

Page 275

GOLDENBERG

Q.   Okay.  And that -- does that time or that date stick out in your mind for any reason?

A.   Yes.

Q.   Why is that?

A.   On June 19th the New York State Legislator passed a bunch of laws on residential housing which destroyed the business.

Q.   Can you be more specific?  And again, we will get to your -- some of your comments from this article, but just generally, what did the legislation that you mentioned -- how did that impact you?

A.   It basically destroyed every opportunity for landlords to raise rents.

Q.   Okay.  Which -- and again, I'm not in the real estate business beyond let's say involvement here.  Is that -- that's the primary way that a landlord would make money in New York City would be by raising the rents; is that correct?

A.   Yeah.  I mean, your rents has to go up.  There are two -- two regulations, one is on the state level, one is on the city.  The city give us no increases on what are supposed to be

Page 276

GOLDENBERG

CPI increases even though we had increases in CPI costs, and the state took out every other avenue to make money.

Q.   So was this -- this legislation or -- I don't know if it was more than one bill, the legislation you're referring to, were you involved in let's say advocating against the passing of that legislation?

A.   Yes.  That's when I got involved in real estate advocacy.

Q.   Fair enough.

A.   Six months before.

Q.   Okay.  And have you been involved in any advocacy since then --

A.   Yes.

Q.   -- to, I don't know, undo the effects of that legislation?

A.   Yes.

Q.   The headline here screams, "Real Estate Investor and Agudah Activist Leon Goldenberg Says, 'It's Time to leave New York!' New York's Real Estate Laws are Wreaking Havoc on Everyone."

So what did you mean when you said or

Page 277

GOLDENBERG

if you said -- should I ask did you say it's time to leave New York?

A.   Yes.

Q.   Okay.  Do you still believe it's time to leave New York?

A.   Yes.

Q.   But you're still in New York?

A.   Not much longer.

Q.   Okay.  Where are you going?

A.   Florida.

Q.   Very nice.  What part of Florida?

A.   Surfside.

Q.   Oh, that's -- I would say very nice, but that's where the --

A.   That wasn't so nice the last few months, right.

Q.   Yes.  I hope -- I hope you weren't directly affected by the --

A.   No.

Q.   -- tower collapse.

A.   Close call, but no.  And because I'm Orthodox.  I looked at an apartment in the building and I told my wife, who went -- went down there, I said, "Measure it on the odometer

70 (Pages 274 - 277)

Page 278

GOLDENBERG

to the shul."  That was .9 miles and I said too far, we're not buying it.

Q.   That was -- just to clarify for the record, that was -- you determined the apartment in the Surfside -- I assume the -- one of the Towers that collapsed --

A.   Yes.

Q.   -- was too far from the synagogue for your tastes, I guess for your liking, and you elected not to purchase it, which sounds like was a good move for you.

A.   Good move.  Good thing I'm Orthodox, otherwise I'd take the (in Hebrew.)

Q.   Real estate investor and agudah activist, the agudah, is that a reference to Agudath Israel?

A.   Yes.

Q.   What generally is Agudath Israel?

A.   It's an advocacy organization that represents the Haredi, the ultra Orthodox -- as our governor loves to say, the ultra Orthodox community of the United States.

Q.   Which governor are you referring to?

A.   The putz who's gone now, Cuomo.

Page 279

GOLDENBERG

Q.   I won't ask you to translate that for the record -- to translate that for the record, Mr. Goldenberg.  So Agudath Israel, what's your -- do you have a title in -- at Agudath Israel?

A.   I'm the treasurer of Agudath Israel Community Services, I'm on the board of trustees, and leave it at that.  That's enough.

Q.   Okay.  And is that -- I know we've discussed some of your political advocacy, is that all or some of that through Agudath Israel?

A.   Some of that is through a agudah.

Q.   Any other organizations that you're involved in on a regular basis?

A.   Yes.

Q.   Can you identify them?

A.   Some of them?

Q.   We can start with some.

A.   You got a pen?

Q.   I do, but we've got a court reporter here, so we'll have it all down on the record.

A.   COJO of Flatbush.

Q.   Okay.

A.   Shalom Torah Centers.

Page 280

GOLDENBERG

(Reporter clarification.)

A.   C-O-J-O of Flatbush; Shalom, S-H-A-L-O-M, Torah, T-O-R-A-H Centers; Cherva, C-H-E-R-V-A, Kaddisha, K-A-D-D-I-S-H-A, of Flatbush; Congregation Khal, K-H-A-L, Yereim, Y-E-R-E-I-M.  Do you want more?

Q.   Just the highlights.

A.   What do you want highlights?  Do you want to know what each one does?

Q.   Oh, no.  You were asking -- if we wanted -- wanted you to keep going.  I don't know if you have more, more organizations to add, or if that covers it?

A.   I probably have another one or two.

Q.   So back to the article here, or the cover story, I'm going to close this out here and I'll pull up the -- at least what I have of the interview.  That was -- was that an interview with you, Mr. Goldenberg?

A.   Yes, it was.

Q.   Okay.  And you were -- again, I'm not going to put words in your mouth, we can read your own words in a second, but generally as you recall, is that your feeling at the time was that

Page 281

GOLDENBERG

there was no future in real estate in New York City; is that --

A.   Correct.

Q.   -- accurate?

A.   Yes.

Q.   Do you still feel that way?

A.   I think we have five more years to go before there's a turnaround.

Q.   And that's a turnaround meaning things will get better in five years?

A.   They won't have a choice.  They'll have wrecked so much damage and it will impact the tenants that -- that they won't have a choice.

Q.   Okay.  So eventually you -- I mean, like many things perhaps it's cyclical and things may eventually get better, you anticipate?

A.   Better.  Not -- not yet the same.

Q.   Okay.  So this is at least I believe what I was able to pull up online, I believe the underlying article from the Ami -- is it Ami Magazine, A-M-I, Ami Magazine?

A.   Yes.

Q.   "Killing the goose that laid the

71 (Pages 278 - 281)

Page 282

GOLDENBERG

golden egg, has New York State effectively brought an end to its real estate industry and how does it impact the average New Yorker?" Mr. Goldenberg, can you confirm that's a picture of you?

A.    Yes.  You see me.  Same face.

Q.    It looks -- it looks like it's me but -- now, are you standing in front of 1360 East 14th Street?

A.    Yes, I am.

Q.    And that's also the offices of Goldmont Realty Corp.?

A.    Correct.

Q.    And is it -- it appears from here -- I've never been there, to my knowledge.  Is it an apartment building?

A.    Yes.

Q.    Okay.  So does Goldmont Realty Corp. own the building?

A.    Yes.

Q.    So it owns --

A.    No, no, no.  Nostrand Newirk owns the building.

Q.    Do you own Nostrand Newirk?

Page 283

GOLDENBERG

A.    Yes.

Q.    Okay.  Do you own -- own it entirely or do you have partners?

A.    In this, outside of my wife, no partners.

Q.    Okay.  And Goldmont -- if I understand correctly from our discussions earlier today, Goldmont Realty Corp. manages the building?

A.    Correct.

Q.    Okay.  On behalf of Nostrand Newkirk?

A.    Yeah.

Q.    Okay.  So in this article -- and I'll let you read it if you like.

A.    I read it.

Q.    Okay.  You've read it or -- I don't know if you need to read your own words, but there's some discussion here about what you've just described, which is that the new real estate -- the new laws are going to have a dramatic impact on the real estate industry and it will be, as I understand it, much more difficult to raise rents and that will have a direct obviously adverse effect on let's say the

Page 284

GOLDENBERG

profitability of the real estate industry, the ability to make money.

This is again -- and I -- it's a little clear here, June -- you know the exact to the date, you know, of the passing of the legislation.  So this article is June 26, 2019. It's within a week or two of that, I think the date -- was it June 19th?

A.    I think it's June 19th, yeah.

Q.    Okay.  Shortly thereafter.  And I know we've discussed and I know you're going to get aggravated so I'm not going to put a date on it, but whatever the date may have been that the agreement that we looked at earlier today would -- which had your signature on it, was sent to me is within a few months -- within let's say two months of this date give or take.

A.    Mm-hmm.

Q.    Did the new real estate laws -- and just, again, you were -- obviously you had strong opinions about, did any of those factor into the concerns that you had about -- that we've discussed earlier today about GateGuard?

MS. MOYAL:  Objection to form.  Over

Page 285

GOLDENBERG

objection you can answer.

A.    If I'm correct, all that took place prior to this, prior to these new laws.

Q.    Okay.  So if you were -- again, I just want to be clear about what you're testifying now.  Your under -- your recollection is that your -- your dealings with GateGuard all occurred before --

A.    Correct.

Q.    -- the laws -- these laws were passed that hurt the real estate business?

A.    Yes.

Q.    So and again, I'm not in the real estate industry, but I'm trying to -- to imagine if I were.  The -- if -- if overnight it seems the profitability of the industry had been dramatically affected, was that a factor in any of your decisions in terms of how you did or didn't deal with let's say Goldmont's agreement with GateGuard?

A.    No.

MS. MOYAL:  Objection.  He just said that it was before, didn't he?  Are you saying did it affect him --

72 (Pages 282 - 285)

Page 286

GOLDENBERG

THE WITNESS: I said it was before. I'm --

MS. MOYAL: After? Are you saying did it affect him after the legislation came out, after the agreement was already supposedly surfaced?

MR. REINITZ: So there's two points in time -- well, three really, right. There's when -- and again, I'm not -- I know Mr. Goldenberg is going to -- not going to be happy if we try to pin him down to a date, so we'll just say one -- one milestone is GateGuard and Goldmont coming to an agreement or agreements over -- for intercoms. Another milestone -- and I'm not suggesting any -- which came first or which came second. That's one date. Another date is these -- the rent laws changing that hurt profitability. And the third date let's say is this -- let's say this dispute started, so GateGuard claiming that Goldmont owed it money and Goldmont not -- let's say not willingly paying that money.

Q.    So my question is was the sequence of

Page 287

GOLDENBERG

events, Mr. Goldenberg, to your recollection, did you first have an agreement with GateGuard, then did the rent laws change and then did you decide -- I'm not suggesting yet whether or not one -- Mr. Goldenberg, are you still there?

A.    Yes, I'm here.

Q.    Was that a phone call?

A.    Yes.

Q.    Who was the phone call from?

A.    The phone call was from me to my controller finding out the date of the checks.

Q.    Okay. And that's Mr. Horowitz?

A.    Yeah.

Q.    That might resolve all your -- you -- you these dates. That's what bothers me. What bothers me about your question is --

MS. MOYAL: He has to ask you the questions today, okay.

THE WITNESS: Stop with the questions.

A.    You're asking me questions about this August 30th date of that letter. You know exactly what date I signed this. You can play all the games you want. You know the date.

Page 288

GOLDENBERG

Ariel Reinitz, you know exactly what day that was.

MS. MOYAL: Leon, just answer the question.

A.    Am I correct?

Q.    You're absolutely correct. And candidly, the only reason the -- we keep going around on this is any sort of attempt to suggest that it may have been on another day. Yeah, I've got the e-mail from Mr. Rubinstein, from your attorney, the --

A.    You know the date from Ari Teman when I signed.

Q.    I'm sorry?

A.    You know the date from Ari Teman that I signed it.

Q.    No. I've -- we can -- I can pull it back up, but let's -- we're not going to get -- if we get sidetracked, the only one that loses is you in terms of the time so let's --

A.    If you're going the full seven hours, it doesn't make a difference.

Q.    Okay. Maybe, maybe not. But in any event, my question, Mr. Goldenberg, to your

Page 289

GOLDENBERG

recollection, let's -- we're going to put three milestones, three points in time and I'm going to ask you to sequence them. The first one is the agreement that you signed. I'm not going to ask you for dates, but I'm going to ask you to your recollection which came first, which came second, which came third. Number one, GateGuard -- Goldmont, excuse me, signs the agreement with GateGuard, point in time two is the rent laws in New York City changed, and point number three is let's just say this dispute boils over, GateGuard demands payment from Goldmont and Goldmont does not pay.

A.    Okay. So let me give you some dates now and stop this shenanigans. The $60,000 was written on 2/12/19.

Q.    Okay.

A.    Okay?

Q.    Mr. Goldenberg, I'm listening, but I just want to know what you're reading off of.

A.    I'm reading off of -- it's called a -- query vouchers.

Q.    Okay.

MR. REINITZ: Ms. Moyal, I'm going to

73 (Pages 286 - 289)

Page 290

GOLDENBERG

call for production of any documents, including those documents Mr. --

MS. MOYAL: Follow up in writing, we'll take it under advisement.

MR. REINITZ: Well, it's -- I will do that too, but these are documents that Mr. Goldenberg has now brought to his deposition and so those documents are -- we're entitled to production of them. I'm just -- I will also follow up in writing.

MS. MOYAL: Wonderful.

MR. REINITZ: I'm asking you to ensure that that happens. Thank you.

A. Okay. So all of this took place before.

Q. Well, there's three points in time and I'm asking you to -- to put them in order for me. So which came first? Did -- did -- I can -- we can do one or the other. Which came first? Did Gate -- Goldmont sign an agreement with GateGuard first or did the rent laws in New York change? Which came first?

A. GateGuard.

Q. Okay. So Goldmont signed an

Page 291

GOLDENBERG

agreement with GateGuard and then the rent laws changed; is that accurate?

A. Yes.

Q. Okay. And then after the rent laws changed -- and again, I'm not yet suggesting anything other than after that Goldmont -- GateGuard -- this dispute let's say started, Goldmont -- GateGuard claimed Goldmont owed some amount of money, black boxed the money, and Goldmont did not pay the amounts that GateGuard was claiming; is that accurate?

A. No.

Q. Okay. Which part is inaccurate?

A. So let's start with A. We signed GateGuard. The checks were not written right away. I don't know exactly when we signed and when the checks were written, but there was some time span.

Q. What happened on February 12th?

A. That's when these checks were written.

Q. Okay.

A. Okay. The $60,000 in checks that I'm talking about. I'm not looking at the total

Page 292

GOLDENBERG

amount there, but that's approximately it, okay. And then we had the dispute with GateGuard and then the laws changed.

Q. All right. I want to be very clear because I think we may be talking about two different things. The dispute that I'm referring to is -- I mean what -- what amounted to -- what -- what culminated let's say in this -- the current lawsuit, which is specifically I would say the -- after the devices were delivered to your office that you testified to earlier today and at that point after the -- my understanding is after the devices were delivered, GateGuard -- I'm not suggesting it was necessarily to you, but at some point after that GateGuard made a claim that -- to some representative of Goldmont, whether it was Abi Goldenberg, whether it was Mr. Rubinstein, maybe someone else, in any event, GateGuard claimed that those devices that were delivered, Goldmont owed -- had to pay GateGuard for those devices and then once Goldmont did not pay, this dispute I would say or this lawsuit followed. So that -- I'm asking about that -- that part of the dispute I would say or that --

Page 293

GOLDENBERG

that dispute.

MS. MOYAL: Objection to form. Is there a question?

Q. That -- that dispute that I just described -- and maybe I made it clear, maybe I didn't --

A. It's clear to me.

Q. -- was that before or after the rent laws changed?

A. It's clear to me. Number one, we ordered 50 intercoms, I wrote a check shortly thereafter for 1199, different amounts, okay. I wrote a check thereafter on February 12, 2019. Thereafter we had a dispute with Mr. GateGuard when we went on to our intercom and I said we're done with him. Then June 19 happened. Then he sent us the boxes, which we told him not to send us.

Abi specific -- because he kept threatening he's going to send them. Abi kept telling him we're not taking it, don't send it, don't send it. Problem was, as I said, it was delivered when nobody was here and they delivered it. But the dispute started before. Not when he

74 (Pages 290 - 293)

Page 294

GOLDENBERG

starts to threaten me, not when he says now I have a contract going back. That's not when the dispute started.

Q. Fair enough.

A. We went -- let's be very, very clear, we were out of doing business with him before the June laws. We decided -- we made a determination we're not going to do any business with him before the June laws. Nobody expected the June laws to be as harsh as they were, including the state assembly and the state senate. So that's a separate issue.

But the bottom line is is that all this happened before the June laws. The June laws changed things, and had they happened a year earlier, I probably wouldn't be in this lawsuit right now. But the fact is that they did happen afterwards. Now you're coming to me and you're telling me you're shipping the units. I don't want to deal with you. I don't want to deal with you not because of June laws. Because I don't want to deal with you. Because you're -- you're accessing information, you're shutting down my buildings without telling me and you're telling

Page 295

GOLDENBERG

me, "I can do it any time" and I should put them in all my buildings so you can shut down all my buildings at any time you want and -- and -- and have a thousand tenants, 2,000 tenants call us up and tell us they can't get into their building? That's what caused it. When he shut down the building.

If he didn't shut down the building, those -- those -- all those would have been put in. And they would have been delivered before June. Because we kept telling him don't send them, don't send them, we're not doing business with you anymore, we're not putting them in, we're not giving you any money, we're not doing anything. You got the timing? Not the August 30th date that you have on that e-mail, which you keep trying to trick me into. And I will say that, you're just trying to trick me. That's your job. I agree, it's your job to try and get me to make a mistake. But that's not a mistake I'm making. And I'll gladly send you the check register. I'm very happy to send it to you because it has the dates that will bury your -- not bury your client, but that's the 60,000 --

Page 296

GOLDENBERG

with that is coming a complaint for my $60,000 back, okay?

Q. Okay.

A. Anything else you want to ask me now?

Q. There is. So I'm still looking at Exhibit 141. June 26th or June 19th we can put as the date that's seared I guess in your memory in terms of the rent laws changing.

MS. MOYAL: Objection.

Q. Your testimony --

MR. REINITZ: Okay we can strike that.

Q. June 19th, which is the date that you testified to as the date of -- approximately the date of the rent laws changing --

A. A date that will live in infamy --

Q. A date that will live in infamy.

A. -- in the real estate industry.

Q. Fair enough. It's your testimony that after that point there was no further let's say -- let's make it simple. Goldmont didn't negotiate further with GateGuard for any other deals after that point. At that point you were done doing business with GateGuard and there was

Page 297

GOLDENBERG

no further discussions or negotiations.

A. Oh, discussions? Constant. He was hocking Abi every day. Oh, I won't say every day, but regularly.

Q. But as far as --

A. I told Abi stop talking to him, stop taking his e-mails. They were so nasty. He kept telling Abi -- I promise Abi's a very good person. And every time he kept telling him, are you happy I'm eating trafe because of you, because of you I'm eating trafe, because of you I'm not keeping Shabbos, because of you, because of you. And you don't know how much that ate at Abi. I said, Don't you realize that he's just playing with you? And he kept doing that. Because of you, Abi, I believed in God until you came along. All this kind of shtus that he wrote. You got all the e-mails. You asked Abi for everything. You can read what he wrote. You know who your client is. I don't have to tell you who your client is. I still don't know how you're getting paid, but that's a separate issue.

Q. Some days I'm not sure either.

A. I hope you're not on -- on

Veritext Legal Solutions

212-279-9424                www.veritext.com                212-490-3430

Page 298

GOLDENBERG

contingency.

Q.   Some days I'm not sure either.

A.   Only most days you're not sure.

Q.   So --

A.   You can spend a whole day on this.

Q.   Who's that?

A.   You're not making money this way.

Q.   I appreciate the concern.

A.   I think all the landlords are going to get together and fight you to the Supreme Court.

Q.   Okay.  Is that -- is that something you've discussed with them?

A.   No.  Not yet.  But I will.

Q.   Who's your first call?

A.   I'm going to look up who you're suing and I'll reach out to them.

MS. MOYAL:  Any questions?

MR. REINITZ:  There is a question.  I don't remember now.

(Simultaneous crosstalk.)

Q.   That's part of the strategy huh, Mr. Goldenberg?  That's the strategy, right?  And it's working.

Page 299

GOLDENBERG

So it's your testimony -- I really just want to go back to it one last time on the dates -- that after the rent laws changed in approximately June 2019, Goldmont didn't execute any -- there were no further agreements that Goldmont actually executed or signed with GateGuard after that?

A.   I don't think --

MS. MOYAL:  What do you mean by agreement?  Other than the one agreement that we're talking about?

Q.   You never signed an agreement --

A.   No.

Q.   -- after June 19th with GateGuard?

A.   No.  No.  We never signed -- there's one agreement that's -- that's out there, that's it.

Q.   Okay.  So going back to it then, it sounds as though the June laws -- well, did the June laws that we're -- I call them the June laws.  Did these -- these new real estate laws from June 2019 that we've been discussing, did that impact how Goldmont deals with any other vendors other than GateGuard?

Page 300

GOLDENBERG

A.   Yes.

Q.   In what way?

A.   We stopped renovating apartments.

Q.   Okay.

A.   We did do some major capital improvements because there was a special program that we took advantage of, a legal program, but a lot of stuff that normally would have gone on before was stopped.

Q.   Okay.  And that -- so going back to the renovation, so the -- what -- are those vendors like -- is that like contractor --

A.   Right.

Q.   -- that type of vendor?

A.   Right.

Q.   So if I'm understanding you correctly, after the laws changed you, I guess, would not be able to renovate an apartment let's say but say -- I don't know what the amounts are but let's say --

A.   You can renovate it, but you can't get an increase.

Q.   Right.  In other words, you -- you would be -- even if you renovated it, you would

Page 301

GOLDENBERG

not be able to increase the rent substantially --

A.   Right.

Q.   -- such that has the renovation would not be worthwhile business -- wouldn't be worth investing the money.

Other than renovations, anything else?  Any other vendors that Goldmont sort of curtailed, you know, lessened its investment in or lessened its business with after the laws changed?

MS. MOYAL:  Other than --

A.   The one you're looking at --

MS. MOYAL:  Wait a sec.  Wait a sec.  Wait a sec.  Other than in relation to GateGuard?

Q.   Other than GateGuard and other --

A.   We had nothing to do with GateGuard.

Q.   -- renovations --

A.   We didn't --

Q.   No, nothing to do with GateGuard.  I'm asking in general.  GateGuard -- Goldmont's business -- again, the cover story, right, the real estate industry is -- the sky is falling, so other than -- you just testified, Mr. Goldenberg,

76 (Pages 298 - 301)

Page 302

GOLDENBERG

that you reduced or eliminated your expense -- expenditures with respect to renovations and my question is what else, if anything else, did you also reduce your expenses?

A.    Appliances, replacing appliances. We started fixing them instead of replacing them.

Q.    Okay.

A.    Different ways to save money.

Q.    Okay. I know you've testified already you've been doing this -- you've been in the real estate business for decades, any other let's say real estate -- any other business people in the real estate industry that you speak to that were taking similar measures --

A.    They all are.

Q.    -- in terms of reducing their -- okay. I'm sorry?

A.    They all are.

Q.    Okay. So across the board your experience or your knowledge is that everybody in New York was -- or many landlords in New York were reducing their expenses anywhere they could?

A.    When you're dealing with rent-stabilized apartments, all landlords did that.

Page 303

GOLDENBERG

Q.    Okay. Is something different about nonrent-stabilized apartments?

A.    Free markets you can charge what you want still right now.

Q.    Okay. And your -- well, I should say Goldmont Realty Corporation's portfolio of buildings that it manages, I think you testified about 80 to 100 are most -- are most of those rent stabilized?

A.    In the mutli-family sector, we're probably 90, 92 rent stabilized.

Q.    What about any non -- I'm not sure what the term is --

A.    Stores are not stabilized.

Q.    I see. So other than --

A.    Not yet.

Q.    I'm sorry?

A.    Not yet.

Q.    Not yet. Okay. Something to look forward to, I guess.

A.    Yeah.

Q.    So other than -- well, let me ask it differently. Who at Goldmont Realty Corp. is involved -- other than yourself and Abi

Page 304

GOLDENBERG

Goldenberg involved in purchasing intercom devices or intercom services?

A.    Purchasing, only Abi.

Q.    Okay.

A.    Not so. I mean, where necessary we have replaced some intercoms. Not with his. I think we replaced one or two intercoms since the laws were passed because we really had no choice.

Q.    Are you familiar with the -- other than GateGuard, which I know we've discussed, well, much of the day, are you familiar with other intercom --

A.    We would have used Metropolitan.

Q.    Metropolitan, is that a name of a company?

A.    Telecom or something like that. What?

Q.    Is that a name of a company?

A.    Yeah.

Q.    Metropolitan Telecom is the name of -- if I'm understanding you correctly, Mr. Goldenberg, an intercom installer?

A.    Yeah. Intercoms, security cameras. We -- another thing which, by the way, we don't

Page 305

GOLDENBERG

install security cameras anymore.

Q.    Okay. And so Metropolitan Telecom installs -- is responsible for installing?

A.    Right.

Q.    Is that all -- intercoms in all of Goldmont's buildings or some of Goldmont's buildings or --

A.    They do a lot of the repairs and I think we changed one or two. And we would not put a GateGuard in even though I had half paid for them already.

Q.    Okay. So if I'm understanding you correctly then, because I know you -- kind of putting two and two together, you -- Goldmont has right now in its possession, I'm not going to hold you to an exact number, but let's say dozens of GateGuard intercoms in its offices and when it needs a new intercom, it does not install GateGuard, it installs another system?

A.    That's right.

Q.    Okay. And --

A.    We have probably 50 of them, maybe 60 of those units.

Q.    Okay.

77 (Pages 302 - 305)

Page 306

GOLDENBERG

A.    And I'd like you to pick them up. One day I may walk into them and I'd get aggravated all over again.

Q.    I've got to go -- I'll have to go to the gym for a while first before I can --

A.    No.  This will be your gym.

Q.    So --

A.    Where do you live?

Q.    I'm sorry?

A.    Where do you live?

Q.    I live -- I'm about to move.  I live right now in the Bronx, in Riverdale.

A.    Oh, in Riverdale?

Q.    Yeah.

A.    Okay.  We have some stuff in Riverdale.

Q.    Okay.  I'm not going to tell you where now because otherwise --

A.    I might be --

Q.    I'll have -- well, I'm not worried about you.  I'm worried about the intercoms.

So you have some -- dozens of GateGuard intercoms.  When a building let's say needs a new intercom, you've already testified

Page 307

GOLDENBERG

GateGuard is not your first call.

A.    Not my last call.

Q.    Understood.  The device -- the intercom device that you do end up installing, I think you testified is through Intercom, approximately how much do those -- those go for for a new intercom?

A.    Somewhere around 4,000, 5 -- depending on the size of the building, I would say average about 4.

Q.    Okay.  About 4,000.  That's for a brand new intercom?

A.    Yeah.

Q.    Okay?

A.    4, maybe 5.  You know, the more units...

Q.    And that's through Metropolitan?

A.    Yeah.

Q.    And what -- just generally, I'm not going to hold you to a -- you know, to a model name or model number, what --

A.    I wouldn't know a model number.

Q.    No problem.  What -- the intercoms you're talking about are like the standard what I

Page 308

GOLDENBERG

think of as like the push button, like, you just, you know, you buzz and it rings --

A.    They're a little more upscale.  More like GateGuard, not quite GateGuard.  Your tenants can answer on their cell phone.

Q.    Okay.  So it's a device similar -- if I'm understanding you, similar to the old school what I think of as the push button, you know, just the buzzers and the intercom and -- and that it's plus some kind of functionality that buzzes to a phone and that's basically it, not too much -- not too many other bells and whistles? That you know of.

A.    That I know of.

Q.    Okay.  Fair enough.  And that, you testified as well, retail -- you estimate you pay about 4 to 5,000 dollars for a brand new --

A.    Yeah.

Q.    Are there other fees in addition to the one-time let's say purchase of the intercom that you have to pay?

A.    No.  No.

Q.    Okay.  After -- and I'm jumping around chronologically, but I know we

Page 309

GOLDENBERG

discussed -- I believe -- I should say I believe we discussed early on that there was an initial purchase of let's say a handful, I think it was less than ten, I'm not going to hold you to a specific number of GateGuard -- a trial, however you want to think -- however you thought about it.  You purchased a number of GateGuard devices initially, installed them, and then I believe you also testified after that at some point you installed -- I'm sorry, you initiated -- Gate -- Goldmont initiated an order for -- there was a reference there to all -- all of Leon and Abi's buildings at some point later on.

My question is on those buildings, other than GateGuard, do you know what -- what intercoms -- what types of intercoms are installed on those buildings?

A.    What's currently installed?

Q.    Currently, yes.

A.    No.  Every building is different. Not every building, but these are older systems. These are the kind of that you're thinking of, you buzz, somebody inside has to buzz you back.

Q.    Right.  Okay.  And --

78 (Pages 306 - 309)

Page 310

GOLDENBERG

A. There's a buzzer in the apartment.

Q. As a matter of, I don't know, just sort of general practice, does Goldmont upgrade the intercoms at regular intervals or is it only if let's say one breaks?

A. Generally only when it breaks. But over there with the GateGuard we felt it was a fairly inexpensive system and it just had a lot of different uses and it was -- you know, it was good for a landlord. Tenants would enjoy it. But the landlords would also get benefits.

Q. Putting aside the -- and I know you mentioned it several times so I'll just -- I'll front it as we say the issue that you mentioned about Mr. Teman allegedly shutting down or GateGuard allegedly shutting down one of the intercoms at some point. Putting that aside, what generally has been -- have you -- have you gotten any feedback from tenants about GateGuard?

A. They liked it.

Q. So the tenant -- the feedback from tenants has generally been positive?

A. Yes.

Q. Okay.

Page 311

GOLDENBERG

A. When we put them in four or five years ago, the tenants were very happy. They're not happy, I'm going to put them in all my buildings? Let's be rational.

Q. Understood.

A. This dispute -- if he had been a mensch, if he had been a regular businessman, there wouldn't be a dispute. I gave him deposits on all my buildings. I gave him deposits to put intercoms in all my buildings. I thought he had a great product. I just throw out $60,000 like that? No. We thought he had a great product. I tried to go into business with him. I thought enough of it that I was willing to invest with him until he, you know, exploded.

And if he didn't explode and he gave us what we asked for, we might have put in -- thank God, we might have put in a million dollars. Whether we would have taken signature rights on the checks or not, I don't know. It doesn't really make a difference. And then he starts playing -- then I order -- even after that I ordered all the intercoms, after I didn't go into business with him, because I still thought

Page 312

GOLDENBERG

he had a great product as a landlord. Not as an investor.

That was a little bit against my better judgment, but Abi was pushing him. Abi really liked him, really wanted to help him. This is what we get -- you know, how you get paid back for being nice. And then he started playing around with the intercoms and I said that's it. I can't have a guy that he's not happy about something, he shuts down all my buildings with a flick of a switch, with a -- with a, you know, click of the mouse key he shuts down my buildings and my tenants can't get into -- can you imagine people coming home from work at 6:00 at night, can't get into the building, intercom doesn't work.

Q. Now, I just want to be clear, Mr. Goldenberg, the complaints that you just referenced, are those -- did you actually receive complaints from tenants or were those --

A. No. I stopped putting them in.

Q. -- you were concerned that you would if he did it again?

A. No. We got -- that's how we found

Page 313

GOLDENBERG

out. When he shut it down, he got -- Abi got a call from one of the buildings, from the manager, that the intercom is not working. So he called up Ari and it came out very clear that Ari shut it down. I don't know if he said, "I shut it down," but when Ari told me that, I said we can't go in with this guy anymore. He has the ability to shut off all my buildings he gets upset about -- about what he ate for supper and he decides, boom, shutting your buildings.

Q. Fair enough.

A. June 19 impacted him because most landlords stopped putting in intercoms.

Q. Did you ever discuss the June 19 laws with Mr. Teman directly?

A. No. I never spoke to him. I'm telling you I stopped speaking to him before that.

Q. Okay.

A. Never answered his e-mails. Nothing.

Q. Back to the tenant complaints just for a second, aside from that incident that you mentioned when the intercom was allegedly shut down, did you receive -- do you know of any other

79 (Pages 310 - 313)

Page 314

GOLDENBERG

tenant complaints?

A.   I think there were complaints, but they were handled.  They were taken care of.  One tenant is out, this, that, you know, which happens, especially with a new system.  You know, I don't think there was anybody extraordinary positive or negative.

Q.   Putting aside -- for those -- again, the handful of buildings that were installed, Goldmont -- the tenants in those buildings still use GateGuard, as far as you know?

A.   As far as I know, yes.

Q.   You have not -- you do not know -- is it correct to say you don't know of any let's say ongoing serious tenant issues with those intercoms?

A.   No.  There was also another concern that after he was arrested -- what's the date of his arrest?

Q.   You know, I don't know.  I think it was in July.

A.   He can't work in real -- in - in the business, who's going to run it?

Q.   What was that, I'm sorry,

Page 315

GOLDENBERG

Mr. Goldenberg?

A.    One of the things that he was sentenced to, as far as I understand, is he's not allowed to be involved in the business.

Q.   Can you be more specific about which business you're referring to?

A.   GateGuard.  What other business does he have?  Maybe he does have others.

Q.   Okay.  So your -- your understanding was that after Mr. Teman's arrest he had -- there was some legal impediment --

A.   Yes.

Q.   -- to him handling his --

A.   Yeah.

Q.   -- ongoing business of GateGuard?

A.   Yes.  And then he was still sending out e-mails.  Abi said he's -- he's crazy, they can put him away for that.  But he would not be able to handle it.  Who's going to -- who's going to, you know, really -- what happens if you have a problem with his intercoms.

Q.   Fair enough.

A.   One-man show.

Q.   Fair enough.  Other than Mr. Teman,

Page 316

GOLDENBERG

do you know -- did you personally interact with anyone else at GateGuard?

A.   No.

Q.   Any other employees?

A.   No.

Q.   Anyone else?

A.   No.

Q.   I know that I asked this, and I just wanted to clarify, earlier on I was curious as to who other than yourself would be involved at Goldmont in selecting intercoms to use or to purchase, I think, and I want to clarify, you mentioned Abi Goldenberg?

A.   Right.

Q.   Anyone else --

A.   The building managers would -- would -- you know, if the intercoms aren't working, if they can't repair them, then they would get involved in purchasing, but I think that also went through Abi.

Q.   Who -- who are the managers you're referring to?

A.   Sam Blau, Marvin Basch, B-A-S-C-H, and Jonathan Samet, S-A-M-E-T.

Page 317

GOLDENBERG

Q.   How are those responsibilities divided up?  Is it by different -- different buildings -- different managers for different buildings?

A.   Yes.

Q.   Okay.  And all those -- those three individuals you mentioned, all three of them work in the office there with you in Brooklyn?

A.   Yes.

Q.   Okay.  Who else other than the building managers you just mentioned is involved in let's say installing intercoms on Goldmont's buildings?

A.   I don't think anybody else.

Q.   Are there supers, superintendents at the different buildings?

A.   They get involved.  In other words, if the intercom is broken, they're the ones that are reporting it.  But they're not involved in purchasing.  I'm not even sure that they can call the repair service.  They may have to ask the manager to call.

Q.   Okay.  Shifting gears here for a second, I know you testified before lunch, I

80 (Pages 314 - 317)

Page 318

GOLDENBERG

believe, about the business relationship between Goldmont Prop -- Goldmont Realty Corp. and the Swieca family.

A. Mm-hmm.

Q. The -- and very specifically, if I recall, the -- Goldmont was I believe hesitant to install GateGuard intercoms on the buildings that it -- Goldmont managed for the Swieca family; is that correct?

A. Correct. Not hesitant. I needed their approval.

Q. Okay. And that was necessary because of the --

A. The amount.

Q. -- the amount that was -- exceeded the -- whatever agreed upon in terms of the outlay?

A. Right.

Q. Okay. Are there other -- other than the Swieca family, are there other let's say family offices that Goldmont Realty Corp. manages buildings for?

A. No.

Q. Okay. Has there ever been -- again,

Page 319

GOLDENBERG

this is obviously a business dispute between GateGuard and Goldmont or the other defendants in this case, have you ever had any business disputes involving the Swiecas during the years that you've worked with them?

A. No.

Q. Okay. Have they -- have you been involved -- or I should say do you know of any other -- any other property owners or managers that the Swiecas have had disputes with in the past?

A. No. I manage all their properties.

Q. Okay.

A. Not all, but all the apartment buildings.

Q. Okay.

A. I'm sure they've had disputes.

Q. Okay. Do they own a lot of real estate in Brooklyn?

A. A fair amount.

Q. Okay.

A. Before June 19 they were very happy.

Q. Understood. Understood.

A. Now it's too much.

Page 320

GOLDENBERG

Q. Are you familiar with an entity known as Coney Realty Corp.?

A. Yes.

Q. Are you aware of any disputes in the past between the Swiecas and Coney Realty?

A. Yes.

Q. Approximately when did that dispute or disputes you're aware of arise?

A. Five, seven years ago.

Q. How do you know Coney just generally?

A. I know Coney very well.

Q. How do you know Coney?

A. Small industry.

Q. Okay. And Coney, is that Peter Rebenwurzel?

A. That's him.

Q. Okay. Do you know Peter through Agudath Israel?

A. I know him through a lot of different things.

Q. Okay. When did you --

A. We did a lot of good things together.

Q. Understood. When did you --

A. One of the things I forgot was the

Page 321

GOLDENBERG

Flatbush Jewish Community Coalition.

Q. That's a group that you're involved with with Mr. Rebenwurzel?

A. Yeah.

Q. Okay. The dispute that you're aware of between the Swiecas and Mr. Rebenwurzel or Coney, do you recall approximately how long ago that was?

A. Five, seven years.

Q. And you -- were you involved in any way in that dispute?

A. No. No.

Q. You had -- did you ever try to get involved, try to help --

A. Yes.

Q. -- resolve the dispute?

A. Yes.

Q. I'm sorry?

A. Yes. Yes, I did.

Q. In what way?

A. I tried to negotiate a settlement.

Q. The dispute as you know it between -- and again, I know you're not a lawyer and I'm not -- I know you weren't necessarily directly

81 (Pages 318 - 321)

Page 322

GOLDENBERG

involved, what generally do you know about the nature of that dispute?

A.    It was a commission dispute.

Q.    Who was claiming the commission?

A.    Coney.

Q.    Okay.  What were they claiming a commission for?

A.    On a building that the Swiecas bought.

Q.    Okay.  Other than Mr. Rebenwurzel, do you know any other personnel at Coney?

A.    Yes.

Q.    Who do you know?

A.    I know his kids.

Q.    Who's that?

A.    One son, whose name escapes me, a son-in-law, Gabay, and Moshe -- ooh, I don't remember his last name right now Hass, Moshe Hass, H-A-S-S.

Q.    So you know all of them through the real estate industry; is that fair to say?

A.    I know them through very different ways.  Mostly through real estate, but Moshe Hass is in one of the shuls that I daven at.

Page 323

GOLDENBERG

Q.    For the record, that's you and Mr. Hass pray at the same synagogue on occasion?

A.    Yes.

Q.    So from what I'm understanding about the dispute from you now, the Rebenwurzels or let's say Coney generally, the personnel there, claimed that the Swiecas owed them a commission on a building that was purchased?

A.    Right.

Q.    Okay.  And the Swiecas, did they pay the commission?

A.    No.  They won the lawsuit, as far as I know.

Q.    Okay.  So there was a lawsuit, Coney was claiming essentially from the Swiecas -- they were asking -- do you recall about how much they were asking for?

A.    No.

Q.    Okay.  Do you know where -- where the -- was there a lawsuit or was it in beth din or --

A.    I think it was a lawsuit.

Q.    Okay.  In any of your involvement, was there -- part of your involvement regarding

Page 324

GOLDENBERG

whether or not the lawsuit -- whether the dispute let's say should be resolved in beth din --

A.    Yes.

Q.    -- as opposed -- okay.

And what was the issue there?  Why wasn't it in beth din?

A.    Not my decision.

Q.    Okay.  But --

A.    I can only recommend.

Q.    Okay.  So your recommendation to -- was that to both parties?

A.    Yeah.

Q.    Okay.  Your recommendation was to take the dispute to beth din?

A.    Either to let me, you know, negotiate it go, to beth din, and they chose to go to court.

Q.    Now, what was the -- once the case was in court, did you have any involvement in the case itself?

A.    No.

Q.    Did you testify in a deposition in the case?

A.    No.

Page 325

GOLDENBERG

Q.    Did you speak to -- did Mr. Rebenwurzel know at the time that you were doing business -- well, I should say were you doing business at the time with the Swieca family?

A.    Yes.

Q.    Okay.  And were you concerned about the dispute in terms of how that may affect your business relationship with the Swiecas?

A.    No.

Q.    Do you know how many buildings the dispute was over?

A.    One.

Q.    And do you recall -- and I apologize if I asked this a minute ago, I just don't remember, what -- approximately the amount that was being claimed --

A.    No.

Q.    -- by the Rebenwurzels.

A.    No.

MS. MOYAL:  Asked and answered.

MR. REINITZ:  I recognize that.

Q.    What -- in terms of the -- the -- your attempt to settle the dispute, what -- what

82 (Pages 322 - 325)

Page 326

GOLDENBERG

were you proposing to the parties?  How would you propose to settle it?

A.   I proposed that some money be paid.

THE VIDEOGRAPHER:  Can we get back on camera, Mr. Goldenberg?

MS. MOYAL:  He's on camera.  Oh, okay.

MR. REINITZ:  Even better.

Q.   So now going back to it, in this case GateGuard has an agreement -- there's an agreement let's say between GateGuard and Goldmont, GateGuard is claiming Goldmont owes it money, Goldmont obviously takes a different position, GateGuard --

A.   We think we're owed money.

Q.   I'm sorry?

A.   We think we're owed money.

Q.   Okay.  So Goldmont takes a diametrically opposed position.  Understood.  And I'm curious as to whether in the course of your discussions with the Swiecas or with the Rebenwurzels in connection with that dispute -- whether you suggested to either -- either party that one or the other parties were acting in a

Page 327

GOLDENBERG

criminal manner?

A.   No.

Q.   Okay.  It never came up -- you never suggested let's say to the Swiecas that Rebenwurzel's demand for payment for a fee, a broker fee, was harassment or something that would be criminal in nature?

A.   Nope.

Q.   Okay.  Did you ever suggest to the Rebenwurzels that Swieca's failure to or refusal to pay what they were demanding was criminal in nature?

A.   It was a commercial dispute.

Q.   Okay.  Did you ever -- I'm sorry.

A.   There were no (indiscernible) from one side or from the other, there were no nasty e-mails, there were no playing, you know, shutting down intercoms.  Totally different, unrelated issues.

Q.   Did it ever -- in your discussions about the possibility with either party -- in your discussions with either party about the possibility of resolving the dispute in beth din, was there any --

Page 328

GOLDENBERG

A.   I just said that.

Q.   I'm sorry?

A.   I already said that.

Q.   Yes.

A.   I already answered that.

Q.   Yeah, I'm about to ask a question though.  Did you suggest to either party during those discussions that not -- refusing to go to a beth din would be a basis to put one or the other parties in prison?

A.   It's not.

Q.   Okay.

A.   I didn't go to court.  I didn't go to -- you know, to court to testify against him especially at the end when they have that, you know, pre-sentencing.  I didn't appear there, okay.  If my nephew wrote something, don't put it on me.

Q.   Did you -- did anyone else that you know consider testifying against Mr. Teman at his trial?

A.   Not that I know.

Q.   Did -- with respect to the --

A.   You see how little I gossip, I don't

Page 329

GOLDENBERG

even know who the other lawsuits are -- you know, all the other lawsuits against him are.

Q.   Did you ever discuss GateGuard --

MS. MOYAL:  Sorry.  Just objection to anyone else that would testify or whatever was your question.  Did anyone say that they would testify?

THE WITNESS:  You're asking me.

MS. MOYAL:  No.

MR. REINITZ:  I'm confused.  Are you rephrasing a question or are you asking me, Ms. Moyal, a question about my question or --

MS. MOYAL:  I'm asking about your question, yes.

MR. REINITZ:  Well, I --

MS. MOYAL:  Can you read back the last question, Michele?

(The record is read back by the reporter.)

MS. MOYAL:  Right.  Thank you.  So anyone else, does that imply that someone did testify or someone did say anything?  Who are you referring to?

83 (Pages 326 - 329)

Page 330

GOLDENBERG

MR. REINITZ: I was asking -- I guess I can rephrase it.

MS. MOYAL: So just objection mischaracterization. Go ahead.

MR. REINITZ: Okay.

Q. Do you, Mr. Goldenberg, know anyone who was -- strike that.

Did you discuss with anyone the possibility of them, whoever you may be speaking to, testifying at Mr. Teman's criminal trial?

A. No. I said that before.

Q. Yes. I got that. Going back to Coney Realty for a second, did you discuss with any of the members of Coney Realty, so that's Mr. Rebenwurzel, Mr. Gabay, Mr. Hass, or anyone else that you know at Coney Realty -- did you ever do GateGuard with any of them?

A. No. I've told you already --

Q. Do you --

A. -- I'm not a gossiper.

Q. Understood. Do you know, Mr. Goldenberg, whether Coney Realty ever used GateGuard as an intercom?

A. No, I don't know.

Page 331

GOLDENBERG

Q. Do you know, Mr. Goldenberg, whether any member of Coney Realty testified at Mr. Teman's trial?

A. No, I don't.

Q. Do you know whether --

A. Did they?

Q. I'm sorry?

A. Did they? Now, I have --

(Simultaneous crosstalk.)

Q. I'm asking --

A. Now -- when I come to shul, now I have lots to talk about.

Q. Do you know whether any member of Coney Realty refused to testify at Mr. Teman's trial?

A. No.

Q. Do you know what bank Coney Realty uses --

A. No.

Q. -- for their banking needs?

What bank does Goldmont primarily use for its banking needs?

A. Signature Bank.

Q. Where is that, the local branch that

Page 332

GOLDENBERG

you use?

A. 64th and New Utrecht.

Q. That's in Brooklyn?

A. In Brooklyn.

Q. Do you have a primary contact at Signature Bank?

A. What's it your business?

Q. I'm just asking.

A. Yeah, I do have. You're not getting it.

Q. Okay. And that's an individual that works at the -- the branch that you referenced?

A. Yes.

Q. Is there any -- I'm not going to pry too much, but is there any particular reason that -- that you're -- that's a sensitive question?

A. I see no reason to tell you. I tell you too many things that you're prying about --

Q. Okay.

A. -- that have nothing to do with your lawsuit.

Q. Okay. Does Coney -- does Goldmont Realty do any business with Coney Realty?

Page 333

GOLDENBERG

A. No.

Q. Have you done any business over the years with Mr. Rebenwurzel?

A. No.

Q. Other than the -- some of the organizations that you've mentioned, do you have any other -- any other connections to Mr. Rebenwurzel?

A. I -- I -- we speak about the real estate, Moshe Hass is very involved with our group of landlords that are working to make the changes.

Q. And the changes, Mr. Goldenberg, you're referring to, are those the legislative changes?

A. Right.

Q. Okay. And then that's generally to let's say undo some of the damage of the recent 2019 laws?

A. This much.

Q. Understood. And Mr. Hass, what's Mr. Hass's involvement in those efforts?

A. Same as mine. I'm, you know, more familiar with the members. I do fundraisers for

84 (Pages 330 - 333)

Page 334

GOLDENBERG

them, they come, they give money.

Q. Is there a formal name or organization that --

A. I don't -- we may have a formal name. I'm not sure.

Q. You don't -- but if there is, you don't know it?

A. I don't -- we don't use it.

Q. Other than yourself and Mr. Hass, who are the other members of his organization?

A. You're really -- you're really going off on tangents that are just unbelievable. There are about 30 members.

Q. Are they all --

A. And no, I did not discuss Ari Teman with any of them.

Q. That -- that wasn't my question, but --

A. That was going to be your next question.

Q. -- that's one of the few I wasn't going to question. That was one of the few --

A. I'm ahead of you.

Q. Okay. Did -- were you involved in

Page 335

GOLDENBERG

organizing this organization?

A. Yes.

Q. Okay. Who else was involved in organizing it?

A. Different people.

Q. Okay. Other than yourself and Mr. Hass?

A. He was an add-on.

Q. Okay. Was Mr. Rebenwurzel involved?

A. He's involved, yeah.

Q. Mr. -- I think you mentioned Newman, Steve Newman?

A. No.

Q. Okay. Is -- was Steve Newman involved in the dispute with -- between Coney and Swieca?

A. I don't know.

Q. Okay. We're going to shift gears here now. Give me a second and I'm going to send Ms. Moyal an e-mail and then I'll pull up another exhibit.

(E-mail was marked Plaintiff's Exhibit 160 for identification, as of this date.)

Page 336

GOLDENBERG

Q. This is going to be Plaintiff's 160. Mr. Goldenberg, let me know when you can see it.

A. Ah, okay.

Q. That -- that -- that woke you up?

A. Yeah, that woke me up.

Q. Okay. Let me know when you're ready, I can flip to the next page.

A. This is the kind of stuff that he sent. This is exactly the kind of stuff. And this is -- if you don't want to call this slander, tell me what it is. I can't believe you're -- you're putting this up.

MS. MOYAL: Okay. Just read it. No pending question.

MR. REINITZ: While you're reading it, just if the videographer is there, I know he's possibly on mute, the -- I just want to get a check on the time how we're doing.

THE VIDEOGRAPHER: Okay. 6 hours and 4 minutes at this point.

THE WITNESS: Oh, you take off the time that we take breaks? I wouldn't have taken breaks.

Page 337

GOLDENBERG

THE VIDEOGRAPHER: On the record. Yeah, this is only on the record.

A. So this is full of slander. I forgot about this letter.

MS. MOYAL: Take your time.

Q. Let me know when you're ready to flip to the next page.

A. There's a next page? It wasn't enough?

Q. There's two. It keeps going.

A. Oh my --

MS. MOYAL: Did you finish the first page?

A. No. Let's go back. Who's he after? Mark Silber? Okay. Let's go. Next page. I don't think I read the whole thing last time either because it was just on and on of -- okay. You can go to the next page. Okay.

Q. All set?

A. Yes. Plenty of slander.

Q. Okay. Have you read this -- is this the first time you're seeing this note, Mr. Goldenberg?

A. I think I saw it, but I don't think I

85 (Pages 334 - 337)

Page 338

GOLDENBERG

read the whole thing.  It was just -- I don't remember.  Maybe Abi told me about it and he didn't want to show it to me.

Q.    Do you have -- I know you showed it to me before your -- your phone, your cell phone?

A.    Yes.

MS. MOYAL:  Objection.  I'm -- no, I'm not going to allow you to do that.

MR. REINITZ:  You don't know what I'm about to do.

MS. MOYAL:  Let me know.

MR. REINITZ:  Okay.  So let -- when I do something objectionable -- so far all I've done is ask --

MS. MOYAL:  There's no show and tell, let me just tell you now.

MR. REINITZ:  I don't intend to do any show and tell.  Okay?  Can I continue?

MS. MOYAL:  Well, I'm waiting.

MR. REINITZ:  If there's no show and tell, can I continue?

MS. MOYAL:  I'm waiting for you to tell me what the question is.

Q.    Mr. Goldenberg --

Page 339

GOLDENBERG

MR. REINITZ:  Okay.  So let me get it out.

Q.    Do you have your phone that you showed me earlier?

A.    Yes.

Q.    This is not a gotcha.  One of those is an Android phone; is that correct?

A.    Yes.

Q.    Okay.  Is the -- your Android phone, do you have the gmail.com app on it?

A.    Gmail?

Q.    Yes.

A.    I don't think.  So why should I have that?

Q.    My question is specifically whether you have a -- my understanding is in order to use an Android phone, you would have to have a Google or Gmail e-mail address associated with it, so I'm curious as to whether you have --

A.    I have no idea.

Q.    I'm sorry?

A.    I have no idea.

Q.    So you're not aware if you have a Gmail e-mail address?

Page 340

GOLDENBERG

A.    No.  Otherwise I can't use my e-mails?

Q.    Well, I think it's specifically with respect to the phone.  So it's your testimony, Mr. Goldenberg, that you don't know if you have a --

A.    I don't know.

Q.    -- Gmail e-mail address?

A.    That doesn't mean that I don't have it.  I wouldn't have set up the phone.

Q.    You didn't -- you didn't set up the phone?

A.    No.  Come on.

Q.    Who set it up?

A.    Probably my assistant.

Q.    That's Ms. Weisberg, is it?

A.    Weisberg, yes.  What do I know from --

Q.    Okay.  So it's possible --

A.    (Indiscernible) a Gmail account here. I don't see an app like that.

(Reporter clarification.)

A.    I don't see anything with a Gmail account.  I mean, I don't know what I'm supposed

Page 341

GOLDENBERG

to look for.  I'm looking at my apps.

MS. MOYAL:  All right.  You're not looking for anything now.

Q.    That's fine.  That's fine. Mr. Goldenberg, maybe it's something I'll take up with Ms. Weisberg but --

MS. MOYAL:  Great

Q.    -- your -- my understanding is that you did not set up your phone then; is that correct?

A.    That's correct.

Q.    Okay.  And does Ms. Weisberg set up all of your phones?

A.    Yes.

Q.    How about your computers, does she set up your computers?

A.    Yeah.

Q.    Does Ms. Weisberg have access to your e-mail?

A.    Yeah.

Q.    Okay.  Does Ms. Weisberg ever send e-mails on your behalf?

A.    Yes.

Q.    Does she ever receive or read e-mails

86 (Pages 338 - 341)

Page 342

GOLDENBERG

on your -- for you, let's say over the phone or other times, tell you what they say?

A. Yeah.

Q. Okay. So she has -- just to simplify, she has full access to your e-mail, that's the @goldmontrealtycorp. e-mail and the AOL e-mail; is that accurate?

A. Yes.

Q. And approximately how long has Ms. Weisberg had access to your e-mails?

A. Since she's working for me.

Q. Approximately how long?

A. Eight years.

Q. Okay. Any of the e-mails -- I think it may have just been one, but there was certainly one e-mail which you -- and I can pull it back up if it's helpful, I believe it was from you to Abi Goldenberg about -- there was some points of a -- questions to him about the contract between Goldmont and GateGuard.

A. Right.

Q. Do you recall whether Ms. Weisberg composed that e-mail and sent that e-mail for you or you wrote it yourself?

Page 343

GOLDENBERG

A. No. No. I had to write it myself. I made a spelling mistake. She would never do that.

Q. Fair enough. Approximately what percentage of your e-mails that are sent from your e-mail accounts come -- do you actually compose or does -- versus Ms. Weisberg?

A. Well, I compose them. She just types them.

Q. Okay. So it's -- you on occasion will -- instead of typing it yourself, you'll dictate it to her?

A. Right. And she composes some, but nothing major.

Q. Fair enough. So coming back to the note here that we're looking at together, I won't read through the whole thing here, it's difficult for me to read, but there are a number of names --

A. It should be difficult.

Q. Yeah, it is. I don't --

A. All a bunch of shtus. Do you know what shtus is?

Q. I do.

Page 344

GOLDENBERG

A. Yeah. All a bunch of garbage.

Q. So there are a number of names that are mentioned here, I'll just start with that. One is Abi Goldenberg, Leon Goldenberg, I think we know who those two folks are. Signed contract reviewed by their attorney, Jacob Rubinstein, you have testified several times, Mr. Goldenberg, that you don't know who Mr. Rubinstein is; is that correct?

A. Right. He certainly didn't review the contract before.

Q. Okay.

A. He might have been the attorney that we called afterwards.

Q. Understood.

A. That's why you have that e-mail exchange going.

Q. Understood. Mark Silber?

A. Never heard of him.

Q. Never heard of him. Rodium, ever heard of that?

A. No.

Q. Okay. Joe Soleimani, do you know who that is?

Page 345

GOLDENBERG

A. No.

Q. His brother Ben, so that's Ben Soleimani?

A. No.

Q. MVI Systems, do you know who that is?

A. I know Shmuel Taub. I guess that he's MVI.

Q. Is that Samuel Taub?

A. Yeah.

Q. Okay.

A. Samuel. I know two Samuel Taubs actually.

Q. Okay. The Samuel Taub you're referring to, or I think you said Shmuel, how do you know that Mr. Taub?

A. How do I know that Mr. Taub? I -- we were in the same shul for a number of years in the doff (ph.) You know what a doff is?

Q. I do.

A. Okay. He was in my doff group for five, seven years.

Q. Just for the record, Mr. Goldenberg, if I understood your testimony, you and Mr. Taub, Mr. Samuel Taub prayed at the same synagogue and

87 (Pages 342 - 345)

Page 346

GOLDENBERG

were also part of the same let's say study group for several years?

A. Yeah.

Q. Okay. And is that in the same neighborhood that you live in now?

A. Yup.

Q. Okay. And what general -- I'm not going to ask your home address, but what -- where -- what neighborhood do you live in in Brooklyn?

A. Flatbush.

Q. Flatbush.

A. A block away from my office.

Q. I've heard of it. So Mr. Taub also, to your knowledge, lives in Flatbush?

A. Yes. Unless he moved out recently. I know everybody's leaving.

Q. So I've heard. So you and Mr. Taub knew each other let's say through synagogue?

A. Right.

Q. Do you know anything about MVI Systems?

A. He has a similar system to GateGuard.

Q. Okay. Have you ever seen Mr. Taub's

Page 347

GOLDENBERG

system?

A. Yes.

Q. Okay. When was the first time approximately, that you saw Mr. Taub's system?

A. Five years ago.

Q. Okay. A while ago. Was that, to the best of your recollection, before you met Mr. Teman?

A. Yeah.

Q. What did you -- was Mr. Taub -- did he pitch the device to you, the MVI device?

A. Yeah.

Q. And he was specifically pitching you to -- to purchase the device to --

A. No.

Q. I'm sorry?

A. No.

Q. What was he pitching?

A. To invest.

Q. So Mr. Taub was pitching to you invest in MVI Systems?

A. Yeah.

Q. Okay. And did you invest?

A. No.

Page 348

GOLDENBERG

Q. Okay. Why not?

A. I thought it was too expensive. It wouldn't do as well as he was hoping and that was my thought process.

Q. Too expensive, are you referring to the device, the intercom, he was selling?

A. Yeah. He wanted a monthly -- I mean, it's been five years ago. He wanted a high monthly charge.

Q. So you're -- five years ago when you met Mr. Taub, you're -- you didn't think the market would be willing to pay what he was asking?

A. Right.

Q. Okay. What about the device itself, what do you remember about the MVI device he showed you?

A. It was a good, interesting device, I thought about putting it in my buildings, but the same problem, and the same reason I wouldn't do it, I didn't think a lot of landlords would do it either. He just wanted a very high monthly fee.

Q. How did you first encounter Mr. Taub with respect to the investment? Is that

Page 349

GOLDENBERG

something he came to you directly with or did someone bring it to you?

A. I think someone brought it to me. I'm not sure.

Q. Who might have brought it to you?

A. I'm not sure.

Q. Okay. Do you know anyone who ultimately invested in MVI?

A. No.

Q. Do you know anyone who also like you considered investing in MVI?

A. No. I don't gossip.

Q. I don't know if I would consider that gossip, but --

A. It is gossip.

Q. Fair enough.

A. If I'm not investing, just to know that he is or looked at it, who cares.

Q. Well, I mean, once you've asked, so the -- we've seen some of the e-mails. I mean, you -- you were in touch with other -- with Mr. Weisman or Mr. --

A. To do business.

Q. Bromberg -- right.

88 (Pages 346 - 349)

Page 350

GOLDENBERG

A.    If Mr. Weisman came to me, if I was in MVI, would I have gone to Jerry and said, Do you want to come in, maybe we can do better on the valuation if we come together? Maybe.  I didn't get to that point.

Q.    Fair enough.  Do you know any other -- other than Mr. Taub, do you know anyone else whose worked at any time for -- at any point for MVI systems?

A.    Not offhand.

Q.    Did you ever discuss MVI Systems with Mr. Teman?

A.    No.

Q.    Did you ever discuss MVI Systems with Abi Goldenberg?

A.    Yes.

Q.    Was that in connection with your -- the investment you were just referencing?

A.    No.  No.  I -- I don't know.  I really don't remember.

Q.    Did you ever -- after that initial pitch you said about five years ago, since that time, have you ever considered installing MVI Systems at any of Goldmont's properties?

Page 351

GOLDENBERG

A.    No.  Since June 19, although I think his prices did come down because he recognized the same problem that I saw, but I -- you know, I'm not involved in it so -- Abi never brought it to me that we should take it.  Maybe he did, maybe he mentioned it, but offhand, no.

Q.    To your knowledge, is -- do -- any of Goldmont buildings currently have MVI systems --

A.    I don't believe so.

Q.    -- installed?

A.    I don't believe so.

Q.    Okay.

A.    I don't know.  I told you we replaced one or two systems.  I don't know whose they are.

Q.    Okay.  And you mentioned Metropolitan Intercom earlier on as a -- the vendor -- primary vendor let's say for Goldmont for installing intercoms; is that accurate?

A.    Yes.

Q.    Is Metropolitan Intercom associated with an individual named Jacob Litchfield?

A.    Yes, he is.

Q.    Do you know Mr. Litchfield?

A.    Yes, I do.

Page 352

GOLDENBERG

Q.    How long have you known Mr. Litchfield?

A.    Since before he got married.

Q.    Can you describe a number of years or some other time frame?  I wasn't at his wedding to my knowledge.

A.    About 18 years.  He's my step son-in-law.

Q.    Mr. Litchfield is your step son-in-law, so I guess he married your -- is it your stepdaughter?

A.    Yes.  Sort of.

Q.    Okay.  Fair to say you know Mr. Litchfield pretty well?

A.    Yes.

Q.    When was the last time, approximately, you spoke to Mr. Litchfield?

A.    Probably within a month.

Q.    Ever talk to Mr. Litchfield about this case?

A.    I don't think so.  I might have mentioned it, but I don't think so.

Q.    Did you ever talk to Mr. Litchfield about Mr. Teman?

Page 353

GOLDENBERG

A.    Not really, no.  I don't think so.

Q.    Ever talk to Mr. Litchfield about GateGuard?

A.    Originally when we were trying to put in the system, I was trying to get him to be a vendor for Ari Teman.

Q.    And "him," you're referring to Mr. Litchfield?

A.    Yeah.

Q.    Okay.  So if I understand you correctly, you were trying to let's say --

A.    Make a shus (ph) --

Q.    I'm sorry?

A.    -- between Ari and -- in between Ari and Yanchi (ph) -- Jacob.

Q.    Okay.  So did you actually make the introduction?  Did you actually introduce, do you recall, Mr. Teman and Mr. Litchfield?

A.    I think Abi did.

Q.    Okay.  Do you know whether Mr. Litchfield or Metropolitan Telecom has any relationship with MVI Systems?

A.    No.

Q.    Do you know whether GateGuard has any

89 (Pages 350 - 353)

Page 354

GOLDENBERG

let's say relationship with MVI Systems?

A. No.

Q. Do you know if --

A. I know that he complained about him, that he stole everything from him. That, I did hear.

Q. Who's -- who's he?

A. Ari Teman.

Q. So Mr. Teman, if I understand correctly, complained to you at some point that MVI Systems --

A. You know, some of the stuff I get through Abi, so I really don't remember.

Q. So your understanding is that Mr. Teman at some point claimed that MVI Systems had stolen something from him?

A. Right.

Q. Okay. Did you ever discuss that with Mr. Taub?

A. No.

Q. Shragie Aranoff here, do you know Mr. Aranoff?

A. No.

Q. Okay. There's another name here, I'm

Page 355

GOLDENBERG

going down in this letter, Jacob Gutwillig, do you know Mr. Gutwillig?

A. No.

Q. How about Daniel Allessandrino?

A. No.

Q. Okay. Now, Mr. Teman calls him a crooked cop, but I think perhaps another way of referring to him is he's a -- Mr. Allessandrino is a detective at the NYPD.

A. Okay.

Q. Did you -- have you ever discussed let's say Mr. Teman with any member of the NYPD?

A. No. Didn't change my train of thought.

Q. What's that, I'm sorry?

A. That I can't take him to criminal court, you know to -- I can't -- I can't --

Q. Okay.

A. -- I can't file criminally against him.

Q. Understood. How about -- Now, Jacob Gutwillig, is -- as far as I recall, I think he still is, a federal prosecutor in Manhattan, did you speak to any -- any federal prosecutors

Page 356

GOLDENBERG

about --

A. No.

Q. -- Mr. Teman?

A. No.

Q. Going back to the section here about -- that references Abi Goldenberg and yourself Leon Goldenberg --

A. Mm-hmm.

Q. -- I'm just going to try to read as little of this as I need. Abi Goldenberg and Leon Goldenberg have written and signed a -- have a written and signed contract reviewed by their attorney Jacob Rubinstein --

A. Right.

Q. -- saying they will pay directly or via a funder 369K to us for the devices they took and have in their possession and are already using the service. Instead their, quote, frum lawyer told our attorney on a recorded call, ask him, that they are rich and will fight for years before paying a bill. In his office months ago Leon even laughed to me about how vendors are idiots to think they'll get paid.

Do you recall ever saying anything

Page 357

GOLDENBERG

like that to Mr. Teman?

A. Absolutely not. I don't talk like that. The whole thing is a lie from A to Z, including that it was reviewed by Jacob Rubinstein. Because we didn't have a lawyer at that time, which was a mistake. We wouldn't be where we are today. And the whole thing from A to Z is a lie. Except the only thing that may be not -- I don't know about this frum lawyer told a lawyer, I don't know about that, that's for sure. I would never say to anybody that I'm rich, okay, that's disputable. And what did he say here that I -- that we will pay directly or via a funder 369, all of it is a lie.

Q. Okay. So there's --

A. From A to Z the entire paragraph is made up. That's exactly what he does. Goodbye, a suicide note. Because of you I'm going to commit suicide, meantime a year or two later he's still here. How come?

Q. Only --

A. You don't have an answer for that, do you?

Q. I don't -- I certainly don't. Only

90 (Pages 354 - 357)

Page 358

GOLDENBERG

Mr. Teman obviously can answer that question.

A.    Yeah.

Q.    But --

A.    And I assume that everything else in here is a lie too. Everything is twisted the way he wants it to be. He's the only honest person in the world and because of Leon and Abi and because of this one and that one and that one, he's going to commit suicide. Should I tell you how many people are alive today because of me?

Q.    Sure.

A.    Okay?

MS. MOYAL:  How about we ask -- do you have a question?

Q.    How many, Mr. Goldenberg? I'm genuinely curious.

A.    Two people are alive because of me.

Q.    Say that again, I'm sorry.

A.    Two people are alive because of me. And I don't mean my kids.

Q.    Okay. And what -- what do you mean?

A.    They were both on drugs and today they're both married with families.

Q.    I take my hat off to you. If I had

Page 359

GOLDENBERG

it on, I would take it off, but no, I -- that doesn't take anything away from you.

So going back to again the -- some of the statements here, so your testimony is that you never said anything of the sort to Mr. Teman at any time regarding --

A.    Let me reiterate.

Q.    Yes.

A.    The whole thing is a lie from "Abi" to "I'm dead." The entire thing. Because he's not dead either, you notice that?

Q.    I do.

A.    But who cares? I'm dead, right? He's not dead either.

Q.    That's my -- that's my understanding.

A.    The entire paragraph from the first A to the last D is a lie. There's nothing in there that has one iota of truth. Can I be clearer than that? Not one iota of truth. It was not reviewed by Jacob Rubinstein before we signed it. We never said we're going to pay through a funder.

MS. MOYAL:  All right. Let him ask a question.

Page 360

GOLDENBERG

A.    We have them in their possessions and we are not using their service. We are not using them. They're sitting here in the office, okay. And what a frum lawyer -- attorney said, I can't answer. That's the only thing -- I don't think it's true. I assume it's a lie like everything else. And that they are rich and will fight for years, not how I talk. It's all a lie.

Q.    Understood. And that's --

A.    And I don't laugh at vendors. And that they're idiots. Yeah, they get paid in my office. They all get paid. Let me tell you one more thing about how I pay. Every bill is written within ten days of receipt. Ten days. Sometimes there's an account that's a little short of money, I hold the checks. These are all the checks that I'm holding for the last 40 years of business. All these checks, that's it.

Q.    Can you clarify what you mean by?

A.    For the past 40 years, that's all the checks, okay. Every vendor gets paid. Every check is written in ten days. Those are my orders. Ten days it's got to be written. That's what I was doing before, you know, when she

Page 361

GOLDENBERG

stopped, me paying bills. I still got some out.

Q.    Mr. Goldenberg, can you just clarify? And I appreciate the --

A.    Yes, you can clarify. It's a lie, it's a lie, it's a lie.

Q.    I wanted to clarify --

A.    How else do you want me to say it? It's a lie, the entire paragraph. And I assume -- I assume that the rest is just as much as a lie. About Silber about, Mr. Gutwillig, about Soleimani, I assume they're all lies.

Q.    I only wanted to ask you about the checks that you just showed me. You just mentioned a second ago you were holding them, can you just --

A.    No. The ones I'm holding? Yes. None of them are made out to GateGuard.

Q.    I didn't think they were, but I wanted to clarify when you say you're holding them, is that -- in other words, before you send them out to be paid, you're holding them for what purpose?

A.    Because those accounts are -- are a little low.

91 (Pages 358 - 361)

Page 362

GOLDENBERG

Q.   Okay.  So you're --

A.   I run 80 buildings and I got 20, 30 checks there.

Q.   Understood.  Understood.  Okay.  So the accounts --

A.   And every bill has to be paid in ten days.

Q.   You never --

A.   There's no such thing as it doesn't get written in ten days.

Q.   Okay.  And we'll come back to that in just half a second.  There was a mention -- and I don't think you were involved in the e-mails on this particular point, but there was some discussion I recall in some of the communications I believe let's say between Mr. Teman and may have been with Abi Goldenberg, it may have been with Mr. Horowitz, may have been with both of them, I don't recall, about at some point I believe Abi and/or Mr. Horowitz had been in touch with a company named Marlin Financial, have you ever heard of Marlin Financial?

A.   No.  But they asked me and I said, no, I'm not giving any information.  I think he

Page 363

GOLDENBERG

did call to find about what information I would want.  Abi was still at this point trying to help your piece of garbage client that you have.  The guy who's dead.  He's dead.  I'm dead, I'm dead, I'm dead, I'm dead.  Your piece of your garbage, that's what you have for a client.  After everything he did, he's still trying to help him.

Q.   Understood.

A.   Am I clear enough?

Q.   Crystal clear.

A.   This is slander, slander with a big S.

MS. MOYAL:  Let him ask you the --

A.   Slander.

MS. MOYAL:  -- questions.

A.   S-L-A-N-D-E-R.  You asked me five times about slander.  Here's your slander right here.  Why are you asking me?  You got it.  Why are you asking me these questions?

Q.   I was actually about to ask you a different question, Mr. Goldenberg.

A.   You're about to ask me a different -- ask me about slander.  How many times are you going to ask?

Page 364

GOLDENBERG

MS. MOYAL:  All right.  Let -- let him ask you a question.

A.   I said slander.

THE WITNESS:  No, I don't want him to speak.

MS. MOYAL:  Okay.  Leon, let him ask you the questions.

Q.   So Marlin Financial you just testified I think a second ago you've heard the name before?

A.   No.

Q.   You've never heard the name Marlin Financial before today?

A.   No.

Q.   Did you ever discuss providing financials to any company in connection with the agreement with GateGuard?

MS. MOYAL:  Apart from what he's already testified to earlier today?

MR. REINITZ:  I mean, Mr. Goldenberg's now testifying he's never heard of Marlin Financial, so --

MS. MOYAL:  No --

MR. REINITZ:  -- I want to know if

Page 365

GOLDENBERG

maybe it was a different -- a different entity.

MS. MOYAL:  -- about providing financials.

A.   He sent a letter to Abi that he wants us to give information so he can borrow against it and I said no.  Did they tell me the name of the company?  Did he send me the e-mail?  I don't remember.

Q.   Fair enough.

A.   He might have told me the name of the -- for some reason the one with the three initials that you had on one of the earlier e-mails, that sounded more familiar.  It could be I heard of the company, that's it.  And I said --

Q.   Fair enough.

A.   -- we're not giving information.  So Abi went ahead and asked -- I don't know exactly how, but he basically wanted to know what information they wanted.  I said we're not giving anything.  I'm not putting my name on this guy where -- where he can get money and they're going to come to me when he doesn't deliver.

Q.   Fair enough.  So do you know whether

92 (Pages 362 - 365)

Page 366

GOLDENBERG

anyone -- I assume it would not be you, but I'll ask, do you know whether anyone at Goldmont ever provided any information at all to Marlin Financial?

A.    I would hope not.

MS. MOYAL:  Any financial information?

MR. REINITZ:  Any information whatsoever.

A.    I would hope not.

Q.    Okay.  My question is though not what you hope, but whether you know if any information --

A.    I have no knowledge of it.

Q.    -- was provided.

A.    But I will be checking now.

MS. MOYAL:  You said you don't know?

THE WITNESS:  I -- I don't know of anybody providing them any information.

MS. MOYAL:  All right.  I just didn't hear you.

THE WITNESS:  And I said I'm going to check on it now and I may -- somebody may be out of a job.

Page 367

GOLDENBERG

Q.    So you don't -- you don't know for example whether Abi Goldenberg provided any information at all whatsoever --

A.    I believe he did not.

Q.    -- to -- okay.

Do you know whether Mr. Horowitz, Saul Horowitz, provided --

A.    He did not.

Q.    Do you know whether Saul -- Mr. Saul Horowitz --

A.    Do you know that it's a quarter after 6?

Q.    We're getting there.

MR. REINITZ:  How much time do we've got on the clock?  Not too much left, right?

A.    I'm trying to waste some of it.

Q.    You're doing a great job.

A.    Not great enough.  I have a 6:30 call.

Q.    Time will tell.

THE VIDEOGRAPHER:  Counsel, I am going to have to reset the video shortly, I just thought I'd let you know.

MR. REINITZ:  Sure.  What -- how much

Page 368

GOLDENBERG

time do we have left?

THE VIDEOGRAPHER:  You can go another five minutes and then I got to reset.

MR. REINITZ:  All right.  So let's do that and then we'll break and then we'll wrap up.

Q.    So --

MS. MOYAL:  Are you -- sorry just off the record.  Are you planning on spending the entire time or is he going to have time for his 6:30 call?

THE WITNESS:  I have a 6:30 call. I'm getting off this.

MR. REINITZ:  Well, we can break, but what -- how long is your call?

THE WITNESS:  An hour, hour and a half.

MR. REINITZ:  Well, I mean, that would make --

THE VIDEOGRAPHER:  Well, it only takes me a couple of seconds to reset if you want to just do that, go off and on.

MR. REINITZ:  Okay.

MS. MOYAL:  All right.

Page 369

GOLDENBERG

MR. REINITZ:  Let's do that and see how much time left and maybe we'll pick up tomorrow and wrap it up.

THE VIDEOGRAPHER:  Okay.  So the time is 6:17.  We are off the record.

(A brief recess was taken.)

THE VIDEOGRAPHER:  The time is 6:18. We are on the record.

MR. REINITZ:  And Howard, I'm sorry, how much time do you have on the --

THE VIDEOGRAPHER:  So you have, let's see, 24 minutes remaining.

MR. REINITZ:  Okay.  All right.  So let's just -- we'll go and see where we're at and if we have to pick up later, we'll do that.

Q.    You were just testifying a second ago, Mr. Goldenberg, that the -- to your knowledge no one at Goldmont Realty Corp. provided financial information to Marlin Financial; is that correct?

A.    Correct.

Q.    Okay.  If anyone at Goldmont Realty Corp. let's say would have had -- well, I'm

93 (Pages 366 - 369)

Page 370

GOLDENBERG

sorry, scratch that.

Who at Goldmont Realty Corp. other than yourself would have access to financial information about Goldmont?

A. Saul Horowitz and Abi. Possibly Abby Linsky also.

Q. Did you hear in any of your discussions -- let's say start with Abi Goldenberg. Did -- did you hear that Marlin Financial had reviewed some information from Goldmont and come back and said that the -- Goldmont's books were, quote, a little light?

A. No.

Q. Okay. You never heard that?

A. No.

Q. Have you ever heard that in other business contexts, that Goldmont's books were a bit -- a little light?

A. No.

Q. Have you ever heard the term just in general in the real estate business having books that are a little light?

A. No.

Q. Okay. So fair to say you don't --

Page 371

GOLDENBERG

you have no idea what that -- the term even means?

A. I would think it means that there's not much in the way of financial backing to it.

Q. Do you know if after -- if after Goldmont -- well, scratch that.

Do you know if Marlin Financial made any requests for additional financial information after it received an initial batch of information from Goldmont?

A. No.

Q. So now going back to the note here that we've got pulled up and we've been discussing, the note here writes that in reference to yourself and to Abi Goldenberg, I guess, and perhaps Goldmont as well, they are rich and will fight for years before paying a bill. Putting aside whether or not you said those specific words, in any of your discussions let's say with Mr. Teman, did it ever come up that Goldmont may use its financial resources to leverage against vendors?

A. So let's be clear, I believe I only met with him twice, once in the office before,

Page 372

GOLDENBERG

which was a nice meeting and nice enough that I took him to meet with Jerry and Yechiel, and I don't think I ever met with him again after that. He called me I believe once and he started getting on the phone and I hung up and after that I did not talk to him.

So the two times that I met with him were nice calls. So in other words, I would have -- forget about whether I say it, I would say it, I wouldn't say it, at that time I was on his side so for him to say that I'm going to fight him and not pay his bills, now you're coming -- this the first time, then you came to me I should give you a million dollars. So the whole thing is a bunch of malarkey, a bunch of lies, okay. I met with him twice and that was it.

It's all -- besides that it's just a bunch of lies anyway because that's what he does, he lies, he lies. He's still alive so that's obviously a lie. When -- the two times that we met, they were very nice friendly conversations. We weren't talking about not paying bills, that's for sure. Besides that, I don't do that. I

Page 373

GOLDENBERG

don't say that. I don't threaten that. And I don't threaten to take you to court and drag you out because at the end of the day, if you think that their office is not charging me plenty of money, you're sadly mistaken. So this is costing me quite a bit money too.

I'm not happy about this lawsuit. I'm not going to give in because of that, but I'm not happy about this lawsuit. This lawsuit's going to cost me a pretty penny. And I'm not that rich that I don't count 10, 15,000 dollars as money. And it's going to cost me a lot more than 10, 15,000 dollars. So as rich as you think I am or as he thinks I am, I really don't care how rich you think I am, I don't throw out money, number one, and number two, the whole thing is garbage.

And the two meetings that we had, they were very nice friendly meetings. He sat here right in this office right -- I'm pointing to where he was sitting. It was a very nice meeting. Did I threaten him? Would we have -- would he have said to me would you like to invest? When did that meeting take place when I

94 (Pages 370 - 373)

Page 374

GOLDENBERG

threatened him? Ask him. You can please mark that down to ask him when that meeting took place. I'd like to know. I never saw him again.

Q. Fair enough. In your discussions with Abi Goldenberg let's say about the -- let's just say about the dispute between Goldmont and GateGuard, was that ever -- did you ever discuss with Abi a strategy of let's say leveraging your resources to put pressure on Mr. Teman let's say to outspend him in -- in litigation?

A. No.

Q. Okay.

A. Litigation is a losing area. The only one that's making money -- well, I don't think you're making money, so I take it back. But generally Shira, her boss is making money. You I think are going to get screwed big time by the time this is over.

Q. How's that?

A. I don't think you're getting paid. I can't imagine that -- that -- that he's making money to just pay you. I mean, the business has got to be shot to hell. Nobody's investing in intercoms. The entire, you know, stabilized part

Page 375

GOLDENBERG

of the -- of the industry is not putting in intercoms. In free markets is he doing it? Yeah. Is he doing it out of town? Maybe.

Q. Have you seen GateGuard intercoms installed anywhere else other than Goldmont's buildings?

A. No.

Q. Have you seen MVI intercoms installed in any other buildings?

A. Not offhand.

Q. Any other intercoms that you're familiar with that you've seen installed?

A. I mean, I've seen intercoms in buildings, I don't pay -- you know, it may surprise you, I'm in real estate, I don't pay that much attention.

Q. Fair enough. Taking two steps back, in any of your discussions with Abi Goldenberg about let's say the strategy here of how to deal with the dispute with GateGuard, did the issue of Mr. Teman's legal -- let's say criminal legal troubles ever come up?

A. Yes.

Q. So was that -- did you account for

Page 376

GOLDENBERG

that as part of the strategy here when you were discussing with Abi how to -- how to handle this case whether, you know --

A. No. I was hoping that that would impact him.

Q. How do you mean?

A. You know, if he's going to jail, going to be in jail, can't work, will it get him to drop the lawsuit. Obviously it didn't.

Q. Okay. So your -- fair to say your hope was that if Mr. Teman went to prison, that would potentially resolve the -- this problem for you?

A. Yes.

Q. Okay. So fair to say --

A. I still wouldn't go testify against him. I wasn't asked to testify against him. I still would not go to the pre-sentencing, you know, when they ask for people that have been hurt. I could have gone to that. You don't have to be one of the people that testified in a trial, you can go just for that. I didn't go for that.

Q. So did you and Abi discuss going to

Page 377

GOLDENBERG

give a victim statement at Mr. Teman's sentencing?

A. May have. I don't remember.

Q. Okay. And so fair to say then that you and let's say Goldmont Realty as well -- you felt that it would be in your financial interest to see Mr. Teman go to prison?

A. I wouldn't like to say that.

MS. MOYAL: Objection. Over objection you can answer.

A. I would not like to say that.

Q. But fair to say that if however it would -- it came about that Mr. Teman ended up in prison, that may indirectly let's say benefit Goldmont?

A. It could have.

Q. Okay.

A. I still don't -- with everything I don't wish him to go to jail.

Q. Okay.

A. He -- and again, I'll go back to what I said before, some people belong there, some people don't. I still don't wish it on him. I've been to prison. I've visited prisons.

95 (Pages 374 - 377)

Page 378

GOLDENBERG

They're not pleasant places. Even -- even the what do you call them? The country club ones. They're not pleasant.

Q. Have you yourself ever been to prison? I mean, have you ever been charged with a crime let's say?

A. We went through --

MS. MOYAL: Objection. Over objection you can answer.

A. We went through this at the very beginning. You forgot about it?

Q. I don't think we touched on this part.

A. Yeah, I think we did.

Q. All right. Well, I don't -- well, whether we did or didn't, I don't remember the answer.

A. You don't remember the answer?

Q. No.

A. It's only seven hours. You're young. Where's your mind?

Q. You've got more stamina than I apparently.

A. I went to prison for solvia jury

Page 379

GOLDENBERG

(ph.)

Q. Fair enough. Was that in the '80s?

A. Hate to say it, before.

Q. Okay. And was that -- it was -- if I understand correctly, part of a political protest?

A. Yeah. Washington, D.C.

Q. Okay. How long were you in -- I don't know if you were in a -- a precinct for, I mean, a couple of hours?

A. Couple of hours.

Q. Okay.

A. They actually drove us around on a bus for hours.

Q. Fair enough.

A. A thousand of us were arrested. It was the first mass arrest in Washington, D.C. before the Vietnam War arrests.

Q. Interesting. So other than that experience, since then, have you ever been charged with a crime?

A. Yes.

MS. MOYAL: Again, over objection, you can answer.

Page 380

GOLDENBERG

Q. When was that?

A. Over a parking dispute.

Q. Okay. What happened?

A. It was dismissed.

Q. Okay. And the -- what was the charge?

A. I don't remember.

Q. About how long -- go ahead.

A. Over 50 years.

Q. 50?

A. Yes.

Q. Was that in the south Bronx?

A. No. That was in Brooklyn, downtown Brooklyn.

Q. All right. I'm going to be mindful of your schedule, Mr. Goldenberg, I do have a few more minutes, but do you want to wrap up and then we can reconvene? I'll be in touch Ms. Moyal to wrap up.

A. How much more time do you have that you're reconvening?

Q. I just have a couple more questions to wrap, up but unless you want to --

A. What do you call a couple

Page 381

GOLDENBERG

more questions. If you ask me --

Q. Another 10 or 15 minutes.

A. You'll be finished in five minutes?

Q. Another 10 or 15 minutes, yeah. I'm not going to be rushed here. You know, again, we've come this far, so -- but I'm trying to be mindful of your -- the Zoom call you mentioned.

A. Okay. Let's go.

Q. Do you have a hard stop?

MS. MOYAL: Do you have -- do you have ten minutes' worth of questions? Then --

MR. REINITZ: Yeah.

MS. MOYAL: -- Leon, can you rush through ten minutes?

THE WITNESS: I'm going to try.

MS. MOYAL: Okay. So at 6:40 we'll call it a hard stop.

THE WITNESS: Thanks. I got takeout.

MR. REINITZ: I'm sorry?

MS. MOYAL: All right. So 6:40 will be a hard stop. Go for it, Ariel.

Q. Do you know an individual by the name of Jack Tawil?

Page 382

GOLDENBERG

A. Yes.

Q. How do you know Mr. Tawil?

A. I'm an investor in his company.

Q. What's the name of the company?

A. Medpod.

Q. About how long did you invest in Medpod?

A. Close to ten years, eight years.

Q. And what generally is Gold -- Medpod's business?

A. They make a traveling medical bag.

Q. Go ahead. I'm sorry.

A. It's a piece of equipment. You can Google it, you'll see.

Q. Okay. And Medpod, are you involved in any other technology companies like that?

MS. MOYAL: What do you mean "like that"? Other medical --

MR. REINITZ: I apologize. Yeah, strike that.

Q. Are you involved in any other companies in the same sector, say medical companies?

A. Medical companies, yes.

Page 383

GOLDENBERG

Q. Okay. What kind of companies?

A. A hospital.

Q. What's the name of the hospital?

A. LTAC.

Q. Where is that?

A. It's in Lakewood, New Jersey.

Q. Okay. And who -- who runs that hospital?

A. His name is Dan Czermak and Dr. Howard Lebowitz.

Q. About how long ago did you invest?

A. AcuteCare. It goes by AcuteCare I think.

Q. AcuteCare?

A. Yeah.

THE VIDEOGRAPHER: Mr. Goldenberg, on camera, please.

Q. About how long ago did you invest in AcuteCare?

A. 15 years.

Q. Can I ask, Mr. Goldenberg are you looking at your phone?

A. Yes.

Q. What are you doing?

Page 384

GOLDENBERG

A. I'm looking for the name.

Q. Okay.

MS. MOYAL: It's okay. You don't have to provide it now, Leon.

A. Okay.

Q. Do you know an individual named David Schick?

A. Yes.

Q. How do you know Mr. Schick?

A. He stole money from me.

Q. About how long ago was that?

A. 25 years exactly.

Q. About how much money did Mr. Schick steal from you?

A. Close as to a million dollars.

Q. Anyone else you know that Mr. Schick stole from?

A. A lot of people. 140, 150 people.

Q. What happened to Mr. Schick?

A. He went to jail for seven, eight years. He's out.

Q. To your knowledge, Mr. Schick is no longer in jail?

A. No.

Page 385

GOLDENBERG

Q. Did you take any action against Mr. Schick with respect to the million dollars that he stole from you?

A. Yes.

Q. What did you do?

A. I went to court.

Q. Okay. And did you --

A. I did not testify at his trial either.

Q. Say that again, I'm sorry?

A. I did not testify at his trial either.

Q. Okay. Were you asked to?

A. Yes.

Q. Okay.

A. I was asked to do a victim statement.

Q. Did you do that?

A. No.

Q. Did you recover any money from Mr. Schick?

A. Yes.

Q. Did you recover all the money?

A. No. No. I would say 40, 50 percent over the next seven, eight, nine years.

97 (Pages 382 - 385)

Page 386

GOLDENBERG

Q.   Did --

A.   He went into involuntary bankruptcy and as the properties were sold off, what the trusts didn't steal came back to us.

Q.   Now, with respect to Mr. Schick, do you know anyone who was involved in his -- raising funds for his legal defense?

A.   No.  I mean, I'm sure I do, but they didn't go around advertising it.

Q.   Understood.  Did you -- if you would have been aware of that, those efforts, would you have tried to stop them?

A.   Yes.

Q.   Okay.  And that's -- why would that be?

A.   He took a total of 150 million dollars from the community.  Mostly from the Orthodox community.  He gave the Orthodox community such a black eye and I was convinced that he would do it again and he did.  He did it a total of three times.

Q.   Mr. Schick swindled people three times?

A.   Yeah.

Page 387

GOLDENBERG

Q.   Wow.  How about you specifically?

A.   No.

Q.   Just once?

A.   Once is enough.

Q.   Understood.  Okay.  Let me just double, triple check here, I think we're -- I think we're done.

THE VIDEOGRAPHER:  We're done with this exhibit?  Okay.

MR. REINITZ:  Yeah, I'm done with the exhibit.

Q.   You know what, last question or two, Mr. Goldenberg, do you have -- other than your primary -- is your residence in Brooklyn your primary residence?

A.   Yes.  Right now.

Q.   Okay.  And you mentioned I think already, but just to clarify, you're -- you're planning on transitioning down to Miami?

A.   Surfside.

Q.   Surfside.  I apologize.  Down to Florida?

A.   Yes.

Q.   Okay.  Other than your let's say

Page 388

GOLDENBERG

residencies in Brooklyn and in Florida, do you have any other residences?

A.   I have one upstate in Woodridge, New York, and I have an apartment in Israel, which I can't get to.

Q.   Is that just right now or ever?

A.   They're in lockdown.  They're getting ready to lock down.

Q.   Okay.  Where in Israel?

A.   Jerusalem.

Q.   Fair enough.

A.   Slavia (ph.)

Q.   Okay.  And how long have you had that property in Israel for?

A.   Six, seven years.

MS. MOYAL:  You said you had two questions.

MR. REINITZ:  I'm sorry?

MS. MOYAL:  I thought you said you just had two more questions.

MR. REINITZ:  Well, you can never trust a lawyer.

MS. MOYAL:  I know.

A.   I'm glad you said it.  I was thinking

Page 389

GOLDENBERG

it.

MR. REINITZ:  On the record.

A.   It's like a photographer.  You ever take a picture at a wedding when a photographer says, One last picture?

Q.   I stole your thunder.  You can use that one next deposition.

So Mr. Goldenberg, as you're sitting here today, you know, I know it's been fun, but --

A.   Right.

Q.   -- throughout the deposition here, every time that I asked you a question that was in any way unclear, did you ask for clarification?

A.   I didn't have too many of them.  I probably did.

Q.   Okay.  So fair to say then when you did answer my questions, the questions that you were answering, you understood them --

A.   Yes.

Q.   -- as I was asking them?  Okay.

Were all the answers that you gave me today based on your own personal knowledge?

98 (Pages 386 - 389)

Page 390

GOLDENBERG

A.   Yes.

Q.   Now, going back to actually not just the beginning of the deposition, but actually before the deposition, were there any documents that you reviewed today before your deposition for the purpose of refreshing your recollection?

A.   Today?

Q.   Any time before the deposition did you review any documents to refresh your recollection?

A.   Several.

Q.   For purposes of testifying?

A.   Not today.

Q.   I'm not asking if you reviewed them today.  I'm asking if at any time prior to the deposition or during the deposition did you review any documents to refresh your recollection for the purposes of testifying today at this deposition?

MS. MOYAL:  Apart from the checks that he testified to earlier?

MR. REINITZ:  Well, that would be one so -- but I'm going to need to hear from Mr. Goldenberg.

Page 391

GOLDENBERG

Q.   Any documents you reviewed --

A.   Yes.

Q.   What documents did you review to refresh your recollection?

A.   Whatever my attorney sent me.

Q.   What documents would those be?

A.   I don't remember.  Nothing major.

MR. REINITZ:  Ms. Moyal, I'm going to follow up with you then, we'll ask for production of any of those documents that Mr. Goldenberg used to refresh recollection.

Q.   Other than those documents that your attorney sent you and the checks that Ms. Moyal referenced, any other documents that you reviewed --

A.   No.

Q.   -- to refresh your recollection?

A.   No.

Q.   Okay.

MS. MOYAL:  Again, please follow up in writing and we'll take it under advisement.

MR. REINITZ:  That's fine.

THE WITNESS:  My advice is don't give

Page 392

GOLDENBERG

him anything.

MS. MOYAL:  You don't make that choice.

Q.   Now, all your answers today, Mr. Goldenberg, that you provided, were all of those based on your own personal knowledge?

A.   Yes.

Q.   Okay.

MS. MOYAL:  Asked and answered.

Q.   Now, I know, you know, sometime -- I mean, we've talked about the timeline here with the -- with the events in this case, but sometimes when we start -- you start retelling something, a story that happens in the past, it could take a little while to jog your memory to remember everything, all the details that were related, is there anything that you've recalled over the course of deposition that you wanted to add to any of your answers that you gave previously?

MS. MOYAL:  Over objection you can answer.

A.   I don't think so.  Except that as far as I'm concerned, Mr. Ari Teman owes me $60,000,

Page 393

GOLDENBERG

the units are here to be picked up, they will not be installed in my buildings, and I wish him luck in his life, but stay out of my life.

Q.   Okay.  Other than what you just testified to, are the answers that you gave today that you'd like to change?

MS. MOYAL:  Over objection you can answer.

A.   I don't think so.

MR. REINITZ:  What's the objection, Ms. Moyal?

MS. MOYAL:  The objection is ask something specific.  This is --

THE WITNESS:  Right.

MR. REINITZ:  I'm offering Mr. Goldenberg --

A.   I answered seven hours of questions.

Q.   Okay.  Are there any -- do you recall any answers that you gave now that you'd like to change?  Nothing comes to mind then that you would like to change your answers to?

A.   Right.

Q.   Okay.  Is there anything else other than the comment that you just provided that --

99 (Pages 390 - 393)

Page 394

GOLDENBERG

that you want to add for the record regarding this case or your testimony?

A. No. What am I going to tell you? I don't owe him the money, I don't owe him the money. I didn't sign the contract. I signed a 4-page contract. I did not sign a 30-page contract.

Q. Okay. Fair enough. My last -- my very last question, and I promise --

MS. MOYAL: Very good.

Q. -- anybody else -- other than I believe you mentioned your assistant, has anybody else been in the room with you at any point today during your deposition?

A. No.

Q. Okay. That's it for me.

MS. MOYAL: All right. Leon, you're good to go.

THE VIDEOGRAPHER: Counsel, I'm going to do a proforma read-on without any objections and that will terminate the recording.

MS. MOYAL: Okay.

THE VIDEOGRAPHER: Here ends media

Page 395

GOLDENBERG

unit six. This concludes the video-recorded virtual remote deposition of Leon Goldenberg taken by the plaintiff on Tuesday August 17, 2021. The time is 6:43 p.m. Eastern Daylight Time and we are going off the record.

(Time noted: 6:43 p.m.)

Page 396

ACKNOWLEDGEMENT

STATE OF NEW YORK )
                   : ss
COUNTY OF        )

I, _____, hereby certify that I have read the transcript of my testimony taken under oath in my deposition; that the transcript is a true, complete and correct record of my testimony, and that the answers on the record as given by me are true and correct.

_____
LEON GOLDENBERG

Signed and subscribed to before me this ____ day of _____, 20___.

_____
Notary Public, State of New York

Page 397

CERTIFICATION

STATE OF NEW YORK )
                   )
COUNTY OF NEW YORK )

I, MICHELE MOSKOWITZ, a Shorthand Reporter and Notary Public within and for the State of New York, do hereby certify:

That LEON GOLDENBERG, the witness whose examination is hereinbefore set forth, was duly sworn/affirmed by me and that this transcript of such examination is a true record of the testimony given by such witness.

I further certify that I am not related to any of the parties to this action by blood or marriage and that I am in no way interested in the outcome of this matter.

IN WITNESS WHEREOF, I have hereunto set my hand this 24th day of August, 2021.

Michele Moskowitz
_____
MICHELE MOSKOWITZ

100 (Pages 394 - 397)

Page 398

** ERRATA SHEET **

CASE: GATEGUARD v. GOLDMONT, ET AL.
DEPOSITION DATE: AUGUST 17, 2021
DEPONENT: LEON GOLDENBERG
PAGE LINE(S)   CHANGE          REASON

____|____|_____|_____
____|____|_____|_____
____|____|_____|_____
____|____|_____|_____
____|____|_____|_____
____|____|_____|_____
____|____|_____|_____
____|____|_____|_____
____|____|_____|_____
____|____|_____|_____
____|____|_____|_____
____|____|_____|_____
____|____|_____|_____
____|____|_____|_____
____|____|_____|_____


_____
       LEON GOLDENBERG


SUBSCRIBED AND SWORN TO BEFORE ME
THIS _____ DAY OF _____, 20___.

_____    _____
(NOTARY PUBLIC)       MY COMMISSION EXPIRES:

101 (Page 398)

**[& - 28th]**                                                                            Page 1

**&**

**&**  2:9 6:3 25:22

**0**

**000002**  88:7
**000020**  3:19 159:3
  159:15
**000021**  3:19 159:4
  159:15
**000087**  3:22 190:3
  190:15
**000116**  3:23
  212:24 213:8
**00017**  3:16 102:24
  103:11
**01609**  1:3

**1**

**1**  14:17,20 38:19
  47:8 53:13 55:9
  64:7 128:9,10
  129:21 150:15
  159:18
**1,000**  171:8,19,21
  175:6
**10**  57:16 373:12,14
  381:3,5
**10,000**  123:14
  136:9
**100**  3:11 21:21
  22:14 23:17 24:9
  24:10 25:9,20
  26:3 27:16 34:20
  35:12,24 36:3
  37:17 47:15 57:25
  145:8,9 214:11
  252:6 303:9
**100,000**  83:16
**10022**  2:5
**10038**  2:12
**101**  3:13 25:4,11
  30:23 31:11 34:19

**1016**  66:23
**102**  3:14,16 53:15
  53:18,22 55:3,9
  58:17 63:4
**103**  88:2 90:2
  95:14 103:4
**104**  3:15 102:25
  103:6,18
**10:05**  1:13 5:14
**11**  3:18 151:21
  153:3
**110**  3:17 151:2,5,8
**1100**  171:23
**111**  3:18 151:22
  152:2 156:17
**115**  3:21 190:3,6
  199:10
**116**  3:23 212:24
  213:3 242:12
**117**  3:24 228:22
  229:3 230:11
  237:21
**118**  4:4 259:6,8
**1199**  293:13
**11:37**  87:11,19
**11:45**  87:17
**11:48**  87:21
**12**  293:14
**120**  3:19 159:4,8
  159:18 163:7
**121**  3:20 160:3,8
  160:12
**12th**  291:20
**1360**  282:9
**140**  4:5 273:24
  274:3 384:19
**141**  296:7
**14th**  282:10
**15**  18:2 207:11
  381:3,5 383:21

**15,000**  373:12,14
**150**  3:17 46:23
  47:14,14,15,18
  48:18,23,24
  384:19 386:17
**151**  3:18
**159**  3:19
**16**  153:22,25
**160**  3:20 4:6
  335:24 336:2
**1609**  5:10
**1610**  19:20 20:10
**17**  1:12 5:13 395:4
  398:2
**18**  151:19 255:22
  352:8
**1834**  66:24
**1868**  267:23
**189**  3:22
**19**  293:17 313:13
  313:15 319:23
  351:2
**1974**  19:18
**1983**  15:11 18:15
**199**  66:25
**19th**  275:6 284:9
  284:10 296:7,14
  299:15
**1:06**  158:4
**1:07**  158:9
**1:20**  1:3 5:10
**1s**  69:4

**2**

**2**  14:20 26:3 28:22
  31:10 39:4 103:18
  156:16 189:11
**2,000**  295:5
**2/12/19**  289:17
**20**  46:19 57:19
  66:25 164:19
  266:16 362:3

396:16 398:23
**2017**  26:5 47:8
**2018**  88:16
**2019**  3:14,18 53:17
  54:3 55:2 59:15
  78:2,4 90:3,14
  103:19 104:13
  126:8,17 127:18
  127:25 128:9,10
  129:21 151:21
  153:3 159:22
  160:16 164:6
  168:15 170:11
  226:15 274:25
  284:7 293:14
  299:5,23 333:20
**2020**  30:10,11
  216:6,13
**2021**  1:12 5:13
  34:7 395:5 397:18
  398:2
**21**  34:7 66:25
**212**  3:23
**21st**  66:25
**228**  3:24
**23**  3:12 160:16
**24**  151:12 369:13
**24th**  397:18
**25**  3:13 49:2 70:17
  131:25 266:16
  268:13 384:13
**259**  4:4
**26**  284:7
**26th**  296:7
**27**  268:7,14,21
**273**  4:5
**28**  103:19 104:13
**289**  3:6
**28th**  109:8 113:3
  114:18 121:16

**[2:00 - abi]**                                                                                                                        Page 2

| | | | |
|---|---|---|---|
| **2:00** 14:18 158:6 | 394:7 | 392:25 | **abc** 123:8,8 |
| **2:05** 158:12 | **4,000** 188:13 307:9 | **600,000** 251:19 | **abi** 1:8 31:6,7,16 |
| **2:06** 158:4 | 307:12 | **612** 155:15 156:2 | 31:23,25 32:9,15 |

**3**

3  27:15 33:16
39:16 41:2,24
188:13 251:12,16
251:20,22
30  3:14 7:18 53:17
54:3,10 55:2
56:23 57:22 58:5
59:15 78:4 127:25
153:16 159:22
160:15 168:15
170:11 174:17,23
177:5,12 178:16
178:17,18,23
254:4 263:13
267:24,25 334:14
362:3 394:7
30th  78:19 127:18
127:22 164:10,22
165:11,11,18,19
166:20 168:3
287:23 295:17
33,000  157:5
33,760  156:20
335  4:6
369  357:15
369k  356:17
391  3:8
3:01  207:17
3:05  207:14
3:10  207:14
3:14  207:19
3:32  54:3

**4**

4  40:16 55:3,4
251:12 307:11,16
308:18 336:22

394:7
4,000  188:13 307:9
307:12
40  20:20 57:3,4,9
148:3,6 360:18,21
385:24
445  2:4
45  87:11
4770  397:21
4:26  272:25
4:40  273:4
4th  242:15

**5**

5  47:4 58:15,16,17
63:4 71:5,8
251:19 307:9,16
5,000  71:8 308:18
50  22:19,22 58:3
124:6 171:8,22
293:12 305:23
380:10,11 385:24
500  175:6
503  2:11
516-967-2622  54:8
53  3:14
5:00  139:4

**6**

6  58:16,17 189:8
268:8 336:21
367:13
60  22:16,18 171:8
171:21 305:23
60,000  171:7,17,21
171:24 180:18
187:14,20,21
196:20 215:16
248:11 251:15
253:5,6 289:16
291:24 295:25
296:2 311:12

392:25
600,000  251:19
612  155:15 156:2
64th  332:3
6:00  312:15
6:17  369:6
6:18  369:8
6:40  381:18,22
6:43  395:5,8

**7**

7  58:16,17 268:8
70  153:15,23 154:2
75  48:21
7500  71:5,8
76  239:20

**8**

8  58:16,17 63:4
88:15 90:3
8,000  227:16
8/27/19  156:11
80  21:21 22:14
145:8,8 303:9
362:3
80s  18:17 379:3
8:30  189:8

**9**

9  189:8 216:6,13
278:2
90  2:11 303:12
92  303:12
9th  2:4 242:14

**a**

a.m.  1:13 5:14
aba  230:8
abbreviation
102:6
abby  17:14 97:8
370:6

abc  123:8,8
abi  1:8 31:6,7,16
31:23,25 32:9,15
33:2,6,9,13 42:4,4
45:7,19 52:10,12
52:15 56:5,17
61:2,6,11,22 62:4
62:6,7 68:19
71:13 72:18,19
74:14 75:19 77:19
90:3,14,15 91:6
92:10,23 94:22
99:12,16,17 100:2
100:5,17,21,25
101:9,14,16,22
103:23 113:17
118:15 124:14
128:14 129:12
130:4,12,16,18,21
134:14 137:6,11
137:18,21 138:2
138:11,16 140:17
140:18 141:7,10
142:4,15,22,25
143:13,14 161:12
161:17,17 162:9
162:10,13 166:25
167:14 173:8,11
173:11,14,18,19
173:22 174:2,9
175:10 176:21,25
177:6,7,8,9,9,19
177:23,24,24
178:2,13,22
180:23 181:5,9,18
181:18 183:4,13
183:17 184:14,25
185:2,5,23 186:6,7
186:12,16,22
188:17 189:12
191:8 192:11,18

192:19,21 193:6 194:4,5,16 199:20 200:5,8,9 203:10 204:8 205:18 206:25 208:9,20 208:24 209:4 210:11,11,25 211:19,24 214:10 218:6 222:12,15 224:20 230:4,18 250:16 292:18 293:20,21 297:4,7 297:9,15,17,19 303:25 304:4 312:5,5 313:2 315:18 316:14,21 338:3 342:19 344:5 350:16 351:5 353:20 354:14 356:7,11 358:8 359:10 362:18,21 363:3 365:6,19 367:3 370:6,9 371:16 374:6,9 375:19 376:3,25

**abi's** 45:8 194:13 204:3,6 297:9 309:13

**abilities** 9:3

**ability** 8:13 72:2 132:25 133:2 284:3 313:8

**able** 8:23 9:2 12:16 120:2 133:15 281:21 300:19 301:2 315:20

**absolutely** 53:13 117:8 243:8,8 252:15 288:7

357:3

**acceptance** 229:11

**accepting** 236:6

**access** 198:14 341:19 342:6,11 370:4

**accessing** 294:24

**accidentally** 192:17 193:6 194:3

**accidents** 149:14 149:22

**accommodate** 139:5,6

**account** 27:18 28:19,20 146:5,21 241:12 340:21,25 360:16 375:25

**accountant** 112:16 112:23

**accounting** 18:6

**accounts** 18:8 46:7 82:6 171:9,22 343:7 361:24 362:6

**accurate** 22:8 26:9 33:25 34:8 36:3 37:18 38:16,21 39:12,19 40:9 44:20 65:8 94:10 106:16 107:20 142:9 164:15 176:22 189:20 197:13,14 222:7,9 241:24 267:2 281:5 291:3,12 342:8 351:19

**accusations** 208:10,17 209:2,6 209:21 265:24

**accused** 170:23

**accusing** 157:20

**acknowledge** 95:13

**acquire** 131:24,25

**acquiring** 114:2

**act** 239:18 240:7 240:11

**acted** 198:24

**acting** 193:25 199:15 211:21 326:25

**action** 1:3 33:23 34:4 191:23,24 204:9 205:10,12 205:18,20 206:2 207:2,6 385:2 397:14

**actions** 221:13 225:6

**active** 142:25 143:17

**activist** 276:21 278:16

**activities** 239:5

**acutecare** 383:13 383:13,15,20

**add** 102:6,18 280:13 335:9 392:20 394:2

**added** 102:13

**addition** 308:20

**additional** 106:13 132:7 371:9

**address** 46:10 63:6 65:4 74:3 339:19,25 340:9 346:9

**addresses** 28:14 28:16 58:24 59:6 63:7 65:3 192:16

**administrative** 7:2 7:9

**administratively** 13:25

**admission** 154:18

**admit** 164:18

**advance** 7:13 266:25

**advantage** 217:18 218:2,4,7 219:9 221:3,10 225:3 247:7,8,13,23 248:5,8,23 300:8

**adverse** 283:25

**advertise** 136:23

**advertising** 136:7 386:10

**advice** 391:25

**advisement** 290:5 391:23

**advocacy** 232:17 276:11,15 278:20 279:11

**advocated** 255:25

**advocating** 240:4 276:8

**affect** 8:13 285:25 286:5 325:9

**affirmed** 6:15 397:10

**agenda** 166:9

**aggravated** 284:13 306:4

**agnes** 15:23,24 16:6 32:16

**ago** 20:9,20 39:7 45:7 47:14 55:10 56:15 57:2 59:16 72:15 74:13 75:13 82:19,20 110:13 133:14 147:3

161:9 167:13 172:21 176:18 196:11 197:9 203:12,12 216:7 229:19,25 239:4 240:10 264:15 267:7 268:24 274:22 311:3 320:10 321:8 325:16 347:6,7 348:9,11 350:23 356:22 361:15 364:10 369:19 383:12,19 384:12

**agoldenberg** 88:15

**agree** 6:11 9:14 40:5 87:8 93:13 124:12 134:4 205:3 213:13 214:7,11 222:2 242:4,20 244:2 245:14,18,20 251:2 253:7 295:20

**agreeable** 7:4 13:19

**agreed** 6:6 92:11 134:6 208:24 223:17 242:5 318:17

**agreement** 3:17 54:24 55:2,6 56:17,24 59:13 60:2,6 61:6,12,14 61:19,20 69:5 71:10 72:7 77:24 78:3,5,5,21,24 79:4 80:4,18 81:3 81:12 90:9 92:12 92:23,24 95:25 134:7 150:25

151:17 156:7,8,18 164:7,8,13,16 166:23,24 168:14 170:2 174:10 176:5 178:6,24 180:22 185:7,21 186:9,25 189:14 189:19 223:4 284:15 285:20 286:6,15 287:3 289:5,9 290:21 291:2 299:11,11 299:13,17 326:11 326:12 364:18

**agreements** 33:13 33:14 58:8 79:25 174:10 286:15 299:6

**agudah** 276:21 278:15,16 279:13

**agudath** 278:17,19 279:4,5,7,12 320:19

**agunah** 255:11,12 256:8

**ah** 336:4

**ahead** 40:18 73:14 74:23 132:24 163:17 164:2 168:6 330:5 334:24 365:19 380:9 382:13

**air** 119:16

**aitza** 213:9

**ajn** 1:3

**al** 5:9 398:2

**alive** 358:11,18,20 372:21

**allegation** 207:3

**alleged** 34:11

**allegedly** 310:16 310:17 313:24

**allessandrino** 355:5,9

**allow** 13:6,8 106:14 190:17 338:9

**allowed** 71:5 174:21 182:3 234:12 315:5

**alluded** 73:16 121:22 124:21 229:18

**allusion** 238:23

**alongside** 141:11 141:13

**amazing** 104:3

**amazon's** 196:9

**ami** 281:22,22,23

**amount** 71:4 106:10 154:24 171:15 187:12 253:3,5 291:10 292:2 318:15,16 319:21 325:17

**amounted** 292:8

**amounts** 135:22 171:24 291:11 293:13 300:20

**analysis** 248:3

**android** 26:24,25 339:8,10,18

**angle** 265:22

**angry** 121:25 124:18,22 126:14 129:7 169:3,4,4 183:10 193:3

**animals** 267:24

**annoy** 139:9 140:3

**annoyed** 188:23

**answer** 7:22 9:8 14:5 32:12,12 35:15 72:24 74:9 96:7 98:10 115:10 125:9,13 126:3 133:10 135:17,18 143:8 148:20 150:10 169:9,9,10 169:13,16 178:10 179:23 202:4,6,8 202:10 204:20 205:23 206:6 207:5 212:11 219:14,24,25 220:15 221:21 228:16 246:2,10 246:16,23,24 247:19 253:12 255:3 267:16 285:2 288:4 308:6 357:23 358:2 360:6 377:11 378:10,18,19 379:25 389:20 392:23 393:9

**answered** 74:9 95:12 99:6 125:3 125:5,7 150:13 202:2 211:17 214:5 220:4,4,12 222:5 252:10 313:21 325:22 328:6 392:10 393:18

**answering** 9:15 165:13 169:19 252:17 389:21

**answers** 9:10 213:16 229:16 389:24 392:5,20 393:6,20,22 396:9

**[anti - asked]** Page 5

anti 233:10 268:18 268:19
anticipate 281:18
antique 19:6
anybody 9:25 10:4 86:17 117:6 134:19 181:8 263:4,5,6 266:3 268:3 314:7 317:15 357:12 366:20 394:12,13
anymore 26:13 128:19 178:2 185:3 197:3 249:7 252:17 295:14 305:2 313:8
anyway 214:7 224:6 372:20
aol 163:15 342:8
aol.com 28:14 88:14 103:20
apart 93:23 364:19 390:21
apartment 277:23 278:5 282:17 300:19 310:2 319:15 388:5
apartments 300:4 302:25 303:3
apologize 40:12 63:12 172:21 262:21,23,25 325:15 382:20 387:22
app 339:11 340:22
apparently 194:8 378:24
appeal 241:11,15
appear 59:10 84:11 328:17

appearances 5:22
appeared 96:8
appearing 5:5
appears 32:14 64:5 180:21 199:15 216:20,22 241:8 244:8 282:15
appendix 58:18
appliances 302:6,6
applicable 249:24 250:3
applications 11:24 12:14,14 13:6
applies 34:21
apply 35:11
appreciate 128:25 139:3 182:24 197:6 206:6 254:16 263:17 298:9 361:4
approached 91:6 107:19 109:8
appropriate 208:17 209:20 211:4
approval 70:25 318:12
approximately 5:14 8:7 15:9 17:24 20:8 21:19 22:13 46:17 47:14 51:7 62:3 66:19 67:14 68:12 72:3 75:12 109:25 113:24,25 138:14 145:8 154:23 161:10 171:20 185:19 231:3 239:7 257:4 261:21 262:9

274:18,22 292:2 296:15 299:5 307:7 320:8 321:8 325:17 342:10,13 343:5 347:5 352:18
apps 27:20 29:16 341:2
april 26:10 30:10 30:11 34:7 128:9
aranoff 354:22,23
arbitration 223:4 224:2
area 21:13 374:14
areas 84:21
argued 180:6
arguing 180:7,10
ari 40:15 43:15 54:2 71:20 82:14 88:21,23 95:5 97:17 103:19 160:13 177:12 192:13,19,21,24 215:9 217:16 220:19 226:25 227:21 241:10,14 242:20 246:9,22 253:23 262:22 263:2,3 288:13,16 313:5,5,7 334:16 353:7,15,15 354:9 392:25
ariel 2:6 5:23 40:7 148:6 190:25 195:11 201:19 233:18 288:2 381:23
ariel.reinitz 2:7
arisen 50:19
arrangement 91:10 132:12

234:11
arrest 170:19 172:23 182:9 314:20 315:11 379:18
arrested 160:13 161:13 164:14 165:20 167:17,23 168:8 170:10 181:22,23 182:8 182:10 184:23,23 198:6,8,9,12 314:19 379:17
arrests 379:19
article 3:20,24 43:15,21 159:25 160:2,4,7,13,16,19 160:24,24 161:8 161:20,23 165:23 228:21 229:19 230:15,17 231:4,6 274:21 275:11 280:16 281:22 283:14 284:7
articles 161:12 162:3 167:15 173:12 184:3
aside 36:10 37:14 40:6 93:14 97:20 126:18 138:2,6 144:4 165:17 173:23 179:14 185:13 204:2 254:17 310:13,18 313:23 314:9 371:19
asked 14:3 35:18 74:8 76:8 95:12 99:5 102:18 117:2 123:18 125:3,5,7 131:15 172:21

**[asked - aware]**                                                    Page 6

184:15 199:14 200:14 201:24 220:3,12 222:5,12 228:19 252:10 268:13 297:19 311:18 316:9 325:16,22 349:20 362:24 363:17 365:19 376:18 385:14,17 389:14 392:10

**asking** 9:8 20:19 35:9 36:5,11,20 37:13,16 38:15 51:17 60:9,10 75:3 76:24 82:24 90:15 92:10 95:9 98:17 119:7 121:20 125:10 130:4,18 132:4 135:11 141:5,15 150:12 160:20 164:20 170:13 177:17 191:2 201:4,8,22 204:6 204:14 205:15,17 209:8 210:8,9 219:13,16 220:7,8 228:13 236:3,21 236:22 241:23 247:21 249:21,23 250:4,8 259:12 265:4 271:4 274:12 280:11 287:22 290:13,18 292:24 301:22 323:17,18 329:9 329:12,15 330:2 331:11 332:9 348:14 363:19,20 389:23 390:15,16

**asks** 26:3 27:16,17
**aspect** 92:22
**assembly** 294:12
**assessment** 214:11
**assist** 240:5 241:11
**assistant** 42:19 259:16 340:16 394:13
**associated** 339:19 351:21
**association** 5:17 5:20
**assume** 63:21 72:9 82:14 83:14 90:16 113:9 119:15 120:24 121:2,6,11 173:8 217:8,9,9,12 218:9,10 219:10 219:20,21 228:14 228:15 250:15 278:6 358:5 360:7 361:10,10,12 366:2
**assumed** 222:14
**assuming** 253:2
**assumption** 173:9 217:8 219:11,15 220:6 242:23 243:2
**assure** 117:16 139:16 140:2 170:3 204:18
**asterisk** 44:17
**ate** 297:14 313:10
**attached** 54:8 174:22 176:14
**attaching** 54:25
**attachment** 54:6 54:11 56:11 79:5 79:6

**attempt** 288:9 325:25
**attention** 170:5,12 172:13,17 375:17
**attorney** 6:19 12:25 35:17,17,17 37:6 40:7 41:14 42:7 53:10 55:17 58:12 80:5,19 81:5 101:25 102:7 102:13,13,18 117:13 152:22 156:9 191:16 193:16 194:2 195:6 199:11,12 201:5,6 203:4,6 248:7 269:24 270:4 288:12 344:7,14 356:14 356:20 360:5 391:6,14
**attorneys** 2:3,10 25:22 26:7 27:21 31:3 35:5 55:20 56:3 157:4,12 172:18 181:7,11 186:2 206:3 239:25 269:7
**atty** 102:6
**august** 1:12 3:14 5:13 53:17 54:3 55:2 59:15 78:2,4 78:19 127:16,18 127:22,25 128:9 164:10,22 165:11 165:11,18,19 242:15 287:23 295:16 395:4 397:18 398:2
**authorities** 194:25 197:12,16 198:18

200:2 204:10 209:5,10 210:16
**authority** 32:8 130:25 131:2 132:5 133:6 134:24
**authorization** 186:18
**avenue** 2:4 19:20 20:10 66:24 146:10 155:15 156:2 276:3
**average** 282:4 307:11
**avi** 39:23 43:11,12 214:7 215:25 216:5,14,19,22,25 217:14 218:3,8,8 218:13,19,21,25 219:6,8,12 220:10 220:25 221:5,23 224:21,22 225:19 229:24 230:4 236:3 241:19,21 242:13 243:16 244:7,13,15,22 245:5,10,14 264:14,19
**avi's** 220:20
**avoid** 120:11,15
**awards** 224:3
**aware** 61:2,5 71:22 79:10 90:11 95:23 96:4 159:22 163:14 171:12 177:5,12 199:23 201:24 234:20 272:5 320:5,9 321:6 339:24 386:12

**[b - beth]** Page 7

| **b** | 359:4 362:12 | 308:12 365:20 | 156:15 167:14 |
|---|---|---|---|

**b** 3:9 4:2 6:14 230:4 316:24
**back** 21:2 23:2 24:12,23 25:19 26:21 28:21 40:25 42:11 43:5 44:9 45:6 50:9 52:11 54:22 55:9 62:24 63:3,18 69:3,3,24 81:10 87:11,17 90:2 93:7,15 95:14 99:14 124:19 138:8 140:16 142:3 145:5 155:11 161:16 163:6 166:13 167:13 171:7,9 172:18 173:22 174:2,6 175:7 176:17 177:7 178:3 180:18 183:3 184:22 190:13 193:2 198:20,22 199:10 203:4 212:5 215:23 224:5,21,24 228:25 229:25 230:14 238:15 241:18,20,22 242:11 243:17 270:3 272:4 280:16 288:19 294:3 296:3 299:3 299:19 300:11 309:24 312:8 313:22 326:5,10 329:18,20 330:13 337:15 342:18 343:16 356:6

370:12 371:13 374:16 375:18 377:22 386:5 390:3
**background** 17:20 18:14,18 273:10
**backing** 371:5
**backwards** 129:2 129:17 159:14 221:22
**bad** 180:6 198:10 226:24 243:25 245:17,21 246:12 263:7,7
**bag** 382:12
**bail** 227:16,19 256:12
**bailed** 227:20
**bank** 160:14 268:7 331:18,22,24 332:7
**banking** 331:21,23
**bankruptcy** 268:4 386:3
**barr** 270:4
**barry** 41:16 42:24 43:2 103:24 112:15,16
**basch** 316:24
**based** 111:13,19 116:24 186:21 201:22 208:15 209:20 210:8 389:25 392:7
**basic** 118:14
**basically** 27:18 47:10 153:13,17 181:24 182:3 189:16 238:10 242:5 275:14

**basis** 75:23 100:19 109:17 125:9 157:15 166:18 226:4 253:7 257:13,16 279:15 328:10
**batch** 371:10
**bates** 3:15,19,21 3:23 88:6 102:23 103:10,11 159:3 159:15 190:2,14 212:23 213:8
**beaten** 220:24
**beating** 204:11
**begging** 120:9
**beginning** 71:18 274:25 378:12 390:4
**begins** 5:3 103:10 159:16 190:18 213:7,9
**behalf** 31:8,24 33:2,6,10,14,17 199:16 269:6 271:21 283:12 341:23
**beis** 221:11,24 225:4,13 250:18 250:19
**belief** 34:11
**believe** 20:25 33:11 41:6 42:8 43:3 52:7,23 55:12,15,19 67:23 68:24 94:20 95:18 102:6,15 103:23 111:9 112:23 113:17 114:10 121:4 122:19,23 125:17 144:10,13

156:15 167:14 173:22 176:17 181:19 194:19 195:15,20 198:2 203:10,10 211:23 212:6 214:10 216:16 222:20 224:8 225:10 226:3 231:14 232:23 233:25 237:10,10,13,14 237:17,17,18 247:7,12 249:2,24 274:8 277:5 281:20,21 309:2,2 309:9 318:2,7 336:12 342:18 351:10,12 362:17 362:21 367:5 371:24 372:5 394:13
**believed** 202:24 233:9 297:17
**believes** 34:12
**bell** 55:23 203:7
**bells** 308:13
**belong** 254:18,19 377:23
**belorusets** 17:11
**ben** 345:3,3
**beneficiary** 47:7
**benefit** 377:15
**benefits** 310:12
**bergenfield** 216:25 217:3
**best** 9:3,4 124:9 139:5 347:8
**beth** 50:25 51:2,5 51:9,11,21 52:4,8 52:18 53:4,7 221:24 222:3,10

222:11,15,18,19
222:23 223:3,11
223:17,19 224:5
224:18,23 225:9
323:21 324:3,7,15
324:17 327:24
328:10
**better** 118:2
281:11,18,19
312:5 326:9 350:4
**beyond** 7:20 142:6
142:8 275:17
**bid** 268:4,7,7,11
**big** 196:7 363:12
374:18
**bigger** 38:8 229:8
**bill** 145:20 146:18
235:14 276:6
356:22 360:14
362:7 371:19
**billion** 116:24
123:16
**bills** 144:19,22
145:2 234:7
235:10 361:2
372:13,24
**binder2** 54:11
**binder2.pdf** 54:5
**binder2.pdf.** 54:6
**bit** 44:15 71:10
94:4 106:9 190:21
273:11 312:4
370:19 373:7
**black** 291:10
386:20
**blackberry** 26:7
26:12,13,22 28:22
38:22,23 39:2
89:17,21
**blau** 45:24 316:24

**blessing** 194:13
204:6
**blew** 95:6 178:19
**block** 34:14
346:14
**blog** 214:16,18
216:10 230:10
232:22 233:23,24
235:21 236:2,5,14
236:22 237:19
241:2,7,24 242:7
242:17,20
**blood** 397:14
**blowing** 179:8
**board** 279:8
302:20
**boards** 143:11
**bogus** 157:11
**boiler** 96:20
**boils** 289:12
**books** 370:13,18
370:22
**boom** 124:2
313:11
**born** 111:25
273:13
**borrow** 91:8 365:7
**boss** 374:17
**bothering** 128:14
**bothers** 287:16,17
**bottom** 88:7
103:18 115:12,13
159:17 190:11,19
213:11,13 237:20
294:14
**bought** 19:17
20:11 322:10
**boxed** 291:10
**boxes** 187:19
188:6 293:18

**branch** 331:25
332:13
**brand** 307:13
308:18
**break** 14:2,6 35:7
37:9 86:20 87:3,5
90:10 139:20
150:19 152:23
157:25 158:3
208:6 272:21
368:6,15
**breaks** 13:17
69:15 70:7,16
310:6,7 336:24,25
**breeze** 240:23
**bridge** 198:5
**brief** 87:20 88:25
104:4 128:18
129:15 207:18
208:6 273:3 369:7
**briefly** 106:23
**bring** 62:9,10
106:9 118:23
127:7 190:13
241:20 349:3
**brings** 112:21,21
**broadening** 143:5
**brodsky** 2:18 5:15
**broken** 317:19
**broker** 327:7
**bromberg** 42:13
103:24 106:23
107:3,6,9,13,19,19
108:3,6,7 109:8,10
109:15,16 112:3
112:12 113:6
114:9 116:9,18
118:4,12,20,23
119:11,18 120:21
121:5,11 124:5
126:12 129:19

134:14 159:17,20
163:10,15 165:23
167:5 168:3
170:12 172:19
184:24 230:14
349:25
**bromberg's**
107:23 121:3
**bronx** 273:13,15
273:17 306:13
380:13
**brooklyn** 5:5 9:19
19:10,11,20 46:11
100:18 146:10
273:12,14 317:9
319:20 332:4,5
346:11 380:14,15
387:15 388:2
**brother** 219:3,4
345:3
**brought** 62:9
93:12 113:19,20
130:2 138:12
156:5 282:3 290:8
349:4,6 351:5
**buh** 123:14,14,15
123:15,15,15
223:10,10,10,10
223:10 224:12,12
**building** 134:5
145:3,13,19,21
146:15,18 147:13
147:17 153:22
154:2 155:10,19
155:24 277:24
282:17,20,24
283:10 295:6,8,9
306:24 307:10
309:21,22 312:16
316:17 317:12
322:9 323:9

**buildings** 45:14,16 58:19 59:10,18 63:19 64:5,6,9,15 65:17 66:22 67:3 67:7 68:17 69:8 69:10,15,19 70:5 73:5,8 94:15,16,19 96:21 98:15 118:16 119:23 120:2 121:17 123:14 127:5 133:7 136:9 145:9 145:12 148:22 149:6,10 153:24 154:11,12 172:3 234:24 294:25 295:3,4 303:8 305:7,8 309:14,15 309:18 311:5,10 311:11 312:11,13 313:3,9,11 314:10 314:11 317:4,5,14 317:17 318:8,23 319:16 325:12 348:20 351:9 362:3 375:7,10,15 393:3

**bunch** 37:24 134:5 275:7 343:23 344:2 372:16,16 372:20

**bundle** 106:14 214:23

**burnt** 149:6

**bury** 182:13 295:24,25

**bus** 379:15

**business** 18:21 19:4,5,13,15 21:4 27:12 29:10,11 30:5 46:25 50:12

50:18,18 57:3 68:12 80:8 84:25 96:12 97:22 104:10 105:11 107:23 112:9,14 126:21,22,24 138:4 140:10 141:20,21 142:13 142:16 144:16,21 148:3,6,24 170:25 171:3 174:3 183:22 185:4 190:21 215:12 219:4,5 221:14 227:3,9 275:8,17 285:12 294:7,9 295:13 296:25 301:5,10,23 302:12,13 311:14 311:25 314:24 315:5,7,8,16 318:2 319:2,4 325:4,5,10 332:8,25 333:3 349:24 360:19 370:18,22 374:23 382:11

**businesses** 18:21 18:22,23 19:9 140:20 142:8 143:10,11

**businessman** 311:8

**busy** 27:9

**butcher** 19:6

**butner** 271:18

**button** 308:2,9

**buy** 96:20 136:6 136:22 234:24

**buying** 61:14 96:18 278:3

**buzz** 308:3 309:24 309:24

**buzzer** 310:2

**buzzers** 308:10

**buzzes** 308:11

**c**

**c** 2:1 66:18 280:3,5 316:24 396:1 397:1,1

**cabinet** 269:24 270:6

**california** 49:6

**call** 25:15 69:24 86:10 87:4 114:7 119:10 166:6,7 167:9 172:17 191:22 196:22 207:12,13 209:12 209:15,16,16,23 210:2,12,14,16 211:2 217:4 220:18 222:11 223:25 227:15,23 227:24 243:12,13 251:19 252:13,14 277:22 287:8,10 287:11 290:2 295:5 298:16 299:21 307:2,3 313:3 317:21,23 336:11 356:20 363:2 367:20 368:12,13,16 378:3 380:25 381:8,19

**called** 93:9 109:15 170:12 172:12 181:3 239:18 261:7 289:22 313:4 344:15 372:5

**calling** 132:23 170:5 177:8

**calls** 32:4,10 35:13 130:9 137:3 157:18 181:15,18 181:19 202:8 211:2 212:10 227:18 247:18 253:9 267:14 355:7 372:9

**camera** 117:19 326:6,7 383:18

**cameras** 304:24 305:2

**candidly** 12:12 222:22 288:8

**capacity** 199:16 216:24 271:7

**capital** 300:6

**captives** 238:19,20

**car** 96:22

**cards** 270:24

**care** 117:14 153:21 263:6 314:4 373:15

**cares** 349:19 359:14

**carolina** 21:18 49:6 271:17,18,19

**case** 5:10 14:25 15:2,5 25:25 31:7 50:13 51:18 52:3 52:4,12,16 67:5 81:22 82:2 83:6 84:16 93:13 106:6 141:16 152:13,14 153:6,11 157:16 237:6,23 238:17 239:15 240:19 241:5,9,9 248:18 248:19 255:10,11

255:24,25 256:7
265:6,16 267:9
269:16,21,25
270:13,21 271:6
271:11 272:18
319:4 324:19,21
324:24 326:10
352:21 376:4
392:13 394:3
398:2
**cases** 69:12 154:7
154:21 157:7,9
158:21 195:5
238:7 239:5,7
254:20 255:10
258:3 265:10,11
265:15,20 271:4,5
**cash** 93:2,4,4
**catch** 168:22,24,24
252:24 271:12
**caton** 66:24
**cattle** 267:25
**cause** 153:20,21
**caused** 295:7
**caveat** 40:23
**cc'ed** 159:21
**cell** 11:7,10 38:24
308:6 338:6
**centers** 279:25
280:4
**century** 238:16
**certain** 133:16
**certainly** 44:25
97:16 122:7,13
124:17,18 125:18
163:22 166:6
180:5 222:14
246:3 271:10
342:17 344:11
357:25

**certify** 396:6
397:7,13
**chaim** 49:16,25
266:7,8
**chain** 102:9,14,19
203:21
**chained** 255:14,22
256:8
**chance** 159:11
160:17 193:2
215:24
**change** 287:4
290:23 355:14
393:7,21,22 398:4
**changed** 38:10
147:13 232:3
289:11 291:3,6
292:4 293:10
294:16 299:4
300:18 301:11
305:10
**changes** 333:13,14
333:16
**changing** 286:19
296:9,16
**character** 226:10
**characterize** 21:4
64:4
**charge** 205:20
267:22 303:4
348:10 380:7
**charged** 378:6
379:22
**charges** 160:14
267:21
**charging** 373:5
**charities** 30:6
**charity** 29:13
**chat** 12:14 29:21
**chats** 130:17

**cheated** 182:7
**cheating** 181:25
**check** 82:4,6,8
93:4 134:8,11
146:20,23 293:12
293:14 295:22
336:19 360:23
366:24 387:7
**checked** 127:22
**checking** 103:16
146:5 366:17
**checks** 33:10
130:13,17 131:4,4
131:9,13 132:5,18
133:3,7,16 134:16
134:25 146:6,7
171:8,19 235:13
287:12 291:16,18
291:21,24 311:21
360:17,18,19,22
361:14 362:4
390:21 391:14
**cherva** 280:4
**child** 227:15,17,18
**childhood** 112:5
163:11
**choice** 281:12,15
304:9 392:4
**choose** 175:25
**chose** 324:17
**chronologically**
308:25
**circling** 44:9
**circumstance**
97:20 234:20
**circumstances**
192:4
**cities** 217:3
**city** 21:12 48:20
49:9 111:14
261:13 275:20,24

275:24 281:3
289:11
**civil** 1:3 225:16
237:22
**claim** 172:5
185:12 189:13
225:22 255:15
292:16
**claimed** 154:14,15
291:9 292:20
323:8 325:18
354:16
**claiming** 185:16
185:20 186:8
189:19 286:22
291:12 322:5,7
323:16 326:13
**claims** 150:5 234:5
234:8
**clarification** 91:19
218:23 226:21
234:16 255:19
280:2 340:23
389:16
**clarified** 123:10
123:11
**clarify** 49:19
52:20 60:25 62:21
64:13 70:16 72:17
73:12,19 74:21
78:16 79:2 106:8
113:3 129:3
158:20 171:11,13
204:23 245:19
255:15 278:4
316:10,13 360:20
361:3,5,7,20
387:19
**clarifying** 254:16
263:22

**[class - complained]**                                                    Page 11

**class**  191:23,24
**classify**  158:22
**clear**  35:4 99:24
   105:18 117:6
   128:22,24 144:10
   144:24 164:21
   165:12,14 169:7,9
   169:21 172:20
   177:17 179:24
   180:3,13 181:20
   200:15 203:14
   204:21 205:21,24
   211:12 216:2
   220:6 232:8
   237:23 245:11
   252:2 259:2,3
   270:23 284:5
   285:6 292:5 293:6
   293:8,11 294:6
   312:18 313:5
   363:10,11 371:24
**cleared**  140:13
   244:17
**clearer**  359:19
**clearly**  123:4
   156:25 157:3,4
**clemency**  270:15
   270:20 271:5,20
**click**  312:13
**client**  140:11
   191:17 194:7,9
   295:25 297:21,22
   363:4,7
**clock**  367:16
**clocks**  153:23
   157:10
**close**  24:22 37:15
   38:9 46:19 53:13
   103:3 117:19
   134:6,7 143:23
   189:22 252:22

254:6 277:22
280:17 382:9
384:16
**closely**  54:21
**closes**  241:15
**closing**  103:4
**club**  378:3
**coal**  49:21 50:4
**coalition**  321:2
**coffee**  240:22
   271:12
**cojo**  279:23
**collapse**  277:21
**collapsed**  278:7
**collect**  81:24
   106:12 256:3
**collecting**  81:20
   81:21 97:4 254:23
   257:9
**collectively**  106:14
**column**  63:5,5,9
   63:16
**come**  11:19 35:19
   43:5 53:7 68:17
   71:12 76:9 77:23
   82:23 83:9 84:4
   93:15 94:24
   100:22 123:12
   130:7,13 137:16
   143:25 166:17
   167:24 175:7
   177:9,22 178:6
   193:2,9 194:11
   220:21 224:8
   228:25 240:22
   253:17,20 266:23
   273:20 331:12
   334:2 340:14
   343:7 350:4,5
   351:3 357:21
   362:12 365:24

370:12 371:21
375:23 381:7
**comes**  144:9 227:2
   248:16 393:21
**coming**  122:7
   133:23 135:2
   256:20 272:4
   286:14 294:19
   296:2 312:15
   343:16 372:14
**comment**  233:21
   393:25
**commentary**
   197:6
**commented**
   249:22
**comments**  275:10
**commercial**
   327:14
**commission**  322:4
   322:5,8 323:8,12
   398:25
**commit**  246:18,19
   246:21 249:4
   253:18 357:20
   358:10
**commitment**
   115:8 117:6,8,9
**committed**  225:13
   253:16,20
**commodities**  19:5
**common**  218:19
   235:9
**communicate**
   29:16 216:14
**communicated**
   39:17 40:15 41:3
   41:25 102:12
**communicating**
   43:9 122:24

**communication**
   26:4 27:17
**communications**
   13:7 29:5 75:13
   177:19 186:7
   362:16
**communities**
   231:14
**community**
   231:10,20,25
   232:16,17,21
   278:23 279:8
   321:2 386:18,19
   386:20
**companies**  111:7
   111:13,16,19
   113:24 114:2
   130:24 139:8
   382:17,23,24,25
   383:2
**company**  32:9,22
   95:18,24 104:19
   105:10,23 106:5
   106:16 110:12,15
   110:19,24 111:3,5
   131:3 132:2,7
   133:3 138:18,20
   138:22 143:2,6
   164:3 196:8,12
   304:16,19 362:22
   364:17 365:9,16
   382:4,5
**comparable**
   133:23
**compare**  36:5
   67:24
**compassion**
   241:16,16
**complained**  354:5
   354:11

**[complaint - conversely]** Page 12

complaint 296:2
complaints 237:3
312:19,21 313:22
314:2,3
complete 140:6
396:8
completely 122:20
complex 235:2
compose 343:8,9
composed 342:24
composes 343:14
compound 98:9
computer 10:17
11:21 12:4 79:23
206:14
computers 10:21
10:24 341:16,17
concern 12:20
71:16 74:15 168:8
168:10 170:7,8
182:25 223:15,18
223:20,21 298:9
314:18
concerned 12:19
35:8 72:20 125:24
126:2 182:20
197:11 205:8
224:18 312:23
325:8 392:25
concerning 39:17
40:15 41:3
concerns 73:13
167:22 284:23
concluded 208:16
concludes 395:2
concluding 224:16
conclusion 32:5,11
35:14,20 179:23
202:9 208:21
212:10 245:24
247:18,20 248:3

253:10 267:15
conclusions 37:12
243:20
concrete 117:3
condos 76:22 77:5
77:11,13,21 78:14
conduct 198:2
212:2,19 252:23
253:7
conducting 11:22
coney 146:9,15
320:3,6,11,12,13
320:15 321:8
322:6,12 323:7,15
330:14,15,17,23
331:3,15,18
332:24,25 335:16
conference 12:24
132:23
confirm 26:10
27:22 34:20,23
35:10 36:2,13
37:13 39:11
152:15 199:14
282:5
confirmed 199:12
214:13 245:13
confuse 165:7
confused 72:13
329:11
congregation
280:6
congress 239:25
240:5,12,14 269:8
270:2 271:15,22
271:24,25
conjunction 77:20
conmtract 89:3
90:4
connect 244:8

connected 31:3
63:8 84:16
connection 57:7
57:14 81:25 266:2
326:23 350:18
364:17
connections 333:8
consequences
177:2
consider 251:9
328:21 349:14
considered 197:18
197:22 349:12
350:24
constant 297:3
consuming 224:3
224:4
contact 190:16
219:2 332:6
contacts 220:9
content 163:5
contents 33:24
34:7 36:2,14
264:10
context 43:7 91:2
104:11 135:8
137:8 170:13
193:25 199:17
202:21
contexts 370:18
contingency 298:2
continue 139:20
338:19,22
continues 118:14
221:5
continuing 143:3
contract 89:6 90:7
90:12,14 91:2,3
92:11 93:9,22
95:16 96:9 99:23
100:2 101:9,18

106:20 121:19,20
127:4,11 128:3
164:23 165:4,5,6,7
165:11 168:18
169:8 174:18,19
174:23 175:24
176:3 178:16,17
178:18 179:16
180:4,9,9,10,11
294:3 342:21
344:6,12 356:13
394:6,7,8
contractor 300:13
contracts 91:9
175:4,20 176:10
234:9,14,18,23,25
contribute 241:12
254:14
contributed
257:18,22 258:7
258:12
control 119:24
131:2,20 132:7,17
controller 17:19
17:25 287:12
conversation 40:2
43:4 104:22
118:24 119:5,10
128:15,18 129:11
129:14 147:15
166:17 167:25
199:8 244:21,22
250:20
conversations
42:21 43:18 77:16
77:18 78:12
128:11 143:22
144:14,18 177:18
183:9 372:23
conversely 65:11

**[convinced - credit]**                                                                        Page 13

| | | | |
|---|---|---|---|
| **convinced** 386:20 | **corporation** 16:3 | 369:22,23 396:8 | 220:24 227:7 |
| **cop** 355:8 | **corporation's** | 396:10 | 247:5 268:17 |
| **copies** 80:16 | 303:7 | **correctly** 22:2 | 270:11 368:22 |
| **copy** 80:13 81:12 | **corral** 114:23 | 28:7 60:24 67:6 | 379:11,12 380:23 |
| **corp** 1:8 5:9 9:23 | **correct** 7:7 9:24 | 68:20 85:8,23 | 380:25 |
| 14:25 15:3,6,9,10 | 10:19 18:12 20:5 | 97:19 133:14 | **course** 50:11 |
| 15:13,16 16:2,6,9 | 22:7 27:6,22 | 142:5 171:18 | 81:18 326:21 |
| 16:20 17:18 18:4 | 28:10 31:17,18 | 186:5 189:16 | 392:19 |
| 18:11,15 19:12 | 34:15 36:15 39:10 | 195:15,20 208:8 | **court** 1:2 5:11,19 |
| 20:15 21:3,20,22 | 41:10 42:14 51:5 | 208:14 232:18 | 6:6,8,10 50:17,21 |
| 22:3,4,10,14 31:8 | 51:6 58:10 59:12 | 283:8 300:18 | 50:24 51:5,24,25 |
| 31:12,24 32:2,7,17 | 61:9,17 64:18,23 | 304:22 305:14 | 70:17 148:5,9,14 |
| 33:3,7,10,14 45:9 | 65:10 66:18 67:4 | 353:12 354:11 | 148:16 149:2,5 |
| 45:21 46:12,18,20 | 67:9,13 69:17,23 | 379:6 | 153:18 186:14 |
| 47:20 55:18 56:3 | 73:9 90:6,18,19,20 | **correspond** 48:11 | 189:17 222:3,20 |
| 58:19 59:11,17,21 | 92:17,19 98:5,8 | 116:15,21 156:21 | 223:6,9 224:2,2,5 |
| 60:17 63:9,11,15 | 100:10 101:11,12 | **correspondence** | 224:8 265:2,15 |
| 64:13 65:2,8,12,16 | 103:20 106:7 | 113:4 122:12 | 268:3,19 279:21 |
| 67:15 68:2 69:6 | 107:10 111:20 | **corresponding** | 298:12 324:18,20 |
| 70:19,22 72:20 | 114:16,21 115:25 | 65:5 | 328:14,15 355:18 |
| 76:14,16,20 77:2 | 116:5 121:24 | **corresponds** | 373:3 385:7 |
| 85:13 86:4,15 | 122:2 132:8,19 | 145:13 | **courts** 265:21 |
| 90:17,21 94:13 | 133:8 142:10 | **cost** 180:12,14 | **cover** 4:5 78:19,23 |
| 96:25 121:16 | 145:10 146:2,24 | 373:11,13 | 273:23 274:9 |
| 137:14 140:21 | 146:25 147:5,6 | **costing** 373:6 | 280:17 301:23 |
| 142:6,9 143:3 | 157:21 175:21,22 | **costly** 224:3 | **covers** 280:14 |
| 144:25 145:7,21 | 176:11 179:21 | **costs** 276:3 | **cpa** 17:21 |
| 145:24 146:17,19 | 183:6 186:10,11 | **councilman** 266:9 | **cpi** 276:2,2 |
| 147:21 149:16 | 193:24 200:25 | 266:12 | **crane** 138:20,22 |
| 153:9 155:23 | 201:6 208:11,12 | **counsel** 5:21 6:5 | 139:7,8 |
| 156:6 176:6 | 208:18,19 209:3 | 6:11 87:7 156:19 | **crazy** 163:16,21 |
| 250:14 282:13,19 | 212:21 216:3,4 | 367:22 394:20 | 165:16 168:5 |
| 283:9 303:24 | 217:22 221:4,25 | **count** 47:16 58:4,6 | 315:18 |
| 318:3,22 320:3 | 230:24,25 232:11 | 373:12 | **created** 235:13 |
| 369:20,25 370:3 | 239:2,6 240:8 | **country** 378:3 | **credit** 89:4 90:5 |
| **corp.'s** 21:3 67:6 | 264:21 275:21 | **county** 396:3 | 91:3,5,7,17,18,20 |
| 68:14 69:7,16 | 281:4 282:14 | 397:3 | 91:21 92:5,16 |
| 84:25 92:3 118:21 | 283:11 285:3,10 | **couple** 23:10 | 95:19 96:10,21 |
| 119:12 147:4 | 288:6,7 314:15 | 31:14 37:21 44:10 | 97:11,15 100:2 |
| **corporate** 31:11 | 318:10,11 339:8 | 84:10 87:24 88:25 | 101:9 270:24,25 |
| 31:19 | 341:11,12 344:10 | 156:14 175:10 | 271:2 |

**crime** 170:24 225:13,14 246:4,7 246:18,21 253:16 253:16,20,21 378:7 379:22
**criminal** 194:10 194:18,20,25 197:23 198:3,6,14 199:18,20,25,25 200:24 202:2,14 202:15,18 205:19 205:20,25 207:2,3 208:10,17,25 209:6,21 211:21 212:2,7,18 229:13 236:11 265:6,24 327:2,8,12 330:11 355:17 375:22
**criminally** 355:20
**critical** 115:7
**crooked** 355:8
**crosstalk** 169:12 195:9 233:12 298:22 331:10
**crying** 177:8
**crystal** 363:11
**culminated** 292:9
**cuomo** 278:25
**curiosity** 27:7
**curious** 12:12 13:3 89:11 266:22 316:10 326:21 339:20 358:17
**current** 44:19 237:6 252:4 292:10
**currently** 81:11 94:8 309:19,20 351:9
**curtailed** 301:9

**customer** 191:18
**cut** 119:25,25 176:21 179:19 199:6 214:3
**cutting** 177:2
**cv** 1:3 5:10
**cyclical** 281:17
**czermak** 383:10

**d**

**d** 3:1 4:1 6:14 280:5,5 359:18 363:17 396:1
**d.c.** 379:8,18
**daily** 100:19 257:12,15
**damage** 281:13 333:19
**damn** 169:2
**dan** 383:10
**daniel** 355:5
**date** 23:18 25:5 53:19 78:4,20,20 103:2 121:20 127:11 128:3,4 151:3,23 159:5,21 160:9,16 164:8,23 165:3,4 168:19,19 168:25 169:2,2,7,8 190:4 212:25 228:23 259:9 273:25 274:20 275:3 284:6,9,13 284:14,18 286:13 286:18,18,20 287:12,23,24,25 288:13,16 295:17 296:8,14,15,16,17 296:18 314:19 335:25 398:2
**date's** 274:19

**dated** 34:7 54:25 55:2 59:14 88:15 127:15,16 153:2 216:6 242:15
**dates** 126:10 127:10 168:25 169:25 186:3 287:16 289:6,15 295:24 299:4
**daughter** 46:2
**daven** 322:25
**david** 384:7
**day** 14:9,16 100:15 103:17 108:23 118:3,13 125:25 138:23 143:2,2,20,21 163:15 180:13,14 198:5 237:15 288:2,10 297:4,5 298:6 304:12 306:3 373:4 396:16 397:18 398:23
**daylight** 5:15 395:6
**days** 100:23,24 168:17,18 267:24 267:25 271:12 297:24 298:3,4 360:15,15,23,24 362:8,11
**dead** 359:11,12,14 359:15 363:5,5,5,5 363:6,6
**deal** 3:20 93:12 123:21,22 124:5 148:8 155:5 159:25 160:7,12 178:2 265:21,22 285:20 294:21,21

294:23 375:20
**dealing** 75:8 234:25 266:19 302:24
**dealings** 285:8
**deals** 49:24 119:2 133:5,17,20 185:25 296:24 299:24
**dealt** 43:2
**decades** 50:11 302:12
**december** 88:15 90:3,14
**decide** 97:13 141:21,22 174:20 202:15 203:5 243:24 245:16 287:5
**decided** 215:10 294:8
**decides** 313:11
**decision** 69:13 78:8 97:12,14,15 97:22 98:4 179:25 210:5 242:10 324:8
**decisions** 285:19
**deem** 204:20
**defend** 39:5
**defendant** 3:12 23:15 24:5 33:23 34:3,6 37:24
**defendant's** 213:8
**defendants** 1:9 2:10 3:11,16,22,23 5:10 6:3 23:14 24:4 34:5 88:6 102:24 103:11 159:15 190:2,14 212:23 259:5

319:3
**defending** 227:14
**defense** 221:12
  225:5 241:14
  243:11 254:8,22
  254:24 256:2,10
  257:8,9,19,22
  258:8,12 386:8
**definitely** 42:15
  83:22 114:11
  187:7 194:19
  249:5
**deft** 195:20
**delete** 82:25 83:2,8
  84:2,3
**deleted** 83:20,22
  83:23
**deleting** 83:5,7,10
**deliver** 365:24
**delivered** 187:24
  188:17,18 292:11
  292:14,21 293:24
  293:24 295:11
**delivery** 188:20
**demand** 327:6
**demanding** 186:8
  189:14 327:12
**demands** 289:13
**denied** 75:7
  186:24
**depending** 105:11
  307:10
**depends** 96:16
**deponent** 33:22
  34:3,4,12 398:3
**deponent's** 6:7
  34:9
**deposed** 8:5 50:10
  50:12
**deposit** 171:25
  172:4,9 174:2

**deposition** 1:11,17
  5:4,7 7:12 10:20
  10:22 11:23 13:24
  51:24 274:13,14
  274:15 290:9
  324:23 389:8,13
  390:4,5,6,9,17,17
  390:20 392:19
  394:15 395:3
  396:7 398:2
**depositions** 205:6
**deposits** 93:8
  311:9,10
**describe** 51:19
  231:18 267:12
  352:5
**described** 91:11
  236:14 283:20
  293:6
**description** 3:10
  4:3 118:15
**deserve** 195:2
  271:2
**deserved** 195:3
  205:25
**desk** 79:16 83:17
  84:8
**despicable** 235:11
**despite** 166:13
  215:9 234:14,17
**destroy** 215:12
**destroyed** 275:8
  275:14
**details** 392:17
**detective** 355:10
**determination**
  294:8
**determine** 32:8
  141:23 227:14
  248:4

**determined** 278:5
**deutsch** 266:7,8,15
  266:25
**device** 26:24 307:4
  307:5 308:7
  347:12,12,15
  348:7,16,17,19
**devices** 10:13,15
  11:7 60:13,18
  61:7 63:9,17 64:7
  187:23 292:11,14
  292:20,22 304:3
  309:8 356:17
**diametrically**
  326:20
**diana** 17:11
**dictate** 343:13
**difference** 18:25
  166:16 187:13
  256:14,17 288:23
  311:22
**different** 16:12
  27:5,25 29:12,23
  30:6 42:20 45:11
  45:17 47:2 49:17
  49:23,24 61:15
  62:20 74:16 76:5
  77:5,23 85:14
  99:8 143:10,22
  145:3 152:13,14
  156:14 161:23
  171:23 182:11
  183:7,21 192:3,4
  195:5 200:20
  203:5,20 206:3
  211:13 215:14
  219:17 227:24
  231:13,23 249:10
  255:18,21 292:7
  293:13 302:9
  303:2 309:21

310:10 317:3,3,4,4
  317:17 320:20
  322:23 326:14
  327:19 335:6
  363:22,23 365:2,2
**differently** 82:25
  303:24
**difficult** 283:24
  343:18,21
**din** 50:25 51:2,5,9
  51:11,21 52:5,8,18
  53:4,7 221:12,24
  221:24 222:3,10
  222:11,15,18,19
  222:23 223:4,11
  223:17 224:5,18
  224:23 225:5,9,14
  250:18,19 323:21
  324:3,7,15,17
  327:24 328:10
**din's** 223:19
**direct** 37:10
  283:25
**directly** 52:21
  277:19 313:16
  321:25 349:2
  356:16 357:14
**disappeared** 206:9
**disappoint** 231:7
**disappointment**
  124:20
**disconnect** 89:8
**discretion** 71:6
**discuss** 52:17
  56:19 61:22 78:10
  118:19 136:20
  137:6 138:12
  141:17 143:23,24
  147:11,16 165:23
  166:4 167:5,18,21
  199:19 211:20,25

218:3 219:4
220:11 230:9
263:4,6 270:18
313:15 329:4
330:9,14 334:16
350:12,15 354:19
364:16 374:8
376:25
**discussed** 7:12
45:7 52:12 63:6
73:4 74:14 77:8
77:13 79:4 100:9
106:25 107:11
108:3,12 126:20
135:4 138:2,15
142:5 163:10
199:24 204:9
207:2,4 210:10
218:7 219:5
220:11 221:24
244:13 248:23
251:8 252:23
263:5 264:14
279:11 284:12,24
298:14 304:11
309:2,3 355:12
**discusses** 80:21,22
**discussing** 56:16
116:9 135:4
163:12 180:23,25
189:15 262:12,19
262:20 299:23
371:15 376:3
**discussion** 78:7
106:24 122:3
134:19 135:12,14
135:23 136:24
137:12,16 141:9
144:5 181:8,12
194:22,23 211:3
244:4,9,11 245:8

251:24 283:19
362:16
**discussions** 52:10
52:15 61:10,11
68:18,22 71:13
97:10 104:12
116:19 119:17
122:16 124:24
130:9,21 134:17
135:9,21,25 136:3
136:12 137:10,17
137:20 140:16,24
141:7,9 142:12
143:9,13 144:6,7
147:7 174:8
176:24 177:19
178:12 183:5,17
184:2 186:6,22
194:15 200:7,10
200:11,12,14,20
204:8 205:17
208:8,23 209:18
220:20 283:8
297:2,3 326:22
327:21,23 328:9
370:9 371:20
374:5 375:19
**dismissed** 380:5
**disputable** 357:13
**dispute** 122:10
157:15 237:22
286:21 289:12
291:8 292:3,7,23
292:25 293:2,5,15
293:25 294:4
311:7,9 319:2
320:8 321:6,12,17
321:23 322:3,4
323:6 324:2,15
325:9,13,25
326:23 327:14,24

335:16 374:7
375:21 380:3
**disputed** 154:14
**disputes** 50:18
51:8,19 53:4
147:22 149:20
183:23 319:5,11
319:18 320:5,9
**disqualify** 170:24
170:25
**disruption** 207:7
**distant** 50:3
**distinction** 64:4
**district** 1:2,2 5:11
5:12 265:16
266:13
**dive** 7:2,10
**divided** 27:12
111:11 317:3
**document** 3:18 4:4
23:24 24:24 25:20
30:24 31:20 32:15
33:5 34:21 35:9
35:24 37:6,11,14
56:11,14 86:2,14
151:6,21 153:2
190:25 193:10
203:18 206:19,21
233:11 259:7
**documentation**
97:2,5 98:2,6,13
99:4
**documents** 3:4,6,7
25:8 33:2 34:19
35:5 57:6,12,18,21
57:24 79:21 81:21
81:22,25 84:12,13
84:22 85:4,9,24
86:14 163:2 265:6
290:2,3,7,9 390:5
390:10,18 391:2,4

391:7,11,13,15
**doff** 345:19,19,21
**doing** 10:17,20
75:24 91:9 126:20
126:22,24 128:19
140:5,11 144:16
170:25 171:3
182:11 194:17,20
196:10,10 219:17
227:3 294:7
295:13,15 296:25
297:16 302:11
325:4,5 336:20
360:25 367:18
375:3,4 383:25
**dollar** 116:14,14
131:24 135:22
**dollars** 105:3,13
105:14,22 106:4
116:25 123:16,24
135:10 180:15
196:19,21 251:16
308:18 311:20
372:15 373:12,14
384:16 385:3
386:18
**domiciled** 111:16
**door** 100:11,12,14
100:15
**dotted** 123:6 142:2
**double** 387:7
**doubt** 58:2 124:4
166:3 172:8
258:20
**downtown** 380:14
**dozen** 49:14
239:11
**dozens** 305:17
306:23
**dr** 383:11

**drag** 373:3
**dramatic** 283:22
**dramatically** 285:18
**drawn** 146:21
**drinks** 227:7
**drive** 86:5 165:16
**driven** 157:4,12
**drop** 376:10
**drove** 379:14
**drugs** 358:23
**duly** 6:15 397:9
**duplicate** 64:24
**dying** 121:23

**e**

**e** 2:1,1 3:1,9,14,15
3:19,21,23 4:1,2,6
6:14,14,14 7:5
12:3,5 13:8,14,18
26:8 27:20 28:12
28:13,16,23 38:23
38:23 40:19,24
41:13,18 42:10
43:2 53:17,23
54:5,7,25 56:11
59:14 60:22 62:13
62:14,18 66:18
79:2 82:4,5,5,19
83:3,7,11,16,20,22
83:23 84:2,7
88:13,17,20 92:7
93:15 95:15 97:11
99:12,16 100:4
102:23 103:10,15
103:19,20 104:4
109:9 113:12
114:6 115:18
119:9,16,18 120:3
120:11,15 121:3
121:25 122:13,20
122:25 123:2

124:11,18 126:14
127:12 128:12
158:25 159:3,10
159:16 162:11,14
163:9 164:21
167:4 190:2 191:6
191:12 192:10,13
192:15,15,22
193:3,12 194:4
201:4,14,22
203:10,20 212:23
213:8 216:6,21
217:14 224:22
228:25 229:23
241:18 242:14,15
243:17 245:12
247:4 250:25
251:8 252:12,20
252:22,24,25
260:16 261:9,9
264:10 280:5,7,7
288:11 295:17
297:8,19 313:21
315:18 316:25
327:18 335:21,23
339:19,25 340:3,9
341:20,23,25
342:6,7,8,11,15,17
342:24,24 343:6,7
344:17 349:21
362:14 363:17
365:9,15 396:1,1,1
397:1
**earlier** 180:22
233:21 234:6
283:8 284:15,24
292:12 294:17
316:10 339:5
351:17 364:20
365:14 390:22

**early** 18:17 20:24
309:3
**easier** 213:12
**east** 66:25 282:9
**eastern** 5:14 395:5
**easy** 177:10
**eating** 249:7
297:11,12
**education** 232:19
232:20
**effect** 175:19
283:25
**effectively** 101:11
282:2
**effects** 276:17
**efforts** 239:23
256:9,23 269:5,14
269:16 270:15,17
270:20 271:20
333:23 386:12
**egg** 282:2
**eight** 342:14 382:9
384:21 385:25
**eisenberg** 49:16
**either** 41:12 52:17
71:5 77:19 127:17
184:19 209:13
215:4 246:24
272:14 297:24
298:3 324:16
326:24,24 327:22
327:23 328:8
337:18 348:23
359:12,15 385:10
385:13
**elected** 278:11
**electronic** 26:4
27:16
**eli** 44:11 113:19
**eligible** 240:6

**eliminated** 302:2
**emet** 261:7,15
262:20 263:24
**employees** 46:17
316:5
**encounter** 348:24
**ended** 166:15
377:14
**ends** 394:25
**enforce** 224:2
**enforced** 223:20
**enforcement** 223:11,12
**engage** 232:17
**engenders** 235:12
**english** 224:11
**enjoy** 310:11
**ensure** 290:14
**entered** 154:16
234:9
**enterprise** 196:4
**entire** 105:16
109:2 141:13
174:18,19 215:7
242:24 357:17
359:11,17 361:9
368:11 374:25
**entirely** 245:14
283:3
**entities** 20:16,18
20:23 23:3,6
46:21 47:5,14,21
47:25 48:4,8,11,18
48:24 49:7 76:25
77:5 131:11
132:13,18 145:4,5
145:16
**entitled** 290:10
**entity** 20:12 22:5
65:24 132:17
137:15 145:3,13

**[entity - extent]** Page 18

145:22,25 146:4
155:21 320:2
365:3
**entrepreneur**
105:23
**equipment** 136:6
136:22 187:21
191:3 203:15,20
382:14
**equity** 20:22 22:5
22:9,15,19 23:4,5
46:21 48:15 64:14
65:9,12,16 76:14
106:5 132:2
**errata** 398:1
**escapes** 44:12
322:17
**especially** 314:6
328:16
**esq** 2:6,13
**essence** 146:5
**essentially** 146:20
241:23 323:16
**established** 255:8
**estate** 18:20 19:13
19:16 20:15,24
21:6,9 46:25 49:3
49:9,23 51:22
57:3,7 108:13,13
108:14 110:4,6,9
131:5,6,8 132:14
132:15 133:5,16
133:20 138:4,15
232:6,10 235:8
273:21 275:17
276:11,21,23
278:15 281:2
282:3 283:21,22
284:2,20 285:12
285:15 296:19
299:22 301:24

302:12,13,14
319:20 322:22,24
333:11 370:22
375:16
**estimate** 308:17
**estimation** 58:9
**et** 5:9 398:2
**event** 179:18
288:25 292:19
**events** 180:24
287:2 392:13
**eventually** 153:18
281:16,18
**everybody** 44:24
45:16 182:14
196:18 302:21
**everybody's**
196:10 346:18
**exaberating** 235:6
**exact** 65:24 66:15
126:10 164:8
253:21 284:5
305:17
**exactly** 35:16
59:15 64:2 74:7
93:9 111:11
146:14 163:19
164:11 176:13
177:4,15 181:3
226:12 229:10
237:12 239:19
250:5 287:24
288:2 291:17
336:10 357:18
365:19 384:13
**examination** 3:2
6:18 397:9,11
**examined** 6:17
**examining** 221:8
**example** 18:24
21:16 33:5 66:25

69:14 81:2 105:20
108:18 131:23
367:3
**examples** 66:23
**exceeded** 318:16
**excellent** 273:8
**exchange** 113:13
122:6 124:22
129:6 344:18
**exchanges** 129:6
**excited** 119:23
**excuse** 25:20
66:13 289:9
**exec** 160:13
**execute** 299:5
**executed** 299:7
**exhaustive** 21:16
67:20
**exhibit** 3:11,13,14
3:15,17,18,19,20
3:21,23,24 4:4,5,6
23:17,19 24:7,8,9
24:9 25:4,9,11,20
26:3 27:16 30:23
31:11 34:19,20
35:12,24 36:3
37:17 53:13,15,15
53:18,22 55:3,9
58:17 63:4 73:3
88:2,6 90:2 95:14
102:25 103:4,4,6
103:18 150:18
151:2,5,7,8,22
152:2 156:17
159:4,8,18 160:3,8
160:11 163:6
189:23 190:3,6
199:10 206:8
212:24 213:3
228:22 229:3
230:11 237:21

242:12 254:7
259:5,8 273:24
274:3,22 296:7
335:22,24 387:10
387:12
**exhibits** 7:4 23:10
87:24 157:23
159:2 189:25
273:9
**exist** 30:21
**existing** 173:16
**expect** 147:14
157:6
**expected** 294:10
**expenditures**
302:3
**expense** 302:2
**expenses** 302:5,23
**expensive** 348:3,6
**experience** 9:7
121:8 222:8,24
223:2 302:21
379:21
**experiences**
119:20 120:21
143:6
**expires** 398:25
**explain** 141:19
**explanation**
224:15
**explode** 311:17
**exploded** 311:16
**exposure** 19:15
**expressed** 122:13
140:19 233:9
**expressing** 124:19
**extent** 36:5 79:20
94:23 121:12
144:18 168:13
170:13 248:6
271:4

[external - financial]                                                    Page 19

external  54:4
  190:15
extraordinary
  314:7
eye  386:20

f

f  397:1
face  282:7
faces  160:15
facilitate  142:14
fact  167:22 168:7
  168:7 170:8,8,21
  170:23 178:3,15
  225:8 294:18
factor  225:9
  284:22 285:18
factual  157:15
  221:15
failure  327:11
fair  26:14 27:3
  35:21 48:3,7 49:2
  53:8,11 55:25
  57:4,15 58:7
  64:25 65:11,15
  69:18 75:11 76:11
  80:10 84:5 85:3
  89:20 98:22 99:2
  112:4 114:17
  119:19 121:6,15
  124:9 128:5,8
  141:6 145:11
  148:2,2 154:7
  157:19 161:5
  164:4,11 165:19
  166:19 168:2,6,13
  175:17 176:16
  179:13 183:11,11
  184:7 185:10
  186:4,21,23 187:6
  187:10,22 189:12
  199:9,9 200:22

202:20 212:14
213:2 216:19
217:10,13 219:8
220:22,24 223:14
227:10 231:9
233:3 235:20
238:19 242:22
243:21 244:15
248:20,22 251:14
254:6 257:17
258:14 261:17
264:8 266:24
268:23 270:20
272:10,18 276:12
294:5 296:20
308:16 313:12
315:23,25 319:21
322:22 343:5,16
349:17 350:7
352:14 365:11,17
365:25 370:25
374:5 375:18
376:11,16 377:5
377:13 379:3,16
388:12 389:19
394:9
fairly  75:23 310:9
fairness  221:7
faith  197:10
  208:15 209:20
  211:5,6
fall  148:18 149:14
  153:18
falling  301:24
falls  8:9 148:21
  149:21 154:4
  158:22
falsely  121:6
familiar  160:4
  203:13 267:8
  271:11 304:10,12

320:2 333:25
365:15 375:13
families  76:19,25
  358:24
family  19:25 29:4
  45:20,20 66:6,10
  66:11,20 67:2,8,10
  67:11,16,16,21,22
  68:5,9,13,15,23
  69:25 70:5,8,23
  73:8 74:18 75:14
  76:12,18 141:13
  218:16,16,18,24
  303:11 318:4,9,21
  318:22 325:6
family's  67:3
fancy  25:23
far  28:12 35:7
  125:24,25 126:22
  134:2,18 172:5
  181:2 197:10
  205:8 224:18
  241:24 278:3,9
  297:6 314:12,13
  315:4 323:13
  338:14 355:23
  381:7 392:24
fashion  101:10
  235:10
fast  126:17 190:12
faster  109:6
  139:13
father  130:5,5
fault  154:19
fax  60:22
fbi  194:22 209:14
february  103:19
  104:13 109:8
  113:3 114:18
  121:16 126:7
  291:20 293:14

federal  51:25
  239:17 271:23
  272:12 355:24,25
fee  67:11,12 327:6
  327:7 348:23
feedback  120:20
  121:7 310:20,22
feel  8:16,17,18,22
  249:12 263:6,7
  281:7
feeling  123:5
  212:13,19 280:25
fees  308:20
feet  188:13
feldman  17:11
fell  93:23 148:22
felt  195:2 254:21
  310:8 377:7
fertig  46:2,3
fifty  254:4
fight  298:11
  356:21 360:8
  371:18 372:13
fighting  180:8
  269:2
figure  202:19
figured  274:18
file  85:8 194:14
  203:23 355:20
filed  237:3
files  84:23,24 85:9
  86:4 248:14
filing  205:14
  252:25
final  210:5 269:9
finalized  158:16
finance  93:11
financial  91:24
  92:15 96:14,25
  97:5 98:13 99:3
  177:2 362:22,23

**[financial - frequently]** Page 20

364:9,14,23 366:5
366:7 369:21,22
370:4,11 371:5,8,9
371:22 377:7
**financially** 182:13
**financials** 98:3
112:22 131:3
364:17 365:5
**financing** 92:22,25
97:25
**find** 19:2 30:22
86:9 106:21
107:18 115:5
154:5 184:19,23
185:11 233:16
242:17,21 248:14
363:2
**finding** 287:12
**fine** 7:20,25 8:18
13:20 87:13
121:13 162:6
207:15 341:5,5
391:24
**finger** 212:16
**finish** 14:12
210:20 233:18
337:13
**finished** 30:21
381:4
**fired** 153:12,20,21
**first** 3:11 6:15 7:3
15:4 19:12,15,17
23:15 24:4 26:2
30:25 31:5 34:5
39:22 40:3 44:11
61:21 62:2,3,8
63:5 86:10 89:2
99:21 101:8
123:10,11 129:24
144:10 147:25
148:7,10,13,13

159:18 163:24
172:22 173:6
185:6,19 187:7
196:9 203:9 214:5
216:21 234:23
235:13 239:18
240:7,11 242:9
244:17 260:24
261:12 269:15
286:17 287:3
289:4,7 290:19,20
290:22,23 298:16
306:6 307:2
337:13,23 347:4
348:24 359:17
372:14 379:18
**fish** 116:7
**fisherbroyles** 2:2
5:24
**fisherbroyles.com**
2:7
**fit** 239:19,19
246:10,22 253:23
**five** 20:9 23:24
24:12 35:24 37:17
51:12 86:19,20
87:3 93:19 94:7
143:21 254:3
272:20 281:8,11
311:2 320:10
321:10 345:22
347:6 348:9,11
350:23 363:17
368:4 381:4
**fix** 69:16 70:9,11
**fixing** 302:7
**flagged** 44:10,24
**flatbush** 279:23
280:3,6 321:2
346:12,13,16

**flick** 312:12
**flip** 24:2,11,12
25:12 54:9,16,17
103:12 151:13
152:10 163:6
190:10,11 213:11
213:13 259:24
336:8 337:7
**flipping** 26:2
27:15 28:21 33:16
55:3 58:14 63:18
69:3 242:12,14
243:16
**floor** 2:4
**florida** 21:18 49:6
277:11,12 387:23
388:2
**focus** 32:24
**focused** 232:19
**focuses** 261:14
**folks** 45:4 344:6
**follow** 209:22
222:21 236:25
247:6 290:4,11
391:10,21
**followed** 292:24
**following** 211:14
**follows** 6:17
**foray** 19:13
**forbid** 227:8
**force** 260:14
264:23
**forcing** 218:10
**foregoing** 34:4
**forget** 134:9
372:10
**forgot** 196:20
320:25 337:4
378:12
**form** 7:19 98:13
133:9 135:16

143:7 205:22
211:16 218:22
226:8 251:13
252:4 253:10
284:25 293:3
**formal** 187:2,4,9
205:10 334:3,5
**formally** 145:12
**formatting** 190:21
**forth** 42:11 177:7
203:4 397:9
**forward** 62:19
93:25 117:18
126:17 137:21
138:21 172:3
173:21 174:6
179:11 190:15
213:9 303:21
**forwarded** 62:14
164:9 191:7
192:19 194:5
**fought** 268:19,25
**found** 62:15
119:24 178:20
181:22,23 227:18
253:15 267:20,21
267:22,25 312:25
**founded** 15:10,12
18:14
**founder** 160:15
**founding** 20:14
**four** 27:25 93:19
94:7 110:13
174:14 196:11
213:10 311:2
**frame** 352:6
**fraud** 160:14
**free** 303:4 375:3
**frequently** 28:25
98:12,20,21 99:7
100:21 218:12

219:2
**fricken** 169:4
**friday** 54:3 189:11
  194:13
**friend** 109:19,20
  163:11,11
**friendly** 372:23
  373:20
**friends** 106:12
  112:5 114:23
  220:20,21
**front** 51:20 73:3
  126:10 188:17,22
  282:9 310:15
**frum** 217:17,19
  218:2 221:9 225:2
  225:25 356:19
  357:10 360:5
**frustration** 124:20
**full** 10:8 118:15
  149:7,12 152:6
  163:17 168:6
  221:12 225:5
  288:22 337:4
  342:6
**fully** 163:23
**fun** 81:20 213:24
  389:10
**functionality**
  308:11
**fund** 66:12,14,16
  67:3,11,16 156:4
  241:12,14 243:11
  254:8,22,24 256:2
  256:4,10 257:8,19
  257:22 258:8,12
**funder** 356:17
  357:14 359:23
**funding** 91:21
  231:24 256:15,18
  256:20,21

**fundraisers**
  231:13,15 333:25
**funds** 76:19 172:5
  386:8
**further** 62:24
  122:15 124:23
  175:2 203:17,19
  224:24 235:5
  296:21,23 297:2
  299:6 397:13
**future** 281:2
**fuzzy** 274:20

**g**

**g** 6:14,14 396:1
**gabay** 322:18
  330:16
**game** 155:2
  169:24
**games** 165:10
  181:24 195:22
  216:9 287:25
**gang** 215:11
**garbage** 344:2
  363:4,6 373:18
**gate** 290:21
  309:11
**gateguard** 1:4 5:8
  5:24 39:17 41:3
  41:20,22,25 42:16
  43:10,14,19 44:4
  44:25 60:18,18
  61:8,15,24 62:4,11
  71:11,16 72:20
  73:13 74:16 75:15
  76:8,9 77:9,14
  78:10 82:15 83:11
  83:21 84:14 85:5
  85:10 90:25 93:17
  94:8,18,25,25
  97:20 104:14
  106:24 107:20,25

108:3 109:10
112:18 114:20,24
115:2,3 116:13,20
118:20 119:12
120:22 121:8,17
124:25 126:21
130:10,12 133:24
135:23 137:19,22
137:25 138:6
140:18,18,25
141:8,10 143:14
160:14 163:13
164:9 168:14
172:6 173:16
174:4,11 176:19
176:22 177:3,25
179:2,17,20 185:3
185:8,11,12,15,17
185:20 186:8,13
186:19,25 187:11
189:13,18 191:18
202:23,24,25
207:4 230:20
284:24 285:8,21
286:14,22 287:3
289:8,10,12
290:22,24 291:2,8
291:9,11,16 292:3
292:14,16,20,21
293:15 296:23,25
299:8,15,25
301:16,17,18,21
301:22 304:11
305:11,18,20
306:24 307:2
308:5,5 309:6,8,16
310:8,17,20
314:12 315:8,16
316:3 318:8 319:3
326:11,12,13,15
329:4 330:18,24

342:21 346:24
353:4,25 361:18
364:18 374:8
375:5,21 398:2
**gateguard's** 60:3,7
  60:14,19 119:20
  143:17 172:13
  186:24
**gathering** 220:23
**gears** 317:24
  335:19
**general** 21:24
  72:22 97:20 118:9
  132:11 154:9
  220:16 240:3
  250:3 269:24
  270:4 274:15
  301:22 310:4
  346:8 370:22
**generally** 14:24
  18:13 29:3 30:4
  46:4 48:10,17
  51:19 53:6 58:23
  59:5 61:23 64:4,7
  69:6 75:25 80:2,4
  81:16 82:9 91:23
  92:22 95:10
  102:17 106:16
  107:22 119:11,19
  142:25 147:20
  160:4,25 162:24
  170:21 176:2
  210:16 212:20
  219:6 231:18
  234:15,18 235:2
  242:5 245:13
  258:2 261:10
  264:9 265:5,8
  266:18 267:11
  275:11 278:19
  280:24 307:20

**[generally - going]** Page 22

310:7,19,23
320:11 322:2
323:7 333:18
374:17 382:10
**genuinely** 183:2
358:17
**getting** 12:21
13:15,18 102:11
105:2 117:4
138:23 139:17
140:20 141:2
142:7 169:3
182:15,21 238:9
297:23 332:10
367:14 368:14
372:6 374:21
388:8
**give** 7:11 18:24
23:20,25 24:2,13
35:23 53:15 58:16
66:23 88:21 89:3
90:4,22 91:3
92:14 95:20 96:17
96:22 97:13,13,14
97:15 100:2 101:9
105:10,13,16
108:18 117:3,9
118:15 151:14
179:24 186:3
196:19,20,21
203:2 206:10,15
207:10 213:3
215:24 251:19
262:10 275:25
284:18 289:15
334:2 335:20
365:7 372:15
373:9 377:2
391:25
**given** 96:21
396:10 397:12

**gives** 241:13
**giving** 13:2 91:6
96:9,19 131:20
160:21 192:25
213:16 229:16
270:25 295:15
362:25 365:18,21
**glad** 388:25
**gladly** 295:22
**gmail** 339:12,19
339:25 340:9,21
340:24
**gmail.com** 53:24
339:11
**go** 7:6 12:7 24:18
25:18 28:12 40:18
40:25 52:8 53:10
59:23 64:16 73:14
75:3 87:8 89:19
110:22 129:2,15
129:17 132:24
138:21 141:20
146:16 153:18
161:16 164:25
166:12 175:2
185:24 194:21,24
198:20,22 200:2
206:22 207:8
212:17 214:21
221:11,24 222:10
222:18 223:3,5,17
223:25 224:23
225:4,9,10,12
229:12 238:11,18
248:13 250:17,19
255:7 261:22
263:2 265:3
272:19 275:22
281:8 299:3 306:5
306:5 307:7
311:14,24 313:8

324:17,17 328:9
328:14,14 330:5
337:15,16,19
368:3,23 369:15
376:17,19,23,23
377:8,20,22 380:9
381:9,23 382:13
386:10 394:19
**gobbledygook**
37:24
**god** 157:9 227:8
297:17 311:19
**goes** 14:16 70:18
238:15 383:13
**gofundme** 241:12
241:13 256:5,6
**going** 7:15,17 9:7
9:11,14 13:17
14:19 21:2 23:8
23:25,25 24:2,11
24:12,22,23,24,25
25:8,19 37:3 39:4
39:17 41:4,7,25
45:6 47:18 50:9
53:13,14 54:9
58:22 64:19 66:22
69:24 74:23 76:5
80:17 82:11 83:19
84:19 86:24 87:18
87:25 93:25 96:25
98:23 103:3,5
104:5 115:18
116:3,24 117:7
120:6 122:21
125:18 126:8
128:23 131:25
136:13,19 137:21
138:25 139:7
140:6,16 141:4
142:3,18 151:11
151:17,24 152:10

157:24 158:24
159:7 160:2,11,23
161:2 163:6,25
164:2,18,20,24
165:2 166:12,12
167:12 169:6
172:3 173:21
174:5 176:16
177:10 179:11
180:12 183:3
184:22 187:18
189:17,18,22
190:9,10,12,13
191:11 195:8
197:11,16 199:6
202:7,11 207:10
212:5 213:3,24
215:14 216:8,9
222:14 224:4,8,9
224:24 225:13,13
225:19 226:5
228:24,25 229:2,3
230:13 235:24
241:6,18 242:3
246:8,24 247:5
249:4 251:10,20
252:23 253:14,23
253:24 259:4
260:14,22 261:22
264:23 277:10
280:12,17,23
283:21 284:12,13
286:11,11 288:8
288:19,22 289:2,3
289:5,6,25 293:21
294:3,9 298:10,17
299:19 300:11
305:16 306:18
307:21 309:5
311:4 314:24
315:20,20 326:10

**[going - goldenberg]**

330:13 332:15
334:12,20,23
335:19,20 336:2
337:11 338:9
344:18 346:9
355:2 356:6,10
357:19 358:10
359:4,22 363:25
365:23 366:23
367:23 368:11
371:13 372:12
373:9,11,13
374:18 376:8,9,25
380:16 381:6,17
390:3,24 391:9
394:4,20 395:6
**gold** 382:10
**gold's** 17:25
**goldberg** 192:13
  192:20,21 193:5
  262:18
**golden** 72:18
  282:2
**goldenberg** 1:8,8
  1:18 3:3,7,12 5:4
  6:1,22,23 7:1,12
  7:15,21 8:1,4 9:1
  10:1 11:1 12:1
  13:1 14:1 15:1,6
  15:24 16:1 17:1
  18:1 19:1 20:1
  21:1 22:1 23:1,4
  23:16,20,21 24:1,5
  25:1 26:1 27:1
  28:1 29:1 30:1
  31:1,6,8,16,23,25
  32:1,9,15,16 33:1
  33:2,6,9,13,23
  34:1,6,16 35:1,4
  36:1,11,18 37:1
  38:1,3 39:1,6,23

40:1,12 41:1 42:1
42:4,5 43:1,11,12
44:1 45:1,19 46:1
47:1 48:1 49:1,16
50:1,2 51:1,3 52:1
52:11,13,16 53:1
53:14 54:1,10,16
54:21 55:1 56:1
56:17,25 57:1
58:1,7,22 59:1
60:1,10 61:1,2,6
61:12,22 62:1,4,7
62:22 63:1 64:1
65:1 66:1,21 67:1
68:1,8,22 69:1
70:1 71:1 72:1,14
72:19 73:1 74:1
74:14 75:1 76:1
77:1 78:1 79:1,16
80:1 81:1 82:1
83:1 84:1 85:1
86:1 87:1,25 88:1
88:14,14 89:1
90:1,3,15 91:1
92:1,10,23 93:1
94:1 95:1 96:1
97:1,19 98:1,18
99:1,9,13,17,17
100:1,3,17,22,25
101:1,10,14,16,22
102:1 103:1,5,21
103:23,24 104:1
105:1 106:1 107:1
108:1 109:1 110:1
111:1 112:1 113:1
114:1 115:1,24
116:1 117:1,16,22
118:1 119:1,8
120:1,19 121:1,15
122:1 123:1 124:1
124:22 125:1

126:1,8 127:1
128:1,25 129:1
130:1 131:1 132:1
133:1,11 134:1,14
135:1 136:1 137:1
137:6,11,18,21
138:1,2,11,16
139:1 140:1,4,17
140:19 141:1,7,10
142:1,4,22,25
143:1,13,15 144:1
144:24 145:1
146:1 147:1,3
148:1 149:1 150:1
151:1,4 152:1
153:1 154:1 155:1
155:17 156:1
157:1,14 158:1,23
159:1,6,20 160:1
160:18 161:1,17
162:1,10,13 163:1
164:1 165:1,15
166:1 167:1,14
168:1 169:1,20
170:1 171:1,14
172:1 173:1,11
174:1,2,9 175:1,9
175:11 176:1,21
176:25 177:1,20
178:1 179:1 180:1
180:23 181:1,5,10
182:1 183:1,13,17
184:1 185:1 186:1
186:7,23 187:1
188:1 189:1 190:1
190:6 191:1,5,8
192:1,11,21 193:1
193:6,18 194:1,5,5
194:16 195:1,15
195:24 196:1
197:1,7 198:1

199:1,20 200:1,6
201:1,23 202:1,5
203:1 204:1,7,8,21
205:1,18 206:1,25
207:1,2,21 208:1,7
208:9,20,24 209:1
209:4 210:1,11,12
210:25 211:1,19
211:24 212:1
213:1,2,23 214:1,7
214:10 215:1,25
216:1,5,15,19,22
216:25 217:1,14
217:20 218:1,3,6,8
218:13,25 219:1,6
219:9 220:1,10,25
221:1,2,5,23 222:1
222:2,22 223:1
224:1,21 225:1
226:1 227:1 228:1
229:1,2,24 230:1,4
230:4 231:1 232:1
232:8 233:1,20
234:1 235:1,17
236:1,4 237:1
238:1,5 239:1,23
240:1 241:1,19,21
242:1,16 243:1,16
244:1,7,13,15,24
245:1,5,11,14
246:1 247:1,12
248:1 249:1 250:1
250:9,23 251:1
252:1,3 253:1
254:1 255:1 256:1
257:1 258:1,24
259:1,14 260:1
261:1 262:1 263:1
264:1,14,19 265:1
266:1 267:1 268:1
268:24 269:1

270:1 271:1,3
272:1 273:1,6
274:1,2 275:1
276:1,22 277:1
278:1 279:1,4
280:1,20 281:1
282:1,5 283:1
284:1 285:1 286:1
286:11 287:1,2,6
288:1,25 289:1,20
290:1,8 291:1
292:1,18 293:1
294:1 295:1 296:1
297:1 298:1,24
299:1 300:1 301:1
301:25 302:1
303:1 304:1,2,23
305:1 306:1 307:1
308:1 309:1 310:1
311:1 312:1,19
313:1 314:1 315:1
315:2 316:1,14
317:1 318:1 319:1
320:1 321:1 322:1
323:1 324:1 325:1
326:1,6 327:1
328:1 329:1 330:1
330:7,23 331:1,2
332:1 333:1,14
334:1 335:1 336:1
336:3 337:1,24
338:1,25 339:1
340:1,6 341:1,6
342:1,19 343:1
344:1,5,5,8 345:1
345:23 346:1
347:1 348:1 349:1
350:1,16 351:1
352:1 353:1 354:1
355:1 356:1,7,8,11
356:12 357:1

358:1,16 359:1
360:1 361:1,3
362:1,18 363:1,22
364:1 365:1 366:1
367:1,3 368:1
369:1,19 370:1,10
371:1,16 372:1
373:1 374:1,6
375:1,19 376:1
377:1 378:1 379:1
380:1,17 381:1
382:1 383:1,17,22
384:1 385:1 386:1
387:1,14 388:1
389:1,9 390:1,25
391:1,12 392:1,6
393:1,17 394:1
395:1,3 396:13
397:8 398:3,21
**goldenberg's**
  142:15 224:22
  225:20 242:13
  364:22
**goldman**   2:13 6:2
**goldmont**   1:8 5:9
  9:23 14:25 15:3,5
  15:7,9,10,12,16
  16:2,6,9,20 17:18
  18:4,11,14 19:12
  20:14 21:2,3,10,20
  21:22,24 22:3,3,10
  22:14 28:14 31:8
  31:12,24 32:2,7,17
  33:3,7,10,14 45:8
  45:9,21 46:11,18
  46:20 47:20 55:17
  56:2 58:19 59:11
  59:17,21 60:17
  63:8,11,15 64:13
  65:2,8,12,16 67:5
  67:6,11,15,21 68:2

68:14 69:5,6,16
70:18,22 71:2
72:19 75:18 76:14
76:16,20 77:2,7,8
77:13,17 78:2,7
84:25 85:12 86:3
86:15 88:14 90:17
90:21 92:3,4,11
93:16,16 94:9,12
94:14 96:4,13,14
96:24 97:3 98:3
99:14 100:18
101:22 102:4
103:20 118:21
119:11 121:16
126:18,19 137:14
140:21 142:6,8,18
143:3,4 144:25
145:7,18,21,24
146:5,7,10,17,19
146:22 147:4,21
149:16 150:5
153:8 154:10,16
155:7,23 156:6
163:15 166:21,22
168:14 171:2
172:12 173:15
174:11 176:5,10
176:19 179:2,18
179:19 185:7,16
185:21 186:9,18
186:23 187:11
189:17 192:12
193:8 199:12,17
202:23,24 211:22
211:25 236:7,10
236:17 250:13
282:13,19 283:7,9
286:14,22,23
289:9,13,13
290:21,25 291:7,9

291:9,11 292:17
292:21,22 296:22
299:5,7,24 301:8
303:7,24 305:15
309:12 310:4
314:11 316:12
318:3,3,7,9,22
319:3 326:13,13
326:14,19 331:22
332:24 342:21
351:9,18 366:3
369:20,24 370:3,5
370:12 371:7,11
371:17,22 374:7
377:6,16 398:2
**goldmont's**   69:20
  70:3,4,9 92:14
  144:8 145:2
  146:12,17 174:3
  187:25 194:2
  285:20 301:22
  305:7,7 317:13
  350:25 370:13,18
  375:6
**goldmontrealty....**
  28:15 88:15
**goldmontrealtyc...**
  342:7
**gonavisha**   195:10
  195:16,20
**good**   5:2 6:23,24
  8:19 69:12 78:13
  86:22 104:19
  110:22 120:13
  139:14 157:24
  158:17 195:25
  223:3,4 227:7
  262:15 272:20
  278:12,13,13
  297:9 310:11
  320:23 348:19

394:11,19
**goodbye** 123:20
  128:17 357:18
**google** 266:23
  339:18 382:15
**goose** 281:25
**gossip** 220:17,18
  328:25 349:13,15
  349:16
**gossiper** 167:9
  330:21
**gotcha** 73:19
  188:25 191:5
  263:21 339:7
**gotten** 144:17
  310:20
**government** 182:7
  231:23 271:23
  272:12
**governor** 278:22
  278:24
**gozal** 191:2,14,15
**granddaughter**
  244:25
**granted** 10:16
  27:4
**great** 7:8 23:24
  103:9 164:3
  176:20 196:8
  206:23 207:25
  215:11 227:4,8
  234:13 311:12,13
  312:2 341:8
  367:18,19
**greek** 226:17,17
  226:18
**greeks** 226:18
**gregorio** 153:8
**grew** 229:7
**group** 19:22 43:8
  49:21 50:4 66:2

105:21 114:14
  116:10 118:5,7
  124:13,16,19
  126:11,12 182:12
  321:3 333:12
  345:21 346:2
**groups** 29:7,9,10
  49:17,20
**grow** 104:18
**guarantee** 115:18
**guess** 7:22 9:6
  13:8 19:2 30:22
  32:3 38:25 39:24
  44:18 47:22 48:6
  72:13 84:18 90:25
  92:5,8 107:18
  158:5 167:24
  170:20 179:5
  183:12 184:19,19
  192:3 195:22
  216:22 256:21
  257:17 278:10
  296:8 300:18
  303:21 330:2
  345:7 352:11
  371:17
**guilty** 181:22,23
  253:16 267:21,22
  268:2,14
**gut** 212:12
**gutwillig** 355:2,3
  355:23 361:11
**guy** 26:16 27:9
  44:11 114:15
  116:11 148:7
  153:14 177:10
  198:7 215:7 224:6
  227:4,8,14 258:18
  258:19,25 312:10
  313:8 363:5
  365:22

**guy's** 215:11 223:5
**guys** 123:23 193:8
**gwg** 1:3
**gym** 306:6,7

**h**

**h** 3:9 4:2 280:4,4,5
  280:5,6 316:24
  322:20
**habit** 62:16
**hairline** 117:21,22
  117:23
**half** 49:14 79:15
  140:9 203:12
  239:11 248:21
  262:10 305:11
  362:13 368:18
**hamburger** 249:7
  251:5,6
**hand** 123:20
  397:18
**handful** 309:4
  314:10
**handle** 7:4 18:7
  71:2 128:16
  315:20 376:3
**handled** 237:22
  314:4
**handling** 52:17
  315:14
**hands** 123:21
**happen** 9:11 124:3
  128:23 146:23
  147:12 174:21
  222:25 294:18
**happened** 165:18
  223:2 237:12
  253:2 262:4
  291:20 293:17
  294:15,16 380:4
  384:20

**happens** 147:17
  150:2 179:18
  222:19 290:14
  314:6 315:21
  392:15
**happy** 9:12 52:8
  120:8,8 127:7
  164:19 179:5
  244:5 245:7
  286:12 295:23
  297:11 311:3,4
  312:10 319:23
  373:8,10
**harass** 250:22
**harassed** 243:23
  245:16
**harassment**
  250:25 251:6,9,13
  252:4 327:7
**hard** 8:8 14:10,20
  17:4 86:5 381:10
  381:19,23
**haredi** 278:21
**harsh** 294:11
**hass** 322:19,20,24
  323:3 330:16
  333:11,22 334:10
  335:8
**hass's** 333:23
**hat** 358:25
**hate** 122:21
  194:11 231:7
  379:4
**havoc** 276:23
**he'll** 266:23
**head** 201:16
  205:16
**headline** 276:20
**healthcare** 108:19
**hear** 114:25 115:2
  115:4 165:12

167:10 179:5 182:18 183:12 207:23 213:17 220:19 226:25 243:22 245:15 253:14 258:5,6 273:6 354:7 366:22 370:8,10 390:24
**heard** 42:20 163:24 183:12,14 183:14 186:5,5 195:14 344:20,21 344:22 346:15,19 362:23 364:10,13 364:23 365:16 370:15,17,21
**heated** 122:6,8
**heating** 45:15
**hebrew** 224:10 238:12 241:16 251:5 278:14
**heights** 164:3
**held** 47:5
**hell** 115:17 374:24
**help** 177:9 254:23 256:25 312:6 321:15 363:3,8
**helped** 239:17
**helpful** 14:23 37:16 135:20 342:18
**helping** 238:25
**hereinbefore** 397:9
**hereunto** 397:17
**hesitant** 96:14 318:7,11
**hesitate** 14:2
**hey** 78:8

**high** 348:9,23
**higher** 106:4
**highlight** 38:3 39:4,18 41:4
**highlighted** 38:20
**highlights** 280:8,9
**highly** 124:4
**hinting** 204:12,13
**hire** 136:8
**hired** 55:20 203:3
**hires** 56:3
**history** 108:25 248:14
**hmm** 58:20 222:21 226:2 284:19 318:5 356:9
**hocking** 129:12 297:4
**hold** 26:20 46:21 59:8 82:11 83:19 94:5 132:22 305:17 307:21 309:5 360:17
**holding** 162:7 248:11 253:3,6 360:18 361:15,17 361:20,22
**home** 101:2,3 272:4 312:15 346:9
**honest** 196:4 358:7
**hope** 277:18,18 297:25 366:6,11 366:13 376:12
**hopefully** 9:9
**hoping** 348:4 376:5
**horizons** 143:5
**horowitz** 17:12,17 17:25 47:22,23

48:3,7 97:6,9 98:5 98:12,19,24 99:3 186:17 287:13 362:19,21 367:7,8 367:11 370:6
**horowitz's** 18:3,10
**horrid** 242:9
**horse** 220:24
**hospital** 239:21,21 383:3,4,9
**hostile** 139:14,18
**hour** 104:23 140:9 248:21 368:17,17
**hours** 14:13 76:2 153:15,16,23 154:2 184:8,11,14 184:16 228:12 272:24 288:22 336:21 378:21 379:11,12,15 393:18
**house** 19:25 235:4 266:13 272:12
**housing** 275:8
**how's** 87:11 374:20
**howard** 2:18 5:15 369:10 383:11
**huge** 124:8
**huh** 298:23
**hung** 372:6
**hurt** 285:12 286:19 376:21
**husband** 255:17 255:20
**hypothetically** 223:16

**i**

**ice** 267:18
**idea** 62:21,22 106:9 116:12

130:11 136:8 196:5,8 199:24 215:11 339:21,23 371:2
**ideas** 45:13
**identical** 31:2 41:7
**identification** 23:17 25:4 53:18 102:25 151:2,23 159:5 160:8 190:4 212:25 228:22 259:8 273:24 335:24
**identified** 27:17 67:19 138:12
**identify** 16:14 26:3 27:19 39:16 40:14 41:2 47:4 279:17
**identity** 179:14
**idiots** 356:24 360:12
**ignore** 54:7
**ignored** 234:11
**imagine** 148:3 184:15 285:15 312:14 374:22
**immediate** 45:20
**impact** 232:21 275:13 281:13 282:4 283:22 299:24 376:6
**impacted** 313:13
**impart** 7:14
**impediment** 315:12
**implication** 176:9
**imply** 329:23
**impression** 198:25
**impressions** 170:7

**improve** 45:14
**improvements** 300:7
**inaccurate** 291:14
**inappropriate** 254:22
**inasmuch** 116:5
**incident** 73:17 95:4 257:6 313:23
**includes** 159:23
**including** 47:5 170:19 221:10 225:3 231:20 290:3 294:11 357:5
**incorrectly** 121:6
**increase** 300:23 301:2
**increases** 275:25 276:2,2
**independent** 18:6
**independently** 71:2 236:23
**indicate** 102:5
**indicated** 65:21 66:22 123:22 168:4
**indication** 125:20
**indirectly** 377:15
**indiscernible** 243:4 327:16 340:21
**individual** 40:23 44:17 48:11 76:25 146:4 240:6 256:25 332:12 351:22 381:24 384:7
**individuals** 50:5 76:19 106:22 110:18 114:8

317:8
**industry** 215:7 232:10 282:3 283:22 284:2 285:15,17 296:19 301:24 302:14 320:14 322:22 375:2
**inexpensive** 310:9
**infamy** 296:17,18
**info** 89:4 90:5 91:3 91:5,22 100:2 101:9
**information** 3:4 17:3 26:6 34:11 88:22 91:7,25 92:15 95:20 96:10 96:15,18,19,22 115:6 116:23,25 170:9,14 190:16 198:15,18 294:24 362:25 363:2 365:7,18,21 366:4 366:8,9,14,20 367:4 369:21 370:5,11 371:9,10
**infrequently** 98:20
**initial** 243:19 309:3 350:22 371:10
**initially** 120:20 178:22 309:9
**initials** 365:14
**initiated** 145:23 309:11,12
**innocent** 267:20
**innuendo** 204:17
**innumerous** 143:11

**inserts** 54:5
**inside** 131:6,8 309:24
**install** 187:18 305:2,19 318:8
**installed** 94:3,8,9 94:19 309:9,11,18 309:19 314:10 351:11 375:6,9,13 393:3
**installer** 304:23
**installing** 78:10 305:4 307:5 317:13 350:24 351:18
**installs** 305:4,20
**instigate** 243:13
**institution** 235:12
**instruct** 125:25 126:2 173:14
**instructed** 98:12 176:21
**instrumental** 270:8
**insurance** 107:24 112:10,11,14
**intend** 338:18
**intended** 191:10 193:5
**intent** 229:13
**interact** 316:2
**interactions** 212:7
**interchangeable** 27:14
**intercom** 60:13,13 61:7,7 69:15 70:7 70:16,18,25 73:17 74:2 187:23 293:16 304:2,3,13 304:23 305:19 306:25 307:5,6,8

307:13 308:10,21 312:16 313:4,24 317:19 330:24 348:7 351:17,21
**intercoms** 60:18 61:24 68:16,23 69:8,9,10,19 70:2 70:3 71:21,25 73:24 74:17 75:7 93:17,25 94:7,8,13 94:14,15,18,18,25 95:2 96:13 119:12 119:20 120:22 121:17 160:14 198:13 215:18 232:15 286:16 293:12 304:7,8,24 305:6,18 306:22 306:24 307:24 309:17,17 310:5 310:18 311:11,24 312:9 313:14 314:17 315:22 316:12,18 317:13 318:8 327:19 351:19 374:25 375:3,5,9,12,14
**interest** 47:5 48:16 91:9 128:19 140:19 142:7,7 143:15 155:18,19 167:8 183:10 377:7
**interested** 38:4 93:24 114:19,22 114:25 115:2,4,5,6 123:2 191:11 192:8,10,23 193:11 197:2 244:3 397:15

**[interesting - items]** Page 28

interesting 62:19 122:4 230:7 264:25 348:19 379:20
interests 142:6
interface 70:23
interim 243:9
interjecting 7:16
internal 78:6
internally 71:12 74:12 126:20
interpret 205:16 244:7
interpreting 205:15
interrogatories 3:12 23:15 24:5 25:23 34:6
interrogatory 31:4 35:12 36:15 37:5 38:19 39:3 39:15 40:16 41:2 41:24 47:4
intervals 310:5
interview 55:20 280:19,19
introduce 353:18
introduced 108:2
introduction 353:18
invest 49:8,9,10,18 68:2,8 107:20 112:24 114:24 115:6 117:7 122:21 125:18 130:5,5,12 141:11 166:14 311:15 347:20,22,24 373:25 382:7 383:12,19

invested 107:9 109:21 110:12 111:8 131:10 349:9
investigate 62:24
investigated 268:5
investigating 45:15
investigation 243:19
investigator 210:14,15
investing 114:19 133:4 141:3,10,22 163:13 301:6 349:12,18 374:24
investment 19:17 20:4 43:10 104:14 105:24 106:11 108:4 110:22,22 116:15,21 122:14 122:15,18 124:16 124:25 126:19,24 128:19 129:21 130:3,8,11,25 131:24 133:3 134:4 135:14,24 136:14 137:2,3,7 137:12,13,19,22 138:3,10,15,19,22 140:17,25 141:8 141:24 142:13 144:4,6 166:16 301:9 348:25 350:19
investments 20:16 20:24,24 49:21 107:2,5,12 108:9 108:14,15 109:22 109:25 110:8 112:7 113:22

114:2 130:24
investor 105:9 112:18 276:21 278:15 312:3 382:4
investors 19:22 66:2 136:15 196:13
invests 141:13
invite 7:15 31:10 227:4,6
inviting 36:12
involuntary 386:3
involve 97:25 137:20 141:9,9
involved 47:24 51:8,12,20 52:3 68:22 81:19,21 86:14 97:10,16,23 98:2,6 110:19 112:18 116:18 134:13 136:15,16 140:20 141:3 142:7,12 143:16 149:16 167:2 180:24 181:11 183:5 192:12 200:6 230:20 236:10,18,19,24 238:6,7 239:8 240:15 254:20 265:11,13,19 269:5 270:15,17 271:6 276:8,10,14 279:15 303:25 304:2 315:5 316:11,20 317:12 317:18,20 319:9 321:3,11,15 322:2 333:11 334:25 335:4,10,11,16

351:5 362:14 382:16,22 386:7
involvement 71:3 95:24 108:13 142:15,17 239:4 239:15,16 240:11 275:18 323:24,25 324:20 333:23
involving 129:22 319:5
iota 359:19,20
iphone 26:23
irrelevant 216:21
island 146:10,15
israel 50:6 261:14 261:16 278:17,19 279:4,6,7,12 320:19 388:5,10 388:15
issue 68:16 70:19 101:14 154:9 170:4 176:25 182:16 211:20 222:17 223:20 248:25 294:13 297:23 310:15 324:6 375:21
issued 225:24
issues 94:24,24 123:7 147:22 183:22 194:10 199:18,20 200:23 201:25 232:9,12 232:21 314:16 327:20
issuing 221:10 225:3 248:24
italics 237:24
item 7:9
items 7:2

**[j - know]** Page 29

**j**

j  280:3
jack  381:25
jacob  41:14 42:7
  44:23 53:23 54:8
  55:9 79:3,10
  127:13 164:9,22
  199:10,11 203:6
  344:7 351:22
  353:16 355:2,22
  356:14 357:5
  359:21
jacobrubinsteine...
  53:23
jail  212:17 214:21
  226:19 227:16,19
  238:10 239:20
  246:19,21 253:17
  253:25 254:2
  255:17,20 258:22
  268:15,16,20,21
  376:8,9 377:20
  384:21,24
january  26:5 47:8
jared  270:6,8
jaywalking  182:9
jeannie  17:9 42:18
  42:19 159:21
jerry  42:22,25
  46:15 104:25
  114:12 118:3,23
  118:25 119:2
  129:19 231:12
  350:3 372:3
jerry's  144:12
jersey  21:17 49:5
  217:2 231:21,22
  383:7
jerusalem  388:11
jew  194:21,24
  217:21 223:8

227:19 238:10
jewelry  19:4
jewish  197:10
  208:15 211:5,6
  231:12 238:24
  321:2
jews  221:9 225:2
  225:25
job  69:9,11 116:6
  116:7 139:2 169:6
  295:20,20 366:25
  367:18
jobs  45:11,12
  175:5
joe  344:24
jog  392:16
john  2:11
joint  191:21
jonathan  50:7
  77:21 271:8,13
  316:25
judge  156:16
  268:10,12,14
judgment  312:5
julie  85:18,21,23
  86:11,13
julie's  85:19
july  159:21 160:16
  164:6 166:20
  168:3,15 170:11
  216:6,13 242:14
  274:25 314:22
jumping  69:3
  113:21 273:11
  308:24
juncture  170:4
june  226:15
  261:25 262:3
  274:24 275:6
  284:5,7,9,10
  293:17 294:8,10

294:10,15,15,22
295:12 296:7,7,14
299:5,15,20,21,21
299:23 313:13,15
319:23 351:2
jury  378:25
justice  202:15
  241:13

**k**

k  280:5,6 396:1
kaddisha  280:5
kandsllp.com  2:14
keep  64:19 82:21
  101:4 117:25,25
  120:10 157:24
  164:17,19 219:10
  242:21 280:12
  288:8 295:18
keeping  217:11
  243:24 245:17,20
  246:11 249:7
  253:8 297:13
keeps  337:11
kept  177:8 188:16
  188:21 255:22
  293:20,21 295:12
  297:8,10,16
key  111:17 312:13
khal  280:6
kiddush  227:5,5,6
kids  231:12
  322:15 358:21
killing  281:25
kind  10:15 11:9
  14:10 26:14 40:14
  50:18 81:17 89:2
  98:2 123:8 149:25
  251:6 256:21
  297:18 305:14
  308:11 309:23
  336:9,10 383:2

kinds  161:12
  249:3
kink  153:13
kippur  249:8
knew  164:12,13
  165:20 173:4
  187:18 201:25
  219:9 221:2
  229:11 230:19
  258:8 346:20
know  7:11,17 9:2
  9:6,12,18 11:18
  12:11,22,22,23,25
  12:25 13:2,21
  14:9 16:25 17:2,5
  17:9,14 18:5
  20:22 22:17 23:10
  23:21 24:17 25:6
  25:16 26:21,23
  27:2,11,11 28:8
  29:4,19,21,22,24
  31:12,20 32:15,17
  33:6,8,18 35:22,24
  36:9 37:17,23
  39:19,22 40:11
  42:11 43:13,17,21
  43:24,25 45:13,14
  48:23 49:22 51:18
  53:20 54:11 55:16
  56:2 60:16 62:13
  62:17 63:25 66:7
  66:24 67:24 69:18
  70:24 72:3,12,12
  73:23 75:17 76:7
  76:15,16 77:7
  78:23 81:11,17,18
  81:19 82:22 84:10
  85:11,12,13 86:16
  88:3,10 89:11
  94:12,16,22 95:3,3
  95:16 96:3 97:9

98:23,24 99:14
100:11 101:2,4
103:7,12 104:8
105:4,10,15
106:21,22 108:12
108:25 110:24
111:16,21,22,24
112:20,22,24
113:8 116:2,12
118:25 120:10,17
121:18,20,23
123:14 124:6,13
124:15,17 125:8
126:10 129:6,12
130:4,15,19,22
132:22 134:12,18
134:19 136:6,8,22
136:23 138:24
139:2,15 142:14
145:5,19 146:6,9,9
146:11,23 148:21
149:22 151:16,25
152:3,5 153:5,11
153:24,25 154:3,5
154:20 159:6,11
160:17 161:23
162:5 163:7,16,22
163:23 164:2,7,16
165:5 166:10,10
166:11,11,20,24
167:7 168:5,11,25
168:25 169:2,2,5,6
169:7,8 171:23
172:6,11,11 173:2
173:20 174:25
176:15 177:4,9,15
177:17 180:3,4
181:2,2,5,11,12,14
182:13,15,17
183:7,19 184:3,18
185:22,23 186:17

188:2,19,21 189:2
189:16 190:7,11
192:2,14 193:23
195:7,11 197:9
198:19,22 199:2
200:9,11,19 201:5
203:2,5,15,16,17
203:21 206:12,13
208:20 209:4,9,14
209:17,24 210:9
211:12 213:4
214:4,15,22 215:2
215:3,3,4,5,5,6
216:20 218:6,11
218:17,19 219:8
219:13,14,22,23
219:24,25 220:2
220:23,23,25
222:12,16 224:9
224:13 225:6,23
227:3,17 228:9
229:4,4,5,18
230:13,21 236:17
236:18,23 237:2,2
237:3,5,8,12,13
238:2 240:23
242:16,23,25
243:2,3 244:4
248:17 249:19
250:11,12,16
253:22 254:20
255:11 258:2,18
258:21 259:6,12
259:24 260:19,24
261:10 265:9,14
266:17 267:6
270:10,12 272:19
273:11 274:2
276:6,17 279:10
280:10,12 283:18
284:5,6,12,12

286:10 287:23,25
288:2,13,16
289:21 291:17
297:14,21,22
300:20 301:9
302:10 304:11
305:14 307:16,21
307:23 308:3,9,14
308:15,25 309:16
310:3,10,13
311:16,21 312:7
312:12 313:6,25
314:5,6,12,13,14
314:15,21,21
315:21 316:2,9,18
317:25 319:9
320:11,12,13,18
320:20 321:23,24
321:25 322:2,12
322:14,15,21,23
323:14,20 324:16
325:3,12 327:18
328:15,17,21,23
329:2,2 330:7,17
330:22,25 331:2,6
331:14,18 333:24
334:8 335:18
336:3,7,18 337:7
338:5,10,12 340:6
340:8,18,25
343:23 344:6,9,24
345:6,7,12,16,17
345:19 346:18,22
349:8,11,14,18
350:7,8,20 351:4
351:14,15,24
352:14 353:21,25
354:4,5,13,22
355:3,18 357:10
357:11 360:25
364:25 365:19,20

365:25 366:3,13
366:18,19 367:2,7
367:10,12,24
371:6,8 374:4,25
375:15 376:4,8,20
379:10 381:6,24
382:3 384:7,10,17
386:7 387:13
388:24 389:10,10
392:11,11
**knowledge**　16:3
18:9 31:25 32:25
33:12 34:10 47:20
53:3 67:2 82:18
90:8 170:14
187:11 217:19
236:11 238:12
244:16 250:8,13
264:2,18 267:13
282:16 302:21
346:16 351:8
352:7 366:15
369:20 384:23
389:25 392:7
**known**　172:23
266:15 320:2
352:2
**knows**　7:22 33:24
34:7 197:7 198:16
198:17 216:23
**kosher**　249:7
**koss**　2:9 6:2 25:22
**kushner**　270:7,10

**l**

**l**　6:14,14 280:4,6
363:17 396:1
**lack**　170:7
**laid**　281:25
**lakewood**　46:13
383:7

lambaste 215:7
land 28:9 39:8
  148:9
landlord 8:8 215:8
  226:11,12,22
  233:10 234:3
  275:19 310:11
  312:2
landlords 181:20
  181:21 182:11,12
  183:6,18 198:10
  214:24 215:10,14
  217:17 218:2
  222:13 226:16,24
  233:23,25 234:6,8
  235:4,14,16 236:6
  236:8,18,23 242:9
  260:11 275:15
  298:10 302:22,25
  310:12 313:14
  333:12 348:22
language 51:4
  214:25
large 66:10
larger 106:15
laugh 360:11
laughed 356:23
law 45:24 153:13
  211:14 239:17
  322:18 352:9,11
laws 211:13
  226:15 275:7
  276:23 283:21
  284:20 285:4,11
  285:11 286:19
  287:4 289:10
  290:22 291:2,5
  292:4 293:10
  294:8,10,11,15,16
  294:22 296:9,16
  299:4,20,21,22,22

300:18 301:10
304:9 313:15
333:20
lawsuit 50:17
  81:18 88:16
  107:17 108:24
  115:9,15,24
  140:10 148:7,23
  155:11 156:5
  191:22 251:11,17
  251:21 252:4,25
  292:10,23 294:17
  323:13,15,21,23
  324:2 332:23
  373:8,10 376:10
lawsuit's 373:10
lawsuits 148:17
  149:15 150:4
  154:6 329:2,3
lawyer 202:12
  212:12 247:25
  321:24 356:20
  357:6,10,11 360:5
  388:23
lawyerly 47:9
lawyers 154:5
  174:20 234:15,18
  234:25
lay 212:5
lean 117:18
  215:22
learn 172:22
  185:15
learned 185:20
  186:6
lease 96:22
leasing 96:16
leave 276:22 277:3
  277:6 279:9
leaving 142:17
  194:12 346:18

lebowitz 383:11
left 123:19 269:17
  367:16 368:2
  369:3
legal 2:18 5:16,17
  32:5,11 35:2,14,20
  37:12 102:20,22
  179:22,25 194:10
  199:18 200:23
  201:25 202:8
  205:7,10,12 206:2
  207:6 212:10
  232:8 241:14,17
  243:11 245:24
  247:18,20,24
  248:2,3 253:10
  254:8,22,24 256:2
  256:10,21 257:8,9
  257:19,22 258:8
  258:12 267:12,15
  300:8 315:12
  375:22,22 386:8
legalities 179:14
legality 185:13
legally 37:24
legislation 275:12
  276:5,7,9,18 284:7
  286:5
legislative 333:15
legislator 275:7
length 108:12
  221:6
lengthy 58:8
  178:24 185:7
leniency 266:6
leon 1:8,18 3:3,12
  5:4 6:22 15:6 23:4
  23:16 24:5 28:15
  33:22 34:6 37:20
  68:7,21 86:20
  88:13 90:15 97:19

114:14 115:21
116:10 118:7,14
139:10,19 140:7
140:14 150:11,21
155:17 159:20
169:11,11,14,17
182:22 196:24
206:15 233:13
242:16 250:9
276:21 288:4
309:13 344:5
356:8,12,23 358:8
364:7 381:15
384:5 394:18
395:3 396:13
397:8 398:3,21
leongoldenberg1
  28:18
lessened 301:9,10
letter 78:18,19,23
  156:15 164:18
  166:15 249:16,17
  249:22 254:12
  266:5,24 287:23
  337:5 355:2 365:6
letters 266:3
level 132:7 133:25
  135:7 239:17
  275:24
levels 231:23
leverage 105:25
  371:23
leveraging 374:9
liability 149:23
liberal 267:19
licensee 47:7
lichtenstein 17:11
lie 123:3,4 357:4,9
  357:15 358:6
  359:10,18 360:7,9
  361:5,6,6,9,11

372:22

**lies** 361:12 372:17 372:20,21,21

**life** 48:24 108:25 109:3 273:13 393:4,4

**light** 370:13,19,23

**liked** 104:19 310:21 312:6

**likes** 117:14

**liking** 278:10

**lily** 46:2

**linden** 66:25

**line** 28:9 91:18 93:6 95:15 99:11 115:13,13 123:6 132:23 142:2 252:11 294:14 398:4

**lines** 39:8 116:20

**link** 159:23 163:14 167:4 172:20,23 174:16,22 176:14 230:14,16 241:13 263:13

**links** 264:22 265:2

**linsky** 17:14 97:8 370:7

**list** 12:7 21:16 44:19,19 63:6,18 64:6 65:3 67:18 67:20 194:10 199:18,20 200:23 201:25

**listed** 39:9 40:24 58:24 69:4 76:13

**listen** 166:13

**listening** 12:17,20 289:20

**lists** 236:22

**litchfield** 351:22 351:24 352:3,10 352:15,18,20,24 353:3,9,19,22

**litigation** 374:11 374:14

**litman** 49:17

**little** 44:15 71:10 72:13 94:4 153:13 163:16,21 168:5 188:23 216:7 229:8 230:14 267:7 273:11 274:19,20 284:5 308:4 312:4 328:25 356:11 360:16 361:25 370:13,19,23 392:16

**live** 20:2 261:12 296:17,18 306:9 306:11,12,12 346:6,10

**lived** 273:12

**lives** 216:25 261:13 266:11 346:16

**living** 248:18,18

**llc** 145:14,20 146:8 146:21

**llp** 2:2,9 5:24

**loans** 88:22

**local** 331:25

**located** 5:18 21:11 48:19 49:4

**location** 5:5

**lock** 388:9

**lockdown** 388:8

**locked** 243:24 245:17,20 246:11 253:8

**lodge** 208:10,17

**logistics** 79:14

**long** 17:24 67:14 85:20 86:24 98:25 109:21 150:24 192:6 213:10 214:22,23 241:5 243:20,21 254:2 266:14 273:11 274:19,22 321:8 342:10,13 352:2 368:16 379:9 380:9 382:7 383:12,19 384:12 388:14

**longer** 53:2 57:15 57:19,22,25 58:3,5 59:21 111:3,6 166:9,9 277:9 384:24

**look** 13:16 24:3,25 31:13 33:18 41:8 59:2 69:11 77:25 88:5,10 118:2 126:15 155:4 156:14 162:17 177:14 193:14 216:12 241:22 259:22 264:23 266:20 298:17 303:20 341:2

**looked** 164:6 180:22 229:24 230:13 233:7 277:23 284:15 349:19

**looking** 27:24 30:23 45:13 63:3 73:2 79:4 84:8 87:10 104:18 124:11 156:16

159:17 227:25 230:11 242:13 291:25 296:6 301:13 341:2,4 343:17 383:23 384:2

**looks** 79:16 282:8 282:8

**lose** 194:8,9

**loses** 288:20

**losing** 374:14

**lost** 190:20 235:7

**lot** 8:9 11:25 30:6 45:10 47:9 49:23 76:4 79:17,17 83:2 157:8 180:24 181:21 184:3 185:24 191:25 196:6 198:5 219:17 226:24,24 227:23 231:10,11 237:18 247:16 249:11 257:5 268:6 300:9 305:9 310:9 319:19 320:20,23 348:22 373:13 384:19

**lots** 331:13

**loud** 219:19

**love** 92:5 182:13

**loves** 278:22

**low** 361:25

**lower** 106:3

**ltac** 383:5

**luck** 393:3

**lunch** 14:10,17 150:15 158:11 163:10 164:6 317:25

**[m - mean]**                                                    Page 33

| m | | | |
|---|---|---|---|

**m** 261:9 280:4,7 281:23 316:25 396:1

**machine** 80:13

**mafia** 206:4,13

**magazine** 4:5 273:23 274:9 281:23,23

**mail** 3:14,15,19,21 3:23 4:6 7:5 12:3 13:8 26:8 27:20 28:13,16,23 38:23 38:23 40:24 41:13 41:18 53:17,23 54:5,7,25 56:11 59:14 60:22 62:14 62:18 79:2 82:5 88:13,17,20 92:7 93:15 95:15 97:11 99:12,16 100:4 102:23 103:10,15 103:19,20 104:4 109:9 113:12 115:18 119:16,18 121:3 122:13 124:18 126:14 127:12 128:12 158:25 159:3,10 159:16 162:11,14 163:9 164:21 167:4 190:2 191:6 191:12 192:10,15 192:15,22 193:3 193:12 194:4 201:4,14,22 203:10,20 212:23 213:8 216:6 217:14 224:22 228:25 229:23 242:14,15 243:17

245:12 247:4 252:12,20,22 260:16 264:10 288:11 295:17 335:21,23 339:19 339:25 340:9 341:20 342:6,7,8 342:17,24,24 343:7 344:17 365:9

**mails** 12:5 13:14 13:18 28:12 40:19 42:10 43:2 62:13 82:4,5,19 83:3,7 83:11,16,20,22,23 84:2,7 114:6 119:9 120:3,11,15 121:25 122:20,25 123:2 124:11 192:13 216:21 241:18 250:25 251:8 252:24,25 297:8,19 313:21 315:18 327:18 340:3 341:23,25 342:11,15 343:6 349:21 362:14 365:15

**maintain** 86:4

**maintaining** 86:14 221:12 225:5

**major** 123:7 163:17 168:5,8 300:6 343:15 391:8

**majority** 22:24 131:12

**making** 136:13,16 137:13 138:21 140:11 142:12 145:22,23,24

146:22,23 185:12 189:13 195:7 205:19 207:3 213:24 295:22 298:8 374:15,16 374:17,22

**malarkey** 372:16

**man** 315:24

**manage** 21:20 46:15 59:17,23 64:10 77:4 153:25 155:24 319:13

**managed** 59:10 63:11,12,14 94:9 318:9

**management** 21:5 21:6 67:12 68:14 69:20 86:3

**manager** 46:8 313:3 317:23

**managers** 316:17 316:22 317:4,12 319:10

**manages** 21:10,23 22:11,15 59:22 67:22 76:20 77:3 77:20,21 145:7,19 146:18 283:9 303:8 318:22

**managing** 67:7 146:12,17

**manhattan** 19:11 355:24

**manner** 40:4 211:21 327:2

**march** 30:9 126:8 126:16 129:21

**marchei** 49:16

**mark** 122:3 193:4 337:16 344:19 374:2

**marked** 23:16 25:3 53:17 88:5 102:24 150:25 151:22 159:4 160:7 190:3 212:24 219:11 228:21 259:7 273:23 335:23

**market** 348:13

**markets** 303:4 375:3

**marlin** 362:22,23 364:9,13,23 366:4 369:21 370:10 371:8

**marriage** 397:15

**married** 352:4,11 358:24

**marvin** 316:24

**maryland** 263:25

**mass** 379:18

**materials** 162:3,10 162:14 167:15

**math** 87:16

**matter** 5:8 44:7 83:2 180:11 200:17 310:3 397:16

**matters** 34:10,12 241:14

**mean** 11:18 29:18 29:22 30:14 36:12 49:19 56:21,22 77:22 78:6 79:15 82:17,21 86:23 89:22 92:3,4 105:6,8 106:3,6 112:13 117:19 125:7 128:2,3,4 130:14 131:19 141:2,3 149:24

157:8,23 160:5 163:18 170:21,23 175:23 178:23 188:5,15 203:11 204:11 214:19 218:16 235:15 240:20 251:11 258:17 275:22 276:25 281:16 292:8 299:10 304:6 340:10,25 348:8 349:20,21 358:21,22 360:20 364:21 368:19 374:23 375:14 376:7 378:6 379:11 382:18 386:9 392:12

**meaning** 261:15 281:10

**means** 9:15 63:25 72:16 130:22 195:11 371:3,4

**meant** 39:2 142:24 236:3,4

**measure** 277:25

**measures** 302:15

**meat** 268:4

**media** 136:7 394:25

**medical** 382:12,19 382:23,25

**medication** 8:12

**medium** 27:17

**mediums** 26:4

**medpod** 382:6,8 382:16

**medpod's** 382:11

**meet** 75:22 104:21 117:10 141:20 206:3 231:22

372:3

**meeting** 40:4 75:22 113:7,9,9,13 113:14 114:5,18 115:14,14,15 117:2,5 121:24 123:10,11,19,23 124:12 126:11 129:18,18,23 134:10 144:12 372:2 373:23,25 374:3

**meetings** 14:11 68:25 75:25 130:8 130:10 134:13,21 136:2,4,25 137:2,8 144:3,8 373:19,20

**member** 47:6 271:15 331:3,14 355:13

**members** 45:20,20 218:18,24 239:24 240:5,12,14 269:8 269:23 270:2,5 271:22,22,24,25 272:11 330:15 333:25 334:11,14

**memorialized** 121:3

**memorializing** 121:5

**memory** 296:8 392:16

**mensch** 311:8

**mention** 52:21 143:15 173:10 240:16 362:13

**mentioned** 9:18 16:16 17:7,17 32:16 39:7 40:19 40:24 43:21 45:5

46:10 47:9,13 49:25 50:8 68:3 74:13 75:12 80:19 84:6 94:5 95:16 96:24 101:17 104:17 106:23 113:2 118:13 122:12 126:14 133:5 135:10 147:2 149:4,5,15 154:9 156:15 167:13 175:8 181:11 183:3 185:5 187:24 197:8 198:21 200:7 208:13 209:23,25 210:4 211:3 215:25 223:15 230:21 231:17 232:2 239:3,12 240:9,21 254:13,21 256:8 265:9 267:7 274:16 275:12 310:14,15 313:24 316:14 317:8,12 333:7 335:12 344:4 351:7,16 352:23 361:15 381:8 387:18 394:13

**mentioning** 254:10,12

**mess** 190:22

**message** 117:20 169:14 190:18

**messages** 11:19 12:21 13:15 29:17 29:17

**met** 43:25 55:11 56:10,13 104:16

104:22 111:18,18 113:5 129:20 134:19 144:11 206:2 230:23 231:3 270:11 347:8 348:12 371:25 372:4,8,17 372:23

**metropolitan** 21:13 304:14,15 304:21 305:3 307:18 351:16,21 353:22

**miami** 387:20

**michael** 49:17

**michele** 1:18 5:19 329:19 397:5,23

**middle** 14:5

**miles** 278:2

**milestone** 286:13 286:16

**milestones** 289:3

**million** 105:3,13 105:14,15,16,22 106:4 116:14,14 123:15,24,25 131:24 251:12,12 251:16,21,22 268:7,8 311:19 372:15 384:16 385:3 386:17

**mincha** 14:17 150:16

**mind** 13:16 86:23 91:23,24 117:24 123:22 134:7 166:9 225:20 248:16 263:3 275:3 378:22 393:21

**mindful** 380:16
381:8
**mine** 11:14 333:24
**minimize** 13:14
**minority** 132:9,16
133:8
**minute** 55:10
72:15 74:13 86:20
87:3 96:13 97:21
133:14 134:8,10
142:4 147:2
167:13 172:21
176:17 197:9
213:4 229:24,25
268:24 272:21
274:21 325:16
**minutes** 37:21
39:7 45:6 50:9
57:2 73:5 86:21
229:19 264:15
272:23,24 336:22
368:4 369:13
380:18 381:3,4,5
381:12,16
**miriam** 17:8
**mischaracterizat...**
72:24 121:10
178:9 245:25
246:15 253:11
330:5
**misheard** 263:18
**misspoke** 40:25
**mistake** 192:14
295:21,21 343:3
357:7
**mistaken** 191:6,15
373:6
**misunderstood**
73:11 198:8
262:16,17

**mixed** 268:3
**mm** 58:20 226:2
284:19 318:5
356:9
**model** 215:12
307:21,22,23
**modifications**
44:18
**molester** 227:15
227:17,18
**moment** 37:15
**monday** 189:10,10
**money** 91:21
104:18 105:22
106:13 123:7,18
135:24 136:14,17
141:25 157:13,13
171:9,15 172:18
173:21,25 174:6
178:5 180:12
185:14,14,16,17
185:21,24 186:8
187:12 196:2,6,12
196:23 202:24
227:23 253:4
255:23 256:3
275:19 276:4
284:3 286:23,24
291:10,10 295:15
298:8 301:6 302:9
326:4,14,16,18
334:2 360:17
365:23 373:6,7,13
373:16 374:15,16
374:17,23 384:11
384:14 385:20,23
394:5,6
**month** 89:14
164:11,12 218:14
352:19

**monthly** 348:8,10
348:23
**months** 138:17
239:21 276:13
277:17 284:17,18
356:22
**morning** 5:2 6:23
6:24 8:16 9:19
10:5,14
**moshe** 322:18,19
322:24 333:11
**moskowitz** 1:18
5:19 397:5,23
**motivated** 73:12
**mouse** 31:21
312:13
**mouth** 72:16
95:23 230:22
238:23 280:23
**mouthful** 225:7
**move** 14:13 24:15
278:12,13 306:12
**moved** 241:10
346:17
**moving** 39:3,15
124:2 140:15
**moyal** 2:13 6:2,2
6:13 7:3,7,9,25
23:9,12 24:7 32:4
32:10 35:7,13
36:4,8,17 37:9,20
38:8 72:23 74:8
86:19 87:2,6,13,15
87:23 95:12 98:9
99:5 109:4 115:20
116:4 120:23
121:9 125:3,6,10
125:14,19,23
126:4 133:9
135:16,25 139:10
139:12,19,23

140:7,12,14
141:15,18 142:20
143:7 148:12,19
150:10,14,20
151:7 158:4,7,14
158:18,25 161:3
165:9 169:11,14
169:17 178:8
179:22 182:22
189:25 196:24
197:4,7 201:3,10
201:11,18 202:7
202:17 204:22,23
205:2,5,22 206:7
206:10,14,18,22
208:2,4 210:20
211:16 212:9,22
213:15,19 218:22
220:3,12,14
221:17 222:5
223:13 226:8
228:2,8,11,15,18
229:14 232:25
233:6,13,17
245:22,24 246:14
246:25 247:9,17
247:22,25 248:6
248:10 251:24
252:10 253:9
255:2,6,7 259:11
260:4,7,21 262:14
263:11,15 267:14
273:8 274:13
284:25 285:23
286:4 287:18
288:4 289:25
290:4,12 293:3
296:10 298:19
299:10 301:12,14
325:22 326:7
329:5,10,13,15,18

329:22 330:4 335:21 336:14 337:6,13 338:8,12 338:16,20,23 341:3,8 358:14 359:24 363:14,16 364:2,7,19,24 365:4 366:7,18,21 368:9,25 377:10 378:9 379:24 380:19 381:11,15 381:18,22 382:18 384:4 388:17,20 388:24 390:21 391:9,14,21 392:3 392:10,22 393:8 393:12,13 394:11 394:18,24

**moyal's** 241:4

**multiple** 18:22 45:17 143:21,22 200:12

**multiples** 175:3,3

**mute** 336:18

**mutli** 303:11

**mutual** 218:18,24 220:9

**mvi** 345:6,8 346:22 347:12,22 348:17 349:9,12 350:3,10,12,15,24 351:9 353:23 354:2,12,16 375:9

**n**

**n** 2:1 3:1 4:1 6:14 6:14 363:17 396:1 396:1 397:1

**name** 5:15 6:20 15:21,24 17:10 39:23,24 40:6,20 42:11 43:22 44:11

44:12,13 49:13 55:10,23 66:15,16 85:15,16,19,20,21 110:14 203:7 260:25 304:15,19 304:21 307:22 322:17,19 334:3,5 354:25 364:11,13 365:8,12,22 381:24 382:5 383:4,10 384:2

**named** 230:5 351:22 362:22 384:7

**names** 66:8 236:20 236:22 240:16 343:20 344:3

**nasty** 120:3 214:24 252:25 297:8 327:17

**nature** 167:9 194:18 220:17 322:3 327:8,13

**necessarily** 162:19 292:15 321:25

**necessary** 194:14 203:23 304:6 318:13

**need** 14:2,9 16:25 17:2 21:15 24:14 87:2,4 123:7,25 160:20 161:7 185:3 206:16,18 237:25 241:4 259:13 283:18 356:11 390:24

**needed** 318:11

**needs** 105:12,13 105:15 146:19 305:19 306:25 331:21,23

**negative** 314:8

**negotiate** 105:14 105:17 106:2,15 296:23 321:22 324:16

**negotiated** 61:13 132:21 133:15,19 151:17 166:25

**negotiating** 105:19 114:15 116:11 118:8 131:23 166:22

**negotiation** 131:18 144:5

**negotiations** 133:24 297:2

**neighbor** 109:18

**neighborhood** 346:6,10

**neither** 174:13 192:11 272:15

**nephew** 43:12,18 213:14 216:3 228:7,10 243:13 250:2 252:13,14 252:14 328:18

**nephew's** 252:12

**never** 30:5 39:21 41:9,17 56:10,13 56:23 60:15 79:12 79:12 80:12 91:13 91:15,15,15 96:8 107:9 112:25 115:3,16 117:4 123:10 125:16,20 127:8 148:4 149:4 171:10 173:22 174:21 180:19 187:11 215:21 234:21 246:6,19 253:18 258:24

263:25 265:2 282:16 299:13,16 313:17,21 327:4,4 343:3 344:20,21 351:5 357:12 359:6,22 362:9 364:13,22 370:15 374:4 388:22

**new** 1:2,20 2:5,5 2:12,12 5:5,12,18 5:18 6:16 16:3 21:12,17 45:13 46:15 48:20 49:5 49:8 69:11 75:2 89:7,16 111:13,19 217:2,2 231:11,21 231:21,22 235:8 260:11 261:13 265:16,20 275:6 275:19 276:22,23 277:3,6,8 281:2 282:2,4 283:20,21 284:20 285:4 289:11 290:22 299:22 302:22,22 305:19 306:25 307:8,13 308:18 314:6 332:3 383:7 388:4 396:2,20 397:2,3,6

**newirk** 282:23,25

**newkirk** 283:12

**newman** 50:6 335:12,13,15

**nice** 180:14 198:7 227:2 258:18,19 258:25 260:2 277:12,14,16 312:8 372:2,2,9,23 373:20,22

**nicely** 228:20
**nicole** 46:3,5,7
**night** 8:20 213:25
 312:15
**night's** 8:19
**nine** 239:21
 385:25
**nir** 191:2
**nobody's** 374:24
**non** 133:20 303:13
**nonreal** 138:15
**nonrent** 303:3
**nope** 327:9
**normally** 14:17
 300:9
**north** 271:17,18
 271:18
**nostrand** 282:23
 282:25 283:12
**notary** 1:19 6:15
 396:20 397:6
 398:25
**note** 13:2 39:6
 63:17 64:5,11,12
 65:5,5 337:23
 343:17 357:19
 371:13,15
**noted** 395:8
**notes** 12:22
**notice** 204:4 223:9
 359:12
**notifications** 11:19
**notified** 202:23
**now's** 157:24
 272:20
**number** 27:18
 40:12 50:10 63:19
 64:7 94:6 98:17
 99:25 131:16
 217:17,25 251:12
 251:22,25 289:8

289:11 293:11
305:17 307:22,23
309:6,8 343:19
344:3 345:18
352:5 373:17,17
**numbers** 27:5,23
 28:3,5 115:3
 117:3,9 123:17
 131:22
**numerous** 177:11
**nyc** 264:7
**nypd** 355:10,13

**o**

**o** 6:14,14 63:21
 280:3,3,4,4 396:1
 397:1
**oath** 6:7 396:7
**object** 7:18 202:7
**objection** 32:4,10
 32:11,12 35:13,14
 36:4 72:23 74:8,9
 98:9,10 99:5
 120:23 121:9
 125:8,15 126:5
 133:9,10 135:16
 143:7,8 148:19,20
 158:18,19 178:8,9
 179:22,23 201:10
 202:9 205:22,23
 211:16 212:9,11
 212:22 218:22
 220:3,14 226:8
 232:25 245:22
 246:2,14,15 247:9
 247:17,19 248:10
 253:9,10 255:2,5
 262:14 267:14,15
 284:25 285:2,23
 293:3 296:10
 329:5 330:4 338:8
 377:10,11 378:9

378:10 379:24
392:22 393:8,11
393:13
**objectionable**
 338:14
**objections** 7:19
 39:5 125:24
 253:11 394:22
**objects** 37:25
**obtain** 88:22 92:16
**obvious** 95:5
**obviously** 34:14
 50:11 51:23
 119:14 135:10
 172:25 180:24
 218:17 260:3,5
 283:25 284:21
 319:2 326:14
 358:2 372:22
 376:10
**occasion** 323:3
 343:11
**occurred** 285:9
**ocean** 155:15
 156:2
**odd** 54:10 234:19
**odometer** 277:25
**offense** 255:18,21
**offer** 78:13
**offering** 244:8,16
 393:16
**offers** 245:5,6
**offhand** 59:20
 83:12 110:16,20
 136:5 143:10
 149:18 150:5
 236:25 248:16
 350:11 351:7
 375:11
**office** 9:20,21,22
 9:23 10:5,8,10

16:12,17,24 17:6,8
17:15 46:8,9
62:20,23 79:18
80:11 84:13,20,21
94:2 100:18,22
104:15 113:18
129:24,25 144:12
144:13,15 162:16
187:17 188:3,7,12
188:12 292:12
317:9 346:14
356:22 360:4,13
371:25 373:5,21
**officer** 31:25 32:2
 32:9 210:13
**officers** 16:7,10,11
 16:18 32:18,23
**offices** 5:18 46:12
 111:15 187:25
 282:12 305:18
 318:22
**oh** 17:10 64:20
 131:8 152:14,25
 184:18 192:19
 229:7 247:2
 277:14 280:11
 297:3,4 306:14
 326:7 336:23
 337:12
**okay** 7:24 8:3,12
 8:16,17,19,22 9:6
 9:18,22,25 10:4,7
 11:7,10,17,21 12:2
 13:9,14,21,24
 14:15,19,23 15:8
 16:24 17:13,20,23
 18:9,20,24 19:7,9
 20:10 21:2,19
 22:8 23:13 24:19
 25:18,19 26:14,17
 26:20,23 27:3,10

**[okay - okay]**                                                                 Page 38

| | | | |
|---|---|---|---|
| 27:15 28:6,11,21 | 101:20 102:3,5 | 188:11,14 189:4 | 284:11 285:5 |
| 29:3,9,15,20 30:4 | 103:3,13,13,14 | 189:22 190:9,24 | 287:13,19 288:24 |
| 30:11,14,20 31:15 | 106:8,18 107:15 | 191:2,9,19,24 | 289:15,18,19,24 |
| 31:19 32:20 33:12 | 107:22 108:18,20 | 193:10,13,15,20 | 290:15,25 291:5 |
| 33:16,20 34:18,25 | 109:14,20 111:5 | 193:21,22 196:3 | 291:14,23,24 |
| 35:21 36:22 38:19 | 111:17,21 112:4,7 | 197:25 199:15 | 292:2 293:13 |
| 39:23,25 40:22 | 112:11,15,17 | 200:9 205:24 | 296:3,4,12 298:13 |
| 41:9,10,14,16 42:7 | 113:2,11,16 114:5 | 206:15,19 208:5 | 299:19 300:5,11 |
| 42:9,12 43:11 | 114:22 116:8 | 208:23 210:15,19 | 302:8,10,18,20 |
| 44:6,22 45:5,12,19 | 117:4 120:5,25 | 213:6,13,19,21 | 303:2,6,20 304:5 |
| 45:25 46:14 47:3 | 126:6 127:3,21,25 | 214:3 215:18,24 | 305:3,13,22,25 |
| 47:23 48:7,10,14 | 128:21 130:23 | 217:6 218:15 | 306:16,18 307:12 |
| 48:18,22 49:15 | 132:10,15 134:2 | 219:16 225:15,17 | 307:15 308:7,16 |
| 50:16 51:2 52:15 | 134:21 135:5 | 227:25 228:11,16 | 308:24 309:25 |
| 52:20,24 53:3,8,11 | 137:10,17 138:10 | 228:18,24 229:17 | 310:25 313:20 |
| 54:13,24 56:7,16 | 138:18,21 139:10 | 229:22 230:9 | 315:10 317:7,11 |
| 56:25 57:14 58:7 | 141:6 144:14 | 233:6,10 234:4 | 317:24 318:13,20 |
| 58:11 61:21 63:3 | 145:4,17 146:8,25 | 236:10 238:21 | 318:25 319:8,14 |
| 64:3,23,23,25 | 147:7,11 149:8,19 | 239:3,7,12 240:17 | 319:17,19,22 |
| 65:15,19 66:4,11 | 150:9,14,20,23 | 240:20 242:11 | 320:15,18,22 |
| 66:16,20 67:14 | 151:6,24 152:14 | 244:23 245:10 | 321:6 322:7,11 |
| 68:20 69:18 70:7 | 152:22,23,25 | 248:9 252:19,21 | 323:11,15,20,24 |
| 71:7,9,15,19 72:10 | 154:7 155:6,9,13 | 253:6,21 256:7,19 | 324:5,9,11,14 |
| 73:2,16,18 74:6,12 | 155:14 156:5,10 | 257:6,11,21,25 | 325:8 326:8,19 |
| 74:20,25 75:5,17 | 156:12 157:22 | 259:17,22 260:2 | 327:4,10,15 |
| 75:20 77:6,12,17 | 158:8 159:12,13 | 260:11,13,20,22 | 328:13,18 330:6 |
| 77:22 79:20,25 | 160:10 161:8,14 | 261:3,6,8,21 262:3 | 332:12,21,24 |
| 80:7,15,24 81:9,14 | 161:20 162:18,22 | 262:6,11 263:3 | 333:18 334:25 |
| 81:16,24 82:5,8,15 | 163:4,9,20,21 | 264:8,12 265:4,8 | 335:4,7,10,15,19 |
| 82:17 83:5,10,13 | 164:4 165:22 | 265:14,23 266:8 | 336:4,7,14,21 |
| 83:15,18,25 84:5 | 167:3 168:2,13 | 266:14,17,22 | 337:16,18,19,22 |
| 84:18,24 85:3,7,12 | 169:17 170:20 | 267:4,6 269:4,13 | 338:13,19 339:2 |
| 85:21,22 86:2,7,13 | 171:6,18 172:4,16 | 269:18,23 271:16 | 339:10 340:20 |
| 86:18 87:6,7,14 | 172:19 173:3,4,10 | 271:20 272:3,8,10 | 341:13,22 342:5 |
| 88:9 89:8,18,20 | 173:18,23 174:8 | 272:15,22 273:19 | 342:15 343:11 |
| 90:2,13 91:10,16 | 174:25 175:17 | 274:2,5,18 275:2 | 344:13,24 345:11 |
| 92:7,20 93:3,5,5 | 176:4,8,16 179:7 | 275:16 276:14 | 345:14,21 346:5,8 |
| 93:14,21 94:12,16 | 179:12 181:9,22 | 277:5,10 279:10 | 346:25 347:4,7,24 |
| 94:21,23 95:21 | 182:8 183:16,25 | 279:24 280:22 | 348:2,16 349:8 |
| 96:11 98:22 99:20 | 184:7 186:12,15 | 281:16,20 282:19 | 351:13,16 352:14 |
| 100:6,12,21 | 186:21 187:6,10 | 283:3,7,12,14,17 | 353:11,17,21 |

**[okay - page]**

354:19,25 355:7
355:11,19 357:12
357:16 358:13,22
360:4,22 362:2,5
362:12 364:7
366:12 367:6
368:24 369:5,14
369:24 370:15,25
372:17 374:13
376:11,16 377:5
377:18,21 379:5,9
379:13 380:4,6
381:9,18 382:16
383:2,8 384:3,4,6
385:8,14,16
386:15 387:6,10
387:18,25 388:10
388:14 389:19,23
391:20 392:9
393:5,19,24 394:9
394:17,24
**old** 29:24 206:12
308:8
**older** 309:22
**once** 30:19 98:3
122:19 128:13
134:3 147:17
217:9 227:15
233:4 292:22
324:19 349:20
371:25 372:5
387:4,5
**ones** 64:10,12
65:21 93:18
191:19 317:19
361:17 378:3
**ongoing** 195:3,4
270:19 314:16
315:16
**online** 281:21

**ooh** 48:21 215:10
322:18
**op** 78:9
**open** 12:3,5 13:10
24:24 34:19 83:17
103:8 171:2
194:12
**opened** 46:13
**opening** 103:6
**operating** 110:25
111:3,6
**operations** 143:17
**opinion** 212:6
221:6 222:8 225:7
241:8
**opinions** 254:17
284:22
**opportunities**
108:4,10 138:3,11
**opportunity** 35:23
138:19 160:21
194:12 275:15
**opposed** 7:16
79:22 324:5
326:20
**ops** 76:22 77:4,11
77:13,21 78:13
**option** 52:21 78:10
134:17 224:18
**order** 60:6,12,17
70:24 104:24
121:21 252:12
290:18 309:12
311:23 339:17
**ordered** 63:10,17
64:8 118:17
121:16 293:12
311:24
**orders** 60:20 61:3
61:6 360:24

**organization**
261:7,11,14
262:19 278:20
334:4,11 335:2
**organizations**
279:14 280:13
333:7
**organizing** 335:2
335:5
**originally** 93:19
353:5
**orthodox** 52:7
53:2,5,7 194:21,23
197:10 200:3
208:15 211:5,7,10
217:20 223:8,24
224:9 231:25
277:23 278:13,21
278:22 386:19,19
**outcome** 269:13
397:16
**outlay** 318:18
**outside** 10:4 18:3
50:21 124:5 131:5
137:7 138:3
140:20 143:2
144:14 211:24
283:5
**outspend** 374:11
**overall** 212:19
**overnight** 285:16
**overtime** 153:16
**overturn** 269:16
**owe** 178:5 185:14
185:24 186:13
187:20 196:20
394:5,5
**owed** 157:20
185:16,16,21
202:24 268:7
286:22 291:9

292:21 323:8
326:16,18
**owes** 171:16
187:21 227:22
326:13 392:25
**owned** 20:10
74:17 145:12
**owner** 47:6 63:23
65:6,22 73:6
131:12 133:8
**owners** 64:10
235:9 319:10
**ownership** 46:22
48:15 77:10 78:9
78:9 132:10
146:14 147:13
155:12,19
**owning** 149:24
**owns** 65:16,23
66:21 67:3 146:8
282:22,23

**p**

**p** 2:1,1
**p.m.** 14:20 54:3
150:15 189:8
395:5,8
**page** 3:2,5,10 4:3
23:24 24:18,18,19
26:3 27:15 28:21
30:24,25 31:10
33:16 35:24 37:17
55:3,4,9 56:23
58:15 59:23 64:16
64:20 73:3 88:9
103:9,12,18
151:19 152:6,20
156:16 159:10,12
159:18 213:22
229:12 235:3
242:14 256:5
259:25 336:8

**[page - personal]** Page 40

337:8,9,14,16,19
394:7,7 398:4
**pages** 24:12,15
25:12,17 54:10
57:16,19,22,25
58:3,5,6,15 63:4
151:12 174:15,17
174:23 177:5,12
178:17,18,18,24
190:10 213:10
256:6 263:14
**paid** 93:9 138:24
146:19 147:14
149:7,11 150:7
154:15,20 182:16
182:21 187:11,14
297:23 305:11
312:7 326:4
356:24 360:12,13
360:22 361:22
362:7 374:21
**pal** 227:8
**pandemic** 30:8
**paper** 79:17,22
84:10,12,12,22
85:9,24 188:21
**papers** 81:10
84:22
**paragraph** 234:3
243:18 357:17
359:17 361:9
**pardon** 269:9,17
272:6
**pardoned** 269:15
**parenthetically**
100:17
**park** 2:4
**parking** 380:3
**part** 69:5,20 70:2
70:4 77:15,17
81:20 140:23

142:14 144:20
145:15 148:23
180:5,8,9,11
181:13 183:8
203:21 242:13
273:15 277:12
291:14 292:25
298:23 323:25
346:2 374:25
376:2 378:14
379:6
**partially** 221:13
225:6
**particular** 97:23
332:16 362:15
**particularly**
264:24
**parties** 6:5 53:5
324:12 326:2,25
328:11 397:14
**partner** 21:24
47:6 149:11
**partners** 15:15
49:10,23 155:15
156:3 283:4,6
**parts** 38:3
**party** 14:25 15:2,4
31:6 50:13 222:25
227:5 326:24
327:22,23 328:8
**pass** 100:14
202:13 239:17
**passed** 62:12
226:15 275:7
285:11 304:9
**passing** 13:2
240:11 276:9
284:6
**pay** 96:21 144:19
144:22 145:20
147:4 178:5

186:18,24,25
189:18 223:11
224:6 234:7 235:9
235:14 268:9
289:14 291:11
292:21,23 308:17
308:22 323:11
327:12 348:13
356:16 357:14
359:22 360:14
372:13 374:23
375:15,16
**payable** 46:7
**paying** 93:2 144:9
147:9 157:20
267:24 286:24
356:22 361:2
371:18 372:24
**payment** 145:22
145:23 146:23
147:23 189:14
289:13 327:6
**payments** 93:8
145:17
**pays** 67:11
**peace** 177:8
**pen** 80:3 279:20
**pencil** 14:21
**pending** 63:24
229:15 260:9
336:15
**pennsylvania**
21:17 49:5
**penny** 373:11
**people** 10:9 16:12
16:17 17:7 29:17
32:22 53:6 62:20
85:14 97:3 123:12
136:8 148:22
161:12,15 167:9
181:14 183:7,21

191:25 196:2
200:20 211:14
220:18 227:22,22
230:19 234:20
238:16 243:22
245:15 246:4,6,17
246:20 253:15,19
253:22 257:8
258:2,22 264:13
268:6 269:3
302:14 312:15
335:6 358:11,18
358:20 376:20,22
377:23,24 384:19
384:19 386:23
**percent** 22:16,18
22:19,23 48:21
49:3 131:25
214:11 252:6
385:24
**percentage** 22:13
48:19 106:5,15
113:25 116:13,20
343:6
**percents** 114:4
**period** 125:17
219:4
**permission** 63:23
63:24 65:6,7,22
67:19 73:6,7
204:3 241:5
**person** 39:16
40:14,17 41:2,24
62:23 75:8 97:3
100:9 124:7 205:9
230:6 238:14
297:10 358:7
**personal** 27:12
29:9 30:6 92:5
112:23 254:17
389:25 392:7

| | | | |
|---|---|---|---|
| **personally** 19:22 19:23 20:12,13 22:9 23:4,5 52:2 60:2,7,12 68:7,8 68:21 85:7 99:13 101:22 102:2 137:13 198:24 208:15 235:22,23 258:2,9 269:4 316:2 | **photographer** 389:4,5 | **plaintiff's** 3:11 23:14,16 24:4,9 25:4,8,11 34:5 53:15,18,22 88:2 102:24 103:6 151:2,5,22,25 152:2 159:4,7 160:8,11 163:6 190:3,6 212:24 213:3 228:21 229:3 259:5,7 273:24 274:3 335:23 336:2 | **point** 12:8 13:25 37:5 51:25 52:21 54:19 60:2,5,8 61:21 74:22 90:13 97:10 109:7 112:25 113:12 114:18 115:12 122:16 129:4 130:4 134:17 135:7 137:25 139:17 142:11 143:12,14 163:12 164:12 165:16 |
| **personnel** 111:18 186:17 322:12 323:7 | **physical** 249:2 | | |
| | **pick** 70:17 187:21 189:6 191:2 306:2 369:3,16 | | |
| | **picked** 109:14 393:2 | | |
| | **picking** 203:16,19 | **plane** 75:9 | 166:5,20 168:15 |
| **pertain** 231:24 | **picture** 193:9 274:5 282:5 389:5 389:6 | **planning** 368:10 387:20 | 170:10 172:14 173:13 176:18,24 177:4 178:12,21 178:22 179:13 185:5,12,15 186:15 187:8 192:5,18 202:22 204:7 210:25 230:24 233:24 260:11 289:10,11 292:13,16 296:21 296:24,24 309:10 309:14 310:18 336:22 350:6,9 354:11,16 362:15 362:20 363:3 394:14 |
| **perused** 234:18 | | **platforms** 30:15 30:16 | |
| **peter** 320:15,18 | **pidyon** 237:24 238:2,11,14,18 239:8 240:25 241:9 265:9 | | |
| **petitioning** 271:25 | | **play** 32:21 63:13 137:21 165:10 169:5,22,24 182:5 200:4 216:9,9 263:21 287:24 | |
| **ph** 195:11 235:6 251:5 345:19 353:13,16 379:2 388:13 | | | |
| | **piece** 92:21 363:4 363:6 382:14 | | |
| | **pin** 286:12 | | |
| | **pitch** 144:21 347:12 350:23 | **playing** 155:2 181:24 196:17 198:13 297:16 311:23 312:8 327:18 | |
| **phenomenal** 196:5 | **pitched** 124:15,16 | | |
| **phone** 26:15 27:5 27:20,23 28:3 38:24 55:22 89:7 89:13,15,16,22 100:9,10 109:9,13 109:14 114:7 119:10 129:25 144:17 187:3,8 193:18 209:23 210:2 287:8,10,11 308:6,12 338:6,6 339:4,8,10,18 340:5,11,13 341:10 342:2 372:6 383:23 | **pitching** 347:14,19 347:21 | | |
| | **place** 78:12,12 113:9 114:6 119:25 121:21 132:12 144:6 174:11 235:13 268:5 285:3 290:15 373:25 374:4 | **plays** 73:23 196:14 | **pointers** 13:2 |
| | | **pleasant** 378:2,4 | **pointing** 36:24 373:21 |
| | | **please** 5:21 6:8,20 9:12 54:7 204:15 204:15,15 241:12 244:4 374:2 383:18 391:21 | |
| | | | **points** 77:23 80:9 286:8 289:3 290:17 342:20 |
| | | | |
| | **placed** 60:6,17,20 61:2,6 | **plenty** 248:14 337:21 373:5 | |
| | **places** 156:14 378:2 | | |
| | | **plight** 241:11 | **police** 194:21 209:13,13 210:13 |
| | **placing** 60:12 | **plow** 86:23 | |
| **phones** 11:8,10 27:4,8 28:2 89:12 341:14 | **plaintiff** 1:5 2:3 3:10 4:3 5:8,9,24 156:19,19 395:4 | **plus** 57:4 124:13 308:11 | **political** 29:13 30:7 231:11,16 |

**[political - profitability]**                                    Page 42

232:9 265:22
279:11 379:6
**pollard** 271:9,13
271:21
**pollard's** 271:11
**populating** 192:15
**porter** 153:12
**portfolio** 303:7
**portion** 39:4 84:9
**position** 117:25
233:22 243:9
252:3 326:15,20
**positive** 119:19
310:23 314:8
**possession** 89:24
305:16 356:18
**possessions** 360:2
**possibility** 43:14
52:17 62:10 69:2
75:14 77:9 85:6
135:3 137:24
148:24 166:18
209:11 226:23
327:22,24 330:10
**possible** 16:16,18
43:10 56:7 68:21
76:9 83:15,18,20
85:3 100:8 107:8
136:10 210:11
243:18 340:20
**possibly** 60:4
77:19 104:25
114:19 136:7
162:4 336:18
370:6
**post** 216:10
217:16 230:10
235:21 236:2,5,15
236:22 237:20
241:24 243:20,21

**potential** 104:14
112:18 116:14
122:14,17 124:24
129:21 130:8,10
135:12,14 136:15
137:6,19,20 138:7
140:17,25 142:13
207:2,6
**potentially** 97:25
143:16,16 163:12
376:13
**power** 105:4,7,7
105:17 106:2,2
114:15 116:11
118:8
**practice** 18:6 83:2
84:3 147:3,4,8,9
310:4
**practices** 144:9
221:14
**pray** 323:3
**prayed** 345:25
**prayer** 227:6
241:15
**pre** 328:17 376:19
**precinct** 379:10
**precipitate** 210:17
**precise** 92:2
**precluded** 197:11
**predicament**
267:12
**prefer** 240:16
**premises** 149:23
**presence** 56:14
**present** 2:17 47:8
134:22
**president** 15:7,8
66:23 269:8,10,11
269:11,20 270:6
**president's** 269:24
270:6

**presidential** 272:5
**pressure** 374:10
**presumably** 194:5
244:9,10
**pretty** 96:7 168:12
352:15 373:11
**previous** 23:2 54:7
245:10
**previously** 392:21
**price** 178:4
**prices** 351:3
**primarily** 19:10
21:11,12 46:24
47:2 50:5 59:10
63:8,14 65:25
86:16 136:12
192:9,23 193:11
232:18,19,20
331:22
**primary** 18:10
21:4 275:18 332:6
351:17 387:15,16
**principals** 66:8
**principle** 238:24
**print** 79:21 80:2
80:18,20,23,24
81:4
**printed** 176:12
**printer** 79:18 80:3
80:14
**prints** 81:5,5
**prior** 9:7 20:14
30:8 61:2 109:7
119:18 121:15
155:11 165:19
285:4,4 390:16
**prison** 160:15
225:11,12 226:5,5
226:9 237:9
238:25 239:21
254:19,19 257:2

328:11 376:12
377:8,15,25 378:6
378:25
**prisons** 377:25
**private** 18:8
**probably** 8:11
16:8 22:16 51:14
80:12,16 121:25
123:24 126:16
133:21 144:20
165:6 207:12
257:23,23,24
267:5 269:3 270:3
280:15 294:17
303:12 305:23
340:16 352:19
389:18
**problem** 44:14
56:19,22 71:21
95:4 169:18
182:17,17 188:18
223:12 293:23
307:24 315:22
348:21 351:4
376:13
**problems** 166:11
**proceeding** 51:23
**proceedings** 51:11
**process** 224:16
348:5
**produced** 115:4
115:16 234:15
**product** 311:12,13
312:2
**production** 3:6,7
290:2,10 391:11
**professional** 18:18
29:10
**profitability** 284:2
285:17 286:20

| | | | |
|---|---|---|---|
| **proforma** 394:21 | **prosecutors** 355:25 | **public** 1:19 6:16 170:9 264:16 396:20 397:6 398:25 | 118:7 127:21 131:21 153:23 168:17 180:5 182:6 189:2,3 202:21 212:16 226:13,19 230:22 238:22 242:19 244:5 245:6,7 257:2 280:23 284:13 289:2 290:18 295:2,10 296:7 305:11 311:2,4,10,18,19 315:19 328:10,18 353:5 374:10 |
| **program** 300:7,8 | **protest** 379:7 | | |
| **projections** 123:13 135:11 | **prove** 153:17 | | |
| **promise** 89:3 90:4 90:22 91:2 99:25 101:8 297:9 394:10 | **provide** 69:7,9 81:9 94:25 96:14 96:25 98:13 99:3 104:11 121:7 175:23 176:3 384:5 | **publicly** 243:10 | |
| | | **pull** 24:23 53:16 122:2 160:10 229:25 241:19,23 280:18 281:21 288:18 335:21 342:17 | |
| **promoting** 254:9 | | | |
| **prompted** 88:19 210:6 | | | |
| **promptly** 144:20 144:22 147:5,9 | **provided** 366:4,16 367:3,8 369:21 392:6 393:25 | **pulled** 171:25 371:14 | |
| **prop** 160:13 318:3 | **provides** 81:6 | **pulling** 23:19 88:2 | |
| **proper** 123:12 | **providing** 9:9 97:4 98:2,6 105:25 106:2 364:16 365:4 366:20 | **purchase** 61:23 69:13 278:11 308:21 309:4 316:13 347:15 | **putting** 40:6 97:20 116:10 126:18 137:25 138:6 141:25 144:4 165:17 168:17 173:23 179:14 185:13 204:2 254:17 295:14 305:15 310:13,18 312:22 313:14 314:9 336:13 348:20 365:22 371:19 375:2 |
| **properly** 154:16 | | | |
| **properties** 21:7,10 21:20,23,25 22:4,6 22:10,14,20,23 46:15 48:12,14 63:15 65:9,20,23 67:21 68:4,8,15 69:4 70:2,8 71:11 71:17 72:21 74:17 74:23 76:12,20,24 77:3 94:10 118:17 118:21,22 119:13 132:16 133:7 145:16 319:13 350:25 386:4 | **pruzansky** 43:23 43:24 198:9 216:12,24 217:4 217:15 224:22 226:11,19 227:11 230:23 231:3,5,14 232:22 233:22 235:21 236:3 237:21 241:7,23 242:6 243:3,10,12 243:13 244:9,12 245:6 249:17 254:4,9 260:3 264:15,20 | **purchased** 19:21 20:4 309:8 323:9 | |
| | | **purchasing** 45:16 69:22 304:2,4 316:20 317:21 | |
| | | **purpose** 30:4 361:23 390:7 | |
| | | **purposes** 390:13 390:19 | |
| | | **pursue** 208:25 209:21 | |
| | | **pursuing** 62:25 141:21 209:5 | **putz** 278:25 |
| **property** 19:17 74:3,4 78:9 146:9 149:25 319:10 388:15 | | | |
| | | | **q** |
| | **pruzansky's** 230:10 236:5 237:19 241:2 247:4 | **push** 178:3 269:8 308:2,9 | **quarter** 105:12,14 132:2 367:12 |
| **propose** 326:3 | | **pushed** 240:12 | **quash** 194:14 203:23 205:2,6 |
| **proposed** 134:16 326:4 | | **pushing** 219:10 312:5 | |
| **proposing** 244:18 326:2 | **pry** 332:15 | | **quashing** 205:8 |
| | **prying** 332:20 | **put** 36:9 37:14 38:25 44:16 72:16 95:22 96:20 105:2 105:21 106:10,11 106:13 114:14 | **query** 289:23 |
| **prosecutor** 210:13 268:12 355:24 | **psycho** 194:14 203:24 | | **question** 7:20 9:8 9:10,13,15 14:4,5 23:2 26:2 36:6,17 36:19,20 41:20,21 60:9 76:4 99:12 |

99:21,25 101:8,13
101:17,21,21
118:9 124:21
125:11 150:13
151:9 152:24
157:18 160:23
164:20 165:13
170:6 174:20
181:3 196:25
197:5,24 200:3
201:12,13,19,21
204:20,23 206:5
210:21,22,24
213:15 214:6
215:18 216:13
220:8 221:18,19
221:21 223:13
228:3,5 229:14,15
233:18,20 246:9
246:22 247:11
250:7 252:21
253:22 254:15
259:11 260:8,24
263:12,16 286:25
287:17 288:5,25
293:4 298:20
302:4 309:15
328:7 329:7,12,13
329:14,16,19
332:18 334:18,21
334:23 336:15
338:24 339:16
358:2,15 359:25
363:22 364:3
366:12 387:13
389:14 394:10
**question's**  99:7
**questionable**
246:3
**questioned**  68:25
75:22,23 258:24

**questioning**  210:6
252:11
**questions**  9:9
25:24,24 31:14
35:2 102:21 109:5
115:10 116:4,6
139:12,24 161:6
169:10,19 182:23
184:15,16,20
197:3 213:20
228:16 260:8,22
260:23 287:19,21
287:22 298:19
342:20 363:16,20
364:8 380:23
381:2,12 388:18
388:21 389:20,20
393:18
**quick**  150:19
267:17
**quicker**  184:20
**quickly**  54:16
136:9 151:25
192:16
**quite**  63:7,19
103:17 172:25
308:5 373:7
**quits**  196:22
251:20
**quiz**  47:18 58:22
216:10
**quote**  130:12
131:12 132:5,18
133:2,16 225:25
356:19 370:13

**r**

**r**  2:1 6:14 19:20
20:10 238:16
280:4,5,7 363:17
397:1

**rabbi**  43:15,20,22
43:24 198:9
216:11,23 217:13
217:14 223:25
224:22 226:11
227:11 230:10,23
231:3,5,14 232:22
233:22 235:21
236:3,4 237:19,21
238:21 240:25
241:7,23 242:6,23
243:2,2,10,12,13
244:8,12 245:6,7
247:3 249:17
254:4,9 264:15,19
**rabbi's**  238:23
**rabbinic**  51:5
222:3,20
**radio**  261:25
262:7,11
**raid**  267:18
**raise**  53:12 176:25
178:3 275:15
283:24
**raised**  62:7 178:15
223:18 273:14
**raising**  224:17
255:23 275:20
386:8
**rant**  139:22
**rarely**  243:21
**rational**  148:10
311:5
**reach**  78:8 109:9
119:2,5 133:25
264:15 298:18
**reached**  63:24
65:6 73:6 104:24
119:3
**reaching**  264:19

**react**  130:3
**read**  24:14 31:9
34:2,4 37:21
54:13,14,15 84:3
104:5 151:12,14
152:11 156:8,9
160:5,18,19 161:4
161:7,15 163:5
190:17 192:6
193:2 213:11
214:19,19 225:19
225:19 229:20,23
232:23,24 233:4
233:14,14,17
234:10,22,24
235:3 236:5
252:12 260:13,16
263:9 280:23
283:15,16,17,18
297:20 329:18,20
336:14 337:17,22
338:2 341:25
343:18,19 356:10
394:21 396:6
**reading**  33:22
58:19 63:20 79:23
151:6 161:9 184:4
190:25 193:10
203:18 231:6
233:4,10 235:18
236:4 252:17
260:12 289:21,22
336:16
**ready**  24:17 33:19
53:10 88:11,12
115:7 123:6 134:3
141:25 245:2,4,5
336:7 337:7 388:9
**real**  3:20 18:20
19:13,16 20:15,24
21:6,9 46:24 49:3

49:9,23 51:22
57:3,7 108:13,13
108:14 110:4,6,9
117:9,18 123:17
131:5,6,8 132:14
132:15 133:5,16
133:20 138:4
149:22 150:19
159:25 160:7,12
190:12 196:7,12
196:12,13 232:6,9
235:8 256:5
273:18,21 275:17
276:11,20,23
278:15 281:2
282:3 283:20,22
284:2,20 285:12
285:14 296:19
299:22 301:24
302:12,13,14
314:23 319:19
322:22,24 333:10
370:22 375:16
**realize**  64:21
152:21 174:15,17
297:15
**realized**  75:8
174:13
**really**  14:13 26:12
29:19,22 37:23
38:4,7 43:13,17,18
47:15 55:23,23
62:15 72:11 73:11
101:24 111:15
112:13,21,24
117:3,14 119:4,5
127:5 128:14
129:11 130:2
138:24 139:2,3
157:11 165:15
168:11 177:15

178:3 180:4,8
182:5 183:9 187:9
191:11 192:5,8,9
200:21 203:7,13
209:16 214:23
215:4,8 216:21
218:9,10 222:16
237:13 238:15,18
240:18 263:5
286:9 299:2 304:9
311:22 312:6,6
315:21 334:12,12
350:21 353:2
354:14 373:15
**realty**  1:8 5:9 9:23
14:25 15:3,6,7,9
15:10,12,16 16:2,6
16:9,20 17:18
18:4,11,14 19:12
20:14 21:2,3,20,22
21:24 22:3,4,10,14
31:8,12,24 32:2,7
32:17 33:3,7,10,14
45:9,21 46:12,18
46:20 47:20 55:17
56:3 58:19 59:11
59:17,21 60:17
63:9,11,15 64:13
65:2,8,12,16 67:6
67:15 68:2,14
69:6,7,16 70:18,22
72:19 76:14,16,20
77:2 84:25 85:13
86:3,15 90:17,21
92:3 94:12 96:24
118:21 119:11
121:16 137:14
140:21 142:6,8
143:3,4 144:25
145:7,21,24
146:17,19 147:4

147:21 149:16
153:9 154:16
155:8,23 156:6
171:2 176:5
234:14,17 250:14
282:13,19 283:9
303:7,24 318:3,22
320:3,6 330:14,15
330:17,23 331:3
331:15,18 332:25
332:25 369:20,24
370:3 377:6
**realty's**  154:10
**reanswer**  125:4
**reason**  102:18
121:4 129:10
161:4 216:18
275:3 288:8
332:16,19 348:21
365:13 398:4
**reasonable**  148:7
**reasons**  181:24
**rebbe**  217:4
**rebenwurzel**
320:16 321:4,7
322:11 325:3
330:16 333:4,9
335:10
**rebenwurzel's**
327:6
**rebenwurzels**
323:6 325:20
326:23 327:11
**recall**  22:25 43:22
55:6,7 56:16 60:5
60:11 62:2,6 72:3
74:3,6,10 75:11,24
77:12 82:13 83:5
83:6,10 88:17
95:10 99:22
110:14,17,18

128:10 129:8
133:22 134:23,25
147:7 150:4
154:23 156:7,21
162:9 173:6
202:22 208:7,14
214:16 234:12
241:21,25 280:25
318:7 321:8
323:17 325:15
342:23 353:19
355:23 356:25
362:16,20 393:19
**recalled**  161:9
164:8 392:18
**recap**  41:19 247:3
**receipt**  360:15
**receive**  26:5 29:17
47:11 81:3 312:20
313:25 341:25
**received**  25:21
26:6,10 27:20
31:3 35:4 156:20
167:3 210:12,25
268:21 371:10
**recess**  87:20
158:11 207:18
273:3 369:7
**recognize**  39:9
58:23 59:5 154:14
154:18 157:14
204:5 231:8
325:23
**recognized**  351:3
**recollection**  3:8
124:10 129:5
285:7 287:2 289:2
289:7 347:8 390:7
390:11,18 391:5
391:12,18

**recollections** 9:4
**recommend**
324:10
**recommendation**
324:11,14
**recommended**
74:24 75:4
**reconvene** 380:19
**reconvening**
380:22
**record** 5:22 6:21
15:21 40:7 51:3,4
66:17 87:8,19,22
104:6 117:10
148:12,13 158:10
158:13,14 168:23
182:2 207:9,17,20
216:2 217:19
255:15,16 259:3
271:10 273:2,5
278:5 279:3,3,22
323:2 329:20
337:2,3 345:23
368:10 369:6,9
389:3 394:2 395:7
396:9,10 397:11
**recorded** 1:17 5:3
356:20 395:2
**recording** 394:23
**recover** 385:20,23
**redeem** 238:25
**redeeming** 238:19
238:20,24
**reduce** 302:5
**reduced** 302:2
**reducing** 302:17
302:23
**refer** 236:7
**reference** 35:8
37:10 90:8,16,22
91:5 194:8 195:21

200:22 205:9
214:17 216:8,11
217:20 234:11
278:16 309:13
371:16
**referenced** 97:11
111:6 130:17
172:5 173:25,25
236:19 261:18
263:20,24 312:20
332:13 391:15
**references** 356:7
**referencing**
201:21 350:19
**referred** 58:18
**referring** 88:23
91:22 144:24
145:18 175:10
225:18 232:14
269:10 276:7
278:24 292:7
315:7 316:23
329:25 333:15
345:15 348:6
353:8 355:9
**refers** 95:17
**refinanced** 98:15
147:18
**reflect** 179:17
**reflected** 233:8
**refresh** 3:7 390:10
390:18 391:5,12
391:18
**refreshing** 390:7
**refusal** 327:11
**refuse** 225:9 235:9
250:19
**refused** 221:23
222:10 224:6,23
331:15

**refusing** 221:11
225:4 250:17
328:9
**regarding** 121:7
208:8,9 264:20
323:25 359:7
394:2
**register** 295:23
**regular** 75:23
109:17 166:18
279:15 310:5
311:8
**regularly** 30:2,18
99:2 297:5
**regulations** 275:23
**reinitz** 2:6 3:3
5:23,23 6:12,25
7:8 8:3 23:9,13
24:8 36:7 40:8
87:9,23 95:13
120:25 121:13
125:6,19,23 126:6
150:17,23 151:8
158:17,19,24
189:24 195:14
201:9,20 204:25
206:7,20,23
207:10 208:2,5
210:23 211:18
233:3,19 247:2,10
247:20,24 248:2,9
255:5,8 286:8
288:2 289:25
290:6,13 296:12
298:20 325:23
326:9 329:11,17
330:2,6 336:16
338:10,13,18,21
339:2 364:21,25
366:9 367:15,25
368:5,15,19,24

369:2,10,14
381:14,21 382:20
387:11 388:19,22
389:3 390:23
391:9,24 393:11
393:16
**reiterate** 169:21
359:8
**related** 29:10
51:22 84:24
231:20 392:18
397:13
**relating** 83:7,11
83:20,22,23 84:13
85:4,10 98:3
232:9 265:6
**relation** 301:15
**relationship** 15:2
68:12 174:4
176:19 185:4
216:23 318:2
325:10 353:23
354:2
**relationships**
173:16
**relative** 50:2
**relatively** 104:4
**released** 256:11
**relevance** 255:7,9
**relevant** 62:23
115:24
**remaining** 49:2
369:13
**remember** 20:19
40:20,20,21 44:13
69:2 82:16 109:11
119:6 135:4 136:5
137:23,24 144:2,2
148:25 156:22,24
161:11,24 162:5
165:25 166:3,8

167:25 175:16 187:9 230:2,2,18 233:4 244:20,21 258:13 298:21 322:19 325:17 338:3 348:17 350:21 354:14 365:10 377:4 378:17,19 380:8 391:8 392:17

**remote** 1:11 5:4 6:11 395:3

**remotely** 6:7 235:12

**renovate** 300:19 300:22

**renovated** 300:25

**renovating** 300:4

**renovation** 300:12 301:4

**renovations** 301:7 301:19 302:3

**rent** 286:19 287:4 289:10 290:22 291:2,5 293:9 296:9,16 299:4 301:2 302:24 303:10,12

**renting** 96:17

**rents** 275:15,20,22 283:24

**repair** 70:14 316:19 317:22

**repairs** 305:9

**repeat** 132:24 148:11 253:15

**repeatedly** 220:4

**rephrase** 9:12 92:9 135:19 330:3

**rephrasing** 329:12

**replace** 89:15

**replaced** 89:17 304:7,8 351:14

**replaces** 26:22

**replacing** 70:6 302:6,7

**replumb** 96:20

**report** 62:24

**reporter** 1:19 5:19 6:6,8,10 91:19 218:23 226:21 234:16 255:19 279:21 280:2 329:21 340:23 397:5

**reporting** 204:10 317:20

**represent** 106:4

**representative** 199:16 292:17

**representatives** 70:24 77:8 234:9 234:19

**representing** 191:16

**represents** 79:11 128:7 278:21

**request** 17:3 41:21 96:15 98:19 186:24 187:3 213:9

**requested** 3:4

**requesting** 98:7

**requests** 371:9

**required** 248:4,7

**reserve** 158:15

**reset** 367:23 368:4 368:22

**residence** 19:24 387:15,16

**residences** 28:4 388:3

**residencies** 28:8 39:8 388:2

**residential** 275:7

**resolve** 52:9 53:4 95:2 287:15 321:17 376:13

**resolved** 50:17 52:4 324:3

**resolving** 70:19 327:24

**resources** 371:22 374:10

**respect** 69:24 99:21 107:25 169:25 267:6 272:3 302:3 328:24 340:5 348:25 385:3 386:6

**respectively** 46:5

**respects** 33:25 34:9 36:3 37:19 38:17,21 39:13,20 40:9

**respond** 99:17,20 101:14,17,23 163:14 179:7

**responded** 101:10

**responding** 122:25

**responds** 39:6 118:12

**response** 25:22 27:21 38:20 39:12 39:18 40:8 41:6 47:11 78:15 99:24 100:3 101:7,13,20 168:3 186:12 189:15

**responses** 3:11 23:14 24:4 25:21 26:6 31:4 34:5 35:9,11,12 36:15

**responsibilities** 18:4,10 69:7,21 70:4 85:23 143:4 317:2

**responsibility** 69:16 70:9 86:8

**responsible** 70:19 86:17 97:4 305:4

**rest** 29:11 118:17 243:19 361:10

**restaurants** 108:21

**retail** 308:17

**retainer** 156:18

**retelling** 392:14

**retired** 262:5

**return** 215:16

**returned** 209:15 209:16

**review** 35:23 36:13 37:16 54:20 79:21,22 120:20 158:16 159:11 213:10 344:11 390:10,18 391:4

**reviewed** 35:22 36:12 58:12 80:6 265:5 344:7 356:13 357:5 359:21 370:11 390:6,15 391:2,16

**reviewing** 90:9

**reviews** 80:8,19

**rich** 356:21 357:12 360:8 371:18 373:12,14,16

**[rid - saying]**

**rid** 177:25,25 182:14 185:2,3
**ridiculous** 268:13
**right** 11:15 12:18 13:12 14:16,23 17:15 25:14 27:5 31:22 35:3 36:14 38:2,6 41:5,16 42:3 45:3 47:12 53:25 57:5 63:2 64:25 70:13,17 85:25 87:2 89:5,9 92:13 93:16 100:5 102:8,10 104:2,7 109:4 118:11 120:13 122:9 123:13 127:9,14 127:19 129:4 132:13 137:4 139:10,23 140:12 140:15 141:18 142:23 146:2,16 151:15 153:4 154:12 157:22 158:15 159:2,19 162:20,21,23 165:9 166:19 167:18 175:15 176:12 177:21 178:7,11,25 179:3 187:13,15 188:3 189:5 193:17 195:17 200:2 203:25 204:5,5 211:8 214:12,15 215:6 225:21 227:14 228:2 229:15 235:11 236:21 240:24 241:3,22 242:19 242:25 245:18

249:8,9 256:22,24 260:7 265:13 266:23 272:17 277:17 286:9 291:16 292:5 294:18 298:24 300:14,16,24 301:3,23 303:5 305:5,16,21 306:13 309:25 316:15 318:19 322:19 323:10 329:22 333:17 341:3 342:22 343:14 344:11 346:21 348:15 349:25 354:18 356:15 359:14,24 363:18 364:2 366:21 367:16 368:5,25 369:14 373:21,21 378:16 380:16 381:22 387:17 388:7 389:12 393:15,23 394:18
**rights** 311:21
**ring** 55:23 203:7
**rings** 308:3
**riverdale** 273:22 306:13,14,17
**road** 101:4
**robs** 226:18
**rodium** 344:21
**role** 17:17 45:7,18 67:7 137:20 142:25 143:2,17 239:22
**roles** 45:17 46:6
**romero** 153:8 156:19

**romero's** 156:19
**room** 9:25 10:4,13 10:25 11:11 12:24 84:23 85:9 188:8 259:15,18 394:14
**rooms** 29:21
**roughly** 30:9 31:2 48:19 59:16 116:13 145:11 157:6
**round** 131:21 215:23
**routinely** 49:11
**rubashkin** 238:17 267:8,8,12 269:2,6 269:21 270:13,21 271:6
**rubinstein** 41:12 41:15 42:7 44:23 53:23 54:6 55:10 55:11,14,16 56:9 79:3,11 127:13 164:9,22 191:13 193:12,15,24 194:6,7 199:11 203:7,8,22 288:11 292:19 344:7,9 356:14 357:6 359:21
**rubinstein's** 201:22 205:16
**rule** 7:18
**ruled** 223:7
**rules** 182:5 222:19
**ruling** 223:19
**run** 152:2 196:4 231:11,22 247:5 314:24 362:3
**running** 11:24
**runs** 261:7 383:8

**rush** 381:15
**rushed** 381:6
**russian** 17:10 85:20,21

**s**

**s** 2:1 3:9 4:2 66:18 280:4,5 316:24,25 322:20,20 363:13 363:17 398:4
**sadly** 373:6
**sales** 144:20
**sam** 45:24 46:8 77:20 316:24
**sam's** 46:5
**samet** 316:25
**samuel** 345:9,12 345:12,14,25
**sarah** 259:10 260:19,25 261:6 261:18 263:24 264:7
**sat** 134:8,10 268:15 373:20
**saul** 17:12,17 47:22 97:6,9 98:5 98:12 367:8,10,10 370:6
**saul's** 17:17
**save** 302:9
**saving** 238:10,14 238:14
**saw** 43:17 188:7 188:22 203:17,18 337:25 347:5 351:4 374:4
**saying** 25:24 161:22 164:17 203:15 227:4 244:7 268:10 285:25 286:4 356:16,25

**says** 52:6 64:2
78:19 118:4
121:18 146:6
163:25 176:14,15
186:13 217:15
241:10 264:7
276:22 294:2
389:6
**scan** 81:7
**scanned** 56:11
86:4
**scanner** 80:11
**scanning** 85:24
**scans** 81:8 85:18
**scenarios** 96:23
**schechter** 41:17
42:24 43:8 103:25
112:15,16 114:9
114:11 118:6
**schedule** 93:8
380:17
**schemes** 195:23,25
**schick** 384:8,10,14
384:17,20,23
385:3,21 386:6,23
**schonfeld** 2:9 6:3
25:22 37:7 55:21
102:15 203:3
**school** 231:11,13
231:22 308:8
**schools** 231:24
**schtick** 195:10,16
195:21
**scratch** 56:8 76:17
76:17 370:2 371:7
**screams** 276:20
**screen** 23:22
**screens** 11:17
**screwed** 181:21
215:15 263:7
374:18

**scroll** 54:21
**scrolling** 47:3
237:20
**sdny** 265:17
**search** 82:10,15,22
83:9 84:4,12 85:8
**searching** 82:13
**seared** 296:8
**sec** 301:14,14,15
**second** 23:20
24:23,24 31:7,9
36:10 44:13 47:13
53:16 63:5,9,16
75:13 79:15 93:6
93:15 95:15
101:13 131:7
132:22 160:3
175:8 187:23
206:11,15 216:9
216:13 228:25
239:4 240:10
280:24 286:18
289:7 313:23
317:25 330:14
335:20 361:15
362:13 364:10
369:18
**seconds** 207:11
368:22
**section** 236:5
356:6
**sections** 233:24
**sector** 303:11
382:23
**secular** 231:12
**security** 304:24
305:2
**see** 11:18 12:24
14:15 23:22,23
25:7 26:21 27:25
31:21 38:12 53:20

53:21 56:10 58:17
62:17 64:6 65:4
78:20 79:16 84:9
84:19,20 88:3
89:19 103:7
117:23 127:22
141:20 151:5
152:3,8 156:24
157:3,4 159:7,12
160:10 161:4
163:7 166:17
167:10 172:25
173:22 176:14
180:19 186:14
189:17 190:7,8
193:7 206:8,15,16
206:18,20 213:5
213:21 229:4,6
259:6 260:11
274:3 282:7
303:16 328:25
332:19 336:3
340:22,24 369:2
369:13,15 377:8
382:15
**seeing** 203:9
337:23
**seeking** 174:3
272:5
**seen** 188:15 231:5
264:9 274:5,8,9
346:25 349:21
375:5,9,13,14
**selecting** 316:12
**sell** 20:8 234:24
**selling** 62:18 348:7
**semitic** 268:18,19
**senate** 294:12
**senator** 226:14
**senators** 272:2

**send** 17:2 26:5
29:17 79:8,13
88:20 158:24
162:13,15,19
163:13 230:16
260:15 293:18,21
293:22,23 295:12
295:13,22,23
335:20 341:22
361:21 365:9
**sender** 54:4
190:15
**sending** 62:13
87:23 88:17
189:24 249:8
250:24 252:24,24
273:8 315:17
**sends** 56:11 80:5
172:20
**sense** 9:11 136:20
167:20 240:4
**sensitive** 332:17
**sent** 23:9 25:24
43:3,16 54:3
93:25 99:16 100:3
120:3 126:15
128:2 161:12,12
161:15,20,24,25
162:2,9,10,10
164:21 166:2,5,15
174:15 177:6
187:8 191:7
192:17 193:6
194:4 230:15
249:5,11 284:16
293:18 336:10
342:24 343:6
365:6 391:6,14
**sentence** 175:9
214:22 221:7
224:25 226:6

**[sentence - signed]**                                        Page 50

245:10 246:5,7
268:18,18
**sentenced** 237:8
237:11 246:18
253:19 315:4
**sentences** 243:21
**sentencing** 266:2,3
266:6 267:2
328:17 376:19
377:3
**sentiment** 242:6
**separate** 182:16
222:17 294:13
297:23
**separately** 35:6
137:7
**september** 3:18
128:10 151:21
153:3
**sequence** 122:11
129:6 286:25
289:4
**serious** 314:16
**serves** 195:19
**service** 94:24 95:2
96:18 232:16
317:22 356:19
360:3
**services** 60:13,19
61:7,24 227:6
279:8 304:3
**servicing** 69:19,22
69:23 70:3,6
**session** 9:8
**set** 3:11 23:15 24:4
24:20 34:5 45:17
48:3,8,24 113:8
192:4 193:22
337:20 340:11,12
340:15 341:10,13
341:17 397:9,17

**sets** 31:4
**setting** 47:24
129:17
**settle** 196:18,19,19
325:25 326:3
**settlement** 3:17
150:25 151:17
153:19 154:17,19
154:20 156:7,17
156:23 157:17
321:22
**seven** 20:9 184:8
184:11,14,16
288:22 320:10
321:10 345:22
378:21 384:21
385:25 388:16
393:18
**shabbos** 227:4
297:13
**shalom** 279:25
280:3
**shame** 196:5
**share** 132:16
**shared** 199:5
**shareholder** 47:6
**sheet** 398:1
**sheets** 157:11
**shenanigans**
289:16
**shift** 335:19
**shifting** 317:24
**shipped** 187:16,17
**shipping** 294:20
**shira** 2:13,14 6:2
374:17
**shirley** 17:11
**shmuel** 345:7,15
**sholom** 267:7
**shook** 123:20,21

**shoot** 89:7 240:23
**shop** 19:6
**short** 214:3 360:17
**shorthand** 1:19
397:5
**shortly** 113:12
126:15 284:11
293:12 367:23
**shot** 374:24
**show** 23:8 26:17
53:14 103:5
115:19 127:15,17
150:19 151:24
160:2 168:18
190:5 213:3 216:8
229:2 242:3 259:4
261:25 262:2,7,12
274:21 315:24
338:4,16,19,21
**showed** 25:9
158:21 162:20,20
167:14 203:11
338:5 339:5
348:18 361:14
**showing** 25:6
30:25 59:14
199:10 242:11
**shown** 35:12
173:12
**shragie** 354:22
**shtus** 297:18
343:23,24
**shul** 229:7 278:2
331:12 345:18
**shuls** 322:25
**shus** 353:13
**shut** 71:20,25
73:17 74:2 75:7
95:5,6 172:2
215:17 256:2
295:3,7,9 313:2,5

313:6,9,24
**shuts** 312:11,13
**shutting** 294:24
310:16,17 313:11
327:19
**shvuyim** 237:24
238:3,11,15,18
239:8 240:25
241:9 265:9
**sic** 89:3 90:4
**side** 13:3 34:19,19
122:8 223:8
227:13 243:6,6
257:18 260:5
327:17 372:12
**sidetracked**
288:20
**sign** 15:6 33:2,9,13
35:18,18 36:16
58:13 79:25 80:3
80:4 81:6 99:13
101:21 102:2
123:6 130:13
131:8,13 132:5,5
133:2,6,16 134:24
141:25 155:6,8
175:20,24,25
176:11 234:21,24
263:9 290:21
394:6,7
**signature** 34:13,14
36:20,23,25 37:14
55:4,8 56:12 79:5
151:18 152:18
164:10 180:21
284:16 311:20
331:24 332:7
397:21
**signed** 15:5 31:5,7
37:6 56:14,23
57:6,12,18,21,24

**[signed - sort]** Page 51

58:8 59:14 72:8
77:25 78:3,5 81:3
81:12 90:8,15
91:8 92:12,23
93:22 95:25 102:4
119:22 127:4
128:3 156:8,10
164:13,17 165:5,7
168:14 169:8
170:2 174:14,14
174:18,19 175:4
177:14 178:16,17
178:18 180:5
181:4 185:7,9,10
185:11 287:24
288:14,17 289:5
290:25 291:15,17
299:7,13,16 344:6
356:12,13 359:21
394:6 396:15
**signing** 31:24 55:6
56:18 59:25 60:6
61:5 131:3 134:16
174:16,16,24
176:13 224:10
229:12
**signs** 33:6 130:16
132:18 289:9
**silber** 193:4
337:16 344:19
361:11
**silently** 233:14
**silly** 40:14
**silver** 261:13
263:25
**similar** 302:15
308:7,8 346:24
**simple** 128:9
296:22
**simplest** 156:13

**simplify** 342:6
**simply** 37:13
168:7 170:8,13
177:19 234:12
235:9
**simultaneous**
169:12 195:9
233:12 298:22
331:10
**single** 59:9 66:4
82:12 267:19
**sister** 217:3
**sit** 58:4,6 108:25
143:10 252:16
253:16 263:4
268:16
**sitting** 12:23 17:15
94:2 140:9 180:7
187:19 189:5
227:19 237:13
238:16 239:20
251:4 253:25
254:2 255:17
360:4 373:22
389:9
**situation** 180:6
235:6
**six** 190:10 276:13
388:16 395:2
**size** 307:10
**skipping** 33:24
**sky** 301:24
**skype** 30:16,19
**slander** 221:11
225:4,17,24
249:14,14 250:8
250:13 253:2,2
336:12 337:4,21
363:12,12,15,18
363:18,24 364:4

**slandered** 226:11
249:24 250:6
**slandering** 221:13
225:6 233:22,25
**slavia** 388:13
**sleep** 8:20 263:3
**slip** 149:14,21
**slow** 54:18 72:7
190:12 238:11,18
**slowly** 233:14
**small** 32:22 114:4
320:14
**smell** 202:13
**smelled** 202:12
**social** 136:7
**society** 225:16
**soft** 177:10
**sold** 386:4
**sole** 131:2
**soleimani** 344:24
345:4 361:12
**solutions** 5:17
**solvia** 378:25
**somebody** 70:11
81:8 105:9 122:21
181:17 209:13
215:13 223:24,24
224:7 226:18
239:18 309:24
366:24
**somebody's**
132:23
**someone's** 12:25
**somewhat** 235:21
**son** 31:17 45:7,24
56:4,17 60:20
104:17 118:15
135:3 161:18
263:8 322:17,18
352:9,11

**soon** 40:21
**sooner** 184:20
**sordid** 235:8
**sorry** 6:10 24:9
28:13 34:2 40:18
40:22 54:25 61:3
66:13 78:4 80:22
85:19,20 89:7,19
105:25 113:21
118:4 120:14
132:24 142:8
146:3,13 184:13
201:17 217:13
232:9 235:17
243:5 245:3,25
247:17,17 249:12
254:11 257:14
259:5 288:15
302:18 303:18
306:10 309:11
314:25 321:19
326:17 327:15
328:3 329:5 331:8
339:22 347:17
353:14 355:16
358:19 368:9
369:10 370:2
381:21 382:13
385:11 388:19
**sort** 9:7 14:24
18:13 35:5 71:9
81:16 88:25 92:16
92:20 93:14 98:18
100:16 102:17
106:13 111:10
116:12 118:8
120:19 126:20
132:6 136:13
147:20 149:19
177:8 195:22
216:23 249:10

Page 52

265:8 288:9 301:8
310:4 352:13
359:6
**sounded** 365:15
**sounds** 86:10
158:17 176:9
178:21 198:24
244:23 278:11
299:20
**south** 21:17 49:5
273:16,17,18,22
380:13
**southern** 1:2 5:11
265:16
**spades** 117:15
**span** 291:19
**speak** 41:7,17 42:4
44:25 51:4 98:24
105:25 109:15
128:14 221:9
225:2 269:20,23
270:2,4 302:14
325:2 333:10
355:25 364:6
**speaking** 39:22
61:18 65:21 68:13
129:8 269:7,7
313:18 330:10
**spec** 245:25
**special** 300:7
**specialist** 5:16
**specific** 14:10
45:10 60:9 61:18
70:25 92:21 94:6
132:20 141:4
181:16 198:2
212:15,15 233:24
250:7 251:25
275:9 293:20
309:6 315:6
371:20 393:14

**specifically** 12:11
42:21 46:16 61:18
68:13 75:25 77:12
97:25 119:8
141:15 177:18
212:6 232:7
292:10 318:6
339:16 340:4
347:14 387:2
**specifics** 51:17
**spelling** 343:3
**spend** 139:4
246:18,20 298:6
**spending** 368:10
**spent** 232:5
**spit** 219:19
**spoke** 39:21 41:9
41:22,22 42:8,15
62:3 75:21 114:10
114:11 121:11
122:24 125:16,17
129:25 177:11
203:3 209:5,9
219:12 242:20
313:17 352:18
**spoken** 8:2 41:11
44:3 55:13 128:13
242:8 261:17
263:19 264:2,12
**springs** 261:13
263:25
**square** 188:13
**ss** 396:2
**stabilized** 302:25
303:3,10,12,15
374:25
**stable** 122:22
163:23
**stacks** 84:10,11
**stamina** 378:23

**stamp** 88:6 103:10
103:11 159:15
**stamped** 3:15,19
3:21,23 102:23
159:3 190:2
212:23
**stand** 234:13
248:10
**standard** 307:25
**standing** 282:9
**stands** 194:7,9
**start** 72:6 85:11,13
152:25 154:6
158:15 173:18
190:19 194:16
230:3 251:18
259:23 279:19
291:15 344:4
370:9 392:14,14
**started** 83:6
144:16 186:2
194:11 199:19
201:2 286:21
291:8 293:25
294:4 302:7 312:8
372:5
**starting** 41:20,23
**starts** 103:17
190:14,16 234:3
294:2 311:23
**state** 1:19 5:21
6:16,20 226:13
275:6,24 276:3
282:2 294:12,12
396:2,20 397:2,6
**stated** 34:11
243:20
**statement** 34:15
377:2 385:17
**statements** 359:5

**states** 1:2 5:11
21:13,15 33:22
278:23
**status** 237:6
**statute** 267:23
**stay** 138:25 213:25
393:4
**steal** 196:2 384:15
386:5
**stealing** 181:25
195:21
**steam** 163:17
168:6
**step** 52:11 175:2
239:18 240:7,11
352:8,10
**stepdaughter**
352:12
**stephan** 31:5,7,16
31:23
**stepped** 194:2,6
**steps** 256:9 375:18
**stern** 17:9 259:10
260:19,25 261:6
261:18 262:6,13
263:19,24 264:7
**steve** 50:6 335:13
335:15
**steven** 216:12
**stick** 275:3
**stipulated** 6:5
**stole** 182:7 354:6
384:11,18 385:4
389:7
**stolen** 354:17
**stop** 14:10,21
54:19 150:15
165:7,10 168:24
169:4 256:10
287:20 289:16
297:7,7 381:10,19

381:23 386:13

**stopped** 122:24,25 195:3 256:14,18 257:8 274:17 300:4,10 312:22 313:14,18 361:2

**store** 19:6

**stores** 303:15

**stories** 162:25

**story** 167:4 214:15 215:2,3,4,5,6 242:17,18,21,24 242:25 243:3,15 260:6 271:13 280:17 301:23 392:15

**strategy** 298:23,24 374:9 375:20 376:2

**street** 2:11 66:23 266:10,11,13 282:10

**strike** 42:2 99:9 296:12 330:8 382:21

**strong** 284:21

**stronger** 214:24

**strongly** 195:2

**stuck** 181:14 223:5 263:14

**study** 346:2

**stuff** 11:9 29:13 47:10 149:25 248:15 300:9 306:16 336:9,10 354:13

**subject** 54:4 62:8 88:16 104:3 159:22 190:15 199:7

**subscribed** 396:15 398:22

**subsequent** 122:15

**substance** 102:11

**substantial** 75:2

**substantially** 301:2

**succeeding** 139:9 139:11

**successful** 270:21 271:5

**successfully** 133:15

**sue** 235:11 251:10 251:20

**suggest** 52:2 53:9 288:9 327:10 328:8

**suggested** 76:16 79:13 119:4 136:18 326:24 327:5

**suggesting** 7:21 36:9 72:15 92:8 171:14 241:8 286:17 287:5 291:6 292:15

**suggestions** 116:19 136:16

**suggests** 224:24 243:17

**suicide** 249:4 357:19,20 358:10

**suing** 182:14 196:17 215:14 251:15 298:17

**suite** 2:11

**sums** 189:21

**super** 153:21,25 157:19

**superintendents** 317:16

**supers** 154:5,10,13 154:15,21 317:16

**supper** 313:10

**supply** 268:5

**support** 264:16,16 264:20 266:6,25

**supported** 243:11

**supporting** 226:5

**supports** 225:10

**suppose** 142:19,21

**supposed** 115:16 163:22 181:25 198:16 201:5 275:25 340:25

**supposedly** 286:7

**supreme** 298:11

**sure** 7:11 9:11 16:13,23 19:2 24:16 29:23 32:13 38:15 41:11 55:15 55:22 62:12 64:17 66:14 67:23 76:3 76:6 78:17 89:8 94:22 96:7 102:16 107:7 111:11 126:25,25 127:6 128:6 131:14,15 132:25 138:5 141:6 143:19 171:13 173:3 174:19 177:11 180:17,18 182:2 184:18 190:20 209:15,15 210:3 210:23 214:19 215:19 221:16 225:18 229:9 233:19 248:13 251:25 256:11

269:19 271:3 297:24 298:3,4 303:13 317:21 319:18 334:6 349:5,7 357:11 358:12 367:25 372:25 386:9

**surfaced** 286:7

**surfside** 277:13 278:6 387:21,22

**surprise** 272:9 375:16

**surprised** 163:24 163:25 170:17

**swear** 6:8

**swearing** 6:11

**swieca** 66:6,20 67:2,3,8,10,10,16 67:16,21,22 68:4,9 68:13,15,23 69:25 70:5,8,23 71:11,16 72:21,25 73:8 74:17,24 75:14 76:12,18 156:4 318:4,9,21 325:5 335:17

**swieca's** 327:11

**swiecas** 71:3 77:2 77:6 78:14 319:5 319:11 320:6 321:7 322:9 323:8 323:11,16 325:10 326:22 327:5

**swindled** 386:23

**switch** 312:12

**sworn** 397:10 398:22

**synagogue** 278:9 323:3 345:25 346:20

**system**  50:24 86:3
  104:19,20 118:13
  118:14 202:15
  305:20 310:9
  314:6 346:24
  347:2,5 353:6
**systems**  187:16
  309:22 345:6
  346:23 347:22
  350:10,12,15,25
  351:9,15 353:23
  354:2,12,16

**t**

**t**  3:9 4:2 213:9
  261:9 280:4
  316:25 396:1
  397:1,1
**table**  58:24
**tablets**  11:8
**take**  6:6 14:3,6
  24:3,25 27:4
  33:18 37:8,20,22
  41:8 44:12 52:11
  58:21 59:2 64:22
  86:19,25 87:3,5
  88:5,9 93:7
  103:11 105:19,24
  115:9 127:8 138:8
  139:19 150:24
  152:23 154:2
  155:4 161:3
  162:17 164:2
  188:19 193:14,15
  195:13 214:15
  226:18,25 240:24
  242:17 256:9
  259:22 262:10
  270:3,23 272:24
  278:14 284:18
  290:5 324:15
  336:23,24 337:6

  341:6 351:6
  355:17 358:25
  359:2,3 373:3,25
  374:16 385:2
  389:5 391:22
  392:16
**taken**  5:7 31:13
  87:20 158:11
  207:18 221:3
  227:22 242:7
  247:22 248:4,7
  273:3 311:20
  314:4 336:25
  369:7 395:4 396:7
**takeout**  381:20
**takes**  98:25 326:14
  326:19 368:22
**talk**  43:13 79:14
  92:22 105:18
  121:23 124:7
  129:12,13 143:19
  148:8 166:15
  167:8 227:11,13
  244:19 331:13
  352:20,24 353:3
  357:3 360:9 372:7
**talked**  28:22,23
  84:6 113:24
  205:24 206:2
  250:17 392:12
**talking**  23:3 37:4
  91:4 108:23
  126:23 133:2
  164:5 175:5 186:2
  197:20 199:3
  200:16 205:13
  240:25 265:24
  291:25 292:6
  297:7 299:12
  307:25 372:24

**talks**  250:11 254:5
**tamara**  17:9,10
**tangent**  81:17
  139:7 140:8
  261:23
**tangents**  334:13
**tastes**  278:10
**taub**  345:7,9,14,16
  345:17,24,25
  346:15,19 347:11
  347:21 348:12,24
  350:8 354:20
**taub's**  346:25
  347:5
**taubs**  345:12
**tawil**  381:25 382:3
**teaneck**  43:15
  217:2,3,5
**tech**  108:19
  160:13
**technology**  110:10
  110:11 111:7
  113:23 382:17
**telecom**  304:17,21
  305:3 353:22
**telephone**  26:8
  28:24 38:24
**tell**  9:2 33:8 48:25
  50:15 56:15 60:8
  60:21,22 62:16
  65:24 71:24 72:11
  76:7 78:11 86:6
  98:16 102:16
  104:15,24 108:11
  109:2 112:13,20
  118:24 119:4
  121:21 127:11,17
  127:19 130:15
  131:14,15 139:2
  139:11 143:10,19
  143:24 144:19

  161:6,11 165:6
  173:19 174:2
  177:5 178:19
  179:10 182:2
  184:25 185:22
  187:4 188:19
  201:16 213:14,23
  219:22 221:15
  222:24 224:20
  229:13 236:20
  250:5,6 253:25
  260:15 261:15,15
  263:8 271:14
  295:6 297:21
  306:18 332:19,19
  336:12 338:16,17
  338:19,22,24
  342:3 358:10
  360:13 365:8
  367:21 394:4
**telling**  136:13,19
  186:13 227:11
  251:4,10,18,18,19
  293:22 294:20,25
  294:25 295:12
  297:9,10 313:18
**tells**  185:5 189:12
  215:9
**teman**  40:16 41:23
  42:16 43:16 44:6
  44:25 52:3,6,22,25
  73:14 82:14 83:7
  83:21,23 84:14
  85:5,10 88:16,23
  90:23 91:6 92:8
  92:14,15 95:5
  97:17 103:19
  104:4,13 108:2
  113:5,13 117:7
  122:12,17 124:14
  124:15,19,24

126:13,15 128:11
129:7,20 130:18
134:24 136:12
144:4,8 147:8,12
147:16 160:13
162:3 163:2
164:14 165:20
166:23 167:16,22
168:7 170:9,10,22
170:25 171:15
172:6,13 173:13
176:22 177:3,23
177:25 181:10,21
183:23 184:22
186:4 192:17
193:4 194:3,8,17
197:12,17 199:21
207:4 208:11,18
209:2,6,22 211:21
212:8,16 215:9
216:15 217:16,18
218:2,4,7 219:9
220:13,19 221:3,9
221:23 222:8,9,10
223:17,21 224:13
224:19,23 225:2,8
225:24 226:4
227:2,21 230:16
241:14,17 243:23
245:20 246:10,11
246:22 247:6,7,13
248:22,24 249:14
249:24 250:8,13
250:18,22 251:9
252:5,8,8 253:23
254:18 261:19
262:12,22 263:20
264:3,16,20 272:4
272:5 288:13,16
310:16 313:16
315:25 328:21

334:16 347:9
350:13 352:25
353:7,19 354:9,10
354:16 355:7,13
356:4 357:2 358:2
359:6 362:17
371:21 374:10
376:12 377:8,14
392:25
**teman's** 106:15
172:22 212:2
236:11,24 237:6
241:9,11 243:11
265:6 272:16
315:11 330:11
331:4,15 375:22
377:2
**teman.com** 54:2
**ten** 8:10 10:12
16:17 17:7 51:10
51:15 67:17 68:11
68:12 86:20,21
94:6,7 100:15
107:12 108:16
143:20 149:17
246:7,20 253:19
254:3 272:21,23
272:24,24 309:5
360:15,15,23,24
362:7,11 381:12
381:16 382:9
**tenant** 310:22
313:22 314:2,5,16
**tenants** 94:17
120:2 198:15,15
281:14 295:5,5
308:6 310:11,20
310:23 311:3
312:14,21 314:11
**tennis** 70:17

**term** 74:15,16
130:16 132:20
133:4,20,23
134:16,23 195:15
205:2,7 217:23
303:14 370:21
371:2
**terminate** 394:22
**terms** 7:3,10 9:3
13:24 14:8 18:13
78:15 82:11,12
84:5 147:23
229:11 236:6
249:21 273:10
285:19 288:21
296:9 302:17
318:17 325:9,24
**terrible** 249:12
**test** 161:2 202:13
**testified** 6:17 56:9
56:12,25 63:7
95:9 120:18
133:13 176:17
197:8 198:25
206:24 208:14
232:23 237:2
242:4 245:19
256:16 257:7
292:12 296:15
301:25 302:10
303:8 306:25
307:6 308:17
309:10 317:25
331:3 344:8
364:10,20 376:22
390:22 393:6
**testify** 8:13,23
173:11 324:23
328:15 329:6,8,24
331:15 376:17,18
385:9,12

**testifying** 208:7
285:7 328:21
330:11 364:22
369:18 390:13,19
**testimony** 60:24
121:12 129:4
296:11,20 299:2
340:5 345:24
359:5 394:3 396:7
396:9 397:12
**texas** 49:6
**thank** 6:4 121:13
157:9 158:23
201:7 206:5
211:18 221:5
263:22 264:5
290:14 311:19
329:22
**thanks** 54:8
381:20
**theft** 195:21
227:23,24
**thereof** 33:24
**thin** 119:16
**thing** 34:2 35:16
78:13,16 82:3
104:5 117:16
152:7,12 154:4
158:20 172:2
212:15 227:20
237:16 243:25
245:18,21 246:12
260:2 269:17
270:23 278:13
304:25 337:17
338:2 343:18
357:4,8,9 359:10
359:11 360:6,14
362:10 372:16
373:17

**[things - time]** Page 56

**things** 42:20 47:2
61:15 76:5 108:24
121:21 123:9
134:6 138:25
140:3 143:22
161:24 173:13
175:7 182:10
194:20 198:4,6
202:16 205:7
227:21 231:24
234:2 237:18
247:5,16 249:6,9
249:11 281:11,17
281:17 292:7
294:16 315:3
320:21,23,25
332:20
**think** 12:23 14:12
18:15 29:18 30:22
37:3,3 40:3,11
42:25 46:10 51:3
52:19 57:3 59:21
62:18 67:17 68:3
71:4 73:21 74:13
74:15 86:16,24
99:6,12 102:21
103:16 104:16
113:2 115:7
117:18 122:19
124:12,14 128:15
128:17 129:10,13
129:24 135:6
136:18,18,21,23
141:24 144:15
145:8 150:13
156:13 157:18,22
167:7 171:4,8,22
174:12 177:13
181:7 183:8
184:11,16 185:25
187:2,3 189:15

190:20 191:7,10
191:12 192:4,11
192:13,13,16
193:5 198:18
199:11,25 202:3
202:16 203:17,18
204:22 205:2,25
206:8 207:5 214:9
215:5,10,12,25
220:6 221:8
222:22 224:25
229:22 230:18,19
232:25 233:8
237:15 240:9
241:4 242:4,24
245:12,18 246:11
249:5,9 251:2,13
251:23 253:3
257:10 258:21
261:4 264:6
267:23 268:7
281:8 284:8,10
292:6 298:10
299:9 303:8 304:8
305:10 307:6
308:2,9 309:4,7
314:3,7,21 316:13
316:20 317:15
323:23 326:16,18
335:12 337:17,25
337:25 339:14
340:4 342:15
344:5 345:15
348:12,22 349:4
351:2 352:22,23
353:2,20 355:8,23
356:24 360:6
361:19 362:14,25
364:10 371:4
372:4 373:4,14,16
374:16,18,21

378:13,15 383:14
387:7,8,18 392:24
393:10
**thinking** 309:23
388:25
**thinks** 105:11
178:17 182:7
373:15
**third** 99:11 101:20
101:21 286:20
289:8
**thought** 74:22
116:23 124:7
134:11 135:13
174:14 188:20
224:16 228:7,10
228:13,14 262:17
263:19 309:7
311:11,13,14,25
348:3,5,20 355:15
367:24 388:20
**thoughts** 7:14 89:2
243:14
**thousand** 295:5
379:17
**thousands** 269:3
**thread** 3:15
102:23 103:10,15
159:16 216:20,22
**threat** 185:23
249:5
**threaten** 252:9
294:2 373:2,3,23
**threatened** 243:23
245:16 252:7
374:2
**threatening**
293:21
**threats** 120:4
221:10 225:3
248:24,25 249:3,3

249:10,11 252:7,7
**three** 19:25 25:12
25:17 28:13 30:24
31:2,4 76:2
100:23 103:9
109:2 110:13
125:11 144:13
145:16 164:25
196:11 265:12
286:9 289:2,3,11
290:17 317:7,8
365:13 386:22,23
**throated** 221:12
225:5
**throw** 311:12
373:16
**thunder** 389:7
**thursday** 103:18
189:10
**tied** 148:4
**ties** 176:21 177:2
179:19
**till** 87:10,11 139:4
189:11
**time** 5:14,15 7:5
7:23 14:2,7 23:25
24:3,13 35:25
37:22 39:22 40:3
44:15 47:7 55:17
58:16,21 60:17
62:3,8 64:22 75:6
77:24 81:25 86:22
87:19,21 97:17
98:25 103:11
104:16 119:21
120:22 122:16
126:18,19 134:20
135:13 138:14
142:11 143:14
148:13 151:14
153:23 157:11,24

158:9,12 165:24
168:11 170:15,16
171:4 174:12
185:6,15,20
188:22 189:8
190:17 203:9
207:16,19 214:23
224:3,4 227:7
230:24 231:2
232:5 240:22
251:24 257:21
258:11 260:16
266:20 271:14
272:20,25 273:4
275:2 276:22
277:2,5 280:25
286:9 288:21
289:3,10 290:17
291:19 295:2,4
297:10 299:3
308:21 325:3,5
336:19,24 337:6
337:17,23 347:4
350:9,24 352:6,17
357:7 359:7
367:15,21 368:2
368:11,11 369:3,5
369:8,11 372:11
372:14 374:18,19
380:21 389:14
390:9,16 395:5,6,8
**timeline** 127:2,6
 392:12
**timely** 235:10
**times** 8:7 50:10
 51:7 52:25 100:15
 120:13 125:11
 131:16 142:5
 143:20,21 164:19
 164:25 171:21
 175:10 177:11

195:5 217:11
220:5,24 245:13
249:23 257:7,20
270:11 310:14
342:3 344:8
363:18,24 372:8
372:22 386:22,24
**timing** 203:2
 295:16
**tips** 12:22
**title** 24:3 45:8,10
 160:12 279:5
**today** 5:13 8:14,25
 10:2 16:17 17:7,8
 20:6 26:9 29:25
 34:16 46:11 51:24
 93:16 115:11
 116:6 122:3
 155:23 180:22
 237:17 248:19
 267:18 283:9
 284:15,24 287:19
 292:12 357:8
 358:11,23 364:14
 364:20 389:10,25
 390:6,8,14,16,19
 392:5 393:6
 394:14
**told** 52:25 93:24
 123:3,5 124:5
 129:23 136:21,22
 173:6,11,20,22
 174:22 178:23
 214:14,20 219:12
 220:16 226:13
 237:16 268:3
 277:24 293:18
 297:7 313:7
 330:19 338:3
 351:14 356:20
 357:10 365:12

**tomorrow** 369:4
**top** 24:13 54:22
 58:18 178:19
 179:8 190:13
 191:12 193:2
 267:20
**topic** 200:10,13,16
**torah** 279:25
 280:4
**total** 63:9,16
 171:24 291:25
 386:17,22
**totally** 131:22
 252:11 327:19
**touch** 174:9
 187:23 218:12
 219:3 244:5 245:8
 272:11 349:22
 362:21 380:19
**touched** 378:13
**touching** 37:4
**tour** 84:19
**tower** 277:21
**towers** 278:7
**town** 49:21 50:4
 375:4
**tpf** 95:16,17
 101:17
**track** 101:4
 138:25 217:11
**trafe** 251:5 297:11
 297:12
**train** 355:14
**training** 17:23
**transaction** 97:24
**transactions** 57:7
 96:12 98:14 99:4
**transcript** 158:16
 396:6,8 397:10
**transitioning**
 387:20

**translate** 195:12
 195:23 279:2,3
**translated** 224:11
**translation** 237:25
**travails** 241:17
**traveling** 382:12
**treasurer** 279:7
**trial** 93:20 234:5,8
 236:12,24 237:2
 309:6 328:22
 330:11 331:4,16
 376:23 385:9,12
**trick** 165:2 169:22
 169:23 295:18,19
**tricks** 63:14 169:5
**tried** 177:10
 311:14 321:22
 386:13
**trip** 8:9 148:18,21
 153:17 154:4
 158:22
**triple** 103:16
 387:7
**troubles** 375:23
**true** 33:25 34:8,9
 34:13 36:3 37:18
 38:16,20 39:12,19
 40:8 182:19,19
 205:5 234:10
 360:7 396:8,10
 397:11
**trump** 269:12,20
**trump's** 270:6
**trust** 388:23
**trustees** 279:8
**trusts** 386:5
**truth** 9:2 243:7
 261:15,16 359:19
 359:20
**try** 61:3 114:23
 138:25 140:14

**[try - unpack]**                                             Page 58

168:20 173:15
223:6 228:17
239:25 241:19
254:23 262:15
286:12 295:20
321:14,15 356:10
381:17
**trying**  17:4 32:21
63:13 73:19 86:23
113:8 114:14
118:4,7 120:10,11
120:15 139:9
140:2 165:7,10,15
168:22,23,24
169:5,22,24 170:4
170:5 171:13
177:7 201:11,18
221:20 233:16
235:15 261:15
263:21 266:2
285:15 295:18,19
353:5,6,12 363:3,8
367:17 381:7
**tuesday**  5:13
395:4
**turn**  223:6
**turnaround**  281:9
281:10
**turned**  122:20
**turnoff**  124:8
**twice**  144:11
371:25 372:17
**twisted**  358:6
**twitter**  26:7 28:19
28:20,23 38:23
**two**  11:12 16:21
16:22 25:7 27:3,5
27:8 28:13 34:18
56:15 59:16 61:15
64:24 76:2 82:7
82:20 111:10

123:6,9 124:14
137:4 144:13
145:16 154:7,21
157:9 158:21
159:10 160:6
161:9 175:7
176:18 177:22
180:8 197:9 203:5
203:12 215:24
218:14 222:23
231:20 232:4,5
234:2 235:3
253:10 265:12
268:16 272:2
275:23,23 280:15
284:8,18 286:8
289:10 292:6
304:8 305:10,15
305:15 337:11
344:6 345:12
351:15 357:20
358:18,20 372:8
372:22 373:17,19
375:18 387:13
388:17,21
**type**  112:11
132:11 138:18
300:15
**types**  29:5 30:17
51:19 76:24 108:9
108:15 110:8
150:3 309:17
343:9
**typing**  343:12

**u**

**u.s.**  267:19
**ultimately**  154:16
349:9
**ultra**  278:21,22
**unbelievable**
334:13

**uncle**  217:16,25
**unclear**  389:15
**uncommon**  260:10
**underlying**  281:22
**understand**  22:2
28:6 60:24 67:6
68:20 76:23 82:24
97:18 142:5
149:24,24 150:2
171:18 186:5
189:16 193:25
194:4 201:3,12,19
202:22 210:3,21
224:11 255:25
283:8,23 315:4
353:11 354:10
379:6
**understanding**
72:17 76:13 85:8
85:22 92:18 154:8
179:17 183:16
210:2,7 224:14
228:4 236:2
263:23 292:13
300:17 304:22
305:13 308:8
315:10 323:5
339:17 341:9
354:15 359:16
**understood**  9:16
17:6,16,16 20:21
20:21 29:25 32:25
47:17,17 49:25
58:14 60:23,23
67:25,25 69:14
70:15 72:14 73:10
73:25,25 79:9,12
89:23 96:23 97:18
100:8,16 101:5,7
115:23 117:12
119:7 121:22

122:9,9 125:22
127:12 129:16
133:13 135:8
137:5 142:3
143:12 144:3
149:8,13,23 157:5
165:16 167:12
170:18,20 172:19
177:16 179:13,15
180:2,16,20 184:5
189:7,9 203:22
207:5 231:16
232:2,16,18
235:25 236:7
307:4 311:6
319:24,24 320:24
326:20 330:22
333:22 344:16,19
345:24 355:22
360:10 362:5,5
363:9 386:11
387:6 389:21
**undo**  276:17
333:19
**unfair**  214:18,21
**uninstalled**  93:19
**unintentionally**
191:7
**unique**  223:21
**unit**  153:22 154:2
395:2
**united**  1:2 5:11
278:23
**units**  294:20
305:24 307:17
393:2
**universal**  223:22
**unjust**  268:17
**unnamed**  225:25
**unpack**  94:4

**unrelated** 96:12 327:20
**unwind** 173:15 174:3
**updates** 104:3,8
**upgrade** 310:4
**upscale** 308:4
**upset** 122:14 313:9
**upstate** 388:4
**usage** 45:15
**use** 26:15 27:10,13 28:3,4,4,24 29:3,6 29:16 30:2,11,14 30:17 38:23 45:14 54:7 74:15 91:17 91:20,21 94:14,15 118:20 119:12 122:22 135:23 168:24 175:12 203:6 314:12 316:12 331:22 332:2 334:9 339:17 340:2 371:22 389:7
**useful** 69:12 89:22
**uses** 310:10 331:19
**usually** 29:4 79:21
**utrecht** 332:3
**utterly** 268:13

**v**

**v** 218:8 280:5 398:2
**vague** 209:11
**valid** 181:23
**valuation** 105:8,17 105:19 106:3 112:22 113:25 123:9 134:4 135:9 350:5

**valuations** 105:5
**value** 105:10
**varied** 18:19 108:17
**various** 23:7 49:8
**vendor** 96:19 148:4,5,14,24 149:5 300:15 351:17,18 353:7 360:22
**vendors** 144:9 147:5,9,17,22 148:15 149:3,7,9 149:11,13 150:6 175:3,19 176:6,7,8 235:2 299:25 300:13 301:8 356:23 360:11 371:23
**verification** 30:24 31:11,20 33:17,21 34:21 35:6,8,10 36:6,10 37:7,10 38:5,9
**verifications** 3:13 25:3,15 31:2
**verify** 36:14 38:16 76:10
**veritext** 5:17,20
**versus** 343:8
**victim** 377:2 385:17
**video** 1:17 5:3,16 30:15 118:2 207:7 367:23 395:2
**videoconference** 1:17
**videoconferenci...** 30:15,18
**videographer** 2:18 5:2 6:4 87:7,14,18

87:21 117:17 158:9,12 207:8,16 207:19 272:25 273:4 326:5 336:17,21 337:2 367:22 368:3,21 369:5,8,12 383:17 387:9 394:20,25
**vietnam** 379:19
**view** 132:6 221:2
**virtual** 5:3 395:3
**virtue** 130:25
**visible** 13:10,16
**visit** 271:15
**visited** 377:25
**vouchers** 289:23
**vs** 5:9 153:8

**w**

**w** 63:21 66:18 396:1
**wait** 233:13 301:14,14,15
**waiting** 338:20,23
**waiving** 39:5
**wake** 119:15 237:15 263:2
**walk** 162:16 306:3
**walked** 100:12,14 123:23 149:11 188:22
**walks** 100:11
**wall** 100:7
**want** 7:11,13,14 7:18 12:10 16:23 26:10,21 27:21 31:9 35:25 37:20 38:25 40:13,25 53:9 54:14,15,20 60:25 63:13 64:13 64:16 66:17 70:15 72:16 73:11 86:20

87:8,10,15 92:2 94:5 95:22 108:25 113:3 117:10,11 117:20 127:16,18 127:22 128:14,22 129:13 132:24 139:3,19,20,21 144:21,23 148:10 151:11,13,16 152:15,23 158:15 160:19 161:16 168:23 169:3,15 171:7,9,11 175:7 177:16,25 180:18 182:6,18 184:11 185:2 193:23 198:18,20,22 200:15 202:4,21 204:21 205:21 207:8,13,13 210:2 211:12 213:11,17 213:21,25 214:2,3 216:2 217:4,7 218:9 219:19,20 219:21,21 223:11 227:23 228:5,14 230:22 232:7,13 238:13,22 241:20 244:6 245:11,19 249:19 252:13 253:14 255:24 258:18,21 267:17 272:23 280:7,9,10 285:6 287:25 289:21 292:5 294:21,21,23 295:4 296:5 299:3 303:5 309:7 312:18 316:13 336:11,19 338:4 350:4 361:8 363:3

**[want - work]**                                                                                       Page 60

364:5,25 368:23
380:18,24 394:2
**wanted**  86:9 88:21
  88:21 95:19,20
  97:23 198:10
  215:19,24 264:8
  268:4 280:12,12
  312:6 316:10
  348:8,9,23 361:7
  361:13,20 365:20
  365:21 392:19
**wants**  105:9,23,23
  115:4 119:25
  179:19 203:16
  213:20 228:5,6
  358:7 365:6
**war**  379:19
**washington**  379:8
  379:18
**waste**  266:20
  367:17
**water**  45:15 95:7
**waterfront**  196:15
**way**  25:23 38:4
  177:13 181:2
  182:6 187:17
  192:10 195:25
  196:22 226:13
  231:4 247:7,15
  249:10 272:14
  275:19 281:7
  298:8 300:3
  304:25 321:12,21
  355:8 358:6 371:5
  389:15 397:15
**ways**  23:7 27:13
  29:23 50:19,23
  184:25 219:17
  227:24 302:9
  322:24

**we've**  44:14,19
  63:6 73:4 79:3,3
  106:22,22 108:12
  143:9 180:23
  181:11 189:14
  220:23 231:13
  250:17 251:8,8,23
  255:8 279:10,21
  284:12,23 299:23
  304:11 349:21
  367:15 371:14,14
  381:7 392:12
**website**  60:3,7,11
  60:14,19,21
**wedding**  352:6
  389:5
**week**  100:23,24
  153:15,23 154:2
  226:14 246:5,19
  253:17,18 274:17
  284:8
**weeks**  109:2
**weight**  234:13
**weinberg**  50:6,7
**weisberg**  17:9
  42:18 159:21
  340:17,18 341:7
  341:13,19,22
  342:11,23 343:8
**weisberg's**  42:19
**weisman**  42:22
  43:8 109:21,22
  110:2,12,18 111:8
  111:21,22 112:8
  113:6 114:8 116:8
  116:17 118:5,9
  126:12 129:19,22
  134:15 349:23
  350:2
**weisman's**  113:18

**weiss's**  112:8
**welcome**  54:18
  192:6 260:13
**went**  38:11,13
  60:11 75:19
  115:17 119:6
  128:16 155:11
  203:4 214:25
  223:9 224:16
  259:16 271:14,16
  277:24,24 293:16
  294:6 316:21
  365:19 376:12
  378:8,11,25
  384:21 385:7
  386:3
**whatcha**  26:12
**whatchamacallit**
  228:6
**whatsapp**  26:8
  28:24,24 29:8,15
**whatsoever**
  366:10 367:4
**wheel**  270:24
**whereof**  397:17
**whistles**  308:13
**white**  272:12
**wholly**  22:4
**wife**  15:17,18 16:5
  16:10 32:16
  277:24 283:5
**wife's**  15:21
**willing**  104:20
  222:18 268:9
  311:15 348:13
**willingly**  286:24
**win**  180:13,13
**winding**  215:23
**wish**  117:22
  241:11 377:20,24
  393:3

**withdraw**  247:10
**witness**  3:2 6:9
  50:14 86:22 87:5
  126:2 139:15,21
  150:12,22 158:6,8
  169:13,15,18
  197:2 201:7
  206:16 207:15
  213:16 221:20
  228:4,9,12,17,19
  229:16 259:12
  286:2 287:20
  329:9 336:23
  364:5 366:19,23
  368:13,17 381:17
  381:20 391:25
  393:15 397:8,12
  397:17
**woke**  336:5,6
**woman**  255:14
  256:9
**won**  323:13
**wonderful**  290:12
**woodridge**  388:4
**word**  122:22 127:9
**words**  12:13,21
  72:16 95:22 113:4
  137:7 153:16
  168:4 197:15
  230:22 238:22
  280:23,24 283:18
  300:24 317:18
  361:21 371:20
  372:9
**work**  9:16 18:7
  29:12,13,13 30:7
  45:21 50:5 75:10
  141:4 175:5 185:2
  221:22 231:10,11
  231:16,23 265:9
  265:25 312:15,17

**[work - yereim]** Page 61

314:23 317:8
376:9
**worked**  17:25
153:15,22 196:8
319:6 350:9
**working**  62:10
67:15 75:9 100:25
101:2,3 143:6
154:10 159:14
239:24,25 298:25
313:4 316:19
333:12 342:12
**works**  69:25 100:5
141:20 176:6
332:13
**world**  196:18
235:8 358:8
**worried**  306:21,22
**worry**  115:21
157:12
**worth**  40:5 62:25
105:12 115:23
125:7 191:4 221:7
221:8 224:25
301:5 381:12
**worthwhile**
141:21,22 224:17
301:5
**wow**  112:2 146:16
273:17 387:2
**wrap**  368:7 369:4
380:18,20,24
**wreaking**  276:23
**wrecked**  281:13
**write**  90:3 95:15
146:6,6 160:24
223:4 242:15,24
263:10 266:2
343:2
**writes**  54:7 114:13
118:5 146:7 194:7

199:13,17 203:23
217:14 221:23
224:23 237:21
245:14 371:15
**writing**  131:4
146:20 214:14
217:15 290:4,11
391:22
**written**  25:24
43:15 134:9,11
176:4,5,10 216:11
266:5 289:17
291:16,18,22
356:12,13 360:15
360:23,24 362:11
**wrong**  26:16 42:2
87:16 127:17
215:8 221:25
226:23
**wrote**  115:17
171:8 214:9,10,18
243:14,14 250:2
252:13 266:24
293:12,14 297:19
297:20 328:18
342:25

**x**

**x**  1:3,9 3:1,9 4:1,2
62:18
**xyz**  145:20,22
146:8,21

**y**

**y**  62:18 280:7
**yanchi**  353:16
**yeah**  14:22 25:10
25:18 26:20 38:10
56:6 64:22 78:25
80:14 85:17 87:9
88:4,8 92:4
103:13 122:5

124:5 126:23
135:19 152:17,19
155:16 159:13,24
160:5 163:8
171:17 173:5
178:14 179:24
182:17 183:15
191:4 192:9,22
193:19,23 195:18
203:18 205:12
206:22 207:22,24
229:5,13 236:9,9
237:25 239:10
244:25 247:2
249:9,18 250:24
250:24,24,25,25
251:6 254:13
258:10,19 262:8
270:22 275:22
283:13 284:10
287:14 288:10
303:22 304:20,24
306:15 307:14,19
308:19 315:15
321:5 324:13
328:7 332:10
335:11 336:6
337:3 341:18,21
342:4 343:22
344:2 345:10
346:4 347:10,13
347:23 348:8
353:10 358:3
360:12 375:4
378:15 379:8
381:5,14 382:20
383:16 386:25
387:11
**year**  57:11 68:12
82:19 98:11
203:12 216:7

257:24 262:10,10
267:5 268:16
294:16 357:20
**years**  18:2 20:9,20
51:13,15 56:15
57:4,9 59:16
67:17 107:12
108:16 110:13
124:6 148:3,6,25
149:17 160:6,15
161:9 196:11
203:12 231:20
232:4,5 239:9
246:8,20 253:19
254:3,3,4,4 255:22
257:5 265:12
266:16 268:13,14
268:17,22 270:14
270:22 281:8,11
311:3 319:5
320:10 321:10
333:4 342:14
345:18,22 346:3
347:6 348:9,11
350:23 352:5,8
356:21 360:9,18
360:21 371:18
380:10 382:9,9
383:21 384:13,22
385:25 388:16
**yechiel**  42:12,15
42:25 103:24
104:25 106:23
112:21 113:18,20
114:12,13 119:3,5
124:4,6 129:19
134:14 159:17,20
163:15 165:22
166:13,17 372:3
**yereim**  280:6

**[yesterday - zooming]**                                        Page 62

**yesterday**   248:21
**yiddish**   195:19
  217:23
**yom**   249:8
**york**   1:2,20 2:5,5
  2:12,12 5:6,12,18
  5:18 6:16 16:3
  21:12 48:20 49:8
  111:14,19 217:2
  231:21 235:8
  260:11 261:13
  265:17,20 275:6
  275:19 276:22
  277:3,6,8 281:2
  282:2 289:11
  290:22 302:22,22
  388:5 396:2,20
  397:2,3,7
**york's**   276:23
**yorker**   282:4
**young**   378:21
**yup**   78:22 214:3
  346:7

**z**

**z**   62:18 213:9
  357:4,9,17
**zero**   108:24
  140:10,10
**zoom**   12:2 29:25
  30:2,11 40:4
  274:19 381:8
**zooming**   71:9
  92:20

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER:  THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019.  PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.