- - -

SUPREME COURT IN THE STATE OF NEW YORK

COUNTY OF NEW YORK

- - -

GATEGUARD, INC.,                  )
                                  ) Index No. 657197/2019
            Plaintiff,            )
                                  )
                                  ) REMOTE DEPOSITION OF
                                  ) ARI TEMAN
                                  )
    -vs-                          ) Filed on Behalf of the
                                  ) Defendants
                                  )
                                  ) Counsel of Record For
                                  ) This Party:
GOLDMONT REALTY CORP.,            )
LEON GOLDENBERG, ABI              ) Simcha D. Schonfeld,
GOLDENBERG,                       ) Esq.
                                  ) Koss & Schonfeld,  LLP
            Defendants.             90 John Street
                                    Suite 503
                                    New York, New York 10038

- - -

REPRODUCTION OF THIS TRANSCRIPT IS PROHIBITED WITHOUT AUTHORIZATION FROM THE CERTIFYING AGENCY

Case 1:20-cv-01609-AEC-GWG   Document 154-6   Filed 02/09/23   Page 2 of 245

                          - - -

          REMOTE DEPOSITION OF ARI TEMAN, a witness

herein, called by the Defendants, for examination,

taken pursuant to the New York Rules of Civil

Procedure, by and before Michelle L. Goehring, a

court reporter and a notary public in and for the

Commonwealth of Pennsylvania, held by videoconference

with all parties appearing remotely from their

respective locations, on Thursday, August 5, 2021, at

10:03 a.m.

COUNSEL PRESENT:

For the Plaintiff:      FISHERBROYLES, LLP
                         by Ariel Reinitz, Esq.
                         445 Park Avenue, Ninth Floor
                         New York, NY 10022
                         Ariel.Reinitz@fisherbroyles.com
                         (646)494-6909

For the Defendants:     KOSS & SCHONFELD,  LLP
                         by Simcha D. Schonfeld, Esq.
                         by Shira Goldman Moyal, Esq.
                         90 John Street
                         Suite 503
                         New York, New York 10038
                         sds@kandsllp.com
                         (212) 796-8916

- - -


                                    - - -
                            I N D E X

WITNESS                                              PAGE

ARI TEMAN

    By Mr. Schonfeld                                   4



                        E X H I B I T S

    EXHIBIT              DESCRIPTION              PAGE

    Exhibit A       Amended Summons
                    and Complaint                  26

    Exhibit B       Corp Search                    29

    Exhibit F       E-mails                        32

    Exhibit H       E-mails                        41

    Exhibit C       E-mails                        78

    Exhibit I       Shachor Employment
                    Letter                        100

    Exhibit J       Herman Employment
                    Letter                        107

    Exhibit D       Goldmont Agreement            134

    Exhibit G       Suicide Letter                136

    Exhibit E       E-mails                       180

P R O C E E D I N G S

THE COURT REPORTER:  The attorneys participating in this deposition acknowledge that I am not physically present in the deposition room and that I will be reporting this deposition remotely.

They further acknowledge that, in lieu of an oath administered in person, the witness will verbally declare his testimony in this matter is under penalty of perjury.

The parties and their counsel consent to this arrangement and waive any objections to this manner of reporting.  Please indicate your agreement by stating your name and your agreement on the record.

MR. REINITZ:  Ariel Reinitz, I agree.

MR. SCHONFELD:  Simcha Schonfeld, I agree.

ARI TEMAN, a witness herein, having been first duly sworn, was examined and testified as follows:

EXAMINATION

BY MR. SCHONFELD:

Q.   Good morning, Mr. Teman.  My name is

Simcha Schonfeld, I'm a partner of the firm of Koss & Schonfeld representing the Defendants, and I will be taking your deposition here today.

Before we begin, just a few background rules.  No. 1, all your answers have to be verbal because the court reporter cannot take down hand gestures.

No. 2 is, if at any time you don't understand a question that I ask you, let me know and I'll be happy to rephrase it.

And, No. 3, at any point you need to take a break for any reason at all, let me know, I'll be happy to accommodate as long as it is not between an answer and a question; okay?

A.    Yes.

Q.    All right.  Mr. Teman, in the past 24 hours have you taken any medications?

A.    Melatonin.

Q.    Anything else?

A.    No.

Q.    Have you not taken any medications that you were required or prescribed to take in the past 24 hours?

A.    No.

Q.    Have you consumed any alcohol in the past 24 hours?

A.    No.

Q.    Have you consumed any drugs or narcotics in the past 24 hours?

A.    No.

Q.    As you sit here today, is there any reason, that you can think of, that you would be impaired or inhibited physically from answering fully and truthfully today?

A.    No.

Q.    Have you spoken with anyone other than your attorney -- and let me just say at the outset to make it very clear, any question that I ask you, it should be assumed if I don't I don't state it expressly, that I do not want you to tell me anything about any communications you had with your attorneys, so I just want to put that out there as a general guidepost.

And with that in mind I will ask you, other than your attorney, did you have any conversations with anyone in preparation for your deposition today?

A.    No.

Q.    Have you reviewed any documents in preparation for your testimony today?

A.    Yes.

Q.    What did you review?

A.    Documents in discovery, the Complaint, and the Interrogatories.

Q.    And did you review the contract between GateGuard and Goldmont?

A.    I believe that's one of the documents in discovery.

Q.    All right.  And did you review the Summons and Complaint as well?

A.    Yes.

Q.    Have you ever been convicted of a crime?

A.    Yes.

Q.    How many times have you been convicted of a crime?

A.    Once.

Q.    All right.  And what was that conviction for?

A.    It is pending appeal, but it was bank fraud and wire fraud.

Q.    And when was that?

Ari Teman
August 05, 2021                                                    8

A.   It was -- the trial was January,
it's still ongoing, they just filed their
Notice of Appeal.

Q.   January 2020?

A.   January 2020, yes.

Q.   Have you been sentenced yet?

A.   Yes.

Q.   And how long was the sentence?

A.   I'm sorry?

Q.   How long?  What's the sentence?

A.   The time of the sentence would be a
year and a day.

Q.   Is that held in advance or suspended
pending the appeal?

A.   Pending appeal.

Q.   And other than that conviction, have
you ever been convicted of any other crimes, a
felony?  And I'm not talking about a parking
ticket or something like that.

A.   No.

Q.   Have you ever testified before
either at trial or in a deposition?

A.   Yes.

Q.   How many times?

A.   A few.

Q.    More than five?

A.    No, I don't believe so.

Q.    Have you testified in any criminal actions other than the one that was the subject of a conviction that you discussed?

A.    No.

Q.    And so fair to say then you've testified in civil actions?

A.    Yes.

Q.    Was that in deposition only or also at trial?

A.    Deposition.

Q.    So you've never testified at trial before?

A.    I don't believe so.

Q.    And do you recall what kind of cases they were, just generally?

A.    Civil disputes.

Q.    Did you testify on behalf of GateGuard in any of those cases?

A.    No.

Q.    On behalf of other companies?

A.    I don't recall.

Q.    Have you testified as a party yourself?

A.     Yes.

Q.     So you've been party to other civil lawsuits?  And by you I mean you, personally, Ari Teman, you've been party to lawsuits?

A.     Yes.

Q.     Are any of those suits still pending?

A.     Yes.

Q.     And do you know the names of the parties in those cases?

A.     Yes.

Q.     Okay.  Can you tell me what they are?

A.     One of them is Teman versus Braverman, et al.  It's a medical malpractice suit in New York.  One of them is Steinberg versus Teman, it's also in New York.  Butch versus Teman.  Seems derivative of Teman versus Braverman, but similar topic, also in New York.

Q.     Have you ever testified as an expert witness in any field at any time?

A.     No.

Q.     Have you ever been either deemed qualified or unqualified as an expert witness in any topic?

Ari Teman
August 05, 2021                                    11

A.   Not that I recall.

Q.   What's your date of birth?

A.   May 10, 1982.

Q.   And your Social Security number?

A.   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.

Q.   Okay.  And what's your full address, your current home address where you live?

A.   My current home address is 650 West Avenue, Miami Beach, Florida 33139.

Q.   And is that where you're sitting right now?

A.   Yes.

Q.   And what is the address of GateGuard currently?

A.   We've multiple.  The one down here 1521 Alton Road, No. 888, Miami Beach, Florida 33139.

Q.   And how long has GateGuard had an office there?

A.   We've had an office there I think about two years.  We also use a nearby co-working space.

Q.   Does GateGuard have, at the present time, a corporate headquarters, a main office anywhere in the country?

A.     We have multiple locations.  I don't think we define anything as our main -- you know, I don't want to make a legal venture as to what's the main office.  We have multiple offices.

Q.     So I'm not trying to pigeonhole with some sort of legal terminology.  So just as a layperson would understand the term, is there any one of your offices in which more work is conducted or more employees are located than any other office?

A.     That would really depend on the day.

Q.     So what other offices does GateGuard currently have?

A.     We have a location in New York City, West 29th Street.

Q.     What's the address there?

A.     I'm not sure of the building number off the top of my head.

Q.     How long has GateGuard had an office there?

A.     About I think since January 2019 -- actually, no, earlier, I'm sorry.  So somewhere in the middle of 2018.

Q.     Does GateGuard lease that property?

Ari Teman
August 05, 2021                                            13

A.    It's like a rental agreement of sorts, yes.

Q.    And when does that lease end?

A.    I don't know that it does.  It's month to month.

Q.    Now, other than the West 29th address and the Miami address, any other offices?

A.    We have locations inside of our installation partners where we do device set up.  So we have one in the Bronx and we have one in Spring Valley, New York.

Q.    Okay.  The location in the Bronx, is that an office?

A.    Yeah.

Q.    Is that also a rental or lease?

A.    Yes.

Q.    And how long has GateGuard had an office there?

A.    That one is actually relatively new, that's a few months -- I'm sorry, the one in Spring Valley is a few months.

Q.    And what about the one in the Bronx?

A.    We had it a couple years.  We just shifted from the location in the Bronx to

another due to somebody passing away.

Q.   Okay.  So GateGuard has had a location in the Bronx since -- can you give me a year, 2017, '18, '19?

A.   '18-'19.  Late '18, early '19.

Q.   Okay.  And so the person who passed away, how did that impact GateGuard's presence in the Bronx?

A.   We were using a location of one of our installers and he passed away, so we moved our operation and location to another installer.

Q.   All right.  At the present time right now, today, August 5, 2021, does GateGuard have any employees?

A.   Besides myself?

Q.   Yeah.  Excluding yourself.

A.   Can you clarify employee?

Q.   Does GateGuard have a payroll?

A.   We have part-time, but we do not have any full-time employees, at least contract.

Q.   So is there anyone who is paid on a W2?

A.   No.

Q.    Was there ever anyone paid on a W2 at GateGuard?

A.    I believe so briefly.

Q.    When was that?

A.    2000 -- I would say late 2018 and then through 2019.

Q.    And who was that individual?

A.    We had a number of sales people, one was Seth Weiss.  We had an operations person, Yoseff Shachor, S-H-A-C-H-O-R.  And a Levi Herman.

Q.    And they were all employed between 2018 and 2019, approximately?

A.    Approximately.

Q.    And they were all W2 employees?

A.    I believe so, and Levi Herman into 2020.

Q.    Okay.  And are any of those three individuals still affiliated with the company, either on a part time basis, a contract basis, or some other way?

A.    No.

Q.    Were they terminated, did they resign, or something else?

A.    We terminated the first two.  And

the third is -- his wife got pregnant and he took a job closer to home.

Q.    And so other than those three individuals, there's never been anybody else who was a W2 employee; is that correct?

A.    That's correct.  And to be clear, I'm not even sure if they were W2.  We used TriNet, they handled our HR, so they handled the forms.  And the salespeople paid on commission might have had a different form.

Q.    Okay.  Now, at the present time, how many independent contractors -- is that a fair term to use, to describe the people who worked for GateGuard?

A.    I'm not a lawyer so I don't know the label.

Q.    Let's not -- fair enough.  I'm not trying to get overly linguistic.  So in any capacity, how many people presently are working for GateGuard, whether part-time, full-time?

A.    Yeah, just let me do a little bit of finger counting.  At least eight.

Q.    Okay.  And is that more or fewer people than GateGuard had in 2020?

A.    Fewer.

Q.    And how about in 2019?

A.    That would depend on when in 2019, but I think for sure fewer.

Q.    So in 2020 GateGuard had more than I think you said eight people?

A.    Yes.

Q.    Okay.  So how many did it have -- I'm imagining it probably fluctuated at some point, so what were the most number of people working for GateGuard and the least number in 2020?  What was the range?

A.    2020, probably a ballpark around 15.

Q.    All right.  What about in 2019, what was the range?

A.    I would say 15 to 22.

Q.    All right.  And in 2018?

A.    7 to 12.

Q.    And is there a particular reason why GateGuard has fewer -- I don't want to use the word employees, but for the record purpose, when I say employee I mean it just in the nonlegal sense, okay.  Not the create some sort of -- I'm just trying to speak normally, so when I say employee, I don't mean necessarily W2, just people working for GateGuard.

So is there, to your knowledge, a particular reason why GateGuard has fewer employees today than it did, say, in 2020 or 2019?

A.    There's more than one reason.

Q.    What are those reasons?

A.    Well, one would be that certain clients, as this Complaint alleges, didn't pay their bills and it takes money to pay people.

Another reason would be certain workers are just done.  So, for example, if we have skill specific engineers for certain tasks and their work is done, we might -- we might not be using them right now.  We might need to call them back if we need to update an app or something like that, but they're not needed every day of the week so to speak.

And then obviously, there's cases like, you know, somebody's wife gets pregnant and they need to take a job closer to home.

Q.    Okay.  Fair enough.  What's your highest level of education?

A.    I have a Bachelor's from Brandeis, and I have bunch of certificates and other sources of education.

Q.    When did you get the Bachelor's, what year?

A.    I was class of '05, but I graduated in '04.

Q.    What's the Bachelor's in, what area?

A.    Psychology and studio art.

Q.    You said you had a bunch of certificates?

A.    Yes.

Q.    Can you tell me what they are?

A.    I have one from Harvard's, I guess their Zoom remote school in pandemic response. I have certificates from Parsons in product design or a certificate in product design. I forget the actual name of the course, but that is the category of the course. I am certified in neurolinguistic programming and hypnosis. That's my education, but I'm sure that's not the topic here.

Q.    So you got a certificate related to pandemic response?

A.    Yeah.

Q.    When was that?

A.    It was in the past year.

Q.    Okay. I was going to say, that

Ari Teman
August 05, 2021                                  20

would be pretty ironic if you had it a couple years ago.

          Okay.  Now, are you currently employed?

          A.    I mean, by the companies I run.

          Q.    Other than, can you clarify -- let's leave those out for a moment.  In other words, any company that you own or have an ownership interest in.  But is there any company that you work for that you get a paycheck from that you don't own?

          A.    No.

          Q.    Let's talk about GateGuard in particular -- no, withdrawn.

          Are you currently receiving or working for any companies, including those that you have an ownership interest in?

          A.    Can you clarify?

          Q.    Are you currently working for any companies that you have a personal ownership stake in?

          A.    You're not -- when you say working for, am I doing work for companies like in relation to companies I own, yeah.

          Q.    Can you tell me how many companies

you own?  It doesn't have to be 100 percent, any ownership interest.

A.    Seven that I count off the top of my head.  I could be missing one or two.

Q.    Can you give me their names?

A.    GateGuard, Friend or Fraud, PropertyPanel, Touch Slabs, 12gurus, Jovari, and UBC ware.

Q.    Are those companies all currently active and doing business?

A.    More or less.

Q.    All right.  So let's talk about GateGuard.  Who is the -- or what is the ownership structure of GateGuard as of today?

A.    GateGuard is solely owned by Friend or Fraud, Inc.

Q.    Friend and Fraud, Inc?

A.    Friend or Fraud, Inc.

Q.    And Friend or Fraud, Inc., when was that incorporated?

A.    I believe 2014, perhaps late 2014.

Q.    And was it always the sole owner of GateGuard?

A.    Yes.

Q.    And who are the current owners of or

shareholders of Friend or Fraud, Inc.?

A.     Off the top of my head, obviously, myself.  We have a number of investors, Jake Goldberg, Michael Mince, Michael Andel.  I think in terms of actual equity that might -- no, that might be it.

Q.     Has that always been the ownership structure of Friend or Fraud, Inc.?

A.     Well, yeah, as the company raised its funds additional -- you know, investors will come one after others.  But this is outside the scope of the Interrogatories, I don't have a list for you off the top of my head.  Basically, from that early onset.

Q.     What percentage of ownership do you have currently in Friend or Fraud, Inc.?

A.     I couldn't give you the exact percentage, but probably ballpark around, say, over 95 percent.

Q.     Okay.  Was that always the case?

A.     Yeah.  It would have been higher.

Q.     So when it first started, you were 100 percent owner, and then you brought on investors and sold them some equity; is that a fair statement?

Ari Teman
August 05, 2021                                                    23

A.     Probably.

Q.     And where is Friend or Fraud, Incorporated?

A.     Delaware.

Q.     Are there any non-equity partners, in other words people who don't actually own shares but do get a portion of the profits of either Friend or Fraud, Inc., or GateGuard?

A.     No.

Q.     Have there ever been?

A.     I'm -- the question is a little confusing.  Do people get a percentage, for example, of sales or revenue, is that what you're asking?

Q.     Was there anyone who, at any time, was entitled to any portion of the profits of either Friend or Fraud, Inc., or GateGuard that was not a shareholder, an actual equity partner.

A.     I don't believe so, no.

Q.     Does Friend or Fraud, Inc., own any other corporations other than GateGuard?

A.     It owns PropertyPanel, Inc.  And it may -- there may be a LookLock, Inc., which is a product, except we didn't sell it.  We may

have incorporated it and they hold it, but haven't done anything.

Q.   And I'm not sure if you mentioned this company, but is there a company called Teman, Inc.?

A.   No.

Q.   And what is the business of GateGuard, how would you describe what they do?

A.   We make a AI doorman intercom for multifamily and office and other sorts of buildings, properties.

Q.   Does GateGuard have a shareholders agreement?

A.   I think we do.

Q.   And does that shareholder agreement show Friend or Fraud, Inc., as its sole shareholder?

A.   I don't know.

Q.   Has GateGuard's shareholders agreement been -- has it ever been updated and changed or has there only been one agreement since it's been formed?

A.   I don't recall any update.

Q.   Do you have a title within GateGuard?

A.    I think officially I would be like CEO and founder, but we don't go throwing around titles.  I don't know if there's an official title on the documents, probably CEO or president.  When you incorporate, you have to put something down.

Q.    As CEO of GateGuard, are there any limits on the authority that you have to act on behalf of the corporation?  In other words, is there anything that you would need consent of anybody else to do?

A.    No, not that I know of.

Q.    So, for example, if you decided you wanted the sell the entire company to me, would you be allowed to do that under the shareholders agreement without the consent of the other investors in Friend or Fraud?

MR. REINITZ:  Objection, calls for a legal conclusion.

BY MR. SCHONFELD:

Q.    You can answer.

A.    I wouldn't get your hopes up, but I don't know.

Q.    And I'm not making an offer by the way.  When was the -- I'm sorry if I asked this

before, I don't think I did, when was GateGuard incorporated?

A.    I believe it was October or November 2016.

(Deposition Exhibit A was marked for identification.)

BY MR. SCHONFELD:

Q.    I have sent a number of exhibits to the court reporter and to your attorney as well.  I am going to -- with your permission, Ari, I'm going to share the screen and show you what has been or will be marked Defendant's Exhibit A, which the Amended Summons and Complaint in this action.

A.    Let me just take a quick bathroom break, just one minute, before the next question.

Q.    Okay.  Sure.  We'll stop and while you take a bathroom break, I'll make a coffee break.

(Short recess was taken.)

BY MR. SCHONFELD:

Q.    So I'm going to show you what has been marked as Defendant's A.  Okay.  Can you see that?

A.    Give me a second.

Q.    I can make it larger if you need it to.

A.    You may need to, but go ahead.

Q.    And, again, for the record, this is the Amended Complaint that's been filed in this action.  And just turning to Paragraph 10 -- and I'll blow it up here so you can see it better -- it says, "GateGuard is a Delaware corporation having a place of business at 5 Penn Plaza No. 2372, New York, New York 10001."

        Do you see that?

A.    Yes, I do.

Q.    Okay.  Is that the case today, does GateGuard have a place of business at that location?

A.    I think we moved at the end of February.

Q.    Of what year?

A.    The year of the Complaint.

Q.    February 2020 or February 2021?

A.    I think of 2020.

Q.    So about a year and a half ago you moved out of that office?

A.    Yeah.

Q.    Where did GateGuard move to?

A.    We moved to 29th Street and are still in the Bronx.

Q.    I think you testified earlier that GateGuard had been at West 29th Street since 2018?

A.    Right.  The office, basically, had two purposes, one was sort of preparing the equipment and, obviously, besides the employees, one was for storing the equipment and one was for preparing equipment, so we just split those two functions up, it was more cost effective.

Q.    So the West 29th Street office was in existence at the time, but you also had the office at Penn Plaza?

A.    Yes.

Q.    So you, basically, just got rid of the Penn Plaza office; is that correct?

A.    Yeah.  To be clear as well, it's sort of like a Regus thing.  So we still have a hot desk affiliated coming in and out.

Q.    You said a Regus?

A.    Yeah.  We were members of the -- of

a network similar to like we were, Regus is like a bigger network, so we continue to work from there, a location with them in Miami.

Q.   So that location in Penn Plaza is still available to GateGuard?

A.   The center, not the specific room, but, yeah, the address.

(Deposition Exhibit B was marked for identification.)

BY MR. SCHONFELD:

Q.   Okay.  I'm now going to show you what has been marked as Plaintiff's Exhibit B. This is just a printout from the Department of State, Division of Corporations.  I will make it bigger because it's hard to see on the screen.

And do you see here it says the date of the initial filing is February 28, 2017, does that sound -- I'm sorry, withdraw that.

If you look up top, entity name, it says GateGuard, Incorporated; do you see that?

A.   Yes.

Q.   And it says that the foreign formation date was November 14, 2016; do you see that?

A.   Yes.

Q.   Is that when GateGuard was formed in Delaware?

A.   I mean, as we see on this document, we formed it in New York and then moved it to Delaware.  But, actually, I think it's in reverse, it was formed in Delaware and then -- yeah, this is the -- can you go to the top of this document, actually?

Q.   Sure.

A.   Yeah.  Okay.  So this is the New York -- I think this is like our foreign entity operating --

Q.   Yeah.  This is a printout from the Department of State, New York, Division of Corporations.

A.   Yeah.

Q.   And you see the highlighted portion there in purple, it says, statements status past due date; do you see that?

A.   Yes.

Q.   Do you know, what's that referring to?

A.   It's news to me.

Q.   Do you know?

A.   No.  We'll definitely look into it.

Q.   Okay.  Down at the -- right underneath that it says, next statement due date is February 28, 2019; do you see that?

A.   Yes.

Q.   Safe to assume you don't know what that's referring to, what type of statement?

A.   No.  I would have to look into it.

Q.   Okay.  And underneath where it says, service of process name and address, and then it says name the corporation and address, 106 West 32nd Street, 2D15, New York, New York 10001; do you see that?

A.   Yes.

Q.   Okay.  Is that an address that GateGuard currently has a location at?

A.   So it's an accordion space called the yard, so they'll collect and forward our mail.  So, you know, obviously, they just --

Q.   That's another sort of shared space type of arrangement?

A.   Yeah.  That's kind of what start ups do nowadays.

Q.   And is that -- does GateGuard currently have a location there or access

there?

A.   I believe we have access there but we don't have a physical desk there.

Q.   Does GateGuard use that location for any purposes?  Do you receive mail there or anything?

A.   I do believe we receive mail there. Not frequently, but I do believe we receive mail there.

Q.   And so does GateGuard pay rent for that space or for that access?

A.   I think there is sort of a yearly fee for mail handling.  I couldn't tell you what it is off the top of my head, but I think it's a low mail box type of thing.

And then if you want to use conference space or have a meeting or rent a desk for the day or be somewhere different for a week or a month, you just pay a kind of piecemeal as needed.

(Deposition Exhibit F was marked for identification.)

BY MR. SCHONFELD:

Q.   Give me a moment here.  I'm going to jump ahead exhibit-wise to Exhibit F, as in

Frank, and this is a series of e-mails, 17-page exhibit, and I'm just going to, for the moment now, just focus on the signature block that appears -- I'll blow it up so you can see it better -- but just for the record, this is an e-mail from ari@teman.com; do you see that?

A.   Yes.

Q.   And it's dated March 15, 2019; do you see that?

A.   Yeah.

Q.   Was that your e-mail address on March 15, 2019?

A.   Yes.

Q.   Is that still your e-mail address today?

A.   Yes.

Q.   Okay.  And I'm just going to make it larger so it's easy to see.  Going down to the bottom of this e-mail, the signature block says Ari Teman/Founder/Teman TM; do you see that?

A.   Yeah.

Q.   What is Teman TM referring to?

A.   It's just a brand name that the company used for some products.

Q.   What does the TM stand for?

A.    Trademark.

Q.    So is the name Teman a trademark?

MR. REINITZ:  Objection, calls for legal conclusion.

THE WITNESS:  You'd have to ask an IP attorney what the status is.  I think we may have actually filed for a trademark, but I don't recall.  I know we definitely registered the GateGuard trademark, I'm not sure about Teman.

BY MR. SCHONFELD:

Q.    That's a signature in your e-mail though.  So I'm just asking you, when you send an e-mail, you sign it, so to speak, electronically as the founder of Teman TM, so I'm just asking you what you mean when you put that in your signature?

A.    Just -- it's a brand name.  I think, you know, by comparison if I work at a WeWork, the brand name is WeWork, but I'm actually working with Locations, LLC, like, you know, WeWork350 something, LLC, right, so it's just a brand name.

Q.    All right.  And under it says GateGuard.xyz; what does that mean?

A.    That's the website for GateGuard.

Q.    And LookLock.xyz, is that also a website?

A.    Yes.

Q.    Same for PropertyPanel.xyz?

A.    Correct.

Q.    And SubletSpy.com?

A.    Yes.

Q.    So these are all entities that you are affiliated with?

A.    Yes.

Q.    You were back when you sent this e-mail I suppose as well; correct?

A.    Yeah.  I don't know how you define entities, but I'm affiliated with these websites, yeah.

Q.    At any time did you have a GateGuard e-mail address?

A.    I believe I do, yeah.

Q.    Did you have one back in 2019?

A.    Yes.

Q.    Did you use it for conducting GateGuard business?

A.    It may have just been sort of an alias, meaning it's the same inbox, but it

would have been ari@gateguard.xyz.

Q.    Have you ever used that as your e-mail address for conducting GateGuard business?

A.    I believe so.

Q.    Okay.  So let's talk about the allegations in this case.  Are you familiar with Goldmont Realty Corporation?

A.    Yes.

Q.    All right.  When did you first come in contact with them?

A.    I believe Abi Goldenberg, son of the founder, Leon Goldenberg, had reached out to us; I think it was about August 2018.

Q.    Okay.  And how did he reach out to you?

A.    Off the top of my head, he may have submitted a form and e-mailed us.

Q.    And what was his purpose in reaching out?  What did he want?

A.    He was interested in our product.

Q.    For himself, for his company, or something else?

A.    For his properties.

Q.    Okay.  And were those properties

owned by Goldmont Realty Corporation?

A.    I couldn't speak to the corporate ownership of the individual building LLCs.

Q.    So you said Abi Goldenberg reached out to you and -- during the time period that you mentioned, and the purpose of that communication was for him to purchase some GateGuard products?

A.    Products and services, yes.

Q.    And what were those products and services?

A.    GateGuard intercom and its associated cloud services.

Q.    And did he actually make a purchase?

A.    Yes.

Q.    All right.  And what did he buy?

A.    He bought a number of GateGuard intercoms and signed on for their multiyear contract.

Q.    Do you remember how many?

A.    I believe he started with four properties.

Q.    Okay.  And were those devices and services paid for?

A.    Could you clarify?

Q.    Well, he made the order; right?

A.    Yes.

Q.    And they were delivered; right?

A.    And installed.

Q.    And were those devices paid for?

A.    So you ask that question, it's like asking if it was paid for, if you made the first, say, two-year out of five years of payment.  So there were payments made but they're not paid for.

Q.    Okay.  So at the time that -- withdrawn.

What were the payment terms of those first -- I believe you said it was four devices?

A.    I think it was four properties.  One of the properties may have actually had two doors and a gate.  I don't recall if it was --

Q.    Whether it was four or five, whatever the number was, that initial order that he made, what were the payment terms?  Was it all supposed to be paid up front, monthly, annual, or something else?

A.    There was a mix.

Q.    Okay.  So what was it?

A.     Speaking generally, there's -- I believe when he signed up -- you go to the website and based on the quantity you're ordering, the price of the devices change.  If you reach a certain quantity, it goes down, a certain number of the up-front payment I should say goes down.

So you make an up-front payment towards the device.  And he would sign a multiyear, monthly agreement that could cover sort of financing towards the device as well as Cloud service and the connectivity.  There may have been a maintenance security deposit.  And then if we have to go make a repair, say somebody vandalizes the device, we'll go send somebody down to the building and fix the lock or something.

And he may have paid -- there's an installation fee, that fee goes away after a certain quantity.

Q.     Okay.  So the devices were ordered and they were delivered and they were installed --

A.     Just to be clear, the terms are robust, so like, you know, it's not the

Ari Teman
August 05, 2021                                          40

entirety of the terms, it's just a general

explanation.  But, obviously, there's terms

related to nonpayment, late payment, tampering

with the device, et cetera.

Q.    So just, specifically, with respect

to the cost of installation and the monthly

fee, at the time those devices were installed,

did Goldmont pay whatever was required of them

at that time?

A.    I believe they did.

Q.    And since then, are those devices

still in operation?

A.    Yes.

Q.    And has Goldmont been paying

whatever they're obligated to pay with respect

to those four or five devices?

A.    I don't think they have.

Q.    Do you know?

A.    I believe they're --

Q.    Have you sent them demand letters

for payment, specifically, with respect to

those devices?

A.    I don't believe so.  It's an

automated system, they would get a prompt for

payment.

                    (Deposition Exhibit H was

    marked for identification.)

    BY MR. SCHONFELD:

         Q.    Okay.  I'm going to show you what's

    been marked as Defendant's Exhibit H.  Okay.

    This is a eight-page exhibit.

                The first page is an e-mail from

    yourself, ari@teman.com, dated Friday,

    September 14, 2018, to

    AGoldberg@goldmontrealty; do you see that?

         A.    Slur.

         Q.    Okay.  And did you send that e-mail?

         A.    It appears so.

         Q.    It says, "Here are four invoices for

    the properties.  Please let me know how I can

    be helpful."

                And I'm going to scroll down to the

    second page -- I'll just blow it up so it's

    easier to read -- here is an e-mail from you to

    Abi Goldenberg dated Thursday, September 13,

    2018, at 10:40 a.m.; do you see that?

         A.    Yes.

         Q.    And skipping down to the third

    paragraph, well, withdrawn.

                There's a sentence here that says,

"So the math here is five devices, it's 3,600 times five equals 18,000."

          Do you see that?

     A.    Yes.

     Q.    Ten devices is 2,600, equals 26,000; correct?

     A.    Correct.

     Q.    And just skipping into the third paragraph, you write, "You can order the other five and we'll store them and not charge monthly fees until they're installed, or you can do the first deal."

          Okay.  Do you see that?

     A.    Yes.

     Q.    And then you continue in parentheses "Unfortunately, we can't fund our teams on promises so we only do final deals with payments, not commitments."

          Do you see that?

     A.    Yes.

     Q.    Okay.  What did you mean by that?

     A.    Again, this is -- this is three years ago, but, generally, the subject matter of this particular discussion was that if you went to ten or more devices, the up-front

payment per each device would go down by a thousand dollars.  And he was expressing to me -- and this is part of the thread and part of phone calls as well -- they were deliberating as to whether they wanted to take advantage of the higher bulk rate, the lower rate for a higher number of devices.

And so we had said, you know, either, basically, you can't then order, let's say, three devices but tell us, give us the price for ten.  If you want the pricing terms, let's say, for ten or more devices, you've got to order ten or more devices.

Q.    Before when you say we can't fund our team on promises, so we only do final deals with payment, not commitments, specifically, that sentence, what did that mean?

A.    Again, I think he had represented to us perhaps on the phone, you know, hey, can we pay for three now but get, you know, the pricing for ten.  Basically, it's a polite way of saying no, if you want the pricing for a certain number of devices, you have to order those devices.  You can't tell us, oh, I own 60 buildings, so give me price for 60, but I'm

Ari Teman
August 05, 2021                                        44

only buying one.

Q.    But you wrote, "We only do final deals with payment," did you mean that they had to pay for the devices before you would actually have them manufactured and delivered?

A.    No.

Q.    So what did that mean, we only do final deals with payment, what does that mean?

A.    Meaning -- I think I've answered the question.

Q.    Okay.  I don't understand your answer, if you could just try to enlighten me. We only do final deals with payment.

A.    Perhaps I'll give you an analogy. Say you go to a store and they say the price for an orange is a dollar.  If you order ten oranges, if you buy ten oranges, the price of an orange is 50 cents.  They're not going accept if you say, well, I'll pay 50 cents for this orange, but I promise to buy nine more.

No.  If you want the price for those ten oranges, you you've got to give them five bucks.  You've got to give them 50 cents times ten up front.  If you want to take those oranges and put them aside and wait to eat them

later, that's your call, but you've got to pay
for them now.

Q.    Okay.  So then taking the analogy to
what we're talking about here, if you want five
devices, you need to pay for them up front;
correct?

A.    Yes.

Q.    And you wouldn't deliver five
devices to him had he not paid for them, is
that what you mean by we only do final deals
with payment?

A.    No.  There were times where
depending on the customer we would install and
then they would pay.  I believe in this case
that was not the case, they were a new
customer, so we would have required some
payment up front before sending people to
install.

Q.    So again, using your orange analogy,
right, if you walk into the grocery store
you're not getting your orange or your device
if you didn't pay for it; correct?

A.    That's not the -- that wasn't the
purpose of the analogy.  Obviously, if you walk
out of a store with an orange you haven't paid

for, and you're not in San Francisco, you've committed a crime.  In San Francisco you've comitted a crime, but they're not going to do anything.

Here it's you're not walking out of the store with one orange for the price of 50 cents if you ordered ten oranges.

This was solely focused on the topic of the price per device up front that you have to pay based on the quantity you were ordering. So we were just politely saying, you have to commit to a quantity and pay for that quantity, you can't make a promise of a future quantity to get a lower per device cost.

Q.    You have to commit and pay for it, right, we only make final deals with payment?

A.    Right.  Yes.

Q.    So if I tell you I want to order X number of devices, I've got to pay you and then you'll deliver them, right, as opposed to me just making a commitment?

A.    I mean, you'd have to clarify commitment.  I mean, that's an important distinction, right.  So if somebody says, oh, I promise -- all of our devices, for example, in

the case we're dealing with now, they've signed a contact.  So if somebody has signed our online contract or, in this case, put it into paper on a contract, that's very different than just making a verbal statement.

Q.    Was there a contract with respect to these devices, the subject of this e-mail?

A.    Eventually, I believe he did sign up online, yes.

Q.    Well, at the time that you sent this e-mail, was there anything -- any contract between GateGuard and Goldmont?

A.    I would have to see the specific date of this e-mail.

Q.    The specific date is September 13, 2018.

A.    So I'm not sure yet if -- I would have to actually -- I'm not sure if it was finalized yet, I think they were still going back and forth on the quantity to see if they should go from four devices to ten or five devices to ten.

Q.    And this e-mail, again, was sent by you acting in your capacity as GateGuard's CEO?

A.    Yes.

Q.   I'm just going to scroll down to the fourth page and this is just a signature of your e-mail.  Let me just scroll back up so you can see where it comes from.  This is an e-mail you see here that was sent September 13, 2018, the same date we were discussing before, 9:40 a.m.; do you see that?

A.   Yes.

Q.   Okay.  And scrolling down to the bottom of your signature here on Page 4 -- fourth page I should say of this exhibit, it says, "All conversations are off-the-record. Social media, too."

Do you see that?

A.   Yes.

Q.   Who actually wrote that language?

A.   Actually, I think that line I took off an e-mail from Seth Godin.

Q.   And who is Seth Godin?

A.   He's a best selling author and speaker on business topics.

Q.   Was that on the signature of all of your e-mails or was it, specifically, on this one?

A.   I think that signature is just

automatically put it at the end of your e-mail, provider as kind of just a template that gets dropped in.  I couldn't say whether it was on all e-mails, but seeing that it replied, it doesn't put the signature, but it was in the template.

Q.    So when you wrote that or when you inserted that in your signature, "All conversations are off-the-record," what did you mean by that?

A.    Conversations are off the record.

Q.    So if you and I have a conversation and we come to an agreement on something, it's off the record, doesn't count in your mind?

A.    Well, see now you're asking for a legal conclusion.

Q.    I'm not.  I'm asking what was in your head when you wrote that, your intent.

A.    Well, off the record doesn't mean that it doesn't count.

Q.    All right.  You wrote these words, what did you mean by that?

A.    Off the record is a common term sort of meaning that we have a bit of a nondisclosure agreement or understanding.

Like, basically, if you sign a contract with someone that has a nondisclosure clause, it does not mean that the contract doesn't count. The contract very much counts, including the nondisclosure part.

Q.    I'm not asking about a contract. I'm asking about conversations, that's the word in your signature, all conversations are off-the-record.  I'm asking you -- I'm not asking you to give me a legal position.  I'm asking you, you wrote those words, what did you mean when you inserted that in your e-mail signature?

A.    I've already said I didn't write those words.  My understanding of that is given the propensity nowadays that people like to go social media with private conversations they've had.  This is saying, no, if we're having a private conversation, don't go start posting it on Twitter or any other social media.

I'm going to have to pee again, so if you have another question, go for it.

Q.    Okay.  Continuing on this signature, "Terms apply to each service," what did you mean by that?

A.    Services that were listed above that we went through, those websites, PropertyPanel, GateGuard, SubletSpy, it's just letting people know that term and supply, and you know --

Q.    And in the next sentence, "Each service is a different entity," what did that mean?

A.    Different LLCs or corporations.

Q.    And in this series of e-mails between you, sent from ari@teman.com, and Abi Goldenberg -- withdrawn.

This signature that we're looking at here that has these terms we've discussed, is that still the signature to your e-mail?

A.    I think it's been modified.

Q.    Has it been modified to remove those words?

A.    It's automatically inserted, so I couldn't tell you off the top of my head.

Let me use the bathroom for a second, about 20 seconds.

Q.    No problem.

(Short recess was taken.)

BY MR. SCHONFELD:

Q.    Now, going back to the time that you

first met or came in contact with any of the Defendants in this action, Abi Goldenberg, Leon Goldenberg, or Goldmont Realty, how many people did you have working for you, including all the companies that you were associated with at the time, part-time, full-time or something else?

A.   Well, all the companies are outside the scope of the deposition, so I just wouldn't be prepared to, you know, tell you.

Q.   You don't know the answer?

A.   It's not that I don't know the answer, it's just that I wouldn't give an accurate answer off the top of my head.

Q.   It doesn't work that way.  So the question is, you, Ari Teman, you testified to a number of companies you're affiliated with.

At the time that you entered or that you first had conversations with the Defendants, how many people did you have working under you full-time, part-time, or some other way?

A.   Right.  Exactly.  So I'm saying I could ballpark it for you, but it would be a range because I've known these people -- I mean I met -- like, for example, I met Abi at

different times, I met Leon, and I met other people at Goldmont, right.  So it could be at one point there was, let's say, 22 people. Another point there could be closer to 30 people.  Another point there could be 15.  So that's what I'm saying.

In other words, if I had this question in advance, I could give you a more robust detailed answer.

Q.    I'm sure.  And did you have people working for you outside of the United States back in 2018 and 2019?

A.    Yes.

Q.    Approximately, how many?

A.    The majority.

Q.    I'm going to go back to Exhibit A which is the Amended Summons and Complaint in this action.  I'll put it back up on the screen.

On Paragraph 3 of the Complaint it says that Goldmont purchased 41 GateGuard intercom devices at a substantial discount from GateGuard's standard price; do you see that?

A.    Hold on a second.  I've got the Zoom -- like the faces popped up, it keeps changing

Ari Teman
August 05, 2021                                              54

shape.  Which paragraph was that?

Q.    Paragraph 3.

A.    Yeah.  Okay.  Yes.  Okay.  Go ahead.

Q.    So what was -- you said it was a substantial discount; correct?

A.    Yes.

Q.    What was the full price and what was the price that Goldmont received?

A.    So I believe it's actually spelled out very clearly in the agreement, which is in discovery.  There were saving something ballpark of $4 million over the total value of the contract.  So they had -- they were going to pay for these 41, $369,000, and so the total would have been closer I guess ballpark $4.24 million.

Q.    Now, did there come a time when you had a conversation with either Leon Goldenberg or Abi Goldenberg about an investment being made in GateGuard?

A.    Multiple times.

Q.    Okay.  And when was the first time, if you recall?

A.    I believe it began January/February 2019.

Q.   Did you meet with them in person about this investment?

A.   Abi and I met both in person and also video chat and phone call, before COVID, that there was still video meetings.

Q.   All right.  When you met in person, do you recall where you met?

A.   In Goldmont's offices.  And then also we met at -- went to 1 Penn Plaza and at 5 Penn Plaza, and at Omni Insurance, which was way at the heck at the end of Midwood.

Q.   Okay.  And who were at the -- whose offices were at the Penn Plaza addresses?

A.   Well, one was ours.  It belongs to Regus, as I said, I want to be very careful not misspeak because it's kind of a piecemeal service, not a typical lease.

And then we met across at 1 Penn Plaza.  I think I referred to it as Barry's office, it's their sort of accountant of sorts, but I think he was subletting from somebody else.  I couldn't say who owns or leases that office.  The building I think is owned by Vornado Realty Trust.

Q.   And did GateGuard and any of the

Defendants, meaning either Goldmont or Abi Goldenberg or Leon Goldenberg ever reach an agreement about a $1 million investment?

A.    Could you clarify the question?

Q.    Did GateGuard and any of the Defendants ever reach an agreement by which any of the Defendants named in this action were going to invest a million dollars in GateGuard?

A.    Yes.

Q.    What were the terms of that agreement?

A.    The terms were that they were going to invest 1 million.  We were, at the time, raising 5 million, and that would have been a $25 million valuation.

Q.    And the $1 million would have given them what, equity in the company or something else?

A.    Yeah, it would have been an equity investment.  So if you're raising five out of 25, let's call that 20 percent, obviously, differs pre and post money.  So they had 20 percent of the 20 percent.

Q.    So, again, I'm not asking you to tell me now what it would have been.  My

question, specifically, what terms were agreed to at the beginning?

A.    Those were the terms.

Q.    Okay.  So what percentage ownership interest, what percentage of shares would the investment bring to the investor -- withdrawn.

Who, specifically, was going to invest the money, was it Abi Goldenberg, Leon Goldenberg, Goldmont, or something else?

A.    It was going to Leon Goldenberg. Whether or not he put it in an LLC or something, it would have been up to him, you know, as many investors of funds do.  But it was very clear it was Leon Goldenberg.

Q.    So Leon Goldenberg was going to invest $1 million in GateGuard; correct?

A.    Yes.

Q.    And Leon Goldenberg, in exchange, was going to become a partner or shareholder of GateGuard?

A.    Well, partner and shareholder are two different things.

Q.    Okay.  Would he become a shareholder in GateGuard?

MR. REINITZ:  Objection, calls

for legal conclusion.

BY MR. SCHONFELD:

Q.    I'm not asking for a legal conclusion.  I'm asking, specifically, what was agreed to at this meeting.

Was there an agreement at this meeting that Leon Goldenberg or his entity would become an shareholder of GateGuard?

A.    He would be an investor.  Again, to Ariel's point, the specific legal term of whether he's called a shareholder or investor is, you know, not my area of expertise.

Q.    I'm not asking for your opinion. I'm asking for what was actually agreed to at this meeting.

A.    So the agreement would be that he would invest $1 million out of the 5 million we were raising.

Q.    And what would he get in exchange for that?

A.    He would get the equivalent of 20 percent of the 20 percent of the value of the company.  So those would be presumably shares, yes.

Q.    20 percent of 20 percent?

A.    But the reason I'm being careful here is that there's, you know, investing that there were already -- as I already pointed out, there's a few percentages that you already operate, so there would be a little bit of dilution, it wouldn't be exactly 20 percent because it's not the first round.  That's why I'm being careful.  I don't want to say it's 20 percent, and then go, oh, it's 17.95 percent.

Q.    I want to be very clear.  I'm not asking you to do any math now.  I'm asking you, in 2019, when you reached an agreement with them as you allege, what was agreed to them? I'm not ask you to calculate it now.  Was there a percentage that was agreed to at that time in exchange for $1 million?

A.    So I'm giving you the agreement without doing to math to your point.  I'm saying the agreement was he would put in a million dollars of a five million dollar raise at a 25 million valuation.  He would be titled to the shares or equity, I don't want to -- again, I'm just being careful as to the shares and equity percentage, all those terms are sort of -- I think they mean the same thing but I'm

not a lawyer -- and that would be the deal.

So, again, that's why I'm not saying he'd get 20 percent of the shares of the company because there was a prior round.  So if he got -- if there was some dilution, he would get 21 percent or he would get 17 percent, that's what I'm saying.  The agreement was he would invest 1 million out of a $5 million investment, $25 million round, and would be entitled to the equity or shares or whatever it's called of GateGuard.

Q.    But that would be 20 percent of your interest in the company or 20 percent of the entire company?

A.    Neither.

Q.    All right.  So then 20 percent of what?

A.    So if you -- if you're investing --

MR. REINITZ:  Objection, asked and answered.  Go ahead, you can answer.

THE WITNESS:  If a company is raising 5 million of a $25 million valuation, that 5 million would be -- that would be, if you're doing basic math, it was a clean round, that would be 20 percent of the company.

But let's say, for example, 3 percent of the company was already owned by other people, right. So now there's, you know, those prior investors and their terms of the stock. I don't have it memorized off the top of my head. They would have some sort of dilution agreement where their stock is worth a different amount because now the company is worth more than it was. They have preferences, classes. So, again, that's why I'm just being careful. It wouldn't equal 20 percent of the company, it would equal 17 or it might equal 21. I can't do the math for you.

BY MR. SCHONFELD:

Q. I want to be clear again, I do not want you to do any math now. I want you tell me what was agreed to two years ago.

A. I did.

Q. We're not doing any math. The 20 percent was that of your interest in Friend or Fraud, or was that 20 percent of GateGuard, Inc.?

A. It was Friend or Fraud. The investment would have been the parent company.

Q. So you were asked -- so they

committed 1 million to Friend or Fraud, and that would give them 20 percent of your interest in Friend or Fraud and not the other investors, correct, that was the agreement?

A.    No.  You keep saying 20 percent of my interest, I keep telling you that's not accurate.

Q.    Okay.  But the investment was going to be made in Friend Or Fraud and that's how they would have their interest in GateGuard; correct?

A.    Yeah.

Q.    And were there any terms with respect to this investment relating to distributions, for example, were they entitled to a preferred return or anything like that?

A.    Yeah.

Q.    Okay.  What were those terms?

A.    I couldn't tell you off the top of my head.  But in general every round gets preference over the next round.  So if there's another round, they get preference and they would get preference for leading the round.

Q.    And the million dollars, was there an agreement on how that was to be funded,

whether it was all in one shot or over time, were there benchmarks?

A.   One shot.  Just similar to that e-mail with Abi about number of oranges so to speak, if you invest a million dollars, you invest a million dollars.

Q.   Was there an attorney present for either side at any of these meetings?

A.   I can't say whether or not any of the people at Goldmont were or were not attorneys.  I believe at the meeting at 1 Penn Plaza there was an attorney.

Q.   Was there ever any formal document drawn up that memorialized this agreement, whether it was a term sheet or an e-mail or anything of that nature, that discusses the terms that you testified to?

A.   There was no official term sheet.

Q.   Is there any communications between you and any of Defendants or, specifically, Leon Goldenberg as the investor in which you explain to him that the investment would be in Friend or Fraud, Inc., and they would be getting the percentage that you discussed?

A.   There are ample discussions in

discovery between myself and Abi Goldenberg, and then there was a meeting at Leon Goldenberg's office where this was discussed with Leon and Abi there.

Q.   So at what point, if you recall, did you actually reach a final agreement with all the terms settled, the amount of the investment, the percentages, the preferred return, all of that, at what point was that agreement filed?

A.   I would say in Leon's office.  And then it was again confirmed to me in -- at the meeting at Omni Insurance before we went in. So it was confirmed and then it was also confirmed to me by Ely Pasternak multiple times.  It was confirmed to me to my face by Yachiel Bromberg.

And also before the purchase it was, okay, great, we're putting in the million dollars, now, we're going to convince this guy Jerry to help us get on top of that.

Q.   Who is Ely Pasternak?

A.   That's a good question.  Ely Pasternak appears to be a very dear friend or something more to Yechiel Bromberg.  I don't

mean to suggest a scandal.  I know that community has had its share of scandals.  I just mean they seem very beholden to each other.  And he was recommended and pushed quite forcefully to be the chief operating.  One of the terms that Abi and Leon had made very clear was that they wanted us to bring on operations people and salespeople.

Q.    You said that the terms of the agreement were confirmed to you by Ely Pasternak; correct?

A.    I said multiple people.

Q.    But he's one of the names you gave; right?

A.    Yes.

Q.    Does he represent Leon Goldenberg or work with him, or how would he come into the picture?

A.    My understanding was that he was working with Leon and with Yechiel Bromberg who was explained to me as sort of a frequent partner and best friend of sorts to Leon Goldenberg.  And that they had him -- for example, he brought in an actual spreadsheet going through the breakdown of the million

dollar investment that he reviewed with then.
So there was -- I mean, the numbers were on the
screen.

Q.    Did Ely Pasternak work for Leon
Goldenberg?

A.    I don't know.

Q.    Why would Ely Pasternack's
representation to you about an investment made
you rely on his word?

A.    So I didn't only rely on his word.
I also relied on Abi Goldenberg's word and Leon
Goldenberg's word, Yechiel Bromberg's word.

Q.    Right.  But I want to take them one
at a time.  Ely Pasternak, okay, you said he
was one of the people that told you this was a
done deal, this was agreed to.

Again, my question is, who is he in
connection with Leon Goldenberg and why would
his word matter to you?

MR. REINITZ:  Objection,
compound.  You can answer.

THE WITNESS:  He was referred
to us by Leon's best friend, partner, Yechiel
Bromberg.  He was presented to me this was a
person they trusted that they will put in to

handle operations.  So it was the reason or belief that he was conveying their words as accurately as he could to the best of his ability.

BY MR. SCHONFELD:

Q.    And Ely Pasternak and Yechiel Bromberg speaking on behalf of Leon Goldenberg, that was your understanding?

A.    Well, you know, I don't want to say on behalf but relaying what Leon Goldenberg had said, as was Abi Goldenberg and Leon Goldenberg -- sorry, that's too many Goldenbergs in one sentence -- Abi Goldenberg and Leon Goldenberg. And Leon Goldenberg as well to my face in his office, which has many paintings and other objects.

Q.    You mentioned before other investors, were there other investors participating with Leon Goldenberg or was the million dollars only coming from Leon Goldenberg?

A.    The way it was explained to me was that Leon was going to put in the million dollars.  And then once that was confirmed, they dragged me out to -- I'll keep calling it

the end of Midwood, it was very far -- where they were trying to get their other friends to join.

I use the word friend loosely because the way Yechiel described Jerry, not in front of Jerry, made the word friend sort of a dubious term.

Q.    What's Jerry's last name?  Was it Weissman?

A.    It was a Jewish last name.  He was the big boss -- big is an insensitive term given the way Yechiel described Jerry -- but he was the head of this Omni Insurance.  I believe it was Weissman.

Q.    And the Complaint alleges that you met at 3877 Flatlands Avenue, was that the end of Midwood that you were referring to before?

A.    It felt like it.  I mean, you know, getting back from that meeting was -- I still remember the trek to a Starbucks, it was long.

Q.    So at that meeting was there an agreement reached about an investment?

A.    There had already been an agreement reached.  That meeting was Leon, Abi, and Yechiel were sitting over here.  You had Ely

Pasternak.  He had Jerry in his chair, it was a special chair with all kinds of contraptions and devices.  And they were sort of pitching Jerry on jumping in so to speak.

Q.   And did Jerry ever say that he would invest?

A.   No.  Jerry was rather ambiguous of it.

Q.   So other than Leon Goldenberg, did anybody, specifically, with respect to the claims in this lawsuit -- I'm not asking about other investors that are unrelated to this lawsuit -- but, specifically, with respect to the allegations in the case, did anybody else agree to participate on that million dollar investment or was it only Leon Goldenberg?

A.   So it was Leon making the investment.  Yechiel seemed to imply that he would be joining, and I don't know if he was going to give Leon something towards that million dollars, but he did confirm that million dollar investment.  He actually did it right before we went into Jerry's offices.

And he said, don't be concerned about how Jerry looks, he looks strange and he

talks -- he didn't say funny, but along those lines. And then it was not a very politically correct heads up, but he said we're going, you know, to put in the million dollars, and he shook my hand.

Q. Okay. Mr. Teman, my question was very specific. It was, other than Leon Goldenberg, did anyone else ever agree to invest part of that million dollars?

A. No. Other than, as I'm saying, Abi Goldenberg and Yechiel Bromberg representing and confirming to me that Leon was making the million dollar investment.

Q. The only agreement that you had was with Leon Goldenberg, he was going to put in the million. He was going to get what we discussed before, whatever that is. That's the only agreement you or GateGuard had with respect to the million dollars; is that correct?

A. I think I've answered this question pretty robustly in the sense that, you know, they would say, okay, we're putting in the million dollars.

And my understanding was that Abi

and Leon and Yechiel were sort of one entity and that it was -- I mean, I don't think, Abi, you know, could make his own decisions.  Abi is under his dad, right, but he can't decide how many intercoms to buy without his dad's approval.  So let's call them one entity, it's really just like Leon with a little, you know, Abi-sized head popping off his shoulder, basically.

Q.    You're speculating on how or who is going to participate.  That's not what I'm asking you.  I'm asking you very specifically --

A.    Well --

Q.    Let me just ask my question again. Did you have an agreement between yourself or GateGuard and any individual person other than Leon Goldenberg?

A.    No.  The investment agreement was made between myself and Leon Goldenberg, face to face --

Q.    And how he was going to get that money -- I'm sorry to interrupt.

A.    Yeah.  Exactly.  Right.  How he was going to get that money.  As along as it was

was legal, it was none of my business.

Q.    Okay.  Thank you.  Now, after that meeting that you had at the office of Omni, you then understood that you had an agreement with Mr. Goldenberg; correct?

A.    No.  I Understood I had an agreement -- first of all, it should be clear it was Leon Goldenberg, because there's two Mr. Goldenbergs.  I understood that I had that agreement at Goldenberg's office.  That predated the Omni meeting.  And that understanding was confirmed multiple times by the -- as I've already explained.

Q.    All right.  And so once that agreement was reached, when was the fund -- when were the funds supposed to be advanced?

A.    It was supposed to be advanced shortly thereafter.  We were expecting the funds within a week or so.  It was explained to us it was just a matter of paperwork.

Q.    Okay.  So let's talk about the paperwork.  What do you mean by that?

A.    Once you agree to the terms, lawyers send out paperwork and you sign it and then they wire the money.

Q.    So did any lawyers prepare any paperwork with respect to the million dollar investment?

A.    It was represented to me that their lawyers were preparing those documents.

Q.    Who represented that to you?

A.    Leon Goldenberg and Abi Goldenberg and Yechiel Bromberg and Ely Pasternak.

Q.    That their lawyers were going to prepare the documents necessary for this investment?

A.    Yeah.  I think the discussion was it was going to just be an industry standard agreement, the type that you find on a Y Combinator website.

Q.    And did you provide any of those individuals with the organizational documents of Friend or Fraud, Inc.?

A.    I don't recall.

Q.    And do you recall if you provided them with any of the documents of the organizational or the corporate documents of GateGuard?

A.    I don't recall.  I do recall that they did ask their accountant to have a chat,

Ari Teman
August 05, 2021                                           74

so it may have been, but I don't recall.

Q.   Do you have a copy of the Friend or Fraud, Incorporated, shareholders agreement or partnership agreement, or whatever document it is that governs that entity?

A.   I believe I do.

Q.   I'm going ask you to give that -- you provide that to your lawyer and I'll call for a production of that document, and we'll follow up in writing.

Now, obviously, the paperwork as you called it was never prepared; correct?

A.   No.

Q.   Did you ever --

A.   I don't know if that's true.

Q.   Okay.  Fair enough.  Let's put it this way --

A.   It was represented to me that it was.

Q.   But you never received any of that paperwork; right?

A.   Correct.

Q.   Did you ever send an e-mail to Leon Goldenberg or any of the other Defendants saying, hey, where is the documents that we

need to finalize this investment?

A.   No.  Because it would have been represented to me that it was forthcoming, and we got this e-mail from Leon's secretary.

Q.   Based on the agreement that you had with Leon Goldenberg, did GateGuard take any actions in reliance on the million dollars that was expected to come?

A.   Yes.

Q.   And what, specifically, did GateGuard do?

A.   We did quite a few things.  Leon had made clear that he needed us to retain operations staff and sales staff; we did that. To take a different office, we did that, that was also just a requirement to contain the additional staff.  To be advertising, we did that.

There were certain things that were required by doing those things.  For example, right, like using an HR service provider, like TriNet and health insurance and telecom services and all the things that come with hiring people and expanding a physical office. And also putting in an increased order for

inventory.

Q.    At what point did you learn --

A.    I'm sure I'm missing -- you know, that's not an exhaustive list, but it's up there.

Q.    At what point did you learn --

A.    One key thing was that we changed the pricing of the device, which impacted us significantly.  So as you'll see discussions back and forth, the plan was with raising this money, we would offer the devices for free.  As you saw in those previous e-mails, we were getting, say, 3,600, 2,600.  I think for one device it was 5,600 up front.

And then the plan here to go to scale was sort of a no money down thing because you could operate off of the investment and then wait for monthly payments come in.  So that was a very significant thing to us, that, based on their representation, we went to that pricing model and that significantly cut into our cash value.

Q.    At what point did you learn that Leon Goldenberg would not be investing $1 million?

A.    There was an e-mail from Jeanne, I believe its was March 12, so about five days after the meeting at Omni.  I was getting out of a taxi getting in to an event that we were sponsoring for Yeshiva University, it's a college in Washington Heights, but the event was in Midtown, a real estate event.  And I was sitting next to Levi Herman, who we had hired on the insistence of Leon that we staff up our sales team.

Q.    But, ultimately, it was your decision whether to add those staff, right, you were the only one who had hiring authority; right?

A.    I mean, I could be.

Q.    Well, who actually hired the personnel that you're talking about?

A.    I hired Levi Herman.

Q.    So you said you hired operations and sales staff; correct?

A.    Correct.

Q.    And I'm talking about, specifically, because you were expecting the million dollars; right?

A.    Yes.

Q.    Who did you hire?  How many people did you hire?

A.    In New York City we hired -- at the time we hired Levi Herman and Yoseff Shachor. We put an offer out to Ely Pasternak that was requested by -- I don't know if it was a letter, but Ely Pasternak was requested by Leon Goldenberg.  And then we also ramped up our hiring of installers.

Q.    And how long after this agreement with Leon Goldenberg did you make those hirings?

A.    Pretty much immediately.

(Deposition Exhibit C was marked for identification.)

BY MR. SCHONFELD:

Q.    Okay.  Mr. Teman, I'm going to show you what's been marked as Exhibit C, and this is a two-page exhibit of e-mails.  I'm going to go to the second page.  I'm just blowing it up so that you can see it.

A.    Can you go to the top first?

Q.    Sorry?

A.    Can you show me the top of the of the document when we are just so I can see what

they are?

Q.   Here you go, it's a two-page exhibit.  The first page is an e-mail from Yechiel Bromberg to Ari Teman dated March 14, 2019.  And I'm going to -- sorry?

A.   Okay.  It looks like an e-mail from Leon Goldenberg to Leon Goldenberg.

Q.   No -- okay.  I'm going to go to the second page.  Okay.  It says, begin forwarded message, from Leon Goldenberg to ari@teman.com, dated March 13, 2019; do you see that?

A.   Yes.

Q.   Okay.  It says, "At this point, Yachiel, Ely, and Jerry backed out."  Correct?

A.   Yeah.  Okay.  There you go.  They backed out means they were in.

Q.   And he writes, "In order to get them interested, we would need to see clear projections at 1,000 buildings, what your cost of products are, the cost of installation, and the cost of operating monthly.  Without these items, we are not going anywhere."

And then continues -- Mr. Goldenberg continues, "On my own, I will not be investing substantial money."

Do you see that?

A.    Yeah.

Q.    That's March 13, 2019.  The personnel that you hired and the expenses that you incurred in reliance of the $1 million, was that -- were those moves made before or after March 13, 2019?

A.    Before.

Q.    So it was after the meeting at Mr. Weissman's office but before this e-mail from Leon Goldenberg?

A.    Yeah.

Q.    It was before the meeting at Weissman's office?

A.    I appreciate the attempt that I got you.  But as I've explained, Leon confirmed the investment prior in his office, as did Abi Goldenberg in video chats and on the phone.

Q.    I'm going to take you back to the Exhibit A, which is the Complaint that you verified.  Paragraph 19, "On or about March 7, 2019, Teman met with L. Goldenberg and A. Goldenberg at 3877 Flatlands Avenue in Brooklyn, NY.

At this meeting, both L. Goldenberg

Ari Teman
August 05, 2021                                              81

and A. Goldenberg represented to Teman that each of them would participate in making an investment into GateGuard, such investment totaling no less than $1 million."

Do you see that?

A.    Yes.

Q.    Now, Mr. Teman, you verified this Complaint; right?

A.    Yeah.

Q.    Are those two sentences true?

A.    Yeah.  Those are true as is the sentence in No. 16 and 17.  It states there were prior communications where they also verified this independently.

Q.    Now, turning to the next page, "On or about March 7, 2019, both L. Goldenberg and A. Goldenberg further instructed Teman to undertake specific business activities on behalf of GateGuard including hiring staff, contracting for product manufacturing and office space, and promotional activities."

Do you see that?

A.    Yeah.  That keyword would be further.

Q.    Is that sentence true?

A.     That keyword there would be further, but, yes, further instructed.  In other words, there were instructions before -- again, there were instructions before and then there were further instructions.

Q.     Right.  And the next paragraph, 22, says, "In reasonable reliance on L. Goldenberg and A. Goldenberg's representation, GateGuard undertook specific business activities referenced above, incurring substantial expense in doing so."

Do you see that?

A.     I do.

Q.     All right.  Is that allegation true?

A.     Yes.

Q.     But it's your contention that those specific activities referenced in Paragraph 22 were done before March 7, 2019?

A.     I think I've already explained that.

Q.     Were those specific business activities undertaken before or after March 7, 2019?

A.     The answer to that would be, yes, they were undertaken before and after.

Q.     So some were before, some were

after; right?

A.   Or they were similar ongoing and then ramped down, right, further instructed. So, for example, you know, the real deal I believe it was after, the hiring was before, right, so depending on which piece.

Q.   Which specific activities were undertaken on or after March 7, 2019?

A.   I believe the real deal advertising kicked off on March 12.  But the hiring, the office, even the negotiating of the advertising was based on the meeting in Leon Goldenberg's office with Leon and Abi and the confirmations that they gave me.

Q.   Okay.  Who was the first person hired, specifically, in the reliance on the million dollars you were expecting from Leon Goldenberg?

A.   I know Levi Herman and Mr. Shachor were hired almost at the same time.  So when one document was signed, then the other.  I don't recall the specific day, but they were after the meetings with Leon and Abi some time in mid -- February was a short month so we'll say mid February.

Q.    But there were multiple meetings with Leon and Abi and there was a point where you reached an agreement; right?

A.    Yes.  Yeah.  We discussed that.

Q.    That wasn't at the first meeting, so it was somewhere during the course of those meetings; right?

A.    It wasn't a meeting with all of them, but that meeting face to face with Leon in his office I think that was the first face-to-face meeting that I recall with Leon. It was confirmed then.

Q.    Okay.  So what was the date of the meeting in which you reached an agreement with Leon Goldenberg for the million dollars?

A.    It was in February 2019 I believe. The specific date, it was early February.

Q.    Early February?

A.    I think so.

Q.    So after that date in early February when you reached that agreement with Leon Goldenberg, why were you continuing to attend meetings with Leon Goldenberg and other people if the deal was already done?

A.    I already explained to you, they

told me that they wanted to get their friends to add.  Remember, we were raising 5 million, this was one of the five, they wanted to get charity and the others to join in.  That's what they represented to me.

Q.   And so -- and, again, what was the specific date that you hired the first person, specifically, in reliance on the agreement with Leon Goldenberg?

MR. REINITZ:  Objection, asked and answered.

THE WITNESS:  I think Levi was February 24, and Mr. Shachor was around the same time, plus or minus a day.  Again, to be clear, like, when the document was signed and countersigned, it was after the meetings with Leon.

BY MR. SCHONFELD:

Q.   What document are you referring?

A.   The employment agreement, like, here's your offer letter.

Q.   So GateGuard had an employment agreement with these two people?

A.   Yes.

Q.   Do you have a copy of it?

A.    We do.

Q.    I'm going to ask you to provide that to your attorney and I'll call for production of those documents.

MR. REINITZ:  We produced that.

BY MR. SCHONFELD:

Q.    Now, you also said that you hired -- other than those two individuals that you testified about, was there anybody else that GateGuard hired, specifically, in reliance to the million dollars that was going to come from Leon Goldenberg?

A.    We ramped up our hiring of installers, guys who put the devices on for us. They were 1099, but we contracted them thereafter.

Q.    How were they paid?  Were they paid by the hour, by the job, or some other way?

A.    It would depend on the person.  So it could be hourly or it could be job and it would depend on what they were doing.

Q.    Were there any of them who were paid even when they weren't working?

A.    No.  Well, I mean, it depends on

what you feel about their work ethic.

Q.    Fair enough.  And so when it comes to hiring an installer, the only time that you would pay them is if they actually did a job; is that correct?

A.    No.  Well, job -- you have to define job.  But if they were doing work for us, whether it was an installation or they were helping us set up and test devices before installation or organize the office or set up a trade show, that sort of thing.  That was the other activities, you know, the reliance, we booked another trade show.

Q.    Now, you also testified that you took additional office space in reliance on that agreement; correct?

A.    Yeah.  That's when we moved from the 106 West 32nd to the 5 Penn Plaza.

Q.    So when you moved to 5 Penn Plaza, what was the date that you moved to 5 Penn Plaza?

A.    Not the exact day.  I know that Shachor is the one who found it and helped arranged it.

Q.    What was the reason -- I'm sorry, I

didn't mean to interrupt you.  You said it was February?

A.    Again, it was at the beginning of the employ of Yoseff Shachor and Levi Herman, so it was somewhere around that time.

Q.    So around February 2019?

A.    Around, yeah.

Q.    Did you sign a lease or any document in connection with that property?

A.    I think they called it like a membership agreement.  I don't want to speak to the legal terms of whether it's a lease or not, because these are co-working spaces and they had their own schtick.

Q.    And was that month to month or for a defined term?

A.    I think it's not quite month to month.  It's not a multiyear lease, but you can't do one month at a time.

Q.    Was that a larger space than the space you were in before?

A.    Yes.

Q.    But GateGuard does not still maintain an office there, does it?

A.    No, we have a -- from my

Ari Teman
August 05, 2021                          89

understanding, we still have -- now, we work at Regus membership, you can go in, but we don't use it every day.

Q.    So the membership agreement, for lack of a better description of it, but the document that GateGuard signed with respect to that office at 5 Penn Plaza in or around February 2019, is that still in effect, that agreement, or has it been modified or canceled?

A.    It's either modified or canceled.  I don't know the specific terms.  We don't -- for instance, we have a specific room there, but we don't have that specific room.

Q.    And what was the difference in rent between what GateGuard was paying at 5 Penn Plaza and what GateGuard was paying at their previous location?

A.    It think it was significant.  I think it was about $3,000.

Q.    Per month?

A.    Yeah.  We went from, like, you know, sort of a tiny, one desk closet-sized space to a place that held, like, six to eight desks.

Q.    And at what point was that agreement modified or terminated?

A.    Which one?

Q.    The agreement in place for the office space at 5 Penn Plaza, you testified before that it's no longer in place now; correct?

A.    No.  That's what I'm trying to clear.  So Regus is like -- it's a membership, so it's like oh, we don't have the big office but we can still use the conference rooms and the hot desks and such.

Like, you know, I could show up there today -- obviously, I can't be there today, I'm bound to be here in front of this deposition -- but I could show up at Regus and say, you know, here is my number ID, we're booking this -- we're going to use this conference room.  They would bill us for that conference.  You know, an example would be, we have a couple of interns or people who are going to assist us with something today, so we're going to take some hot desks they would call it.

Sort of -- I'm trying to be careful because it's not like an apartment lease where I'm moving in January and I have to leave by

the end of December.  It's a membership agreement, not a lease.

I've got to pee again.

Q.    No problem.

(Short recess was taken.)

BY MR. SCHONFELD:

Q.    So, Mr. Teman, do you know why Leon Goldenberg said that he would invest a million dollars and then didn't?

MR. REINITZ:  Objection, calls for speculation.

THE WITNESS:  I can't read minds.

BY MR. SCHONFELD:

Q.    Okay.  Fair enough.  I'm going to put back up Exhibit A.  Paragraph 24 of the Summons and Complaint reads, "Rather, upon information and belief, L. Goldenberg and A. Goldenberg each made their respective false representations with the intent to cause GateGuard to undertake the referenced activities and incur the referenced expenses in order to gain further leverage against GateGuard in subsequent business negotiations."

Do you see that, Mr. Teman?

A.    Yes.

Q.    Is that allegation true?

A.    Yechiel Bromberg even confirms it in one of his e-mails.  Yes.

Q.    So that allegation is true?

A.    I mean, you've got Leon Goldenberg's best friend saying he was trying to get leverage over me.

Q.    So you were not reading Leon Goldenberg's mind when you alleged this in the Complaint; right?

MR. REINITZ:  Objection, calls for legal conclusion.

THE WITNESS:  I just said I don't read minds.  I did hear that directly from Leon.

BY MR. SCHONFELD:

Q.    What did you hear directly from Leon?

A.    As I explained in the Complaint, Leon made a rather lowball offer in an attempt to take complete control of the company.

Q.    So when you say in order to gain further leverage against GateGuard in subsequent business negotiations, what,

specifically, are you referring to?

A.    Leon Goldenberg made an offer to take control of the company for $250,000 and said that Abi signs the check, meaning that his son could control the cash flow and our ability to operate.

Q.    So it's your allegation that Leon Goldenberg offered a million dollars so that he could later offer $250,000?

A.    Yeah.  I mean, that's part of it.

Q.    What else is there besides that, if that's only part of it?

A.    Well, they said the part where he was working to take control of the company.

Q.    How did he work to take control of the company?

A.    It's pretty straightforward.  He buried us in expenses having no real intention in making the investment.  And then when we were running on fumes, he offered just enough money to cover the damage that he caused to give his son, who had expressed interest in having his own business with a friend, and take control of my business.

Q.    When you say he buried you expenses,

are you talking about the people you hired, the

office space, and the advertising?

      A.    The inventory, the contracts, et

cetera.

      Q.    What do you mean by the inventory?

      A.    I already explained that we put in a

larger order with our factories.

      Q.    GateGuard put in a large order for

inventory?

      A.    Yeah.

      Q.    Based on the million dollar --

expected million dollar investment?

      A.    Yeah.  Which, again, as the document

shows, was combined with a large order from

Abi, and Abi Goldenberg put it in on behalf of

Goldmont where they were going to get the

devices for free because they were sort of the

first to take advantage of this.  The

investment enabled the offering where instead

of paying thousands of dollars upfront for the

device, you get it for free and just pay your

monthly fees.

      Q.    So GateGuard made a large offer --

I'm sorry, GateGuard made a large order of

devices based on the million dollar -- expected

million dollar investment from Leon Goldenberg; correct?

A.    Yes.

Q.    When was that order made?

A.    I don't know the exact date off the top of my head, but it was after the meeting at Leon's office.

Q.    Was it before GateGuard entered into an agreement with Goldmont for the sale of 41 devices?

A.    It was -- so you have to be careful there, right.  Remember, Abi Goldenberg -- and you have it in discovery where he's taking photos of our terms that he's ordering online, the 60 buildings, so there was that order. Like when you say, oh, 41 devices, he first ordered 60 devices and graciously took photos of himself doing it.  Not selfies, not of himself, but of his screen as he was doing it. That's one order.

        And then, obviously, you have Jacob, their attorney, who edited the screen and had Leon sign it, and that was sort of a superseding agreement to the original agreement.

Q.    But neither of those orders were because of the million dollar investment, right, those were independent of whether a million dollars was going to be invested?

A.    Correct.  It's just abundantly clear in the messages between myself and Abi that the price offered to them, the special deal offered to them was only made, we could have only made it because we expected to get the cash from the investment as opposed to them paying cash for the devices.

Q.    Other than the devices that were ordered by GateGuard, specifically, for Goldmont, did GateGuard order any other additional devices, specifically, on reliance of the million dollar investment?

A.    Yes.  I believe there's a 500 unit -- we're ordering from a factory, so we're not like ordering pieces.  It's not like you go to Best Buy and you buy a laptop, right.  You go to a laptop factory and they'll say here's a main order quantity, you know, 500 devices.

Q.    And when was that order of 500 devices made?

A.    You just asked and I told you I

Ari Teman
August 05, 2021                                       97

don't recall the exact date, but it was on or

about the time that Abi put in the 60 building

order that was he taking pictures of with his

phone.

Q.    And do you have a copy of that

order?

A.    I probably do.  I'm sure I do.

Q.    I'll ask you to produce it to your

attorney and then I'll call for its production.

A.    They're going to have a trade secret

concern that I'll have to address.

Q.    That's fine.  You can redact any

trade secrets, I'm not interested in your

intellectual property.

A.    Okay.

Q.    Do you recall whether that order was

made before or after Leon Goldenberg e-mailed

you telling you he would not be making the

investment?

A.    It was definitely before.  My

understanding from Leon's e-mail is that his

secretary actually sent the e-mail.  It seems

that they both use the same e-mail account.  I

don't know if he sent it on his behalf or if he

typed it.

Q.   Okay.  I'm going to take you back to Exhibit C, which I've shown you before.  Again, this is the e-mail from Leon Goldenberg to ari@teman.com, dated March 14, 2019, at 4:49 p.m.; correct?

A.   Yes.

Q.   Okay.  Not a trick question.  Going to the second paragraph --

A.   It's just a little bit grainy, but, yeah.

Q.   I can change the sizing.  Does this make it easier for you to see or harder?

A.   It's just grainy.  Okay.

Q.   In the second paragraph it says, "In order to get them interested, we would need to see clear projections at 1,000 buildings, what your cost of product are, cost of installation and cost of operating monthly."

Do you recall receiving this e-mail?

A.   Yes.

Q.   And did you ever provide the information that Mr. Goldenberg asked for?

A.   They already had it.

Q.   I'm sorry?  The projections here.

A.   They already had it.  I already

talked to you about the spreadsheet that Ely Pasternak had.  We had provided them a similar spreadsheet, which I know is in discovery. This e-mail, as they say in Israel, is bullshit.

Q.    All right.

MR. REINITZ:  While you're getting yourself organized, I'm just going to make a request for us to review the transcript before anything is finalized.  Rule 30.  That's all.  No big deal.

MR. SCHONFELD:  Request to review the transcript before it's finalized?

MR. REINITZ:  Before it's completely -- in other words, once the transcript is prepared, we get 30 days to request -- the witness is entitled to review the transcript before it's finalized.  That's all.

MR. SCHONFELD:  Yes, the witness is entitled to do so.

MR. REINITZ:  Yeah.  Rule 30, we got to make the request, so we're making the request.  That's all.

MR. SCHONFELD:  Fair enough.

Your request is agreed to, granted.

MR. REINITZ:  Thank you.  Much appreciated.

(Deposition Exhibit I was marked for identification.)

BY MR. SCHONFELD:

Q.    I want to show you something but I haven't sent it to your attorney yet.  I'll just put it on the screen and I'll ask that this be marked as Exhibit -- I think we're up to Exhibit I -- and we'll circulate the marked exhibits afterwards.

For the record, this is a document with the description Employment Offer Letter, Bates No. GG00204; it was produced by GateGuard during discovery.  And I'll put it up on the screen.

Mr. Teman, can you see this document?

A.    No, it's pretty small.

Q.    I'll blow it up.  Do you see it now?

A.    Okay.  So this is actually just clarifying -- so now I recall -- sorry, there was a lot of dates and we got, like, two days notice for this thing -- I know there was a lot

of back of forth.

But now I recall that I met in Leon's office, it was the day after Christmas, which I don't think is a holiday many of us celebrate, maybe Chinese food. So December 26 for those not familiar, that was the meeting in Leon's office. I mixed up the meeting at Penn with the meeting at Leon's office.

Q. So let's look at Exhibit I. This is a document dated January 31, 2019, it is an employment offer to Yoseff Shachor; correct?

A. Yes.

Q. Okay. And turning to the second page of the exhibit, Bates-marked GG00205, it is signed by Yoseff Shachor, February 13, 2019; correct?

A. Yes.

Q. And it doesn't have your actual physical signature, but it says, sincerely Ari Teman, CEO, Friend or Fraud, Incorporated; correct?

A. Yeah.

Q. Okay. Who actually hired Yoseff Shachor, was it Friend or Fraud or was it GateGuard?

A.    Friend or Fraud is a parent company of GateGuard.

Q.    Well, let me read the first sentence of this letter.  "We are pleased to offer you a position as operation manager at Friend or Fraud, Incorporated."

A.    Right.  Friend or Fraud.

Q.    So GateGuard never actually hired Yoseff Shachor at all; correct?

A.    No.  GateGuard did.

Q.    GateGuard hired Yoseff?

A.    I'm sorry, I misspoke.  Friend or Fraud.  Friend or Fraud is sort of just like, you know, the entity that holds the property, holds the companies, hires the staff, they're the same company.

Q.    So, again, GateGuard never hired Yoseff Shachor; is that correct?

A.    I'm sorry, GateGuard, Inc., never hired Yoseff Shachor.  But GateGuard Team hired Yoseff Shachor.

Q.    GateGuard TM?

A.    Team.

Q.    What's GateGuard Team?

A.    In other words, like, you know, if

Ari Teman
August 05, 2021                                    103

you got hired by -- if you say, hey, I got hired by Gmail, right, you got hired by Alphabet or Google, and then there's a department, there's Gmail.  And Gmail might have its own operating entity, it might have -- you know, I'm sure it does, I'm sure there's like, you know, Google Mail Operations, LLC or something like that.  So it's all the same company, it's all Alphabet, it's all Google.

Q.   GateGuard Team is not a formal entity or anything like that, it's just an informal term that you're using?

A.   Yeah.

Q.   Was Yoseff Shachor actually paid for his work?

A.   I don't recall.  He was very short-lived.

Q.   Okay.  Well, this says commencing as of February 12, 2019, right, the third paragraph?

A.   Yes.

Q.   Did he actually start working then?

A.   He did start working.

Q.   And who actually paid him, was it Friend or Fraud or was it somebody else?

Ari Teman
August 05, 2021                                       104

A.    Actually, it gets a little bit complicated there in terms of the corporate entities because we would use TriNet, which is like a health insurance HR service.  And they have this weird loophole where you pay them and then, you know, so they can get a group insurance plan -- again, I'm not a lawyer, right.  If you would just say in layman's terms he works for us, we pay him with our money. Friend or Fraud, right, would pay him the money but pay him the money from the GateGuard operations.

But he also possibly got paid technically through some TriNet entity, and if we would we pay them, they would distribute the money to them.

There's also -- again, I just want to be very careful, there's sort of a -- I think there's an official time or number of days you have to be at the company before TriNet would kick it.

Q.    Now, you said that after having reviewed this document, you now recall that you had a meeting with Leon Goldenberg on Christmas Eve 2018?

A.    The day after Christmas.

Q.    So December 26?

A.    I don't know what they call that, Christmas Katan or something, I don't know. It's just an inside Jewish joke -- yeah, it was December 26.

Q.    December 26, 2018, and that's when you actually had the agreement with Mr. Goldenberg?

A.    That's when he would be putting in the million dollars.

Q.    And that's when you had the agreement and said that the lawyers were going to put together the paperwork, what you testified to previously, that happened on December 26, 2018?

A.    That meeting with all the paintings and the stuff in the office and the variable ego trip and photos in the bullpen/main hallway of his office.  Yeah.  That was December 26, 2018.

Q.    Let me be very, very specific Mr. Teman, the meeting that you described in which you had reached a final agreement with Mr. Goldenberg that was the subject of the

paperwork, that was on December 26, 2018?

A.    Yes.   The verification that he would be putting in the million dollars and then that we would go around to try to get his friends to complete the -- or get towards the $5 million round, those meetings were then after that.

Q.    But you had a deal with him on December 26, 2018?

A.    Yes.

Q.    And here this letter is dated January 31, 2019, more than a month later, no paperwork, no investment, why did you make a hiring based on that agreement?

A.    I believed your clients.

Q.    Do you have any e-mails in that month saying, hey, what's going on, where's the money, where's the paperwork?

A.    No.   Lawyers are not the fastest moving people in the world.

Q.    Mr. Temon, during the course of your deposition, an attorney by the name of Ronald Coleman entered an appearance on behalf of GateGuard.   Is he representing GateGuard?

A.    He is, yes.

Q.    Okay.   Is Mr. Reinitz still

Ari Teman
August 05, 2021                                                    107

representing?

A.    Thankfully, yes.

Q.    All right.  And do you consent to this deposition continuing in the absence of Mr. Coleman?

A.    Yes.

(Deposition Exhibit J was marked for identification.)

BY MR. SCHONFELD:

Q.    I some how muted myself.  I'm going to show you now and I'll ask that this be marked as Exhibit J.

A.    It's really small.  Is there a way to make it full screen?

Q.    I'm going to increase the size.  And just for the record, this is a document produced by GateGuard during discovery, Bates-marked GG00221.  It is dated February 29, 2019.  It is addressed to Mr. Simcha Levi Herman with the subject employment offer letter; do you see that?

A.    I do.

Q.    And the first sentence reads, "We are pleased to offer you a position as head of sales at Friend or Fraud, Incorporated."

Do you see that?

A.    Yes.

Q.    Now, this is now two months after your agreement with Mr. Goldenberg in which you had received no money, no paperwork.  Is it your testimony that this hiring was made in reliance on that investment and that agreement?

A.    Yes.

Q.    Is there a reason why -- withdrawn.

Prior to making this hiring, did you e-mail Mr. Goldenberg, either Leon or Abi -- well, withdrawn.

Prior to making this hiring, did you e-mail Mr. Goldenberg saying, look, I'm making another hiring based on your investment, where is the money or where is the paperwork?

A.    No.  Again, keep in mind that they were taking me around saying that they were going the raise even more money, right.  So it would have been -- not that I'm the most politically correct person, you've read my e-mails -- but it would have been politically foolish to start saying, hey, why don't you pay up while they're getting their friends to get more than a million dollars.

Q.   So during the period between December 26, 2018, and the middle of March when Mr. Goldenberg told you he was not going to be investing, he was taking you to different people trying to get you additional funds; is that your testimony?

A.   So I think lawyers would call that a compound statement.  Because he didn't -- do you want to break it down for me or do you just want to ask the question more simply?

Q.   During that period of time, between December 26, 2018, and the date that Leon Goldenberg, March 13, 2019, e-mailed you telling you he would not be investing substantial money, you attended a number of meetings for the purpose of raising additional capital; is that correct?

A.   March 13 or March 12.  Yeah.  They did a -- what the heck is the term -- they did a bit of a show, they paraded me around to their different friends to try to convince them to get us more money.

Q.   And so the purpose of those meetings were not to bring them on to the million dollars that Leon Goldenberg was investing, but

it was to raise capital in addition to the million dollars?  Was that your understanding?

     A.    Yes.  It was not inclusive of the million, it was an addition to the million.

          It was also made clear because Ely Pasternak even made a spreadsheet saying, well, if we only had Leon's million, this is how we'd go ahead.

     Q.    I'm going to put back up on the screen Exhibit F, Defendant's Exhibit F, which is a string of e-mails we saw briefly before.

          Now, this is an e-mail from you, Ari Teman, March 15, 2019, to Leon Goldenberg.  And copied on that e-mail is Yechiel Bromberg, Jerry Weissman, Ely Pasternak, A. Goldenberg, Jeanne Weisberg, and Ariel Reinitz; do you see that?

     A.    Yes.

     Q.    Okay.  And was this your response to Mr. Goldenberg's e-mail in which he said he would not be investing?

     A.    It appears so.

     Q.    So let's go through this.  This first sentence -- well, withdrawn.

          Did you write this e-mail yourself

or did someone help you with it?

A.    I don't recall.  It could have been that I got some input from Levi Herman or not, this was more than two years ago.

Q.    Okay.  All right.  Let's look at the first paragraph.  "Yechiel -- and just for the purpose of the record, that's a reference to Yechiel Bromberg; correct?

A.    Yes.

Q.    Okay.  And, again, I'm just quoting directly.  "Yechiel said right to my face in the hallway after the meeting, 'we're going to put in $1 million and only have to figure the valuation.'  He said it with a big smile and pat on my shoulder.  It wasn't ambiguous.  If Yechiel is an honest person, he will admit this."

Do you see that?

A.    I do.

Q.    Which meeting were you referring to?

A.    There were multiple meetings.  In fact, there were multiple meetings even in at the Omni places I had explained.

So, obviously, you have the meetings with Abi, meetings with Leon, meetings and

phone calls with Abi, meetings with Leon.  The other meetings at Penn.

And then even at Omni we met first in this entryway or foyer so to speak, and then there was like a little snack room.  One of the guys talked about Minhah, the afternoon prayer service.  They didn't have a problem with meeting at that office.  And there was sort of a powwow that's -- so after that meeting, Yechiel confirmed, and then he said, as I said, not a politically correct heads up about Jerry's appearance and way of being.

And I was able to keep a straight face when he did that, but I was a little surprised.  And then he gave me a pat on the back and we went down the hall to Jerry.

Q.    So the meeting you're referring to in this e-mail is the one at Jerry Weissman's office?

A.    The first of the two meetings in Jerry Weissman's office.  The one in the hallway.

Q.    Was that the March 7, 2019 meeting that you referenced in the Complaint that took place on Flatlands Avenue?

A.    Yes.

Q.    So why in this e-mail did you not say to Leon Goldenberg, but you promised almost three months ago, on December 26, 2018, why are you referring to a meeting that happened just a week prior to this if the agreement was actually few months old?

A.    The subject matter of the e-mail I'm replying to, which you even pointed out and if you scroll it's right there, it says that Yechiel is backing out.  So this is not even necessarily in reference to that million, because Yechiel is a follow on and he's saying Yechiel is backing out.

I mean, I understand what you're tying to do, but it doesn't make any sense even from the plain text reading of the e-mail.

Q.    So the e-mail was referring to an agreement you had with Yechiel?

A.    I mean, it literally says Yechiel and so and so and so and so are backing out.  So you can't back out of something you haven't stepped into.

Q.    My question is, did you have an agreement with Yechiel that was separate from

the agreement with Leon Goldenberg?

A.    I think I've already explained that. They were going to invest in addition to Leon's million.

Q.    So Leon was going to put in a million, and how much was Yechiel going to put in?

A.    That's exactly what was said here. They said that they were going to figure out their valuation.  The understanding is that they were going to put in another million on top of it.  That Yechiel and Jerry and that group were going to try to top off.  Remember, we were raising a total of 5 million.  They even say it in the next paragraph there, "Doing things less than the 3 to 5 million we budgeted."

Q.    So this e-mail here has nothing to do with the money that Leon Goldenberg agreed to invest; is that correct?

A.    Well, there's more parts to this e-mail.

Q.    Well, the e-mail ends on this page. I can make it a drop smaller if it's easier to see, but I'm referring to this specific e-mail,

March 15, 2019, at 2:24 p.m.

My question to you is is this e-mail referring to the million dollars that Leon Goldenberg agreed to invest in GateGuard?

A.    It would appear that this e-mail is referring to both Leon Goldenberg's $1 million investment and also the follow on investment. That e-mail makes it very clear that there was a budget raise of 3 to 5 million.

Q.    Did you have an agreement with Yechiel Bromberg independent of Leon Goldenberg's million dollars, yes or no?

A.    I had a representation -- I had an agreement with Leon down to the percentages and that he would be leading the run.  Then he brought me around and he got a representation from Yechiel that he would be joining, that he would be adding an investment.

And then they, obviously, brought me to Jerry's office -- said mean things about Jerry and then brought me in to Jerry's office and tried to get Jerry's money.  Which, you know, it doesn't seem like a nice thing to do. I feel bad for Jerry, but he seems like he's -- he might not even be alive actually.  I hope

he's okay.

Q.    So, again, this e-mail is not referring to the million dollars that Leon Goldenberg agreed to invest; is that correct or not?

A.    I've answered that question.

Q.    Okay.  Fair enough.  Now, if you go further down into the paragraph in bold, "There was no ambiguity in my discussions with Abi either."

Do you see that?

A.    Yeah.  There you go.

Q.    What's that referring to?

A.    The discussion of Leon investing a million dollars.  If I could give you an geschockt -- I don't mean to make anyone uncomfortable with German -- but a geschockt of this e-mail, it's you're not only lying but all of these people will confirm the representations that you made to me.

Abi was in the room with Leon and can confirm it.  Ely and Abi were in the room with Leon, so was Yechiel, during follow-up meetings where it was reiterated.  Abi, of course, was in the meeting when the offer was

Ari Teman
August 05, 2021                                    117

made.

Initially, Ely was working, using a spreadsheet, as I mentioned here, that said, okay, if we've only got the million that Leon says he's putting in, this is what we do. We're going to try to get Yechiel and Jerry to top off.

So I mean, yeah -- I mean, this e-mail is also written in not the best of moods, but it makes things pretty clear.

Q.   If you look at that third paragraph that begins in all bold, "There was no ambiguity," and you add in parentheses, "hiring staff, the orders with China, the Real Deal adds, YU Sponsorships, et cetera."

Do you see that?

A.   Yeah.

Q.   Was that referring -- were those expenditures made based on the investment that Yechiel was going to make or that Leon Goldenberg was going to make?

A.   No, that's my point.  So that second bold section refers to the Leon's agreement to invest.

Q.   So when you write, "There was zero

Ari Teman
August 05, 2021                                          118

ambiguity in the words from Ely or Yechiel that the decision was made to put in $1 million," which $1 million is that referring to, the million dollars from Leon Goldenberg, the million dollars from Yechiel Bromberg, or somebody else?

A.    No.  I never said there was a million dollars from Yechiel Bromberg.

To be very clear -- again, this is an e-mail written in haste in response to a very disgusting e-mail.  You even see Abi Goldenberg wrote to me and Leon Goldenberg wrote to me, and you quote it right here, sending that message through e-mail to Jeanne -- there you go, the secretary sent the e-mail.

In other words, they even acknowledged in the thread and in a separate -- in that message from Abi that the way they did this was disgusting.  And so this was a hasty reply.  If you're trying the pick out a legal argument from this, then good luck.

But what's very clear here is that there's two things going on.  This e-mail was primarily focused on the fact that, hey, all of

your friends confirmed the same thing you told me to my face. It's not just that I'm saying you told me this to my face and then we had an disagreement, but you also confirmed it to all these people and they acted on it.

Ely made a whole spreadsheet based on Leon's million dollars.

Q. I'm going to move down to Page 4 of this exhibit -- I'm sorry, not Page 4 -- oh, it is Page 4. Sorry about that, I'm not moving fast, I apologize.

Okay. Page 4, which is Bates-marked 000030, this is an e-mail on Friday, March 15, 2019, at 10:35 a.m., from Leon Goldenberg to you; do you recall this e-mail?

A. Yes.

Q. Okay. The e-mail that we discussed, was that in response to this e-mail from Leon Goldenberg?

A. Say that again?

Q. The e-mail that we just discussed before, was that your response to this e-mail from Leon Goldenberg?

A. Again, you've got to -- I have to see the full document -- I just want to be

careful to be caught in a got you.  It appears to be the same thread.

Q.    Fair enough.  Now, he writes -- Mr. Goldenberg does in the fourth paragraph, "There were five of us at the meeting.  From our side, there was no one at the meeting who committed to giving you a million dollars.  We were looking to discuss our options and if you think a million dollars is invested chikchok, then I have to tell you that is not how it works."

Do you see that, Mr. Teman?

A.    I do.

Q.    And do you know what meeting he's referring to?

A.    It could have been -- he could be referring to either the meeting in 5 Penn, or he could have been referring to the meeting in Jerry's office -- not 5 Penn, 1 Penn, sorry.

Q.    And then he continues, "Yes, you also met with their accountant who also was not satisfied with getting real numbers from you."

Do you recall meeting with an accountant for Leon Goldenberg?

A.    I think that that was the meeting

Ari Teman
August 05, 2021                                    121

in -- the meeting in 1 Penn, yeah.

Q.     And your understanding of Mr. Goldberg's e-mail is that he's not referring to his original December 26, 2018 agreement to invest $1 million?

A.     There were not five people in that meeting.

Q.     So that million dollars was still, as far as you were concerned, was still coming; correct?

A.     When?

Q.     When you received this e-mail, and I'm talking about there were five of us at this meeting, your understanding was that the million dollar agreement that was reached on December 26, 2018, was still in effect; is that correct?

MR. REINITZ:  Objection, calls for legal conclusion.

THE WITNESS:  You're asking me to speculate and read Leon Goldenberg's mind.

BY MR. SCHONFELD:

Q.     I'm not.  I'm not asking you to read Leon Goldenberg's mind.

A.     Go back to the original e-mail from

Jeanne right there in this thread and it makes it very clear that he's not going to do what he said he was going to do.

Q.    I'm asking you, in your mind, when you received this e-mail, did you understand that to be referring to the original agreement with Leon Goldenberg as well, or only the additional million that was discussed at the meeting with Jerry Weissman?

A.    I mean, pardon the vernacular but I understood this e-mail to be just a pile of bullshit made up on the spot because he got called out.  You see in the thread that he turned to Yechiel Bromberg and said, did I do this.  Like, come on, this is not an honest man and this e-mail is just full of inaccuracies.

Q.    Let's go back to the first page of this exhibit.  And you write here towards the bottom, third paragraph from the bottom, "Your behavior inspires me to work even harder.  It inspires me to never trust a guy with a kippah again, too.  Only the frum guys make such promises so easily."

What did you mean by that?

A.    You know, there's a -- and, again, I

don't necessarily believe this all the time. Again, this was an e-mail sent in haste and in anger, although somewhat nicely formatted, given the limit of time.

There's a famous ad that goes around of some -- it's in a frum magazine, an Orthodox publication. It's a service advertising a way to save money. And the photo is an Ultra-Orthodox man carrying an air-conditioner back into Walmart at the end of summer and the title is, there's an easier way to save.

There seems to be, unfortunately, a bit of a cultural acceptance that you can, basically, screw your vendors by making false promises and giving false hope. And I encountered that a number of times, which is why we have pretty strict terms in our online agreements.

Q. Where was this ad in relating to Walmart? Where did that appear?

A. I would have to go find it.

Q. And how is that relevant to the question I asked you about what you wrote in your e-mail?

A. It's a discussion that frum guys

Ari Teman
August 05, 2021                                    124

have no problems making agreements with vendors that they have no intention of fulfilling.

Q.    And by frum, you mean Orthodox Jews; correct?

A.    You know, I would say that there's not -- I would say, you know, this is getting into the weeds, right.  So, you know, there's -- it's more of an identity than a practice.

Q.    So do you consider a guy with a kippah to be untrustworthy?

A.    No, definitely not.  I have many kippahs we buy them in bulk from China.

Q.    By kippah I mean a skull cap, a yarmulke?

A.    My father wears a skull cap and I trust my father.

Q.    So when you wrote it, "It inspires me to never trust a guy with a Kippah again, too" were you saying that you consider people who wear kippahs to be untrustworthy?

A.    This is a bit of an artful expression where I'm, basically, saying, you're being an embarrassment to our people, you are acting in business very dishonestly.  Perhaps

you have public persona, but the way you treat your vendors is unethical, and it's calling out the hypocrisy.

Like, you put yourself as this leader of this religious group, which Leon does, a leader of a religious community, but then behind the scenes you're just lying to people's faces.  And, as you saw in Yechiel's e-mail, he's trying to get leverage over the little guy and crush him so he can get a better deal.

It's just, you know, this is an artful way of saying, shame on you, you hypocrite.

Q.    As you sit here today, do you consider Orthodox Jews to be less trustworthy than people of other groups?

A.    No.

Q.    Then you say on the bottom, "I'd say good Shabbos, but I'm done with Shabbos for a long time now."

What did you mean by that?

A.    I don't recall.

Q.    What does Shabbos mean?

A.    How much detail do you want?  Do you

want the 39 categories of effort that are forbidden on the Sabbath? Do you want me to give you the explanation from my modities or do you want a later -- perhaps you're probably like (witness says a word in Hebrew) I would think or a (witness says a word in Hebrew). This is going to be real tough for the court reporter.

It really depends, right, because the Sabbath is at one hand such a universal term and yet it also means something different to each of us.

Q. Okay. What I want to know is what you meant. I don't need a convoluted discourse. I just want to know, you wrote a sentence, I'm asking you what you meant when you wrote that word?

A. I did. I was just telling this guy to piss off. I mean, what do you -- I don't know that it's particular relevant. You know, I carry on the Sabbath and I don't hold by the Arabs so, you know, what does that mean. I don't know.

Religion is a very complicated thing and we all go through our journeys with

Ari Teman
August 05, 2021                                127

religious faith and belief and practice.  And for some, the Sabbath is driving to their family and having a Sabbath dinner, thereby using a combustion engine violating at least one of the 39 categories.  And for other people it's living sort of Amish style life for 25 hours, which would be sundown and Friday -- I'm sorry, sundown and Saturday.

Q.    I'm staying in the same exhibit.  I am going to turn -- and I apologize for the scrolling -- to the 10th page of the exhibit, it's Bates-marked 000109.  That is an e-mail from you to Leon Goldenberg, the same date, March 15, 2019.  The first e-mail that we looked at from this exhibit was at 2:24 p.m., this is an e-mail at 5:06 p.m.; do you see that?

A.    I do.

Q.    And fair to say that this e-mail is an apology for the previous e-mail?

A.    It's an apology for the tone.

Q.    So you write, "I'm sorry for my tone.  I went in to a very dark hole when I got that news.  I have to improve how I handle such things."

Ari Teman
August 05, 2021                                    128

What did you mean by a dark hole?

A.    You get depressed.

Q.    All right.  Now, in the second sentence you say, "I will try to be as good a mensch as Abi is, conduct myself as he would in business, and I'm sorry again I let my fear get ahead of me."

Do you see that?

A.    Yeah.  I very clearly didn't know what Abi really was at the time.

Q.    Okay.  When you say your fear, what did you mean?  Your fear of what?

A.    I think it's pretty clear with Leon crushing us with expenses so that he could take over the company, obviously.  But like he crushed us with expenses, and now I feared, oh, I've got to pay these people, this guy's got a wife, you know, these people are married and they've got to pay the rent.

I mean, when you're running a company there's responsibility.  If you hire someone, you know, maybe unlike these guys I try to keep my word and pay the people what I promise to pay.

Q.    So at this point did you know that

Ari Teman
August 05, 2021                                           129

Leon was not investing the million, or did you still think his million was on the table?

A.   I think his secretary's e-mail makes it pretty clear that things were no longer --

Q.   I'm sorry, I can't hear you.

A.   I think that his secretary's e-mail made that perfectly clear that things were not as he had promised us in December.

Q.   So you understood his previous e-mail to say you were going to get no investment, not from Leon, not from Jerry Weissman, not from anybody; correct?

A.   Well, certainly not the million dollars that he had promised.

Q.   And then you conclude by saying, "Thank you for believing in me and trying and I'm sorry again."  Correct?

A.   Yes.

Q.   Now, this is at a time where you allege that you incurred expenses because of him, your company was in trouble and that he had reneged on an investment agreement?

A.   Yeah.

MR. SCHONFELD:  Okay.  It's ten to 1:00 right now.  Why don't we take 10

minutes or 15 minutes and come back at 1:05,

does that work for everyone?

MR. REINITZ:  Sure.

MR. SCHONFELD:  See you then.

(Short recess was taken.)

BY MR. SCHONFELD:

Q.    Mr. Teman, at some point did there

come a time when GateGuard entered into an

agreement with Goldmont for the sale by

GateGuard to Goldmont of intercom devices?

MR. REINITZ:  Objection, calls

for legal conclusion.  You can answer.

THE WITNESS:  Did we enter

into an agreement to sell intercom devices?

BY MR. SCHONFELD:

Q.    Yes.

A.    Yes.

Q.    Now, you testified about one

earlier, right, when Abi -- I forget if it was

five or ten devices which we discussed, and

then was a sale to Goldmont subsequent to that?

A.    There were multiple sales to

Goldmont subsequent to that.

Q.    How many; do you recall?

A.    There were -- there was the order of

Ari Teman
August 05, 2021                                                131

10 or I think it was 12 devices.  Then there's -- which you just showed on the screen before, where he was taking pictures as he was putting an online order.  Then there was the superseding agreement that they had their attorney Jacob edit and negotiate with my attorney, our lawyer.

Q.    And that agreement was, ultimately, signed?

A.    Yes.

Q.    By all parties, both parties, by GateGuard and by Goldmont?

A.    Yes.

Q.    Do you remember when that agreement was signed?

A.    The specific date off the top of my head, no.  I know that Jacob e-mailed us the signature with Leon signing it.  And I know that I e-mailed the signed document back to Ariel.

Q.    All right.  Just so to make the record clear I'll show you Paragraph 3 of the Complaint, Exhibit A, it says, "On August 30, 2019, Goldmont and GateGuard entered in to an equipment purchase agreement whereby Goldmont

Ari Teman
August 05, 2021                                                  132

purchased 41 GateGuard intercom devices at a substantial discount from GateGuard standard pricing."

Do you see that?

A.     Yes.

Q.     Okay.  Does that refresh your recollection as to the date of the agreement?

A.     Okay.

Q.     So it was August 30, 2019; correct?

A.     Yeah.

Q.     Not a trick question.  That's what you allege in the Complaint.

A.     Yeah.  Zoom did a weird thing where it keeps moving you guys from the column.  When you share documents, the people jump around the screen.

Q.     The reality of the world we're operating in today.

A.     Yeah.  You think it would just keep together so I can still see the document underneath, but it's like, oh, you got a document, it's cover it up.

Q.     So, Mr. Teman, August 30, 2019, we are now eight months after the agreement that you testified to earlier by which Leon

Goldenberg was going to invest a million dollars in GateGuard and which he had not done; correct?

A.    Yes.

Q.    And yet still eight months later, after the e-mail exchanges that we discussed previously, GateGuard offered Goldmont a substantial discount; is that correct?

A.    Yes.

Q.    Why?

A.    Why did -- it wasn't out of the goodness of our hearts to offer them a discount, it was that they had an agreement. Abi had conveyed to me in conversations that he felt bad about the way they had handled things and understood that his father had caused significant damage to the company and wasn't going to take control of the company through investment.

And that they would, you know, entertain financing through a third party company so that we could get this up front payment. The discount was sort of a result of the maximum they would be willing to pay per month per building.

Q.   Were you still holding out hope at this point that Leon Goldenberg was going to come through the million dollar investment or had you given up on that?

A.   Not only given up on it, I would never want that guy to be a shareholder of my company after the way he acted.

(Deposition Exhibit D was marked for identification.)

BY MR. SCHONFELD:

Q.   I am going to show you what has been marked as Exhibit D, and this is Equipment Purchase Agreement between Goldmont and related entities and GateGuard; do you see that document?

A.   What did you guys do, photocopy it seven times and then scan it back in?  This was a digital file and now it's like sideways and skewed.

Q.   Okay.  I'm not seeing it sideways and skewed on my end.

A.   It's a little bit slanted.

Q.   Is this the agreement that you -- that GateGuard and Goldmont entered into for the sale of those 41 devices?

A.    Can I see the rest of the document?

Q.    Sure.  There's the first page.  Let me know when I can continue.

A.    Yeah.  Okay.

Q.    Does this look like the contract, the agreement?

A.    It looks familiar.  Yeah.

MR. REINITZ:  Sorry, the document is incomplete.  Can you show him the full document?

MR. SCHONFELD:  What's it missing?  It's missing signature.

MR. REINITZ:  There's a lengthy addendum of the revised terms.

MR. SCHONFELD:  Appendix A.

MR. REINITZ:  At least in the version that we received and the version that we produced.

MR. SCHONFELD:  Maybe I pulled up the wrong document, give me a second.

MR. REINITZ:  If it helps, my recollection is that there was the -- like the file name was Binder 2 or something like that, if that rings a bell.  It was something like that off the top of my head.

MR. SCHONFELD: Okay.

MR. REINITZ: That was the file name I believe to that effect that we received from -- I received from Jacob Rubinstein and I'm fairly certain we produced as well.

MR. SCHONFELD: I'm trying to find it here.

MR. REINITZ: I don't have a problem if you want to show it, but just be clear that's only part -- that's not the full document.

MR. SCHONFELD: I would rather find it. You can look too and if you find it, let me know. This file is voluminous.

Okay. So I don't want to waste time. So let's just move ahead to something else and then we'll come back to it as soon as I find it.

THE WITNESS: I can keep explaining Jewish holidays as you try to find it.

(Deposition Exhibit G was marked for identification.)

BY MR. SCHONFELD:

Q.    All right.  We'll go to something more fun.  Mr. Teman, I am going to show you what has been marked as Exhibit G.  This is a document entitled, Goodbye, a suicide note; do you see that?

A.    I do.

Q.    Okay.  Did you write this?

A.    I believe so.

Q.    Did you post it online somewhere?

A.    I believe so.

Q.    Okay.  And when did you write it?

A.    I don't recall the exact date.  It would have been late 2019.

Q.    And was it something specific that prompted you write this?

A.    I was feeling pretty bad.

Q.    All right.  And where -- you said it was posted online?

A.    You did.

Q.    Oh, I'm sorry.  I asked you and I thought you said yes.  I apologize.  Was this posted online?

A.    I think so.  I don't recall.

Q.    All right.  Do you recall where it was posted, if it was?

A.    It could have been Twitter.  I don't know.

Q.    Okay.  Do you have a Twitter account?

A.    I do.

Q.    All right.  What's your twitter handle?

A.    It's my full name without the middle name.  So it's not my full name, it's just the first name and last name with nothing in the middle.

Q.    So at A-R-I-T-E-M-A-N?

A.    Correct.

Q.    Do you have a Facebook page?

A.    I have a personal profile and a Facebook page, yeah.

Q.    And so you don't recall whether this was posted on Twitter or Facebook or somewhere else?

A.    I mean, as the title might imply it wasn't exactly my best moment.

Q.    Understood.  And first sentence, "If you are reading this, I am dead.  I was killed because religious philanthropists, landlords in New York City, ordered from us, took our stuff,

Ari Teman
August 05, 2021                    139

and never paid."

Do you see that?

A.    I do.

Q.    Is it only religious people that you feel wronged you?

A.    I appreciate what you're trying to get at, but that's not even the purpose here. I'm calling out the hypocrisy of these individuals who purport to be religious are, in fact, thieves.

Q.    And going down to the second paragraph, "But look at the Orthodox Jewish community, because that is who steals from us, they literally have ads in their magazines about how Walmart is just a rental center because they return things they used after using them, like air-conditioners after the summer.  Enough is enough."

Now, that's a reference to the ad that we've discussed earlier; correct?

A.    Correct.

Q.    And, again, is this something that you believe, what you write in this paragraph, is unique to the Orthodox Jewish community?

A.    Well, let me just take a step back

and explain the context, this is a suicide note and I'm right now speaking to you.  I am not dead.  So there are things that are expressed in this note that perhaps I didn't fully believe.

Otherwise, you -- you might actually might have a problem to be talking to a dead guy.  And then you get some intellectual property attorney from that movie with the sixth sense, you know, Ashton Kutcher -- anyway, whatever, you get the point.  I wouldn't take this as a malicious document.

Q.    Do you have a bias or prejudice against members of the Orthodox Jewish community?

A.    I love members of the Orthodox Jewish community.  I am very close with many members of the Orthodox Jewish community.  My family are members of the Orthodox Jewish community.  I am very close with the (witness says a word in Hebrew).  I am very close with the other religious folks, the (witness says a word in Hebrew).  I do kosher.

Q.    Okay.  Now, moving down --

A.    I will say this, even if you thought

I was a antisemite, your clients still have to keep their contract.

Q.   Moving down you have a paragraph entitled with a bullet, Abi Goldenberg; do you see that?

A.   Yeah.

Q.   Now, I'm not going to read the whole thing, but in the middle photograph it says, "Instead their "frum" lawyer told our attorney on a recorded call (ask him!) that they are rich and can will fight for years before paying a bill."

Do you see that?

A.   Yeah.  He's quoted in the Complaint.

Q.   Who is in possession of this recording?

A.   I believe Ariel Reinitz.

Q.   So this was a conversation between Ariel Reinitz and Mr. Goldenberg's attorneys?

A.   Jacob Rubinstein.  I don't know if he was retained by Mr. Goldenberg or Goldmont, but he was representing Goldmont.

Q.   Were you on that call as well?

A.   No.  But I heard the recording.

Q.   You heard the recording?

A.    I did.

Q.    Do you know who made the recording?

A.    I don't know who made the recording.

Q.    And do you have a copy of the recording in your possession?

A.    I'm not sure that I do.

Q.    Well, I will call for the production of the recording from Mr. Reinitz.

Going off of the next page, it says towards it bottom, "When life is going well, I get sick.  I don't sleep.  I go insane from sleep deprivation, which feeds depression, which feeds sleep deprivation and on and on."

Do you see that?

A.    Yeah, I do.

Q.    Now, you testified at the very beginning of the deposition today that the only medication you've taken in the past 24 hours was melatonin; correct?

A.    Yes.

Q.    Do you -- that's a sleep aid; right?

A.    It's considered a sleep aid, yes.

Q.    Now, when you -- do you suffer from sleep deprivation?

MR. REINITZ:  I'm going to

object for a second.  If you want to ask him about his medical history, that's fine, I would ask that we mark that -- we mark a protective order here, but I'm not going to allow that to be -- it's to be marked confidential.

You can go ahead.  You can answer. Is that okay with you?

MR. SCHONFELD:  I'm not going to stipulate to -- you know, we can discuss it afterwards.  I'm not looking --

MR. REINITZ:  I'm going to ask the court reporter -- can you agree that the court reporter mark these segments as confidential for us to discuss after the deposition on how those sections will be handled?

MR. SCHONFELD:  Absolutely.

MR. REINITZ:  Okay.

Go ahead, you can answer.

THE WITNESS:  Can you repeat the question?

BY MR. SCHONFELD:

Q.   Do you suffer from sleep deprivation?

A.   I have at times suffered from sleep

Ari Teman
August 05, 2021                                            144

deprivation.  I do not believe that right now
I'm not suffering from a clinical sleep
deprivation.

Q.    You said you do not believe that
right now you are suffering from a clinical
sleep deprivation?

A.    Yes.  I said at times I have
suffered from it, I have been diagnosed at
times with forms of sleep deprivation and sleep
disorders.  But I do not believe now that I
have -- you know, I haven't slept great, but I
don't believe that I'm clinically sleep
deprived at the current moment.

Q.    When you were first diagnosed with
sleep deprivation?

A.    See, there's an interesting story.
So I was diagnosed, but it wasn't disclosed to
me in I believe September 2011, by a medical
center against who we have a medical
malpractice suit ongoing because they diagnosed
but didn't provide the test results and then
proceeded to commit fraud and malpractice.
Their founders have gone to jail a couple of
times since.

                 But then it was correctly figured

out actually the Sunday before Hurricane Sandy, whatever date that is.  And firmed by NYU the April after that, NYU Sleep Center.

And then had an 11-hour surgery to rebuild my airways which had collapsed from an old high school wrestling injury.  So that was the first period of a rather prolonged and painful period of sleep deprivation.

And then in December 2019, December 25 -- that's what nonJews would call Christmas, and heck, the Jews would call it Christmas but not observe it -- I complained of sleep deprivation.  I had a sleep tracker at the time, and I was tracking my sleep and was not getting more than like three and a half hours of sleep.  I ended up going to a sleep doctor to give me medication to sedate me.

It wasn't until August -- July/August 2020 that an in-clinic sleep study and MRI diagnosed that I had sleep disorder, in this case it was largely caused by degenerative discs causing tension headaches and physical pain that were getting my body from staying asleep in the night.

Q.    And that surgery that you had to

reopen your airways, when was that?

A. To rebuild my airways. It was by a Dr. Glenn Goldman out in California. It was ballpark about five years ago. I don't -- off the top -- no, it was more -- maybe about 2014, it could have been before.

Q. So this suicide note, Exhibit G, was written, the entire Goldenberg saga, and after you had filed suit in 2020; right?

A. Yes. This is when I was having the sleep issues due to the degenerative discs.

Q. And so you've been suffering from sleep deprivation for a long time, for a number of years; is that correct?

A. Two separate periods I explained. We'll call it a Braverman period where they diagnosed the breathing condition that was fixed with surgery. And then there's a period from late 2019 to mid 2020 where I had degenerative discs that were in the lower back and also by the neck, and steroids -- I started treatment and they were given to me around early February 2020 to help alleviate those symptoms.

Q. So from the later part of 2018,

which is what I'm most interested in, up until the present time, have you been treated for sleep deprivation?

A.    Only for like the last month, December 2019, until, you know, June through August of the following year.

Q.    Okay.  What was nature of that treatment?

A.    I just explained it was the steroids for the degenerative discs.

Q.    You're not treating currently for sleep deprivation?

A.    No.  Because it was just a side effect of the physical pain and the discs kind of slipping and pinching -- I'm not a doctor, but kind of just pinching on the spine and causing significant headaches that were, therefore, causing it to be difficult to sleep.

Q.    And so you write, "I go insane from sleep deprivation which feeds depression."

Have you been diagnosed with depression?

A.    At times, yeah.

Q.    Are you currently on any medications for depression?

Ari Teman
August 05, 2021                                                           148

A.    No.

Q.    Have you ever been?

A.    I get -- and it's discussed in messages with Abi Goldenberg, he once sought the information to help his niece or Leon's granddaughter.  I do a ketamine IV, it's like -- they put an IV in you for an hour and it kind of gets you back.

Q.    So you've been treated with a ketamine IV for depression?

A.    Yeah.

Q.    When was the last time you were treated?

A.    Last time I was treated a month and a half ago.  Now, I only do it like a month and a half to every three months.

Q.    When was the --

A.    Miracle drug, very helpful to people.

Q.    When was the first time you were treated in any way for depression, whether it was with the IV or medication?

A.    First time I was treated for depression?  I was a Jewish kid and grew up in Northern New Jersey, so probably when I was

five years old.

Q.    By treated I mean have you ever been on any medications for the depression?

A.    Yeah.  I mean, there's a whole med mal suit about medications that I was given that I shouldn't have been given, there's people who have tried multiple medications in the past, none of them worked.

But I don't have ongoing depression. It's situational triggers that will -- my brain is not that good at recovering from it, but thankfully there's the ketamine IV and then they pull it out and then you're good and you're usually good for a month, month and a half, three months.

Q.    Okay.  And during the period from, let's say, the middle part of 2018 until the lawsuit that was filed, were you treated during that time for depression?

A.    From the -- say the first date again.

Q.    The middle part of 2018.

A.    Until this lawsuit was filed?

Q.    Yeah.  Until early 2020.

A.    I mean, you see it right there in

the WhatsApp messages to Abi Goldenberg.  I was getting the ketamine IVs.  They were a newly popular thing at the time, the first time I tried it.

Q.   Have you taken any medications, all medications for depression?

A.   Not in the last five years.  Maybe longer.

Q.   That's fine.  I don't need earlier than the last five years.  And other than depression and sleep disorder, have you ever been diagnosed with any other psychiatric disorder -- or condition, I don't want to call it disorder, condition?

A.   PTSD and, you know, that's pretty much it.  Anxiety -- the specific category was anxiety.

Q.   And when were you diagnosed with PTSD, how long ago?

A.   About five years ago.

Q.   And were you treated with medications for that?

A.   No.  Therapy.  Although the Ketamine IV is sort of a two for one.  But I went to a PTSD specialist.

Q.   And I apologize if I'm prying too much, it's uncomfortable to me to even ask, but I just --

A.   You're all right.  Ask away.  Go ahead.

Q.   Did the PTSD result from a specific event?

A.   Yeah.  I was abused by a doctor.

Q.   Sexually abused?

A.   I mean, you know --

Q.   That's enough.  That's okay.  That's fine.  I got it.

A.   Yeah.

Q.   Frankly, I'm uncomfortable even asking the question.  You have my sympathies.  Sorry for what you've gone through.

A.   I'm sure you brought it up because you're sympathetic.

Q.   Moving down, you refer to another fucking Jew, Eric Braverman, is that Dr. Braverman that you mentioned before?

A.   Yeah.

Q.   Is he a psychologist or psychiatrist?

A.   No.  He's not Board certified in

anything.  He's just a plain old doctor who misleads people into thinking he's a specialist.

Q.    He's the one who you have a medical malpractice case pending against?

A.    Him and his group, yeah.

MR. REINITZ:  So I just want to reiterate -- that entire colloquy, from the time -- since I last interjected, as far as I am concerned, Mr. Schonfeld, you may feel differently, I'm going to ask the court reporter to mark that as, for now, confidential and just designate it separately on the transcript and I'll coordinate with you separately in terms of how that will be handled.

MR. SCHONFELD:  I completely agree.  Absolutely.

MR. REINITZ:  Thank you very much.

MR. SCHONFELD:  All right.  I think I've got the full agreement now.  I'll put it up on the screen as Exhibit D.  I will scroll through it quickly just so that we can confirm that this is the full document.  For

the record, this is a 31-page exhibit.

And with the understanding, counsel, that I scroll through it quickly and, you know, you didn't have the chance to look at it word for word, but does this appear to be the complete purchase agreement?  Are you okay with this being marked?

MR. REINITZ:  You've got to ask the witness.  It looks better to me than the last one, that's what I'll say.

THE WITNESS:  I don't see page numbers.  Let's just go page by page, I'll read through it.

BY MR. SCHONFELD:

Q.    I'm just going ask you some questions about this document.

A.    I'm going to look at every page.

Q.    Okay.  So, here is the first page, tell me when you're ready to move on.  Do you want me to make it bigger for you?

A.    Yeah.

Q.    Can I go to the next page or are you still reading?

A.    Still reading.  It's going to be a while.  Okay.  You can scroll down.

Q.    This is still part of that same page because I made it bigger.

A.    I understand how it works.

MR. SCHONFELD:  Reporter, we can be off for this part.

(Discussion held off the record.)

BY MR. SCHONFELD:

Q.    Mr. Teman, having had the opportunity to review the entire Exhibit D, is this the agreement entered into between GateGuard and Goldmont in August 2019?

A.    It appears to.

Q.    Now, just with respect to the actual agreement itself and with -- this exhibit includes appendices and exhibit -- or addendum, I forget how it's termed.  But just with respect to the actual contract, the first three pages until the signatures, can you tell me who drafted this agreement?

A.    So it's began as a discussion between myself and Abi Goldenberg.  It was handed off to Ariel Reinitz and Jacob, their attorney.  And I believe the final version, the final edits were actually made by Jacob.

Q.    And is what we're looking at, the purchase agreement, is this part of a standard form that GateGuard uses, had you worked off of that or was this drafted from scratch for Goldmont?

A.    I just said that Jacob edited this document, so this is custom for Goldmont, customized by Goldmont's attorney.

Q.    My question is, is this a form that was then customized to Goldmont or was this the document that was created from --

A.    So as you can see, the exiting terms of the website were taken.  It appears Jacob, obviously, going back and fourth with Ariel Reinitz, our counsel, took out some paragraphs, made some notes, made some edits.  For example, you saw that they took out Paragraph 14.  You can see in the payment terms, the end of the line that we can't store their checking account information.

So they made some edits to our existing online terms, obviously -- or, as you know, our original payment terms allow us to store and use clients checking info for ongoing fees and payments and penalties.

And then there's this sort of superseding agreement on top that was custom for Goldmont.

Q.    All right.  Let's look at the actual agreement itself.  And the third paragraph, which begins, "GateGuard," third line says, "The current value of GateGuard's gold plan is $49.99 per device and subject to periodic price increases.  Though such price increases shall never affect inflate the price of the 30 years of free hosting provided to Goldmont under this agreement."

Do you see this?

A.    Yes.

Q.    Okay.  Do you know what that is referring to -- withdrawn.

When it says it's subject to periodic price increases, is that determined by GateGuard, by Goldmont, or in some other way?

MR. REINITZ:  Objection, calls for legal conclusion.  You can answer.

THE WITNESS:  The standard terms, which were edited, allow us to increase the monthly fee every year by a small percentage, which is, you know, standard.  And

the deal is that they are paying everything up front and we're going to give them the monthly fee for free so those increases would not have any effect on them later on.

BY MR. SCHONFELD:

Q.    Okay.  Now, the paragraph that begins, "Upon delivery of the devices to Goldmont."

Do you see that paragraph?

A.    I do.

Q.    And it discusses a third-party financier, TPF.  Do you know what that is referring to?

A.    It's referring to Marlin Financial, an equipment financing --

Q.    Okay.  And does GateGuard have a relationship with -- is it Marlin, M-A-R-L-I-N?

A.    Yes.

Q.    Does GateGuard, at the present time, have a relationship with Marlin Financial?

MR. REINITZ:  Objection, vague.  You can answer.

THE WITNESS:  I'm going to ask, what do you mean by relationship?

BY MR. SCHONFELD:

Q.    Does Marlin Financial finance any of GateGuard's current sales?

A.    So, again, Marlin doesn't provide finances to the seller, it provides financing to the buyer.  So maybe we sold something and Marlin provided financing to that buyer and I wouldn't know, so I couldn't answer that question.

Q.    Have you ever done a transaction where Marlin provided the financing?

A.    I just told you there would be no way of knowing.  What if I sold somebody a $50,000 device and they went to Marlin and financed it, between them and Marlin -- I can't speak for Marlin.

Q.    Do you know, in the event that a buyer would use Marlin, would GateGuard be paid by Marlin or the buyer?

A.    Oh.  Well, again, I don't know what other agreements Marlin might have.  If we were to introduce Marlin to a buyer, the way it would work, for example, in this agreement, the way it worked and the way we explained it to Jacob and Abi and Leon is that the buyer is buying the equipment, Marlin is providing them

the funds.  But Marlin is going to give us the funds directly and take their cut right away.

Q.   Marlin would provide the funds to whom?

A.   To GateGuard.  So Goldmont is buying these devices from us and they have two options, they can give us the $369,000 out of their own pocket or how they get their $369,000 is up to them.  Or they can sign an agreement between them and Marlin where they say, Marlin, you give the money to GateGuard and we, Goldmont, will pay you a monthly fee towards that amount.

Q.   Understood.  So in that scenario, Marlin would be the one paying GateGuard; right?

A.   So I don't want to give a legal definition here.

Q.   I'm not asking for a legal definition.  I'm asking you from a practical standpoint, you're going to get -- let's say this contract had been followed in the sense that GateGuard went to Marlin, used them as a third-party financier.  And now you, meaning GateGuard, has to be paid $369,000.  That check

or wire, however it's going to be paid, would paid by Marlin; is that correct?

A.    I don't -- I want to be careful about legal definitions.  It might be that Marlin wires the funds, but who is paying us would be -- you know, I'll give an example -- I don't know if you have kids -- but if you say to your kid, go give this dollar to the storekeeper and they're going to give you an apple to bring to me, but you had arranged it. Is the kid paying the storekeeper or are you paying the storekeeper and the kid is just transferring the money.

So in this agreement, Goldmont is buying the equipment from us, they're getting financing from Marlin, whether Marlin wires the money to Goldmont or they have to wire it to us.  If Marlin wires it to us, it wouldn't make a difference in terms of who is the payer. Goldmont is the payer.

Q.    Has GateGuard ever done a deal in which there was third-party financing of the purchaser?

A.    Yeah.  People buy with credit cards all the time.

Q.    Other than credit cards, I'm talking about a third-party financier such as Marlin.

A.    I couldn't answer that.  Again, I have no idea where people get their funds and where they get their financing.

Like most buildings in New York are financed, right, so maybe they're getting their money for their devices from Signature Bank or Chase.

Q.    Just to be clear, your testimony, as you're here today is you have no idea if GateGuard has entered into a contract with a another party in which third party financing was used; that's your testimony?

A.    Again, your question is very vague. If I enter into a contract with someone to buy, we'll just make up a number, $10,000 worth of equipment, and they pay with their credit card, well then the answer would be somebody has -- we've entered a contract with them, they've used a third-parity financier, the credit card company to pay, right.

So let's say that I enter into a contract with somebody and it was their checking account, but their checking account is

really financed by a mortgage and/or some sort of operating loan from a bank. So if I tell you no, then I would be wrong, because they're actually getting their equipment and they're building everything else, their operating expenses are funded by a bank.

If you want to ask a more specific question, I can give you a more specific answer. But that's a very vague question.

Q. Did you ever offer any client, other than Goldmont, the opportunity to use a third-party financier?

A. We let people pay with credit card.

Q. Other than -- I said this before but I'll say it again just to be clear, excluding credit cards have you ever entered into an agreement in which the opportunity to use a third-party financier, the way it appears in this contract, was presented to a purchaser?

MR. REINITZ: Asked and answered. You can answer.

THE WITNESS: I believe we have. We've certainly let other people know about Marlin and given them the opportunity to use Marlin. Some of them have, in fact, much

of them have said, oh, we have our own

financing.

BY MR. SCHONFELD:

Q.    But you said some of them have used

Marlin, right, that's what you just said?

A.    No.  I said some of them, and then I

said pretty much all of them have said we have

our own financier.

Again, the nature of real estate is

you have some sort of leverage asset, you're

getting financing from a bank.  People who have

a pile of cash in the bank and they're just

buying their buildings and buying their

equipment for cash, they're being financed by a

third party.

Q.    Mr. Teman, my question is really

simple.  To your knowledge, has GateGuard ever

entered into a contract with a party, other

than Goldmont, in which third-party financing,

other than credit cards, was used to pay for

the devices?

A.    I'm going to have to say yes.

Pretty much everybody who has got some sort of

an operating loan or mortgage is using

third-party financing to pay for whatever

they're paying for.

I'm not trying to be difficult, but, you know, you can have a sharky guy, I don't want you to turn around and say, oh, didn't you say they never used financing to buy anything, here is some sort of financing agreement they have with their bank.

Q.   So, to your knowledge, Mr. Teman, has any customer of GateGuard ever use Marlin Financial to finance the purchase of the devices from GateGuard?

A.   See, there you go, that's a nice specific question.  And the answer to that is no.

Q.   Okay.  Now, continuing in this paragraph it says, "In the event Goldmont elects to veto said TPF, Goldmont agrees to make an upfront payment to GateGuard within 30 days of delivery of the devices and consensus on a reasonable payment medium, corresponding to the total purchase payments."

Do you see that?

A.   I do.

Q.   Okay.  So what does a reasonable payment medium mean?

MR. REINITZ:  Objection, calls for legal conclusion.  You can answer.

THE WITNESS:  It means a reasonable method of payment such as a wire or a bank check.

BY MR. SCHONFELD:

Q.    So did GateGuard and Goldmont ever reach a consensus on a reasonable payment medium?

MR. REINITZ:  Objection, calls for a legal conclusion.  You can answer.

THE WITNESS:  Yeah.  They paid us multiple times via checks.

BY MR. SCHONFELD:

Q.    I'm referring to, specifically, with respect to this contract and the devices that were being sold in this contract that requires payment to be made when there's a consensus on a reasonable payment medium.  My question is with respect to these devices, did GateGuard and Goldmont reach a consensus on a reasonable payment medium, yes or no?

MR. REINITZ:  Objection, calls for legal conclusion.  You can answer.

THE WITNESS:  Yeah.  My

understanding is that we agreed that they could pay by either check or wire.

BY MR. SCHONFELD:

Q.    When was that agreement made?

A.    At the same time this agreement was made.

Q.    Who made that agreement?

A.    The parties involved in this agreement were Ariel Reinitz, Jacob Rubinstein, and then, obviously, Leon Goldenberg signed the agreement and then I signed the agreement.

Q.    Specifically -- I'm not asking about signing the agreement.  I'm talking about, specifically, the reaching of a consensus. Mr. Reinitz was present when that agreement was made?

A.    Yeah.  There's even e-mails about it.

Q.    About, specifically, about the consensus on the reasonable payment medium?

MR. REINITZ:  Objection, calls for legal conclusion.  You can answer.

THE WITNESS:  I think I've answered the question.

BY MR. SCHONFELD:

Ari Teman
August 05, 2021                                          167

Q.     So what -- withdrawn.

Now, it says corresponding to the total purchase payments; do you see that?

A.     Yes.

Q.     Okay.  And if you look further up in the document, the very first paragraph, it says, "For each of the devices, Goldmont agrees to pay $125 a month for 72 months, $9,000 total, (the purchase payments)."

Do you see that?

A.     Correct.

Q.     So the purchase payments were $125 a month for 72 months; is that correct?

A.     That's for 41 devices.  It says at the end of the paragraph the total purchase price of Goldmont of the 41 devices was $369,000.

Q.     That's what 125 times 41 times 72 equals, right, the total cost would be that; right?

A.     Yeah.  Total purchase payments they would have had to have made to -- Marlin would have had to make to use.

Q.     But the terms were $125 a month for 72 months; isn't that correct?

Ari Teman
August 05, 2021                                      168

                    MR. REINITZ:  Objection, calls

for legal conclusion.  You can answer.

                    THE WITNESS:  That seems to be

what it says.

BY MR. SCHONFELD:

     Q.    Now, moving down it says, "GateGuard

agrees to install each of the devices within 30

calendar days of notification from Goldmont

that the device has been transported to the

building at which it is to be installed."

          Do you see that?

     A.    Yes.

     Q.    And at any time was GateGuard

notified by Goldmont that a device had been

transported to the building at which it was to

be installed?  I'm referring, specifically, and

only to the devices that are the subject of

this agreement.

     A.    No.

          Let me take a two minute break to

pee.

     Q.    Sure.

               (Short recess was taken.)

BY MR. SCHONFELD:

     Q.    I'm going to move to the third page,

and you see the signature of Leon Goldenberg;

do you see that?

        A.    I do, yeah.

        Q.    Okay.  Did you sign this agreement

as well, Mr. Teman?

        A.    I did.

        Q.    Okay.  Now, the fourth page which is

Appendix A, Goldmont Realty, Corp. Buildings;

do you see that?

        A.    I do.

        Q.    Okay.  And it says, "Devices already

under contract (63)."

              What is that referring to?

        A.    The online sign up where Abi

Goldenberg was taking pictures with his phone

and WhatsApping to me as he signed up.

        Q.    So is that inclusive of the 41

devices of this contract or is that an

additional 63 devices?

              MR. REINITZ:  Objection, calls

for legal conclusion.  You can answer.

              THE WITNESS:  It believe it's

inclusive.  It was explained to me that these

other 20 buildings were owned by another entity

I think.

BY MR. SCHONFELD:

Q.    Okay.  Under the -- so there are a bunch of addresses here and on the right side there's a column, total devices ordered.  And in a number of places it says, "Cannot do without permission of owner.  Reached out to them to get permission.  Pending."

Do you see that?

A.    I do.

Q.    And do you know who entered that information?

A.    I don't know who entered it.  It's interesting, I don't think you guys have produced discovery on those communications.  I guess we're going to want to see those communications if Goldmont or Jacob is reaching out to this third party, shouldn't we see those e-mails?

Q.    So you don't know who -- okay.

A.    If you wouldn't mind I guess we're going to -- Ariel is probably going to make a request for you to send those communications to us.  Ariel, do your job.

Q.    No, I'm happy to let you talk as long as you want.  Trust me, you're making me a

happy man.  It says, cannot do without permission of the owners.  Do you know who the owners of these buildings are?

A.    I think I do now.  I didn't know at the time.

Q.    Was this Appendix A attached to the contract at the time that you signed it?

A.    Listen, it's a PDF, so I don't know. I may have just been given the document with the -- meaning like physically attached to an e-mail that was two PDFs.

Q.    Did you sign the contract in person, you know, with wet ink signature or did you sign it electronically?

A.    I don't do wet ink signatures all that much, I usually do a digital signature.

Q.    So do you recall whether the contract with Goldmont was signed in person or by e-mail or some other way?

A.    I got an e-mail from Jacob -- or I should say we got an e-mail from Jacob, GateGuard and Ariel Reinitz, our counsel.  And my understanding is that Ariel e-mailed it back to them.

Q.    And you don't know if this Appendix

A was attached to the version that you signed?

A. I don't recall in this moment. I'm sure it was in the same e-mail. Again, I just want to be cautious of my language, whether it was one PDF or two or in the same e-mail or the same thread. If you're asking me if I was aware of the appendix, I was.

Q. You don't recall seeing this language before, cannot do without permission of owner?

A. I do. I said I was aware of it. Again, I'm just being cautious about the word attached, right. You mean was it one single PDF or was it multiple PDFs in the same e-mail, but I was definitely aware. There were discussions about this.

Q. And you don't know whether that language about the permission of owner was entered by you or your attorney or Goldmont or their attorney?

A. It was definitely not entered by myself and my attorney.

Q. But that language, was it there at the time you signed the contract?

A. Yes.

Q.    Okay.  I'm going to show you Page -- the 29th page of this exhibit, it has Page No. 22 at the bottom.  And if you look under the heading LookLock Pricing; do you see that?

A.    I do.

Q.    What is LookLock?

A.    It was a -- it is a -- it's like a door handle smart lock.

Q.    Okay.  Was that sold to Goldmont as well?

A.    No.  Abi had expressed interest in it, but we hadn't begun to sell it.

Q.    If you look further up on the page there's a -- towards the top there's a heading, GateGuard Panel (Intercom Service) Pricing; do you see that?

A.    Yeah.

Q.    And it says the gold plan, 50 to 99 units, $44.99 paid yearly; is that correct?

A.    That's what it says.

Q.    Okay.  This document, this portion of the contract which begins on the eighth page of the PDF, it says terms and conditions, and it says, "Last revised: August 15, 2019."

Do you see that?

A.   Yes.

Q.   Who can actually revise these terms and conditions?

A.   So as I already stated, these particular -- this document that you're showing us now was modified by Jacob Rubinstein and Ariel Reinitz.  For example, they removed Paragraph 14, they added a line where we had the permission to draft checks for example, you know, there's other edits throughout the document.

Q.   Now, who drafted the original version before it was modified?

A.   The earliest version of our online terms was drafted by a law firm, GKH, I think it's Gross Kleinhendler maybe Hodak-- GKH, they're a firm -- when we started producing our products, Lowenstein Sandler, a once respected firm with a lot of work in start up technology, a lot of their attorneys have since left other firms, including Mr. Reinitz.  And they would have us have similar documents, for example, employment agreements and our online terms done by an international law firm GKH, which had

attorneys licensed to practice in the United States and all over the world.

They even left us the Stevie Nicks clause, there's a fun e-mail about that.

Q.   Yes.  Paragraph 32 on page 25 of the terms and conditions, it says, "No Stevie Nicks.  You agree to never play any Stevie Nicks song in, near, for, or around any member of our team or any of our devices or networks. She really ruined that band."

Do you see that?

A.   Yeah.  It's something I believe strongly.  It's a popular opinion.  People who understand music, I don't know if you've heard the original Fleetwood Mac, but it's a much better band.  And then she started sleeping with everybody.  She then tore it apart.  Just a lot of drama.

Q.   So in the event that somebody played Stevie Nicks music at their facility, that would be a breach of the contract; right?

MR. REINITZ:  Objection, calls for legal conclusion.

MR. SCHONFELD:  I'll withdraw the question.

BY MR. SCHONFELD:

Q.   Did you ever -- let me try that again.  Did you ever have any conversations with any of the Defendants regarding what they may or may not have to provide to Marlin Financial in order to get third party financing?

A.   Yeah.  As a matter of fact, there's messages to that effect in discovery.

Q.   And do you know whether Goldmont was advised that they would have to provide financial records to Marlin Financial before they signed this contract?

MR. REINITZ:  Objection, calls for speculation.

BY MR. SCHONFELD:

Q.   I'm not asking you to speculate, the question was do you know?

A.   Yeah.  They very much were.  Jacob even said he's discussed it with Abi.

Q.   And that was -- that was before the contract was signed, right?  That was my question, before the contract was signed.

A.   Yeah.  Before and after.

Q.   Is that stated in the e-mail or did

you have that verbally?

A.    I know it was discussed in phone calls with Jacob.  It's also explained in the in Marlin terms.  And I know they were introduced and spoke with Tim Shane at Marlin who explained the process.

Q.    This was before the contract was signed?  My question is limited, specifically, to before the agreement was signed.

A.    So ask the question again, just to make it clear.

MR. SCHONFELD:  Reporter, can you read back the original question?

(Reporter read back from the record.)

THE WITNESS:  The answer is yes, they were advised.

BY MR. SCHONFELD:

Q.    Do you know if Goldmont was advised at any time prior to them signing contract that they would have to provide financial records to Marlin Financial?

A.    Yes.

Q.    Yes, they were advised of that?

A.    Yes, I know.  And, yes, they were

advised.

Q. Who advised them of that?

A. I know that GateGuard did. Myself and Ariel Reinitz. And I know that it was also a topic of discussion between myself and Abi Goldenberg and myself and their attorney, Jacob Rubinstein.

Q. And were any of those communications by e-mail?

A. Off the top of my head, I don't recall. I know there were WhatsApp messages as well and phone calls, and I know that there were questions about how to work and explanations given to Jacob at one point between Ariel Reinitz and Jacob. I wouldn't necessarily know the entirety.

MR. SCHONFELD: So I'll call for the production of any documents or e-mails or WhatsApp messages or other communications, specifically, prior to the date of the contract at issue was executed that informed or advised Goldmont that they would have provided financial records to Marlin Financial.

BY MR. SCHONFELD:

Q. Now, Mr. Teman, at the time that the

contract at issue was executed, was GateGuard already in possession of the intercom devices or did you purchase them after the contract was signed?

A. We were already in possession of these devices.

Q. Were they part of GateGuard's stock or where they purchased, specifically, for Goldmont in anticipation of the contract or something else?

A. We had already addressed this. Remember, Abi Goldenberg taking photos of his online sign up, so we purchased -- I believe we made this purchase -- we had prior purchases, obviously, from our factory, but I believe that these devices largely or almost entirely -- maybe entirely included purchase made after the representations made by Leon Goldenberg on December 26, 2018, that they were going to make an investment and the subsequent online signup with photography by Abi Goldenberg.

Q. Now, at any time after the contract was executed was Goldmont -- was GateGuard advised that they should not deliver the devices at issue to Goldmont?

A.    Sorry, could you say that again?

Q.    At any time after the contract was issued but before the devices were actually delivered, were you or anybody at GateGuard told by Goldmont or any representative of Goldmont not to deliver the devices?

A.    No.

Q.    Do you know if your attorney was ever advised by anyone at Goldmont or representing Goldmont not to deliver the devices before they were delivered?

A.    Not that I know of.  And there's nothing in the terms that bear any weight whether or not they tell us to deliver -- I mean, like, when you purchase something from Amazon, for example, you don't have to also check a box or tell them, yes, you're also allowed to deliver the product I bought.

You sign the agreement to purchase the devices, we deliver the devices.  I don't understand the question.  Is that what you're asking?

(Deposition Exhibit E was marked for identification.)

BY MR. SCHONFELD:

Q.    I'm satisfied with your answer.
Okay.  I'm going to show you what has been
marked as Defendant's Exhibit E, as in Edward.
And this is a four-page PDF, there are Bates
numbers at the bottom beginning 000004 -- I
think it's five zeros -- and I'm going go to
the second page.  And I'm going -- can you see
this?

A.    Yes.

Q.    Okay.  October 4, 2019, e-mail from
Ariel Reinitz, and it does not say who it's to.
But it says, "Hi, Jacob see below, can the
devices be delivered?  Thanks, Ariel Reinitz."
Do you see that?

A.    It seems like it was written to
Jacob.  Yeah.

Q.    Do you know who Jacob is?

A.    The lawyer for Goldmont.

Q.    All right.  And just to correct to
record, I may have misspoken.  It's dated
October 24, 2019.  Okay.
And scrolling up, Mr. Rubinstein,
October 24, 2019, at 1:47 p.m., responds to
Mr. Reinitz, "Not until we clarify how to prove
finances in a simpler way so we can get this

squared away."

Do you see that?

A.    I do.

Q.    Are you aware or were you aware of this exchange before I just showed it to you right now?

A.    Before you showed it to me, yeah. We reviewed the discovery documents.

Q.    Were you aware at the time, in October 24, 2019, that Mr. Rubinstein had advised Mr. Reinitz not to deliver the devices until, as he wrote in his e-mail, we clarify how to prove finance in a simpler way.  Were you aware of that at the time?

A.    I mean, I don't appear to be copied on the e-mail.  But I do know that we gave them a simple way to prove their finances, we even provided a bookkeeper who we would pay to consolidate their finances.

Q.    That wasn't my question.

A.    Right -- you asked the question, I'm giving you the answer.  Which is this doesn't say not to deliver the devices, it says give a simpler way to prove the financing and we'll deliver.  So there you go, they were given a

simple way and we delivered.

Q.    Were you aware that Mr. Rubinstein instructed your attorney not to deliver the devices, "Until we clarify how to prove finances in a simpler way so we can get this squared away."  Were you aware of that?

A.    I don't -- at what time?

Q.    At the -- in October 2019, prior to the devices being delivered.

A.    I don't recall.

Q.    Do you know when the devices were actually delivered?

A.    Yeah.  Shortly after that.

Q.    Okay.  Moving up to the first page of this exhibit, Exhibit E, Mr. Reinitz responds -- again, just for the record, Mr. Rubinstein's e-mail was Thursday October 24, 2019, at 1:47 p.m.  Mr. Reinitz responded shortly thereafter, October 24, 2019, at 2:17 p.m.

A.    Yeah.

Q.    And he writes, "These requests are from the financing company; we have no discretion to override them.  The only way to simplify is for someone at Goldmont to

communicate directly with the financier to figure out how to provide what they need. (I think there were some initial direct communications?)

If Goldmont doesn't want to work with a financer, that's fine, but they'll need to arrange to pay GateGuard directly per the agreement. Happy to discuss, let me know. Thanks."

Do you see that e-mail.

A. I do.

Q. Now, you were not copied on this e-mail; right?

A. Correct.

Q. Did you authorize your attorney to speak on behalf of the company?

A. He's the corporate attorney.

Q. He's the corporate attorney?

A. Yeah. I mean, he's our attorney, he speaks on behalf of our company. I don't understand the -- why would he not be, he's handling the deal.

Q. Fair enough. So now Mr. Rubinstein e-mailed Mr. Reinitz, don't deliver until we figure out the financing. Mr. Reinitz responds

to him in the e-mail that I just showed you.

Do you know if at any point after that if there were any communications between either the attorneys or the parties in which Goldmont said, okay, you can deliver them now?

MR. REINITZ:  Objection. Misstating the prior facts or testimony.

MR. SCHONFELD:  Fair enough. I'll withdraw the question.

BY MR. SCHONFELD:

Q.    Do you know if there were any communications between either the attorneys or the parties after Mr. Reinitz's e-mail of October 24, 2019, at 2:17 p.m., in which Goldmont agreed to accept delivery of the devices?

A.    I mean -- so just for context, I was working out of Miami.  This was handled by Levi Herman.  But, like, Goldmont opened the door and carried the boxes into their office and put them in a specific place and directed us where to put them in their office.  They accepted the devices.  We didn't break through a window and put the devices in the building.

Forgive me, but I'm confused by the

questions.  It's like -- again, I just go back to the example of, like, I don't have to give Amazon specific permission to deliver the product that I ordered.  I don't get it.  Maybe if you can explain the question.  I just don't understand what you're asking.

Q.   After Mr. Rubinstein had directed GateGuard not to deliverer the products, at any time did either he or anyone at Goldmont advise you or anyone from GateGuard that you can deliver the products, yes or no?

MR. REINITZ:  Objection, misstating the facts and/or testimony.  You can answer.

THE WITNESS:  Mr. Rubinstein did not instruct GateGuard about anything regarding the delivery that I know of, whether to deliver or not, nor would we have even bothered to ask Mr. Rubinstein whether or not we could deliver.  Because Ariel Reinitz confirmed to us that the deal was signed and executed.  Obviously, when somebody signs an agreement, you deliver.

BY MR. SCHONFELD:

Q.   Let's go back to e-mail from

Mr. Reinitz, October 24, 2019, at 12:24 p.m. where he writes, "Hi, Jacob.  See below, can the devices be delivered?"

Do you see that?

A.    Yeah.

Q.    Mr. Rubinstein responds, "Not until we clarify how to prove finances in a simpler way so we can get this squared away."

Do you see that?

A.    Right.  And then you showed me that Ariel immediately clarified.

Q.    At any point after that, did either Goldmont or any of their representatives say that the devices can be delivered, yes or no?

A.    No, it's not yes or no question. They gave us a condition by which we deliver, Ariel immediately fulfilled the condition and we delivered.

Q.    Okay.  So they -- we need to clarify how to prove finances in a simpler way.  So how were the finances proved in a simpler way?

A.    That wasn't the question.  It was, we need to clarify how to prove the finances, and we clarified how.  Now you're just making stuff up that's not even on the screen in front

of us.

Q.    I'll read it again, "Not until we clarify how to prove finances in a simpler way so we can get this squared away."  Right?

A.    Right.  Scroll up little bit.

Q.    Let's look --

A.    And then Ariel writes -- clarifies how, and then we deliver.

Q.    Mr. Teman, let me ask my question. "Not until we clarify how to prove finances in a simpler way so we can get this squared away."

You said before that was a condition for delivery; right?

A.    No, it was not.  I did not say that.

Q.    Okay.  So when he said not until we clarify how to prove finances in a simpler way, do you at least agree that he meant that the devices should yet be delivered?

MR. REINITZ:  Objection, calls for speculation.  You can answer.

THE WITNESS:  No, I don't. And I also -- again, we just read through -- we took a long break, I don't know how many minutes it was, but we went through the whole agreement.  There's not a damn thing in the

agreement that says that there's any condition about simple explanations of financing or clarifying -- no.  You sign the agreement and we deliver the devices.  You've got 30 days to pay.  You can get the financing through Marling, you can get the financing through someone else, you can pay us with cash.

There's just absolutely no reason for -- I mean, it just doesn't matter, you know, Jacob Rubinstein could have said, wait, not until the sky turns green.  It's like, well, that's not in the agreement.

BY MR. SCHONFELD:

Q.    So I'm not asking you whether you think Rubinstein had a right to say what he did or not.  My question is, after that e-mail, whether it was required or not, whether you think it was necessary or not, did you or anyone at GateGuard receive a communication from anyone at Goldmont saying, you may now deliver the devices?  Regardless of whether it was necessary in your opinion, did you receive a communication saying that?

A.    You have it on video that they gave us permission to deliver.  They opened the door

and they helped us carry the devices into their offices. They didn't call the cops and have us arrested for breaking into their office.

I mean, am I missing something?

Q. I appreciate it. Thank you. How many devices were actually delivered?

A. 60 devices.

Q. When were they delivered; do you know?

A. Not we've gone back and forth today with a bunch of dates.

Q. Fair enough. I understand. I'm not going the ask you for the exact date if you don't know it off the top of your head.

But were the 60 devices delivered in one delivery or was there more than one delivery?

A. One delivery.

Q. At any time did you receive any communications from anyone at Goldmont advising you that any of those devices were defective or not working properly?

A. No.

Q. Now, you referred previously to Mr. Reinitz as the corporate attorney of

GateGuard; is that correct?

A.    Yes.  I mean, he's the corporate attorney representing GateGuard, that's what I mean by that.

Q.    Okay.

A.    He's not an employee of GateGuard.

Q.    He's not in-house counsel or anything like that?

A.    No.

Q.    All right.  You have a claim in this action for attorneys fees.  How much have you paid Mr. Reinitz to date or his firm with respect to this litigation?

MR. REINITZ:  Objection, that's privileged.  Don't answer.

MR. SCHONFELD:  Are you withdrawing the claim?

MR. REINITZ:  No.

MR. SCHONFELD:  As a privilege you're making a claim for an account.  I'm asking what that amount is.

MR. REINITZ:  The claim for the amount is to be resolved --

THE WITNESS:  I mean, it's still ongoing so how would I know what the

amount is yet?

MR. SCHONFELD:  Well, the question was how much have you paid to date.

Mr. Reinitz, you're saying that the amount that a client pays an attorney is privileged?

MR. REINITZ:  The amounts that GateGuard has paid myself or my firm in this action, yes, as far as I'm concerned right now, are privileged.  That's something that we can, you know, get from the report when the time comes to decide that that's something that we can provide you, the accounting report.

THE WITNESS:  I mean, I'll save you the time and say, generally, I don't know at this point and don't remember, so, you know --

MR. SCHONFELD:  I just want to clarify in the nature of the privilege that's being asserted.  It is your contention, counsel, that the amount of money that was paid or that is due to be paid by a client to an attorney in an action where a claim for attorneys fees is made, is privileged information; is that your position?

MR. REINITZ:  I'll have to think about it.  Off the top of my head -- I understand your position, I'm right now asserting privileged.  If, you know, the question whether we'll withdraw the claim for attorneys fees or provide you with the accounting, that's something I would be happy to take up with you separately.

MR. SCHONFELD:  Well, I would actually bring the witness back for follow up questioning on this because --

MR. REINITZ:  I don't object to that.

MR. SCHONFELD:  Okay.

BY MR. SCHONFELD:

Q.    Mr. Teman, do you have a retainer signed with Mr. Reinitz's firm?

A.    I think that would also be privilege, but, yeah, I'm sure I have a retainer signed with his firm.  Probably more than one.

Q.    Is Mr. Reinitz paid hourly or Mr. Reinitz' firm?

A.    I honestly wouldn't recall the detail of the retainer agreement at this time.

I mean, you have to your Interrogatories.  I know I'm supposed to know anything and everything about GateGuard, but this -- you guys, as Jacob threatened to do, you guys have dragged this out for quite some time, so that details is no longer fresh in my memory.

I can't tell you what I don't remember.  But I'm sure if we're required to, we'll look it up and give you an answer.

Q.   Does Mr. Reinitz have any ownership interest or profit sharing rights in any of the companies that you own?

A.   I don't believe so.

MR. SCHONFELD:  All right.  Let's just take five minutes and then I think we can wrap up.  Let's meet back here in 2:05.

(Short recess was taken.)

MR. SCHONFELD:  Okay.  Mr. Teman, I will say what comes so unnaturally for trial lawyers to say which is, I have no further questions at this time.

We're going to close the record subject to what we discussed before.  And I'll be ordering a copy of the transcript.

MR. REINITZ:  I'll be ordering

Ari Teman
August 05, 2021                                                    195

a copy as well.

                              (At 2:51 p.m., the deposition

was concluded.  Signature was not waived.)

C E R T I F I C A T E

- - -

I, ARI TEMAN, do hereby certify that I
have read the foregoing transcript and it is a
true and correct copy of my deposition, except
for the changes, if any, made by me on the
attached Deposition Correction Sheet.


_____

_____
Date

```
ERRATA SHEET                           REASON FOR
PAGE        LINE                    CHANGE/CORRECTION

_____       _____       _____

_____       _____       _____

_____       _____       _____

_____       _____       _____

_____       _____       _____

_____       _____       _____

_____       _____       _____

_____       _____       _____

_____       _____       _____

_____       _____       _____

_____       _____       _____

_____       _____       _____

_____       _____       _____

_____       _____       _____

_____       _____       _____

_____       _____       _____

_____       _____       _____

_____       _____       _____

_____       _____       _____

_____       _____       _____

_____       _____       _____

_____       _____       _____
```

COMMONWEALTH OF PENNSYLVANIA     )
                                 ) SS
COUNTY OF ALLEGHENY              )


                    CERTIFICATE

     I, Michelle L. Goehring, a notary public
in and for the Commonwealth of Pennsylvania, do
hereby certify that the witness, ARI TEMAN, was
by me first duly sworn to testify the truth,
the whole truth, and nothing but the truth;
that the foregoing deposition was taken at the
time and place stated herein; and that the said
deposition was recorded stenographically by me
and then reduced to typewriting under my
direction, and constitutes a true record of the
testimony given by said witness.

     I further certify that I am not a
relative, employee or attorney of any of the
parties, or a relative or employee of either
counsel, and that I am in no way interested
directly or indirectly in this action.

     IN WITNESS WHEREOF, I have hereunto set my
hand and affixed my seal of office this 16th
day of August 2021.

                    *Michelle L. Goehring*

| Exhibits | $ | 0 |
|---|---|---|
| **EX A Ari Teman 08-05-21**<br>3:11 26:5,13<br>53:16 80:20<br>91:16 131:23 | **$1**<br>56:3,16<br>57:16 58:17<br>59:16 76:24<br>80:5 81:4<br>111:13 115:6<br>118:2,3<br>121:5 | **000004**<br>181:5<br>**000030**<br>119:13<br>**000109**<br>127:12 |
| **EX B Ari Teman 08-05-21**<br>3:13 29:8,12 | **$10,000**<br>161:17 | **04**<br>19:4 |
| **EX C Ari Teman 08-05-21**<br>3:16 78:14,<br>18 98:2 | **$125**<br>167:8,12,24 | **05**<br>19:3 |

83:10 103:19
109:18 131:1
**125**
167:18
**12:24**
187:1
**12gurus**
21:7
**13**
41:20 47:15
48:5 79:11
80:3,7
101:15
109:13,18
**14**
29:24 41:9
79:4 98:4
155:17 174:9
**15**
17:12,15
33:8,12 53:5
110:13 115:1
119:13
127:14 130:1
173:25
**1521**
11:16
**16**
81:12
**17**
60:6 61:12
81:12
**17-page**
33:1
**17.95**
59:9
**18**
14:4,5
**18,000**
42:2
**18-'19**
14:5
**19**
14:4,5 80:21
**1982**
11:3

| Exhibits | $ | 1 |
|---|---|---|
| **EX D Ari Teman 08-05-21**<br>3:20 134:8,<br>12 152:23<br>154:10 | **$25**<br>56:15 60:9,<br>22 | **1**<br>5:6 55:9,18<br>56:13 60:8<br>62:1 63:11<br>120:19 121:1 |
| **EX E Ari Teman 08-05-21**<br>3:22 180:23<br>181:3 183:15 | **$250,000**<br>93:3,9<br>**$3,000**<br>89:19 | **1,000**<br>79:19 98:16<br>**10**<br>11:3 27:7<br>129:25 131:1 |
| **EX F Ari Teman 08-05-21**<br>3:14 32:21,<br>25 110:10 | **$369,000**<br>54:14 159:7,<br>8,25 167:17<br>**$4**<br>54:12 | **100**<br>21:1 22:23<br>**10001**<br>27:12 31:13 |
| **EX G Ari Teman 08-05-21**<br>3:21 136:23<br>137:3 146:7 | **$4.24**<br>54:15<br>**$44.99**<br>173:20 | **106**<br>31:11 87:18<br>**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**<br>11:5 |
| **EX H Ari Teman 08-05-21**<br>3:15 41:1,5 | **$49.99**<br>156:8<br>**$5**<br>60:8 106:5 | **1099**<br>86:16<br>**10:35**<br>119:14 |
| **EX I Ari Teman 08-05-21**<br>3:17 100:4,<br>11 101:9 | **$50,000**<br>158:13<br>**$9,000**<br>167:8 | **10:40**<br>41:21<br>**10th**<br>127:11 |
| **EX J Ari Teman 08-05-21**<br>3:18 107:7,<br>12 | **(**<br><br>**(63)**<br>169:12 | **11-hour**<br>145:4<br>**12**<br>17:17 77:2 |

Ari Teman
August 05, 2021

2

**1:00**
129:25
**1:05**
130:1
**1:47**
181:23
183:18

---

**2**

---

**2**
5:9 135:23
**2,600**
42:5 76:13
**20**
51:21 56:21,
22,23 58:21,
22,25 59:6,8
60:3,12,13,
16,25 61:11,
19,21 62:2,5
169:24
**2000**
15:5
**2011**
144:18
**2014**
21:21 146:5
**2016**
26:4 29:24
**2017**
14:4 29:18
**2018**
12:24 15:5,
13 17:16
28:7 36:14
41:9,21
47:16 48:5
53:12 104:25
105:7,16,21
106:1,8
109:2,12
113:4 121:4,
16 146:25
149:17,22
179:19

**2019**
12:22 15:6,
13 17:1,2,13
18:4 31:4
33:8,12
35:20 53:12
54:25 59:12
79:5,11
80:3,7,22
81:16 82:18,
22 83:8
84:16 88:6
89:8 98:4
101:10,15
103:19
106:11
107:19
109:13
110:13
112:23 115:1
119:14
127:14
131:24
132:9,23
137:13 145:9
146:19 147:5
154:12
173:25
181:10,21,23
182:10
183:8,18,19
185:14 187:1
**2020**
8:4,5 15:17
16:24 17:4,
11,12 18:3
27:22,23
145:19
146:9,19,23
149:24
**2021**
14:14 27:22
**21**
60:6 61:13
**22**
17:15 53:3
82:6,17
173:3

**2372**
27:11
**24**
5:19,25 6:3,
6 85:13
91:16 142:18
181:21,23
182:10
183:17,19
185:14 187:1
**25**
56:21 59:21
127:6 145:10
175:5
**26**
101:5 105:2,
6,7,16,20
106:1,8
109:2,12
113:4 121:4,
16 179:19
**26,000**
42:5
**28**
29:18 31:4
**29**
107:18
**29th**
12:16 13:6
28:3,6,15
173:2
**2:17**
183:20
185:14
**2:24**
115:1 127:15
**2D15**
31:12

---

**3**

---

**3**
5:12 53:20
54:2 61:1
114:16 115:9
131:22

**3,600**
42:1 76:13
**30**
53:4 99:10,
16,22 131:23
132:9,23
156:10
164:18 168:7
189:4
**31**
101:10
106:11
**31-page**
153:1
**32**
175:5
**32nd**
31:12 87:18
**33139**
11:9,17
**3877**
68:16 80:23
**39**
126:1 127:5

---

**4**

---

**4**
48:10 119:8,
9,10,12
181:10
**41**
53:21 54:14
95:9,16
132:1 134:25
167:14,16,18
169:17
**4:49**
98:5

---

**5**

---

**5**
14:14 27:11
55:9 56:14
58:17 60:22,
23 85:2

87:18,19,20
89:7,15 90:3
114:14,16
115:9
120:17,19

**5,600**
76:14

**50**
44:18,19,23
46:6 173:19

**500**
96:17,22,23

**5:06**
127:16

---

### 6

**60**
43:24,25
95:15,17
97:2 190:7,
15

**63**
169:19

**650**
11:8

---

### 7

**7**
17:17 80:21
81:16 82:18,
21 83:8
112:23

**72**
167:8,13,18,
25

---

### 8

**888**
11:16

---

### 9

**95**

22:19

**99**
173:19

**9:40**
48:6

---

### A

**A-R-I-T-E-M-A-N**
138:12

**a.m.**
41:21 48:7
119:14

**Abi**
36:12 37:4
41:20 51:10
52:2,25
54:19 55:3
56:1 57:8
63:4 64:1,4
65:6 66:11
67:11,13
68:24 70:10,
25 71:2,3
73:7 80:17
83:13,23
84:2 93:4
94:15 95:12
96:6 97:2
108:11
111:25 112:1
116:9,21,22,
24 118:11,19
128:5,10
130:19
133:14 141:4
148:4 150:1
154:22
158:24
169:14
173:12
176:20 178:5
179:12,21

**Abi-sized**
71:8

**ability**
67:4 93:5

**able**
112:13

**above**
51:1 82:10

**absence**
107:4

**absolutely**
143:17
152:18 189:8

**abundantly**
96:5

**abused**
151:8,9

**accept**
44:19 185:15

**acceptance**
123:13

**accepted**
185:22

**access**
31:25 32:2,
11

**accommodate**
5:14

**accordion**
31:17

**account**
97:23 138:4
155:19
161:25
191:20

**accountant**
55:20 73:25
120:21,24

**accounting**
192:13 193:7

**accurate**
52:13 62:7

**accurately**
67:3

**acknowledge**
4:4,7

**acknowledged**
118:18

**across**
55:18

**act**
25:8

**acted**
119:5 134:7

**acting**
47:24 124:25

**action**
26:14 27:7
52:2 53:18
56:7 191:11
192:9,23

**actions**
9:4,8 75:7

**active**
21:10

**activities**
81:18,21
82:9,17,21
83:7 87:12
91:22

**actual**
19:15 22:5
23:18 65:24
101:18
154:14,18
156:4

**ad**
123:5,19
139:19

**add**
77:12 85:2
117:13

**added**
174:9

**addendum**
135:14
154:16

**adding**
115:18

**addition**
110:1,4
114:3

**additional**
22:10 75:17
87:15 96:15
109:5,16
122:8 169:19

address
  11:6,7,8,13
  12:17 13:7
  29:7 31:10,
  11,15 33:11,
  14 35:18
  36:3 97:11
addressed
  107:19
  179:11
addresses
  55:13 170:3
adds
  117:15
administered
  4:8
admit
  111:16
ads
  139:14
advance
  8:13 53:8
advanced
  72:16,17
advantage
  43:5 94:18
advertising
  75:17 83:9,
  11 94:2
  123:7
advise
  186:9
advised
  176:11
  177:17,19,24
  178:1,2,21
  179:24 180:9
  182:11
advising
  190:20
affect
  156:10
affiliated
  15:19 28:23
  35:10,15
  52:16

afternoon
  112:6
afterwards
  100:12
  143:10
ago
  20:2 27:24
  42:23 61:17
  111:4 113:4
  146:4 148:15
  150:19,20
AGOLDBERG@
GOLDMONTREALT
Y
  41:10
agree
  4:17,19
  69:15 70:8
  72:23 143:12
  152:18 175:7
  188:17
agreed
  57:1 58:5,14
  59:13,15
  61:17 66:16
  100:1 114:19
  115:4 116:4
  166:1 185:15
agreement
  4:14,15 13:1
  24:13,15,20,
  21 25:16
  39:10 49:13,
  25 54:10
  56:3,6,11
  58:6,16
  59:12,17,19
  60:7 61:7
  62:4,25
  63:14 64:6,
  10 65:10
  68:22,23
  70:14,18
  71:16,19
  72:4,7,10,15
  73:14 74:3,4
  75:5 78:10
  84:3,14,21

85:8,20,23
87:16 88:11
89:4,9,24
90:2 91:2
95:9,24,25
105:8,13,24
106:13
108:4,7
113:6,19,25
114:1
115:10,14
117:23
121:5,15
122:6 129:22
130:9,14
131:5,8,14,
25 132:7,24
133:13
134:13,23
135:6 152:22
153:6
154:11,15,20
155:2 156:2,
5,12 158:22
159:9 160:14
162:17 164:6
166:4,5,7,9,
11,13,15
168:18 169:4
177:9 180:19
184:8 186:23
188:25
189:1,3,12
193:25
agreements
  123:18 124:1
  158:20
  174:24
agrees
  164:17 167:7
  168:7
ahead
  27:4 32:25
  54:3 60:20
  110:8 128:7
  136:17
  143:6,19
  151:5

AI
  24:9
aid
  142:21,22
air-
conditioner
  123:9
air-
conditioners
  139:17
airways
  145:5 146:1,
  2
alcohol
  6:2
alias
  35:25
alive
  115:25
allegation
  82:14 92:2,5
  93:7
allegations
  36:7 69:14
allege
  59:13 129:20
  132:12
alleged
  92:10
alleges
  18:8 68:15
alleviate
  146:23
allow
  143:4 155:23
  156:23
allowed
  25:15 180:18
Alphabet
  103:3,9
Alton
  11:16
Amazon
  180:16 186:3
ambiguity
  116:9 117:13
  118:1

| | | | |
|---|---|---|---|
| **ambiguous** | **answered** | **appears** | 98:4 |
| 69:7 111:15 | 44:9 60:20 | 33:4 41:13 | **Ariel** |
| **Amended** | 70:21 85:11 | 64:24 110:22 | 4:16 110:16 |
| 26:13 27:6 | 116:6 162:21 | 120:1 154:13 | 131:20 |
| 53:17 | 166:24 | 155:13 | 141:17,19 |
| **Amish** | **answering** | 162:18 | 154:23 |
| 127:6 | 6:11 | **appendices** | 155:14 166:9 |
| **amount** | **answers** | 154:16 | 170:21,23 |
| 61:8 64:7 | 5:6 | **appendix** | 171:22,23 |
| 159:13 | **anticipation** | 135:15 169:8 | 174:8 178:4, |
| 191:21,23 | 179:9 | 171:6,25 | 15 181:11,13 |
| 192:1,5,21 | **antisemite** | 172:7 | 186:20 |
| **amounts** | 141:1 | **apple** | 187:11,17 |
| 192:7 | **anxiety** | 160:10 | 188:7 |
| **ample** | 150:16,17 | **apply** | **Ariel's** |
| 63:25 | **anybody** | 50:24 | 58:10 |
| **analogy** | 16:4 25:11 | **appreciate** | **around** |
| 44:14 45:3, | 69:10,14 | 80:15 139:6 | 17:12 22:18 |
| 19,24 | 86:10 129:12 | 190:5 | 25:3 85:13 |
| **and/or** | 180:4 | **appreciated** | 88:5,6,7 |
| 162:1 186:13 | **anyone** | 100:3 | 89:7 106:4 |
| **Andel** | 6:13,24 | **approval** | 108:18 |
| 22:4 | 14:23 15:1 | 71:6 | 109:20 |
| **anger** | 23:15 70:8 | **approximately** | 115:16 123:5 |
| 123:3 | 116:16 180:9 | 15:13,14 | 132:15 |
| **annual** | 186:9,10 | 53:14 | 146:22 164:4 |
| 38:23 | 189:19,20 | **April** | 175:8 |
| **answer** | 190:20 | 145:3 | **arrange** |
| 5:15 25:21 | **apart** | **Arabs** | 184:7 |
| 44:12 52:10, | 175:17 | 126:22 | **arranged** |
| 12,13 53:9 | **apartment** | **area** | 87:24 160:10 |
| 60:20 66:21 | 90:24 | 19:5 58:12 | **arrangement** |
| 82:23 130:12 | **apologize** | **argument** | 4:12 31:21 |
| 143:6,19 | 119:11 | 118:22 | **arrested** |
| 156:21 | 127:10 | **Ari** | 190:3 |
| 157:22 158:7 | 137:21 151:1 | 4:20 10:4 | **art** |
| 161:3,19 | **apology** | 26:11 33:20 | 19:6 |
| 162:9,21 | 127:20,21 | 52:15 79:4 | **artful** |
| 164:13 | **app** | 101:19 | 124:22 |
| 165:2,11,24 | 18:15 | 110:12 | 125:13 |
| 166:22 168:2 | **appeal** | **ari@** | **Ashton** |
| 169:21 | 7:23 8:3,14, | **gateguard.** | 140:10 |
| 177:16 181:1 | 15 | **xyz.** | **asked** |
| 182:22 | **appearance** | 36:1 | 25:25 60:19 |
| 186:14 | 106:22 | **ari@teman.com** | 61:25 85:10 |
| 188:20 | 112:12 | 33:6 41:8 | 96:25 98:22 |
| 191:15 | | 51:10 79:10 | 123:23 |

137:20
162:20
182:21

**asking**
23:14 34:13,
16 38:7
49:15,17
50:6,7,9,10,
11 56:24
58:3,4,13,14
59:11 69:11
71:12
121:20,23
122:4 126:16
151:15
159:19,20
166:12 172:6
176:17
180:22 186:6
189:14
191:21

**asleep**
145:24

**asserted**
192:20

**asserting**
193:4

**asset**
163:10

**assist**
90:20

**associated**
37:13 52:5

**assume**
31:6

**assumed**
6:16

**attached**
171:6,10
172:1,13

**attempt**
80:15 92:21

**attend**
84:22

**attended**
109:15

**attorney**
6:14,23 26:9
34:6 63:7,12
86:3 95:22
97:9 100:8
106:21
131:6,7
140:9 141:9
154:24 155:8
172:19,20,22
178:6 180:8
183:3
184:15,17,
18,19 190:25
191:3 192:5,
23

**attorneys**
4:3 6:19
63:11 141:19
174:21 175:1
185:4,12
191:11
192:24 193:6

**August**
14:14 36:14
131:23
132:9,23
145:18 147:6
154:12
173:25

**author**
48:20

**authority**
25:8 77:13

**authorize**
184:15

**automated**
40:24

**automatically**
49:1 51:18

**available**
29:5

**Avenue**
11:9 68:16
80:23 112:25

**aware**
172:7,11,15
182:4,9,14

183:2,6

---

**B**

---

**Bachelor's**
18:23 19:1,5

**back**
18:15 35:12,
20 47:20
48:3 51:25
53:12,16,18
68:19 76:10
80:19 91:16
98:1 101:1
110:9 112:16
113:22
121:25
122:17
123:10 130:1
131:19
134:17
136:18
139:25
146:20 148:8
155:14
171:23
177:13,14
186:1,25
190:10
193:10

**backed**
79:14,16

**background**
5:6

**backing**
113:11,14,21

**bad**
115:24
133:15
137:16

**ballpark**
17:12 22:18
52:23 54:12,
15 146:4

**band**
175:10,16

**bank**
7:24 161:8
162:2,6
163:11,12
164:7 165:5

**Barry's**
55:19

**based**
39:3 46:10
75:5 76:20
83:12 94:11,
25 106:13
108:15
117:19 119:6

**basic**
60:24

**basically**
22:14 28:8,
19 43:9,21
50:1 71:9
123:14
124:23

**basis**
15:20

**Bates**
100:15 181:4

**Bates-marked**
101:14
107:18
119:12
127:12

**bathroom**
26:15,19
51:20

**Beach**
11:9,16

**bear**
180:13

**began**
54:24 154:21

**begin**
5:5 79:9

**beginning**
57:2 88:3
142:17 181:5

**begins**
117:12 156:6

| | | | |
|---|---|---|---|
| 157:7 173:23 | **belongs** | **blowing** | **break** |
| **begun** | 55:14 | 78:20 | 5:13 26:16, |
| 173:13 | **below** | **Board** | 19,20 109:9 |
| **behalf** | 181:12 187:2 | 151:25 | 168:20 |
| 9:19,22 25:9 | **benchmarks** | **body** | 185:23 |
| 67:7,10 | 63:2 | 145:23 | 188:23 |
| 81:19 94:15 | **besides** | **bold** | **breakdown** |
| 97:24 106:22 | 14:16 28:10 | 116:8 | 65:25 |
| 184:16,20 | 93:11 | 117:12,23 | **breaking** |
| **behavior** | **best** | **booked** | 190:3 |
| 122:20 | 48:20 65:22 | 87:13 | **breathing** |
| **behind** | 66:23 67:3 | **booking** | 146:17 |
| 125:7 | 92:7 96:20 | 90:16 | **briefly** |
| **beholden** | 117:9 138:21 | **bookkeeper** | 15:3 110:11 |
| 65:3 | **better** | 182:18 | **bring** |
| **belief** | 27:9 33:5 | **boss** | 57:6 65:7 |
| 67:2 91:18 | 89:5 125:10 | 68:11 | 109:24 |
| 127:1 | 153:9 175:16 | **bothered** | 160:10 |
| **believe** | **bias** | 186:19 | 193:10 |
| 7:10 9:2,15 | 140:13 | **bottom** | **Bromberg** |
| 15:3,16 | **big** | 33:19 48:10 | 64:17,25 |
| 21:21 23:20 | 68:11 90:8 | 122:19 | 65:20 66:24 |
| 26:3 32:2,7, | 99:11 111:14 | 125:19 | 67:7 70:11 |
| 8 35:19 | **bigger** | 142:10 173:3 | 73:8 79:4 |
| 36:5,12 | 29:2,15 | 181:5 | 92:3 110:14 |
| 37:21 38:14 | 153:20 154:2 | **bought** | 111:8 115:11 |
| 39:2 40:10, | **bill** | 37:17 180:18 | 118:5,8 |
| 19,23 45:14 | 90:17 141:12 | **bound** | 122:14 |
| 47:8 54:9,24 | **bills** | 90:13 | **Bromberg's** |
| 63:11 68:13 | 18:9 | **box** | 66:12 |
| 74:6 77:2 | **Binder** | 32:15 180:17 | **Bronx** |
| 83:5,9 84:16 | 135:23 | **boxes** | 13:11,13,23, |
| 96:17 123:1 | **birth** | 185:20 | 25 14:3,8 |
| 136:3 137:8, | 11:2 | **brain** | 28:4 |
| 10 139:23 | **bit** | 149:10 | **Brooklyn** |
| 140:5 141:17 | 16:21 49:24 | **brand** | 80:24 |
| 144:1,4,10, | 59:5 98:9 | 33:23 34:18, | **brought** |
| 12,18 154:24 | 104:1 109:20 | 20,23 | 22:23 65:24 |
| 162:22 | 123:13 | **Brandeis** | 115:16,19,21 |
| 169:22 | 124:22 | 18:23 | 151:17 |
| 175:12 | 134:22 188:5 | **Braverman** | **bucks** |
| 179:13,15 | **block** | 10:15,19 | 44:23 |
| **believed** | 33:3,19 | 146:16 | **budget** |
| 106:14 | **blow** | 151:20,21 | 115:9 |
| **believing** | 27:8 33:4 | **breach** | **budgeted** |
| 129:16 | 41:18 100:21 | 175:21 | 114:17 |
| **bell** | | | |
| 135:24 | | | |

**building**
  12:18 37:3
  39:16 55:23
  97:2 133:25
  162:5
  168:10,15
  185:24
**buildings**
  24:11 43:25
  79:19 95:15
  98:16 161:6
  163:13
  169:8,24
  171:3
**bulk**
  43:6 124:13
**bullet**
  141:4
**bullpen/main**
  105:19
**bullshit**
  99:5 122:12
**bunch**
  18:24 19:7
  170:3 190:11
**buried**
  93:18,25
**business**
  21:10 24:7
  27:10,16
  35:23 36:4
  48:21 72:1
  81:18 82:9,
  20 91:24
  92:25 93:23,
  24 124:25
  128:6
**Butch**
  10:17
**buy**
  37:16 44:17,
  20 71:5
  96:20 124:13
  160:24
  161:16 164:5
**buyer**
  158:5,6,17,

  18,21,24
**buying**
  44:1 158:25
  159:5 160:15
  163:13

———————

**C**

———————

**calculate**
  59:14
**calendar**
  168:8
**California**
  146:3
**call**
  18:15 45:1
  55:4 56:21
  71:6 74:8
  86:3 90:22
  97:9 105:3
  109:7
  141:10,23
  142:7
  145:10,11
  146:16
  150:13
  178:17 190:2
**called**
  24:4 31:17
  58:11 60:11
  74:12 88:10
  122:13
**calling**
  67:25 125:2
  139:8
**calls**
  25:18 34:3
  43:4 57:25
  91:10 92:12
  112:1 121:18
  130:11
  156:20
  165:1,10,23
  166:21 168:1
  169:20
  175:22
  176:14 177:3

  178:12
  188:19
**canceled**
  89:9,10
**cap**
  124:14,16
**capacity**
  16:19 47:24
**capital**
  109:17 110:1
**card**
  161:18,21
  162:13
**cards**
  160:24 161:1
  162:16
  163:20
**careful**
  55:15 59:1,
  8,23 61:11
  90:23 95:11
  104:18 120:1
  160:3
**carried**
  185:20
**carry**
  126:21 190:1
**carrying**
  123:9
**case**
  22:20 27:15
  36:7 45:14,
  15 47:1,3
  69:14 145:21
  152:5
**cases**
  9:16,20
  10:10 18:18
**cash**
  76:22 93:5
  96:9,10
  163:12,14
  189:7
**categories**
  126:1 127:5
**category**
  19:16 150:16

**caught**
  120:1
**caused**
  93:21 133:16
  145:21
**causing**
  145:22
  147:17,18
**cautious**
  172:4,12
**celebrate**
  101:5
**center**
  29:6 139:15
  144:19 145:3
**cents**
  44:18,19,23
  46:7
**CEO**
  25:2,4,7
  47:24 101:20
**certain**
  18:7,10,12
  39:5,6,20
  43:23 75:19
  136:5
**certainly**
  129:13
  162:23
**certificate**
  19:14,20
**certificates**
  18:24 19:8,
  13
**certified**
  19:16 151:25
**cetera**
  40:4 94:4
  117:15
**chair**
  69:1,2
**chance**
  153:4
**change**
  39:4 98:11
**changed**
  24:21 76:7

| | | | |
|---|---|---|---|
| **changing** | **claims** | 192:5,22 | **comes** |
| 53:25 | 69:11 | **clients** | 48:4 87:2 |
| **charge** | **clarified** | 18:8 106:14 | 192:12 |
| 42:10 | 187:11,24 | 141:1 155:24 | **comitted** |
| **charity** | **clarifies** | **clinical** | 46:3 |
| 85:4 | 188:7 | 144:2,5 | **commencing** |
| **Chase** | **clarify** | **clinically** | 103:18 |
| 161:9 | 14:18 20:6, | 144:12 | **commission** |
| **chat** | 18 37:25 | **close** | 16:10 |
| 55:4 73:25 | 46:22 56:4 | 140:17,20,21 | **commit** |
| **chats** | 181:24 | **closer** | 46:12,15 |
| 80:18 | 182:12 183:4 | 16:2 18:20 | 144:22 |
| **check** | 187:7,19,23 | 53:4 54:15 | **commitment** |
| 93:4 159:25 | 188:3,10,16 | **closet-sized** | 46:21,23 |
| 165:5 166:2 | 192:19 | 89:22 | **commitments** |
| 180:17 | **clarifying** | **cloud** | 42:18 43:16 |
| **checking** | 100:23 189:3 | 37:13 39:12 | **committed** |
| 155:19,24 | **class** | **co-working** | 46:2 62:1 |
| 161:25 | 19:3 | 11:22 88:13 | 120:7 |
| **checks** | **classes** | **coffee** | **common** |
| 165:13 | 61:10 | 26:19 | 49:23 |
| 174:10 | **clause** | **Coleman** | **communicate** |
| **chief** | 50:2 175:4 | 106:22 107:5 | 184:1 |
| 65:5 | **clean** | **collapsed** | **communication** |
| **chikchok** | 60:24 | 145:5 | 37:7 189:19, |
| 120:9 | **clear** | **collect** | 23 |
| **China** | 6:15 16:6 | 31:18 | **communication** |
| 117:14 | 28:21 39:24 | **college** | **s** |
| 124:13 | 57:14 59:10 | 77:6 | 6:19 63:19 |
| **Chinese** | 61:15 65:6 | **colloquy** | 81:13 |
| 101:5 | 72:7 75:13 | 152:8 | 170:14,16,22 |
| **Christmas** | 79:18 85:15 | **column** | 178:8,19 |
| 101:3 104:24 | 90:7 96:5 | 132:14 170:4 | 184:4 185:3, |
| 105:1,4 | 98:16 110:5 | **Combinator** | 12 190:20 |
| 145:11,12 | 115:8 117:10 | 73:15 | **community** |
| **circulate** | 118:9,23 | **combined** | 65:2 125:6 |
| 100:11 | 122:2 128:13 | 94:14 | 139:13,24 |
| **City** | 129:4,7 | **combustion** | 140:15,17, |
| 12:15 78:3 | 131:22 | 127:4 | 18,20 |
| 138:25 | 136:11 | **come** | **companies** |
| **civil** | 161:10 | 22:11 36:10 | 9:22 20:5, |
| 9:8,18 10:2 | 162:15 | 49:13 54:17 | 16,20,23,24, |
| **claim** | 177:11 | 65:17 75:8, | 25 21:9 |
| 191:10,17, | **clearly** | 23 76:18 | 52:5,7,16 |
| 20,22 192:23 | 54:10 128:9 | 86:12 122:15 | 102:15 |
| 193:5 | **client** | 130:1,8 | **company** |
| | 162:10 | 134:3 136:18 | 15:19 20:8,9 |

22:9 24:4 25:14 33:24 36:22 56:17 58:23 60:4, 13,14,21,25 61:2,8,12,24 92:22 93:3, 14,16 102:1, 16 103:9 104:20 128:15,21 129:21 133:17,18,22 134:7 161:22 183:23 184:16,20

**comparison** 34:19

**complained** 145:12

**Complaint** 7:7,13 18:8 26:14 27:6, 21 53:17,20 68:15 80:20 81:8 91:17 92:11,20 112:24 131:23 132:12 141:14

**complete** 92:22 106:5 153:6

**completely** 99:15 152:17

**complicated** 104:2 126:24

**compound** 66:21 109:8

**concern** 97:11

**concerned** 69:24 121:9 152:10 192:9

**conclude** 129:15

**conclusion** 25:19 34:4 49:16 58:1,4 92:13 121:19 130:12 156:21 165:2,11,24 166:22 168:2 169:21 175:23

**condition** 146:17 150:13,14 187:16,17 188:12 189:1

**conditions** 173:24 174:4 175:6

**conduct** 128:5

**conducted** 12:10

**conducting** 35:22 36:3

**conference** 32:17 90:9, 17,18

**confidential** 143:5,14 152:12

**confirm** 69:21 116:19,22 152:25

**confirmations** 83:13

**confirmed** 64:12,14,15, 16 65:10 67:24 72:12 80:16 84:12 112:10 119:1,4 186:21

**confirming** 70:12

**confirms** 92:3

**confused** 185:25

**confusing** 23:12

**connection** 66:18 88:9

**connectivity** 39:12

**consensus** 164:19 165:8,18,21 166:14,20

**consent** 4:12 25:10, 16 107:3

**consider** 124:10,20 125:16

**considered** 142:22

**consolidate** 182:19

**consumed** 6:2,5

**contact** 36:11 47:2 52:1

**contention** 82:16 192:20

**context** 140:1 185:17

**continue** 29:2 42:15 135:3

**continues** 79:23,24 120:20

**continuing** 50:23 84:22 107:4 164:15

**contract** 7:8 14:22 15:20 37:19 47:3,4,6,11 50:1,3,4,6

54:13 135:5 141:2 154:18 159:22 161:12,16, 20,24 162:19 163:18 165:16,17 169:12,18 171:7,12,18 172:24 173:23 175:21 176:13,22,23 177:7,20 178:20 179:1,3,9,22 180:2

**contracted** 86:16

**contracting** 81:20

**contractors** 16:12

**contracts** 94:3

**contraptions** 69:2

**control** 92:22 93:3, 5,14,15,24 133:18

**conversation** 49:12 50:19 54:18 141:18

**conversations** 6:24 48:12 49:9,11 50:7,8,17 52:18 133:14 176:3

**conveyed** 133:14

**conveying** 67:2

**convicted** 7:15,19 8:17

conviction
  7:22 8:16
  9:5
convince
  64:20 109:21
convoluted
  126:14
coordinate
  152:14
copied
  110:14
  182:15
  184:12
cops
  190:2
copy
  74:2 85:25
  97:5 142:4
Corp
  169:8
corporate
  11:24 37:2
  73:22 104:2
  184:17,18
  190:25 191:2
corporation
  25:9 27:10
  31:11 36:8
  37:1
corporations
  23:22 29:14
  30:16 51:8
correct
  16:5,6 28:20
  35:6,13
  42:6,7 45:6,
  22 54:5
  57:16 62:4,
  11 65:11
  70:3,20 72:5
  74:12,22
  77:20,21
  79:14 87:5,
  16 90:5 95:2
  96:5 98:5
  101:11,16,21
  102:9,18

108:21
109:17 111:8
112:11
114:20 116:4
121:10,17
124:4
129:12,17
132:9 133:3,
8 138:13
139:20,21
142:19
146:14 160:2
167:11,13,25
173:20
181:19
184:14 191:1
correctly
  144:25
corresponding
  164:20 167:2
cost
  28:13 40:6
  46:14 79:19,
  20,21 98:17,
  18 167:19
counsel
  4:11 153:2
  155:15
  171:22 191:7
  192:21
count
  21:3 49:14,
  20 50:3
countersigned
  85:16
counting
  16:22
country
  11:25
counts
  50:4
couple
  13:24 20:1
  90:19 144:23
course
  19:15,16
  84:6 106:20

116:25
court
  4:2 5:7 26:9
  126:7
  143:12,13
  152:11
cover
  39:10 93:21
  132:22
COVID
  55:4
create
  17:22
created
  155:11
credit
  160:24
  161:1,18,21
  162:13,16
  163:20
crime
  7:16,19
  46:2,3
crimes
  8:17
criminal
  9:3
crush
  125:10
crushed
  128:16
crushing
  128:14
cultural
  123:13
current
  11:7,8 21:25
  144:13 156:7
  158:2
custom
  155:7 156:2
customer
  45:13,16
  164:9
customized
  155:8,10

cut
  76:21 159:2

_____

D
_____

dad
  71:4
dad's
  71:5
damage
  93:21 133:17
damn
  188:25
dark
  127:23 128:1
date
  11:2 29:17,
  24 30:20
  31:4 47:14,
  15 48:6
  84:13,17,20
  85:7 87:20
  95:5 97:1
  109:12
  127:13
  131:16 132:7
  137:12 145:2
  149:20
  178:20
  190:13
  191:12 192:3
dated
  33:8 41:8,20
  79:4,11 98:4
  101:10
  106:10
  107:18
  181:20
dates
  100:24
  190:11
day
  8:12 12:12
  18:17 32:18
  83:22 85:14
  87:22 89:3
  101:3 105:1

days
 77:2 99:16
 100:24
 104:20
 164:19 168:8
 189:4
dead
 138:23
 140:3,7
deal
 42:12 60:1
 66:16 83:4,9
 84:24 96:7
 99:11 106:7
 117:14
 125:11 157:1
 160:21
 184:22
 186:21
dealing
 47:1
deals
 42:17 43:15
 44:3,8,13
 45:10 46:16
dear
 64:24
December
 91:1 101:5
 105:2,6,7,
 16,20 106:1,
 8 109:2,12
 113:4 121:4,
 16 129:8
 145:9,10
 147:5 179:19
decide
 71:4 192:12
decided
 25:13
decision
 77:12 118:2
decisions
 71:3
declare
 4:9

deemed
 10:23
defective
 190:21
Defendant's
 26:12,24
 41:5 110:10
 181:3
Defendants
 5:2 52:2,19
 56:1,6,7
 63:20 74:24
 176:4
define
 12:2 35:14
 87:6
defined
 88:16
definitely
 31:1 34:8
 97:20 124:12
 172:15,21
definition
 159:18,20
definitions
 160:4
degenerative
 145:21
 146:11,20
 147:10
Delaware
 23:4 27:9
 30:3,6,7
deliberating
 43:4
deliver
 45:8 46:20
 179:24
 180:6,10,14,
 18,20
 182:11,23,25
 183:3 184:24
 185:5 186:3,
 11,18,20,23
 187:16 188:8
 189:4,21,25

delivered
 38:3 39:22
 44:5 180:4,
 11 181:13
 183:1,9,12
 187:3,14,18
 188:18
 190:6,8,15
deliverer
 186:8
delivery
 157:7 164:19
 185:15
 186:17
 188:13
 190:16,17,18
demand
 40:20
department
 29:13 30:15
 103:4
depend
 12:12 17:2
 86:20,22
depending
 45:13 83:6
depends
 86:25 126:9
deposit
 39:13
deposition
 4:3,5,6 5:3
 6:25 8:22
 9:10,12 26:5
 29:8 32:21
 41:1 52:8
 78:14 90:14
 100:4 106:21
 107:4,7
 134:8 136:23
 142:17
 143:15
 180:23
depressed
 128:2
depression
 142:12

147:20,22,25
 148:10,21,24
 149:3,9,19
 150:6,11
deprivation
 142:12,13,24
 143:24
 144:1,3,6,9,
 15 145:8,13
 146:13
 147:3,12,20
deprived
 144:13
derivative
 10:18
describe
 16:13 24:8
described
 68:5,12
 105:23
description
 89:5 100:14
design
 19:14
designate
 152:13
desk
 28:23 32:3,
 18 89:22
desks
 89:23 90:10,
 21
detail
 125:25
 193:25
detailed
 53:9
determined
 156:18
device
 13:10 39:9,
 11,15 40:4
 43:1 45:21
 46:9,14
 76:8,14
 94:21 156:8
 158:13

168:9,14

**devices**
37:23 38:5,
15 39:4,21
40:7,11,16,
22 42:1,5,25
43:7,10,12,
13,23,24
44:4 45:5,9
46:19,25
47:7,21,22
53:22 69:3
76:11 86:15
87:9 94:17,
25 95:10,16,
17 96:11,12,
15,22,24
130:10,14,20
131:1 132:1
134:25 157:7
159:6 161:8
163:21
164:11,19
165:16,20
167:7,14,16
168:7,17
169:11,18,19
170:4 175:9
179:2,6,16,
25 180:3,6,
11,20 181:13
182:11,23
183:4,9,11
185:16,23,24
187:3,14
188:18
189:4,21
190:1,6,7,
15,21

**diagnosed**
144:8,14,17,
20 145:20
146:17
147:21
150:12,18

**difference**
89:14 160:19

**different**
16:10 32:18
47:4 51:6,8
53:1 57:22
61:8 75:15
109:4,21
126:11

**differently**
152:11

**differs**
56:22

**difficult**
147:18 164:2

**digital**
134:18
171:16

**dilution**
59:6 60:5
61:7

**dinner**
127:3

**direct**
184:3

**directed**
185:21 186:7

**directly**
92:15,18
111:11 159:2
184:1,7

**disagreement**
119:4

**disclosed**
144:17

**discount**
53:22 54:5
132:2 133:8,
13,23

**discourse**
126:15

**discovery**
7:6,11 54:11
64:1 95:13
99:3 100:16
107:17
170:14 176:9
182:8

**discretion**
183:24

**discs**
145:22
146:11,20
147:10,14

**discuss**
120:8 143:9,
14 184:8

**discussed**
9:5 51:13
63:24 64:3
70:17 84:4
119:17,21
122:8 130:20
133:6 139:20
148:3 176:20
177:2

**discusses**
63:16 157:11

**discussing**
48:6

**discussion**
42:24 73:12
116:14
123:25
154:6,21
178:5

**discussions**
63:25 76:9
116:9 172:16

**disgusting**
118:11,20

**dishonestly**
124:25

**disorder**
145:20
150:11,13,14

**disorders**
144:10

**disputes**
9:18

**distinction**
46:24

**distribute**
104:15

**distributions**
62:15

**Division**
29:14 30:15

**doctor**
145:17
147:15 151:8
152:1

**document**
30:4,9 63:13
74:4,9 78:25
83:21 85:15,
19 88:8 89:6
94:13
100:13,19
101:10
104:23
107:16
119:25
131:19
132:20,22
134:15
135:1,9,10,
20 136:12
137:4 140:12
152:25
153:16
155:7,11
167:6 171:9
173:22
174:6,12

**documents**
7:2,6,11
25:4 73:5,
10,17,21,22
74:25 86:4
132:15
174:23
178:18 182:8

**doing**
20:23 21:10
59:18 60:24
61:19 75:20
82:11 86:22
87:7 95:18,
19 114:15

**dollar**
44:16 59:20

66:1 69:15,
22 70:13
73:2 94:11,
12,25 95:1
96:2,16
121:15 134:3
160:8

**dollars**
43:2 56:8
59:20 62:24
63:5,6 64:20
67:20,24
69:21 70:4,
9,19,24 75:7
77:23 83:17
84:15 86:12
91:9 93:8
94:20 96:4
105:11 106:3
108:25
109:25 110:2
115:3,12
116:3,15
118:4,5,8
119:7 120:7,
9 121:8
129:14 133:2

**door**
173:9 185:19
189:25

**doorman**
24:9

**doors**
38:18

**draft**
174:10

**drafted**
154:20 155:4
174:13,16

**dragged**
67:25

**drama**
175:18

**drawn**
63:14

**driving**
127:2

**drop**
114:24

**dropped**
49:3

**drug**
148:18

**drugs**
6:5

**dubious**
68:7

**due**
14:1 30:20
31:3 146:11
192:22

**duly**
4:21

---

**E**

---

**e-mail**
33:6,11,14,
19 34:12,14
35:13,18
36:3 41:7,
12,19 47:7,
11,14,23
48:3,4,18
49:1 50:12
51:14 63:4,
15 74:23
75:4 77:1
79:3,6 80:10
97:21,22,23
98:3,19 99:4
108:11,14
110:12,14,
20,25 112:18
113:2,8,17,
18 114:18,
22,23,25
115:2,5,8
116:2,18
117:9
118:10,11,
14,16,24
119:13,15,
17,18,21,22
121:3,12,25

122:5,11,16
123:2,24
125:9
127:12,14,
16,19,20
129:3,6,10
133:6
171:11,19,
20,21 172:3,
5,14 175:4
176:25 178:9
181:10
182:12,16
183:17
184:10,13
185:1,13
186:25
189:16

**e-mailed**
36:18 97:17
109:13
131:17,19
171:23
184:24

**e-mails**
33:1 48:23
49:4 51:9
76:12 78:19
92:4 106:15
108:22
110:11
166:17
170:18
178:18

**earlier**
12:23 28:5
130:19
132:25
139:20 150:9

**earliest**
174:15

**early**
14:5 22:14
84:17,18,20
146:23
149:24

**easier**
41:19 98:12

114:24
123:11

**easily**
122:23

**easy**
33:18

**eat**
44:25

**edit**
131:6

**edited**
95:22 155:6
156:23

**edits**
154:25
155:16,21
174:11

**education**
18:22,25
19:18

**Edward**
181:3

**effect**
89:8 121:16
136:3 147:14
157:4 176:9

**effective**
28:14

**effort**
126:1

**ego**
105:19

**eight**
16:22 17:5
89:23 132:24
133:5

**eight-page**
41:6

**eighth**
173:23

**either**
8:22 10:23
15:20 23:8,
17 43:9
54:18 56:1
63:8 89:10
108:11

116:10
120:17 166:2
185:4,12
186:9 187:12
**electronically**
34:15 171:14
**elects**
164:17
**Ely**
64:15,22,23
65:10 66:4,
7,14 67:6
68:25 73:8
78:5,7 79:14
99:1 110:5,
15 116:22
117:2 118:1
119:6
**embarrassment**
124:24
**employ**
88:4
**employed**
15:12 20:4
**employee**
14:18 16:5
17:21,24
191:6
**employees**
12:10 14:15,
21 15:15
17:20 18:3
28:11
**employment**
85:20,22
100:14
101:11
107:20
174:24
**enabled**
94:19
**encountered**
123:16
**end**
13:3 27:18
49:1 55:11

68:1,16 91:1
123:10
134:21
155:18
167:15
**ended**
145:16
**ends**
114:23
**engine**
127:4
**engineers**
18:12
**enlighten**
44:12
**enter**
130:13
161:16,23
**entered**
52:17 95:8
106:22 130:8
131:24
134:24
154:11
161:12,20
162:16
163:18
170:10,12
172:19,21
**entertain**
133:21
**entire**
25:14 60:14
146:8 152:8
154:10
**entirely**
179:16,17
**entirety**
40:1 178:16
**entities**
35:9,15
104:3 134:14
**entitled**
23:16 60:10
62:15 99:17,
21 137:4
141:4

**entity**
29:20 30:12
51:6 58:7
71:1,6 74:5
102:14
103:5,11
104:14
169:24
**entryway**
112:4
**equal**
61:11,12
**equals**
42:2,5
167:19
**equipment**
28:10,11,12
131:25
134:12
157:15
158:25
160:15
161:18 162:4
163:14
**equity**
22:5,24
23:18 56:17,
19 59:22,24
60:10
**equivalent**
58:21
**Eric**
151:20
**estate**
77:7 163:9
**et**
40:4 94:3
117:15
**et al**
10:15
**ethic**
87:1
**Eve**
104:25
**event**
77:4,6,7
151:7 158:16

164:16
175:19
**Eventually**
47:8
**everybody**
163:23
175:17
**everyone**
130:2
**exact**
22:17 87:22
95:5 97:1
137:12
190:13
**exactly**
52:22 59:6
71:24 114:8
138:21
**EXAMINATION**
4:23
**examined**
4:21
**exchange**
57:18 58:19
59:16 182:5
**exchanges**
133:6
**excluding**
14:17 162:15
**executed**
178:21
179:1,23
186:22
**exhaustive**
76:4
**exhibit**
26:5,13
29:8,12
32:21,25
33:2 41:1,5,
6 48:11
53:16 78:14,
18,19 79:3
80:20 91:16
98:2 100:4,
10,11 101:9,
14 107:7,12

| | | | |
|---|---|---|---|
| 110:10 119:9 122:18 127:9,11,15 131:23 134:8,12 136:23 137:3 146:7 152:23 153:1 154:10,15,16 173:2 180:23 181:3 183:15 | 72:13,19 80:16 82:19 84:25 92:20 94:6 111:23 114:2 146:15 147:9 158:23 169:23 177:3,6 | **factory** 96:18,21 179:15 **facts** 185:7 186:13 **fair** 9:7 16:12,17 18:21 22:25 74:16 87:2 91:15 99:25 116:7 120:3 127:19 184:23 185:8 190:12 | 20 85:13 88:2,6 89:8 101:15 103:19 107:18 146:23 **fee** 32:13 39:19 40:7 156:24 157:3 159:12 |
| **exhibit-wise** 32:25 | **explaining** 136:21 | | |
| **exhibits** 26:8 100:12 | **explanation** 40:2 126:3 | | **feeds** 142:12,13 147:20 |
| **existence** 28:16 | **explanations** 178:14 189:2 | | |
| **existing** 155:22 | **expressed** 93:22 140:3 173:12 | **fairly** 136:5 | **feel** 87:1 115:24 139:5 152:10 |
| **exiting** 155:12 | **expressing** 43:2 | **faith** 127:1 | **feeling** 137:16 |
| **expanding** 75:24 | **expression** 124:23 | **false** 91:19 123:14,15 | **fees** 42:11 94:22 155:25 191:11 192:24 193:6 |
| **expected** 75:8 94:12, 25 96:9 | **expressly** 6:17 | **familiar** 36:7 101:6 135:7 | |
| **expecting** 72:18 77:23 83:17 | **F** | **family** 127:3 140:19 | **felony** 8:18 |
| | | **famous** 123:5 | **felt** 68:18 133:15 |
| **expenditures** 117:19 | **face** 64:16 67:14 71:20,21 84:9 111:11 112:14 119:2,3 | **far** 68:1 121:9 152:9 192:9 | **fewer** 16:23,25 17:3,19 18:2 |
| **expense** 82:10 | | **fast** 119:11 | **field** 10:21 |
| **expenses** 80:4 91:22 93:18,25 128:14,16 129:20 162:6 | **face-to-face** 84:11 | **fastest** 106:18 | **fight** 141:11 |
| | **Facebook** 138:14,16,18 | **father** 124:16,17 133:16 | **figure** 111:13 114:9 184:2,25 |
| | **faces** 53:25 125:8 | | |
| **expert** 10:20,24 | **facility** 175:20 | **fear** 128:6,11,12 | **figured** 144:25 |
| **expertise** 58:12 | **fact** 111:22 118:25 139:10 162:25 176:8 | **feared** 128:16 | **file** 134:18 135:23 136:3,15 |
| **explain** 63:22 140:1 186:5 | | **February** 27:19,22 29:18 31:4 83:24,25 84:16,17,18, | **filed** 8:2 27:6 34:7 64:10 146:9 |
| **explained** 65:21 67:22 | **factories** 94:7 | | |

149:18,23

**filing**
29:18

**final**
42:17 43:15
44:2,8,13
45:10 46:16
64:6 105:24
154:24,25

**finalize**
75:1

**finalized**
47:19 99:10,
13,18

**finance**
158:1 164:10
182:13

**financed**
158:14 161:7
162:1 163:14

**financer**
184:6

**finances**
158:4 181:25
182:17,19
183:5 187:7,
20,21,23
188:3,10,16

**financial**
157:14,20
158:1 164:10
176:6,12
177:21,22
178:23

**financier**
157:12
159:24
161:2,21
162:12,18
163:8 184:1

**financing**
39:11 133:21
157:15
158:4,6,10
160:16,22
161:5,13
163:2,11,19,

25 164:5,6
176:7 182:24
183:23
184:25
189:2,5,6

**find**
73:14 123:21
136:8,14,19,
21

**fine**
97:12 143:2
150:9 151:12
184:6

**finger**
16:22

**firm**
5:1 174:16,
18,20,25
191:12 192:8
193:17,20,23

**firmed**
145:2

**firms**
174:22

**first**
4:21 15:25
22:22 36:10
38:8,14 41:7
42:12 52:1,
18 54:22
59:7 72:7
78:22 79:3
83:15 84:5,
10 85:7
94:18 95:16
102:3 107:23
110:24 111:6
112:3,20
122:17
127:14 135:2
138:10,22
144:14 145:7
148:20,23
149:20 150:3
153:18
154:18 167:6
183:14

**five**
9:1 38:8,19
40:16 42:1,
2,10 44:22
45:4,8 47:21
56:20 59:20
77:2 85:3
120:5 121:6,
13 130:20
146:4 149:1
150:7,10,20
181:6

**fix**
39:16

**fixed**
146:18

**Flatlands**
68:16 80:23
112:25

**Fleetwood**
175:15

**Florida**
11:9,16

**flow**
93:5

**fluctuated**
17:8

**focus**
33:3

**focused**
46:8 118:25

**folks**
140:22

**follow**
74:10 113:13
115:7 193:10

**follow-up**
116:23

**followed**
159:22

**following**
147:6

**follows**
4:22

**food**
101:5

**foolish**
108:23

**forbidden**
126:2

**forcefully**
65:5

**foreign**
29:23 30:12

**forget**
19:15 130:19
154:17

**Forgive**
185:25

**form**
16:10 36:18
155:3,9

**formal**
63:13 103:10

**formation**
29:24

**formatted**
123:3

**formed**
24:22 30:2,
5,7

**forms**
16:9 144:9

**forth**
47:20 76:10
101:1 190:10

**forthcoming**
75:3

**forward**
31:18

**forwarded**
79:9

**found**
87:23

**founder**
25:2 34:15
36:13

**founders**
144:23

**four**
37:21 38:14,
16,19 40:16
41:14 47:21

four-page
  181:4
fourth
  48:2,11
  120:4 155:14
  169:7
foyer
  112:4
Francisco
  46:1,2
Frank
  33:1
Frankly
  151:14
fraud
  7:24 21:6,
  16,17,18,19
  22:1,8,16
  23:2,8,17,21
  24:16 25:17
  61:21,23
  62:1,3,9
  63:23 73:18
  74:3 101:20,
  24 102:1,6,
  7,13 103:25
  104:10
  107:25
  144:22
free
  76:11 94:17,
  21 156:11
  157:3
frequent
  65:21
frequently
  32:8
Friday
  41:8 119:13
  127:7
friend
  21:6,15,17,
  18,19 22:1,
  8,16 23:2,8,
  17,21 24:16
  25:17 61:20,
  23 62:1,3,9

63:23 64:24
65:22 66:23
68:4,6 73:18
74:2 92:7
93:23
101:20,24
102:1,5,7,
12,13 103:25
104:10
107:25
friends
  68:2 85:1
  106:4 108:24
  109:21 119:1
front
  38:22 44:24
  45:5,17 46:9
  68:6 76:14
  90:13 133:22
  157:2 187:25
frum
  122:22
  123:6,25
  124:3 141:9
fucking
  151:20
fulfilled
  187:17
fulfilling
  124:2
full
  11:6 54:7
  107:14
  119:25
  122:16
  135:10
  136:11
  138:8,9
  152:22,25
full-time
  14:21 16:20
  52:6,20
fully
  6:11 140:4
fumes
  93:20
fun

137:2 175:4
functions
  28:13
fund
  42:16 43:14
  72:15
funded
  62:25 162:6
funds
  22:10 57:13
  72:16,19
  109:5 159:1,
  2,3 160:5
  161:4
funny
  70:1
future
  46:13

─────────────

        G

─────────────

gain
  91:23 92:23
gate
  38:18
Gateguard
  7:9 9:20
  11:13,18,23
  12:13,20,25
  13:18 14:2,
  15,19 15:2
  16:14,20,24
  17:4,10,19,
  25 18:2
  20:13 21:6,
  13,14,15,23
  23:8,17,22
  24:8,12,25
  25:7 26:1
  27:9,16
  28:2,6 29:5,
  21 30:2
  31:16,24
  32:4,10 34:9
  35:1,17,23
  36:3 37:8,
  12,17 47:12

51:3 53:21
54:20 55:25
56:5,8
57:16,20,24
58:8 60:11
61:21 62:10
70:18 71:17
73:23 75:6,
11 81:3,19
82:8 85:22
86:11 88:23
89:6,15,16
91:21,24
92:24 94:8,
23,24 95:8
96:13,14
100:15
101:25
102:2,8,10,
11,17,19,20,
22,24 103:10
104:11
106:23
107:17 115:4
130:8,10
131:12,24
132:1,2
133:2,7
134:14,24
154:12 155:3
156:6,19
157:16,19
158:17
159:5,11,15,
23,25 160:21
161:12
163:17
164:9,11,18
165:7,20
168:6,13
171:22
173:16 178:3
179:1,23
180:4 184:7
186:8,10,16
189:19
191:1,3,6
192:8

| | | | |
|---|---|---|---|
| **Gateguard's** | 52:12 53:8 | 70:3,15,16 | 37:4 41:20 |
| 14:7 24:19 | 62:2 69:20 | 71:11,22,25 | 51:11 52:2,3 |
| 47:24 53:23 | 74:7 93:22 | 73:9,13 74:7 | 54:18,19 |
| 156:7 158:2 | 116:15 126:3 | 78:17,19 | 56:2 57:8,9, |
| 179:7 | 135:20 | 79:5,8,22 | 10,14,15,18 |
| **Gateguard.xyz** | 145:17 157:2 | 80:19 86:2, | 58:7 63:21 |
| 34:25 | 159:1,7,11, | 12 90:16,20, | 64:1 65:16, |
| **gave** | 17 160:6,8,9 | 21 91:15 | 23 66:5,18 |
| 65:13 83:14 | 162:8 182:23 | 94:16 96:4 | 67:7,10,11, |
| 112:15 | 186:2 | 97:10 98:1,7 | 13,14,19,21 |
| 182:16 | **given** | 99:8 105:13 | 69:9,16 |
| 187:16 | 50:15 56:16 | 106:16 | 70:8,11,15 |
| 189:24 | 68:12 123:4 | 107:10,15 | 71:18,20 |
| **general** | 134:4,5 | 108:19 109:3 | 72:5,8 73:7 |
| 6:20 40:1 | 146:22 | 110:9 111:12 | 74:24 75:6 |
| 62:20 | 149:5,6 | 114:3,5,6,9, | 76:24 78:8, |
| **generally** | 162:24 171:9 | 11,13 117:6, | 11 79:7,10, |
| 9:17 39:1 | 178:14 | 20,21 118:24 | 23 80:11,18, |
| 42:23 192:15 | 182:25 | 119:8 122:2, | 22,23,25 |
| **German** | **giving** | 3 126:7 | 81:1,16,17 |
| 116:17 | 59:17 120:7 | 127:10 | 82:7 83:18 |
| **geschockt** | 123:15 | 129:10 | 84:15,22,23 |
| 116:16,17 | 182:22 | 133:1,18 | 85:9 86:13 |
| **gestures** | **GKH** | 134:2,11 | 91:8,18,19 |
| 5:8 | 174:16,17,25 | 137:2 139:11 | 93:2,8 94:15 |
| **getting** | **Glenn** | 141:7 142:9, | 95:1,12 |
| 45:21 63:24 | 146:3 | 10,25 143:4, | 97:17 98:3, |
| 68:19 76:13 | **Gmail** | 8,11 145:16 | 22 104:24 |
| 77:3,4 99:8 | 103:2,4 | 152:11 | 105:9,25 |
| 108:24 | **Godin** | 153:15,17,24 | 108:4,11,14 |
| 120:22 124:6 | 48:18,19 | 155:14 | 109:3,13,25 |
| 145:15,23 | **goes** | 157:2,23 | 110:13,15 |
| 150:2 160:15 | 39:5,7,19 | 159:1,21 | 113:3 114:1, |
| 161:7 162:4 | 123:5 | 160:1,9 | 19 115:4 |
| 163:11 | **going** | 163:22 | 116:4 117:21 |
| **GG00204** | 19:25 26:10, | 168:25 | 118:4,12 |
| 100:15 | 11,23 29:11 | 170:15,21 | 119:14,19,23 |
| **GG00205** | 32:24 33:2, | 173:1 179:19 | 120:4,24 |
| 101:14 | 17,18 41:4, | 181:2,6,7 | 122:7 127:13 |
| **GG00221** | 17 44:18 | 190:13 | 133:1 134:2 |
| 107:18 | 46:3 47:19 | **gold** | 141:4,21 |
| **give** | 48:1 50:21 | 156:7 173:19 | 146:8 148:4 |
| 14:3 21:5 | 51:25 53:16 | **Goldberg** | 150:1 154:22 |
| 22:17 27:1 | 54:13 56:8, | 22:4 | 166:10 |
| 32:24 43:10, | 12 57:7,10, | **Goldberg's** | 169:1,15 |
| 25 44:14,22, | 15,19 62:8 | 121:3 | 178:6 |
| 23 50:10 | 64:20 65:25 | **Goldenberg** | 179:12,18,21 |
| | 67:23 69:20 | 36:12,13 | **Goldenberg's** |
| | | | 64:3 66:11, |

12 72:10
82:8 83:12
92:6,10
110:20
115:6,12
121:21,24
141:19
**Goldenbergs**
67:12 72:9
**Goldman**
146:3
**Goldmont**
7:9 36:8
37:1 40:8,14
47:12 52:3
53:2,21 54:8
56:1 57:9
63:10 94:16
95:9 96:14
130:9,10,21,
23 131:12,
24,25 133:7
134:13,24
141:21,22
154:12
155:5,7,10
156:3,11,19
157:8 159:5,
12 160:14,
17,20 162:11
163:19
164:16,17
165:7,21
167:7,16
168:8,14
169:8 170:16
171:18
172:19
173:10
176:10
177:19
178:22
179:9,23,25
180:5,6,9,10
181:18
183:25 184:5
185:5,15,19
186:9 187:13

189:20
190:20
**Goldmont's**
55:8 155:8
**good**
4:25 64:23
118:22
125:20 128:4
149:11,13,14
**Goodbye**
137:4
**goodness**
133:12
**Google**
103:3,7,9
**governs**
74:5
**graciously**
95:17
**graduated**
19:3
**grainy**
98:9,13
**granddaughter**
148:6
**granted**
100:1
**great**
64:19 144:11
**green**
189:11
**grew**
148:24
**grocery**
45:20
**Gross**
174:17
**group**
104:6 114:13
125:5 152:6
**groups**
125:17
**guess**
19:11 54:15
170:15,20
**guidepost**
6:21

**guy**
64:20 122:21
124:10,19
125:10
126:18 134:6
140:8 164:3
**guy's**
128:17
**guys**
86:15 112:6
122:22
123:25
128:22
132:14
134:16
170:13

———————————

**H**

———————————

**half**
27:24 145:15
148:15,16
149:15
**hall**
112:16
**hallway**
105:19
111:12
112:22
**hand**
5:8 70:5
126:10
**handed**
154:23
**handle**
67:1 127:24
138:7 173:9
**handled**
16:8 133:15
143:16
152:16
185:18
**handling**
32:13 184:22
**happened**
105:15 113:5

**happy**
5:11,14
170:24 171:1
184:8 193:7
**hard**
29:15
**harder**
98:12 122:20
**Harvard's**
19:11
**haste**
118:10 123:2
**hasty**
118:20
**head**
12:19 21:4
22:2,14
32:14 36:17
49:18 51:19
52:13 61:6
62:20 68:13
71:8 95:6
107:24
131:17
135:25
178:10
190:14 193:2
**headaches**
145:22
147:17
**heading**
173:4,15
**headquarters**
11:24
**heads**
70:3 112:11
**health**
75:22 104:4
**hear**
92:15,18
129:5
**heard**
141:24,25
175:14
**hearts**
133:12

| | | | |
|---|---|---|---|
| **Hebrew** 126:5,6 140:21,23 | 80:4 83:16, 20 85:7 86:8,11 94:1 101:23 102:8,11,17, 20 103:1,2 | **hopes** 25:22 | **immediately** 78:13 187:11,17 |
| **heck** 55:11 109:19 145:11 | **hires** 102:15 | **hosting** 156:11 | **impact** 14:7 |
| **Heights** 77:6 | **hiring** 75:24 77:13 78:9 81:19 83:5,10 86:14 87:3 106:13 108:6,10,13, 15 117:13 | **hot** 28:23 90:10, 21 | **impacted** 76:8 |
| **held** 8:13 89:23 154:6 | | **hour** 86:19 148:7 | **impaired** 6:10 |
| **help** 64:21 111:1 146:23 148:5 | | **hourly** 86:21 193:22 | **imply** 69:18 138:20 |
| **helped** 87:23 190:1 | | **hours** 5:19,25 6:3, 6 127:7 142:18 145:16 | **important** 46:23 |
| **helpful** 41:16 148:18 | **hirings** 78:12 | | **improve** 127:24 |
| **helping** 87:9 | **history** 143:2 | **HR** 16:8 75:21 104:4 | **in-clinic** 145:19 |
| **helps** 135:21 | **Hodak--** 174:17 | **Hurricane** 145:1 | **in-house** 191:7 |
| **Herman** 15:11,16 77:8,18 78:4 83:19 88:4 107:20 111:3 185:19 | **hold** 24:1 53:24 126:21 | **hypnosis** 19:17 | **inaccuracies** 122:16 |
| | **holding** 134:1 | **hypocrisy** 125:3 139:8 | **inbox** 35:25 |
| | **holds** 102:14,15 | **hypocrite** 125:14 | **included** 179:17 |
| **hey** 43:19 74:25 103:1 106:16 108:23 118:25 | **hole** 127:23 128:1 | | **includes** 154:16 |
| | **holiday** 101:4 | **I** | **including** 20:16 50:4 52:4 81:19 174:22 |
| **high** 145:6 | **holidays** 136:21 | **ID** 90:15 | |
| **higher** 22:21 43:6,7 | **home** 11:7,8 16:2 18:20 | **idea** 161:4,11 | **inclusive** 110:3 169:17,23 |
| **highest** 18:22 | **honest** 111:16 122:15 | **identification** 26:6 29:9 32:22 41:2 78:15 100:5 107:8 134:9 136:24 180:24 | **incomplete** 135:9 |
| **highlighted** 30:18 | | | **incorporate** 25:5 |
| **hire** 78:1,2 128:21 | **honestly** 193:24 | | **incorporated** 21:20 23:3 24:1 26:2 29:21 74:3 101:20 102:6 107:25 |
| | **hope** 115:25 123:15 134:1 | **identity** 124:8 | |
| **hired** 77:8,16,18, 19 78:3,4 | | **imagining** 17:8 | **increase** 107:15 156:23 |

Ari Teman
August 05, 2021

22

| | | | |
|---|---|---|---|
| **increased** | **injury** | **insurance** | **inventory** |
| 75:25 | 145:6 | 55:10 64:13 | 76:1 94:3,5, |
| **increases** | **ink** | 68:13 75:22 | 9 |
| 156:9,18 | 171:13,15 | 104:4,7 | **invest** |
| 157:3 | **input** | **intellectual** | 56:8,13 |
| **incur** | 111:3 | 97:14 140:8 | 57:8,16 |
| 91:22 | **insane** | **intent** | 58:17 60:8 |
| **incurred** | 142:11 | 49:18 91:20 | 63:5,6 69:6 |
| 80:5 129:20 | 147:19 | **intention** | 70:9 91:8 |
| **incurring** | **insensitive** | 93:18 124:2 | 114:3,20 |
| 82:10 | 68:11 | **intercom** | 115:4 116:4 |
| **independent** | **inserted** | 24:9 37:12 | 117:24 121:5 |
| 16:12 96:3 | 49:8 50:12 | 53:22 | 133:1 |
| 115:11 | 51:18 | 130:10,14 | **invested** |
| **independently** | **inside** | 132:1 173:16 | 96:4 120:9 |
| 81:14 | 13:9 105:5 | 179:2 | **investing** |
| **indicate** | **insistence** | **intercoms** | 59:2 60:18 |
| 4:14 | 77:9 | 37:18 71:5 | 76:24 79:24 |
| **individual** | **inspires** | **interest** | 109:4,14,25 |
| 15:7 37:3 | 122:20,21 | 20:9,17 21:2 | 110:21 |
| 71:17 | 124:18 | 57:5 60:13 | 116:14 129:1 |
| **individuals** | **install** | 61:20 62:3, | **investment** |
| 15:19 16:4 | 45:13,18 | 6,10 93:22 | 54:19 55:2 |
| 73:17 86:9 | 168:7 | 173:12 | 56:3,20 57:6 |
| 139:9 | **installation** | **interested** | 60:9 61:24 |
| **industry** | 13:10 39:19 | 36:21 79:18 | 62:8,14 |
| 73:13 | 40:6 79:20 | 97:13 98:15 | 63:22 64:8 |
| **inflate** | 87:8,10 | 147:1 | 66:1,8 68:22 |
| 156:10 | 98:17 | **interesting** | 69:16,18,22 |
| **info** | **installed** | 144:16 | 70:13 71:19 |
| 155:24 | 38:4 39:23 | 170:13 | 73:3,11 75:1 |
| **informal** | 40:7 42:11 | **interjected** | 76:17 80:17 |
| 103:12 | 168:10,16 | 152:9 | 81:3 93:19 |
| **information** | **installer** | **international** | 94:12,19 |
| 91:18 98:22 | 14:12 87:3 | 174:25 | 95:1 96:2, |
| 148:5 155:20 | **installers** | **interns** | 10,16 97:19 |
| 170:11 | 14:10 78:9 | 90:19 | 106:12 |
| 192:25 | 86:15 | **Interrogatori** | 108:7,15 |
| **informed** | **instance** | **es** | 115:7,18 |
| 178:21 | 89:12 | 7:7 22:12 | 117:19 |
| **inhibited** | **instruct** | **interrupt** | 129:11,22 |
| 6:10 | 186:16 | 71:23 88:1 | 133:19 134:3 |
| **initial** | **instructed** | **introduce** | 179:20 |
| 29:18 38:20 | 81:17 82:2 | 158:21 | **investor** |
| 184:3 | 83:3 183:3 | **introduced** | 57:6 58:9,11 |
| **Initially** | **instructions** | 177:5 | 63:21 |
| 117:2 | 82:3,4,5 | | **investors** |
| | | | 22:3,10,24 |

25:17 57:13
61:4 62:4
67:18 69:12
**invoices**
41:14
**involved**
166:8
**IP**
34:6
**ironic**
20:1
**Israel**
99:4
**issue**
178:21
179:1,25
**issued**
180:3
**issues**
146:11
**items**
79:22
**IV**
148:6,7,10,
22 149:12
150:24
**IVS**
150:2

---

### J

**Jacob**
95:21 131:6,
17 136:4
141:20
154:23,25
155:6,13
158:24 166:9
170:16
171:20,21
174:7 176:19
177:3 178:6,
14,15
181:12,16,17
187:2 189:10
**jail**
144:23

**Jake**
22:3
**January**
8:1,4,5
12:22 90:25
101:10
106:11
**January/february**
54:24
**Jeanne**
77:1 110:16
118:15 122:1
**Jerry**
64:21 68:5,
6,12 69:1,4,
5,7,25 79:14
110:15
112:16,18,21
114:12
115:21,24
117:6 122:9
129:11
**Jerry's**
68:8 69:23
112:12
115:20,21,22
120:19
**Jersey**
148:25
**Jew**
151:20
**Jewish**
68:10 105:5
136:21
139:12,24
140:14,17,
18,19 148:24
**Jews**
124:3 125:16
145:11
**job**
16:2 18:20
86:19,21
87:4,6,7
170:23
**join**

68:3 85:4
**joining**
69:19 115:17
**joke**
105:5
**journeys**
126:25
**Jovari**
21:7
**July/august**
145:19
**jump**
32:25 132:15
**jumping**
69:4
**June**
147:5

---

### K

**Katan**
105:4
**keep**
62:5,6 67:25
108:17
112:13
128:23
132:19
136:20 141:2
**ketamine**
148:6,10
149:12
150:2,23
**key**
76:7
**keyword**
81:23 82:1
**kick**
104:21
**kicked**
83:10
**kid**
148:24
160:8,11,12
**kids**
160:7

**killed**
138:23
**kind**
9:16 31:22
32:19 49:2
55:16
147:14,16
148:8
**kinds**
69:2
**kippah**
122:21
124:11,14,19
**kippahs**
124:13,21
**Kleinhendler**
174:17
**know**
5:11,14 10:9
12:3 13:4
16:15 18:19
22:10 24:18
25:3,12,23
30:22,25
31:6,19
34:8,19,21
35:14 39:25
40:18 41:15
43:8,19,20
51:4 52:9,
10,11 57:13
58:12 59:2
61:3 65:1
66:6 67:9
68:18 69:19
70:4,22
71:3,7 74:15
76:3 78:6
83:4,19
87:12,22
89:11,21
90:11,15,18
91:7 95:5
96:22 97:24
99:3 100:25
102:14,25
103:6,7
104:6 105:3,

4 115:23
120:14
122:25
124:5,6,7
125:12
126:13,15,
20,22,23
128:9,18,22,
25 131:17,18
133:20 135:3
136:15 138:2
140:10
141:20
142:2,3
143:9 144:11
147:5 150:15
151:10 153:3
155:23
156:15,25
157:12
158:7,16,19
160:6,7
162:23 164:3
170:10,12,19
171:2,4,8,
13,25 172:17
174:11
175:14
176:10,18
177:2,4,19,
25 178:3,4,
11,12,16
180:8,12
181:17
182:16
183:11 184:8
185:2,11
186:17
188:23
189:10
190:9,14
191:25
192:11,16,17
193:4

**knowing**
158:12

**knowledge**
18:1 163:17

164:8

**known**
52:24

**kosher**
140:23

**Koss**
5:2

**Kutcher**
140:10

———————————

L

———————————

**label**
16:16

**lack**
89:5

**landlords**
138:24

**language**
48:16 172:4,
9,18,23

**laptop**
96:20,21

**large**
94:8,14,23,
24

**largely**
145:21
179:16

**larger**
27:2 33:18
88:20 94:7

**late**
14:5 15:5
21:21 40:3
137:13
146:19

**law**
174:16,25

**lawsuit**
69:11,13
149:18,23

**lawsuits**
10:3,4

**lawyer**
16:15 60:1
74:8 104:7

131:7 141:9
181:18

**lawyers**
72:23 73:1,
5,9 105:13
106:18 109:7

**layman's**
104:8

**layperson**
12:8

**leader**
125:5,6

**leading**
62:23 115:15

**learn**
76:2,6,23

**lease**
12:25 13:3,
16 55:17
88:8,12,18
90:24 91:2

**leases**
55:22

**leave**
20:7 90:25

**left**
174:21 175:3

**legal**
12:3,7 25:19
34:4 49:16
50:10 58:1,
3,10 72:1
88:12 92:13
118:21
121:19
130:12
156:21
159:17,19
160:4 165:2,
11,24 166:22
168:2 169:21
175:23

**lengthy**
135:14

**Leon**
36:13 52:2
53:1 54:18

56:2 57:8,
10,14,15,18
58:7 63:21
64:2,4 65:6,
16,20,22
66:4,11,18
67:7,10,11,
13,14,19,20,
23 68:24
69:9,16,17,
20 70:7,12,
15 71:1,7,
18,20 72:8
73:7 74:23
75:6,12
76:24 77:9
78:7,11
79:7,10
80:11,16
83:12,13,17,
23 84:2,9,
11,15,21,23
85:9,17
86:13 91:7
92:6,9,16,
19,21 93:2,7
95:1,23
97:17 98:3
104:24
108:11
109:12,25
110:13
111:25 112:1
113:3 114:1,
5,19 115:3,
6,11,14
116:3,14,21,
23 117:4,20
118:4,12
119:14,18,23
120:24
121:21,24
122:7 125:5
127:13
128:13
129:1,11
131:18
132:25 134:2
158:24

166:10 169:1 179:18

**Leon's**
64:11 66:23 75:4 95:7 97:21 101:3, 7,8 110:7 114:3 117:23 119:7 148:5

**letter**
78:7 85:21 100:14 102:4 106:10 107:21

**letters**
40:20

**letting**
51:3

**level**
18:22

**leverage**
91:23 92:8, 24 125:9 163:10

**Levi**
15:10,16 77:8,18 78:4 83:19 85:12 88:4 107:19 111:3 185:18

**licensed**
175:1

**lieu**
4:8

**life**
127:6 142:10

**limit**
123:4

**limited**
177:8

**limits**
25:8

**line**
48:17 155:19 156:6 174:9

**lines**
70:2

**linguistic**
16:18

**list**
22:13 76:4

**listed**
51:1

**Listen**
171:8

**literally**
113:20 139:14

**litigation**
191:13

**little**
16:21 23:11 59:5 71:7 98:9 104:1 112:5,14 125:10 134:22 188:5

**live**
11:7

**living**
127:6

**LLC**
34:21,22 57:11 103:7

**LLCS**
37:3 51:8

**loan**
162:2 163:24

**located**
12:10

**location**
12:15 13:13, 25 14:3,9,11 27:17 29:3,4 31:16,25 32:4 89:17

**locations**
12:1 13:9 34:21

**lock**
39:16 173:9

**long**
5:14 8:8,10 11:18 12:20

13:18 68:20 78:10 125:21 146:13 150:19 170:25 188:23

**longer**
90:4 129:4 150:8

**look**
29:20 31:1,8 101:9 108:14 111:5 117:11 135:5 136:14 139:12 153:4,17 156:4 167:5 173:3,14 188:6

**looked**
127:15

**looking**
51:12 120:8 143:10 155:1

**Looklock**
23:24 173:4, 7

**Looklock.xyz**
35:2

**looks**
69:25 79:6 135:7 153:9

**loophole**
104:5

**loosely**
68:4

**lot**
100:24,25 174:20,21 175:18

**love**
140:16

**low**
32:15

**lowball**
92:21

**Lowenstein**
174:19

**lower**
43:6 46:14 146:20

**luck**
118:22

**lying**
116:18 125:7

---

**M**

**M-A-R-L-I-N**
157:17

**Mac**
175:15

**made**
38:1,7,9,21 54:20 62:9 65:6 66:8 68:6 71:20 75:13 80:6 91:19 92:21 93:2 94:23, 24 95:4 96:8,24 97:17 108:6 110:5,6 116:20 117:1,19 118:2 119:6 122:12 129:7 142:2,3 154:2,25 155:16,21 165:18 166:4,6,7,16 167:22 179:14,17,18 192:24

**magazine**
123:6

**magazines**
139:14

**mail**
31:19 32:5, 7,9,13,15

103:7

**main**
11:24 12:2,4
96:22

**maintain**
88:24

**maintenance**
39:13

**majority**
53:15

**make**
6:15 12:3
24:9 26:19
27:2 29:14
33:17 37:14
39:8,14
46:13,16
71:3 78:11
98:12 99:9,
23 106:12
107:14
113:16
114:24
116:16
117:20,21
122:22
131:21
153:20
160:18
161:17
164:18
167:23
170:21
177:11
179:19

**makes**
115:8 117:10
122:1 129:3

**making**
25:24 46:21
47:5 69:17
70:12 81:2
93:19 97:18
99:23
108:10,13,14
123:14 124:1
170:25
187:24

191:20

**mal**
149:5

**malicious**
140:12

**malpractice**
10:15
144:20,22
152:5

**man**
122:15 123:9
171:1

**manager**
102:5

**manner**
4:13

**manufactured**
44:5

**manufacturing**
81:20

**March**
33:8,12 77:2
79:4,11
80:3,7,21
81:16 82:18,
21 83:8,10
98:4 109:2,
13,18 110:13
112:23 115:1
119:13
127:14

**mark**
143:3,13
152:12

**marked**
26:6,12,24
29:9,12
32:22 41:2,5
78:15,18
100:5,10,11
107:8,12
134:9,12
136:24 137:3
143:5 153:7
180:24 181:3

**Marlin**
157:14,17,20

158:1,3,6,
10,13,14,15,
17,18,20,21,
25 159:1,3,
10,15,23
160:2,5,16,
18 161:2
162:24,25
163:5 164:9
167:22
176:5,12
177:4,5,22
178:23

**Marling**
189:6

**married**
128:18

**math**
42:1 59:11,
18 60:24
61:13,16,19

**matter**
4:10 42:23
66:19 72:20
113:8 176:8
189:9

**maximum**
133:24

**mean**
10:3 17:21,
24 20:5 30:4
34:16,25
42:21 43:17
44:3,7,8
45:10 46:22,
23 49:10,19,
22 50:3,12,
25 51:7
52:24 59:25
65:1,3 66:2
68:18 71:2
72:22 77:15
86:25 88:1
92:6 93:10
94:5 113:15,
20 115:20
116:16 117:8
122:10,24

124:3,14
125:22,24
126:19,22
128:1,12,20
138:20
149:2,4,25
151:10
157:24
164:25
172:13
180:15
182:15
184:19
185:17 189:9
190:4 191:2,
4,24 192:14

**meaning**
35:25 44:9
49:24 56:1
93:4 159:24
171:10

**means**
79:16 126:11
165:3

**meant**
126:14,16
188:17

**med**
149:4

**media**
48:13 50:17,
20

**medical**
10:15 143:2
144:18,19
152:4

**medication**
142:18
145:17
148:22

**medications**
5:19,23
147:24
149:3,5,7
150:5,6,22

**medium**
164:20,25
165:9,19,22

166:20

**meet**
55:1

**meeting**
32:17 58:5,
7,15 63:11
64:2,13
68:19,21,24
72:3,11 77:3
80:9,13,25
83:12 84:5,
8,9,11,14
95:6 101:6,
7,8 104:24
105:17,23
111:12,20
112:8,9,17,
23 113:5
116:25
120:5,6,14,
17,18,23,25
121:1,7,14
122:9

**meetings**
55:5 63:8
83:23 84:1,
7,23 85:16
106:6
109:16,23
111:21,22,
24,25 112:1,
2,20 116:24

**melatonin**
5:20 142:19

**member**
175:8

**members**
28:25
140:14,16,
18,19

**membership**
88:11 89:2,4
90:7 91:1

**memorialized**
63:14

**memorized**
61:5

**mensch**
128:5

**mentioned**
24:3 37:6
67:17 117:3
151:21

**message**
79:10
118:14,19

**messages**
96:6 148:4
150:1 176:9
178:11,19

**met**
52:1,25 53:1
55:3,6,7,9,
18 68:16
80:22 101:2
112:3 120:21

**method**
165:4

**Miami**
11:9,16 13:7
29:3 185:18

**Michael**
22:4

**mid**
83:24,25
146:19

**middle**
12:24 109:2
138:8,11
141:8
149:17,22

**Midtown**
77:7

**Midwood**
55:11 68:1,
17

**million**
54:12,16
56:3,8,13,
14,15,16
57:16 58:17
59:16,20,21
60:8,9,22,23
62:1,24

63:5,6 64:19
65:25 67:20,
23 69:15,21,
22 70:4,9,
13,16,19,24
73:2 75:7
76:25 77:23
80:5 81:4
83:17 84:15
85:2 86:12
91:8 93:8
94:11,12,25
95:1 96:2,4,
16 105:11
106:3,5
108:25
109:24
110:2,4,7
111:13
113:12
114:4,6,11,
14,16 115:3,
6,9,12
116:3,15
117:4 118:2,
3,4,5,8
119:7 120:7,
9 121:5,8,15
122:8 129:1,
2,13 133:1
134:3

**Mince**
22:4

**mind**
6:22 49:14
92:10 108:17
121:21,24
122:4 170:20

**minds**
91:13 92:15

**Minhah**
112:6

**minus**
85:14

**minute**
26:16 168:20

**minutes**
130:1 188:24

**Miracle**
148:18

**misleads**
152:2

**missing**
21:4 76:3
135:12 190:4

**misspeak**
55:16

**misspoke**
102:12

**misspoken**
181:20

**misstating**
185:7 186:13

**mix**
38:24

**mixed**
101:7

**model**
76:21

**modified**
51:15,16
89:9,10,25
174:7,14

**modities**
126:3

**moment**
20:7 32:24
33:2 138:21
144:13 172:2

**money**
18:9 56:22
57:8 71:23,
25 72:25
76:11,16
79:25 93:21
104:9,10,11,
16 106:17
108:5,16,19
109:15,22
114:19
115:22 123:8
159:11
160:13,17
161:8 192:21

**month**
  13:5 32:19
  83:24 88:15,
  17,18,19
  89:20
  106:11,16
  133:25 147:4
  148:14,15
  149:14
  167:8,13,24
**monthly**
  38:22 39:10
  40:6 42:11
  76:18 79:21
  94:22 98:18
  156:24 157:2
  159:12
**months**
  13:21,22
  108:3 113:4,
  7 132:24
  133:5 148:16
  149:15
  167:8,13,25
**moods**
  117:10
**morning**
  4:25
**mortgage**
  162:1 163:24
**move**
  28:2 119:8
  136:17
  153:19
  168:25
**moved**
  14:10 27:18,
  25 28:3 30:5
  87:17,19,20
**moves**
  80:6
**movie**
  140:9
**moving**
  90:25 106:19
  119:10
  132:14
  140:24 141:3

  151:19 168:6
  183:14
**MRI**
  145:20
**multifamily**
  24:10
**multiple**
  11:15 12:1,4
  54:21 64:15
  65:12 72:12
  84:1 111:21,
  22 130:22
  149:7 165:13
  172:14
**multiyear**
  37:18 39:10
  88:18
**music**
  175:14,20
**muted**
  107:10

—————————

**N**

—————————

**name**
  4:14,25
  19:15 29:20
  31:10,11
  33:23 34:2,
  18,20,23
  68:8,10
  106:21
  135:23 136:3
  138:8,9,10
**named**
  56:7
**names**
  10:9 21:5
  65:13
**narcotics**
  6:6
**nature**
  63:16 147:7
  163:9 192:19
**nearby**
  11:21

**necessarily**
  17:24 113:12
  123:1 178:16
**necessary**
  73:10
  189:18,22
**neck**
  146:21
**need**
  5:12 18:14,
  15,20 25:10
  27:2,4 45:5
  75:1 79:18
  98:15 126:14
  150:9 184:2,
  6 187:19,23
**needed**
  18:16 32:20
  75:13
**negotiate**
  131:6
**negotiating**
  83:11
**negotiations**
  91:24 92:25
**network**
  29:1,2
**networks**
  175:9
**neurolinguist
ic**
  19:17
**never**
  9:13 16:4
  74:12,20
  102:8,17,19
  118:7 122:21
  124:19 134:6
  139:1 156:10
  164:5 175:7
**newly**
  150:2
**news**
  30:24 127:24
**nice**
  115:23
  164:12

**nicely**
  123:3
**Nicks**
  175:3,7,8,20
**niece**
  148:5
**night**
  145:24
**nine**
  44:20
**non-equity**
  23:5
**nondisclosure**
  49:25 50:2,5
**nonjews**
  145:10
**nonlegal**
  17:22
**nonpayment**
  40:3
**Northern**
  148:25
**note**
  137:4 140:1,
  4 146:7
**notes**
  155:16
**notice**
  8:3 100:25
**notification**
  168:8
**notified**
  168:14
**November**
  26:3 29:24
**nowadays**
  31:23 50:16
**number**
  11:4 12:18
  15:8 17:9,10
  22:3 26:8
  37:17 38:20
  39:6 43:7,23
  46:19 52:16
  63:4 90:15
  104:19
  109:15

123:16
146:13
161:17 170:5

**numbers**
66:2 120:22
153:12 181:5

**NY**
80:24

**NYU**
145:2,3

———————————

O

———————————

**oath**
4:8

**object**
143:1 193:12

**Objection**
25:18 34:3
57:25 60:19
66:20 85:10
91:10 92:12
121:18
130:11
156:20
157:21
165:1,10,23
166:21 168:1
169:20
175:22
176:14 185:6
186:12
188:19
191:14

**objections**
4:13

**objects**
67:16

**obligated**
40:15

**observe**
145:12

**obviously**
18:18 22:2
28:10 31:19
40:2 45:24
56:21 74:11

90:12 95:21
111:24
115:19
128:15
155:14,22
166:10
179:15
186:22

**October**
26:3 181:10,
21,23 182:10
183:8,17,19
185:14 187:1

**off-the-
record**
48:12 49:9
50:9

**offer**
25:24 76:11
78:5 85:21
92:21 93:2,9
94:23 100:14
101:11 102:4
107:20,24
116:25
133:12
162:10

**offered**
93:8,20 96:7
133:7

**offering**
94:19

**office**
11:19,20,24
12:4,11,20
13:14,19
24:10 27:25
28:8,15,17,
20 55:20,23
64:3,11
67:15 72:3,
10 75:15,24
80:10,14,17
81:21 83:11,
13 84:10
87:10,15
88:24 89:7
90:3,8 94:2

95:7 101:3,
7,8 105:18,
20 112:8,19,
21 115:20,21
120:19
185:20,22
190:3

**offices**
12:5,9,13
13:8 55:8,13
69:23 190:2

**official**
25:4 63:18
104:19

**officially**
25:1

**okay**
5:16 10:12
11:6 13:13
14:2,6 15:18
16:11,23
17:7,22
18:21 19:25
20:3 22:20
26:18,24
27:15 29:11
30:11 31:2,
9,15 33:17
36:6,15,25
37:23 38:11,
25 39:21
41:4,5,12
42:13,21
44:11 45:3
48:9 50:23
54:3,22
55:12 57:4,
23 62:8,18
64:19 66:14
70:6,23
72:2,21
74:16 78:17
79:6,8,9,13,
15 83:15
84:13 91:15
97:15 98:1,
7,13 100:22
101:13,23

103:18
106:25
110:19
111:5,10
116:1,7
117:4
119:12,17
126:13
128:11
129:24
132:6,8
134:20 135:4
136:1,16
137:7,11
138:3 140:24
143:7,18
147:7 149:16
151:11
153:6,18,25
156:15
157:6,16
164:15,24
167:5 169:4,
7,11 170:2,
19 173:1,10,
22 181:2,10,
21 183:14
185:5 187:19
188:15 191:5
193:14

**Omni**
55:10 64:13
68:13 72:3,
11 77:3
111:23 112:3

**once**
7:20 67:24
72:14,23
99:15 148:4
174:19

**one**
7:10 9:4
10:14,16
11:15 12:9
13:11,12,20,
21,23 14:9
15:8 18:5,7
19:11 21:4

22:11 24:21
26:16 28:9,
11,12 35:20
38:16 44:1
46:6 48:24
53:3 55:14
63:1,3 65:5,
13 66:13,15
67:12 71:1,6
76:7,13
77:13 83:21
85:3 87:23
88:19 89:22
90:1 92:4
95:20 112:5,
18,21 120:6
126:10 127:5
130:18
150:24 152:4
153:10
159:15
172:5,13
178:14
190:16,18
193:21
**ongoing**
8:2 83:2
144:20 149:9
155:24
191:25
**online**
47:3,9 95:14
123:17 131:4
137:9,18,22
155:22
169:14
174:15,24
179:13,20
**onset**
22:14
**opened**
185:19
189:25
**operate**
59:5 76:17
93:6
**operating**
30:13 65:5

79:21 98:18
103:5 132:18
162:2,5
163:24
**operation**
14:11 40:12
102:5
**operations**
15:9 65:7
67:1 75:14
77:19 103:7
104:12
**opinion**
58:13 175:13
189:22
**opportunity**
154:10
162:11,17,24
**opposed**
46:20 96:10
**options**
120:8 159:7
**orange**
44:16,18,20
45:19,21,25
46:6
**oranges**
44:17,22,25
46:7 63:4
**order**
38:1,20 42:9
43:9,13,23
44:16 46:18
75:25 79:17
91:23 92:23
94:7,8,14,24
95:4,15,20
96:14,22,23
97:3,6,16
98:15 130:25
131:4 143:4
176:6
**ordered**
39:21 46:7
95:17 96:13
138:25 170:4
186:4

**ordering**
39:4 46:10
95:14 96:18,
19
**orders**
96:1 117:14
**organizationa
l**
73:17,22
**organize**
87:10
**organized**
99:8
**original**
95:24 121:4,
25 122:6
155:23
174:13
175:15
177:13
**Orthodox**
123:6 124:3
125:16
139:12,24
140:14,16,
18,19
**outset**
6:15
**outside**
22:12 52:7
53:11
**overly**
16:18
**override**
183:24
**owned**
21:15 37:1
55:23 61:2
169:24
**owner**
21:22 22:23
170:6
172:10,18
**owners**
21:25 171:2,
3

**ownership**
20:8,17,20
21:2,14
22:7,15 37:3
57:4
**owns**
23:23 55:22

---

**P**

---

**p.m.**
98:5 115:1
127:15,16
181:23
183:18,20
185:14 187:1
**page**
41:7,18
48:2,10,11
78:20 79:3,9
81:15 101:14
114:23
119:8,9,10,
12 122:17
127:11 135:2
138:14,16
142:9
153:11,12,
17,18,22
154:1 168:25
169:7 173:2,
3,14,23
175:5 181:7
183:14
**pages**
154:19
**paid**
14:23 15:1
16:9 37:24
38:5,7,10,22
39:18 45:9,
25 86:18,23
103:14,24
104:13 139:1
158:17
159:25
160:1,2
165:12

173:20 191:12 192:3,8,21, 22 193:22

**pain** 145:23 147:14

**painful** 145:8

**paintings** 67:15 105:17

**pandemic** 19:12,21

**Panel** 173:16

**paper** 47:4

**paperwork** 72:20,22,24 73:2 74:11, 21 105:14 106:1,12,17 108:5,16

**paraded** 109:20

**paragraph** 27:7 41:24 42:9 53:20 54:1,2 80:21 82:6,17 91:16 98:8, 14 103:20 111:6 114:15 116:8 117:11 120:4 122:19 131:22 139:12,23 141:3 155:17 156:5 157:6, 9 164:16 167:6,15 174:9 175:5

**paragraphs** 155:15

**pardon** 122:10

**parent** 61:24 102:1

**parentheses** 42:15 117:13

**parking** 8:18

**Parsons** 19:13

**part** 15:20 43:3 50:5 70:9 93:10,12,13 136:11 146:25 149:17,22 154:1,5 155:2 179:7

**part-time** 14:20 16:20 52:6,20

**participate** 69:15 71:11 81:2

**participating** 4:3 67:19

**particular** 17:18 18:2 20:14 42:24 126:20 174:6

**parties** 4:11 10:10 131:11 166:8 185:4,13

**partner** 5:1 23:19 57:19,21 65:22 66:23

**partners** 13:10 23:5

**partnership** 74:4

**parts** 114:21

**party** 9:24 10:2,4 133:21 161:13

163:15,18 170:17 176:6

**passed** 14:6,10

**passing** 14:1

**past** 5:18,25 6:3, 6 19:24 30:20 142:18 149:8

**Pasternack's** 66:7

**Pasternak** 64:15,22,24 65:11 66:4, 14 67:6 69:1 73:8 78:5,7 99:2 110:6, 15

**pat** 111:15 112:15

**pay** 18:8,9 32:10,19 40:8,15 43:20 44:4, 19 45:1,5, 14,22 46:10, 12,15,19 54:14 87:4 94:21 104:5, 9,10,11,15 108:23 128:17,19, 23,24 133:24 159:12 161:18,22 162:13 163:20,25 166:2 167:8 182:18 184:7 189:5,7

**paycheck** 20:10

**payer** 160:19,20

**paying** 40:14 89:15, 16 94:20 96:10 141:11 157:1 159:15 160:5,11,12 164:1

**payment** 38:9,13,21 39:6,8 40:3, 21,25 43:1, 16 44:3,8,13 45:11,17 46:16 133:23 155:18,23 164:18,20,25 165:4,8,18, 19,22 166:20

**payments** 38:9 42:18 76:18 155:25 164:21 167:3,9,12, 21

**payroll** 14:19

**pays** 192:5

**PDF** 171:8 172:5, 14 173:24 181:4

**PDFS** 171:11 172:14

**pee** 50:21 91:3 168:21

**penalties** 155:25

**penalty** 4:10

**pending** 7:23 8:14,15 10:7 152:5 170:7

**Penn**

27:11 28:17,
20 29:4
55:9,10,13,
18 63:11
87:18,19,20
89:7,15 90:3
101:7 112:2
120:17,19
121:1

**people**
15:8 16:13,
19,24 17:5,
9,25 18:9
23:6,12
45:17 50:16
51:3 52:3,
19,24 53:2,
3,5,10 61:3
63:10 65:8,
12 66:15
75:24 78:1
84:23 85:23
90:19 94:1
106:19 109:5
116:19 119:5
121:6
124:20,24
125:17 127:5
128:17,18,23
132:15 139:4
148:19 149:7
152:2 160:24
161:4
162:13,23
163:11
175:13

**people's**
125:8

**percent**
21:1 22:19,
23 56:21,23
58:22,25
59:6,9 60:3,
6,12,13,16,
25 61:2,11,
20,21 62:2,5

**percentage**
22:15,18

23:12 57:4,5
59:15,24
63:24 156:25

**percentages**
59:4 64:8
115:14

**perfectly**
129:7

**period**
37:5 109:1,
11 145:7,8
146:16,18
149:16

**periodic**
156:8,18

**periods**
146:15

**perjury**
4:10

**permission**
26:10 170:6,
7 171:2
172:9,18
174:10 186:3
189:25

**person**
4:8 14:6
15:9 55:1,3,
6 66:25
71:17 83:15
85:7 86:20
108:21
111:16
171:12,18

**persona**
125:1

**personal**
20:20 138:15

**personally**
10:3

**personnel**
77:17 80:4

**philanthropis
ts**
138:24

**phone**
43:4,19 55:4

80:18 97:4
112:1 169:15
177:2 178:12

**photo**
123:8

**photocopy**
134:16

**photograph**
141:8

**photography**
179:21

**photos**
95:14,17
105:19
179:12

**physical**
32:3 75:24
101:19
145:22
147:14

**physically**
4:4 6:10
171:10

**pick**
118:21

**picture**
65:18

**pictures**
97:3 131:3
169:15

**piece**
83:6

**piecemeal**
32:20 55:16

**pieces**
96:19

**pigeonhole**
12:6

**pile**
122:11
163:12

**pinching**
147:15,16

**piss**
126:19

**pitching**
69:3

**place**
27:10,16
89:23 90:2,4
112:25
185:21

**places**
111:23 170:5

**plain**
113:17 152:1

**Plaintiff's**
29:12

**plan**
76:10,15
104:7 156:7
173:19

**play**
175:7

**played**
175:19

**Plaza**
27:11 28:17,
20 29:4
55:9,10,13,
19 63:12
87:18,19,21
89:7,16 90:3

**Please**
4:13 41:15

**pleased**
102:4 107:24

**pocket**
159:8

**point**
5:12 17:9
53:3,4,5
58:10 59:18
64:5,9 76:2,
6,23 79:13
84:2 89:24
117:22
128:25 130:7
134:2 140:11
178:14 185:2
187:12
192:16

**pointed**
59:3 113:9

polite
  43:21
politely
  46:11
politically
  70:2 108:21,
  22 112:11
popped
  53:25
popping
  71:8
popular
  150:3 175:13
portion
  23:7,16
  30:18 173:22
position
  50:10 102:5
  107:24
  192:25 193:3
possession
  141:15 142:5
  179:2,5
possibly
  104:13
post
  56:22 137:9
posted
  137:18,22,25
  138:18
posting
  50:19
powwow
  112:9
practical
  159:20
practice
  124:9 127:1
  175:1
prayer
  112:6
pre
  56:22
predated
  72:11
preference
  62:21,22,23

preferences
  61:9
preferred
  62:16 64:8
pregnant
  16:1 18:19
prejudice
  140:13
preparation
  6:24 7:3
prepare
  73:1,10
prepared
  52:9 74:12
  99:16
preparing
  28:9,12 73:5
prescribed
  5:24
presence
  14:7
present
  4:4 11:23
  14:13 16:11
  63:7 147:2
  157:19
  166:15
presented
  66:24 162:19
presently
  16:19
president
  25:5
presumably
  58:23
pretty
  20:1 70:22
  78:13 93:17
  100:20
  117:10
  123:17
  128:13 129:4
  137:16
  150:15
  163:7,23
previous
  76:12 89:17

127:20 129:9
previously
  105:15 133:7
  190:24
price
  39:4 43:11,
  25 44:15,17,
  21 46:6,9
  53:23 54:7,8
  96:7 156:8,
  9,10,18
  167:16
pricing
  43:11,21,22
  76:8,21
  132:3 173:4,
  16
primarily
  118:25
printout
  29:13 30:14
prior
  60:4 61:4
  80:17 81:13
  108:10,13
  113:6 177:20
  178:20
  179:14 183:8
  185:7
private
  50:17,19
privilege
  191:19
  192:19
  193:19
privileged
  191:15
  192:6,10,24
  193:4
probably
  17:8,12
  22:18 23:1
  25:4 97:7
  126:4 148:25
  170:21
  193:20
problem

51:22 91:4
  112:7 136:10
  140:7
problems
  124:1
proceeded
  144:22
process
  31:10 177:6
produce
  97:8
produced
  86:5 100:15
  107:17
  135:18 136:5
  170:14
producing
  174:18
product
  19:13,14
  23:25 36:21
  81:20 98:17
  180:18 186:4
production
  74:9 86:3
  97:9 142:7
  178:18
products
  33:24 37:8,
  9,10 79:20
  174:19
  186:8,11
profile
  138:15
profits
  23:7,16
programming
  19:17
projections
  79:19 98:16,
  24
prolonged
  145:7
promise
  44:20 46:13,
  25 128:24

| | | | |
|---|---|---|---|
| **promised** 113:3 129:8, 14 | 11 177:21 184:2 192:13 193:6 | **purchased** 53:21 132:1 179:8,13 | |
| **promises** 42:17 43:15 122:23 123:15 | **provided** 73:20 99:2 156:11 158:6,10 178:22 182:18 | **purchaser** 160:23 162:19 | **Q** |
| **promotional** 81:21 | **provider** 49:2 75:21 | **purchases** 179:14 | **qualified** 10:24 |
| **prompt** 40:24 | **provides** 158:4 | **purple** 30:19 | **quantity** 39:3,5,20 46:10,12,13 47:20 96:22 |
| **prompted** 137:15 | **providing** 158:25 | **purport** 139:9 | **question** 5:10,15 6:15 23:11 26:17 38:6 44:10 50:22 52:15 53:8 56:4 57:1 64:23 66:17 70:6, 21 71:15 98:7 109:10 113:24 115:2 116:6 123:23 132:11 143:21 151:15 155:9 158:8 161:15 162:8,9 163:16 164:13 165:19 166:24 175:25 176:18,23 177:8,10,13 180:21 182:20,21 185:9 186:5 187:15,22 188:9 189:16 192:3 193:5 |
| **propensity** 50:16 | **prying** 151:1 | **purpose** 17:20 36:19 37:6 45:24 109:16,23 111:7 139:7 | |
| **properly** 190:22 | **psychiatric** 150:12 | **purposes** 28:9 32:5 | |
| **properties** 24:11 36:24, 25 37:22 38:16,17 41:15 | **psychiatrist** 151:24 | **pushed** 65:4 | |
| | **psychologist** 151:23 | **put** 6:20 25:6 34:16 44:25 47:3 49:1,5 53:18 57:11 59:19 66:25 67:23 70:4, 15 74:16 78:5 86:15 91:16 94:6, 8,15 97:2 100:9,16 105:14 110:9 111:13 114:5,6,11 118:2 125:4 148:7 152:23 185:20,22,24 | |
| **property** 12:25 88:9 97:14 102:14 140:9 | **Psychology** 19:6 | | |
| **Propertypanel** 21:7 23:23 51:2 | **PTSD** 150:15,19,25 151:6 | | |
| **Propertypanel .xyz** 35:5 | **public** 125:1 | | |
| **protective** 143:3 | **publication** 123:7 | | |
| **prove** 181:24 182:13,17,24 183:4 187:7, 20,23 188:3, 10,16 | **pull** 149:13 | | **questioning** 193:11 |
| | **pulled** 135:19 | **putting** 64:19 70:23 75:25 105:10 106:3 117:5 131:3 | **questions** 153:16 178:13 186:1 |
| **proved** 187:21 | **purchase** 37:7,14 64:18 131:25 134:13 153:6 155:2 164:10,21 167:3,9,12, 15,21 179:3, 14,17 180:15,19 | | **quick** 26:15 |
| **provide** 73:16 74:8 86:2 98:21 144:21 158:3 159:3 176:5, | | | **quickly** 152:24 153:3 |

**quite**
 65:4 75:12
 88:17
**quote**
 118:13
**quoted**
 141:14
**quoting**
 111:10

_____

**R**

_____

**raise**
 59:20 108:19
 110:1 115:9
**raised**
 22:9
**raising**
 56:14,20
 58:18 60:22
 76:10 85:2
 109:16
 114:14
**ramped**
 78:8 83:3
 86:14
**range**
 17:11,14
 52:24
**rate**
 43:6
**reach**
 36:15 39:5
 56:2,6 64:6
 165:8,21
**reached**
 36:13 37:4
 59:12 68:22,
 24 72:15
 84:3,14,21
 105:24
 121:15 170:6
**reaching**
 36:19 166:14
 170:16
**read**
 41:19 91:12

92:15 102:3
108:21
121:21,23
141:7 153:12
177:13,14
188:2,22
**reading**
 92:9 113:17
 138:23
 153:23,24
**reads**
 91:17 107:23
**ready**
 153:19
**real**
 77:7 83:4,9
 93:18 117:14
 120:22 126:7
 163:9
**reality**
 132:17
**Realty**
 36:8 37:1
 52:3 55:24
 169:8
**reason**
 5:13 6:9
 17:18 18:2,
 5,10 59:1
 67:1 87:25
 108:9 189:9
**reasonable**
 82:7 164:20,
 24 165:4,8,
 19,21 166:20
**reasons**
 18:6
**rebuild**
 145:5 146:2
**recall**
 9:16,23 11:1
 24:23 34:8
 38:18 54:23
 55:7 64:5
 73:19,20,24
 74:1 83:22
 84:11 97:1,

16 98:19
100:23 101:2
103:16
104:23 111:2
119:15
120:23
125:23
130:24
137:12,23,24
138:17
171:17
172:2,8
178:11
183:10
193:24
**receive**
 32:5,7,8
 189:19,22
 190:19
**received**
 54:8 74:20
 108:5 121:12
 122:5 135:17
 136:4
**receiving**
 20:15 98:19
**recess**
 26:21 51:23
 91:5 130:5
 168:23
**recollection**
 132:7 135:22
**recommended**
 65:4
**record**
 4:15 17:20
 27:5 33:5
 49:11,14,19,
 23 100:13
 107:16 111:7
 131:22 153:1
 154:7 177:15
 181:20
 183:16
**recorded**
 141:10
**recording**
 141:16,24,25

142:2,3,5,8
**records**
 176:12
 177:21
 178:23
**recovering**
 149:11
**redact**
 97:12
**refer**
 151:19
**reference**
 111:7 113:12
 139:19
**referenced**
 82:10,17
 91:21,22
 112:24
**referred**
 55:19 66:22
 190:24
**referring**
 30:22 31:7
 33:22 68:17
 85:19 93:1
 111:20
 112:17
 113:5,18
 114:25
 115:3,6
 116:3,13
 117:18 118:3
 120:15,17,18
 121:4 122:6
 156:16
 157:13,14
 165:15
 168:16
 169:13
**refers**
 117:23
**refresh**
 132:6
**regarding**
 176:4 186:17
**registered**
 34:9

**Regus**
28:22,24
29:1 55:15
89:2 90:7,14
**Reinitz**
4:16 25:18
34:3 57:25
60:19 66:20
85:10 86:5
91:10 92:12
99:7,14,22
100:2 106:25
110:16
121:18
130:3,11
135:8,13,16,
21 136:2,9
141:17,19
142:8,25
143:11,18
152:7,19
153:8 154:23
155:15
156:20
157:21
162:20
165:1,10,23
166:9,15,21
168:1 169:20
171:22
174:8,22
175:22
176:14
178:4,15
181:11,13,24
182:11
183:15,18
184:24,25
185:6
186:12,20
187:1 188:19
190:25
191:12,14,
18,22 192:4,
7 193:1,12,
22
**Reinitz'**
193:23

**Reinitz's**
185:13
193:17
**reiterate**
152:8
**reiterated**
116:24
**related**
19:20 40:3
134:13
**relating**
62:14 123:19
**relation**
20:24
**relationship**
157:17,20,24
**relaying**
67:10
**relevant**
123:22
126:20
**reliance**
75:7 80:5
82:7 83:16
85:8 86:11
87:12,15
96:15 108:7
**relied**
66:11
**Religion**
126:24
**religious**
125:5,6
127:1 138:24
139:4,9
140:22
**rely**
66:9,10
**remember**
37:20 68:20
85:2 95:12
114:13
131:14
179:12
192:16
**remote**
19:12

**remotely**
4:6
**remove**
51:16
**removed**
174:8
**reneged**
129:22
**rent**
32:10,17
89:14 128:19
**rental**
13:1,16
139:15
**reopen**
146:1
**repair**
39:14
**repeat**
143:20
**rephrase**
5:11
**replied**
49:4
**reply**
118:21
**replying**
113:9
**report**
192:11,13
**reporter**
4:2 5:7 26:9
126:8
143:12,13
152:12 154:4
177:12,14
**reporting**
4:6,13
**represent**
65:16
**representatio
n**
66:8 76:20
82:8 115:13,
16

**representatio
ns**
91:20 116:20
179:18
**representativ
e**
180:5
**representativ
es**
187:13
**represented**
43:18 73:4,6
74:18 75:3
81:1 85:5
**representing**
5:2 70:11
106:23 107:1
141:22
180:10 191:3
**request**
99:9,12,17,
23,24 100:1
170:22
**requested**
78:6,7
**requests**
183:22
**required**
5:24 40:8
45:16 75:20
189:17
**requirement**
75:16
**requires**
165:17
**resign**
15:24
**resolved**
191:23
**respect**
40:5,15,21
47:6 62:14
69:10,13
70:19 73:2
89:6 154:14,
18 165:16,20
191:13

respected
174:19
respective
91:19
responded
183:18
responds
181:23
183:16
184:25 187:6
response
19:12,21
110:19
118:10
119:18,22
responsibility
128:21
rest
135:1
result
133:23 151:6
results
144:21
retain
75:13
retained
141:21
retainer
193:16,20,25
return
62:16 64:9
139:16
revenue
23:13
reverse
30:7
review
7:5,8,12
99:9,13,17
154:10
reviewed
7:2 66:1
104:23 182:8
revise
174:3

revised
135:14
173:25
rich
141:11
rid
28:19
right
5:18 7:12,21
11:11 14:13,
14 17:13,16
18:14 21:12
28:8 31:2
34:22,24
36:10 37:16
38:1,3 45:20
46:16,17,20,
24 49:21
52:22 53:2
55:6 60:16
61:3 65:14
66:13 69:23
71:4,24
72:14 74:21
75:21 77:12,
14,24 81:8
82:6,14
83:1,3,6
84:3,7 92:11
95:12 96:3,
20 99:6
102:7 103:2,
19 104:8,10
107:3 108:19
111:5,11
113:10
118:13 122:1
124:7 126:9
128:3 129:25
130:19
131:21
137:1,17,24
138:6 140:2
142:21
144:1,5
146:9 149:25
151:4 152:21
156:4 159:2,

16 161:7,22
163:5
167:19,20
170:3 172:13
175:21
176:22
181:19
182:6,21
184:13
187:10
188:4,5,13
189:15
191:10 192:9
193:3
rings
135:24
Road
11:16
robust
39:25 53:9
robustly
70:22
Ronald
106:21
room
4:5 29:6
89:12,13
90:17 112:5
116:21,22
rooms
90:9
round
59:7 60:4,9,
24 62:20,21,
22,23 106:6
Rubinstein
136:5 141:20
166:9 174:7
178:7 181:22
182:10 183:2
184:23
186:7,15,19
187:6
189:10,15
Rubinstein's
183:17
ruined

175:10
Rule
99:10,22
rules
5:6
run
20:5 115:15
running
93:20 128:20

─────────

S

─────────

S-H-A-C-H-O-R
15:10
Sabbath
126:2,10,21
127:2,3
Safe
31:6
saga
146:8
sale
95:9 130:9,
21 134:25
sales
15:8 23:13
75:14 77:10,
20 107:25
130:22 158:2
salespeople
16:9 65:8
San
46:1,2
Sandler
174:19
Sandy
145:1
satisfied
120:22 181:1
Saturday
127:8
save
123:8,11
192:15
saving
54:11

saying
  43:22 46:11
  50:18 52:22
  53:6 59:19
  60:2,7 62:5
  70:10 74:25
  92:7 106:16
  108:14,18,23
  110:6 113:13
  119:2
  124:20,23
  125:13
  129:15
  189:20,23
  192:4
says
  27:9 29:17,
  21,23 30:19
  31:3,9,11
  33:19 34:24
  41:14,25
  46:24 48:12
  53:21 79:9,
  13 82:7
  98:14 101:19
  103:18
  113:10,20
  117:5 126:5,
  6 131:23
  140:21,22
  141:8 142:9
  156:6,17
  164:16
  167:2,7,14
  168:4,6
  169:11 170:5
  171:1
  173:19,21,
  24,25 175:6
  181:12
  182:23 189:1
scale
  76:16
scan
  134:17
scandal
  65:1

scandals
  65:2
scenario
  159:14
scenes
  125:7
Schonfeld
  4:18,19,24
  5:1,2 25:20
  26:7,22
  29:10 32:23
  34:11 41:3
  51:24 58:2
  61:14 67:5
  78:16 85:18
  86:7 91:6,14
  92:17 99:12,
  20,25 100:6
  107:9 121:22
  129:24
  130:4,6,15
  134:10
  135:11,15,19
  136:1,7,13,
  25 143:8,17,
  22 152:10,
  17,21 153:14
  154:4,8
  157:5,25
  163:3 165:6,
  14 166:3,25
  168:5,24
  170:1 175:24
  176:1,16
  177:12,18
  178:17,24
  180:25
  185:8,10
  186:24
  189:13
  191:16,19
  192:2,18
  193:9,14,15
school
  19:12 145:6
schtick
  88:14

scope
  22:12 52:8
scratch
  155:4
screen
  26:11 29:16
  53:19 66:3
  95:19,22
  100:9,17
  107:14
  110:10 131:2
  132:16
  152:23
  187:25
screw
  123:14
scroll
  41:17 48:1,3
  113:10
  152:24
  153:3,25
  188:5
scrolling
  48:9 127:11
  181:22
second
  27:1 41:18
  51:21 53:24
  78:20 79:9
  98:8,14
  101:13
  117:22 128:3
  135:20
  139:11 143:1
  181:7
seconds
  51:21
secret
  97:10
secretary
  75:4 97:22
  118:15
secretary's
  129:3,6
secrets
  97:13

section
  117:23
sections
  143:15
security
  11:4 39:13
sedate
  145:17
see
  26:25 27:8,
  13 29:15,17,
  21,25 30:4,
  18,20 31:4,
  13 33:4,6,9,
  18,20 41:10,
  21 42:3,13,
  19 47:13,20
  48:4,5,7,14
  49:15 53:23
  76:9 78:21,
  25 79:11,18
  80:1 81:5,22
  82:12 91:25
  98:12,16
  100:18,21
  107:21 108:1
  110:16
  111:18
  114:25
  116:11
  117:16
  118:11
  119:25
  120:12
  122:13
  127:16 128:8
  130:4 132:4,
  20 134:14
  135:1 137:5
  139:2 141:5,
  13 142:14
  144:16
  149:25
  153:11
  155:12,18
  156:13 157:9
  164:12,22
  167:3,10

168:11
169:1,2,9
170:8,15,17
173:4,17
174:1 175:11
181:7,12,14
182:2 184:10
187:2,4,9
**seeing**
49:4 134:20
172:8
**segments**
143:13
**selfies**
95:18
**sell**
23:25 25:14
130:14
173:13
**seller**
158:4
**selling**
48:20
**send**
34:13 39:15
41:12 72:24
74:23 170:22
**sending**
45:17 118:14
**sense**
17:22 70:22
113:16
140:10
159:22
**sentence**
8:8,10,11
41:25 43:17
51:5 67:13
81:12,25
102:3 107:23
110:24
126:16 128:4
138:22
**sentenced**
8:6
**sentences**
81:10

**separate**
113:25
118:18
146:15
**separately**
152:13,15
193:8
**September**
41:9,20
47:15 48:5
144:18
**series**
33:1 51:9
**service**
31:10 39:12
50:24 51:6
55:17 75:21
104:4 112:7
123:7 173:16
**services**
37:9,11,13,
24 51:1
75:23
**set**
13:10 87:9,
10
**Seth**
15:9 48:18,
19
**settled**
64:7
**seven**
21:3 134:17
**Sexually**
151:9
**Shabbos**
125:20,24
**Shachor**
15:10 78:4
83:19 85:13
87:23 88:4
101:11,15,24
102:9,18,20,
21 103:14
**shame**
125:13

**Shane**
177:5
**shape**
54:1
**share**
26:11 65:2
132:15
**shared**
31:20
**shareholder**
23:18 24:15,
17 57:19,21,
23 58:8,11
134:6
**shareholders**
22:1 24:12,
19 25:16
74:3
**shares**
23:7 57:5
58:23 59:22,
23 60:3,10
**sharky**
164:3
**sheet**
63:15,18
**shifted**
13:25
**shook**
70:5
**short**
26:21 51:23
83:24 91:5
130:5 168:23
**short-lived**
103:17
**shortly**
72:18
183:13,19
**shot**
63:1,3
**shoulder**
71:8 111:15
**show**
24:16 26:11,
23 29:11
41:4 78:17,

24 87:11,13
90:11,14
100:7 107:11
109:20
131:22
134:11 135:9
136:10 137:2
173:1 181:2
**showed**
131:2 182:5,
7 185:1
187:10
**showing**
174:6
**shown**
98:2
**shows**
94:14
**sick**
142:11
**side**
63:8 120:6
147:13 170:3
**sideways**
134:18,20
**sign**
34:14 39:9
47:8 50:1
72:24 88:8
95:23 159:9
169:4,14
171:12,14
179:13
180:19 189:3
**signature**
33:3,19
34:12,17
48:2,10,22,
25 49:5,8
50:8,13,23
51:12,14
101:19
131:18
135:12 161:8
169:1
171:13,16
**signatures**
154:19

171:15

**signed**
37:18 39:2
47:1,2 83:21
85:15 89:6
101:15
131:9,15,19
166:10,11
169:16
171:7,18
172:1,24
176:13,22,23
177:8,9
179:4 186:21
193:17,20

**significant**
76:19 89:18
133:17
147:17

**significantly**
76:9,21

**signing**
131:18
166:13
177:20

**signs**
93:4 186:22

**signup**
179:20

**Simcha**
4:18 5:1
107:19

**similar**
10:19 29:1
63:3 83:2
99:2 174:23

**simple**
163:17
182:17 183:1
189:2

**simpler**
181:25
182:13,24
183:5 187:7,
20,21 188:3,
11,16

**simplify**

183:25

**simply**
109:10

**sincerely**
101:19

**single**
172:13

**sit**
6:8 125:15

**sitting**
11:10 68:25
77:8

**situational**
149:10

**sixth**
140:10

**size**
107:15

**sizing**
98:11

**skewed**
134:19,21

**skill**
18:12

**skipping**
41:23 42:8

**skull**
124:14,16

**sky**
189:11

**Slabs**
21:7

**slanted**
134:22

**sleep**
142:11,12,
13,21,22,24
143:23,25
144:2,6,9,
12,15 145:3,
8,13,14,16,
19,20
146:11,13
147:3,12,18,
20 150:11

**sleeping**
175:16

**slept**
144:11

**slipping**
147:15

**Slur**
41:11

**small**
100:20
107:13
156:24

**smaller**
114:24

**smart**
173:9

**smile**
111:14

**snack**
112:5

**social**
11:4 48:13
50:17,20

**sold**
22:24 158:5,
12 165:17
173:10

**sole**
21:22 24:16

**solely**
21:15 46:8

**somebody's**
18:19

**son**
36:12 93:5,
22

**song**
175:8

**sort**
12:7 17:22
28:9,22
31:20 32:12
35:24 39:11
49:23 55:20
59:24 61:6
65:21 68:6
69:3 71:1
76:16 87:11
89:22 90:23

94:17 95:23
102:13
104:18 112:8
127:6 133:23
150:24 156:1
162:1
163:10,23
164:6

**sorts**
13:2 24:10
55:20 65:22

**sought**
148:4

**sound**
29:19

**sources**
18:25

**space**
11:22 31:17,
20 32:11,17
81:21 87:15
88:20,21
89:22 90:3
94:2

**spaces**
88:13

**speak**
17:23 18:17
34:14 37:2
63:5 69:4
88:11 112:4
158:15
184:16

**speaker**
48:21

**speaking**
39:1 67:7
140:2

**speaks**
184:20

**special**
69:2 96:7

**specialist**
150:25 152:3

**specific**
18:12 29:6
47:13,15

58:10 70:7 81:18 82:9, 17,20 83:7, 22 84:17 85:7 89:11, 12,13 105:22 114:25 131:16 137:14 150:16 151:6 162:7,8 164:13 185:21 186:3

**specifically** 40:5,21 43:16 48:23 57:1,7 58:4 63:20 69:10, 13 71:13 75:10 77:22 83:16 85:8 86:11 93:1 96:13,15 165:15 166:12,14,19 168:16 177:8 178:20 179:8

**speculate** 121:21 176:17

**speculating** 71:10

**speculation** 91:11 176:15 188:20

**spelled** 54:9

**spine** 147:16

**split** 28:13

**spoke** 177:5

**spoken** 6:13

**sponsoring** 77:5

**Sponsorships** 117:15

**spot** 122:12

**spreadsheet** 65:24 99:1,3 110:6 117:3 119:6

**Spring** 13:12,22

**squared** 182:1 183:6 187:8 188:4, 11

**staff** 75:14,17 77:9,12,20 81:19 102:15 117:14

**stake** 20:21

**stand** 33:25

**standard** 53:23 73:13 132:2 155:2 156:22,25

**standpoint** 159:21

**Starbucks** 68:20

**start** 31:22 50:19 103:22,23 108:23 174:20

**started** 22:22 37:21 146:21 174:18 175:16

**state** 6:17 29:14 30:15

**stated** 174:5 176:25

**statement** 22:25 31:3,7 47:5 109:8

**statements** 30:19

**states** 53:11 81:12 175:2

**stating** 4:14

**status** 30:19 34:6

**staying** 127:9 145:23

**steals** 139:13

**Steinberg** 10:16

**step** 139:25

**stepped** 113:23

**steroids** 146:21 147:9

**Stevie** 175:3,6,7,20

**stipulate** 143:9

**stock** 61:5,7 179:7

**stop** 26:18

**store** 42:10 44:15 45:20,25 46:6 155:19, 24

**storekeeper** 160:9,11,12

**storing** 28:11

**story** 144:16

**straight** 112:13

**straightforward** 93:17

**strange** 69:25

**Street** 12:16 28:3, 6,15 31:12

**strict** 123:17

**string** 110:11

**strongly** 175:13

**structure** 21:14 22:8

**studio** 19:6

**study** 145:19

**stuff** 105:18 138:25 187:25

**style** 127:6

**subject** 9:4 42:23 47:7 105:25 107:20 113:8 156:8,17 168:17

**Subletspy** 51:3

**Subletspy.com** 35:7

**subletting** 55:21

**submitted** 36:18

**subsequent** 91:24 92:25 130:21,23 179:20

**substantial** 53:22 54:5 79:25 82:10

109:15 132:2
133:8
**suffer**
142:23
143:23
**suffered**
143:25 144:8
**suffering**
144:2,5
146:12
**suggest**
65:1
**suicide**
137:4 140:1
146:7
**suit**
10:16 144:20
146:9 149:5
**suits**
10:6
**summer**
123:10
139:18
**Summons**
7:13 26:13
53:17 91:17
**Sunday**
145:1
**sundown**
127:7,8
**superseding**
95:24 131:5
156:2
**supply**
51:4
**suppose**
35:13
**supposed**
38:22 72:16,
17
**sure**
12:18 16:7
17:3 19:18
24:3 26:18
30:10 34:10
47:17,18
53:10 76:3

97:7 103:6
130:3 135:2
142:6 151:17
168:22 172:3
193:19
**surgery**
145:4,25
146:18
**surprised**
112:15
**suspended**
8:13
**sworn**
4:21
**sympathetic**
151:18
**sympathies**
151:15
**symptoms**
146:24
**system**
40:24

———————————

**T**
———————————

**table**
129:2
**take**
5:8,13,24
18:20 26:15,
19 43:5
44:24 66:13
75:6,15
80:19 90:21
92:22 93:3,
14,15,23
94:18 98:1
128:14
129:25
133:18
139:25
140:12 159:2
168:20 193:8
**taken**
5:19,23
26:21 51:23
91:5 130:5

142:18 150:5
155:13
168:23
**takes**
18:9
**taking**
5:3 45:3
95:13 97:3
108:18 109:4
131:3 169:15
179:12
**talk**
20:13 21:12
36:6 72:21
170:24
**talked**
99:1 112:6
**talking**
8:18 45:4
77:17,22
94:1 121:13
140:7 161:1
166:13
**talks**
70:1
**tampering**
40:3
**tasks**
18:12
**taxi**
77:4
**team**
43:15 77:10
102:20,23,24
103:10 175:9
**teams**
42:16
**technically**
104:14
**technology**
174:20
**telecom**
75:22
**tell**
6:18 10:12
19:10 20:25
32:13 43:10,

24 46:18
51:19 52:9
56:25 61:16
62:19 120:10
153:19
154:19 162:2
180:14,17
**telling**
62:6 97:18
109:14
126:18
**Teman**
4:20,25 5:18
10:4,14,17,
18 24:5
33:22 34:2,
10,15 52:15
70:6 78:17
79:4 80:22
81:1,7,17
91:7,25
100:18
101:20
105:23
110:13
120:12 130:7
132:23 137:2
154:9 163:16
164:8 169:5
178:25 188:9
193:16
**Teman/
founder/teman**
33:20
**Temon**
106:20
**template**
49:2,6
**ten**
42:5,25
43:11,12,13,
21 44:16,17,
22,24 46:7
47:21,22
129:25
130:20
**tension**
145:22

**term**
  12:8 16:13
  49:23 51:4
  58:10 63:15,
  18 68:7,11
  88:16 103:12
  109:19
  126:11
**termed**
  154:17
**terminated**
  15:23,25
  89:25
**terminology**
  12:7
**terms**
  22:5 38:13,
  21 39:24
  40:1,2 43:11
  50:24 51:13
  56:10,12
  57:1,3 59:24
  61:4 62:13,
  18 63:17
  64:7 65:6,9
  72:23 88:12
  89:11 95:14
  104:2,8
  123:17
  135:14
  152:15
  155:12,18,
  22,23 156:23
  160:19
  167:24
  173:24
  174:3,16,24
  175:6 177:4
  180:13
**test**
  87:9 144:21
**testified**
  4:22 8:21
  9:3,8,13,24
  10:20 28:5
  52:15 63:17
  86:10 87:14
  90:3 105:15

  130:18
  132:25
  142:16
**testify**
  9:19
**testimony**
  4:9 7:3
  108:6 109:6
  161:10,14
  185:7 186:13
**text**
  113:17
**Thank**
  72:2 100:2
  129:16
  152:19 190:5
**thankfully**
  107:2 149:12
**Thanks**
  181:13 184:9
**Therapy**
  150:23
**thieves**
  139:10
**thing**
  28:22 32:15
  59:25 76:7,
  16,19 87:11
  100:25
  115:23 119:1
  126:24
  132:13 141:8
  150:3 188:25
**things**
  57:22 75:12,
  19,20,23
  114:16
  115:20
  117:10
  118:24
  127:25
  129:4,7
  133:15
  139:16 140:3
**think**
  6:9 11:20
  12:2,22

  17:3,5 22:5
  24:14 25:1
  26:1 27:18,
  23 28:5
  30:6,12
  32:12,14
  34:6,18
  36:14 38:16
  40:17 43:18
  44:9 47:19
  48:17,25
  51:15 55:19,
  21,23 59:25
  70:21 71:2
  73:12 76:13
  82:19 84:10,
  19 85:12
  88:10,17
  89:18,19
  100:10 101:4
  104:19 109:7
  114:2 120:9,
  25 126:6
  128:13
  129:2,3,6
  131:1 132:19
  137:23
  152:22
  166:23
  169:25
  170:13 171:4
  174:16 181:6
  184:3
  189:15,18
  193:2,18
**thinking**
  152:2
**third**
  16:1 41:23
  42:8 103:19
  117:11
  122:19
  133:21
  156:5,6
  161:13
  163:15
  168:25
  170:17 176:6

**third-parity**
  161:21
**third-party**
  157:11
  159:24
  160:22 161:2
  162:12,18
  163:19,25
**thought**
  137:21
  140:25
**thousand**
  43:2
**thousands**
  94:20
**thread**
  43:3 118:18
  120:2 122:1,
  13 172:6
**three**
  15:18 16:3
  42:22 43:10,
  20 113:4
  145:15
  148:16
  149:15
  154:18
**throwing**
  25:2
**Thursday**
  41:20 183:17
**ticket**
  8:19
**Tim**
  177:5
**time**
  5:9 8:11
  10:21 11:24
  14:13 15:20
  16:11 23:15
  28:16 35:17
  37:5 38:11
  40:7,9 47:10
  51:25 52:6,
  17 54:17,22
  56:13 59:15
  63:1 66:14

78:4 83:20,
23 85:14
87:3 88:5,19
97:2 104:19
109:11
123:1,4
125:21
128:10
129:19 130:8
136:17
145:14
146:13 147:2
148:12,14,
20,23 149:19
150:3 152:9
157:19
160:25 166:5
168:13
171:5,7
172:24
177:20
178:25
179:22 180:2
182:9,14
183:7 186:9
190:19
192:11,15
193:25

**times**
7:18 8:24
42:2 44:23
45:12 53:1
54:21 64:16
72:12 123:16
134:17
143:25
144:7,9,24
147:23
165:13
167:18

**tiny**
89:22

**title**
24:24 25:4
123:11
138:20

**titled**
59:21

**titles**
25:3

**TM**
33:20,22,25
34:15 102:22

**today**
5:4 6:8,11,
25 7:3 14:14
18:3 21:14
27:15 33:15
90:12,13,20
125:15
132:18
142:17
161:11
190:10

**told**
66:15 85:1
96:25 109:3
119:1,3
141:9 158:11
180:5

**tone**
127:21,23

**top**
12:19 21:3
22:2,13
29:20 30:8
32:14 36:17
51:19 52:13
61:5 62:19
64:21 78:22,
24 95:6
114:12,13
117:7 131:16
135:25 146:5
156:2 173:15
178:10
190:14 193:2

**topic**
10:19,25
19:19 46:8
178:5

**topics**
48:21

**tore**
175:17

**total**
54:12,14
114:14
164:21
167:3,9,15,
19,21 170:4

**totaling**
81:4

**Touch**
21:7

**tough**
126:7

**TPF**
157:12
164:17

**tracker**
145:13

**tracking**
145:14

**trade**
87:11,13
97:10,13

**trademark**
34:1,2,7,9

**transaction**
158:9

**transcript**
99:9,13,16,
18 152:14

**transferring**
160:13

**transported**
168:9,15

**treat**
125:1

**treated**
147:2 148:9,
13,14,21,23
149:2,18
150:21

**treating**
147:11

**treatment**
146:22 147:8

**trek**
68:20

**trial**
8:1,22 9:11,
13

**trick**
98:7 132:11

**triggers**
149:10

**Trinet**
16:8 75:22
104:3,14,21

**trip**
105:19

**trouble**
129:21

**true**
74:15 81:10,
11,25 82:14
92:2,5

**trust**
55:24 122:21
124:17,19
170:25

**trusted**
66:25

**trustworthy**
125:16

**truthfully**
6:11

**try**
44:12 106:4
109:21
114:13 117:6
128:4,23
136:21 176:2

**trying**
12:6 16:18
17:23 68:2
90:6,23 92:7
109:5 118:21
125:9 129:16
136:7 139:6
164:2

**turn**
127:10 164:4

**turned**
122:14

Ari Teman
August 05, 2021                                    45

turning
  27:7 81:15
  101:13
turns
  189:11
twitter
  50:20 138:1,
  3,6,18
two
  11:21 15:25
  21:4 28:9,13
  38:17 57:22
  61:17 72:8
  81:10 85:23
  86:9 100:24
  108:3 111:4
  112:20
  118:24
  146:15
  150:24 159:6
  168:20
  171:11 172:5
two-page
  78:19 79:2
two-year
  38:8
tying
  113:16
type
  31:7,21
  32:15 73:14
typed
  97:25
typical
  55:17

_____

U

UBC
  21:8
ultimately
  77:11 131:8
Ultra-
orthodox
  123:9
uncomfortable
  116:17

151:2,14
underneath
  31:3,9
  132:21
understand
  5:10 12:8
  44:11 113:15
  122:5 154:3
  175:14
  180:21
  184:21 186:6
  190:12 193:3
understanding
  49:25 50:15
  65:19 67:8
  70:25 72:12
  89:1 97:21
  110:2 114:10
  121:2,14
  153:2 166:1
  171:23
understood
  72:4,6,9
  122:11 129:9
  133:16
  138:22
  159:14
undertake
  81:18 91:21
undertaken
  82:21,24
  83:8
undertook
  82:9
unethical
  125:2
unique
  139:24
unit
  96:18
United
  53:11 175:1
units
  173:20
universal
  126:10

University
  77:5
unlike
  128:22
unqualified
  10:24
unrelated
  69:12
untrustworthy
  124:11,21
up-front
  39:6,8 42:25
update
  18:15 24:23
updated
  24:20
upfront
  94:20 164:18
ups
  31:22

_____

V

vague
  157:22
  161:15 162:9
Valley
  13:12,22
valuation
  56:15 59:21
  60:22 114:10
valuation.'
  111:14
value
  54:12 58:22
  76:22 156:7
vandalizes
  39:15
variable
  105:18
vendors
  123:14 124:1
  125:2
venture
  12:3

verbal
  5:7 47:5
verbally
  4:9 177:1
verification
  106:2
verified
  80:21 81:7,
  14
vernacular
  122:10
version
  135:17
  154:24 172:1
  174:14,15
versus
  10:14,17,18
veto
  164:17
video
  55:4,5 80:18
  189:24
violating
  127:4
voluminous
  136:15
Vornado
  55:24

_____

W

W2
  14:24 15:1,
  15 16:5,7
  17:25
wait
  44:25 76:18
  189:11
waive
  4:12
walk
  45:20,24
walking
  46:5
Walmart
  123:10,20
  139:15

**want**
6:17,20 12:3
17:19 32:16
36:20 43:11,
22 44:21,24
45:4 46:18
55:15 59:8,
10,22 61:15,
16 66:13
67:9 88:11
100:7 104:17
109:9,10
119:25
125:25
126:1,2,4,
13,15 134:6
136:10,16
143:1 150:13
152:7 153:20
159:17 160:3
162:7 164:4
170:15,25
172:4 184:5
192:18

**wanted**
25:14 43:5
65:7 85:1,3

**ware**
21:8

**Washington**
77:6

**waste**
136:16

**way**
15:21 25:25
43:21 52:14,
21 55:11
67:22 68:5,
12 74:17
86:19 107:13
112:12
118:19
123:7,11
125:1,13
133:15 134:7
148:21
156:19
158:12,21,23

162:18
171:19
181:25
182:13,17,24
183:1,5,24
187:8,20,21
188:3,11,16

**wear**
124:21

**wears**
124:16

**website**
35:1,3 39:3
73:15 155:13

**websites**
35:16 51:2

**weeds**
124:7

**week**
18:17 32:19
72:19 113:6

**weight**
180:13

**weird**
104:5 132:13

**Weisberg**
110:16

**Weiss**
15:9

**Weissman**
68:9,14
110:15 122:9
129:12

**Weissman's**
80:10,14
112:18,21

**went**
42:25 51:2
55:9 64:13
69:23 76:20
89:21 112:16
127:23
150:24
158:13
159:23
188:24

**West**
11:8 12:16
13:6 28:6,15
31:12 87:18

**wet**
171:13,15

**Wework**
34:19,20

**Wework350**
34:22

**Whatsapp**
150:1
178:11,19

**Whatsapping**
169:16

**wife**
16:1 18:19
128:18

**window**
185:23

**wire**
7:24 72:25
160:1,17
165:4 166:2

**wires**
160:5,16,18

**withdraw**
29:19 175:24
185:9 193:5

**withdrawing**
191:17

**withdrawn**
20:14 38:12
41:24 51:11
57:6 108:9,
12 110:24
156:16 167:1

**witness**
4:9,20
10:21,24
34:5 60:21
66:22 85:12
91:12 92:14
99:17,21
121:20
126:5,6
130:13

136:20
140:20,22
143:20
153:9,11
156:22
157:23
162:22
165:3,12,25
166:23 168:3
169:22
177:16
186:15
188:21
191:24
192:14
193:10

**word**
17:20 50:7
66:9,10,11,
12,19 68:4,6
126:5,6,17
128:23
140:21,23
153:4,5
172:12

**words**
20:7 23:6
25:9 49:21
50:11,15
51:17 53:7
67:2 82:2
99:15 102:25
118:1,17

**work**
12:9 18:13
20:10,23
29:2 34:19
52:14 65:17
66:4 87:1,7
89:1 93:15
103:15
122:20 130:2
158:22
174:20
178:13 184:5

**worked**
16:13 149:8
155:3 158:23

| | | | |
|---|---|---|---|
| **workers** | 49:7,18,21 | 142:15 | 118:1,5,8 |
| 18:11 | 50:11 | 147:23 | 122:14 |
| **working** | 118:12,13 | 148:11 | **Yechiel's** |
| 16:19 17:10, | 123:23 | 149:4,24 | 125:8 |
| 25 20:16,19, | 124:18 | 151:8,13,22 | **Yeshiva** |
| 22 34:21 | 126:15,17 | 152:6 153:21 | 77:5 |
| 52:4,20 | 182:12 | 160:24 | **York** |
| 53:11 65:20 | | 165:12,25 | 10:16,17,19 |
| 86:24 93:14 | | 166:17 | 12:15 13:12 |
| 103:22,23 | **Y** | 167:21 169:3 | 27:11 30:5, |
| 117:2 185:18 | | 173:18 | 12,15 31:12 |
| 190:22 | | 175:12 | 78:3 138:25 |
| **works** | **Yachiel** | 176:8,19,24 | 161:6 |
| 104:9 120:11 | 64:17 79:14 | 181:16 182:7 | **Yoseff** |
| 154:3 | **yard** | 183:13,21 | 15:10 78:4 |
| **world** | 31:18 | 184:19 187:5 | 88:4 101:11, |
| 106:19 | **yarmulke** | 193:19 | 15,23 102:9, |
| 132:17 175:2 | 124:15 | **year** | 11,18,20,21 |
| **worth** | **yeah** | 8:12 14:4 | 103:14 |
| 61:7,9 | 13:15 14:17 | 19:2,24 | **YU** |
| 161:17 | 16:21 19:22 | 27:20,21,24 | 117:15 |
| **wrestling** | 20:24 22:9, | 147:6 156:24 | |
| 145:6 | 21 28:1,21, | **yearly** | |
| **write** | 25 29:7 | 32:12 173:20 | **Z** |
| 42:9 50:14 | 30:8,11,14, | **years** | |
| 110:25 | 17 31:22 | 11:21 13:24 | |
| 117:25 | 33:10,21 | 20:2 38:8 | **zero** |
| 122:18 | 35:14,16,19 | 42:23 61:17 | 117:25 |
| 127:22 | 54:3 56:19 | 111:4 141:11 | **zeros** |
| 137:7,11,15 | 62:12,17 | 146:4,14 | 181:6 |
| 139:23 | 71:24 73:12 | 149:1 150:7, | **Zoom** |
| 147:19 | 79:15 80:2, | 10,20 156:10 | 19:12 53:24 |
| **writes** | 12 81:9,11, | **Yechiel** | 132:13 |
| 79:17 120:3 | 23 84:4 | 64:25 65:20 | |
| 183:22 187:2 | 87:17 88:7 | 66:12,23 | |
| 188:7 | 89:21 93:10 | 67:6 68:5, | |
| **writing** | 94:10,13 | 12,25 69:18 | |
| 74:10 | 98:10 99:22 | 70:11 71:1 | |
| **written** | 101:22 | 73:8 79:4 | |
| 117:9 118:10 | 103:13 | 92:3 110:14 | |
| 146:8 181:15 | 105:5,20 | 111:6,8,11, | |
| **wrong** | 109:18 | 16 112:10 | |
| 135:20 162:3 | 116:12 | 113:11,13, | |
| **wronged** | 117:8,17 | 14,19,20,25 | |
| 139:5 | 121:1 128:9 | 114:6,12 | |
| **wrote** | 129:23 | 115:11,17 | |
| 44:2 48:16 | 132:10,13,19 | 116:23 | |
| | 135:4,7 | 117:6,20 | |
| | 138:16 | | |
| | 141:6,14 | | |